**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Case 15-cv-01889

RODOLFO LLACUA;
ESLIPER HUAMAN;
and those similarly situated

       Plaintiffs,

v.

WESTERN RANGE ASSOCIATION;
MOUNTAIN PLAINS AGRICULTURAL SERVICE;
MARTIN AUZA SHEEP CORPORATION;
NOTTINGHAM LAND AND LIVESTOCK, LLLP;
TWO BAR SHEEP CORPORATION, LLC;
BALL BROTHERS SHEEP COMPANY;
ESTILL RANCHES, LLC;
CUNNINGHAM SHEEP COMPANY;
DENNIS RICHINS DBA DENNIS RICHINS LIVESTOCK; AND
CHILD RANCH, LLC

       Defendants.

---

**COMPLAINT**

---

       Comes now, the above-named Plaintiffs, on behalf of themselves and those similarly situated, with this Complaint alleging as follows:

**<u>INTRODUCTORY STATEMENT</u>**

1.      The sheep ranching industry in the Western United States is dominated by ranchers who are members of the Western Range Association ("WRA") and the Mountain Plains Agricultural Service ("MPAS"). The ranchers, like all employers, have a

legal obligation to compete for shepherd labor in an open market. Instead they use these membership organizations to fix wages at unconscionably low levels.

2.      Because of this collusion, few domestic workers desire to work as shepherds. Therefore the sheep ranching industry is now dependent on the importation of foreign H-2A shepherds that are, in essence, indentured servants.[1] A 2010 survey by Colorado Legal Services found deplorable conditions for shepherds:

- Almost 73 percent of the shepherds reported having zero days off over the course of a year.
- More than 80 percent were not permitted to leave their ranch.
- Approximately 35 percent were paid less than once a month.
- 85 percent were not allowed to have visitors who were not ranch employees.
- Roughly 70 percent reported never having access to a functioning toilet.
- 85 percent were never permitted to engage in social activities.
- Almost 50 percent reported not having the opportunity or ability to read their employment contracts.[2]

3.      The industry is not shy in viewing shepherds less as employees with legal rights and more as indentured servants who should be subject to even criminal sanction if they refuse to work. One sheep rancher and MPAS member recently introduced a state bill that would have made it a crime for a shepherd to leave his flock. Meanwhile, the WRA has labeled some shepherds as "runaways" that need to be rounded up and deported. As explained by WRA President Lane Jensen, "[a] significant effort was made

---

[1] *See generally* Southern Poverty Law Center, Close to Slavery: Guestworker Programs in the United States (2013), *available at* https://www.splcenter.org/sites/default/files/d6_legacy_files/downloads/publication/SPLC-Close-to-Slavery-2013.pdf.
[2] Colorado Legal Services *et al.*, *Overworked and Underpaid: H-2A Herders in Colorado* (2009), *available at* http://users.frii.com/cls/Overworked%20and%20Underpaid.pdf.

jointly between Western Range and Mountain Plains last summer to locate and deport shepherds that had jumped their contract as well as to penalize those that assisted contract breakers in finding employment. While the effort succeeded in locating runaways, there was no assistance from Immigration officials or the Department of Labor to penalize, deport, or even make contact with known jumpers." The use of criminal sanctions to enforce civil work contracts and the industry's employ of the terms "runaways" or "jumpers" to describe non-compliant workers echoes some of the darkest periods of our nation's labor past and is indicative of the problems engrained in the H-2A program in general and the importation of H-2A shepherds specifically.

4.      The deplorable conditions of H-2A shepherds and the lack of U.S. workers participating in the shepherd labor market are not the result of natural market conditions. Instead, both are the result of the WRA's, the MPAS's, and all of their member ranchers' collusion and conspiracy to fix wages and thereby eliminate any competitive market for shepherd labor and strip shepherds, both foreign and domestic, of their ability to bargain for wages in a free market.

5.      The WRA and the MPAS, as illegal and anticompetitive combinations among their members, advertise and prepare the documents that set out shepherd job offers in the domestic market at illegally fixed wages.

6.      If those job offers are not filled domestically, they then turn to the H-2A program where the associations again implement the illegal fixed wages on behalf of their members.

7.     Regardless of any variation between the ranchers, they fix the wages for all offers at <u>exactly</u> the minimums established by the DOL for H-2A shepherds, without allowing shepherds, foreign or domestic, to shop between ranchers for better wages commensurate with their experience or abilities.

8.     The result of this price fixing conspiracy or conspiracies is absurdly low wages for all shepherds, the exclusion of most American workers from the shepherd labor market, and the importation of vulnerable foreign workers.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 [Federal Question]. Venue is proper pursuant to 28 U.S.C. § 1391. Defendants are alleged to have entered into a conspiracy that has suppressed the wages of Plaintiffs residing in Colorado. Additionally, some of the Defendants' principal places of business are in Colorado.

## PARTIES

10.     Plaintiff Rodolfo Llacua is a former sheepherder and WRA employee who resides in Colorado.

11.     Plaintiff Esliper Huaman is a former sheepherder and WRA employee.

12.     Defendant Western Range Association is a California non-profit corporation with its principal place of business at 1245 E. Brickyard Road, Suite # 190, Salt Lake City, UT 84106. The WRA does business in Colorado.

13.     Defendant Mountain Plains Agricultural Service is a Wyoming non-profit corporation with its principal place of business at 811 N Glenn Rd, Casper, WY 82601. The MPAS does business in Colorado.

14.     Defendant Martin Auza Sheep Corporation is an Arizona Corporation with its principal place of business in Yuma, Arizona. Defendant Martin Auza Sheep Corporation also does business in Brawley, California. Defendant Martin Auza Sheep Corporation is or was a member of the WRA and the MPAS.

15.     Defendant Nottingham Land and Livestock, LLLP is a Colorado Limited Liability Limited Partnership, with its principal place of business in Craig, Colorado. Defendant Nottingham Land and Livestock, LLLP is or was a member of the WRA.

16.     Defendant Two Bar Sheep Corporation, LLC, is a Colorado Limited Liability Corporation with its principal place of business in Craig, Colorado. Defendant Two Bar Sheep Corporation, LLC is or was a member of the WRA and the MPAS.

17.     Defendant Ball Brothers Sheep Company is an Idaho Corporation with its principal place of business in Lewisville, Idaho. Defendant Ball Brothers Sheep Company is or was a member of the WRA and the MPAS

18.     Defendant Estill Ranches, LLC is a Nevada Limited Liability Company with its principal place of business in Gerlach, Nevada. Defendant Estill Ranches, LLC is or was a member of the WRA and the MPAS.

19.     Defendant Cunningham Sheep Company is an Oregon Domestic Business Corporation with its principal place of business in Pendleton, Oregon. Defendant Cunningham Sheep Company is or was a member of the WRA and the MPAS.

20.     Defendant Dennis Richins DBA Dennis Richins Livestock is an individual who is domiciled in Utah. Defendant Richins is or was a member of the WRA.

21.     Defendant Child Ranch, LLC, is a Wyoming Limited Liability Corporation with its principal place of business in Cokeville, Wyoming. Defendant Child Ranch, LLC, is or was a member of the WRA and the MPAS.

## STATEMENT OF FACTS

### I.     The American Sheepherding Industry

22.     Sheep ranches in the western United States raise sheep to produce meat and wool, products that are currently valued at roughly $275 million per year.

23.     A critical component of the sheep industry are the shepherds that the ranches employ to tend the herds.

24.     As the WRA and the MPAS describe, the shepherds tend herds of 1,000 sheep or more, "often in rugged high altitude terrain or dry desert conditions, hauling water for the animals, herding them to grazing areas and making sure they have enough to eat, keeping them from going astray, and protecting them from the constant threat of natural predators like coyotes, mountain lions, and wolves, harmful or poisonous plants, and man-made dangers like highways and domesticated dogs. During lambing, calving or kidding season, the shepherds assist the animals in the birthing process, and at all times, the shepherds provide for the health and medical needs of the herd."

25.     These ranches are all independent businesses, competing in the labor market for shepherds.

26.     However, the ranches that are members of the WRA and MPAS – which the

WRA and MPAS claim to be "nearly all" sheep ranchers – have conspired to fix one of

their principal costs: shepherd wages.

27.     WRA and MPAS members compete in the market to sell the same types of

products, principally meat and wool. They, including member defendants, do not share

profits or distribute losses, but through the WRA and MPAS they collude to fix shepherd

wages.

## II.      Restraint of Trade in the Domestic Labor Market

28.     Like any industry, the sheep ranches of the western United States, first must look

to the domestic market for labor.

29.     The ranches do this through advertisements and by placing job orders with state

recruitment agencies.

30.     However, instead of each competing for labor by offering different wages

depending on market forces, ranch needs, and labor skills, the ranches illegally fix these

wages through their membership organizations, the WRA and the MPAS.

31.     The fixed wage is set unconscionably low because the ranchers know that if the

positions are not filled domestically, the Immigration and Nationality Act ("INA"), 8

U.S.C. § *1101 et seq.*, allows them to look to an international market where they also fix

the wages at a government-set minimum.

32.     The ranchers use this government-set wage floor for foreign recruitment as the

fulcrum around which they set domestic shepherd wages.

33.     This rate in most states is only $2 to $3 per hour.

34.     The ranches know that if they negotiate in the domestic market to bring in more domestic workers, these wages will be reflected in wage surveys that will increase the government minimum for foreign laborers in the following years.

35.     In the absence of the ranchers' agreement to fix shepherd wages, ranchers would negotiate with available range workers and the average wage would increase to something similar to the minimum wage for domestic ranch hands, general ranch farmworkers, or closed range herders, which are substantially higher than H-2A shepherds.

36.     The result of the restraint of trade is extremely depressed stagnant wages for both domestic and foreign shepherds. The wages entice relatively few domestic workers and leave the industry free to hire foreign workers, over whom the ranchers can exercise greater control, including by attempting to stop "runaways" whose lack of familiarity with the English language and the U.S. legal system makes less likely to complain about the deplorable working conditions in the industry.

**III.      Restraint of Trade in the Foreign Labor Market**

37.     Ranchers have historically claimed that there is an insufficient supply of domestic shepherds. While there was a true labor shortage during the Second World War that gave rise to the Bracero program (a precursor to today's H-2A visa program), the reason for the current lack of domestic shepherds is that wages are illegally fixed far below the market rate for similar jobs.

38.     The H-2A Visa Program is an agricultural guest worker visa program that allows for the issuance of work visas to foreign workers to fill positions that employers cannot fill through the domestic labor market.

39.     Pursuant to the INA, 8 U.S.C. § 1188, the United States Department of Labor's ("DOL's") role is to ensure that there is in fact a shortage of American workers willing and able to fill the positions that employers seek to fill with foreign H-2A workers.

40.     Before permitting the importation of foreign workers under H-2A visas, the INA requires the DOL to certify that:

> (A) there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition, and
> (B) the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed.

41.     To implement its statutory duty under the INA, the DOL has promulgated regulations. *See* 20 C.F.R. §§ 655.100 *et seq.*

42.     Under the regulations, before a foreign worker can be imported under an H-2A visa, an employer must first offer the job to U.S. workers through State Workforce Agencies. *Id.* § 655.121. Because H-2A visas are only issued for positions that cannot be filled by domestic labor, DOL regulations prescribe that employers offer domestic workers "no less than the same benefits, wages, and working conditions that the employer is offering, intends to offer, or will provide to H–2A workers."  20 C.F.R. § 655.122(a).

43.     Additionally, ranchers or membership associations acting on their behalf must offer, *inter alia*, the "worker at least the AEWR [Adverse Effect Wage Rate], the prevailing hourly wage rate, the prevailing piece rate, the agreed-upon collective bargaining rate, or the Federal or State minimum wage rate, in effect at the time work is performed, whichever is highest, for every hour or portion thereof worked during a pay period."  20 C.F.R. § 655.122(l). These job offers to domestic workers are called "job orders."

44.     Only if American workers do not accept a position offered through a job order can the employer submit an Application for Temporary Employment Certification (an "H-2A Application") to the DOL for certification.

IV.     **Special Procedures for Shepherds**

45.     Exceptions to the DOL H-2A regulations, known as "special procedures", can be made for particular agricultural industries.

46.     The DOL has implemented special procedures in the sheepherding industry. The current special procedures were implemented in 2011. *See* 76 Fed. Reg. 47,256 (issued Aug. 4, 2011). New special procedures are due to go into effect at the end of 2015. *See* 80 Fed. Reg. 20,300 (proposed Apr. 15, 2015).

47.     Although the special procedures depart and expand upon the requirements set out in the regulations, they are intended to effectuate the same basic principles and policies: shepherd jobs paid at or above a DOL-set wage floor must first be offered to American workers through "job orders" and only after American workers do not take the

offered jobs – and after application to, and certification by, the DOL – can foreign workers be imported to fill shepherd positions with an H-2A visa.

48.     Although, "[t]he employer's job offer must offer to U.S. workers no less than the same benefits, wages, and working conditions that the employer is offering, intends to offer, or will provide to H-2A workers," 20 C.F.R. § 655.122(a), there is no statute, regulation, or special procedure preventing ranchers from offering higher wages to the domestic workers in the job orders than they do to H-2A workers in the H-2A Applications.

49.     Currently, the wage floors set by the DOL for sheepherding jobs offered by employers in the H-2A program are set at the following in the following states:

| State(s) | Wage Floor ($/Month) |
|---|---|
| Colorado, Idaho, Montana, New Mexico, North Dakota, Oklahoma, Texas, Utah, and Wyoming | $750 |
| Arizona and Washington | $750 |
| Nevada | $800 |
| California | $1,422.55 |
| Oregon | $1,277 |

## V.     The WRA, the MPAS, and Sheepherding under the H-2A Program

50.     Among other things, the WRA and the MPAS, on behalf of their members, file H-2A Applications with the DOL.

51.     Defendants Martin Auza Sheep Corporation; Two Bar Sheep Corporation, LLC; Ball Brothers Sheep Company; Estill Ranches, LLC; Cunningham Sheep Company; and Child Ranch, LLC are or were members of both the WRA and the MPAS.

52.     Defendants Nottingham Land and Livestock, LLLP and Dennis Richins DBA Dennis Richins are or were members of the WRA.

53.     The DOL releases statistics each year for the shepherd H-2A program.

54.     The last complete year of released data is from October 1, 2013 to October 1, 2014.

55.     In that time period, the WRA submitted H-2A Applications for approximately 1,214 H-2A shepherds for its members.

56.     All of these WRA H-2A Applications offered <u>exactly</u> the DOL H-2A wage floors as a wage term.

57.     Based upon a review of the WRA job orders associated with the WRA H-2A Applications, the job orders to U.S. workers that preceded these H-2A Applications offered the same wages as the H-2A Applications and therefore also almost always offered <u>exactly</u> the DOL H-2A wage floors as a fixed wage to the U.S. workers.

58.     In that 2013-2014 time period, the MPAS submitted H-2A Applications for approximately 788 H-2A shepherds for its members.

59.     All but one of these H-2A Applications offered <u>exactly</u> the DOL H-2A wage floors as a wage term.

60.     Based upon a review of the MPAS job orders associated with the MPAS H-2A Applications, the job orders to U.S. workers that preceded these H-2A Applications offered the same wages as the H-2A Applications and therefore also almost always offered <u>exactly</u> the DOL H-2A wage floors as a fixed wage to the U.S. workers.

61.     As a result, almost every shepherd working in the United States is an H-2A worker.

62.     The USDOL recently estimated that there were only 18 domestic shepherds left in the United States.

63.     From October 1, 2013, to October 1, 2014, the WRA hired roughly 55% of all shepherds hired in the United States.

64.     From October 1, 2013, to October 1, 2014, the MPAS hired roughly 36% of all shepherds hired in the United States.

## VI.     The Conspiracy or Conspiracies to Fix Shepherd Wages

65.     Through the WRA and the MPAS, the WRA, the MPAS, and both organizations' members agreed to fix the wages of domestic shepherds and H-2A shepherds at exactly the wage floors set by the DOL.

66.     Through the WRA, the WRA and its members agreed to fix the wages of domestic shepherds and H-2A shepherds at exactly the H-2A wage floors set by the DOL for H-2A shepherds.

67.     The WRA therefore effects an agreement between its members to fix shepherd wages at the minimum DOL authorized wage floor, and sometimes an illegally low amount, through (a) the issuance of job orders for domestic workers that set the offered wage for domestic workers at the minimum wage floor for H-2A shepherds, and (b) the issuance of applications to the DOL that set the wage offered to H-2A workers at exactly the minimum DOL wage floor. .

68.     Through the MPAS, the MPAS and its members agreed to fix the wages of domestic shepherds and H-2A shepherds at exactly the H-2A wage floors set by the DOL for H-2A sheep shepherds.

69.     The MPAS therefore effects an agreement between its members to fix shepherd wages at the minimum DOL wage floor, and sometimes an illegally low amount, through (a) the issuance of job orders for domestic workers that set the offered wage for domestic workers at the minimum wage floor for H-2A shepherds, and (b) the issuance of applications to the DOL that set the wage offered to H-2A workers at exactly the minimum DOL wage floor.

70.     The MPAS and the WRA conspire with their members and each other to use job orders and H-2A Applications to fix the wages for their members' shepherds at exactly the H-2A shepherd wage floors set by the DOL.

71.     In a competitive market, and absent the price fixing, ranchers would offer a higher wage to U.S. workers than they do H-2A workers to account for the additional cost of bringing an H-2A worker to the country. H-2A workers are more costly to employers because, pursuant to the H-2A regulations, they must be reimbursed by their employers for travel to and from the place of recruitment in their home country.

## VII.     The Effects of the Anti-Competitive Conspiracy on the DOL's Wage Determinations

72.     The DOL sets wage floors to prevent an "adverse effect" on the U.S. workers in the shepherd labor market and sets these floors by conducting wage surveys that review the wages paid to shepherds in the relevant market.

73.     By agreeing to a cap on the amount that Defendant ranchers pay their shepherds at exactly the minimum DOL wage floor, the result of Defendants' conspiracy is an artificial ceiling on wages that would otherwise increase under normal market forces. As a consequence of this wage stagnation, the DOL's wage surveys reflect an artificially low wage for shepherds.

74.     Because the Defendants' wage fixing has artificially depressed wages in the shepherd labor market, it has also artificially depressed the DOL's wage floors, the very same minimum wage that Defendants rely on in fixing wages paid to their workers.

75.     While wages in other similar industries have continued to rise with normal inflation, the wages for shepherds are stuck, in some cases at less than half of the Federal minimum wage for covered workers.

76.     The price fixing's downward pressure on the DOL's wage floors, and therefore on the fixed wage, has led to absurdly low wages for shepherds. When the Industrial Welfare Commission of the State of California examined shepherd wages in 2000, it determined that "the wages paid to shepherds may be inadequate to supply the cost of proper living and that the hours and working conditions of shepherds may be prejudicial to their health and welfare." It then voted to remove the shepherd exemption from California's minimum wage.

77.     The price fixing conspiracy is further evidenced by the WRA's instructions to its members to change the fixed prices when the DOL's wage floors are adjusted. In January 2015, the WRA instructed its members in Oregon to uniformly move from one fixed wage to another, stating "beginning January 1, 2015 the wage rate for shepherds

working in Oregon is $1,326.46" and ordering that WRA members in Oregon "should immediately adjust your wage payments to the above monthly wage amount."

78.     The WRA and the MPAS also both instruct their members to pay shepherds in Nevada at below the applicable state minimum wage, fixing the Nevada shepherd wage at an illegal rate.

79.     The members of the WRA and the members of the MPAS each entered into and implemented nearly identical price fixing conspiracies and tacitly colluded to perpetuate both conspiracies. That tacit collusion is itself an unreasonable restraint of trade.

80.     Absent this unreasonable restraint of trade resulting from the price fixing conspiracy or conspiracies, the ranchers currently conspiring to fix the wages of shepherds would compete in the shepherd labor market for shepherds. Similarly, absent the price fixing, shepherds would compete in the shepherd labor market for the best sheepherding jobs, putting normal upward pressure on wages.

## VIII.     Allegations Regarding Illegal Deductions

### 1. The Enterprise

81.     The WRA and its members have formed an association-in-fact (the "Enterprise").

82.     The purpose of the Enterprise was and is recruiting shepherds for the member-ranches.

83.     This Enterprise, by recruiting shepherds for ranches in the United States both domestically and abroad, has an effect on interstate and foreign commerce.

### 2.  Association

84.     The WRA and its members are an association in fact. The WRA is the lynchpin of the Enterprise; while the Enterprise could continue without any particular member ranch, the Enterprise could not exist without the WRA because it requires the WRA to recruit shepherds. The WRA has existed as a membership organization since the 1950s.

85.     As explained below, the WRA engaged in its Enterprise's racketeering activities.

### 3.  Participation

86.     The WRA participated directly in the conduct of the affairs of its Enterprise. Among other acts of participation, the WRA repeatedly recruited shepherds for its member ranches.

87.     As explained below, the WRA further participated directly in the conduct of the affairs of the Enterprise through a pattern of racketeering activity.

### 4.  Pattern of Racketeering Activity

88.     The WRA engaged in a pattern of racketeering activity by committing multiple, continuing, and related acts of fraud for the benefit of the Enterprise over a period of years.

89.     Among other things, the WRA has engaged in schemes and artifices to defraud state governments, the federal government, and shepherds, including by using electronic communications.

90.     The WRA lied to state governments, the federal government, and the shepherds by assuring all of these parties that shepherds would not be subject to unreasonable

deductions pursuant to 20 C.F.R. § 655.122, which requires free and clear wage payments, bars illegal kickbacks, and bars employers from using deductions to "reduce the wage payment made to the employee below the minimum amounts required…."

91.    The WRA also lied to state governments, the federal government, and the shepherds by assuring all of these parties that shepherds would be reimbursed "for reasonable costs incurred by the worker for transportation and daily subsistence from the place from which the worker has come to work for the employer, whether in the U.S. or abroad to the place of employment", as required by 20 C.F.R. § 655.122.

92.    On behalf of its members and on a continual and reoccurring basis, the WRA submits job orders to domestic state workforce agencies in several states, which are agencies of state governments. These job orders promise to reimburse travel expenses for domestic workers consistent with 20 C.F.R. § 655.122.

93.    In recent job orders to state workforce agencies, the WRA has promised "[t]ransportation from point of recruitment to worksite and from the worksite back to the point of recruitment will be provided by Employer. Employer will reimburse worker for subsistence costs during travel to the worksite not later than the end of the first pay period upon the presentation of receipts and from and from the worksite at the end of the job based on the rates established by the applicable regulations."

94.    In reliance on the statements in the job orders, the state workforce agencies review and approve the job orders to be offered to domestic workers.

95.    On behalf of its members and on a continual and reoccurring basis, the WRA submits H-2A Applications to the DOL with attached copies of job orders that were not

filled by domestic workers. These job orders contain the promise to reimburse travel

expenses described above.

96.     These H-2A Applications also make the following promise: "The employer and its

agents have not sought or received payment of any kind from the H-2A worker for any

activity related to obtaining labor certification, including payment of the employer's

attorneys' fees, application fees, or recruitment costs.  For purposes of this paragraph,

payment includes, but is not limited to, monetary payments, wage concessions

(including deductions from wages, salary, or benefits), kickbacks, bribes, tributes, in

kind payments, and free labor."

97.     Each H-2A Application submitted by the WRA is signed under penalty of perjury

by an agent of the WRA.

98.     In reliance on the H-2A Applications and attached job orders, the DOL approves

the H-2A Applications and allows the WRA to recruit foreign workers using H-2A visas.

99.     The WRA's statements are fraudulent because it has a policy of unreasonably

deducting expenses that are primarily for the benefit or convenience of the employer

from the wages of its shepherd employees, including medical checkups, criminal

background checks and travel and subsistence expenses (which include bus fares,

meals, and hotels necessary to travel between the shepherd's place of recruitment and

the workplace, and travel necessary to complete the other pre-travel requirements, *e.g.,*

the medical checkups).

100.    The WRA's fraudulent intentions are evidenced by the difference between its

representations to the state workforce agencies and the DOL, which parrot the

regulatory travel reimbursement requirements, and the vague promise made to shepherds in their form "PRE-EMPLOYMENT NOTICE OF RIGHTS AND OBLIGATIONS", given to shepherds before employment and travel. That form states only that "[t]ransportation for travel to and from your home country are paid if you complete the contract terms."

### 5.    These Actions Have Injured Shepherds

101.    By conducting its Enterprise through patterns of racketeering, the WRA has injured the shepherds it recruits who work on the ranches that, together with the WRA, comprise the Enterprise.

102.    Among other things, the WRA's actions have caused the shepherds to have expenses that are primarily for the benefit and convenience of the WRA illegally deducted from shepherds' wages.

## RULE 23 CLASS ALLEGATIONS

## IX.    The Price Fixing Class

103.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

104.    Plaintiffs assert Count I as a Class Action pursuant to Fed. R. Civ. Proc. 23 as what is termed here the "Price Fixed Class."

105.    Pending any modifications necessitated by discovery, the named Plaintiffs define the "Price Fixed Class" as follows:

> ALL PERSONS WHO WORKED OR APPLIED TO WORK
> AS A SHEPHERD FOR THE WRA, MPAS, OR ANY OF
> THE MEMBER RANCHERS OF THE WRA OR THE MPAS
> FROM 9/1/11 TO THE PRESENT

106.    The members of the putative class are so numerous that joinder of all potential

class members is impracticable. The Plaintiffs do not know the exact size of the class

since that information is within the control of the Defendants. However, WRA and the

MPAS claim to recruit "nearly all" of the roughly 2000 to 2500 shepherds employed in

the United States each year.

107.    There are questions of law or fact common to the classes that predominate over

any individual issues that might exist, including whether or not the WRA and the MPAS

fixed shepherd wages.

108.    The class claims asserted by Plaintiffs are typical of the claims of all of the

potential Class Members because all potential Class Members experienced the same or

similar pay as a result of Defendants' conspiracy. A class action is superior to other

available methods for the fair and efficient adjudication of this controversy because

numerous identical lawsuits alleging similar or identical causes of action would not

serve the interests of judicial economy.

109.    Plaintiffs will fairly and adequately protect and represent the interests of the

class.  Plaintiffs' wages were artificially kept at the same low level as other shepherds

as a result of the same conspiracy.

110.    Plaintiffs are represented by counsel experienced in litigation on behalf of low-

wage workers and in class actions.

111.    The prosecution of separate actions by the individual potential Class Members

would create a risk of inconsistent or varying adjudications with respect to individual

potential Class Members that would establish incompatible standards of conduct for Defendants.

112.   Plaintiffs are unaware of any members of the putative class who are interested in presenting their claims in a separate action.

113.   Plaintiffs are unaware of any pending litigation commenced by members of the Class concerning the instant controversies.

114.   It is desirable to concentrate this litigation in this forum because many of the Defendants and Plaintiffs are located in, or do business in, Colorado and H-2A shepherds operate exclusively in the Western United States.

115.   This class action will not be difficult to manage due to the uniformity of claims among the Class Members and the susceptibility of the claims to class litigation and the use of representative testimony and representative documentary evidence.

116.   The contours of the class will be easily defined by reference to Defendants' records and government records.

**X.     The Illegal Deduction Class**

117.   Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

118.   Plaintiff Huaman asserts Count II and III as a Class Action pursuant to Fed. R. Civ. Proc. 23 as what is termed here the "Illegal Deduction Class."

119.   Pending any modifications necessitated by discovery, the "Illegal Deduction Class" is defined as follows:

ALL PERSONS WHO WERE RECRUITED AS
SHEPHERDS, A.K.A. SHEEPHERDERS, BY THE WRA

BETWEEN 9/1/2011 AND THE PRESENT WHO HAD
EXPENSES THAT ARE PRIMARILY FOR THE BENEFIT
AND CONVENIENCE OF THE EMPLOYER DEDUCTED
FROM THEIR WAGES

120.   The members of the putative class are so numerous that joinder of all potential

class members is impracticable. The Plaintiff does not know the exact size of the class

since that information is within the control of the Defendant. However, according to the

DOL's 2014 statistics, the WRA recruited approximately 1200 shepherds.

121.   There are questions of law or fact common to the classes that predominate over

any individual issues that might exist, including whether or not the WRA took illegal

deductions from shepherd wages.

122.   The class claims asserted by the Plaintiff are typical of the claims of all of the

potential Class Members because all potential Class Members experienced the same

illegal deductions due to the WRA's policies. A class action is superior to other available

methods for the fair and efficient adjudication of this controversy because numerous

identical lawsuits alleging similar or identical causes of action would not serve the

interests of judicial economy.

123.   Plaintiff will fairly and adequately protect and represent the interests of the

class.  Plaintiff suffered from the same illegal deductions as the Class Members.

124.   Plaintiff is represented by counsel experienced in litigation on behalf of low-wage

workers and in class actions.

125.   The prosecution of separate actions by the individual potential Class Members

would create a risk of inconsistent or varying adjudications with respect to individual

potential Class Members that would establish incompatible standards of conduct for Defendants.

126.    Plaintiff is unaware of any members of the putative class who are interested in presenting their claims in a separate action.

127.    Plaintiff is unaware of any pending litigation commenced by members of the Class concerning the instant controversies.

128.    It is desirable to concentrate this litigation in this forum because many of the Defendants and Plaintiffs are located in, or do business in, Colorado and shepherds operate exclusively in the western United States.

129.    This class action will not be difficult to manage due to the uniformity of claims among the Class Members and the susceptibility of the claims to class litigation and the use of representative testimony and representative documentary evidence.

130.    The contours of the class will be easily defined by reference to Defendant's records and government records.

## COUNT I: RESTRAINT OF TRADE IN VIOLATION OF 15 U.S.C. §§ 1 *ET SEQ.*

### Plaintiffs and the Price Fixing Class against all Defendants

131.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

132.    As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all other similarly situated employees pursuant to Fed. R. Civ P. 23.

133.    The conduct of the Defendants, as described herein, substantially affected interstate and international commerce and caused antitrust injury.

134.    The Defendants are competitors in the industry and should be competing with each other to attract the most capable shepherds.

135.    They do not share profits or risk of loss.

136.    But, through collusive conduct, they do pay all of their shepherds the same price-fixed wages, dramatically reducing costs and increasing the profits of all ranchers.

137.    The WRA, the MPAS, and their members, including Defendant Ranchers, conspired and agreed to fix the wages offered and paid to shepherds at the minimum DOL wage floor. This fixed rate is artificially low, and the fixing of wages through the operation of Defendant membership associations, the WRA and the MPAS, amounts to a *per se* violation of the Sherman Antitrust Act.

138.    The tacit collusion between the WRA and the MPAS necessary to carry out identical illegal price fixing conspiracies within each organization is a *per se* violation of the Sherman Antitrust Act.

139.    The WRA and its members conspired and agreed to fix wages offered and paid to shepherds at the DOL wage floors through the WRA's filing of (a) job offers for domestic workers, and (b) applications for certifications of H-2A workers that both offered exactly the same wage set at exactly the wage floors set by the DOL. The fixing of wages amounts to a *per se* violation of the Sherman Antitrust Act, and the fixed rate set by Defendants has remained artificially low because it has continually put downward pressure on the DOL's wage surveys and, thus, the same minimum wage requirements upon which Defendants rely to fix wages.

140.    The MPAS and its members conspired and agreed to fix wages offered and paid

to shepherds at the wage floors set by the DOL through the MPAS's filing of (a) job

offers for domestic workers, and (b) applications for certifications of H-2A workers that

both offered exactly the same wage set at exactly the DOL wage floors. The fixing of

wages amounts to a *per se* violation of the Sherman Antitrust Act, and the fixed rate set

by Defendants has remained artificially low because it has continually put downward

pressure on the DOL's wage surveys and, thus, the same minimum wage requirements

upon which Defendants rely to fix wages.

141.    In the alternative, Plaintiffs allege that the Defendants' price-fixing agreement is

anticompetitive and illegal under the Rule of Reason. For purposes of the Rule of

Reason, the relevant geographic market for the claim alleged in this Count is the United

States, and the relevant service market consists of the services provided by shepherds

employed in the United States.

142.    The WRA's and MPAS's relevant conduct – price fixing in their role as a recruiter

for their members – unreasonably restrains trade in the shepherd labor market. The

price fixing is not essential to the H-2A program and has no procompetitive virtues.

Defendants' collusive activity had and has the effect of –

> (a) fixing the compensation of shepherd Plaintiffs and the Price Fixed
>
> Class at an artificially low level;
>
> (b) eliminating, to a substantial degree, competition for shepherd labor,
>
> particularly among potential domestic shepherds;
>
> (c) driving Plaintiffs and other workers from the shepherd labor market;

(d) restraining trade in that shepherds are not able to negotiate their wage rates above the DOL wage floors; and

(e) restraining trade by artificially lowering the H-2A shepherd wage floors resulting from the DOL's surveys.

143.    Defendants' unreasonable restraint or restraints of trade have damaged the Plaintiffs and the members of the Price Fixed Class.

144.    As a result, Plaintiffs and those similarly situated suffered injuries and are entitled to treble damages, fees, and costs as set forth by law.

145.    Plaintiffs and those similarly situated are also entitled to injunctive relief to end the price fixing scheme, and to force the Defendants to take affirmative steps to correct the market.

## COUNT II: CIVIL RICO, 18 U.S.C. 1964(C)

**Plaintiff Huaman and the Illegal Deduction Class against Defendant WRA**

146.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

147.    As set forth above, Plaintiff Huaman asserts this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

148.    As described above, the WRA, made fraudulent statements to state workforce agencies, the DOL, the Plaintiff, and the Illegal Deduction Class regarding illegal deductions. These acts violated 18 U.S.C. § 1343 (wire fraud), and the repeated violations constituted a pattern of racketeering.

149.    By conducting its Enterprise through patterns of racketeering, the WRA injured Plaintiff and the Illegal Deduction Class.

150.    Among other things, each of these RICO violations have caused the Plaintiff and the Illegal Deduction Class employed by the WRA and WRA member ranchers to have amounts illegally deducted from their wages.

151.    As a result, Plaintiff Huaman and those similarly situated suffered injuries and are entitled to treble damages, fees, and costs as set forth by law.

<u>**COUNT III: BREACH OF CONTRACT OR QUASI CONTRACT**</u>

**Plaintiff Huaman and the Illegal Deduction Class against Defendant WRA**

152.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

153.    As set forth above, Plaintiff Huaman asserts this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

154.    The Plaintiff and the Illegal Deduction Class entered into contracts with the WRA that explicitly or impliedly incorporated the requirements of 20 C.F.R. § 655.122.

155.    As set forth above, the WRA breached these contracts by deducting expenses that were primarily for the benefit and convenience of the employer, including travel expenses from the point of recruitment to the worksite, from shepherd wages.

156.    As a result of the breach, the Plaintiff and the Illegal Deduction class suffered damages.

157.    In the alternative to a contract claim, the Plaintiff is entitled to relief in promissory estoppel. The WRA promised the Plaintiff and the Illegal Deduction Class that it would

adhere to 20 C.F.R. § 655.122. The Plaintiff and the Illegal Deduction Class relied on this promise to their detriment by traveling to WRA member ranches to work as shepherds, where the WRA illegally deducted wages that were primarily for the benefit and convenience of the WRA. The Plaintiff and Illegal Deduction Class are entitled to damages, including the illegally deducted wages.

158.   Similarly, in the alternative to a contract claim, the Plaintiff is also entitled to relief in unjust enrichment and quantum meruit. A benefit was conferred on the WRA when the Plaintiff and the Illegal Deduction Class traveled to WRA member ranches to work and the WRA illegally deducted amounts from their wages in violation of 20 C.F.R. § 655.122; that benefit was appreciated by the WRA as it retained the illegal deductions; and it is unjust for the WRA to be permitted to retain the illegally deducted wages. The Plaintiff and the Illegal Deduction Class reasonably expected to be paid wages free and clear pursuant to 20 C.F.R. § 655.122 and were not. As a result, the Plaintiff and the illegal deduction class are entitled to the reasonable value of the services provided without amounts illegally deducted and the WRA should be disgorged of the illegally deducted wages.

**THE PLAINTIFFS DEMAND A JURY TRIAL**

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs respectfully request that judgment be entered in their favor and in favor of those similarly situated as follows:

a. Certifying and maintaining this action as a class action, with Plaintiffs as designated class representatives and with their counsel appointed as class counsel;

b. Declaring Defendants in violation of each of the counts set forth above;

c. Awarding treble damages for antitrust injuries to Plaintiffs and those similarly situated;

d. Awarding treble damages for RICO injuries to Plaintiffs and those similarly situated;

e. Awarding pre-judgment, post-judgment, and statutory interest;

f. Awarding attorneys' fees;

g. Awarding costs;

h. Ordering equitable relief, including a judicial determination of the rights and responsibilities of the parties;

i. Awarding such other and further relief as the Court may deem just and proper.


Respectfully Submitted,

s/Alexander Hood_____
Alexander Hood
Towards Justice
Attorney and Director of Litigation
1535 High St., Suite 300
Denver, CO 80218
Tel.: 720-239-2606
Fax: 303-957-2289
Email: alex@towardsjustice.org

s/Nina E. DiSalvo_____
Nina E. DiSalvo
Towards Justice
Attorney and Executive Director
1535 High St., Suite 300
Denver, CO 80218
Tel.: 720-239-2606
Fax: 303-957-2289
Email: nina@towardsjustice.org

s/Andrew Schmidt_____
Andrew Schmidt
Towards Justice
Of Counsel
1535 High St., Suite 300
Denver, CO 80218
Tel.: 720-239-2606
Fax: 303-957-2289
Email: andy@towardsjustice.org

Attorneys for the Plaintiffs