## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: 15-cv-01889

RODOLFO LLACUA, ESLIPER HUAMAN,
and those similarly situated

       Plaintiffs,

   v.

WESTERN RANGE ASSOCIATION,
MOUNTAIN PLAINS AGRICULTURAL SERVICE,
MARTIN AUZA SHEEP CORPORATION,
NOTTINGHAM LAND AND LIVESTOCK, LLLP,
TWO BAR SHEEP CORPORATION, LLC,
BALL BROTHERS COMPANY,
ESTILL RANCHES, LLC,
CUNNINGHAM SHEEP COMPANY,
DENNIS RICHINS d/b/a DENNIS RICHINS LIVESTOCK,
and CHILD RANCH, LLC.

       Defendants.

---

## DEFENDANT MOUNTAIN PLAINS AGRICULTURAL SERVICE'S
## MEMORANDUM OF LAW IN SUPPORT
## OF MOTION TO DISMISS

---

Defendant Mountain Plains Agricultural Service (MPAS) has moved to dismiss the Complaint filed by Plaintiffs Rodolfo Llacua and Esliper Huaman, purportedly on behalf of themselves and all others similarly situated. This case should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) because the Complaint fails to allege sufficient facts, even if accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## FACTUAL ALLEGATIONS IN THE COMPLAINT

A.    <u>Plaintiffs' Own Factual Allegations</u>.

Plaintiffs allege they were former sheepherders and were employed by Defendant Western Range Association (WRA).  (¶¶ 10-11.)  Plaintiff Llacua also alleges that he lives in Colorado.  (¶ 10.)  While the Complaint is full of conclusions, that is the sum and total of all their factual allegations in support of their claims for relief under the Sherman Antitrust Act, 15 U.S.C. Sec. 1 *et seq.* (Count 1), against Defendant MPAS for which they demand class status under Fed. R. Civ. P. 23 and a jury trial.

Plaintiffs do not allege they were employed by MPAS at any time.  They do not allege when they were employed:  their claims may be barred by the statute of limitations.  We do not know.  We do not know where they worked, which could be relevant to venue and jurisdiction, and is relevant to the amount of wages they claim were due.  They do not allege what, when, or how they were paid:  it seems likely that they were paid in accordance with adverse effect wage rates (AEWR) set by the Wage and Hour Division of the U.S. Department of Labor, since that is the essence of Plaintiffs' antitrust charges, but Defendant can only guess.  They seek relief against other Defendants for alleged illegal deductions from pay, but fail to identify any deductions, legal or otherwise, that were made from their wages.  Defendants thus are left almost completely in the dark as to the facts that underlie claims asserted by these two Plaintiffs.  The mere allegation that at some time they were employed by WRA to herd sheep is plainly insufficient to satisfy even a generous construction of *Iqbal* and *Twombly*'s pleading requirements.

B.      Plaintiffs' Allegations Concerning Defendant MPAS.

Plaintiffs allege as pertinent facts related to the antitrust count the following[1]:

- Defendant Mountain Plains Agricultural Service (MPAS) is a Wyoming non-profit corporation with its principal place of business at 811 N Glenn Rd, Casper, WY 82601. The MPAS does business in Colorado. (Complaint, ¶ 13.)

- MPAS and the other Defendants engaged in "collusion and conspiracy to fix wages and thereby eliminate any competitive market for shepherd labor and strip shepherds, both foreign and domestic, of their ability to bargain for wages in a free market." (Complaint, ¶ 4.) This is a conclusory allegation because it alleges that Defendants colluded and conspired, but fails to identify any facts supporting that conclusion.

- Defendants "advertise and prepare the documents that set out shepherd job offers in the domestic market at illegally fixed wages." (Complaint, ¶ 5.) This is also a conclusory allegation, in that it asserts that wages were illegally "fixed" but alleges no facts to support that allegation.

- "Regardless of any variation between the ranchers, they fix the wages for all offers at exactly the minimums established by the DOL for H-2A shepherds, without allowing shepherds, foreign or domestic, to shop between ranchers for better wages commensurate with their experience or abilities." (Complaint, ¶ 7.) This also is a conclusory allegation. Advertising a job at the minimum wage set

---

[1] Plaintiffs make a number of factual allegations totally unrelated to the antitrust count, such as, the survey results by Colorado Legal Services (¶ 2), a proposed bill by a sheep rancher (¶ 3), efforts to locate workers and employers who have violated federal law (¶ 3).

by the U.S. Department of Labor as the adverse effect wage rate (AEWR) is strictly in compliance with the laws and regulations governing guest workers under the H-2A program, and thus is likely an example of "parallel" conduct, rather than collusion.  Plaintiffs offer no facts to support their conclusion that Defendants' actions were the product of an illegal agreement, and not compliance with a Federal mandate.

- The ranches "illegally fix these wages through their membership organizations, the WRA and the MPAS." (Complaint, ¶ 30.)  The allegation of illegal fixing of wages is conclusory.

- "The fixed wage is set unconscionably low because the ranchers know that if the positions are not filled domestically, the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 et seq., allows them to look to an international market where they also fix the wages at a government-set minimum." (Complaint, ¶ 31.) This is yet another conclusory allegation, for the same reasons explained above. Whether Plaintiffs find the wages "unconscionable" or not is irrelevant to their claim that it is the result of an illegal, price-fixing agreement:  indeed, Plaintiffs concede that the wage rate is one that is decreed by the government.

- "The ranchers use this government-set wage floor for foreign recruitment as the fulcrum around which they set domestic shepherd wages." (Complaint, ¶ 32.) This is another conclusory allegation devoid of factual support, and in fact reflects the inverse of the truth:  It is the government that sets the wage based on regulations, and not the ranchers who deploy government as a cat's-paw to set wages.

- "The ranches know that if they negotiate in the domestic market to bring in more domestic workers, these wages will be reflected in wage surveys that will increase the government minimum for foreign laborers in the following years." (Complaint, ¶ 34.)  This is a conclusory allegation in that it presumes to read the ranchers' minds, and absurdly imputes to them the power to manipulate the U.S. Department of Labor.

- In the absence of the ranchers' agreement to fix shepherd wages, ranchers would negotiate with available range workers and the average wage would increase to something similar to the minimum wage for domestic ranch hands, general ranch farmworkers, or closed range herders, which are substantially higher than H-2A shepherds." (Complaint, ¶ 35.)  This allegation is sheer speculation and devoid of any factual content.

- "Among other things, the WRA and the MPAS, on behalf of their members, file H-2A Applications with the DOL." (Complaint, ¶ 50.)  In a refreshing departure, Plaintiffs here allege a fact, but it describes conduct that is perfectly legal.

- "Through the WRA and the MPAS, the WRA, the MPAS, and both organizations' members agreed to fix the wages of domestic shepherds and H-2A shepherds at exactly the wage floors set by the DOL." (Complaint, ¶ 65.)  This is a conclusory allegation because, in precisely the manner rejected by the U.S. Supreme Court in *Twombly* and discussed below, it alleges that an agreement exists based purely on circumstantial evidence that can more readily be explained as parallel conduct in strict compliance with Federal laws and regulations.

- "Through the WRA, the WRA and its members agreed to fix the wages of domestic shepherds and H-2A shepherds at exactly the H-2A wage floors set by the DOL for H-2A shepherds." (Complaint, ¶ 66.)  Again, as explained above, Plaintiffs' allegation is conclusory and asks the Court to infer that an illegal agreement was reached based on purely circumstantial evidence that more likely reflects legal, parallel conduct.

- "The WRA therefore effects an agreement between its members to fix shepherd wages at the minimum DOL authorized wage floor, and sometimes an illegally low amount, through (a) the issuance of job orders for domestic workers that set the offered wage for domestic workers at the minimum wage floor for H-2A shepherds, and (b) the issuance of applications to the DOL that set the wage offered to H-2A workers at exactly the minimum DOL wage floor." (Complaint, ¶ 67.)  Plaintiffs' allegations are conclusory and ask the Court to infer that an illegal agreement was reached based on purely circumstantial evidence that can more readily be explained as economically rational, legal, parallel conduct.

- "Through the MPAS, the MPAS and its members agreed to fix the wages of domestic shepherds and H-2A shepherds at exactly the H-2A wage floors set by the DOL for H-2A sheep shepherds." (Complaint, ¶ 68.)  Plaintiffs' allegation is conclusory and is based on circumstantial evidence that can more readily be explained as legal, parallel conduct.  Moreover, there is nothing illegal about a trade association advising its members how to comply with Federal rules and regulations, though Plaintiffs seek to recast this conduct as an agreement in restraint of trade.

- "The MPAS therefore effects an agreement between its members to fix shepherd wages at the minimum DOL wage floor, and sometimes an illegally low amount, through (a) the issuance of job orders for domestic workers that set the offered wage for domestic workers at the minimum wage floor for H-2A shepherds, and (b) the issuance of applications to the DOL that set the wage offered to H-2A workers at exactly the minimum DOL wage floor." (Complaint, ¶ 69.) This is a summary of the foregoing, conclusory allegations and, like its constituent parts, is devoid of factual support.

- "The MPAS and the WRA conspire with their members and each other to use job orders and H-2A Applications to fix the wages for their members' shepherds at exactly the H-2A shepherd wage floors set by the DOL." (Complaint, ¶ 70.) This is a conclusory allegation in that it characterizes as a conspiracy that trade associations' advice to their members about compliance with Federal laws and regulations. There is no evidence of any agreement or conspiracy.

- "The price fixing conspiracy is further evidenced by the WRA's instructions to its members to change the fixed prices when the DOL's wage floors are adjusted. In January 2015, the WRA instructed its members in Oregon to uniformly move from one fixed wage to another, stating 'beginning January 1, 2015 the wage rate for shepherds working in Oregon is $1,326.46' and ordering that WRA members in Oregon 'should immediately adjust your wage payments to the above monthly wage amount.'" (Complaint, ¶ 77.) This is a conclusory allegation, and mischaracterizes as illegal "instructions" the trade associations' advice to

members concerning the latest Government rules and regulations pertinent to their business.

- "The WRA and the MPAS also both instruct their members to pay shepherds in Nevada at below the applicable state minimum wage, fixing the Nevada shepherd wage at an illegal rate."  (Complaint, ¶ 78.) This is a conclusory allegation, and mischaracterizes as illegal "instructions" the trade associations' advice to members concerning the latest Federal rules and regulations pertinent to their business and does not even state what the purported wages were set.

- "The members of the WRA and the members of the MPAS each entered into and implemented nearly identical price fixing conspiracies and tacitly colluded to perpetuate both conspiracies.  That tacit collusion is itself an unreasonable restraint of trade."  (Complaint, ¶ 79.)  This is a conclusory allegation, in that it alleges a conspiracy and "tacit" collusion to fix prices based on purely circumstantial evidence, where the only predicate acts consist of compliance with Federal law and can more readily be understood as economically rational, law-abiding, parallel conduct.

- "Absent this unreasonable restraint of trade resulting from the price fixing conspiracy or conspiracies, the ranchers currently conspiring to fix the wages of shepherds would compete in the shepherd labor market for shepherds.  Similarly, absent the price fixing, shepherds would compete in the shepherd labor market for the best sheepherding jobs, putting normal upward pressure on wages." (Complaint, ¶ 80.)  This conclusory summary again assumes illegal agreements

based on circumstantial evidence and conduct that complies with Federal laws,

regulations, and directives.

When the Complaint is shorn of conclusory allegations and emotional terms and only facts remain, we are left with the following.  WRA and MPAS prepare H-2A applications for the members of their organizations.  The U.S. Department of Labor established the Adverse Effect Wage Rate (AEWR) for shepherds at varying rates by State according to a special procedure under the H-2A program.  When WRA and MPAS prepared the H-2A applications, they used the AEWR in all applications (but one) that they filed with DOL.[2]  WRA and MPAS advertise these rates in job orders and notices submitted to the states for domestic workers, and when they are unsuccessful in filling the available positions, they can recruit foreign workers to work as shepherds.  WRA hired roughly 55% of the H-2A shepherds and MPAS hired roughly 35% of the H-2A shepherds in the cited 12 month period.  In essence, the facts as alleged by Plaintiffs assert that the Defendants paid for labor in compliance with the requirements imposed upon them by the U.S. Department of Labor: this is hardly illegal conduct.  When DOL changed the AEWR for Oregon, WRA informed its members of the new AEWR.  Currently, DOL estimates that there are only 18 domestic shepherds in the U.S. and, not surprisingly, almost all shepherds in the U.S. are foreign H-2A workers recruited and hired in accordance with DOL procedures.

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129

---

[2]  For purposes of the Motion to Dismiss, Defendant accepts the allegation that its members paid no more than the AEWR as pled.  Defendants reserve the right to dispute this allegation if the case is not dismissed, and will show that some employers offered and paid base wages in excess of the published minimum, and some offered opportunities to earn additional pay and bonuses.

S.Ct. 1937, 1949 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This "plausibility" standard is satisfied "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A plaintiff must demonstrate more than "a sheer possibility that a defendant has acted unlawfully." *Id.*

Legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement fail to constitute well-pled facts for Rule 12(b)(6) purposes. *Iqbal*, 129 S.Ct. at 1949. Even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (alteration marks omitted). The Court will not consider unwarranted inferences, unreasonable conclusions, or arguments. *Iqbal*, 129 S.Ct. at 1951–52. Detailed factual allegations are not required, but the Complaint must plead sufficient facts to allow a court, drawing on judicial experience and common sense, to infer more than the mere possibility of misconduct. *Id.* at 1950 (*quotation marks omitted*). Without such "heft," *id.* at 1947, the plaintiff's claims cannot establish a valid entitlement to relief. Facts that are merely consistent with a defendant's liability will not suffice to nudge the plaintiffs' claims "across the line from conceivable to plausible." *Id.* at 1951 (quotations omitted).

The Tenth Circuit articulated a "refined," post- *Iqbal* and *Twombly* standard for the sufficiency of a Complaint in *Kansas Penn Gaming, LLC v. Collins,* 656 F.3d 1210, 1214 (10th Cir.2011). A Complaint must allege sufficient facts to be plausible on its face. "Plausibility" refers "to the scope of the allegations in a complaint:  if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims

across the line from conceivable to plausible.'" *Robbins v. Oklahoma,* 519 F.3d 1242, 1247

(10th Cir.2008) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955).  Further, "[t]he nature and

specificity of the allegations required to state a plausible claim will vary based on context."

*Kansas Penn,* 656 F.3d at 1215; *see also Iqbal,* 129 S.Ct. at 1950 ("Determining whether a

complaint states a plausible claim for relief will ... be a context-specific task that requires the

reviewing court to draw on its judicial experience and common sense.").  Thus, in this Circuit the

*Twombly/Iqbal* standard is "a middle ground between heightened fact pleading, which is

expressly rejected, and allowing complaints that are no more than labels and conclusions or a

formulaic recitation of the elements of a cause of action, which the Court stated will not do."

*Robbins,* 519 F.3d at 1247 (internal quotation marks and citations omitted); *Khalik v. United Air*

*Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012).

## ARGUMENT AND AUTHORITY

Fed. R. Civ. P. 8 (a)(2) states that "[a] pleading that states a claim for relief must contain:

. . . a short and plain statement of the claim showing that the pleader is entitled to relief," but this

Complaint does not even come close.  Instead, it alleges illegal agreements based on evidence

that consists almost exclusively of law-abiding conduct by the Defendants, rails against

economic reality, and indicts an industry and the government agency that regulates it.  This is not

sufficient to survive a Motion to Dismiss.  Plaintiffs' allegations are insufficient to satisfy even

the minimal burden necessary to survive a Motion to Dismiss post-*Iqbal* and *Twombly*.

All the Plaintiffs allege about themselves is that they were employed by WRA as

shepherds:  there are no other specific factual allegations of what they were paid, whether that

pay met or exceeded the AEWR, or indeed of any harm they claim to have suffered as a result of

the alleged conspiracy.  Their allegations about Defendants consist principally of conclusory

allegations and descriptions of economically-rational, law-abiding conduct that do not state claims upon which relief can be granted.

A.      Plaintiffs Fail To Allege Facts Sufficient To State An Antitrust Claim.

Like the Plaintiffs in the instant case, the plaintiffs in *Twombly* alleged violations of the Sherman Antitrust Act, 15 U.S.C. § 1, which requires a "contract, combination ..., or conspiracy, in restraint of trade or commerce." *Twombly*, 550 U.S. at 548, 127 S. Ct. at 1961.  The *Twombly* plaintiffs sought a class action under Fed. R. Civ. P. 23 on behalf of themselves and other similarly situated subscribers to telephone and internet services who claimed to have been harmed by alleged collusion between providers of such services to fix prices.  The District Court dismissed for failure to state a claim, because the plaintiffs alleged only instances of parallel behavior but no agreement between the putative conspirators:  the complaint did not "alleg[e] facts ... suggesting that refraining from competing in other territories . . . was contrary to [the ILECs'] apparent economic interests, and consequently [does] not rais[e] an inference that [the ILECs'] actions were the result of a conspiracy." *Twombly v. AT&T*, 313 F. Supp. 2d 174, 188 (S.D.N.Y. 2003).  The Second Circuit reversed, and the Supreme Court granted certiorari to "address the proper standard for pleading an antitrust conspiracy through allegations of parallel conduct." *Twombly*, 550 U.S. at 553, 127 S. Ct. at 1963.  The Supreme Court held that stating a claim under Sherman Act's restraint of trade provision required a complaint with enough factual matter, taken as true, to suggest that an agreement was made, and that allegations of parallel business conduct and a bare assertion of conspiracy will not alone suffice to state a claim.

Plaintiffs' antitrust claim in the instant case suffers from the same infirmity as that of the plaintiffs in *Twombly*.  They do not allege any facts that MPAS and the other Defendants ever entered into any agreement placing a ceiling on wages, but place their faith entirely in allegations

of parallel conduct:   to wit, offering the AEWR set by the U.S. Department of Labor for sheepherders.  This is factually insufficient to withstand dismissal under *Twombly*.

     1.    <u>Plaintiffs' Allegations Are Conclusory</u>.

As set forth in the Statement of Facts above, the allegations in Plaintiffs' Complaint consist almost exclusively of conclusory statements, which invite the reader to assume or infer that illegal activity has occurred without offering a shred of evidence that it has.  Plaintiffs allude to "agreements," but cite no evidence of any agreement.  See, e.g., Complaint paragraphs:

¶ 4 - Alleging that MPAS and the other Defendants engaged in "collusion and conspiracy to fix wages and thereby eliminate any competitive market for shepherd labor and strip shepherds, both foreign and domestic, of their ability to bargain for wages in a free market" (conclusory allegation of conspiracy and collusion; no facts);

¶ 5 - Defendants "advertise . . . illegally fixed wages" (conclusory allegation of illegality);

¶ 7 - "[F]ix the wages for all offers at exactly the minimums established by the DOL" (conclusory allegation of "fixing," admittedly in compliance with DOL published rates);

¶ 30 - "[I]llegally fix these wages through their membership organizations, the WRA and the MPAS (conclusory characterization of illegality);

¶ 31 "[S]et [wages] unconscionably low because the ranchers know that if the positions are not filled domestically, the Immigration and Nationality Act ("INA"), 8 U.S.C. § *1101 et seq*., allows them to look to an international market where they also fix the wages at a government-set minimum" (conclusory allegation of unethical conduct, admittedly in compliance with Government rates);

¶ 32 - "[U]se this government-set wage floor for foreign recruitment as the fulcrum around which they set domestic shepherd wages" (admits that rates comply with Government rules);

¶ 34 - "The ranches know that if they negotiate in the domestic market to bring in more domestic workers, these wages will be reflected in wage surveys that will increase the government minimum for foreign laborers in the following years" (allegation of legal and economically rational conduct, insinuating evil motive without factual support);

¶ 65 - "Through the WRA and the MPAS, the WRA, the MPAS, and both organizations' members agreed to fix the wages of domestic shepherds and H-2A shepherds at exactly the wage floors set by the DOL" (conclusory allegation of "fixing" wages where they admittedly comply with rates set by DOL);

¶ 66 - "Through the WRA, the WRA and its members agreed to fix the wages of domestic shepherds and H-2A shepherds at exactly the H-2A wage floors set by the DOL for H-2A shepherds" (same);

¶ 67 - "The WRA therefore effects an agreement between its members to fix shepherd wages at the minimum DOL authorized wage floor, and sometimes an illegally low amount, through (a) the issuance of job orders for domestic workers that set the offered wage for domestic workers at the minimum wage floor for H-2A shepherds, and (b) the issuance of applications to the DOL that set the wage offered to H-2A workers at exactly the minimum DOL wage floor" (conclusory mischaracterization of compliance advice by trade association to its members as collusion);

¶ 68 - "Through the MPAS, the MPAS and its members agreed to fix the wages of domestic shepherds and H-2A shepherds at exactly the H-2A wage floors set by the DOL for H-2A sheep shepherds" (allegation of agreement to fix wages unsupported by facts);

¶ 69 - "The MPAS therefore effects an agreement between its members to fix shepherd wages at the minimum DOL wage floor, and sometimes an illegally low amount, through (a) the issuance of job orders for domestic workers that set the offered wage for domestic workers at the minimum wage floor for H-2A shepherds, and (b) the issuance of applications to the DOL that set the wage offered to H-2A workers at exactly the minimum DOL wage floor" (same);

¶ 70 - "The MPAS and the WRA conspire with their members and each other to use job orders and H-2A Applications to fix the wages for their members' shepherds at exactly the H-2A shepherd wage floors set by the DOL" (conclusory allegation of conspiracy to comply with law devoid any factual support);

¶ 77 - "The price fixing conspiracy is further evidenced by the WRA's instructions to its members to change the fixed prices when the DOL's wage floors are adjusted.  In January 2015, the WRA instructed its members in Oregon to uniformly move from one fixed wage to another, stating "beginning January 1, 2015 the wage rate for shepherds working in Oregon is $1,326.46" and ordering that WRA members in Oregon "should immediately adjust your wage payments to the above monthly wage amount" (conclusory mischaracterization of advice from trade association to its members regarding compliance with law as an illegal conspiracy);

¶ 78 - "The WRA and the MPAS also both instruct their members to pay shepherds in Nevada at below the applicable state minimum wage, fixing the Nevada shepherd wage at an illegal rate" (same);

¶ 79 - "The members of the WRA and the members of the MPAS each entered into and implemented nearly identical price fixing conspiracies and tacitly colluded to perpetuate both conspiracies.  That tacit collusion is itself an unreasonable restraint of trade" (conclusory allegation that conduct, which factually complies with law, reflects an illegal conspiracy); and

¶ 80 - "Absent this unreasonable restraint of trade resulting from the price fixing conspiracy or conspiracies, the ranchers currently conspiring to fix the wages of shepherds would compete in the shepherd labor market for shepherds.  Similarly, absent the price fixing, shepherds would compete in the shepherd labor market for the best sheepherding jobs, putting normal upward pressure on wages" (conclusory allegation that law-abiding conduct is an unreasonable restraint of trade).

Nothing in this lengthy recitation is evidence of an illegal agreement, or circumstantial evidence of an illegal conspiracy:  the illegality and evil intent are all off-stage, alluded to and suggested by Plaintiffs but never revealed.  At the end of the day, the few allegations that do state facts demonstrate compliance with rules published by USDOL.  Such allegations fail to satisfy the "plausibility" test articulated by the Supreme Court in *Iqbal* and *Twombly*.

2.    Plaintiffs Fail To Allege An Agreement.

Plaintiffs utterly fail to plead any facts whatsoever to support an actual, as opposed to a presumed, or "tacit," agreement among Defendants.  (See above.)  Instead, they ask this Court to infer, based on conduct that is strictly in compliance with Federal law, that there was a nefarious

plot to depress shepherds' pay and, in essence, to rope the U.S. Department of Labor into the scheme so that the resulting AEWR would serve Defendants' purposes.  The Complaint fails to point to any agreement between any of the Defendants to engage in price-fixing, but instead simply asks the Court to infer that such an agreement must exist – because Defendants *complied with the law*.  This does not satisfy the "plausible" pleading requirements defined by the Supreme Court and the Tenth Circuit:

> "Plausibility" refers to the scope of the allegations in a complaint:  if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs have not nudged their claims across the line from "conceivable" to "plausible."

*Robbins v. Oklahoma,* 519 F.3d 1242, 1247 (10th Cir.2008) (quotation marks corrected) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955).

"Because § 1 of the Sherman Act does not prohibit all unreasonable restraints of trade but only restraints effected by a contract, combination, or conspiracy, the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Twombly,* 550 U.S. at 553 (internal citations and brackets omitted).  Such an agreement is established by evidence that the alleged conspirators "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984).  There is none in Plaintiffs' Complaint.

      3.    <u>The Facts Alleged Suggest Parallel Conduct At Most.</u>

Plaintiffs ask this Court to infer the existence of an illegal agreement from Defendants' conduct because all the Defendants were taking steps to comply with USDOL's wage rates, but this is not enough to get them past a Motion to Dismiss.  The Tenth Circuit has held that:

> While consciously parallel behavior may contribute to a finding of antitrust conspiracy, it is insufficient, standing alone, to prove conspiracy.  Such parallel behavior may, however, support the existence of an illegal agreement when

augmented by additional evidence from which an understanding among the parties may be inferred.  Such evidence may include a showing that the parties are acting against their own individual business interests, or that there is motivation to enter into an agreement requiring parallel behavior. Mere exchanges of information, even regarding price, are not necessarily illegal, in the absence of additional evidence that an agreement to engage in unlawful conduct resulted from, or was a part of, the information exchange.

*Mitchael v. Intracorp, Inc.,* 179 F.3d 847, 858–59 (10th Cir.1999) (citations and internal quotations omitted).  Plaintiffs' allegations fall squarely within the bounds of what the Tenth Circuit has held to be insufficient:  here, the parties acted in their own individual business interests, and there was not motivation to enter into any illegal agreement since they all were complying with USDOL prescriptions.  The exchange of compliance information between the associations and their members is unaccompanied by any evidence suggesting that unlawful conduct was the result.

Proof of a § 1 conspiracy must include evidence tending to exclude the possibility of independent action, *see Monsanto Co. v. Spray–Rite Service Corp.,* 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984); *Twombly*, 550 U.S. at 554, 127 S. Ct. at 1964.  There is none here: in fact, the "evidence" overwhelmingly can be explained by independent action:  specifically, compliance with Federal law.  In *Twombly*, as here, the allegedly anti-competitive conduct the defendants were alleged to have engaged in actually reflected specific provisions of Federal law. In *Twombly*, the defendant telephone and internet providers were reacting, in predictably similar ways, to new rules issued by the Federal government.  In this case, Defendants were offering wages at rates set by the Federal government:  that is hardly illegal conduct.

In the instant case, MPAS and the other Defendants were advertising for jobs and offering the AEWR that the U.S. Department of Labor had decreed was the prevailing wage rate required to be offered that year to both domestic and H-2A sheepherders.  The H-2A regulations

also decree that the same wage must be published, and offered to all comers, domestic or foreign. It should come as no surprise that when the government sets very specific rules for a particular market, actors in that market will comply with those rules. Such conduct, without more, does not violate the antitrust laws, any more than do motorists who adhere to a posted speed limit. Individual companies paying the prevailing wage rate required by DOL shows that each company is acting in its own business interest and not against such interest, and engaging in conduct that complies with the law.

B.     MPAS Is At Least Partially Exempt From The Antitrust Laws.

As an agricultural trade association for ranchers, MPAS is exempt from most aspects of the antitrust laws. The Capper–Volstead Act, in relevant part, states:

> Persons engaged in the production of agricultural products as farmers, planters, **ranchmen**, dairymen, nut or fruit growers **may act together in associations**, corporate or otherwise, with or without capital stock, in collectively processing, **preparing for market**, handling, and marketing in interstate and foreign commerce, such products of persons so engaged. Such associations may have marketing agencies in common; and **such associations and their members may make the necessary contracts and agreement to effect such purposes**: *Provided, however,* That such associations are operated for the mutual benefit of the members thereof....

7 U.S.C. § 291 (emphasis added).  See *Bell v. Fur Breeders Agric. Co-op.,* 348 F.3d 1224, 1231 (10th Cir. 2003); see also *Sunkist Growers, Inc. v. Winckler & Smith Citrus Prod. Co.,* 370 U.S. 19, 27–28, 82 S.Ct. 1130, 8 L.Ed.2d 305 (1962); *Maryland & Virginia Milk Producers,* 362 U.S. at 464–66, 80 S.Ct. 847; *United States v. Borden Co.,* 308 U.S. 188, 204–05, 60 S.Ct. 182, 84 L.Ed. 181 (1939).  In *Bell*, the Tenth Circuit affirmed summary judgment in favor of a trade association for mink ranchers, concluding that a cooperative and its board members constituted single entity unable to conspire with itself, rendering Sherman Act's restraint of trade prohibitions inapplicable to the challenged mink-feed pricing and delivery activities.  *Bell,* 348

F.3d 1224.  The same is true here:  MPAS, an association of ranchers, cannot be convicted of "conspiring" with its rancher members.

C.      USDOL AEWR is Independent Action.

As the Supreme Court observed in *Twombly*, an economically rational response to legislation is not a crime, even when it leads independent actors in a marketplace to behave in substantially the same fashion.  "[C]onscious parallelism," a common reaction of "firms in a concentrated market [that] recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions" is "not in itself unlawful."  *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 227, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993); see 6 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 1433a, p. 236 (2d ed.2003) (hereinafter Areeda & Hovenkamp) ("The courts are nearly unanimous in saying that mere interdependent parallelism does not establish the contract, combination, or conspiracy required by Sherman Act § 1"); Turner, The Definition of Agreement Under the Sherman Act:  Conscious Parallelism and Refusals to Deal, 75 Harv. L.Rev. 655, 672 (1962) ("[M]ere interdependence of basic price decisions is not conspiracy"), *Twombly*, 550 U.S. at 553-54, 127 S. Ct. at 1964.

When the U. S. Department of Labor publishes the AEWR for sheepherders, it is making an official pronouncement about the prevailing wage rate a worker performing that job must be paid.  It is only economically rational – and emphatically not evidence of conspiracy – for employers seeking to hire such workers to offer a rate that conforms to the government's decree.  The employers certainly have no incentive to offer a rate higher than the prevailing wage, since they must offer the same wage to all applicants and effectively must hire all applicants who meet minimum qualifications.  In the final analysis, the decision to offer the AEWR is economically rational and consistent with Defendants' self-interest.

D.      Lobbying Government Does Not Violate Antitrust Laws.

Plaintiffs' claim that MPAS and other Defendants violated the antitrust laws by somehow imposing their will on the U.S. Department of Labor to come up with a low wage rate fails because such activity has been recognized as exempt by the Supreme Court, which has rejected any interpretation of the Sherman Act that would allow plaintiffs to look behind the actions of state sovereigns to base their claims on "perceived conspiracies to restrain trade," *Hoover v. Ronwin,* 466 U.S., 558, 580, 104 S.Ct., 1989, 2001 (1984).  "*[A]ny* action that qualifies as state action is "*ipso facto* ... exempt from the operation of the antitrust laws."  *City of Columbia v. Omni Outdoor Adver., Inc.,* 499 U.S. 365, 379, 111 S. Ct. 1344, 1353, 113 L. Ed. 2d 382 (U.S.S.C. 1991) (original emphasis); citing *Hoover*, 466 U.S. at 568, 104 S.Ct., at 1995); see also *E. R. R. Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 81 S. Ct. 523, 5 L. Ed. 2d 464 (1961) (federal antitrust laws do not regulate the conduct of private individuals in seeking even anticompetitive action from the government).

In *Noerr,* a consortium of railroads directed a publicity campaign toward obtaining governmental action adverse to the interests of trucking companies, but the action was held not to violate the Sherman Antitrust Act because the Act's purpose was to prevent illegal cooperative activity by private actors and not efforts to influence governmental action.  See also *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 85 S. Ct. 1585, 14 L. Ed. 2d 626 (1965) (joint efforts by coal mine operators to influence public officials did not violate the antitrust laws even though intended to eliminate competition).

**CONCLUSION**

Accordingly, for the reasons set forth above, Defendants respectfully request that their Motion be granted, this case dismissed in its entirety, and any such other and further relief as the Court may deem fit.

Respectfully submitted this 7th day of October, 2015.


*/s/ J. Larry Stine*
J. Larry Stine
Elizabeth K. Dorminey
Raymond Perez
WIMBERLY, LAWSON, STECKEL,
  SCHNEIDER & STINE, P.C.
Suite 400, Lenox Towers
3400 Peachtree Road, N.E.
Atlanta, Georgia 30326
Phone: (404)365-0900
Fax: (404) 261-3707
Email: jls@wimlaw.com
        bdorminy@bellsouth.net
        rp@wimlaw.com

*Attorneys for Defendant*
*Mountain Plains Agricultural Service*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: 15-cv-01889

RODOLFO LLACUA, ESLIPER HUAMAN,
and those similarly situated

       Plaintiffs,

  v.

WESTERN RANGE ASSOCIATION,
MOUNTAIN PLAINS AGRICULTURAL SERVICE,
MARTIN AUZA SHEEP CORPORATION,
NOTTINGHAM LAND AND LIVESTOCK, LLLP,
TWO BAR SHEEP CORPORATION, LLC,
BALL BROTHERS COMPANY,
ESTILL RANCHES, LLC,
CUNNINGHAM SHEEP COMPANY,
DENNIS RICHINS d/b/a DENNIS RICHINS LIVESTOCK,
and CHILD RANCH, LLC.

       Defendants.

---

## CERTIFICATE OF SERVICE

---

    I HEREBY CERTIFY that I electronically filed the foregoing **DEFENDENT MOUNTAIN PLAINS AGRICULTURAL SERVICE'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Alexander Hood
Nina E. DiSalvo
Andrew Schmidt
TOWARDS JUSTICE
1535 High St., Suite 300
Denver, CO 80218

This 7th day of October, 2015.

/s/ J. Larry Stine

J. Larry Stine
Elizabeth K. Dorminey
Raymond Perez
WIMBERLY, LAWSON, STECKEL,
  SCHNEIDER & STINE, P.C.
Suite 400, Lenox Towers
3400 Peachtree Road, N.E.
Atlanta, Georgia 30326
Phone: (404)365-0900
Fax: (404) 261-3707
Email: jls@wimlaw.com
        bdorminy@bellsouth.net
        rp@wimlaw.com

Attorneys for Defendant
Mountain Plains Agricultural Service