**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Case 15-cv-01889-REB-CBS

RODOLFO LLACUA;
ESLIPER HUAMAN;
LEOVEGILDO VILCHEZ GUERRA;
LIBER VILCHEZ GUERRA;
RAFAEL DE LA CRUZ;
and those similarly situated

       Plaintiffs,

v.

WESTERN RANGE ASSOCIATION;
MOUNTAIN PLAINS AGRICULTURAL SERVICE;
MARTIN AUZA SHEEP CORPORATION;
NOTTINGHAM LAND AND LIVESTOCK, LLLP;
TWO BAR SHEEP CORPORATION, LLC;
BALL BROTHERS SHEEP COMPANY;
ESTILL RANCHES, LLC;
CUNNINGHAM SHEEP COMPANY;
DENNIS RICHINS DBA DENNIS RICHINS LIVESTOCK; and
CHILD RANCH, LLC

       Defendants.

---

### FIRST AMENDED COMPLAINT

---

Comes now, the above-named Plaintiffs, on behalf of themselves and those

similarly situated, with this Complaint alleging as follows:

The Plaintiffs are amending their complaint by right pursuant to FRCP 15(a)(1).

## INTRODUCTORY STATEMENT

1.      The sheep ranching industry in the Western United States is dominated by

ranchers who are members of the Western Range Association ("WRA") and the

Mountain Plains Agricultural Service ("MPAS"). The ranchers, like all employers, have a

legal obligation to compete for shepherd labor in an open market. Instead they use

these membership organizations to fix wages at unconscionably low levels.

2.      Because of this collusion, few domestic workers desire to work as shepherds.

Therefore the sheep ranching industry is now dependent on the importation of foreign

H-2A shepherds that are, in essence, indentured servants.[1] A 2010 survey by Colorado

Legal Services found deplorable conditions for shepherds:

- Almost 73 percent of the shepherds reported having zero days off over the course of a year.
- More than 80 percent were not permitted to leave their ranch.
- Approximately 35 percent were paid less than once a month.
- 85 percent were not allowed to have visitors who were not ranch employees.
- Roughly 70 percent reported never having access to a functioning toilet.
- 85 percent were never permitted to engage in social activities.
- Almost 50 percent reported not having the opportunity or ability to read their employment contracts.[2]

3.      The industry is not shy in viewing shepherds less as employees with legal rights

and more as indentured servants who should be subject to even criminal sanction if

they refuse to work. One sheep rancher and MPAS member recently introduced a state

---

[1] *See generally* Southern Poverty Law Center, Close to Slavery: Guestworker Programs in the United States (2013), *available at* https://www.splcenter.org/sites/default/files/d6_legacy_files/downloads/publication/SPLC-Close-to-Slavery-2013.pdf.
[2] Colorado Legal Services *et al.*, *Overworked and Underpaid: H-2A Herders in Colorado* (2009), *available at* http://users.frii.com/cls/Overworked%20and%20Underpaid.pdf.

bill that would have made it a crime for a shepherd to leave his flock. Meanwhile, the WRA has labeled some shepherds as "runaways" that need to be rounded up and deported. As explained by WRA President Lane Jensen, "[a] significant effort was made jointly between Western Range and Mountain Plains last summer to locate and deport shepherds that had jumped their contract as well as to penalize those that assisted contract breakers in finding employment. While the effort succeeded in locating runaways, there was no assistance from Immigration officials or the Department of Labor to penalize, deport, or even make contact with known jumpers." The use of criminal sanctions to enforce civil work contracts and the industry's employ of the terms "runaways" or "jumpers" to describe non-compliant workers echoes some of the darkest periods of our nation's labor past and is indicative of the problems engrained in the H-2A program in general and the importation of H-2A shepherds specifically.

4.      The deplorable conditions of H-2A shepherds and the lack of U.S. workers participating in the shepherd labor market are not the result of natural market conditions. Instead, both are the result of the WRA's, the MPAS's, and all of their member ranchers' collusion and conspiracy to fix wages and thereby eliminate any competitive market for shepherd labor and strip shepherds, both foreign and domestic, of their ability to bargain for wages in a free market.

5.      The WRA and the MPAS, as illegal and anticompetitive combinations among their members, advertise and prepare the documents that set out shepherd job offers in the domestic market at the <u>same</u> illegal, fixed wage for all jobs, without regard in any variations between the ranchers and potential applicants. Regardless of any variation

between the ranches, they fix the wages for all offers for potential domestic workers at

exactly the minimums established by the U.S. Department of Labor (hereinafter "DOL")

for immigrant shepherds, without allowing shepherds, foreign or domestic, to shop

between ranchers for better wages commensurate with their experience or abilities.

6.      If the initial job offers are not filled by domestic workers—and they rarely, if ever,

are—the ranchers turn back to the WRA and MPAS to recruit immigrant shepherds

under the H-2A program. For these workers, too, the ranches, through and with the aid

of the WRA and MPAS, illegally set all wages at the same rate, which is the wage floor

established by the DOL for immigrant shepherds.

7.      The result of this price fixing conspiracy or conspiracies is absurdly low wages for

all shepherds, the exclusion of most American workers from the shepherd labor market,

and the importation of vulnerable foreign workers working for meager pay, under

atrocious living and working conditions, and without any meaningful opportunity to

bargain for anything better like other employees in the labor market.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 [Federal

Question]. Venue is proper pursuant to 28 U.S.C. § 1391. Defendants are alleged to

have entered into a conspiracy that has suppressed the wages of Plaintiffs residing in

Colorado. Additionally, some of the Defendants' principal places of business are in

Colorado.

## **PARTIES**

9.      Plaintiff Rodolfo Llacua is a former shepherd and WRA employee who resides in Colorado.

10.      Plaintiff Esliper Huaman is a former shepherd and WRA employee.

11.      Plaintiff Leovegildo Vilchez is a former shepherd and WRA employee.

12.      Plaintiff Liber Vilchez Guerra is a former shepherd and WRA employee.

13.      Plaintiff Rafael de la Cruz is a former shepherd and MPAS employee.

14.      Defendant Western Range Association is a California non-profit corporation with its principal place of business at 1245 E. Brickyard Road, Suite # 190, Salt Lake City, UT 84106. The WRA does business in Colorado.

15.      Defendant Mountain Plains Agricultural Service is a Wyoming non-profit corporation with its principal place of business at 811 N Glenn Rd, Casper, WY 82601. The MPAS does business in Colorado.

16.      Defendant Martin Auza Sheep Corporation is an Arizona Corporation with its principal place of business in Yuma, Arizona. Defendant Martin Auza Sheep Corporation also does business in Brawley, California. Defendant Martin Auza Sheep Corporation is or was a member of the WRA and the MPAS.

17.      Defendant Nottingham Land and Livestock, LLLP is a Colorado Limited Liability Limited Partnership, with its principal place of business in Craig, Colorado. Defendant Nottingham Land and Livestock, LLLP is or was a member of the WRA.

18.     Defendant Two Bar Sheep Corporation, LLC, is a Colorado Limited Liability Corporation with its principal place of business in Craig, Colorado. Defendant Two Bar Sheep Corporation, LLC is or was a member of the WRA and the MPAS.

19.     Defendant Ball Brothers Sheep Company is an Idaho Corporation with its principal place of business in Lewisville, Idaho. Defendant Ball Brothers Sheep Company is or was a member of the WRA and the MPAS

20.     Defendant Estill Ranches, LLC is a Nevada Limited Liability Company with its principal place of business in Gerlach, Nevada. Defendant Estill Ranches, LLC is or was a member of the WRA and the MPAS.

21.     Defendant Cunningham Sheep Company is an Oregon Domestic Business Corporation with its principal place of business in Pendleton, Oregon. Defendant Cunningham Sheep Company is or was a member of the WRA and the MPAS.

22.     Defendant Dennis Richins DBA Dennis Richins Livestock is an individual who is domiciled in Utah. Defendant Richins is or was a member of the WRA.

23.     Defendant Child Ranch, LLC, is a Wyoming Limited Liability Corporation with its principal place of business in Cokeville, Wyoming. Defendant Child Ranch, LLC, is or was a member of the WRA and the MPAS.

## STATEMENT OF FACTS

### I.     The American Sheepherding Industry

24.     Sheep ranches in the western United States raise sheep to produce meat and wool, products that are currently valued at roughly $275 million per year.

25.     A critical component of the sheep industry are the shepherds that the ranches employ to tend the herds.

26.     As the WRA and the MPAS describe, the shepherds tend herds of 1,000 sheep or more, "often in rugged high altitude terrain or dry desert conditions, hauling water for the animals, herding them to grazing areas and making sure they have enough to eat, keeping them from going astray, and protecting them from the constant threat of natural predators like coyotes, mountain lions, and wolves, harmful or poisonous plants, and man-made dangers like highways and domesticated dogs. During lambing, calving or kidding season, the shepherds assist the animals in the birthing process, and at all times, the shepherds provide for the health and medical needs of the herd."

27.     These ranches are all independent businesses, competing against each other to sell their products and in the labor market for shepherds

28.     However, the ranches that are members of the WRA and MPAS– which the WRA and MPAS claim to be "nearly all" sheep ranchers in the United States – have conspired to fix one of their principal costs: shepherd wages.

29.     WRA and MPAS members compete in the market to sell the same types of products, principally meat and wool. They, including member defendants, do not share profits or distribute losses, but through the WRA and MPAS they collude to fix shepherd wages.

30.     The fixing and suppression of shepherd wages results in a windfall for MPAS and WRA members and causes shepherds to work for shockingly low wages without any opportunity bargain for more.

II.      **Restraint of Trade in the Domestic Labor Market**

31.      Pursuant to the immigration laws, the sheep ranches of the western United States, first must look to the domestic market for labor.

32.      The ranches do this through advertisements and by placing job orders with state recruitment agencies.

33.      However, instead of each ranch competing for domestic labor by offering different wages depending on market forces, ranch needs, and labor skills, the ranches illegally fix these wages through their membership organizations, the WRA and the MPAS.

34.      The fixed wage is set unconscionably low because the ranchers know that if the positions are not filled domestically, the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, allows them to look to an international market for vulnerable and desperate immigrants who are willing to work for wages that Defendants have illegally fixed at the government-set wage floor.

35.      The ranchers, acting through their membership associations, thus, use this government-set wage floor for foreign workers as the same wage that they offer to the domestic market through advertisements and job orders.

36.      This rate in most states is only $2 to $3 per hour.

37.      The ranches know that if they negotiate in the domestic market to bring in more domestic workers, domestic workers will demand higher wages. These wages will, in turn, be reflected in wage surveys upon which the government will rely in setting a wage floor for foreign laborers in future years.

38.     In the absence of the ranchers' agreement to fix shepherd wages, ranchers would negotiate with available range workers and the average wage would increase to something similar to the minimum wage for domestic ranch hands, general ranch farmworkers, or closed range herders. All of these employees earn substantially more than H-2A shepherds.

39.     The result of the restraint of trade is extremely depressed stagnant wages for both domestic and foreign shepherds. The wages entice relatively few domestic workers and leave the industry free to hire foreign workers, over whom the ranchers can exercise greater control, including by attempting to stop "runaways" whose lack of familiarity with the English language and the U.S. legal system makes less likely to complain about the deplorable working conditions in the industry.

III.     **Restraint of Trade in the Foreign Labor Market**

40.     Ranchers have historically claimed that there is an insufficient supply of domestic shepherds and, therefore, that they must look to the foreign labor market to recruit workers. While there was a true labor shortage during the Second World War which gave rise to the Bracero program (a precursor to today's H-2A visa program), the dearth of domestic shepherds today is <u>not</u> the result of an unwilling or incapable workforce, but rather the ranchers' concerted efforts to suppress wages well below the fair market value of the shepherds' work. The WRA and the MPAS are the instruments of this anticompetitive conduct.

41.    The H-2A Visa Program is an agricultural guest worker visa program that allows for the issuance of work visas to foreign workers to fill positions that employers cannot fill through the domestic labor market.

42.    Pursuant to the INA, 8 U.S.C. § 1188, the United States Department of Labor's ("DOL's") role is to ensure that there is in fact a shortage of American workers willing and able to fill the positions that employers seek to fill with foreign H-2A workers.

43.    Specifically, before permitting the importation of foreign workers under H-2A visas, the INA requires the DOL to certify that:

>    (A) there are not sufficient workers who are able, willing, and qualified, and who will be available at the time and place needed, to perform the labor or services involved in the petition, and
>    (B) the employment of the alien in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed.

44.    To implement its statutory duty under the INA, the DOL has promulgated regulations. *See* 20 C.F.R. §§ 655.100 *et seq.*

45.    Under the regulations, before a foreign worker can be imported under an H-2A visa, an employer must first offer the job to U.S. workers through State Workforce Agencies. *Id.* § 655.121. Because H-2A visas are only issued for positions that cannot be filled by domestic labor, DOL regulations prescribe that employers offer domestic workers "no less than the same benefits, wages, and working conditions that the employer is offering, intends to offer, or will provide to H–2A workers." 20 C.F.R. § 655.122(a).

46.     Additionally, ranchers or membership associations acting on their behalf must

offer, among other things, the "worker at least the AEWR [Adverse Effect Wage Rate],

the prevailing hourly wage rate, the prevailing piece rate, the agreed-upon collective

bargaining rate, or the Federal or State minimum wage rate, in effect at the time work is

performed, whichever is highest, for every hour or portion thereof worked during a pay

period." 20 C.F.R. § 655.122(l). These job offers to domestic workers are called "job

orders."

47.     Only if American workers do not accept a position offered through a job order can

the employer submit an Application for Temporary Employment Certification (an "H-2A

Application") to the DOL for certification.

## IV.     Special Procedures for Shepherds

48.     Exceptions to the DOL H-2A regulations, known as "special procedures", can be

made for particular agricultural industries.

49.     The DOL has implemented special procedures in the sheepherding industry. The

current special procedures were implemented in 2011. *See* 76 Fed. Reg. 47,256

(issued Aug. 4, 2011). New special procedures are due to go into effect at the end of

2015. *See* 80 Fed. Reg. 20,300 (proposed Apr. 15, 2015).

50. Although the special procedures depart and expand upon the requirements

set out in the regulations, they are intended to effectuate the same basic

principles and policies: shepherd jobs paid at or above a DOL-set wage floor

must first be offered to American workers through "job orders" and only after

American workers do not take the offered jobs – and after application to, and

certification by, the DOL – can ranchers import foreign shepherds through H-2A visas.

51.     Although, "[t]he employer's job offer must offer to U.S. workers no less than the same benefits, wages, and working conditions that the employer is offering, intends to offer, or will provide to H-2A workers," 20 C.F.R. § 655.122(a), there is no statute, regulation, or special procedure preventing ranchers from offering higher wages to the domestic workers in the job orders than they do to H-2A workers in the H-2A Applications.

52.     The wage floors set by the DOL for H-2A shepherds are set as follows:

| State(s) | Wage Floor ($/Month) |
|---|---|
| Colorado, Idaho, Montana, New Mexico, North Dakota, Oklahoma, Texas, Utah, and Wyoming | $750 |
| Arizona and Washington | $750 |
| Nevada | $800 |
| California | $1,422.55 |
| Oregon | $1,277 |

## V.      The WRA, the MPAS, and Sheepherding under the H-2A Program

53.     Among other things, the WRA and the MPAS, on behalf of their members, file H-2A Applications with the DOL.

54.     Defendants Martin Auza Sheep Corporation; Two Bar Sheep Corporation, LLC; Ball Brothers Sheep Company; Estill Ranches, LLC; Cunningham Sheep Company; and Child Ranch, LLC are or were members of both the WRA and the MPAS.

55.    Defendants Nottingham Land and Livestock, LLLP and Dennis Richins DBA Dennis Richins are or were members of the WRA.

56.    The DOL releases statistics each year for the shepherd H-2A program.

57.    The last complete year of released data is from October 1, 2013 to October 1, 2014.

58.    In that time period, the WRA submitted H-2A Applications for approximately 1,214 H-2A shepherds for its members.

59.    All of these WRA H-2A Applications offered <u>exactly</u> the DOL H-2A wage floors as a wage term.

60.    Based upon a review of the WRA job orders associated with the WRA H-2A Applications, the job orders to U.S. workers that preceded these H-2A Applications offered the same wages as the H-2A Applications and therefore also almost always offered <u>exactly</u> the DOL H-2A wage floors as a fixed wage to the U.S. workers.

61.    In that 2013-2014 time period, the MPAS submitted H-2A Applications for approximately 788 H-2A shepherds for its members.

62.    All but one of these H-2A Applications offered <u>exactly</u> the DOL H-2A wage floors as a wage term.

63.    Based upon a review of the MPAS job orders associated with the MPAS H-2A Applications, the job orders to U.S. workers that preceded these H-2A Applications offered the same wages as the H-2A Applications and therefore also almost always offered <u>exactly</u> the DOL H-2A wage floors as a fixed wage to the U.S. workers.

64.     As a result, almost every shepherd working in the United States is an H-2A worker who earns <u>exactly</u> the wage floor for H-2A shepherds set by the DOL.

65.     The DOL recently estimated that there were only 18 domestic shepherds left in the United States.

66.     From October 1, 2013, to October 1, 2014, the WRA hired roughly 55% of all shepherds hired in the United States.

67.     From October 1, 2013, to October 1, 2014, the MPAS hired roughly 36% of all shepherds hired in the United States.

**VI.     The Conspiracy or Conspiracies to Fix Shepherd Wages**

68.     Through the WRA and the MPAS, the WRA, the MPAS, and both organizations' members agreed to fix the wages of domestic shepherds and H-2A shepherds at exactly the wage floors set by the DOL.

69.     Through the WRA, the WRA and its members agreed to fix the wages of domestic shepherds and H-2A shepherds at exactly the H-2A wage floors set by the DOL for H-2A shepherds.

70.     The WRA therefore effects an agreement between its members to fix shepherd wages at the minimum DOL authorized wage floor, and sometimes an illegally low amount, through (a) the issuance of job orders for domestic workers that set the offered wage for domestic workers at the minimum wage floor for H-2A shepherds, and (b) the issuance of applications to the DOL that set the wage offered to H-2A workers at exactly the minimum DOL wage floor.

71.     Through the MPAS, the MPAS and its members have agreed to fix the wages of domestic shepherds and H-2A shepherds at exactly the H-2A wage floors set by the DOL for H-2A sheep shepherds.

72.     The MPAS therefore effects an agreement between its members to fix shepherd wages at the minimum DOL wage floor, and sometimes an illegally low amount, through (a) the issuance of job orders for domestic workers that set the offered wage for domestic workers at the minimum wage floor for H-2A shepherds, and (b) the issuance of applications to the DOL that set the wage offered to H-2A workers at exactly the minimum DOL wage floor.

73.     The MPAS and the WRA conspire with their members and each other to use job orders and H-2A Applications to fix the wages for their members' shepherds at exactly the H-2A shepherd wage floors set by the DOL.

74.     As just one illustration of the anticompetitive effects of this collusion, in a competitive market, and absent the price fixing, ranchers would offer a higher wage to U.S. workers than they do H-2A workers to account for the additional cost of bringing an H-2A worker to the country. H-2A workers are more costly to employers because, pursuant to the H-2A regulations, they must be reimbursed by their employers for travel to and from the place of recruitment in their home country.

## VII.     The Effects of the Anti-Competitive Conspiracy on the DOL's Wage Determinations

75.     The DOL sets wage floors to prevent an "adverse effect" on the U.S. workers in the shepherd labor market and sets these floors by conducting wage surveys that review the wages paid to shepherds in the relevant market.

76.     By agreeing to a cap on the amount that Defendant ranchers pay their shepherds at exactly the minimum DOL wage floor, the result of Defendants' conspiracy is an artificial ceiling on wages that would otherwise increase under normal market forces. As a consequence of this wage stagnation, the DOL's wage surveys reflect an artificially low wage for shepherds.

77.     Because the Defendants' wage fixing has artificially depressed wages in the shepherd labor market, it has also artificially depressed the DOL's wage floors, the very same minimum wage that Defendants rely on in fixing wages paid to their workers.

78.     While wages in other similar industries have continued to rise with normal inflation, the wages for shepherds are stuck, in some cases at less than half of the Federal minimum wage for covered workers.

79.     The price fixing's downward pressure on the DOL's wage floors, and therefore on the fixed wage, has led to absurdly low wages for shepherds. When the Industrial Welfare Commission of the State of California examined shepherd wages in 2000, it determined that "the wages paid to shepherds may be inadequate to supply the cost of proper living and that the hours and working conditions of shepherds may be prejudicial to their health and welfare." It then voted to remove the shepherd exemption from California's minimum wage.

80.     The price fixing conspiracy is further evidenced by the WRA's instructions to its members to change their fixed wage when the DOL adjusts its wage floor. These instructions reveal Defendants' conspiracy to comply with the DOL wage floor by all paying exactly that amount and no more. In January 2015, the WRA instructed its

members in Oregon to <u>uniformly</u> begin paying <u>exactly</u> the new DOL wage floor: "[B]eginning January 1, 2015 the wage rate for shepherds working in Oregon is $1,326.46" You "should immediately adjust your wage payments to [that] monthly wage amount."

81.     Although WRA and MPAS members agree to pay <u>exactly</u> the wage floor set by the DOL, this floor falls below the applicable Nevada minimum wage, meaning that Defendants employing shepherds in Nevada conspire to fix wages at an illegally low level.

82.     The members of the WRA and the members of the MPAS each entered into and implemented nearly identical price fixing conspiracies and tacitly colluded to perpetuate both conspiracies. That tacit collusion is itself an unreasonable restraint of trade.

83.     Absent this unreasonable restraint of trade resulting from the price fixing conspiracy or conspiracies, the ranchers currently conspiring to fix the wages of shepherds would compete in the shepherd labor market for shepherds. Similarly, absent the price fixing, shepherds would compete in the shepherd labor market for the best sheepherding jobs, putting normal upward pressure on wages.

**VIII.     Allegations Regarding Illegal Deductions**

**1. The Enterprises**

84.     The WRA and its members have formed an association-in-fact. The MPAS and its members have formed an association-in-fact. These associations-in-fact shall hereinafter be referred to as the "Enterprises."

85.     The purpose of the Enterprises was and is recruiting shepherds for the member-ranches.

86.     The Enterprises, through domestic and foreign recruiting of shepherds to work at U.S. ranches, have an effect on interstate and foreign commerce.

### 2.  Association

87.     The WRA and the MPAS are the lynchpins of their respective Enterprises; while the Enterprises could continue without any particular member ranch, the Enterprises could not exist without the WRA and the MPAS because they require the WRA and the MPAS to effect the wage fixing in the process of recruiting shepherds.

88.     The WRA has existed as a membership organization since at least the 1950s.

89.     The MPAS has existed as a membership organization since at least 1988.

90.     As explained below, the WRA and the MPAS engaged in the racketeering activities of their respective Enterprises.

### 3.  Participation

91.     The WRA and the MPAS participated directly in the affairs of their respective Enterprises. Among other acts of participation, the WRA and the MPAS repeatedly recruited shepherds for their member ranches.

92.     As explained below, the WRA and the MPAS further participated directly in the conduct of the affairs of the Enterprises through patterns of racketeering activity.

**4. Patterns of Racketeering Activity**

93.     The WRA and the MPAS engaged in patterns of racketeering activity by committing multiple, continuing, and related acts of fraud for the benefit of the respective Enterprises over a period of years.

94.     Among other things, the WRA and the MPAS have engaged in schemes and artifices to defraud state governments, the federal government, and shepherds, including by using electronic communications.

95.     The WRA and the MPAS defrauded state governments, the federal government, and the shepherds by assuring all of these entities that shepherds would not be subject to unreasonable deductions pursuant to 20 C.F.R. § 655.122, which requires free and clear wage payments, bars illegal kickbacks, and bars employers from using deductions to "reduce the wage payment made to the employee below the minimum amounts required."

96.     The WRA and the MPAS also defrauded state governments, the federal government, and the shepherds by assuring all of these parties that shepherds would be reimbursed "for reasonable costs incurred by the worker for transportation and daily subsistence from the place from which the worker has come to work for the employer, whether in the U.S. or abroad to the place of employment," as required by 20 C.F.R. § 655.122.

97.     The WRA and the MPAS made these assurances despite simultaneously knowingly and intentionally implementing policies that violated 20 C.F.R. § 655.122.

98.     On behalf of their members and on a continual and reoccurring basis, the WRA and the MPAS submit job orders to several domestic state workforce agencies, which are agencies of their state governments. These job orders promise to reimburse travel expenses for domestic workers consistent with 20 C.F.R. § 655.122.

99.     In recent job orders to state workforce agencies, the WRA has promised "[t]ransportation from point of recruitment to worksite and from the worksite back to the point of recruitment will be provided by Employer. Employer will reimburse worker for subsistence costs during travel to the worksite not later than the end of the first pay period upon the presentation of receipts and from the worksite at the end of the job based on the rates established by the applicable regulations."

100.    In recent job orders to state workforce agencies, the MPAS has promised "[t]he employer will provide advance inbound transportation (most economical common carrier or other transportation which conforms to the Interstate Commerce Commission (ICC)). The employer will also provide subsistence at a minimum amount of $11.86 per 24-hour period of travel from the place of recruitment to the place of employment. Workers who provide receipts for meals and non-alcoholic beverages in excess of $11.86 will be reimbursed during the first pay period, up to the maximum amount of $46.00 per 24-hour period of travel (12:01 A.M.-12:00 midnight) from the place of recruitment to the place of employment. Transportation and subsistence which was advanced to the worker may be deducted from the worker's pay, but will be reimbursed to the worker upon 50% completion of the work contract. Workers who voluntarily quit or are terminated for cause prior to completing 50% of the contract period will be required to

reimburse the employer for the full amounts of transportation and subsistence which were advanced and/or reimbursed to the worker. In the event of termination for contract impossibility, employer will reimburse the worker the full amount of any deductions made from the workers' pay by the employer for transportation and subsistence expenses to the place of employment; and pay the worker for any costs incurred by the worker for transportation and daily subsistence to that employer's place of employment. Upon completion of the work contract, or termination for contract impossibility (including due to Act of God or medical reasons), the employer will provide or pay outbound transportation (under the most economical common carrier or other transportation which conforms to ICC regulations) and subsistence from the work site to the place of recruitment. The amounts the employer will pay outbound subsistence will be the minimum amount of $11.86 per 24-hour period of travel. The maximum amount reimbursed not to exceed $46.00 per 24-hour period of travel (12:01- 12:00 midnight) for workers who provide receipts. This requirement will be nullified if the worker has contracted with a subsequent H-2A employer who has agreed to pay for the worker's transportation and subsistence costs from the present employer's work site. Written notification to the NPC, and DHS in case of H-2A workers, or any other method specified by the Department or DHS in a notice published in the Federal Register, will relieve the employer of the responsibility of providing outbound (return to place of recruitment) transportation and subsistence expenses to workers who voluntarily abandon employment before the end of the contract period, or who are terminated for cause."

21

101.    In reliance on statements like these in the job orders, the state workforce agencies review and approve job orders to be offered to domestic workers.

102.    On behalf of their members and on a continual and reoccurring basis, the WRA and the MPAS submit H-2A Applications to the DOL with attached copies of job orders offering positions that domestic workers did not fill. These job orders contain the promises to reimburse travel expenses described above.

103.    These H-2A Applications also make the following promise: "The employer and its agents have not sought or received payment of any kind from the H-2A worker for any activity related to obtaining labor certification, including payment of the employer's attorneys' fees, application fees, or recruitment costs. For purposes of this paragraph, payment includes, but is not limited to, monetary payments, wage concessions (including deductions from wages, salary, or benefits), kickbacks, bribes, tributes, in kind payments, and free labor."

104.    Each H-2A Application submitted by the WRA is signed under penalty of perjury by an agent of the WRA.

105.    Each H-2A Application submitted by the MPAS includes a certification by an agent of the MPAS that the information in the H-2A Application is true and correct.

106.    In reliance on the H-2A Applications and attached job orders, the DOL reviews and approves H-2A Applications and allows the WRA and the MPAS to recruit foreign workers using H-2A visas.

107.    The H-2A Applications and job orders are submitted to the respective agencies by wire or mail.

108.    The statements by the WRA and the MPAS are fraudulent because the MPAS and WRA each has a policy of unreasonably deducting expenses that are primarily for the benefit or convenience of the employer from the wages of shepherd employees, including medical checkups, criminal background checks and travel and subsistence expenses (which include bus fares, meals, and hotels necessary to travel between the shepherd's place of recruitment and the workplace, and travel necessary to complete the other pre-travel requirements, *e.g.,* the medical checkups).

109.    The WRA's fraudulent intentions are evidenced by the difference between its representations to the state workforce agencies and the DOL, which parrot the regulatory travel reimbursement requirements, and the vague promise made to shepherds in their form "PRE-EMPLOYMENT NOTICE OF RIGHTS AND OBLIGATIONS," which the WRA gives to shepherds before travelling to the United States. That form states only that "[t]ransportation for travel to and from your home country are paid if you complete the contract terms."

### 5.    These Actions Have Injured Shepherds

110.    By conducting their Enterprises through patterns of racketeering, the WRA and the MPAS have injured the shepherds they recruit to work on the ranches that, together with the WRA and the MPAS, comprise the Enterprises.

111.    The WRA and the MPAS have also directly or indirectly deducted amounts from shepherds' wages that are for the benefit or convenience of the WRA.

IX.     **Allegations Regarding the Failure to Pay Nevada Minimum Wage**

112.    At all relevant times, the MPAS has employed shepherds in Nevada and paid those shepherds at or about $750 per month.

113.    At all relevant times, the MPAS controlled its shepherd employees' employment by, among other things, setting the terms and conditions of employment, including the wage rate, recruiting the employees, and maintaining employment records.

114.    At all relevant times, the Nevada minimum wage was set by the Nevada Constitution at either $7.25 per hour or $8.25 per hour, depending on whether the employer provides health benefits.

115.    Shepherds are entitled to the Nevada constitutional minimum wage.

116.    During a normal workweek, shepherds work more than 40 hours per week.

117.    $750 in wages per month compensates an employee in Nevada for less than 24 hours per week of work.

118.    The $750 per month wage rate is therefore unconstitutional and illegal under Nevada law.

## RULE 23 CLASS ALLEGATIONS

X.      **The Price Fixing Class**

119.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

120.    Plaintiffs assert Count I as a Class Action pursuant to Fed. R. Civ. Proc. 23 as what is termed here the "Price Fixed Class."

121.    Pending any modifications necessitated by discovery, the named Plaintiffs define the "Price Fixed Class" as follows:

> ALL PERSONS WHO WORKED OR APPLIED TO WORK
> AS A SHEPHERD FOR THE WRA, MPAS, OR ANY OF
> THE MEMBER RANCHERS OF THE WRA OR THE MPAS
> FROM 9/1/11 TO THE PRESENT

122.    The members of the putative class are so numerous that joinder of all potential class members is impracticable. The Plaintiffs do not know the exact size of the class because that information is within the control of the Defendants. However, WRA and the MPAS claim to recruit "nearly all" of the roughly 2000 to 2500 shepherds employed in the United States each year.

123.    There are questions of law or fact common to the classes that predominate over any individual issues that might exist. Common questions include, but are not limited to whether the WRA and the MPAS and their respective members fix shepherd wages through the operation of joint ventures that recruit workers and set wages.

124.    The class claims asserted by Plaintiffs are typical of the claims of all of the potential Class Members because all potential Class Members experienced the same or suffered suppressed wages as a consequence of Defendants' price fixing. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because numerous identical lawsuits alleging similar or identical causes of action would not serve the interests of judicial economy.

125.    Plaintiffs will fairly and adequately protect and represent the interests of the class.  Plaintiffs' wages were artificially kept at the same low level as other shepherds as a result of the same conspiracy.

126.    Plaintiffs are represented by counsel experienced in litigation on behalf of low-wage workers and in class actions.

127.    The prosecution of separate actions by the individual potential Class Members would create a risk of inconsistent or varying adjudications with respect to individual potential Class Members that would establish incompatible standards of conduct for Defendants.

128.    Plaintiffs are unaware of any members of the putative class who are interested in presenting their claims in a separate action.

129.    Plaintiffs are unaware of any pending litigation commenced by members of the Class concerning the instant controversies.

130.    It is desirable to concentrate this litigation in this forum because many of the Defendants and Plaintiffs are located in, or do business in, Colorado and H-2A shepherds operate exclusively in the Western United States.

131.    This class action will not be difficult to manage due to the uniformity of claims among the Class Members and the susceptibility of the claims to class litigation and the use of representative testimony and representative documentary evidence.

132.    The contours of the class will be easily defined by reference to Defendants' records and government records.

## XI.      The WRA Illegal Deduction Class

133.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

134.    Plaintiffs Huaman, Leovegildo Vilchez Guerra, and Liber Vilchez Guerra assert

Counts II and V as a Class Action pursuant to Fed. R. Civ. Proc. 23 as what is termed

here the "Illegal Deduction Class."

135.    Pending any modifications necessitated by discovery, the "WRA Illegal Deduction

Class" is defined as follows:

> ALL PERSONS WHO WERE RECRUITED AS
> SHEPHERDS, A.K.A. SHEEPHERDERS, BY THE WRA
> BETWEEN 9/1/2011 AND THE PRESENT WHO HAD
> EXPENSES THAT ARE PRIMARILY FOR THE BENEFIT
> AND CONVENIENCE OF THE EMPLOYER DEDUCTED
> FROM THEIR WAGES

136.    The members of the putative class are so numerous that joinder of all potential

class members is impracticable. The Plaintiffs do not know the exact size of the class

since that information is within the control of the Defendant. However, according to the

DOL's 2014 statistics, the WRA recruited approximately 1200 shepherds in the previous

year.

137.    There are questions of law or fact common to the classes that predominate over

any individual issues that might exist, including whether or not the WRA took illegal

deductions from shepherd wages.

138.    The class claims asserted by the Plaintiff are typical of the claims of all of the

potential Class Members because all potential Class Members experienced the same

illegal deductions due to the WRA's policies. A class action is superior to other available

methods for the fair and efficient adjudication of this controversy because numerous

identical lawsuits alleging similar or identical causes of action would not serve the

interests of judicial economy.

139.    Plaintiff will fairly and adequately protect and represent the interests of the class.  Plaintiff suffered from the same illegal deductions as the Class Members.

140.    Plaintiff is represented by counsel experienced in litigation on behalf of low-wage workers and in class actions.

141.    The prosecution of separate actions by the individual potential Class Members would create a risk of inconsistent or varying adjudications with respect to individual potential Class Members that would establish incompatible standards of conduct for Defendants.

142.    Plaintiff is unaware of any members of the putative class who are interested in presenting their claims in a separate action.

143.    Plaintiff is unaware of any pending litigation commenced by members of the Class concerning the instant controversies.

144.    It is desirable to concentrate this litigation in this forum because many of the Defendants and Plaintiffs are located in, or do business in, Colorado and shepherds operate exclusively in the western United States.

145.    This class action will not be difficult to manage due to the uniformity of claims among the Class Members and the susceptibility of the claims to class litigation and the use of representative testimony and representative documentary evidence.

146.    The contours of the class will be easily defined by reference to Defendant's records and government records.

**XII.      The MPAS Illegal Deduction Class**

147.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

148.    Plaintiff De La Cruz asserts Count III and VI as a Class Action pursuant to Fed. R. Civ. Proc. 23 as what is termed here the "MPAS Illegal Deduction Class."

149.    Pending any modifications necessitated by discovery, the "Illegal Deduction Class" is defined as follows:

> ALL PERSONS WHO WERE RECRUITED AS
> SHEPHERDS, A.K.A. SHEEPHERDERS, BY THE WRA
> BETWEEN 9/1/2011 AND THE PRESENT WHO HAD
> EXPENSES THAT ARE PRIMARILY FOR THE BENEFIT
> AND CONVENIENCE OF THE EMPLOYER DEDUCTED
> FROM THEIR WAGES

150.    The members of the putative class are so numerous that joinder of all potential class members is impracticable. Plaintiff De La Cruz does not know the exact size of the class since that information is within the control of the Defendant. However, according to the DOL's 2014 statistics, the MPAS recruited approximately 780 shepherds in the previous year.

151.    There are questions of law or fact common to the classes that predominate over any individual issues that might exist, including whether or not the MPAS took illegal deductions from shepherd wages.

152.    The class claims asserted by the Plaintiff are typical of the claims of all of the potential Class Members because all potential Class Members experienced the same illegal deductions due to the MPAS' policies. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because numerous

identical lawsuits alleging similar or identical causes of action would not serve the interests of judicial economy.

153.   Plaintiff will fairly and adequately protect and represent the interests of the class.  Plaintiff suffered from the same illegal deductions as the Class Members.

154.   Plaintiff is represented by counsel experienced in litigation on behalf of low-wage workers and in class actions.

155.   The prosecution of separate actions by the individual potential Class Members would create a risk of inconsistent or varying adjudications with respect to individual potential Class Members that would establish incompatible standards of conduct for Defendants.

156.   Plaintiff is unaware of any members of the putative class who are interested in presenting their claims in a separate action.

157.   Plaintiff is unaware of any pending litigation commenced by members of the Class concerning the instant controversies.

158.   It is desirable to concentrate this litigation in this forum because many of the Defendants and Plaintiffs are located in, or do business in, Colorado and shepherds operate exclusively in the western United States.

159.   This class action will not be difficult to manage due to the uniformity of claims among the Class Members and the susceptibility of the claims to class litigation and the use of representative testimony and representative documentary evidence. The contours of the class will be easily defined by reference to Defendant's records and government records.

**XIII.      The Nevada Minimum Wage Class**

160.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

161.    Plaintiff De La Cruz asserts Count IV as a Class Action pursuant to Fed. R. Civ. Proc. 23 as what is termed here the "NV Minimum Wage Class."

162.    Pending any modifications necessitated by discovery, the "NV Minimum Wage Class" is defined as follows:

> ALL PERSONS WHO WERE EMPLOYED AS
> SHEPHERDS, A.K.A. SHEEPHERDERS BY THE MPAS IN
> NEVADA BETWEEN 9/1/2013 AND THE PRESENT

163.    The members of the putative class are so numerous that joinder of all potential class members is impracticable. Plaintiff De La Cruz does not know the exact size of the class since that information is within the control of the Defendant. However, according to the DOL's 2014 statistics, the MPAS employed 43 shepherds in Nevada in the previous year.

164.    There are questions of law or fact common to the classes that predominate over any individual issues that might exist, whether the MPAS fail to pay Nevada shepherds at least Nevada minimum wage.

165.    The class claims asserted by the Plaintiff are typical of the claims of all of the potential Class Members because all potential Class Members allege they were paid less than the Nevada minimum wage by the MPAS. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because

numerous identical lawsuits alleging similar or identical causes of action would not serve the interests of judicial economy.

166.    Plaintiff will fairly and adequately protect and represent the interests of the class.  Plaintiff suffered from the same illegally low wage as the class.

167.    Plaintiff is represented by counsel experienced in litigation on behalf of low-wage workers and in class actions.

168.    The prosecution of separate actions by the individual potential Class Members would create a risk of inconsistent or varying adjudications with respect to individual potential Class Members that would establish incompatible standards of conduct for Defendants.

169.    Plaintiff is unaware of any members of the putative class who are interested in presenting their claims in a separate action.

170.    Plaintiff is unaware of any pending litigation commenced by members of the Class concerning the instant controversies.

171.    It is desirable to concentrate this litigation in this forum because many of the Defendants and Plaintiffs are located in, or do business in, Colorado and shepherds operate exclusively in the western United States.

172.    This class action will not be difficult to manage due to the uniformity of claims among the Class Members and the susceptibility of the claims to class litigation and the use of representative testimony and representative documentary evidence.

The contours of the class will be easily defined by reference to Defendant's records and government records.

## COUNT I: RESTRAINT OF TRADE IN VIOLATION OF 15 U.S.C. §§ 1 *ET SEQ.*

### Plaintiffs and the Price Fixing Class against all Defendants

173.   Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

174.   As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all other similarly situated employees pursuant to Fed. R. Civ P. 23.

175.   The conduct of the Defendants, as described herein, substantially affected interstate and international commerce and caused antitrust injury.

176.   Defendant ranchers are competitors in the industry and should be competing with each other to attract the most capable shepherds.

177.   They do not share profits or risk of loss.

178.   But, through collusive conduct, they do pay all of their shepherds the same price-fixed wages, dramatically reducing costs and increasing the profits of all ranchers.

179.   The WRA, the MPAS, and their members, including Defendant Ranchers, conspired and agreed to fix the wages offered and paid to shepherds at the minimum DOL wage floor. This fixed rate is artificially low, and the fixing of wages through the operation of Defendant membership associations, the WRA and the MPAS, amounts to a *per se* violation of the Sherman Antitrust Act.

180.   The tacit collusion between the WRA and the MPAS necessary to carry out identical illegal price fixing conspiracies within each organization is a *per se* violation of the Sherman Antitrust Act.

181.     The WRA and its members conspired and agreed to fix wages offered and paid to shepherds at the DOL wage floors through the WRA's filing of (a) job offers for domestic workers, and (b) applications for certifications of H-2A workers that both offered exactly the same wage set at exactly the wage floors set by the DOL. The fixing of wages amounts to a *per se* violation of the Sherman Antitrust Act, and the fixed rate set by Defendants has remained artificially low because it has continually put downward pressure on the DOL's wage surveys and, thus, the ba2sis for Defendants' price-fixed wages.

182.     The MPAS and its members conspired and agreed to fix wages offered and paid to shepherds at the wage floors set by the DOL through the MPAS's filing of (a) job offers for domestic workers, and (b) applications for certifications of H-2A workers that both offered exactly the same wage set at exactly the DOL wage floors. The fixing of wages amounts to a *per se* violation of the Sherman Antitrust Act, and the fixed rate set by Defendants has remained artificially low because it has continually put downward pressure on the DOL's wage surveys and, thus, the same minimum wage requirements upon which Defendants rely to fix wages.

183.     In the alternative, Plaintiffs allege that the Defendants' price-fixing agreement is anticompetitive and illegal under the Rule of Reason. For purposes of the Rule of Reason, the relevant geographic market for the claim alleged in this Count is the United States, and the relevant service market consists of the services provided by shepherds employed in the United States.

184.    The WRA's and MPAS's relevant conduct – price fixing in their role as a recruiter for their members – unreasonably restrains trade in the shepherd labor market. The price fixing is not essential to the H-2A program and has no procompetitive virtues. Defendants' collusive activity had and has the effect of –

> (a) fixing the compensation of shepherd Plaintiffs and the Price Fixed Class at an artificially low level;
>
> (b) eliminating, to a substantial degree, competition for shepherd labor, particularly among potential domestic shepherds;
>
> (c) driving Plaintiffs and other workers from the shepherd labor market;
>
> (d) restraining trade in that shepherds are not able to negotiate their wage rates above the DOL wage floors; and
>
> (e) restraining trade by artificially lowering the H-2A shepherd wage floors resulting from the DOL's surveys.

185.    Defendants' unreasonable restraint or restraints of trade have damaged the Plaintiffs and the members of the Price Fixed Class.

186.    As a result, Plaintiffs and those similarly situated suffered injuries and are entitled to treble damages, fees, and costs as set forth by law.

187.    Plaintiffs and those similarly situated are also entitled to injunctive relief to end the price fixing scheme, and to force the Defendants to take affirmative steps to correct the market.

## COUNT II: CIVIL RICO, 18 U.S.C. 1964(C)

**Plaintiffs Huaman, Leovegildo Vilchez Guerra, Liber Vilchez Guerra, and the WRA Illegal Deduction Class against Defendant WRA**

188.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

189.    As set forth above, Plaintiff Huaman asserts this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

190.    As described above, the WRA, made fraudulent statements to state workforce agencies, the DOL, the Plaintiff, and the WRA Illegal Deduction Class regarding illegal deductions. These acts violated 18 U.S.C. § 1343 (wire fraud) and/or 18 U.S.C. § 1341 (mail fraud), and the repeated violations constituted a pattern of racketeering

191.    The fraud was knowing or intentional.

192.    By conducting its Enterprise through patterns of racketeering, the WRA injured Plaintiffs and the WRA Illegal Deduction Class.

193.    Among other things, each of these RICO violations have caused the Plaintiffs and the WRA Illegal Deduction Class employed by the WRA and WRA member ranchers to have amounts illegally deducted from their wages.

194.    As a result, Plaintiffs and those similarly situated suffered injuries and are entitled to treble damages, fees, and costs as set forth by law.

## COUNT III: CIVIL RICO, 18 U.S.C. 1964(C), AGAINST THE MPAS

**Plaintiff De La Cruz and the MPAS Illegal Deduction Class against Defendant MPAS**

195.   Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

196.   As set forth above, Plaintiff De La Cruz asserts this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

197.   As described above, the MPAS, made fraudulent statements to state workforce agencies, the DOL, the Plaintiff, and the MPAS Illegal Deduction Class regarding illegal deductions. These acts violated 18 U.S.C. § 1343 (wire fraud) and/or 18 U.S.C. § 1341 (mail fraud), and the repeated violations constituted a pattern of racketeering.

198.   The fraud was knowing or intentional.

199.   By conducting its Enterprise through patterns of racketeering, the MPAS injured Plaintiff and the MPAS Illegal Deduction Class.

200.   Among other things, each of these RICO violations have caused the Plaintiff and the MPAS Illegal Deduction Class employed by the MPAS and MPAS member ranchers to have amounts illegally deducted from their wages.

201.   As a result, Plaintiffs and those similarly situated suffered injuries and are entitled to treble damages, fees, and costs as set forth by law.

## COUNT IV: FAILURE TO PAY AT LEAST NEVADA MINIMUM WAGE

**Plaintiff De La Cruz and the NV Minimum Wage Class against Defendant MPAS**

202.   Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

203.    As set forth above, Plaintiff De La Cruz asserts this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

204.    MPAS employed Plaintiff De La Cruz and the NV Minimum Wage Class in Nevada and paid the Plaintiffs less than the Nevada minimum wage, usually only $750 per month.

205.    As a result, the Plaintiffs are entitled to the difference between the wages paid and the Nevada minimum wage pursuant to Nev. Const. art. 15, § 16; Nev. Rev. Stat. § 608.260; and *Thomas v. Nevada Yellow Cab Corp.*, 327 P. 3d 518 (Nev. 2014).

206.    Plaintiff De La Cruz sent a written demand demanding wages at least five days prior to bringing this claim. The Plaintiff and the NV Minimum Wage Class are therefore additionally entitled to attorney's fees.

## COUNT V: BREACH OF CONTRACT OR QUASI CONTRACT AGAINST THE WRA

**Plaintiff Huaman, Leovegildo Vilchez Guerra, Liber Vilchez Guerra, and the WRA Illegal Deduction Class against Defendant WRA**

207.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

208.    As set forth above, Plaintiffs Huaman, Leovegildo Vilchez Guerra, and Liber Vilchez Guerra assert this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

209.    The Plaintiffs and the WRA Illegal Deduction Class entered into contracts with the WRA that explicitly or impliedly incorporated the requirements of 20 C.F.R. § 655.122.

210.    As set forth above, the WRA breached these contracts by deducting expenses that were primarily for the benefit and convenience of the employer, including travel expenses from the point of recruitment to the worksite, from shepherd wages.

211.    As a result of the breach, the Plaintiffs and the WRA Illegal Deduction class suffered damages.

212.    In the alternative to a contract claim, the Plaintiffs are entitled to relief in promissory estoppel. The WRA promised the Plaintiffs and the WRA Illegal Deduction Class that it would adhere to 20 C.F.R. § 655.122. The Plaintiffs and the WRA Illegal Deduction Class relied on this promise to their detriment by traveling to WRA member ranches to work as shepherds, where the WRA illegally deducted wages that were primarily for the benefit and convenience of the WRA. The Plaintiffs and WRA Illegal Deduction Class are entitled to damages, including the illegally deducted wages.

213.    Similarly, in the alternative to a contract claim, the Plaintiff and the WRA Illegal Deduction Class are also entitled to relief in unjust enrichment and quantum meruit. A benefit was conferred on the WRA when the Plaintiff and the WRA Illegal Deduction Class traveled to WRA member ranches to work and the WRA illegally deducted amounts from their wages in violation of 20 C.F.R. § 655.122; that benefit was appreciated by the WRA as it retained the illegal deductions; and it is unjust for the WRA to be permitted to retain the illegally deducted wages. The Plaintiff and the WRA Illegal Deduction Class reasonably expected to be paid wages free and clear pursuant to 20 C.F.R. § 655.122 and were not. As a result, the Plaintiff and the WRA illegal deduction class are entitled to the reasonable value of the services provided without

amounts illegally deducted and the WRA should be disgorged of the illegally deducted wages.

**COUNT VI: BREACH OF CONTRACT OR QUASI CONTRACT AGAINST THE MPAS**

**Plaintiff De La Cruz and the MPAS Illegal Deduction Class against Defendant MPAS**

214.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

215.    As set forth above, Plaintiff De La Cruz asserts this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

216.    The Plaintiff and the MPAS Illegal Deduction Class entered into contracts with the MPAS that explicitly or impliedly incorporated the requirements of 20 C.F.R. § 655.122.

217.    As set forth above, the MPAS breached these contracts by deducting expenses that were primarily for the benefit and convenience of the employer, including travel expenses from the point of recruitment to the worksite, from shepherd wages.

218.    As a result of the breach, the Plaintiff and the MPAS Illegal Deduction class suffered damages.

219.    In the alternative to a contract claim, the Plaintiff is entitled to relief in promissory estoppel. The MPAS promised the Plaintiff and the MPAS Illegal Deduction Class that it would adhere to 20 C.F.R. § 655.122. The Plaintiff and the MPAS Illegal Deduction Class relied on this promise to their detriment by traveling to MPAS member ranches to work as shepherds, where the MPAS illegally deducted wages that were primarily for

the benefit and convenience of the MPAS. The Plaintiff and MPAS Illegal Deduction

Class are entitled to damages, including the illegally deducted wages.

220.    Similarly, in the alternative to a contract claim, the Plaintiff and the MPAS Illegal

Deduction Wage Class are also entitled to relief in unjust enrichment and quantum

meruit. A benefit was conferred on the MPAS when the Plaintiff and the MPAS Illegal

Deduction Class traveled to MPAS member ranches to work and the MPAS illegally

deducted amounts from their wages in violation of 20 C.F.R. § 655.122; that benefit was

appreciated by the MPAS as it retained the illegal deductions; and it is unjust for the

MPAS to be permitted to retain the illegally deducted wages. The Plaintiff and the

MPAS Illegal Deduction Class reasonably expected to be paid wages free and clear

pursuant to 20 C.F.R. § 655.122 and were not. As a result, the Plaintiff and the MPAS

Illegal Deduction Class are entitled to the reasonable value of the services provided

without amounts illegally deducted and the MPAS should be disgorged of the illegally

deducted wages.

**PLAINTIFFS DEMAND A JURY TRIAL**

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiffs respectfully request that judgment be entered in their

favor and in favor of those similarly situated as follows:

   a.   Certifying and maintaining this action as a class action, with Plaintiffs as

        designated class representatives and with their counsel appointed as

        class counsel;

   b.   Declaring Defendants in violation of each of the counts set forth above;

41

c.   Awarding treble damages for antitrust injuries to Plaintiffs and those similarly situated;

d.   Awarding treble damages for RICO injuries to Plaintiffs and those similarly situated;

e.   Awarding damages for failing to pay NV minimum wage;

f.   Awarding contract damages;

g.   Awarding pre-judgment, post-judgment, and statutory interest;

h.   Awarding attorneys' fees;

i.   Awarding costs;

j.   Ordering equitable relief, including a judicial determination of the rights and responsibilities of the parties;

k.    Awarding such other and further relief as the Court may deem just and proper.

Respectfully Submitted,

s/Alexander Hood
Alexander Hood
Towards Justice
Attorney and Director of Litigation
1535 High St., Suite 300
Denver, CO 80218
Tel.: 720-239-2606
Fax: 303-957-2289
Email: alex@towardsjustice.org

s/Andrew Schmidt
Andrew Schmidt
Towards Justice
Of Counsel
1535 High St., Suite 300
Denver, CO 80218

Tel.: 720-239-2606
Fax: 303-957-2289
Email: andy@towardsjustice.org

s/David Seligman
David Seligman
Attorney
Towards Justice
1535 High St., Suite 300
Denver, CO 80218
Tel.: 720-248-8426
Fax: 303-957-2289
Email: david@towardsjustice.org

s/Dermot Lynch
Dermot Lynch
Attorney and Skadden Fellow
Towards Justice
1535 High St., Suite 300
Denver, CO 80218
Tel.: 720-239-2606
Fax: 303-957-2289
Email: dermot@towardsjustice.org

Attorneys for the Plaintiffs

**Certificate of Service**

I hereby certify that on October 28, 2015 I served a true and correct copy of the forgoing on the individuals below pursuant to F.R.C.P. 5.

*Attorneys for Defendants*

Justin David Cumming
L. Anthony George
Kenneth F. Rossman, IV
James Larry Stine
Elizabeth K. Dorminey
Raymond Perez, II
Billie Jean Siddoway
Ellen Jean Winograd

s/Alexander Hood
Alexander Hood