# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.: 15-cv-01889

RODOLFO LLACUA, ESLIPER HUAMAN,
and those similarly situated

        Plaintiffs,

   v.

WESTERN RANGE ASSOCIATION,
MOUNTAIN PLAINS AGRICULTURAL SERVICE,
MARTIN AUZA SHEEP CORPORATION,
NOTTINGHAM LAND AND LIVESTOCK, LLLP,
TWO BAR SHEEP CORPORATION, LLC,
BALL BROTHERS COMPANY,
ESTILL RANCHES, LLC,
CUNNINGHAM SHEEP COMPANY,
DENNIS RICHINS d/b/a DENNIS RICHINS LIVESTOCK; and
CHILD RANCH, LLC.

        Defendants.

---

## DEFENDANT CUNNINGHAM SHEEP COMPANY'S
## MOTION TO DISMISS UNDER RULES 12(B)(2) AND 12(B)(6)

---

Cunningham Sheep Company ("CSC") respectfully moves to dismiss the Complaint pursuant to Rule 12(b)(6). Plaintiffs have not alleged enough non-conclusory facts to state a plausible Sherman Act § 1 claim against CSC under *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). Moreover, even if plaintiff's had alleged a proper § 1 price fixing conspiracy, both the *Noerr-Pennington* and *Parker* immunity doctrines would shield CSC from any liability for petitioning the federal government and then acting in accordance with Department of Labor and Oregon state wage rates.

# I. FACTS[1]

## A.  Well-Pleaded Facts[2]

The Western Range Association ("WRA") is a California entity with its principal place of business in Utah.  (¶ 12)[3]  The Mountain Plains Agricultural Service ("MPAS") is a Wyoming entity with its principal place of business in Wyoming.  (¶ 13)  Plaintiffs are former WRA employees.  (¶¶ 10-11.)  The dates of their WRA employment are not alleged.  They do not allege what, when, or how they were paid by WRA.  They also do not allege when the claimed price fixing conspiracy involving WRA and MPAS members began or how long it lasted.

CSC is an Oregon entity with its principal place of business in Oregon.  (¶ 19)  Plaintiffs allege that CSC is a member of both WRA and MPAS.[4]  (¶ 51)  Plaintiffs do not allege that they have ever been employed by CSC or that CSC has taken any specific actions within the State of Colorado — or anywhere else for that matter — in furtherance of the alleged price fixing conspiracy.

The Department of Labor's (DOL's) H-2A Visa Program is an agricultural guest worker program that allows for the issuance of work visas to foreign workers to fill positions that U.S. employers cannot fill through the domestic labor market.  (¶ 38)  Before DOL issues visas for foreign workers under the H-2A program, it must determine that there is a shortage of domestic

---

[1] This section is divided into three parts: (i) well-pleaded facts that are assumed true for purposes of a Rule 12(b) motion; (ii) conclusory facts that are not entitled to any weight; and (iii) facts set forth in the October 16, 2015 Final Herder Rule issued by the United States Department of Labor, of which the Court may take judicial notice.
[2] On a Rule 12(b)(6) motion, well-pleaded facts are accepted as true.  *Ruiz v. McDonnell,* 299 F.3d 1173, 1181 (10th Cir. 2002).
[3] All ("¶ __") citations are to the paragraphs of the Complaint.
[4] CSC is a member of WRA, but not of MPAS.

workers and that employment of foreign workers will not adversely affect the wages of domestic workers.[5]  (¶ 40)

If DOL makes those necessary determinations and H-2A work visas are allowed, DOL sets a minimum Adverse Effects Wage Rate (AEWR) that an H-2A employer must pay its foreign workers so that their employment does not erode wages for domestic employees.  (¶ 72) DOL establishes the AEWRs by conducting wage surveys.  (¶ 72)

AEWR rates vary by state.  (¶ 49)  The AEWR for Oregon is $1,277 while the rate for Colorado, Idaho, Montana, New Mexico, North Dakota, Texas, Utah, Wyoming, Arizona and Washington is $750.[6]  (¶ 49)

WRA provides information to its members regarding the wage rates  that must be observed in order to comply with the DOL regulations that apply to each member's geographic region.  (¶ 77)  In January 2015, WRA instructed its Oregon members that they needed to pay $1,326 to comply with federal law.

WRA and MPAS file H-2A applications on behalf of their members.  (¶ 50)  When doing so, they use the AEWR existing at the time in all or nearly all applications.  (¶¶ 50, 56)  Between October 2013 and October 2014, WRA and MPAS hired roughly 90% of the H-2A shepherds in the United States.  (¶¶63-64)  DOL estimates that there are only 18 domestic shepherds in the United States.  (¶ 62)

---

[5] 8 U.S.C. § 1188(a)(1).
[6] These DOL minimum rates are changing under the 2015 Final Rule discussed *supra*.

## B.  Conclusory Allegations[7]

The allegations above — although not all true — are at least well-pleaded.  But most averments in the Complaint are not.  For instance, throughout the complaint, Plaintiffs sprinkle bald references to a price-fixing conspiracy with no other detail about when or how the conspiracy was formed, how long it lasted, or how it operated.  (¶¶ 1, 4, 5, 7-8, 26, 30-32, 65-70, 79-80) There are also conclusory allegations about the imagined motivations of alleged (but non-specific) conspirators and how wages would be higher but for the alleged conspiracy.  (¶ 31-35, 71, 73-75, 80)  Finally, despite the repeated and fantastic allegations about the conspiracy, there is absolutely no mention of how, when, where, through whom, and in what specific manner CSC participated in it.

## C.  The Federal Herder Rule[8]

On October 16, 2015, DOL issued the Temporary Agricultural Employment of H–2A Foreign Workers in the Herding or Production of Livestock on the Range in the United States: Final Rule ("**Final Herder Rule**").[9]  The Final Herder Rule becomes effective on November 16, 2015 and was issued after DOL considered over 500 comments from interested persons, including WRA, MPAS, and a number of employee advocacy groups.  In the Final Herder Rule, DOL noted that two joint comments from a number of worker advocacy groups had been received during the comment period and both supported the new rule.  80 FR 62960-61.

---

[7] Conclusory factual statements and legal conclusions are not entitled to a presumption of truth.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[8] Although these facts are not contained in averments within the Complaint, they may still properly be considered on a motion to dismiss under Rule 12(b)(6).  *Dist. Hosp. Partners, L.P. v. Sebelius,* 794 F. Supp. 2d 162, 170 (D.D.C. 2011) (proper to consider Federal Register in ruling on Rule 12(b)(6) motion to dismiss).

[9] 80 FR 62958 (October 16, 2015).

Moreover, the Final Herder Rule acknowledged that the wage rate paid to shepherds in Oregon has been governed for decades by a settlement and more recently a state minimum wage law.

> Oregon's sheep and goat herder wage rate for the H–2A program was, until recently, set by a legal settlement in *Zapata* v. *Western Range Association*. 80 FR 62986 n. 18.

> Oregon's current interpretation of its minimum wage law, which is applicable to these occupations, requires a payment higher than that required by the *Zapata* settlement. 80 FR 62986 n. 18.

> Under Oregon's minimum wage law, the required rate is $1,603.33 per month for range workers (calculated based on the State minimum wage multiplied by 2,080 hours and divided by 12 months) and is adjusted annually based on increases to the State minimum wage. 80 FR 62986.

> Oregon's state required wage is higher than the rate required under the AEWR. 80 FR 63026.

## II.  ARGUMENT

CSC respectfully moves to dismiss Plaintiffs' complaint for two independent reasons. First, the Complaint fails to allege facts that support a plausible price-fixing claim in which CSC participated.  Second, even if the Complaint alleged sufficient facts, CSC would be immune under the *Noerr-Pennington* and *Parker* doctrines because its actions were in accordance with policy decisions by the government.

### A.      Plaintiffs Fail to Allege a Plausible § 1 Claim Against CSC

Plaintiffs' claim against CSC must be dismissed because the complaint fails to allege a plausible Sherman Act § 1 claim under *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ("*Twombly*"), a case that like this one involved an alleged price-fixing conspiracy.

### 1.      The *Twombly* Plausibility Standard

The gravamen of the *Twombly* complaint was that in the wake of the Telecommunications

Act of 1996 — intended to increase competition within local telephone service markets — the

defendant telephone carriers were behaving in similar (legal) ways by erecting barriers to entry

into their territories and not aggressively trying to enter other carriers' territories, which had been

opened by the 1996 Act.   The District Court dismissed the complaint because the alleged conduct

was consistent with the defendants' independent economic interests.   After the Second Circuit

reversed, the Supreme Court granted certiorari to "address the proper standard for pleading an

antitrust conspiracy through allegations of parallel conduct."   *Twombly*, 550 U.S. at 553.   It

ultimately held that a § 1 complaint must contain enough well-pleaded facts to suggest that an

agreement was made.   Allegations of parallel conduct that is also consistent with independent

economic interests combined with bald allegations of conspiracy are not enough to satisfy this

plausibility standard.   *Id.* at 566-67.   As discussed below, Plaintiffs' antitrust claim in this case

suffers from the same deficiency as the *Twombly* complaint.

### 2.      Conclusory allegations Must be Disregarded

The first step in evaluating the sufficiency of a complaint's antitrust averments under

*Twombly* is to separate the wheat from the chaff.   The wheat consists of well-pleaded factual

allegations, while the chaff comprises the bare legal conclusions, recitals of claims elements, and

conclusory statements such as "defendants conspired to fix prices."[10]   Here the Complaint

---

[10] "[A] court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no
more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the
framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual
allegations, a court should assume their veracity and then determine whether they plausibly give rise to an
entitlement to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).

contains numerous examples legal conclusions and naked fact averments that must be disregarded under *Twombly*. These are cited in § 1(B) above and also referenced in MPAS's motion to dismiss. (Doc. No. 11 at p. 2)

> **3.      Economically Rational Conduct That Adheres to an Established Federal Program is Not Illegal**

When all of the legal conclusions and conclusory fact allegations are stripped away, what is left of the Complaint's antitrust claim are these general averments: (i) Defendants pay the required minimum wages to H-2A workers; (ii) Defendants use those minimum wages when filling out applications to obtain new H-2A workers; (iii) the applications influence DOL's establishment of future AEWRs; (iv) Defendants pay whatever new AEWRs are set by DOL but do not pay more;[11] and (v) this process results in a stagnation in shepherd wages. In other words, Defendants' allegedly illegal conduct is paying an AEWR and then using the AEWR they pay on future H-2A applications. But all of those allegations are consistent with how an independent economic actor would behave. Nothing about those allegations suggests collusion. Indeed, the fact that employers must pay whatever rate the federal government establishes suggest that collusion would be ineffective.

> **4.      Raising a Rate When the Rate is Sufficient to Obtain Required Labor is Irrational**

When DOL publishes the AEWR for sheepherders, it is making an official and formal conclusion about the prevailing wages rate that such workers are in fact paid in the various geographic regions. Further, DOL is issuing a corresponding mandate regarding the minimum wage that must be paid if employers wish to recruit foreign laborers to perform such work. It

---

[11] CSC does pay more that federal law requires.

is therefore economically rational for employers seeking to hire domestic shepherds to recruit them at the AEWR, and, in the absence of sufficient applicants[12], to utilize the guest worker program at the wage rates established by the federal government.  Employers have no incentive to offer a rate higher than the prevailing wage, since they must offer the same wage to all applicants and effectively must hire all applicants who meet minimum qualifications.   In the final analysis, the decision to offer the AEWR is economically rational and consistent with Defendants' self-interest.

### 5.      Membership in a Trade Association is not an Antitrust Violation

Plaintiffs seem to assume that membership in a trade association is tantamount to collusion, but that is not the case.  Numerous courts have held that membership in a trade association and attending trade group meetings are not sufficient to give rise to the inference of a price-fixing conspiracy.  *See, e.g., In re Processed Egg Products Antitrust Litig.,* 821 F. Supp. 2d 709, 722 (E.D. Pa. 2011); *In re Ins. Brokerage Antitrust Litig.,* 618 F.3d 300, 349 (3d Cir. 2010); *In re Text Messaging Antitrust Litig.,* 46 F. Supp. 3d 788, 806 (N.D. Ill. 2014) aff'd, 782 F.3d 867 (7th Cir. 2015) ("neither defendants' membership in the [association], nor their common adoption of the trade group's suggestions, plausibly suggest conspiracy"); *LaFlamme v. Societe Air France,* 702 F. Supp. 2d 136, 148 (E.D.N.Y. 2010) ("membership and participation in a trade association alone does not give rise to a plausible inference of illegal agreement"); *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 567 n. 12 (2007).  Moreover, the fact that WRA and MPAS submitted H-2A applications on behalf of members is specifically contemplated by the H-2A

---

[12] Under the H-2A program employers must of course demonstrate a labor shortage before utilizing the services of foreign guest workers.  As noted in the Final Herder Rule (*see, e.g.,* 80 FR 62962), it is not necessarily the wage that prevents employers from attracting the services of domestic shepherds, but rather the nature of the 24/7 work where one is exposed to the elements in geographically and socially isolated settings.

program.  *See, e.g.*, 20 CFR 655.502 (defining "employer" to include "person, firm, corporation, or other association or organization").  So that too is not enough to plausibly suggest a conspiracy.

> **6.     CSC's Alleged Participation in a Conspiracy is Particularly Implausible Because the Wage Rates it Pays Are Independent of the AEWR**

While the alleged conspiracy is implausible as to any of the named defendants, it is particularly nonsensical when it comes to CSC.  That is so because unlike employers from other states, "Oregon's state required wage is higher than the rate required under the AEWR."  80 FR 63026.  In other words, CSC must pay a higher wage under Oregon law no matter what the AEWR is.  Thus, there is absolutely no financial benefit to CSC in trying to depress the AEWR when it must pay more than the AEWR in any event.  As to CSC, plaintiffs' conspiracy theory not only lacks factual support, it is utterly nonsensical.

**B.     On the Facts Alleged, the *Noerr-Pennington* and *Parker* Immunities Apply to CSC**

> **1.     Under the *Noerr-Pennington*, Private Efforts — Even Concerted Efforts — to Influence Government Policy Do not Create Antitrust Liability**

The First Amendment explicitly protects the right to petition the government, and in the context of anti-competition cases, courts have carved out immunity for actions that arise from the lawful petitioning of government agencies.  *See Eastern R. R. Presidents Conf. v. Noerr Motor Freight Inc.*, 365 U.S. 127, 81 S. Ct. 523 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 671, 85 S. Ct. 1585(1965).  Thus, in *Pennington*, the defendants could not be liable for paying wages set by the Secretary of Labor, to whom the defendants had petitioned, and in *Noerr*, petitions to the government could not be the basis for an antitrust claim because the Sherman Act is meant to control "business activity" and not "political activity."  The holdings

from *Noerr* and *Pennington* has given rise to a simple rule: "parties are immune from liability arising from the antitrust injuries caused by government action which results from the petitioning." *A.D. Bedell Wholesale Co., Inc. v. Philip Morris Inc.*, 263 F.3d 239 (3d Cir. 2001).

Here, the wages set by DOL are the product of wage surveys in the relevant market (¶ 72) and the Herder Rule, based on comments by WRA and MPAS, associations that represented CSC (¶ 19).  To the extent there are any damages in this case, they are based on government action which has resulted from the petitioning of many different interested persons including CSC, either directly from the wage surveys or through the representation of WRA and MPAS. Accordingly, CSC is immune under *Noerr-Pennington*.

### 2.    Under *Parker*, Private Compliance with Official Government Action Does not Create Antitrust Liability

While *Noerr-Pennington* protects petitions to the government, the *Parker* doctrine protects the government's right to adopt anticompetitive regulations, "anticompetitive restraints that sovereign states impose as an act of government." *A.D. Bedell*, 263 F.3d at 254 (quoting *Parker v. Brown*, 317 U.S. 341, 352, 63 S. Ct. 307 (1943).  In following such anticompetitive government action, a private actor is similarly immune from antitrust liability.  *See, e.g.*, *Sessions Tank Liners, Inc. v. Joor Mfg., Inc.*, 17 F.3d 295, 298 (9th Cir. 1994) (observing that *Parker* immunity applies to "states as well as to private parties").

*Parker* applies whenever two conditions are met: "First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively supervised' by the State itself." *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*, 445 U.S. 97, 105, 100 S. Ct. 937 (1980) (internal citation omitted).

As alleged, DOL bases its rates on regular wage surveys; in addition, Oregon sets its own minimum wage rate that is higher than the AEWR.  Such determinations by DOL and Oregon are clear, affirmative expressions of state policy, and they are actively supervised by the government.  (¶¶ 19, 72)  In acting in accordance with the AEWR or Oregon minimum wage laws, CSC enjoys immunity under *Parker*.

## III.  CONCLUSION

For the reasons set forth above, CSC respectfully requests that its Motion to Dismiss be granted and the case against it dismissed with prejudice.

Respectfully submitted this 29th day of October, 2015.

*s/ Bradford J. Axel*
Brendan V. Monahan
Bradford J. Axel
STOKES LAWRENCE, P.S
1420 Fifth Avenue, Suite 3000
Seattle, Washington 98
Phone: (206) 626-6000
Fax: (206) 464-1496
Email: Bradford.axel@stokeslaw.com

*Attorneys for Defendant*
*Cunningham Sheep Company*

CERTIFICATE OF SERVICE

I hereby certify that on October 29, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

Alexander Neville Hood
Towards Justice
1535 High Street, Suite 300
Denver, CO 80218
Tel: 720-239-2606
Fax: 303-957-2289
Email: alex@towardsjustic.org
Attorneys for Plaintiffs

Elizabeth K. Dorminey
James Larry Stine
Raymond Perez, II
Wimberly Lawson Steckel Schneider & Stine, P.C.
3400 Peachtree Road Northeast, Suite 400
Atlanta, GA 30326
Tel: 404-365-0900
Fax: 404-261-3707
Emails: ekd@wimlaw.com
        jls@wimlaw.com
        rp@winlawcom
Attorneys for Defendant Mountain Plains Agriculture Service

L. Anthony
Bryan Cave LLP-Denver
1700 Lincoln Street, Suite 4100
Denver, CO 80203-4541
Tel: 303-861-7000
Fax: 303-866-0200
Email: Anthony.george@bryancave.com
and
Ellen Jean Wingrad
Woodburn & Wedge
6100 Neil Road, Suite 500
Reno, NV 89511
Tel: 755-688-3000

Fax: 755-688-3088
Email: ewinograd@woodburnandwedge.com
Attorneys for Defendant Western Range Association


Dated this 29th day of October, 2015.


s/Bradford J. Axel
Bradford J. Axel
Stokes Lawrence, P.S.
1420 Fifth Avenue, Suite 3000
Seattle, WA 98101
Tel: 206-626-6000
Primary ECF Email: bja@stokeslaw.com
Attorney for Defendant Cunningham Sheep
Company