**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: 15-cv-01889-REB-CBS

RODOLFO LLACUA, et al.,
and those similarly situated

        Plaintiffs,

   v.

WESTERN RANGE ASSOCIATION,
Et al.,
        Defendants.

---

**DEFENDANT MOUNTAIN PLAINS AGRICULTURAL SERVICE'S
MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT
AND MEMORANDUM IN SUPPORT**

---

Defendant Mountain Plains Agricultural Service (MPAS) move to dismiss the Plaintiffs' First Amended Complaint (Doc. 32). It should be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) because it fails to allege sufficient facts, even if accepted as true, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

**FACTUAL ALLEGATIONS IN THE COMPLAINT**

A.   <u>Plaintiffs' Own Factual Allegations</u>.

Plaintiffs Llacua, Huaman, Vilchez, and Guerra allege they are former sheepherders and were employed by Defendant Western Range Association (WRA). (Doc. 32 ¶¶ 9-12.) Plaintiff de la Cruz alleges that he was a shepherd employed by MPAS. (Doc. 32 ¶ 13.) Plaintiff Llacua also alleges that he resides in Colorado. (Doc. 32

¶ 9.) That is the sum and total of all their factual allegations in support of their claims against Defendants under the Sherman Antitrust Act, 15 U.S.C. Sec. 1, *et seq.*; civil RICO, 18 U.S.C. 1964(c); Nevada minimum wage; and breach of contract, for which they demand class status under Fed.R.Civ.P. 23 and a jury trial.

Plaintiff de la Cruz is the only Plaintiff who alleges that he was employed by MPAS.[1] But he fails to allege when he was so employed: his claims may be barred by the statute of limitations. We do not know where he claims to have worked, which could preclude the claim under Nevada's minimum wage law and also could be relevant to venue and jurisdiction, and the amount of wages allegedly due. He alleges nothing about how much, when, or how he was paid. Plaintiffs seek relief for alleged illegal deductions from pay, but none states any facts pertaining to when or how much they were paid, or any specific deductions, legal or otherwise, that were made from their wages. No facts support Plaintiffs' standing to assert civil RICO claims or breach of contract claims. In short, Defendants are left almost completely in the dark as to the facts that underlie the claims asserted by Plaintiffs. The mere allegation that at some time Plaintiffs were employed to herd sheep, somewhere, is plainly insufficient to satisfy even a generous construction of *Iqbal* and *Twombly*'s pleading requirements.

B.     Plaintiffs' Factual Allegations Concerning Defendant MPAS.

Unsupported, conclusory allegations make up the bulk of Plaintiffs' First Amended Complaint, but a few factual allegations slip in. Plaintiffs allege that

---

[1] For purposes of this Motion to Dismiss, Defendant MPAS accepts Plaintiffs' allegation that it employed de la Cruz as true: however, MPAS reserves the right to show the Court that it never directly employed any H2A shepherd, but only assisted its rancher members in their recruitment efforts by preparing applications pursuant to the H2A visa program.

Defendants WRA and MPAS, on behalf of their members, advertise and prepare the documents that set out shepherd job offers in the domestic market at the adverse effect wage rates (AEWR) established by the U.S. Department of Labor. (Doc. 32 ¶¶ 5, 75.) The WRA and the MPAS, on behalf of their members, file H-2A Applications with the DOL. (Doc. 32 ¶ 53.) The WRA and the MPAS recruit shepherds for their member ranches. (Doc. 32 ¶ 91.)

When WRA and MPAS prepared the H-2A applications, they used the AEWR in all applications (but one) that they filed with DOL.[2] (Doc. 32 ¶ ¶58-63.) When DOL changed the AEWR for Oregon, WRA informed its members of the new AEWR. (Doc. 32 ¶ 80.) WRA and MPAS advertise these rates in job orders and notices submitted to the states for domestic workers, and when they are unsuccessful in filling the available positions, they can recruit foreign workers to work as shepherds. (Doc. 32 ¶ 45.) WRA and MPAS together facilitated the hiring of the majority of the H-2A shepherds hired in the U.S. (Doc. 32 ¶ ¶66-67.) In summary, the facts, as pled by Plaintiffs, are that the Defendants offered domestic and foreign shepherds pay at rates strictly in compliance with the requirements imposed upon them by the U.S. Department of Labor. (Doc. 32 ¶ ¶58-63.) Plaintiffs' conclusory allegations that such conduct constituted an illegal conspiracy are not entitled to a presumption of truthfulness, should be disregarded by the Court.[3]

---

[2] For purposes of the Motion to Dismiss, Defendant accepts as true the allegation that its members paid no more than the AEWR as pled. Defendants reserve the right to dispute this allegation if the case is not dismissed, and will show that some employers offered and paid base wages in excess of the published minimum, and some offered opportunities to earn additional pay and bonuses.

[3] *Iqbal,* 556 U.S. at 681 (2009); *Meek v. Jordan,* 534 Fed.Appx. 762, 764 (10th Cir. 2013).

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[4] This "plausibility" standard is satisfied "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." A Plaintiff must demonstrate more than "a sheer possibility that a defendant has acted unlawfully." *Id.* Legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement fail to constitute well-pled facts for Rule 12(b)(6) purposes. *Iqbal*, 129 S.Ct. at 1949. Even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory."[5] The Court will not consider unwarranted inferences, unreasonable conclusions, or arguments. *Iqbal*, 129 S.Ct. at 1951–52. Detailed factual allegations are not required, but the Complaint must plead sufficient facts to allow a court, drawing on judicial experience and common sense, to infer more than the mere possibility of misconduct. *Id.* at 1950 (*quotation marks omitted*). Without such "heft," *id.* at 1947, the plaintiff's claims cannot establish a valid entitlement to relief. Facts that are merely consistent with a defendant's liability will not suffice to nudge the plaintiffs' claims "across the line from conceivable to plausible." *Id.* at 1951 (quotations omitted).

---

[4] *Iqbal*, 129 S.Ct. at 1949 (*quoting Twombly*, 550 U.S. at 570).
[5] *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008) (alteration marks omitted).

## ARGUMENT AND AUTHORITY

Plaintiffs' First Amended Complaint does not come close to alleging sufficient facts to withstand a motion to dismiss. Instead, it alleges evidence that consists almost exclusively of law-abiding conduct by the Defendants and asks the Court to infer illegal agreements. In lieu of facts, Plaintiffs rail against economic reality, and seek to indict an industry and the government agency that regulates it. This is not sufficient to survive a Motion to Dismiss. Plaintiffs' allegations are insufficient to satisfy even the minimal "plausibility" burden necessary to survive a Motion to Dismiss post-*Iqbal* and *Twombly*.

All the Plaintiffs allege about themselves is that they were employed by Defendants as shepherds: there are no other specific factual allegations of where or when they worked, what they were paid, whether that pay met or exceeded the AEWR, whether it was subject to any deductions of any sort, whether they were denied reimbursement for travel expenses or subsistence, or indeed of any harm they claim to have suffered as a result of the alleged conspiracy. Their allegations consist principally of conclusory statements and descriptions of economically-rational, law-abiding conduct that do not state claims upon which relief can be granted.

Plaintiffs' antitrust and RICO claims fail because they fail to allege predicate acts of conspiracy, relying instead on conclusory allegations and innuendo. The illegal deductions claims fail because they make no factual allegations at all concerning their pay. Finally, there is no private right of action under the H2A visa regulations. All of Plaintiffs' claims are due to be dismissed.

A.   <u>Plaintiffs Fail To Allege Facts Sufficient To State An Antitrust Claim (Count I)</u>.

Like the Plaintiffs in the instant case, the plaintiffs in *Twombly* alleged violations of the Sherman Antitrust Act, which requires a "contract, combination ..., or conspiracy, in restraint of trade or commerce."[6] The *Twombly* plaintiffs sought a class action under Rule 23 on behalf of themselves and other similarly situated subscribers to telephone and internet services who claimed to have been harmed by alleged collusion between providers of such services to fix prices. The District Court dismissed for failure to state a claim, because the plaintiffs alleged only instances of parallel behavior but no agreement between the putative conspirators: the complaint did not "alleg[e] facts ... suggesting that refraining from competing in other territories ... was contrary to [the ILECs'] apparent economic interests, and consequently [does] not rais[e] an inference that [the ILECs'] actions were the result of a conspiracy."[7] The Second Circuit reversed, and the Supreme Court granted certiorari to "address the proper standard for pleading an antitrust conspiracy through allegations of parallel conduct."[8] The Supreme Court held that stating a claim under Sherman Act's restraint of trade provision required a complaint with enough factual matter, taken as true, to suggest that an agreement was made, and that allegations of parallel business conduct and a bare assertion of conspiracy will not alone suffice to state a claim. Plaintiffs' antitrust claim suffers from the same infirmity as that in *Twombly*. They do not allege any facts that MPAS and the other Defendants ever entered into any agreement placing a ceiling on wages, but place their faith entirely in allegations of parallel conduct: to wit, offering the AEWR set by the

---

[6] *Twombly*, 550 U.S. at 548, 127 S.Ct. at 1961.
[7] *Twombly v. AT&T*, 313 F. Supp. 2d 174, 188 (S.D.N.Y. 2003).
[8] *Twombly*, 550 U.S. at 553, 127 S.Ct. at 1963.

USDOL for sheepherders. This is factually insufficient to withstand dismissal under *Twombly*.

1. <u>Plaintiffs' Allegations Are Conclusory</u>.

Plaintiffs' Amended Complaint invites the Court to assume or infer that illegal activity has occurred without offering a shred of evidence that it has. Plaintiffs allude to "agreements," but furnish none. Nowhere is there any actual or circumstantial evidence of an illegal conspiracy: the illegality and evil intent are off-stage, suggested but never revealed. At the end of the day, the few allegations that do state facts demonstrate compliance with USDOL rules. Such allegations fail to satisfy the "plausibility" test articulated by the Supreme Court in *Iqbal* and *Twombly*.

2. <u>Plaintiffs Fail To Allege Any Illegal Agreement</u>.

Plaintiffs utterly fail to plead any facts whatsoever to support an actual, as opposed to a presumed, or "tacit," agreement among Defendants. Instead, they ask this Court to infer, based on conduct that is strictly in compliance with Federal law, that there was a nefarious plot to depress shepherds' pay and, in essence, to rope USDOL into the scheme so that the resulting AEWR would serve Defendants' purposes. The Complaint points to no agreement between any of the Defendants to engage in price-fixing, but instead simply asks the Court to infer that such an agreement must exist – because Defendants *complied with the law*. This does not satisfy the "plausible" pleading requirements defined by the Supreme Court and the Tenth Circuit:

> "Plausibility" refers to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs have not nudged their claims across the line from "conceivable" to "plausible."

*Robbins v. Oklahoma,* 519 F.3d 1242, 1247 (10th Cir. 2008) (quotation marks corrected) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. 1955). "Because § 1 of the Sherman Act does not prohibit all unreasonable restraints of trade but only restraints effected by a contract, combination, or conspiracy, the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express."[9] Such an agreement is established by evidence that the alleged conspirators "had a conscious commitment to a common scheme designed to achieve an unlawful objective."[10] There is none in Plaintiffs' Complaint.

       3.     <u>The Facts Alleged Suggest At Most Parallel, Self-Interested Conduct</u>.

Plaintiffs ask this Court to infer the existence of an illegal agreement from Defendants' conduct because all the Defendants complied with USDOL's wage rates, but this is not enough to get them past a Motion to Dismiss. The Tenth Circuit has held that:

> While consciously parallel behavior may contribute to a finding of antitrust conspiracy, it is insufficient, standing alone, to prove conspiracy. Such parallel behavior may, however, support the existence of an illegal agreement when augmented by additional evidence from which an understanding among the parties may be inferred. Such evidence may include a showing that the parties are acting against their own individual business interests, or that there is motivation to enter into an agreement requiring parallel behavior. Mere exchanges of information, even regarding price, are not necessarily illegal, in the absence of additional evidence that an agreement to engage in unlawful conduct resulted from, or was a part of, the information exchange.

*Mitchael v. Intracorp, Inc.,* 179 F.3d 847, 858–59 (10th Cir. 1999). Plaintiffs' allegations fall squarely within the bounds of what the Tenth Circuit has held to be insufficient: here,

---

[9] *Twombly*, 550 U.S. at 553 (internal citations and brackets omitted).
[10] *Monsanto Co. v. Spray-Rite Serv. Corp.,* 465 U.S. 752, 764 (1984).

the parties acted in their own individual business interests, and there was no motivation to enter into any illegal agreement since they all were complying with USDOL prescriptions. The exchange of compliance information between the associations and their members is unaccompanied by any evidence suggesting that unlawful conduct was the result.

Proof of a § 1 conspiracy must include evidence tending to exclude the possibility of independent action.[11] There is none here: in fact, the "evidence" overwhelmingly can be explained by independent action: specifically, compliance with Federal law and economic self-interest. In *Twombly*, as here, the allegedly anti-competitive conduct the defendants were alleged to have engaged in actually reflected compliance with new rules issued by the Federal government governing telecoms: here, Defendants were offering wages at rates set by the Federal government. Neither constitutes illegal conduct.

The H-2A regulations decree that the AEWR must be published, and offered to all comers, domestic or foreign, experienced or inexperienced. It should come as no surprise that when the government sets very specific rules for a particular market, actors in that market will comply with those rules. They also have no incentive to bid against themselves by offering rates in excess of the amounts determined by DOL. Such conduct, without more, does not violate the antitrust laws, any more than would a shopper who pays no more than the advertised price for a product. Individual companies paying the prevailing wage rate required by DOL shows that each company

---

[11] *See Monsanto Co. v. Spray–Rite Service Corp.*, 465 U.S. 752, 104 S.Ct. 1464 (1984); Twombly, 550 U.S. at 554, 127 S.Ct. at 1964.

is acting in its own business interest and not against such interest, and engaging in conduct that complies with the law.

B.      MPAS And WRA Are At Least Partially Exempt From The Antitrust Laws.

Plaintiffs' conspiracy claims also fail because, as agricultural trade associations for ranchers, MPAS and WRA are exempt from most aspects of the antitrust laws. The Capper–Volstead Act, in relevant part, states:

> Persons engaged in the production of agricultural products as farmers, planters, **ranchmen**, dairymen, nut or fruit growers **may act together in associations**, corporate or otherwise, with or without capital stock, in collectively processing, **preparing for market**, handling, and marketing in interstate and foreign commerce, such products of persons so engaged. Such associations may have marketing agencies in common; and **such associations and their members may make the necessary contracts and agreement to effect such purposes**: *Provided, however,* That such associations are operated for the mutual benefit of the members thereof....

7 U.S.C. § 291 (emphasis added).[12] By assisting their members in recruiting shepherds, MPAS and WRA were acting for the mutual benefit of their members within the bounds of the law. There can be no "conspiracy" between a trade association and its constituent members. In *Bell*, the Tenth Circuit affirmed summary judgment in favor of a trade association for mink ranchers, concluding that a cooperative and its board members constituted a single entity unable to conspire with itself, rendering Sherman Act's restraint of trade prohibitions inapplicable to the challenged mink-feed pricing and delivery activities. *Bell,* 348 F.3d 1224. The same is true here: MPAS, an association of ranchers, cannot be convicted of "conspiring" with its rancher members.

---

[12] *See Bell v. Fur Breeders Agric. Co-op., 348 F.3d 1224, 1231 (10th Cir. 2003); see also Sunkist Growers, Inc. v. Winckler & Smith Citrus Prod. Co., 370 U.S. 19, 27–28, 82 S.Ct. 1130 (1962); Maryland & Virginia Milk Producers, 362 U.S. at 464–66, 80 S.Ct. 847; United States v. Borden Co., 308 U.S. 188, 204–05, 60 S.Ct. 182 (1939).*

C.  USDOL AEWR is Independent Action.

As the Supreme Court observed in *Twombly*, an economically rational response to legislation is not a crime, even when it leads independent actors in a marketplace to behave in substantially the same fashion. "[C]onscious parallelism," a common reaction of "firms in a concentrated market [that] recogniz[e] their shared economic interests and their interdependence with respect to price and output decisions" is "not in itself unlawful."[13]

When USDOL publishes the AEWR for sheepherders, it is making an official pronouncement about the rate a worker performing that job must be paid. It is only economically rational – and emphatically not evidence of conspiracy – for employers seeking to hire such workers to offer a rate that conforms to the government's decree. The employers certainly have no incentive to offer a rate higher than the prevailing wage, since they must offer the same wage to all applicants and must hire all who meet minimum qualifications. In the final analysis, the decision to offer the AEWR is economically rational and consistent with Defendants' self-interest.

D.  Lobbying Government Does Not Violate Antitrust Laws.

Plaintiffs' claim that Defendants violated the antitrust laws by somehow imposing their will on USDOL to come up with a low wage rate fails because such activity has been recognized as exempt by the Supreme Court, which has rejected any

---

[13] *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227, 113 S.Ct. 2578 (1993); see 6 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 1433a, p. 236 (2d ed. 2003) ("The courts are nearly unanimous in saying that mere interdependent parallelism does not establish the contract, combination, or conspiracy required by Sherman Act § 1"); Turner, The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal, 75 Harv. L.Rev. 655, 672 (1962) ("[M]ere interdependence of basic price decisions is not conspiracy"), Twombly, 550 U.S. at 553-54, 127 S.Ct. at 1964.

interpretation of the Sherman Act that would allow plaintiffs to look behind the actions of state sovereigns to base their claims on "perceived conspiracies to restrain trade."[14] In *Noerr*, a consortium of railroads directed a publicity campaign toward obtaining governmental action adverse to the interests of trucking companies, but the action was held not to violate the Sherman Act because the Act's purpose was to prevent illegal cooperative activity by private actors and not efforts to influence governmental action.[15]

The First Amendment explicitly protects the right to petition the government, and in the context of anti-competition cases, courts have carved out immunity for actions that arise from the lawful petitioning of government agencies.[16] In *Pennington*, the Court held that the defendants could not be liable for paying wages at rates set by the Secretary of Labor, to whom the defendants had petitioned. This explodes Plaintiffs' theory that Defendants conspired with DOL to depress shepherd wages. The holdings from *Noerr* and *Pennington* have given rise to a simple rule: "parties are immune from liability arising from the antitrust injuries caused by government action which results from the petitioning." [17]

E.  Complying With Federal Laws And Regulations Does Not Violate Antitrust Laws.

Here, the wage rates set by DOL are the product of wage surveys in the relevant

---

[14] *Hoover v. Ronwin*, 466 U.S., 558, 580, 104 S.Ct., 1989, 2001 (1984). "[A]ny action that qualifies as state action is "ipso facto ... exempt from the operation of the antitrust laws." *City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 379, 111 S.Ct. 1344, 1353 (1991) (original emphasis); citing *Hoover*, 466 U.S. at 568, 104 S.Ct., at 1995; see also *E. R. R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523 (1961) (federal antitrust laws do not regulate the conduct of private individuals in seeking even anticompetitive action from the government).

[15] *See also United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585 (1965) (joint efforts by coal mine operators to influence public officials did not violate the antitrust laws even though intended to eliminate competition).

[16] *See Noerr*, 365 U.S. 127, 81 S.Ct. 523; *Pennington*, 381 U.S. at 671(1965).

[17] *A.D. Bedell Wholesale Co., Inc. v. Philip Morris Inc.*, 263 F.3d 239 (3d Cir. 2001).

market. (Doc. 32 ¶ 75.) Plaintiffs' allegation that Defendants have conspired with government to skew those results are unsupported by any facts, but in the final analysis, the AEWR is the result of government's action, not Defendants'. And unlike private actors in the marketplace, the government, as a sovereign entity, has the right to adopt anticompetitive regulations.[18] In following such anticompetitive government action, a private actor is similarly immune from antitrust liability.[19] DOL's decisions with respect to the AEWR thus cannot be the basis for an antitrust claim against any Defendant.

F.  <u>Plaintiffs Fail To State A Claim Under Civil RICO (Count III)</u>.

Plaintiffs allege violation of § 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate ... commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Plaintiffs also allege violation of § 1962(d), which makes it illegal "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  The elements of a civil RICO claim are (1) conduct of (2) an enterprise (3) through a pattern (4) of racketeering activity.[20]

Plaintiff's racketeering claim does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face." *Iqbal,* 556 U.S. at 678.

---

[18] *A.D. Bedell,* 263 F.3d at 254 (quoting *Parker v. Brown,* 317 U.S. 341, 352, 63 S.Ct. 307 (1943).
[19] *See, e.g., Sessions Tank Liners, Inc. v. Joor Mfg., Inc.,* 17 F.3d 295, 298 (9th Cir. 1994) (observing that *Parker* immunity applies to "states as well as to private parties").
[20] *Tal v. Hogan,* 453 F.3d 1244, 1261 (10th Cir. 2006) (citation omitted). "Racketeering activity" is defined in 18 U.S.C. § 1961(1)(B) as "any act which is indictable" under any of the crimes listed in the statute. These underlying acts are "predicate acts" and form the basis for RICO liability. *Tal,* 453 F.3d at 1261.

Rather, Plaintiffs offer only "labels and conclusions" that the defendants violated the RICO statute. *Id*. at 678. "[R]acketeering activity" is defined to include several predicate criminal acts. Plaintiffs fall short here, alleging no criminal acts but only, in very general terms, that MPAS and WRA used electronic communications to make fraudulent statements concerning the terms of employment. (Doc. 32 ¶¶ 96-98,197.) In addition to these elements, a plaintiff must also show proximate causation between the RICO predicate offense and the injury.[21] Plaintiffs seek to accomplish this with a simple conclusory statement that they were subjected to unidentified illegal deductions. (Doc. 32 ¶ 200.)

Plaintiffs' allegations lack factual support. First, none of the acts alleged can remotely be described as criminal. Second, Plaintiffs assert that Defendants made false or fraudulent representations about promises of reimbursement or deductions from pay, but nowhere allege that any reimbursement was denied or sums deducted, legally or otherwise, from their earnings. This does not meet the required minimum for pleading. As the Tenth Circuit has explained:

> The threat of treble damages and injury to reputation which attend RICO actions justify requiring plaintiff to frame its pleading in such a way that will give the defendant ... clear notice of the factual basis of the predicate acts. [T]his is particularly important in cases where the predicate fraud allegations provide the only link to federal jurisdiction.

*Cayman Exploration Corp. v. United Gas Pipeline Co.,* 873 F.2d 1357, 1362 (10th Cir. 1989). To be pled with particularity, Plaintiffs would have to set forth the time, place, and contents of the false representation, the identity of the party making the false

---

[21] *Hemi Group, LLC v. City of New York,* 559 U.S. 1, 8 (2010).

statements, and the consequences thereof. *Tal,* 453 F.3d at 1263. Plaintiffs fail to do any such thing. Nor do Plaintiffs allege the existence of a scheme to defraud, or the use of electronic communications for the purpose of executing the scheme. *Tal,* 453 F.3d at 1263. As the Tenth Circuit has explained:

> A scheme to defraud is conduct intended or reasonably calculated to deceive persons of ordinary prudence or comprehension. The objective reference to persons of ordinary prudence or comprehension assists in determining whether the accused's conduct was calculated to deceive. Fraudulent intent is required. That said, a scheme to defraud by false representations may be accomplished by patently false statements or statements made with a reckless indifference as to their truth or falsity, *and deceitful concealment of material facts may constitute actual fraud.*

*United States v. Cochran,* 109 F.3d 660, 664–65 (10th Cir. 1997) (internal quotations, alterations and citations omitted, emphasis added). "A scheme to defraud focuses on the intended end result and affirmative misrepresentations are not essential...." *Id.* at 664. The court also clarified that misleading omissions can form the basis of a mail or wire fraud claim even where there is no fiduciary duty. See *id.* ("Even apart from a fiduciary duty, in the context of certain transactions, a misleading omission is actionable as fraud if it is intended to induce a false belief and resulting action to the advantage of the misleader and the disadvantage of the misled.").

Nor do Plaintiffs satisfy the pleadings requirement as to injury. In *Hemi Group, LLC v. City of New York,* 559 U.S. 1, 9 (2010), the Supreme Court explained:

> [T]o state a claim under civil RICO, the plaintiff is required to show that a RICO predicate offense not only was a "but for" cause of his injury, but was the proximate cause as well. Proximate cause for RICO purposes ... should be evaluated in light of its common-law foundations; proximate cause thus requires some direct relation between the injury asserted and the injurious conduct alleged. A link that is "too remote," "purely contingent," or "indirec[t]" is insufficient.

(internal citations and quotations omitted). Again, Plaintiffs utterly fail to make factual allegations that any one of them suffered any actual injury: that expenses due to be reimbursed were not, that subsistence was due but not paid, that illegal deductions from pay were taken. Plaintiffs' factual pleading is insufficient to support their RICO claims and therefore they should be dismissed.

G. <u>Plaintiffs Fail To Allege Sufficient Facts To Support Their Nevada Minimum Wage Claim (Count IV)</u>.

Plaintiffs allege that MPAS employed shepherds in Nevada, and failed to pay minimum wage in that state, but not a single Plaintiff claims to have been employed in Nevada. (Doc. 32 ¶¶ 112-118.) Plaintiff de la Cruz alone alleges that he was employed by MPAS, but never says where. In this utter vacuum of pleading, any claim alleging violation of Nevada's minimum wage law should be dismissed.

H. <u>Plaintiffs Fail To Allege Sufficient Facts To Support An Action For Breach Of Contract Or Quasi-Contract Under 20 C.F.R. 655.122 (Count VI)</u>.

Plaintiffs' breach of contract claims are due to be dismissed because they fail to plead even the minimal facts necessary to support such a claim, e.g., that there was a contract between Defendant and any Plaintiff, and that the contract was breached. The elements of breach of contract are: (1) the existence of a contract between the parties; (2) consideration; (3) Plaintiff's performance or willingness to perform in compliance with the contract; (4) Defendants' breach of the contract; and (5) damages as a result of the breach.[22] Again, Plaintiff de la Cruz is the only Plaintiff who claims to have been employed by Defendant MPAS. This arguably satisfies the first element, but all of the

---

[22] *Britvic Soft Drinks, Ltd. V. ACSIS Techs., Inc.*, 265 F.Supp.2d 1179, 1187 (D.Kan. 2003).

others fail for want of evidence. He has never alleged consideration, performance, breach, or damages. He has never said where or when he was employed, on what terms, what he was paid, whether sums due him were not paid or deductions from his pay were unlawfully made. All he has given the Court to go on is that he was employed by MPAS as a shepherd. That is plainly insufficient to support a claim for breach of contract or quasi-contract.

I.   There Is No Private Right Of Action Under 20 C.F.R. 655.122.

Plaintiffs' claim for damages due to an alleged breach of promises made in job postings (see Doc. 32 ¶¶ 219, 220) fails because there is no private right of action under this law. Courts have refused to find that a private right of action exists under the Wagner-Peyser Act, 29 U.S.C. 49 *et seq.*, which provides for the establishment of the United States Employment Service to promote the establishment and maintenance of a national system of public employment offices throughout the United States. The Wagner-Peyser Act is a statute providing a means for exchange of information on employment opportunities and conditions, and nowhere expressly provides for a private cause of action for damages.

The terms of the Act and its regulations do not proscribe conduct on the part of participants in the programs of the United States Employment Service. The Act assesses no penalties and affords no private remedies. The regulations deal with placement services to be provided by state agencies and specifically, in 20 C.F.R. 602.8, provide for agricultural and related industry placement services. 20 CFR part 651 sets forth general provisions governing the federal-state employment service system.

No private right of action is contemplated by the pertinent regulations.

Given the absence of a specific provision creating a private remedy and the absence of legislative history tending to support an intention to create such a remedy, a private remedy for money damages may not be implied.[23]

Because no private right of action exists, Plaintiffs' Count VI should be dismissed.

## CONCLUSION

Accordingly, for the reasons set forth above, Defendants respectfully request that their Motion be granted, this case dismissed in its entirety, and any such other and further relief as the Court may deem fit.

Respectfully submitted this 16th day of November, 2015.

        /s/ J. Larry Stine
        J. Larry Stine
        Elizabeth K. Dorminey
        Raymond Perez
        WIMBERLY, LAWSON, STECKEL,
         SCHNEIDER & STINE, P.C.
        Suite 400, Lenox Towers
        3400 Peachtree Road, N.E.
        Atlanta, Georgia 30326
        Phone: (404)365-0900
        Fax: (404) 261-3707
        Email: jls@wimlaw.com
              bdorminy@bellsouth.net
              rp@wimlaw.com
        *Attorneys for Defendant*
        *Mountain Plains Agricultural Service*

---

[23] *Transamerica Mortgage Advisors v. Lewis*, 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 99 S.Ct. 2749, 61 L.Ed.2d 82 (1978).

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: 15-cv-01889-REB-CBS

RODOLFO LLACUA, et al.,
and those similarly situated

       Plaintiffs,

  v.

WESTERN RANGE ASSOCIATION,
Et al.,
       Defendants.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I electronically filed the foregoing **DEFENDENT MOUNTAIN PLAINS AGRICULTURAL SERVICE'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT AND MEMORANDUM OF LAW IN SUPPORT** with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

          Alexander Hood
          Nina E. DiSalvo
          Andrew Schmidt
          TOWARDS JUSTICE
       1535 High St., Suite 300
          Denver, CO 80218

This 16th day of November, 2015.

                                  */s/ J. Larry Stine*
                                  J. Larry Stine
                                  Elizabeth K. Dorminey
                                  Raymond Perez
                                  WIMBERLY, LAWSON, STECKEL,
                                    SCHNEIDER & STINE, P.C.

Suite 400, Lenox Towers
3400 Peachtree Road, N.E.
Atlanta, Georgia 30326
Phone: (404)365-0900
Fax: (404) 261-3707
Email: jls@wimlaw.com
   bdorminy@bellsouth.net
   rp@wimlaw.com

*Attorneys for Defendant*
*Mountain Plains Agricultural Service*

2