IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Case 15-cv-01889-REB-CBS

RODOLFO LLACUA;
ESLIPER HUAMAN;
LEOVEGILDO VILCHEZ GUERRA;
LIBER VILCHEZ GUERRA;
RAFAEL DE LA CRUZ;
and those similarly situated

      Plaintiffs,

v.

WESTERN RANGE ASSOCIATION;
MOUNTAIN PLAINS AGRICULTURAL SERVICE;
MARTIN AUZA SHEEP CORPORATION;
NOTTINGHAM LAND AND LIVESTOCK, LLLP;
TWO BAR SHEEP CORPORATION, LLC;
BALL BROTHERS SHEEP COMPANY;
ESTILL RANCHES, LLC;
CUNNINGHAM SHEEP COMPANY;
DENNIS RICHINS DBA DENNIS RICHINS LIVESTOCK; and
CHILD RANCH, LLC

      Defendants.

---

## SECOND AMENDED COMPLAINT

---

Plaintiffs file this Second Amended Complaint pursuant to the parties' revised scheduling order, adopted by the Court on November 27, 2015. *See* ECF Doc. No. 68.

**INTRODUCTORY STATEMENT**

**I.      An Industry Pervaded by Lawlessness**

1.      The market that supplies labor for sheep ranchers is regulated by a complex scheme of federal and state laws that, among other things, allows for the importation of temporary foreign workers and sets minimum wage floors for shepherds.

2.      Notwithstanding government's heavy regulation of this industry, the labor market for shepherds in the United States is pervaded by lawlessness that harms shepherds and contravenes the basic tenets of a free and competitive market.

3.      Sheep ranchers perpetuate this lawlessness through, with the aid of, and in conjunction with membership associations known as the Western Range Association ("WRA") and the Mountain Plains Agricultural Service ("MPAS"). The industry is dominated by ranches that are members of these associations.

4.      The lawlessness begins in the setting of wages for shepherds. Ranchers, like all employers, have a legal obligation to compete for shepherd labor in an open market. Instead, they use these membership organizations to fix wages across the industry – for both domestic *and* foreign shepherds – at precisely the wage floor set by the United States Department of Labor (the "DOL") for foreign shepherds working in the United States on temporary, H-2A visas.

5.      The concerted conduct that results in the fixing of wages is starkly illustrated by the WRA's and MPAS's explicit communications to their members to adjust the wages they pay their shepherds to precisely the DOL-set wage floor, but no more, and the WRA's and MPAS's preparation of job announcements and job offers that set shepherd

| Deleted: ranching |
| Deleted: Western |
| Deleted: dominated by ranchers who are members of |
| Deleted: The ranchers |
| Deleted: at unconscionably low levels |
| Formatted: Footer, Centered |
| Deleted: |
| Deleted: ¶ |
| Formatted: Font: Arial |
| Formatted: Font: Arial, 12 pt |

wages at precisely this amount without any acknowledgement of even the possibility that appropriate shepherd wages might differ from ranch to ranch or shepherd to shepherd.

6.      The lawlessness continues in the importation of desperate, foreign workers to fill shepherd positions. To obtain the temporary visas necessary to import these workers legally, the WRA and the MPAS, on behalf of their member ranches, provide assurances to state and federal agencies that ranches will not deduct certain expenses from shepherds' wages and will reimburse shepherds for various expenses, including travel expenses.

7.      These assurances are false and fraudulent. The WRA and the MPAS, as a matter of policy, fail to make promised reimbursements, which amounts to an illegal deduction from wages.

8.      Finally, in at least one state—Nevada—the MPAS illegally refuses to pay Nevada minimum wage to shepherds who fall within state minimum wage protections.

## II.      Resulting Market Distortions that Foster Harsh and Anachronistic Employment Practices

9.      Because of the ranches' collusion in setting shepherds' wages at levels that are strikingly low even relative to the most low-wage employment opportunities in the rest of the American economy, few domestic workers desire to work as shepherds. Therefore, the sheep ranching industry is now dependent on the importation of foreign H-2A

**Deleted:** this

**Deleted:**
**Formatted:** Footer, Centered
**Deleted:** ¶
**Formatted:** Font: Arial
**Formatted:** Font: Arial, 12 pt

shepherds who are, in essence, indentured servants.[1] A 2010 survey by Colorado Legal

Services found deplorable conditions for shepherds:

- Almost 73 percent of the shepherds reported having zero days off over the course of a year.
- More than 80 percent were not permitted to leave their ranch.
- Approximately 35 percent were paid less than once a month.
- 85 percent were not allowed to have visitors who were not ranch employees.
- Roughly 70 percent reported never having access to a functioning toilet.
- 85 percent were never permitted to engage in social activities.
- Almost 50 percent reported not having the opportunity or ability to read their employment contracts.[2]

10.     The industry is not shy in viewing shepherds less as employees with legal rights

and more as indentured servants who should be subject to even criminal sanction if

they refuse to work. One sheep rancher and MPAS member recently introduced a state

bill that would have made it a crime for a shepherd to leave his flock. Meanwhile, the

WRA has labeled some shepherds as "runaways" that need to be rounded up and

deported. As explained by WRA President Lane Jensen, "[a] significant effort was made

jointly between Western Range and Mountain Plains last summer to locate and deport

shepherds that had jumped their contract as well as to penalize those that assisted

contract breakers in finding employment. While the effort succeeded in locating

runaways, there was no assistance from Immigration officials or the Department of

---

[1] *See generally* Southern Poverty Law Center, Close to Slavery: Guestworker Programs in the United States (2013), *available at* https://www.splcenter.org/sites/default/files/d6_legacy_files/downloads/publication/SPLC-Close-to-Slavery-2013.pdf.
[2] Colorado Legal Services *et al.*, *Overworked and Underpaid: H-2A Herders in Colorado* (2009), *available at* http://users.frii.com/cls/Overworked%20and%20Underpaid.pdf.

Labor to penalize, deport, or even make contact with known jumpers." The use of

criminal sanctions to enforce civil work contracts and the industry's use of the terms

"runaways" or "jumpers" to describe non-compliant workers echoes some of the darkest

periods of our nation's labor past and is indicative of the problems engrained in the H-

2A program in general and the importation of H-2A shepherds specifically.

11.     The deplorable conditions of H-2A shepherds and the lack of U.S. workers

participating in the shepherd labor market are not the result of natural market

conditions. Instead, both are the result of the WRA's, the MPAS's, and all of their

member ranchers' collusion and conspiracy to fix wages, thereby eliminating any

competitive market for shepherd labor and stripping shepherds, both foreign and

domestic, of their ability to bargain for wages in a free market.

12.     The result of this price fixing conspiracy or conspiracies is absurdly low wages for

all shepherds, the exclusion of most American workers from the shepherd labor market,

and the importation of vulnerable foreign workers working for meager pay, under

atrocious living and working conditions, and without any meaningful opportunity to

bargain for anything better like other employees in the labor market.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 [Federal

Question].

14.     Venue is proper pursuant to 28 U.S.C. § 1391, 18 U.S.C. § 1965(a), 15 U.S.C.

§§ 15(b) & 22.  Defendants all transact business in Colorado and a substantial part of

the events or omissions giving rise to the claims against each Defendant occurred in Colorado.

15.     The Court has *in personam* jurisdiction over Defendants because each, among other things: (a) transacted business in the United States, including in this District; (b) paid Plaintiffs and members of the Classes (defined herein) artificially fixed and suppressed wages throughout the United States, including in this District; or (c) had substantial aggregate contacts with the United States as a whole, including in this District.

## PARTIES

16.     Plaintiff Rodolfo Llacua is a former shepherd and WRA employee who resides in Colorado. He is originally from Peru and worked as an H-2A shepherd for more than nine years.

17.     Plaintiff Esliper Huaman is a former shepherd and WRA employee who worked in Utah. He is originally from Peru and worked as an H-2A shepherd for around six years.

18.     Plaintiff Leovegildo Vilchez is a former shepherd and WRA employee who worked in Colorado. He is originally from Peru and worked as an H-2A shepherd for more than four years

19.     Plaintiff Liber Vilchez Guerra is a former shepherd and WRA employee who worked in Colorado. He is originally from Peru and worked as an H-2A shepherd for more than three years.

20.     Plaintiff Rafael De La Cruz is a former shepherd and MPAS employee who worked in Nevada. He is originally from Peru and worked as an H-2A shepherd for around six years.

21.     Plaintiffs each entered into multiple H-2A employment contracts.  Each of the H-2A employment contracts entered into by each of the Plaintiffs included a wage term equal to the DOL-set wage floor for the state in which each Plaintiff worked.

22.     Defendant Western Range Association is a California non-profit corporation with its principal place of business at 1245 E. Brickyard Road, Suite # 190, Salt Lake City, UT 84106. The WRA transacts business in Colorado by, among other things, recruiting shepherds for Colorado ranches.

23.     Defendant Mountain Plains Agricultural Service is a Wyoming non-profit corporation with its principal place of business at 811 N Glenn Rd, Casper, WY 82601. The MPAS transacts business in Colorado by, among other things, recruiting shepherds for Colorado sheep ranches.

24.     Together the WRA and MPAS shall be referred to as "Association Defendants."

25.     Defendant Martin Auza Sheep Corporation is an Arizona Corporation with its principal place of business in Yuma, Arizona. Defendant Martin Auza Sheep Corporation also does business in Brawley, California. Defendant Martin Auza Sheep Corporation is or was a member of the WRA and the MPAS.

26.     Defendant Nottingham Land and Livestock, LLLP, is a Colorado Limited Liability Limited Partnership, with its principal place of business in Craig, Colorado. Defendant Nottingham Land and Livestock, LLLP, is or was a member of the WRA.

27.    Defendant Two Bar Sheep Corporation, LLC, is a Colorado Limited Liability Corporation with its principal place of business in Craig, Colorado. Defendant Two Bar Sheep Corporation, LLC, is or was a member of the WRA and the MPAS.

28.    Defendant Ball Brothers Sheep Company is an Idaho Corporation with its principal place of business in Lewisville, Idaho. Defendant Ball Brothers Sheep Company is or was a member of the WRA and the MPAS.

29.    Defendant Estill Ranches, LLC, is a Nevada Limited Liability Company with its principal place of business in Gerlach, Nevada. Defendant Estill Ranches, LLC, is or was a member of the WRA and the MPAS.

30.    Defendant Cunningham Sheep Company is an Oregon Domestic Business Corporation with its principal place of business in Pendleton, Oregon. Defendant Cunningham Sheep Company is or was a member of the WRA and the MPAS.

31.    Defendant Dennis Richins DBA Dennis Richins Livestock is an individual who is domiciled in Utah. Defendant Richins is or was a member of the WRA.

32.    During at least some of the period from 2001 until 2014, Defendant Richins was the Executive Director of the WRA. During this period, he oversaw substantially all of the WRA's operations, including its submission of job orders and H-2A Applications (explained below) on behalf of ranches based in Colorado. In fact, Defendant Richins signed off on almost all—if not all—H-2A job orders and H-2A Certification Applications during his time as Executive Director, including a substantial number of H-2A Certification Applications and job orders for Colorado-based ranches.

33.     Defendant Child Ranch, LLC, is a Wyoming Limited Liability Corporation with its principal place of business in Cokeville, Wyoming. Defendant Child Ranch, LLC, is or was a member of the WRA and the MPAS.

34.     Together, Martin Auza Sheep Corporation, Nottingham Land and Livestock, LLLP, Ball Brothers Sheep Company, Estill Ranches, LLC, Cunningham Sheep Company, Dennis Richins DBA Dennis Richins Livestock, Child Ranch, LLC, shall be referred to as "Rancher Defendants."

35.     Each of the Rancher Defendants was a member of the WRA, the MPAS, or both at some point within 4 years prior to the filing of this action.

36.     Upon information and belief, all of the Rancher Defendants are either directly, or through their states' growers associations, members of the American Sheep Industry Association (ASI). The ASI is located in Colorado.

37.     Among other things, ASI members benefit from the ASI's news and educational materials, trainings and conferences, and public policy advocacy.

38.     All of the Rancher Defendants produce sheep on the open range.

39.     According to the National Research Council's Committee on the Economic Development and Current Status of the Sheep Industry in the United States, most sheep raised on the open range are moved to feedlots for finishing, and all of the major sheep feedlots in the United States are located in Colorado.

40.     Upon information and belief, the Rancher Defendants use Colorado feedlots to finish their sheep.

**STATEMENT OF FACTS**

**III.     The American Sheepherding Industry and Its Shepherds**

41.     Sheep ranches in the western United States raise sheep to produce meat and wool, which generate roughly $275 million per year for the industry.

42.     The industry depends upon thousands of shepherds, employed by ranches, to tend to the sheep herds.

43.     As the WRA and the MPAS describe, the shepherds tend herds of 1,000 sheep or more, "often in rugged high altitude terrain or dry desert conditions, hauling water for the animals, herding them to grazing areas and making sure they have enough to eat, keeping them from going astray, and protecting them from the constant threat of natural predators like coyotes, mountain lions, and wolves, harmful or poisonous plants, and man-made dangers like highways and domesticated dogs. During lambing, calving or kidding season, the shepherds assist the animals in the birthing process, and at all times, the shepherds provide for the health and medical needs of the herd."

**IV.     Regulatory Scheme Governing Importation of Foreign Shepherd Labor**

44.     The H-2A Visa Program is an agricultural guest worker visa program administered by the DOL that allows for the issuance of work visas to foreign workers to fill positions that employers cannot fill through the domestic labor market.

45.     Pursuant to the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, before issuing H-2A visas, the DOL is charged with ensuring that there is in fact a shortage of American workers willing and able to fill the positions that employers seek to fill with foreign H-2A workers.

46.     Specifically, before permitting the importation of foreign workers under H-2A

visas, the INA requires the DOL to certify that:

> (A) there are not sufficient workers who are able, willing, and
> qualified, and who will be available at the time and place
> needed, to perform the labor or services involved in the
> petition, and
> (B) the employment of the alien in such labor or services will
> not adversely affect the wages and working conditions of
> workers in the United States similarly employed.

47.     To implement its statutory duty under the INA, the DOL has promulgated

regulations. *See* 20 C.F.R. §§ 655.100 *et seq.*

48.     Under the regulations, before a foreign worker can be imported under an H-2A

visa, an employer must first offer the job to U.S. workers through State Workforce

Agencies. *Id.* § 655.121. Because H-2A visas are only issued for positions that cannot

be filled by the domestic labor market, DOL regulations prescribe that employers offer

domestic workers "no less than the same benefits, wages, and working conditions that

the employer is offering, intends to offer, or will provide to H–2A workers."  20 C.F.R. §

655.122(a).

49.     Additionally, ranchers or membership associations acting on their behalf must

offer, among other things, the "worker at least the AEWR [Adverse Effect Wage Rate],

the prevailing hourly wage rate, the prevailing piece rate, the agreed-upon collective

bargaining rate, or the Federal or State minimum wage rate, in effect at the time work is

performed, whichever is highest, for every hour or portion thereof worked during a pay

period."  20 C.F.R. § 655.122(l).

50.     These job offers to domestic workers are called "job orders."

Deleted:

Deleted: These job offers to domestic workers are called "job orders."

Formatted: Footer, Centered

Deleted:

Deleted: ¶

Formatted: Font: Arial

Formatted: Font: Arial, 12 pt

51.   Only if American workers do not accept a position offered through a job order can the employer submit an Application for Temporary Employment Certification (an "H-2A Application") to the DOL for certification.

52.   The DOL can promulgate exceptions to the H-2A Visa Program, known as "special procedures," for particular agricultural industries.

53.   The DOL has implemented special procedures in the sheepherding industry. The DOL implemented one set of special procedures in 2011 that were in effect until November 16, 2015. *See* 76 Fed. Reg. 47,256 (issued Aug. 4, 2011).

54.   Prior to November 16, 2015, the wage floor established by DOL was as follows:

| State(s) | Wage Floor ($/Month) |
|---|---|
| Colorado, Idaho, Montana, New Mexico, North Dakota, Oklahoma, Texas, Utah, and Wyoming | $750 |
| Arizona and Washington | $750 |
| Nevada | $800 |
| California | $1,422.55 |
| Oregon | $1,277 |

55.   As of November 16, 2015, the wage floor for H-2A shepherds was raised by the Department of Labor to $1206.31 per month. *See Labor Certification Process for the Temporary Employment of Aliens in Agriculture in the United States: Adverse Effect Wage Rate for Range Occupations Through 2016*, 80 Fed. Reg. 70,840, 70840 (the "2015 Special Procedures"). This wage floor can be higher in individual states, such as California and Oregon, based on higher state-level minimum-wage laws.

56.     Although the special procedures depart and expand upon the requirements set out in the regulations, they are intended to effectuate the same basic principles and policies: shepherd jobs paid at or above a DOL-set wage floor must first be offered to American workers through "job orders" and only after American workers do not take the offered jobs—and after application to, and certification by, the DOL—can ranchers import foreign shepherds through H-2A visas.

57.     Although "[t]he employer's job offer must offer to U.S. workers no less than the same benefits, wages, and working conditions that the employer is offering, intends to offer, or will provide to H-2A workers," 20 C.F.R. § 655.122(a), there is no statute, regulation, or special procedure preventing ranchers from offering higher wages to the domestic workers in the job orders than they do to H-2A workers in the H-2A Applications.

Furthermore, although the DOL sets wage floors for foreign H-2A shepherds,

|   |   |
|---|---|
|   |   |
|   |   |
|   |   |
|   |   |

58.     , there is no statute, regulation, or special procedure preventing ranchers from offering higher wages to some or all foreign shepherds working in the United States on H-2A visas.

**V.     Allegations Regarding Defendants' Wage Fixing**

> **A.  Association Defendants, Rancher Defendants, and their Collusive Relationships**

59.     The sheep ranching industry is highly concentrated under Association Defendants. From October 1, 2013, to October 1, 2014, the WRA hired roughly 55% of all open range shepherds hired in the United States. From October 1, 2013, to October 1, 2014, the MPAS hired roughly 36% of all open range shepherds hired in the United States.

60.     Association Defendants play a considerable role in the recruitment, hiring, and oversight of H-2A shepherds, and as a consequence, WRA and MPAS members have frequent opportunities to communicate with Association Defendants and with each other regarding the recruitment and hiring of shepherds.

61.     Members of the ASI benefit from online educational tools and weekly newsletters that also provide ranchers with frequent opportunities to communicate about issues regarding the employment of shepherds.

62.     Although ranches compete in the sale of their products, principally meat and wool, the ranches that are members of the WRA and MPAS have conspired to fix one of their principal costs: shepherd wages.

63.     Rancher Defendants and other members of Association Defendants do not share profits or distribute losses, but through the WRA and MPAS they collude to fix shepherd wages at precisely the wage floor set by the DOL.

64.     The members of the WRA and the members of the MPAS each entered into and implemented nearly identical price fixing conspiracies and, together, tacitly colluded to perpetuate both conspiracies.

65.    The fixing and suppression of shepherd wages results in a windfall for MPAS and WRA members and causes shepherds to work for shockingly low wages without any opportunity to bargain for more.

66.    Absent this unreasonable restraint of trade resulting from the price fixing conspiracy or conspiracies, the ranchers currently conspiring to fix the wages of shepherds would compete in the shepherd labor market for shepherds. Similarly, absent the price fixing, shepherds would compete in the shepherd labor market for the best sheepherding jobs, putting normal upward pressure on wages.

**B.  Concerted Conduct to Fix Wages Offered to Domestic Shepherds**

67.    With respect to the recruitment of domestic shepherds, the WRA and the MPAS each act as illegal combinations of competitors.

68.    In this role, among other things, the WRA's and the MPAS's principal purpose is to create job orders for and on behalf of their members.

69.    With respect to the recruitment of domestic shepherds, member ranchers—including Rancher Defendants—maintain membership in the WRA and the MPAS and enlist their services in preparing job orders for the purpose of allocating decisions regarding wages offered to domestic shepherds to associations constituted by competitor ranchers, and with the knowledge that the Association Defendants use job orders to illegally fix shepherd wages at the DOL-set wage floor for each state.

70.    Additionally, these job orders evidence concerted conduct among the WRA and its members and the MPAS and its members to offer domestic shepherds at precisely the wage floor set by the Department of Labor for foreign shepherds.

71.     Based upon a review of the WRA job orders associated with WRA H-2A Applications filed between October 1, 2013 and October 1, 2014, the job orders to U.S. workers that preceded these H-2A Applications offered the same wages as the H-2A Applications and therefore almost always offered exactly the DOL H-2A wage floors for each state as a fixed wage to potential U.S. workers.

72.     Based upon a review of the MPAS job orders associated with the MPAS H-2A Applications filed between October 1, 2013 and October 1, 2014, the job orders to U.S. workers that preceded these H-2A Applications offered the same wages as the H-2A Applications and therefore almost always offered exactly the DOL H-2A wage floors for each state as a fixed wage to the U.S. workers.

73.     Attached to this complaint as Exhibit A are job orders prepared by Association Defendants on behalf of Rancher Defendants within the four years prior to the commencement of this litigation.

74.     Each Rancher Defendant offered a shepherd position in at least one of the attached job orders, and in all of these job orders, Rancher Defendants, acting through either the WRA or the MPAS, offered exactly the same wage as all of the other ranches making offers within the same state. *See* Ex. A.

75.     The content of the job orders strikingly illustrates Defendants' collusive activity. For example, in job orders filed by Association Defendants on behalf of multiple member ranches, Association Defendants do not separate out the wages offered to domestic shepherds by ranch, but instead provide a blanket wage rate for all ranches

16

operating in a state. For example, the "Wage Rates" section of a job order prepared by the WRA in 2014 states as follows:

| 17. Wage Rates, Special Pay Information and Deductions / Tarifa de Pago, Información Sobre Pagos Especiales y Deducciones (Rebajas) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Crop Activities | Hourly Wage | Piece Rate / Unit(s) | Special Pay (bonus, etc.) | Deductions* | Yes/Sí | No | Pay Period / Período de Pago |
| Cultivos | Salario por Hora | Pago por Pieza / Unidad(es) | Pagos Especiales (Bono, etc.) | Deducciones | | | / / |
| Sheepherding | $750.00 | $ | | Social Security / Seguro Social | ✓ | ☐ | Weekly / Semanal |
| | $ | $ | | Federal Tax / Impuestos Federales | ✓ | ☐ | ☐ |
| | $ | $ | | State Tax /Impuestos Estatales | ✓ | ☐ | Bi-weekly/ Quincenal |
| | $ | $ | | Meals / Comidas | ☐ | ✓ | |
| | $ | $ | | Other (specify) / Otro (especifica) | ☐ | ✓ | Monthly/Mensual ✓ |
| | | | | | | | Other/Otro ☐ |

18. More Details About the Pay / Mas Detalles Sobre el Pago:

76.     The wage offered in this order is $750 per month.

77.     The portion of the job order that requires listing the address of every employer offering this wage (Field 2 below) directs the potential job applicant to an addendum:

Deleted:

Formatted: Footer, Centered

Deleted: ¶

Formatted: Font: Arial

Formatted: Font: Arial, 12 pt



78.    In the case of the job order excerpted above, the Addendum names 18 ranches, each of which, pursuant to the generic language in the "Wage Rates" section offers domestic workers exactly the DOL-set wage floor and no more.  *See* Ex. B at 7-9.

79.    This job order is the same or substantially similar to dozens of other WRA job orders.

80.    The irrationality of Defendants' conduct provides further evidence of these conspiracies. In a competitive market, and absent the price fixing, ranchers would offer at the very least a nominally higher wage to U.S. workers than they do H-2A workers to account for the additional cost of bringing an H-2A worker to the country normally from

Deleted: a

Deleted:

Formatted: Footer, Centered

Deleted: ¶

Formatted: Font: Arial

Formatted: Font: Arial, 12 pt

Peru, H-2A workers are more costly to employers because, pursuant to the H-2A regulations, they must be reimbursed by their employers for travel to and from the place of recruitment in their home country. Instead, Defendants fix wages for domestic workers at the DOL-set wage floor for foreign workers to ensure the unavailability of domestic workers and the stagnation of the DOL-set wage floor.

81.     In most states, the DOL-set wage floor for most H-2A shepherds used to be only $2 to $3 per hour. At the time of the filing of this Second Amended Complaint, it is approximately $4.50 per hour or $1206.30 per month for most workers. And, yet, in the absence of the ranchers' combination or agreement to fix shepherd wages, ranchers would negotiate with available range workers and the average wage would increase to something similar to the minimum wage for domestic ranch hands, general ranch farmworkers, or closed range herders. All of these employees earn substantially more than H-2A shepherds and, unlike H-2A shepherds, these employees receive differing wages commensurate with multiple variables, including skill, job location, experience, and work environment, as would be expected in a competitive labor market.

82.     Furthermore, freely negotiated wages would be reflected in the wage surveys upon which the government will rely in setting a wage floor for foreign laborers in future years, thus increasing the meager wage floor for H-2A shepherds.

83.     Defendants set wages offered to domestic shepherds at low levels because Rancher Defendants know that if the positions are not filled domestically, the Immigration and Nationality Act allows them to look to an international market for vulnerable and desperate immigrants. These immigrants are willing to work for wages

that are aberrational in the American labor market and that, for the reasons set out below, Defendants agree to fix at the bare minimum allowable by law.

84.      The DOL recently estimated that there were only 18 domestic shepherds left in the United States.

### C. Concerted Conduct to Fix Wages Paid to Foreign Shepherds

85.      With respect to the recruitment of foreign shepherds, the WRA and the MPAS each act as illegal combinations of competitors.

86.      Among other things, one of the principal purposes of the WRA and the MPAS is to file H-2A applications on behalf of their members with the DOL.

87.      With respect to the recruitment of foreign ranchers, member ranchers—including Rancher Defendants—maintain membership in the WRA and the MPAS, and enlist their services in preparing H-2A applications, for the purpose of allocating decisions regarding foreign shepherd wages to associations constituted by competitor ranchers, and with the knowledge that the Association Defendants use job orders to illegally fix shepherd wages at the DOL-set wage floor for each state.

88.      Additionally, these H-2A Applications evidence concerted conduct among the WRA and its members and the MPAS and its members to pay foreign shepherds exactly the wage floor set by the DOL for each state.

89.      The DOL releases statistics each year for the shepherd H-2A program. The latest year for which the DOL has released complete data runs from October 1, 2013 to October 1, 2014.

90.     In that time period, the WRA submitted, on behalf of its members, H-2A Applications for approximately 1,214 H-2A shepherds. All of these WRA H-2A Applications offered exactly the DOL-prescribed H-2A wage floors as the relevant wage term.

91.     In the same time period, the MPAS submitted H-2A Applications for approximately 788 H-2A shepherds for its members. All but one of these H-2A Applications offered exactly the DOL H-2A wage floors as a wage term.

92.     Attached to this complaint as Exhibit C are H-2A Applications prepared by Association Defendants on behalf of Rancher Defendants within the four years prior to the commencement of this litigation.

93.     Each Rancher Defendant offered a shepherd position in at least one of the attached H-2A Applications, and in all of these H-2A Applications, Rancher Defendants, acting through either the WRA or the MPAS, offered exactly the same wage as all of the other ranches making offers within the same state. *See* Ex. C.

94.     The content of the H-2A Applications strikingly illustrate Defendants' collusive activity. For example, in substantially all H-2A Applications filed by Association Defendants on behalf of multiple member ranches, Association Defendants do not separate out the wages for H-2A shepherds by ranch, but instead provide a blanket wage rate for all ranches operating in a state. For example, the "Rate of Pay" set out in a WRA-prepared H-2A Application filed in 2014 appears as follows:

**G. Rate of Pay**

1. Basic Rate of Pay Offered *    |    1a. Overtime Rate of Pay *if applicable* $

From: $ _750_ . _00_    To (Optional) $ _1,603_ . _33_    From: $ _0_ . _00_    To (Optional) $ _0_ . _00_

2. Per: (Choose only one) *    ☐ Hour ☐ Week ☐ Bi-Weekly ☑ Month ☐ Year ☐ Piece Rate

2a. If Piece Rate is indicated in question 2, specify the wage offer requirements: $ N/A

3. Additional Wage Information (e.g., multiple worksite applications, itinerant work, or other special procedures). If necessary, add attachment to *continue and complete* description. $

SEE ADDENDUM.

CA $1,600.34; AZ, CO, ID, ND, SD, UT, WY $750.00; OR $1,603.33; NV $800.00 PER MONTH.

EMPLOYER SHALL PROVIDE HOUSING AND BOARD IN

Ex. D, at 5.

95.    The "Rate of Pay" section of the H-2A Application does not mention the names of individual ranches, which are set out in an attached "Addendum."

96.    In the case of the H-2A Application excerpted above, the Addendum includes the names of dozens of ranches, each of which, pursuant to the generic language in the "Rate of Pay" section pays its H-2A shepherds exactly the DOL-set wage floor and no more.

97.    This H-2A Application is the same or substantially similar to dozens of other WRA H-2A Applications.

98.    The price fixing conspiracy is further evidenced by Defendants' conduct in adjusting the wages paid to H-2A shepherds in lockstep with changes to the DOL-set wage floor for each state.

99.    For example, in January 2015, the WRA instructed its members in Oregon to uniformly begin paying exactly the new DOL wage floor: "[B]eginning January 1, 2015 the wage rate for shepherds working in Oregon is $1,326.46.". You "should immediately adjust your wage payments to [that] monthly wage amount."

100.    In the absence of a conspiracy, Defendants' conduct in fixing wages for H-2A shepherds would be irrational.  In a free market, ranchers would negotiate with H-2A shepherds who would, therefore, receive differing wages commensurate with multiple variables, including skill, job location, experience, and work environment.

**D.   The Effects of the Anti-Competitive Conspiracy on the DOL's Wage Determinations**

101.    The DOL sets wage floors to prevent an "adverse effect" on the U.S. workers in the shepherd labor market and sets these floors by conducting wage surveys that review the wages paid to shepherds in the relevant market.

102.    By agreeing to a cap on the amount that Defendant ranchers pay their shepherds at exactly the minimum DOL wage floor, the result of Defendants' conspiracy is an artificial ceiling on wages that would otherwise increase under normal market forces. As a consequence of this wage stagnation, the DOL's wage surveys reflect an artificially low wage for shepherds.

103.    Because the Defendants' wage fixing has artificially depressed wages in the shepherd labor market, it has also artificially depressed the DOL's wage floors, the very same minimum wage that Defendants rely on in fixing wages paid to their workers.

104.    While wages in other similar industries have continued to rise with normal inflation, the wages for shepherds—until recently—were stuck, in some cases at less than half of the federal minimum wage for covered workers.

105.    The price fixing's downward pressure on the DOL's wage floors, and therefore on the fixed wage, has led to absurdly low wages for shepherds. When the Industrial Welfare Commission of the State of California examined shepherd wages in 2000, it

determined that "the wages paid to shepherds may be inadequate to supply the cost of proper living and that the hours and working conditions of shepherds may be prejudicial to their health and welfare." It then voted to remove the shepherd exemption from California's minimum wage.

106.   The stagnation of DOL's H-2A wage floor represents both a motive for Defendants' wage fixing and one of the market distortions resulting from Defendants' wage-fixing conspiracies in a highly regulated labor market.

**E.  The Resulting Restraint of Trade and Antitrust Injuries**

107.   Defendants' wage-fixing conspiracy has artificially restrained trade in the United States labor market for shepherds, generally, as well as in the markets for domestic shepherds and H-2A shepherds separately.

108.   With regard to the market for shepherds generally, the result of Defendants' conspiracies is suppressed, stagnated wages for all shepherds in the United States. As a consequence, shepherds working on U.S. sheep ranches are deprived of the normal fruits of their labor and have very little incentive to become better shepherds.

109.   The fixed wages entice relatively few domestic shepherds, who are effectively deprived of their right to work as shepherds in the domestic labor market.

110.   Ranchers historically have claimed that there is an insufficient supply of domestic shepherds and, therefore, that they must look to the foreign labor market to recruit workers. While there was a true labor shortage during the Second World War which gave rise to the Bracero program (a precursor to today's H-2A visa program), the dearth of domestic shepherds today is not the result of an unwilling or incapable workforce, but

**Deleted:** The price fixing conspiracy is further evidenced by the WRA's instructions to its members to change their fixed wage when the DOL adjusts its wage floor. These instructions reveal Defendants' conspiracy to comply with the DOL wage floor by all paying exactly that amount and no more. In January 2015, the WRA instructed its members in Oregon to uniformly begin paying exactly the new DOL wage floor: "[B]eginning January 1, 2015 the wage rate for shepherds working in Oregon is $1,326.46"

**Deleted:**
**Formatted:** Footer, Centered
**Deleted:** ¶
**Formatted:** Font: Arial
**Formatted:** Font: Arial, 12 pt

rather the Defendants' concerted efforts to suppress wages well below the fair market value of the shepherds' work.

111.   In this distorted labor market, Defendants rely on foreign shepherds, over whom Defendants can exert substantial and even anachronistic control, including by preventing "runaways" and abusing employees whose lack of familiarity with English and the United States legal system renders less likely to complain about their deplorable working conditions.

## VI.   Allegations Regarding Illegal Deductions

### A.   The Enterprises

#### 1.   "Richins Enterprise"

112.   As Executive Director of the WRA, Defendant Richins formed an association-in-fact with the WRA, which shall be referred to as the "Richins Enterprise."

113.   Richins served as Executive Director of the WRA from 2001 until sometime in 2014. From 1985 until 2001 he was a WRA board member, and president of the WRA from 1988 until 2001.

114.   In this role, Richins had substantial involvement in the WRA's policies regarding payment of shepherd wages and signed all—or almost all—H-2A job orders and H-2A Certifications for WRA employees. *See also Ruiz v. Fernandez*, 949 F. Supp. 2d 1055, 1069 (E.D. Wash. 2013) (citing Richins's testimony regarding WRA's wage-payment policies).

**Moved up [6]:** <#>  You "should immediately adjust your wage payments to [that] monthly wage amount."¶

**Deleted:** <#>Although WRA and MPAS members agree to pay exactly the wage floor set by the DOL, this floor falls below the applicable Nevada minimum wage, meaning that Defendants employing shepherds in Nevada conspire to fix wages at an illegally low level.¶
The members of the WRA and the members of the MPAS each entered into and implemented nearly identical price fixing conspiracies and tacitly colluded to perpetuate both conspiracies. That tacit collusion is itself an unreasonable restraint of trade.

**Moved up [4]:** <#> ¶
Absent this unreasonable restraint of trade resulting from the price fixing conspiracy or conspiracies, the ranchers currently conspiring to fix the wages of shepherds would compete in the shepherd labor market for shepherds. Similarly, absent the price fixing, shepherds would compete in the shepherd labor market for the best sheepherding jobs, putting normal upward pressure on wages.¶

**Formatted:** A2, Numbered + Level: 1 + Numbering Style: A, B, C, ... + Start at: 1 + Alignment: Left + Aligned at:  0.5" + Indent at:  0.75"

**Formatted:** Footer, Centered

**Deleted:**

**Deleted:** ¶

**Formatted:** Font: Arial

**Formatted:** Font: Arial, 12 pt

115.    In conducting their illegal racketeering scheme, Richins and the WRA acted with the common purpose of minimizing member ranches' payments to H-2A shepherds and thereby increasing the WRA's market share or profits.

### 2.  The "WRA Enterprise"

116.    The WRA and its members have formed an association-in-fact, which shall be referred to as the "WRA Enterprise."

117.    The common purpose of each of the members of the WRA Enterprise was and is recruiting shepherds for WRA member ranches and minimizing member ranches' payments to H-2A shepherds.

118.    The WRA is the lynchpin of the WRA Enterprise, but the WRA Enterprise could not function without the informal, association-in-fact established between the WRA and its members.

119.    The WRA uses the WRA Enterprise to file job orders and H-2A Applications on behalf of the WRA's members.

120.     Because it receives fees from member ranches in exchange for preparing job orders and H-2A Applications, the WRA has independent financial incentive to participate in the WRA Enterprise's pattern of racketeering.

121.    The WRA has existed as a membership organization recruiting shepherds for its members since at least the 1950s.

### 3.  The "MPAS Enterprise"

122.    The MPAS and its members have formed an association-in-fact, which shall be referred to as the "MPAS Enterprise."

123.    The common purpose of each of the members of the MPAS Enterprise was and is recruiting shepherds for MPAS member ranches and minimizing member ranches' payments to H-2A shepherds.

124.    The MPAS is the lynchpin of the WRA Enterprise, but the MPAS Enterprise could not function without the informal, association-in-fact established between the MPAS and its members.

125.    The MPAS uses the MPAS Enterprise to file job orders and H-2A Applications on behalf of the MPAS's members.

126.    Because it receives fees from member ranches in exchange for preparing job orders and H-2A Applications, the MPAS has an independent financial incentive to participate in the MPAS Enterprise's pattern of racketeering.

127.    The MPAS has existed as a membership organization recruiting shepherds for its members since at least 1988.

### B.  Patterns of Racketeering

128.    The Enterprises engaged in patterns of racketeering activity by committing multiple, continuing, and related acts of fraud for the benefit of the respective Enterprises over a period of years.

129.    Specifically, the Enterprises continually and repeatedly have made material and false representations to state governments, the federal government, and shepherds by assuring all of these entities that shepherds would not be subject to unreasonable deductions pursuant to 20 C.F.R. § 655.122, which requires free and clear wage

payments, bars illegal kickbacks, and bars employers from using deductions to "reduce the wage payment made to the employee below the minimum amounts required."

130.    The Enterprises also have continually and repeatedly defrauded state governments, the federal government, and shepherds by misrepresenting to these entities that shepherds would be reimbursed "for reasonable costs incurred by the worker for transportation and daily subsistence from the place from which the worker has come to work for the employer, whether in the U.S. or abroad to the place of employment," as required by 20 C.F.R. § 655.122.

131.    The Enterprises made these assurances despite simultaneously knowingly and intentionally implementing policies that violated 20 C.F.R. § 655.122.

132.    In recent job orders to state workforce agencies, the WRA has promised that

   [t]ransportation from point of recruitment to worksite and from the worksite back to the point of recruitment will be provided by Employer. Employer will reimburse worker for subsistence costs during travel to the worksite not later than the end of the first pay period upon the presentation of receipts and from the worksite at the end of the job based on the rates established by the applicable regulations.

133.    The WRA made this promise or substantially the same promise in substantially all of its job orders submitted within the four years prior to the filing of this Second Amended Complaint.

134.    In recent job orders to state workforce agencies, the MPAS has promised that

   [t]he employer will provide advance inbound transportation (most economical common carrier or other transportation which conforms to the Interstate Commerce Commission (ICC)). The employer will also provide subsistence at a minimum amount of $11.86 per 24-hour period of travel from the place of recruitment to the place of employment. Workers who provide receipts for meals and non-alcoholic beverages in excess of $11.86 will be reimbursed during the first pay period, up to the maximum

amount of $46.00 per 24-hour period of travel (12:01 A.M.-12:00 midnight) from the place of recruitment to the place of employment. Transportation and subsistence which was advanced to the worker may be deducted from the worker's pay, but will be reimbursed to the worker upon 50% completion of the work contract. Workers who voluntarily quit or are terminated for cause prior to completing 50% of the contract period will be required to reimburse the employer for the full amounts of transportation and subsistence which were advanced and/or reimbursed to the worker. In the event of termination for contract impossibility, employer will reimburse the worker the full amount of any deductions made from the workers' pay by the employer for transportation and subsistence expenses to the place of employment; and pay the worker for any costs incurred by the worker for transportation and daily subsistence to that employer's place of employment. Upon completion of the work contract, or termination for contract impossibility (including due to Act of God or medical reasons), the employer will provide or pay outbound transportation (under the most economical common carrier or other transportation which conforms to ICC regulations) and subsistence from the work site to the place of recruitment. The amounts the employer will pay outbound subsistence will be the minimum amount of $11.86 per 24-hour period of travel. The maximum amount reimbursed not to exceed $46.00 per 24-hour period of travel (12:01- 12:00 midnight) for workers who provide receipts. This requirement will be nullified if the worker has contracted with a subsequent H-2A employer who has agreed to pay for the worker's transportation and subsistence costs from the present employer's work site. Written notification to the NPC, and DHS in case of H-2A workers, or any other method specified by the Department or DHS in a notice published in the Federal Register, will relieve the employer of the responsibility of providing outbound (return to place of recruitment) transportation and subsistence expenses to workers who voluntarily abandon employment before the end of the contract period, or who are terminated for cause.

135.    The MPAS made this promise or substantially the same promise in substantially all its job orders submitted within the four years prior to the filing of this complaint.

136.    In reliance on statements like these in the job orders, the state workforce agencies review and approve job orders to be offered to domestic workers.

137.    The Enterprises, acting through Association Defendants, submit or have submitted H-2A Applications to the DOL with attached copies of job orders offering

positions that domestic workers did not fill. These job orders contain the promises to

reimburse travel expenses described above.

138.   All H-2A Applications filed within the relevant statute of limitations also make the

following promise:

> The employer and its agents have not sought or received payment of any
> kind from the H-2A worker for any activity related to obtaining labor
> certification, including payment of the employer's attorneys' fees,
> application fees, or recruitment costs. For purposes of this paragraph,
> payment includes, but is not limited to, monetary payments, wage
> concessions (including deductions from wages, salary, or benefits),
> kickbacks, bribes, tributes, in kind payments, and free labor.

139.   Each H-2A Application submitted by the WRA is signed under penalty of perjury

by an agent of the WRA.

140.   Each H-2A Application submitted by the MPAS includes a certification by an

agent of the MPAS that the information in the H-2A Application is true and correct.

141.   In reliance on these H-2A Applications and job orders, the DOL reviews and

approves H-2A Applications and allows the WRA and the MPAS to recruit foreign

workers using H-2A visas.

142.   Pursuant to state and DOL instructions, all job orders and H-2A Applications

must be submitted to the respective agencies by wire or mail.

143.   The statements by the WRA and the MPAS are fraudulent because the MPAS

and WRA each has a policy of unreasonably deducting expenses that are primarily for

the benefit or convenience of the employer from the wages of shepherd employees,

including medical checkups, criminal background checks and travel and subsistence

expenses (which include bus fares, meals, and hotels necessary to travel between the

shepherd's place of recruitment and the workplace, and travel necessary to complete the other pre-travel requirements, *e.g.,* the medical checkups).

144.    The WRA's fraudulent intentions are further evidenced by the discrepancies between its representations to the state workforce agencies and the DOL, which parrot the regulatory travel reimbursement requirements, and the vague promise made to shepherds in their form "PRE-EMPLOYMENT NOTICE OF RIGHTS AND OBLIGATIONS," which the WRA gives to shepherds before travelling to the United States. That form states only that "[t]ransportation for travel to and from your home country are paid if you complete the contract terms."

C.    **These Patterns of Racketeering and Fraudulent Acts Injured Plaintiffs**

145.    The Enterprises' fraudulent misrepresentations caused Plaintiffs injury by inducing the DOL to issue H-2A certifications authorizing each of Plaintiffs' H-2A visas for employment as shepherds.

146.    Notwithstanding the assurances the Enterprises made to the DOL, Plaintiffs were victims of illegal deductions that were primarily for the benefit of the Association Defendants and their members. In this way, the Richins Enterprise's and the WRA Enterprise's underlying predicate acts of mail and wire fraud caused injury to Plaintiffs Huaman, Leovegildo Vilchez Guerra, and Liber Vilchez Guerra. And the MPAS Enterprise's underlying predicate acts of mail and wire fraud caused injury to Plaintiff De la Cruz.

147.    Furthermore, notwithstanding the assurances the Enterprises made to the Department of Labor, the Enterprises did not receive the legally-required travel

31

reimbursement. In this way, the Richins Enterprise's and the WRA Enterprise's underlying predicate acts of mail and wire fraud caused injury to Plaintiffs Huaman, Leovegildo Vilchez Guerra, and Liber Vilchez Guerra. And the MPAS Enterprise's underlying predicate acts of mail and wire fraud caused injury to Plaintiff De la Cruz.

148.    These frauds occurred when Plaintiffs arrived in the United States after paying these expenses and not being reimbursed. Plaintiff De La Cruz arrived in the United States in April 2012 and April 2015 without being reimbursed for travel and other expenses. Plaintiff Leovegildo Vilchez Guerra arrived in May 2011 and May 2014 without being reimbursed. Plaintiff Liber Vilchez Guerra arrived November 2014 without being reimbursed. And Plaintiff Huaman arrived in March 2011 without being reimbursed.

149.    Each of these named Plaintiffs incurred expenses that were required to be reimbursed pursuant to 20 C.F.R. § 655.122 and were not. For example, each of the named Plaintiffs incurred travel and subsistence expenses from his place of recruitment and his workplace that were never reimbursed, *e.g.*, bus tickets, hotels, and meals.

150.    All H-2A Applications and job orders filed by the Enterprises with state workforce agencies or the DOL with start dates corresponding to the dates when Plaintiffs began working as H-2A shepherds contained the fraudulent statements detailed above in paragraphs 134-150, or substantially similar statements.  *See* Ex. E.

| Deleted: |
| Formatted: Footer, Centered |
| Deleted: ¶ |
| Formatted: Font: Arial |
| Formatted: Font: Arial, 12 pt |

**VII.      Allegations Regarding the Failure to Pay Nevada Minimum Wage**

151.   For several years until mid-November 2015, the MPAS has employed shepherds in Nevada, including Plaintiff De la Cruz, and paid those shepherds approximately $800 per month.

152.   Upon information and belief, the MPAS currently pays its shepherd employees in Nevada exactly the minimum set by the DOL in the 2015 Special Procedures.

153.   The MPAS has exerted substantial control over the recruitment and hiring of shepherds in Nevada and has set shepherd wages.

154.   At all relevant times, the MPAS controlled its shepherd employees' employment by, among other things, setting the terms and conditions of employment, including the wage rate, recruiting the employees, and maintaining employment records.

155.   At all relevant times, the Nevada minimum wage was set by the Nevada Constitution at either $7.25 per hour or $8.25 per hour, depending on whether the employer provides health benefits.

156.   Shepherds are entitled to the Nevada constitutional minimum wage.

157.   During a normal workweek, shepherds, including Plaintiff De la Cruz, work more than 40 hours per week.

158.   $800 in wages per month compensates an employee in Nevada for less than 24 hours per week of work.

159.   The $800 per month wage rate is therefore unconstitutional and illegal under Nevada law.

**RULE 23 CLASS ALLEGATIONS**

**Deleted:** At all relevant times

**Deleted:** at or about $750

**Deleted:** 750

**Deleted:** 750

**Formatted:** Footer, Centered

**Deleted:**

**Deleted:** ¶

**Formatted:** Font: Arial

**Formatted:** Font: Arial, 12 pt

**VIII.** **The Price Fixing Classes**

160.   Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

161.   Pending any modifications necessitated by discovery, the named Plaintiffs define the "Price Fixed Class" as follows:

> ALL PERSONS WHO WORKED OR APPLIED TO WORK AS A SHEPHERD FOR THE WRA, MPAS, OR ANY OF THE MEMBER RANCHERS OF THE WRA OR THE MPAS BEGINNING IN 9/1/11.

162.   Pending any modifications necessitated by discovery, the named Plaintiffs define the "WRA Price Fixed Class" as follows:

> ALL PERSONS WHO WORKED OR APPLIED TO WORK AS A SHEPHERD FOR THE WRA OR ANY OF THE WRA MEMBER RANCHERS BEGINNING ON 9/1/11

163.   Pending any modifications necessitated by discovery, the named Plaintiffs define the "MPAS Price Fixed Class" as follows:

> ALL PERSONS WHO WORKED OR APPLIED TO WORK AS A SHEPHERD FOR THE MPAS OR ANY OF THE MPAS MEMBER RANCHERS BEGINNING ON 9/1/11

164.   The members of the putative class are so numerous that joinder of all potential classes members is impracticable. Plaintiffs do not know the exact size of the classes because that information is within the control of the Defendants. However, WRA and the MPAS claim to recruit "nearly all" of the roughly 2000 to 2500 shepherds employed in the United States each year.

165.   There are questions of law or fact common to the classes that predominate over any individual issues that might exist. Common questions include, but are not limited to

---

Deleted: Class

Moved down [7]: <#>R. Civ

Deleted: <#>Plaintiffs assert Count I as a Class Action pursuant to Fed.

Deleted: <#>. Proc. 23 as what is termed here the "Price Fixed Class." ¶

Deleted: FROM

Deleted: TO THE PRESENT

Formatted: Indent: Left: 0"

Deleted: class

Deleted: The

Deleted: class

Formatted: Footer, Centered

Deleted:

Deleted: ¶

Formatted: Font: Arial

Formatted: Font: Arial, 12 pt

whether the WRA and the MPAS and their respective members fix shepherd wages through the operation of joint ventures that recruit workers and set wages.

166.    The class claims asserted by Plaintiffs are typical of the claims of all of the potential members of the classes because all potential class members suffered suppressed wages as a consequence of Defendants' price fixing. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because numerous identical lawsuits alleging similar or identical causes of action would not serve the interests of judicial economy.

167.    Plaintiffs will fairly and adequately protect and represent the interests of the class. Plaintiffs' wages were artificially kept at the same low level as other shepherds as a result of the same conspiracy.

168.    Plaintiffs are represented by counsel experienced in litigation on behalf of low-wage workers and in class actions.

169.    The prosecution of separate actions by the individual potential Class Members would create a risk of inconsistent or varying adjudications with respect to individual potential Class Members that would establish incompatible standards of conduct for Defendants.

170.    Plaintiffs are unaware of any members of the putative classes who are interested in presenting their claims in a separate action.

171.    Plaintiffs are unaware of any pending litigation commenced by members of the putative classes concerning the instant controversies.

172.   It is desirable to concentrate this litigation in this forum because many of the Defendants and Plaintiffs are located in, or do business in, Colorado and H-2A shepherds operate exclusively in the western United States.

173.   This class action will not be difficult to manage due to the uniformity of claims among the Class Members and the susceptibility of the claims to class litigation and the use of representative testimony and representative documentary evidence.

174.   The contours of the classes will be easily defined by reference to Defendants' records and government records.

**IX.     The WRA Illegal Deduction Class**

175.   Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

176.   Plaintiffs Huaman, Leovegildo Vilchez Guerra, and Liber Vilchez Guerra assert Counts II and V as a Class Action pursuant to Fed. R. Civ. Proc. 23 as what is termed here the "Illegal Deduction Class."

177.   Pending any modifications necessitated by discovery, the "WRA Illegal Deduction Class" is defined as follows:

> ALL PERSONS WHO WERE RECRUITED AS SHEPHERDS, A.K.A. SHEEPHERDERS, BY THE WRA BETWEEN 9/1/2011 AND THE PRESENT.

178.   The members of the putative class are so numerous that joinder of all potential class members is impracticable. The Plaintiffs do not know the exact size of the class since that information is within the control of the Defendant. However, according to the

DOL's 2014 statistics, the WRA recruited approximately 1200 shepherds in the previous year.

179.   There are questions of law or fact common to the classes that predominate over any individual issues that might exist, including whether or not the WRA took illegal deductions from shepherd wages.

180.   The class claims asserted by the Plaintiff are typical of the claims of all of the potential Class Members because all potential Class Members experienced the same illegal deductions due to the WRA's policies. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because numerous identical lawsuits alleging similar or identical causes of action would not serve the interests of judicial economy.

181.   Plaintiff will fairly and adequately protect and represent the interests of the class. Plaintiff suffered from the same illegal deductions as the Class Members.

182.   Plaintiff is represented by counsel experienced in litigation on behalf of low-wage workers and in class actions.

183.   The prosecution of separate actions by the individual potential Class Members would create a risk of inconsistent or varying adjudications with respect to individual potential Class Members that would establish incompatible standards of conduct for Defendants.

184.   Plaintiff is unaware of any members of the putative class who are interested in presenting their claims in a separate action.

185.    Plaintiff is unaware of any pending litigation commenced by members of the

Class concerning the instant controversies.

186.    It is desirable to concentrate this litigation in this forum because many of the

Defendants and Plaintiffs are located in, or do business in, Colorado and shepherds

operate exclusively in the western United States.

187.    This class action will not be difficult to manage due to the uniformity of claims

among the Class Members and the susceptibility of the claims to class litigation and the

use of representative testimony and representative documentary evidence.

188.    The contours of the class will be easily defined by reference to Defendant's

records and government records.

**X.      The MPAS Illegal Deduction Class**

189.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if

fully re-written herein.

190.    Plaintiff De La Cruz asserts Count III and VI as a Class Action pursuant to Fed.

R. Civ. Proc. 23 as what is termed here the "MPAS Illegal Deduction Class."

191.    Pending any modifications necessitated by discovery, the "Illegal Deduction

Class" is defined as follows:

> ALL PERSONS WHO WERE RECRUITED AS
> SHEPHERDS, A.K.A. SHEEPHERDERS, BY THE MPAS
> BETWEEN 9/1/2011 AND THE PRESENT.

192.    The members of the putative class are so numerous that joinder of all potential

class members is impracticable. Plaintiff De La Cruz does not know the exact size of the

class since that information is within the control of the Defendant. However, according

**Deleted:** WRA

**Deleted:** WHO HAD EXPENSES THAT ARE PRIMARILY FOR THE BENEFIT AND CONVENIENCE OF THE EMPLOYER DEDUCTED FROM THEIR WAGES

**Formatted:** Footer, Centered

**Deleted:**

**Deleted:** ¶

**Formatted:** Font: Arial

**Formatted:** Font: Arial, 12 pt

to the DOL's 2014 statistics, the MPAS recruited approximately 780 shepherds in the previous year.

193.   There are questions of law or fact common to the classes that predominate over any individual issues that might exist, including whether or not the MPAS took illegal deductions from shepherd wages.

194.   The class claims asserted by the Plaintiff are typical of the claims of all of the potential Class Members because all potential Class Members experienced the same illegal deductions due to the MPAS' policies. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because numerous identical lawsuits alleging similar or identical causes of action would not serve the interests of judicial economy.

195.   Plaintiff will fairly and adequately protect and represent the interests of the class. Plaintiff suffered from the same illegal deductions as the Class Members.

196.   Plaintiff is represented by counsel experienced in litigation on behalf of low-wage workers and in class actions.

197.   The prosecution of separate actions by the individual potential Class Members would create a risk of inconsistent or varying adjudications with respect to individual potential Class Members that would establish incompatible standards of conduct for Defendants.

198.   Plaintiff is unaware of any members of the putative class who are interested in presenting their claims in a separate action.

Deleted:

Deleted:

Formatted: Footer, Centered

Deleted:

Deleted: ¶

Formatted: Font: Arial

Formatted: Font: Arial, 12 pt

199.   Plaintiff is unaware of any pending litigation commenced by members of the Class concerning the instant controversies.

200.   It is desirable to concentrate this litigation in this forum because many of the Defendants and Plaintiffs are located in, or do business in, Colorado and shepherds operate exclusively in the western United States.

201.   This class action will not be difficult to manage due to the uniformity of claims among the Class Members and the susceptibility of the claims to class litigation and the use of representative testimony and representative documentary evidence.

The contours of the class will be easily defined by reference to Defendant's records and government records.

**XI.    The Nevada Minimum Wage Class**

202.   Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

203.   Plaintiff De La Cruz asserts Count IV as a Class Action pursuant to Fed. R. Civ. Proc. 23 as what is termed here the "NV Minimum Wage Class."

204.   Pending any modifications necessitated by discovery, the "NV Minimum Wage Class" is defined as follows:

> ALL PERSONS WHO WERE EMPLOYED AS
> SHEPHERDS, A.K.A. SHEEPHERDERS BY THE MPAS IN
> NEVADA BETWEEN 9/1/2013 AND THE PRESENT

205.   The members of the putative class are so numerous that joinder of all potential class members is impracticable. Plaintiff De La Cruz does not know the exact size of the class since that information is within the control of the Defendant. However, according

Deleted:

Formatted: Footer, Centered

Deleted: ¶

Formatted: Font: Arial

Formatted: Font: Arial, 12 pt

to the DOL's 2014 statistics, the MPAS employed 43 shepherds in Nevada in the previous year.

206.    There are questions of law or fact common to the classes that predominate over any individual issues that might exist, whether the MPAS fail to pay Nevada shepherds at least Nevada minimum wage.

207.    The class claims asserted by the Plaintiff are typical of the claims of all of the potential Class Members because all potential Class Members allege they were paid less than the Nevada minimum wage by the MPAS. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because numerous identical lawsuits alleging similar or identical causes of action would not serve the interests of judicial economy.

208.    Plaintiff will fairly and adequately protect and represent the interests of the class. Plaintiff suffered from the same illegally low wage as the class.

209.    Plaintiff is represented by counsel experienced in litigation on behalf of low-wage workers and in class actions.

210.    The prosecution of separate actions by the individual potential Class Members would create a risk of inconsistent or varying adjudications with respect to individual potential Class Members that would establish incompatible standards of conduct for Defendants.

211.    Plaintiff is unaware of any members of the putative class who are interested in presenting their claims in a separate action.

Deleted:

Deleted:
Formatted: Footer, Centered
Deleted: ¶
Formatted: Font: Arial
Formatted: Font: Arial, 12 pt

212.   Plaintiff is unaware of any pending litigation commenced by members of the Class concerning the instant controversies.

213.   It is desirable to concentrate this litigation in this forum because many of the Defendants and Plaintiffs are located in, or do business in, Colorado and shepherds operate exclusively in the western United States.

214.   This class action will not be difficult to manage due to the uniformity of claims among the Class Members and the susceptibility of the claims to class litigation and the use of representative testimony and representative documentary evidence. The contours of the class will be easily defined by reference to Defendant's records and government records.

### COUNT I: RESTRAINT OF TRADE IN VIOLATION OF 15 U.S.C. §§ 1 *ET SEQ.*

**Plaintiffs and the Price Fixed Class against all Defendants**

215.   Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

216.   As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all other similarly situated employees pursuant to Fed. R. Civ P. 23.

217.   The conduct of the Defendants, as described herein, substantially affected interstate and international commerce and caused antitrust injury.

218.   Defendant ranchers are competitors in the industry and should be competing with each other to attract the most capable shepherds.

219.   They do not share profits or risk of loss.

220. But, through collusive conduct, they offer all shepherds price-fixed wages that vary solely based on the state in which the ranch is located.

221. Also through collusive conduct, they pay all of their shepherds price-fixed wages that vary solely based on the state in which the ranch is located.

222. The WRA, the MPAS, and their members, including Defendant Ranchers, conspired and agreed to fix the wages offered and paid to shepherds at the minimum DOL wage floor. This fixed rate is artificially low, and the fixing of wages through the operation of Defendant membership associations, the WRA and the MPAS, amounts to a *per se* violation of the Sherman Antitrust Act.

223. The tacit collusion between the WRA and the MPAS necessary to carry out identical illegal price fixing conspiracies within each organization is also a *per se* violation of the Sherman Antitrust Act.

224. The WRA and its members conspired and agreed to fix wages offered and paid to shepherds at the DOL wage floors through the WRA's filing of (a) job offers for domestic workers, and (b) applications for certifications of H-2A workers that both offered exactly the same wage set at exactly the wage floors set by the DOL. The fixing of wages amounts to a *per se* violation of the Sherman Antitrust Act, and the fixed rate set by Defendants has remained artificially low because it has continually put downward pressure on the DOL's wage surveys and, thus, the basis for Defendants' price-fixed wages.

225. The MPAS and its members conspired and agreed to fix wages offered and paid to shepherds at the wage floors set by the DOL through the MPAS's filing of (a) job

Deleted: do

Deleted: the same
Deleted: , dramatically reducing costs and increasing
Deleted: profits of all ranchers.

Deleted: ba2sis

Formatted: Footer, Centered
Deleted:
Deleted: ¶
Formatted: Font: Arial
Formatted: Font: Arial, 12 pt

offers for domestic workers, and (b) applications for certifications of H-2A workers that both offered exactly the same wage set at exactly the DOL wage floors. The fixing of wages amounts to a *per se* violation of the Sherman Antitrust Act, and the fixed rate set by Defendants has remained artificially low because it has continually put downward pressure on the DOL's wage surveys and, thus, the same minimum wage requirements upon which Defendants rely to fix wages.

226.    In the alternative, Plaintiffs allege that the Defendants' price-fixing agreement is anticompetitive and illegal under the Rule of Reason. For purposes of the Rule of Reason, the relevant geographic market for the claim alleged in this Count is the United States, and the relevant markets consist of (a) the labor market for shepherds in the United States; (b) the labor market for domestic shepherds in the United States; and (c) the labor market for immigrant, H-2A shepherds in the United States.

227.    The WRA's and MPAS's relevant conduct—price fixing in their role as a recruiter for their members—unreasonably restrains trade in the shepherd labor market. The price fixing is not essential to the H-2A program and has no procompetitive virtues. Defendants' collusive activity had and has the effect of –

> (a) fixing the compensation of shepherd Plaintiffs and the Price Fixed Class at an artificially low level;
>
> (b) eliminating, to a substantial degree, competition for shepherd labor, particularly among potential domestic shepherds;
>
> (c) driving Plaintiffs and other workers from the shepherd labor market;

**Deleted:** service

**Deleted:** consists of the services provided by

**Deleted:** employed

**Deleted:** –

**Deleted:** –

**Formatted:** Footer, Centered

**Deleted:**

**Deleted:** ¶

**Formatted:** Font: Arial

**Formatted:** Font: Arial, 12 pt

(d) restraining trade in that shepherds are not able to negotiate their wage rates above the DOL wage floors; and

(e) restraining trade by artificially lowering the H-2A shepherd wage floors resulting from the DOL's surveys.

228.   Defendants' unreasonable restraint or restraints of trade have damaged the Plaintiffs and the members of the Price Fixed Class.

229.   As a result, Plaintiffs and those similarly situated suffered injuries and are entitled to treble damages, fees, and costs as set forth by law.

230.   Plaintiffs and those similarly situated are also entitled to injunctive relief to end the price fixing scheme, and to force the Defendants to take affirmative steps to correct the market.

**COUNT II: RESTRAINT OF TRADE IN VIOLATION OF 15 U.S.C. §§ 1 *ET SEQ.***

**Plaintiffs and the WRA Price Fixed Class against the WRA and Rancher Defendants**

231.   Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

232.   As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all other similarly situated employees pursuant to Fed. R. Civ. P. 23.

233.   The conduct of the Defendants, as described herein, substantially affected interstate and international commerce and caused antitrust injury.

234.   Defendant ranchers are competitors in the industry and should be competing with each other to attract the most capable shepherds.

235.   They do not share profits or risk of loss.

236.    But, through collusive conduct, they offer all shepherds price-fixed wages that vary solely based on the state in which the ranch is located.

237.    Also through collusive conduct, they pay all of their shepherds price-fixed wages that vary solely based on the state in which the ranch is located.

238.    The WRA and its members, including Defendant Ranchers, conspired and agreed to fix the wages offered and paid to shepherds at the minimum DOL wage floor. This fixed rate is artificially low, and the fixing of wages through the operation of the WRA amounts to a *per se* violation of the Sherman Antitrust Act.

239.    The WRA and its members conspired and agreed to fix wages offered and paid to shepherds at the DOL wage floors through the WRA's filing of (a) job offers for domestic workers, and (b) applications for certifications of H-2A workers that both offered exactly the same wage set at exactly the wage floors set by the DOL. The fixing of wages amounts to a *per se* violation of the Sherman Antitrust Act, and the fixed rate set by Defendants has remained artificially low because it has continually put downward pressure on the DOL's wage surveys and, thus, the basis for Defendants' price-fixed wages.

240.    In the alternative, Plaintiffs allege that the Defendants' price-fixing agreement is anticompetitive and illegal under the Rule of Reason. For purposes of the Rule of Reason, the relevant geographic market for the claim alleged in this Count is the United States, and the relevant markets consist of (a) the labor market for shepherds in the United States; (b) the labor market for domestic shepherds in the United States; and (c) the labor market for immigrant, H-2A shepherds in the United States.

Deleted:

Formatted: Footer, Centered

Deleted: ¶

Formatted: Font: Arial

Formatted: Font: Arial, 12 pt

241.    The WRA's relevant conduct—price fixing in their role as a recruiter for their members—unreasonably restrains trade in the shepherd labor market. The price fixing is not essential to the H-2A program and has no procompetitive virtues. Defendants' collusive activity had and has the effect of –

        (a) fixing the compensation of shepherd Plaintiffs and the Price Fixed Class at an artificially low level;

        (b) eliminating, to a substantial degree, competition for shepherd labor, particularly among potential domestic shepherds;

        (c) driving Plaintiffs and other workers from the shepherd labor market;

        (d) restraining trade in that shepherds are not able to negotiate their wage rates above the DOL wage floors; and

        (e) restraining trade by artificially lowering the H-2A shepherd wage floors resulting from the DOL's surveys.

242.    Defendants' unreasonable restraint or restraints of trade have damaged the Plaintiffs and the members of the WRA Price Fixed Class.

243.    As a result, Plaintiffs and those similarly situated suffered injuries and are entitled to treble damages, fees, and costs as set forth by law.

244.    Plaintiffs and those similarly situated are also entitled to injunctive relief to end the price fixing scheme, and to force the Defendants to take affirmative steps to correct the market.

**COUNT III: RESTRAINT OF TRADE IN VIOLATION OF 15 U.S.C. §§ 1 *ET SEQ.***

**Plaintiffs and the MPAS Price Fixed Class against the MPAS and all Rancher Defendants Except Nottingham Land and Livestock and Defendant Richins**

245.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

246.    As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all other similarly situated employees pursuant to Fed. R. Civ P. 23.

247.    The conduct of the Defendants, as described herein, substantially affected interstate and international commerce and caused antitrust injury.

248.    Defendant ranchers are competitors in the industry and should be competing with each other to attract the most capable shepherds.

249.    They do not share profits or risk of loss.

250.    But, through collusive conduct, they offer all shepherds price-fixed wages that vary solely based on the state in which the ranch is located.

251.    Also through collusive conduct, they pay all of their shepherds price-fixed wages that vary solely based on the state in which the ranch is located.

252.    The MPAS and its members, including Defendant Ranchers that are members of the MPAS, conspired and agreed to fix the wages offered and paid to shepherds at the minimum DOL wage floor. This fixed rate is artificially low, and the fixing of wages through the operation of the MPAS amounts to a *per se* violation of the Sherman Antitrust Act.

253.    The MPAS and its members conspired and agreed to fix wages offered and paid to shepherds at the DOL wage floors through the MPAS's filing of (a) job offers for

domestic workers, and (b) applications for certifications of H-2A workers that both offered exactly the same wage set at exactly the wage floors set by the DOL. The fixing of wages amounts to a *per se* violation of the Sherman Antitrust Act, and the fixed rate set by Defendants has remained artificially low because it has continually put downward pressure on the DOL's wage surveys and, thus, the basis for Defendants' price-fixed wages.

254.   In the alternative, Plaintiffs allege that the Defendants' price-fixing agreement is anticompetitive and illegal under the Rule of Reason. For purposes of the Rule of Reason, the relevant geographic market for the claim alleged in this Count is the United States, and the relevant markets consist of (a) the labor market for shepherds in the United States; (b) the labor market for domestic shepherds in the United States; and (c) the labor market for immigrant, H-2A shepherds in the United States.

255.   The MPAS's relevant conduct—price fixing in their role as a recruiter for their members—unreasonably restrains trade in the shepherd labor market. The price fixing is not essential to the H-2A program and has no procompetitive virtues.

Defendants' collusive activity had and has the effect of –

> (a) fixing the compensation of shepherd Plaintiffs and the Price Fixed Class at an artificially low level;
>
> (b) eliminating, to a substantial degree, competition for shepherd labor, particularly among potential domestic shepherds;
>
> (c) driving Plaintiffs and other workers from the shepherd labor market;

Deleted:

Formatted: Footer, Centered

Deleted: ¶

Formatted: Font: Arial

Formatted: Font: Arial, 12 pt

(d) restraining trade in that shepherds are not able to negotiate their wage

rates above the DOL wage floors; and

(e) restraining trade by artificially lowering the H-2A shepherd wage floors

resulting from the DOL's surveys.

256. Defendants' unreasonable restraint or restraints of trade have damaged the

Plaintiffs and the members of the MPAS Price Fixed Class.

257. As a result, Plaintiffs and those similarly situated suffered injuries and are entitled

to treble damages, fees, and costs as set forth by law.

258. Plaintiffs and those similarly situated are also entitled to injunctive relief to end

the price fixing scheme, and to force the Defendants to take affirmative steps to correct

the market.

**COUNT IV: CIVIL RICO, 18 U.S.C. 1964(C)**

**Plaintiffs Huaman, Leovegildo Vilchez Guerra, Liber Vilchez Guerra, and the WRA Illegal Deduction Class against Defendant WRA and Defendant Richins**

259. Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if

fully re-written herein.

260. As set forth above, Plaintiffs Huaman, Leovegildo Vilchez Guerra, Liber Vilchez

Guerra assert this count on his own behalf and on behalf of all those similarly situated

pursuant to Fed. R. Civ. P. 23.

261. All relevant job orders submitted to the state workforce agencies within the

relevant statute of limitations contained false promises that shepherds would be

reimbursed consistent with 20 C.F.R. § 655.122. In fact, the WRA had and has a policy

of not reimbursing consistent with 20 C.F.R. § 655.122, including failing to reimburse for

expenses incurred by the named Plaintiffs and those similarly situated prior to leaving their countries of origin. The WRA therefore has and had knowledge that the representations to the SWAs were false or, at best, had ignorance regarding the veracity of those representations. State workforce agencies rely on the representations in job orders to determine whether the jobs in the job orders will be offered to domestic workers. If a job order is not offered to domestic workers, it cannot subsequently be offered to foreign workers through an H-2A Application.

262.    All relevant H-2A applications submitted to the DOL by WRA during the relevant statute of limitations included, and were the result of, the fraudulent job orders described in the previous paragraph and contained additional false promises that any sheepherder hired pursuant to the applications would be reimbursed consistent with 20 C.F.R. § 655.122. In fact, the WRA had and has a policy of not reimbursing consistent with 20 C.F.R. § 655.122, including failing to reimburse for expenses incurred by the named Plaintiffs and those similarly situated prior to leaving their countries of origin. The WRA therefore has and had knowledge that the representations to the DOL in the applications were false or, at best, had ignorance regarding the veracity of those representations. The DOL relied on the representations in applications to determine whether the jobs requested in the applications would be offered to foreign workers.

The WRA knew or should have known that it was not reimbursing consistent with 20 C.F.R. § 655.122, despite its representations to the state workforce agencies and DOL to the contrary, because it had agents directing the named Plaintiffs and those similarly situated to undertake these pre-departure expenses and knew that it did not reimburse

Deleted:

Formatted: Footer, Centered

Deleted: ¶

Formatted: Font: Arial

Formatted: Font: Arial, 12 pt

for the expenses. These expenses include medical checkups, criminal background checks and travel and subsistence expenses (which include bus fares, meals, and hotels necessary to travel between the shepherd's place of recruitment and the workplace, and travel necessary to complete the other pre-travel requirements, e.g., the medical checkups).

263.    The submission of job orders to the state workforce agencies and the H-2A Applications to the DOL containing the false statements, while simultaneously implementing a policy of not reimbursing consistent with 20 C.F.R. § 655.122, represents a scheme or artifice by the WRA to defraud or obtain money or property by false pretenses, representations, or promises. U.S. mails or interstate wires were used to execute this scheme because state workforce agencies only accept job orders by mail or email and the DOL only accepts H-2A Applications by mail or through its online filing system.

264.    These acts violated 18 U.S.C. § 1343 (wire fraud) or 18 U.S.C. § 1341 (mail fraud).

265.    By participating in the Richins Enterprise and the WRA Enterprise, which engaged in patterns of racketeering and commission of the underlying predicate acts, Defendant Richins and the WRA injured Plaintiffs and the WRA Illegal Deduction Class.

266.    Plaintiffs and those similarly situated suffered injuries and are entitled to treble damages, fees, and costs as set forth by law.

**COUNT V: CIVIL RICO, 18 U.S.C. 1964(C), AGAINST THE MPAS**

**Plaintiff De La Cruz and the MPAS Illegal Deduction Class against Defendant MPAS**

267.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

268.    As set forth above, Plaintiff De La Cruz asserts this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

269.    All relevant job orders submitted to the state workforce agencies within the relevant statute of limitations contained false promises that shepherds would be reimbursed consistent with 20 C.F.R. § 655.122. In fact, the MPAS had and has a policy of not reimbursing consistent with 20 C.F.R. § 655.122, including failing to reimburse for expenses incurred by the named Plaintiffs and those similarly situated prior to leaving their countries of origin. The MPAS therefore has and had knowledge that the representations to the SWAs were false or, at best, had ignorance regarding the veracity of those representations. State workforce agencies rely on the representations in job orders to determine whether the jobs in the job orders will be offered to domestic workers. If a job order is not offered to domestic workers, it cannot subsequently be offered to foreign workers through an H-2A Application.

270.    All relevant H-2A applications submitted to the DOL by MPAS during the relevant statute of limitations included, and were the result of, the fraudulent job orders described in the previous paragraph and contained additional false promises that any sheepherder hired pursuant to the applications would be reimbursed consistent with 20 C.F.R. § 655.122. In fact, the MPAS had and has a policy of not reimbursing consistent

Deleted: III

Deleted: As described above, the MPAS, made fraudulent statements

Formatted: Pattern: Clear (White)

Deleted: , the DOL, the Plaintiff,

Formatted: Pattern: Clear (White)

Formatted: Pattern: Clear (White)

Formatted: Pattern: Clear (White)

Formatted: Pattern: Clear (White)

Deleted: Illegal Deduction Class

Deleted: illegal deductions.

Formatted: Pattern: Clear (White)

Formatted: Footer, Centered

Deleted:

Deleted: ¶

Formatted: Font: Arial

Formatted: Font: Arial, 12 pt

with 20 C.F.R. § 655.122, including failing to reimburse for expenses incurred by the named Plaintiffs and those similarly situated prior to leaving their countries of origin. The MPAS therefore has and had knowledge that the representations to the DOL in the applications were false or, at best, had ignorance regarding the veracity of those representations. The DOL relied on the representations in applications to determine whether the jobs requested in the applications would be offered to foreign workers.

271.   The MPAS knew or should have known that it was not reimbursing consistent with 20 C.F.R. § 655.122, despite its representations to the state workforce agencies and DOL to the contrary, because it had agents directing the named Plaintiffs and those similarly situated to undertake these pre-departure expenses and knew that it did not reimburse for the expenses. These expenses include medical checkups, criminal background checks and travel and subsistence expenses (which include bus fares, meals, and hotels necessary to travel between the shepherd's place of recruitment and the workplace, and travel necessary to complete the other pre-travel requirements, e.g., the medical checkups).

272.   The submission of job orders to the state workforce agencies and the H-2A Applications to the DOL containing the false statements, while simultaneously implementing a policy of not reimbursing consistent with 20 C.F.R. § 655.122, represents a scheme or artifice by the MPAS to defraud or obtain money or property by false pretenses, representations, or promises. U.S. mails or interstate wires were used to execute this scheme because state workforce agencies only accepts job orders by

**Deleted:**
**Formatted:** Footer, Centered
**Deleted:** ¶
**Formatted:** Font: Arial
**Formatted:** Font: Arial, 12 pt

mail or email and the DOL only accepts H-2A Applications by mail or through its online filing system.

273.   These acts violated 18 U.S.C. § 1343 (wire fraud) or 18 U.S.C. § 1341 (mail fraud).

274.   By participating in the MPAS Enterprise, which engaged in patterns of racketeering and commission of the underlying predicate acts, Defendant MPAS injured Plaintiffs and the MPAS Illegal Deduction Class.

275.   Plaintiffs and those similarly situated suffered injuries and are entitled to treble damages, fees, and costs as set forth by law.

## COUNT VI: FAILURE TO PAY AT LEAST NEVADA MINIMUM WAGE

**Plaintiff De La Cruz and the NV Minimum Wage Class against Defendant MPAS**

276.   Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

277.   As set forth above, Plaintiff De La Cruz asserts this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

278.   MPAS employed Plaintiff De La Cruz and the NV Minimum Wage Class in Nevada during the relevant statute of limitations and paid the Plaintiffs less than the Nevada minimum wage, usually only $800 per month until mid-November 2015.

279.   Upon information and belief, since mid-November 2015, the MPAS pays its Nevada shepherd employees exactly the 2015 special procedures minimum, which is still far less than Nevada minimum wage.

280.   As a result, the Plaintiffs are entitled to the difference between the wages paid and the Nevada minimum wage pursuant to Nev. Const. art. 15, § 16; Nev. Rev. Stat. § 608.260; and *Thomas v. Nevada Yellow Cab Corp.*, 327 P. 3d 518 (Nev. 2014).

281.   Plaintiff De La Cruz sent a written demand demanding wages at least five days prior to bringing this claim. The Plaintiff and the NV Minimum Wage Class are therefore additionally entitled to attorney's fees.

**COUNT VII: BREACH OF CONTRACT OR QUASI CONTRACT AGAINST THE WRA**

**Plaintiff Huaman, Leovegildo Vilchez Guerra, Liber Vilchez Guerra, and the WRA Illegal Deduction Class against Defendant WRA**

282.   Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

283.   As set forth above, Plaintiffs Huaman, Leovegildo Vilchez Guerra, and Liber Vilchez Guerra assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

284.   Plaintiffs and the WRA Illegal Deduction Class entered into contracts with the WRA that explicitly or impliedly incorporated the requirements of 20 C.F.R. § 655.122 either through the H-2A Applications and job orders, which constitute job offers accepted by Plaintiffs and those similarly situated, or as implied terms in their employment contracts.

285.   As set forth above, the WRA breached these contracts by deducting expenses that were primarily for the benefit and convenience of the employer from shepherd wages. These deductions include expenses incurred by the Plaintiffs, which were never reimbursed by the WRA, such as expenses for medical checkups, criminal background

checks, and travel and subsistence expenses (which include bus fares, meals, and hotels necessary to travel between the shepherd's place of recruitment and the workplace, and travel necessary to complete the other pre-travel requirements, e.g., the medical checkups).

286.    As a result of the breach, the Plaintiffs and the WRA Illegal Deduction class suffered damages.

287.    In the alternative to a contract claim, the Plaintiffs are entitled to relief in promissory estoppel. The WRA promised the Plaintiffs and the WRA Illegal Deduction Class that it would adhere to 20 C.F.R. § 655.122. The Plaintiffs and the WRA Illegal Deduction Class relied on this promise to their detriment by traveling to WRA member ranches to work as shepherds, where the WRA illegally deducted wages that were primarily for the benefit and convenience of the WRA. The Plaintiffs and WRA Illegal Deduction Class are entitled to damages, including the illegally deducted wages.

288.    Similarly, in the alternative to a contract claim, the Plaintiff and the WRA Illegal Deduction Class are also entitled to relief in unjust enrichment and quantum meruit. A benefit was conferred on the WRA when the Plaintiff and the WRA Illegal Deduction Class traveled to WRA member ranches to work and the WRA illegally deducted amounts from their wages in violation of 20 C.F.R. § 655.122; that benefit was appreciated by the WRA as it retained the illegal deductions; and it is unjust for the WRA to be permitted to retain the illegally deducted wages. The Plaintiff and the WRA Illegal Deduction Class reasonably expected to be paid wages free and clear pursuant to 20 C.F.R. § 655.122 and were not. As a result, the Plaintiff and the WRA illegal

deduction class are entitled to the reasonable value of the services provided without amounts illegally deducted and the WRA should be disgorged of the illegally deducted wages.

### COUNT VIII: BREACH OF CONTRACT OR QUASI CONTRACT AGAINST THE MPAS

**Plaintiff De La Cruz and the MPAS Illegal Deduction Class against Defendant MPAS**

289.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

290.    As set forth above, Plaintiff De La Cruz asserts this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

291.    Plaintiffs and the MPAS Illegal Deduction Class entered into contracts with the MPAS that explicitly or impliedly incorporated the requirements of 20 C.F.R. § 655.122, either through the H-2A Applications and job orders, which constitute job offers accepted by Plaintiffs and those similarly situated, or as implied terms in their employment contracts.

292.    As set forth above, the MPAS breached these contracts by deducting expenses that were primarily for the benefit and convenience of the employer from shepherd wages. These deductions include expenses incurred by the Plaintiffs, which were never reimbursed by the MPAS, such as expenses for medical checkups, criminal background checks, and travel and subsistence expenses (which include bus fares, meals, and hotels necessary to travel between the shepherd's place of recruitment and the

workplace, and travel necessary to complete the other pre-travel requirements, e.g., the medical checkups).

293.    As a result of the breach, the Plaintiff and the MPAS Illegal Deduction class suffered damages.

294.    In the alternative to a contract claim, the Plaintiff is entitled to relief in promissory estoppel. The MPAS promised the Plaintiff and the MPAS Illegal Deduction Class that it would adhere to 20 C.F.R. § 655.122. The Plaintiff and the MPAS Illegal Deduction Class relied on this promise to their detriment by traveling to MPAS member ranches to work as shepherds, where the MPAS illegally deducted wages that were primarily for the benefit and convenience of the MPAS. The Plaintiff and MPAS Illegal Deduction Class are entitled to damages, including the illegally deducted wages.

295.    Similarly, in the alternative to a contract claim, the Plaintiff and the MPAS Illegal Deduction Wage Class are also entitled to relief in unjust enrichment and quantum meruit. A benefit was conferred on the MPAS when the Plaintiff and the MPAS Illegal Deduction Class traveled to MPAS member ranches to work and the MPAS illegally deducted amounts from their wages in violation of 20 C.F.R. § 655.122; that benefit was appreciated by the MPAS as it retained the illegal deductions; and it is unjust for the MPAS to be permitted to retain the illegally deducted wages. The Plaintiff and the MPAS Illegal Deduction Class reasonably expected to be paid wages free and clear pursuant to 20 C.F.R. § 655.122 and were not. As a result, the Plaintiff and the MPAS Illegal Deduction Class are entitled to the reasonable value of the services provided

Deleted:

Formatted: Footer, Centered

Deleted: ¶

Formatted: Font: Arial

Formatted: Font: Arial, 12 pt

without amounts illegally deducted and the MPAS should be disgorged of the illegally

deducted wages.

**PLAINTIFFS DEMAND A JURY TRIAL**

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that judgment be entered in their

favor and in favor of those similarly situated as follows:

    a. Certifying and maintaining this action as a class action, with Plaintiffs as

       designated class representatives and with their counsel appointed as

       class counsel;

    b. Declaring Defendants in violation of each of the counts set forth above;

    c. Awarding treble damages for antitrust injuries to Plaintiffs and those

       similarly situated;

    d. Awarding treble damages for RICO injuries to Plaintiffs and those similarly

       situated;

    e. Awarding damages for failing to pay NV minimum wage;

    f. Awarding contract damages;

    g. Awarding pre-judgment, post-judgment, and statutory interest;

    h. Awarding attorneys' fees;

    i. Awarding costs;

    j. Ordering equitable relief, including a judicial determination of the rights

       and responsibilities of the parties;

Deleted:

Deleted:
Formatted: Footer, Centered
Deleted: ¶
Formatted: Font: Arial
Formatted: Font: Arial, 12 pt

k.   Awarding such other and further relief as the Court may deem just and

proper.

Respectfully Submitted,

s/ Alexander Hood
Alexander Hood
Towards Justice
Attorney and Director of Litigation
1535 High St., Suite 300
Denver, CO 80218
Tel.: 720-239-2606
Fax: 303-957-2289
Email: alex@towardsjustice.org

s/ Andrew Schmidt
Andrew Schmidt
Towards Justice
Of Counsel
1535 High St., Suite 300
Denver, CO 80218
Tel.: 720-239-2606
Fax: 303-957-2289
Email: andy@towardsjustice.org

s/ David Seligman
David Seligman
Attorney
Towards Justice
1535 High St., Suite 300
Denver, CO 80218
Tel.: 720-248-8426
Fax: 303-957-2289
Email: david@towardsjustice.org

s/ Dermot Lynch
Dermot Lynch
Attorney and Skadden Fellow
Towards Justice
1535 High St., Suite 300
Denver, CO 80218
Tel.: 720-239-2606
Fax: 303-957-2289

Deleted: ___

Deleted: ___

Deleted: ___

Deleted: ___

Formatted: Footer, Centered
Deleted:
Deleted: ¶
Formatted: Font: Arial
Formatted: Font: Arial, 12 pt

Email: dermot@towardsjustice.org

Attorneys for the Plaintiffs

Deleted:

Formatted: Footer, Centered

Deleted: ¶

Formatted: Font: Arial

Formatted: Font: Arial, 12 pt

**Certificate of Service**

I hereby certify that on December 4, 2015, I served a true and correct copy of the forgoing on the individuals below pursuant to F.R.C.P. 5.

*Attorneys for Defendants*

Amber J. Munck
Billie Jean Siddoway
Bradford Joseph Axel
Brendan Victor Monahan
Elizabeth K. Dorminey
J. Roderick Betts
James Larry Stine
Justin David Cumming
Kenneth F. Rossman, IV
Lauren Elizabeth Rosner
Naomi G. Beer
Raymond Perez, II

s/ Alexander Hood
Alexander Hood