**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: 15-cv-01889-REB-CBS

RODOLFO LLACUA et al., and those similarly situated,

      Plaintiffs,

v.

WESTERN RANGE ASSOCIATION et al.,

      Defendants.

---

**DEFENDANT WESTERN RANGE ASSOCIATION'S COMBINED
MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT
AND MEMORANDUM OF LAW IN SUPPORT THEREOF**

---

## TABLE OF CONTENTS

I.  INTRODUCTION AND SUMMARY OF RELEVANT FACTS ................................. 1

II. LEGAL ARGUMENT .................................................................................... 2

   A.  Standard of Review ................................................................................ 2

   B.  Plaintiffs' Antitrust Claim Must Be Dismissed .......................................... 3

      1.  Conclusory Allegations Must Be Disregarded ................................. 3
      2.  The Alleged Parallel Conduct is Insufficient to State a
          Conspiracy ................................................................................ 5
      3.  Western Range's Conduct is Shielded From Liability In Any
          Event ......................................................................................... 10

         a.  Western Range is Immune under Noerr-Pennington .......... 10
         b.  Western Range Cannot be Held Liable for Complying
             with State Minimum Wage Laws. ...................................... 10

   C.  Plaintiffs' RICO Claim Under 18 U.S.C. § 1962(c) is Patently
       Defective .............................................................................................. 11

      1.  Plaintiffs Fail to Plead a RICO "Enterprise" Distinct from the
          Association Itself ......................................................................... 12
      2.  Plaintiffs Have Not Pled a "Pattern of Racketeering Activity." ....... 15

   D.  Plaintiffs Fail to State a Claim for Breach of Contract. ............................ 17

III. CONCLUSION .......................................................................................... 19

## <u>TABLE OF AUTHORITIES</u>

**Federal Cases**

*A.D. Bedell Wholesale Co., Inc. v. Philip Morris, Inc.*,
  263 F. 3d 239 (3d Cir. 2001) .................................................................... 10

*Bd. of Cnty. Comm'rs of San Juan Cnty. v. Liberty Grp.*,
  965 F.2d 879 (10th Cir. 1992) ............................................................ 12, 14

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................. 3, 4, 7, 8, 9

*Brannon v. Boatmen's First Nat. Bank of Okla.*,
  153 F.3d 1144 (10th Cir. 1998) .......................................................... 12, 14

*Brooks v. Bank of Boulder*,
  891 F. Supp. 1469 (D. Colo. 1995) .......................................................... 11

*California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.*,
  445 U.S. 97 (1980) .................................................................................... 11

*Cayman Exploration Corp. v. United Gas Pipeline Co.*,
  873 F.2d 1357 (10th Cir. 1989) ................................................................. 8

*CGC Holding Co., LLC v. Broad & Cassel*,
  773 F.3d 1076 (10th Cir. 2014) ............................................................... 11

*Cleveland v. United States*,
  531 U.S. 12 (2000) ............................................................................. 16, 17

*Compliance Marketing, Inc. v. Drugtest, Inc.*,
  2010 WL1416823 (D. Colo. Apr. 7, 2010) ................................................. 9

*Copperweld Corp. v. Independence Tube Corp.*,
  467 U.S. 752 (1984) ................................................................................... 7

*Design Basics, LLC v. ProBuild Co., LLC*,
  2011 WL 3366436 (D. Colo. 2011) ........................................................... 8

*Dirt Hogs Inc. v. Nat. Gas Pipeline Co.*,
  No. 99-6026, 210 F.3d 389, 2000 WL 368411 (10th Cir. April 10, 2000) ..... 12, 13, 14

*In re Dow Co. Sarabond Prods. Liab. Litig.*,
  666 F. Supp. 1466 (D. Colo. 1987) .......................................................... 11

*Eastern R. R. Presidents Conf. v. Noerr Motor Freight, Inc.*,
  365 U.S. 127 (1961) ................................................................................. 10

*Figueroa Ruiz v. Alegria*,
  896 F.2d 645 (1st Cir. 1990) .................................................................... 11

*GF Gaming Corp. v. City of Black Hawk*,
  405 F.3d 876 (10th Cir. 2005) ................................................................... 3

*Greenway Nutrients, Inc. v. Blackburn*,
2015 WL 1524941 (D. Colo. Feb. 23, 2015) ......................................................... 18

*In re High Fructose Corn Syrup Antitrust Litig.*,
295 F.3d 651 (7th Cir. 2002) ............................................................................ 3, 6

*Internet Archive v. Shell*,
505 F.Supp.2d 755 (D.Colo. 2007) ....................................................................... 12

*Jennings v. Auto Meter Prods., Inc.*,
495 F.3d 466 (7th Cir. 2007) ............................................................................... 11

*Kan. Penn Gaming, LLC v. Collins*,
656 F.3d 1210 (10th Cir. 2011) ............................................................................. 3

*Mayor & Council of Baltimore v. Citigroup, Inc.*,
709 F.3d 129 (2d Cir.2013) .................................................................................... 9

*McDonald v. Miller*,
945 F. Supp. 2d 1201 (D. Colo. 2013) *reversed in part on different
grounds*, 769 F.3d 1202 (10th Cir. 2014) ............................................................. 18

*McNally v. United States*,
483 U.S. 350 (1987) ............................................................................................... 16

*Mitchael v. Intracorp., Inc.*,
179 F.3d 847 (10th Cir.1999) ................................................................................. 8

*Monsanto Co. v. Spray Rite Serv. Corp.*,
465 U.S. 752 (1984) ................................................................................................ 4

*Nichols v. Mahoney*,
608 F. Supp. 2d 526 (S.D.N.Y. 2009) ...................................................................... 7

*Parker v. Brown*,
317 U.S. 341 (1943) ............................................................................................... 10

*Pasquantino v. United States*,
544 U.S. 349 (2005) ............................................................................................... 16

*Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*,
30 F.3d 339 (2d Cir. 1994) .................................................................................... 13

*Robbins v. Oklahoma*,
519 F.3d 1242 (10th Cir. 2008) .............................................................................. 7

*Robbins v. Wilkie*,
300 F.3d 1208 (10th Cir. 2002) ............................................................................. 11

*Romstad v. City of Colorado Springs*,
No. 14-CV-3508-CMA-CBS, 2015 WL 4743189 (D. Colo. Aug. 10,
2015)...................................................................................................................... 18

*Sedima, S.P.R.L. v. Imrex Co.*,
473 U.S. 479 (1985) ............................................................................................... 12

*Sessions Tank Liners, Inc. v. Joor Mfg., Inc.*,
   17 F.3d 295 (9th Cir. 1994) ................................................................ 10

*Shell v. Am. Family Rights Ass'n*,
   899 F. Supp. 2d 1035 (D. Colo. 2012) ....................................... 17, 18, 19

*Skilling v. United States*,
   130 S. Ct. 2896 (2010) ...................................................................... 16

*Systemcare v. Wang Labs. Corp.*,
   117 F.3d 1137 (10th Cir. 1997) .............................................................. 3

*Tal v. Hogan*,
   453 F.3d 1244 (10th Cir. 2006) ..................................................... 12, 17

*Tatten v. Bank of Am. Corp.*,
   562 F. App'x 718 (10th Cir. 2014) ....................................................... 18

*Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*,
   346 U.S. 537 (1954) ........................................................................ 4, 7

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001) ................................................................. 5

*TV Communications Network, Inc. v. Turner Network Telev., Inc.*,
   964 F.2d 1022 (10th Cir. 1992) ............................................................. 3

*U.S. v. Smith*,
   413 F.3d 1253 (10th Cir. 2005) ........................................................... 12

*United Mine Workers of Am. v. Pennington*,
   381 U.S. 657 (1965) .......................................................................... 10

*United States v. United States Gypsum Co.*,
   438 U.S. 422 (1978) ............................................................................ 5

*Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local*,
   883 F.2d 132 (D.C. Cir. 1989) ............................................... 2, 12, 13, 14

**Federal Statutes**

18 U.S.C. § 1341 ............................................................................. 15, 16

18 U.S.C. § 1343 .................................................................................. 15

18 U.S.C. § 1346 ............................................................................. 15, 16

18 U.S.C. § 1961(1) .............................................................................. 15

**Rules**

20 C.F.R. § 655.122 ............................................................................... 1

20 C.F.R. § 655.131 ............................................................................... 8

20 C.F.R. § 655.211 ............................................................................... 6

Fed. R. Civ. P. 9(b)................................................................................................ 12, 17

Fed. R. Civ. P. 12(b)(6) ................................................................................. 1, 2, 3, 19

**Other Authorities**

Report of the Fast Food Wage Board to the NYS Commissioner of Labor,
July 27, 2015, *available at*
http://labor.ny.gov/workerprotection/laborstandards/pdfs/Fast-Food-
Wage-Board-Report.pdf............................................................................................ 6

Defendant Western Range Association (hereinafter "Western Range"), by and through its undersigned counsel, respectfully moves the Court to dismiss Plaintiffs' Second Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6). Plaintiffs have now amended their Complaint against Western Range twice, without resolving any of the basic pleading deficiencies in the original.

## I.   INTRODUCTION AND SUMMARY OF RELEVANT FACTS

Plaintiffs allege that through participation in the U.S. Department of Labor H2-A Program, Western Range and its members have unlawfully limited or conspired to limit the wages of domestic sheep herders. The H-2A program enables employers to hire temporary agricultural workers from foreign countries on terms set by the DOL, which is specifically entrusted by statute to set the conditions of employment for H-2A workers so as to not have an adverse effect on domestic wages. Based on the submission of "job offers" that Plaintiffs admit are *required* by the applicable DOL regulations outlined in 20 C.F.R. § 655.122, (2d Am. Compl. at ¶ 46), and by allegedly paying wages at rates that Plaintiffs concede are the "government set wage floor," (*id*. ¶ 34), Plaintiffs seek to represent various nationwide classes of sheepherders with respect to alleged (i) restraint of trade in violation of the Sherman Act against all Defendants (Count I), (ii) violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") against Western Range (Count II), and (iii) breach of contract against Western Range (Count V). All three claims fail for the following reasons.

As to the Sherman Act, Plaintiffs do not plead any of the critical elements necessary to sustain a concerted action antitrust claim. Indeed, Plaintiffs have not alleged any facts showing that Western Range had any anti-competitive communications whatsoever with the other defendants, much less that Western Range conspired or otherwise agreed with others to restrain competition. Plaintiffs rest their entire theory of antitrust liability on the unremarkable assertion that wages paid to

shepherds allegedly equal the minimum wage set by the various states based on wage data collected under federal law by the DOL. But even assuming that to be true, that is precisely the economic outcome one would expect in a competitive market if the minimum wage is set at a level greater than the natural market equilibrium wage that would occur without government intervention. Stated differently, the mere fact that actual wages may equal the minimum wage cannot, standing alone, support a concerted action claim under § 1 of the Sherman Act. The fact that Western Range submitted visa applications and work orders in exactly the format required by a federal regulatory scheme certainly cannot give rise to antitrust liability.

Plaintiffs' RICO claim is likewise devoid of any allegations suggesting a RICO "enterprise"—one that exists separate and apart from the alleged racketeering activity and that meets the legal requirements that it have structure, leadership and organization separate from the defendant entity. Certainly, the law is clear that as an association, Western Range "cannot join with its own members to do that which it normally does and thereby form an enterprise separate and apart from itself." *Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local*, 883 F.2d 132, 141 (D.C. Cir. 1989).

As to breach of contract, Plaintiffs allege that Western Range deducted unspecified expenses at some unknown time and place which they claim are the employer's responsibility to pay under the applicable DOL regulations. But they fail to set forth any of the elements of such a claim: they have not identified the actual contracts which purport to bind Western Range; where, when or for whom any named plaintiff worked; or any specific instance of an alleged illegal deduction.

## II.    LEGAL ARGUMENT

### A.    Standard of Review

A suit will be dismissed pursuant to Fed. R. Civ. Rule 12(b)(6) if the complaint does not "have enough allegations of fact, taken as true, 'to state a claim to relief that is

plausible on its face.'" *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[M]ere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice"; rather, "a plaintiff must offer specific factual allegations to support each claim." *Kan. Penn Gaming*, 656 F.3d at 1214 (quoting *Twombly*, 550 U.S. at 555). Where an immunity defense or some other complete defense to the claims exists, the Court should dismiss the claims pursuant to Fed. R. Civ. P. 12(b)(6). *See GF Gaming Corp. v. City of Black Hawk,* 405 F.3d 876, 879 (10th Cir. 2005). Allegations of behavior "in line with a wide swath of rational and competitive business strategy" are insufficient; instead there must be factual allegations that are not also consistent with lawful activity and give rise to an inference of unlawful conduct." *Twombly*, 550 U.S. at 554.

## B.     Plaintiffs' Antitrust Claim Must Be Dismissed.

The elements of a claim for violation of § 1 of the Sherman Act are that the defendants (1) entered into a plausible "contract, combination or a conspiracy"; (2) that "unreasonably restrains trade" in a relevant market. *Systemcare v. Wang Labs. Corp.*, 117 F.3d 1137, 1139 (10th Cir. 1997); *TV Communications Network, Inc. v. Turner Network Telev., Inc.,* 964 F.2d 1022, 1027 (10th Cir. 1992).  Allegations of "parallel conduct unfavorable to competition" are not sufficient to allege a conspiracy, "absent some factual context suggesting agreement, as distinct from identical, independent action." *Twombly*, 550 U.S. at 548-49.  "[A]n express, manifested agreement, and thus an agreement involving actual, verbalized communication, must be proved in order for a price-fixing conspiracy to be actionable under the Sherman Act." *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 654 (7th Cir. 2002) (Posner, J.).

### 1.     Conclusory Allegations Must Be Disregarded.

Supreme Court precedent is clear that an antitrust claim must be dismissed if the conspiracy allegations are insufficient. "Because § 1 of the Sherman Act does not prohibit all unreasonable restraints of trade … but only restraints effected by a contract, combination, or a conspiracy, … [t]he crucial question is whether the challenged anticompetitive conduct stem[s] from independent decision or from an agreement, tacit, or express." *Twombly*, 550 U.S. at 553 (quoting *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537, 540 (1954)) (internal citations omitted). A conspiracy claim requires a "complaint with enough factual matter (taken as true) to suggest that an agreement was made … [and] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 556. A Complaint must allege plausible facts supporting the conclusion that the conspiring parties "had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Monsanto Co. v. Spray Rite Serv. Corp.,* 465 U.S. 752, 768 (1984).

There is none of that in Plaintiffs' second amended pleading. Plaintiffs' allegations consist almost exclusively of conclusory statements that merely invite the reader to assume or infer that illegal activity has occurred, without offering a shred of evidence that it has. For example, Plaintiffs allude to "agreements," but cite no evidence of any actual agreement. Instead, they ask the Court to infer, based on conduct that is strictly in compliance with federal and state wage laws, that there was a nefarious plot to depress shepherds' pay.

An allegation that "frequent opportunities to communicate" exist is not, of course, an allegation of anticompetitive conduct; it is not an allegation of conduct at all.  (2d Am. Compl. at ¶ 59.) It is difficult to see how access to an "opportunity" could ever give rise to legal liability.  Further, actual communication on any number of lawful topics between members of the same industry, both through a trade association or individually, is a normal practice and perfectly legal.  And the publication of pricing data, including wage and benefits information, provided that it is disseminated to both sides of the transaction

and not kept secret, is often a procompetitive practice:  "The exchange of price data and other information among competitors does not invariably have anticompetitive effects; indeed such practices can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive."  *United States v. United States Gypsum Co.*, 438 U.S. 422, 441 n. 16 (1978); *Todd v. Exxon Corp.*, 275 F.3d 191 at 213 (2d Cir. 2001).[1]  Even if the ranchers never voluntarily communicated to each other about their employment issues, they are literally *required by law* to publish their wage and benefits information through the State Workforce Agencies to ensure that domestic employees have a full and fair opportunity to apply for the relevant positions, (2d Am. Compl. at ¶ 47), and to complete federal wage surveys, (*Id.* at ¶ 89).

### 2.    The Alleged Parallel Conduct is Insufficient to State a Conspiracy

The allegation that the wages offered by defendants converge on the mandated minimum wage, even if true, is consistent with lawful conduct and competitive market behavior.  If the government-established minimum wage is greater than the natural, market equilibrium wage rate that would occur in the absence of a minimum wage rule, then uniform wages at the minimum wage are precisely the expected economic outcome in a competitive marketplace.  This is so because when a government-established minimum wage is greater than the market equilibrium wage that would otherwise obtain but for the government's wage-setting intervention, the supply of workers willing to work at the resulting, elevated price exceeds the demand for workers at that elevated price, driving wages uniformly to the mandatory minimum.  This axiom

---

[1] A principle factor to be taken into consideration when looking at whether the collection and dissemination of wage information is anticompetitive is the level of concentration in the industry.  *Todd*, 275 F.3d at 208 (("fourteen defendants" is "not a concentrated market under the Department of Justice Merger Guidelines").  Although Plaintiffs allege that the majority of ranches are members of two trade associations, (2d Am. Comp. at ¶ 58), this does not transform hundreds of small ranching operations into a highly concentrated industry, especially when domestic producers constitute only a tiny share of the highly globalized market for wool and sheep.

of labor markets is in evidence throughout the macro-economy.  For example, a study commissioned by the New York state government found that wages for almost all fast food workers fell within a narrow band near the $8.75 minimum wage rate.  *See* Report of the Fast Food Wage Board to the NYS Commissioner of Labor, July 27, 2015 at 10[2]. Even in the absence of government mandates, in a competitive market prices tend to converge on one a single point.  *See In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d at 658. This is hardly the only industry where the minimum wage exceeds the competitive market wage rate or where higher paid work is difficult to find, particularly for low-skilled workers living in rural areas.  There is also the added twist that it is actually *illegal* to offer H2-A visa holders a higher wage than domestic workers – a point Plaintiffs concede, (*see* 2d Am. Compl. at ¶ 50) – which would naturally tend further to promote convergence of actual wages at the minimum wage by ranchers acting in complete independence of one another.

Plaintiffs essentially admit the natural competitive wage rate would fall *below* the government-imposed minimum wage because, as they state, H2-A visa holders "are willing to work for wages that are aberrational in the American labor market." (2d Am. Compl. at ¶ 90.)  By contrast, the allegations that, but for some mythical conspiracy, shepherd wages would be *higher* than the government-imposed wage are both conclusory and implausible.  Plaintiffs argue, for example, that "in the absence of the ranchers' combination or agreement to fix shepherd wages, ranchers would negotiate with available range workers and the average wage would increase to something similar to the minimum wage for domestic ranch hands, general ranch farmworkers, or closed range herders."  (*Id*. at ¶ 88.)  The minimum wage for these other workers, however, is set through the same regulatory process that sets the minimum wage for sheepherders, 20 C.F.R. § 655.211, and the application of a different regulatory minimum wage cannot

---

[2] Available at http://labor.ny.gov/workerprotection/laborstandards/pdfs/Fast-Food-Wage-Board-Report.pdf.

be evidence of a different natural market wage. Indeed, this allegation amounts to an admission that those segments of the livestock industry that Western Range does not represent also pay exactly minimum wage.

Plaintiffs also allege that employment of workers who immigrated from a lower wage country wrongfully depresses domestic wages.   (2d Am. Compl. at ¶ 115-17.) The employment of foreign workers is simply not an antitrust violation.   *Nichols v. Mahoney*, 608 F. Supp. 2d 526, 544 (S.D.N.Y. 2009) ("Moreover, the second alleged antitrust injury—that defendants inflated the size of the labor pool—is the antithesis of an injury to competition, which is the type of injury the antitrust laws are intended to prevent. Defendants' complaint is not about too little competition in the market for construction labor, but too much …. The idea that it harms competition to have more people competing for jobs, or if there are workers in the market who will compete for jobs by cutting the price (i.e., by accepting a lower wage), is ludicrous.")

Allegations that "are so general that they encompass a wide swath of conduct, much of it innocent …." are simply insufficient to sustain a federal antitrust lawsuit. *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008) (quoting *Twombly*, 550 U.S. at 570).   In the seminal *Twombly* case, plaintiffs asserted the defendants had engaged in parallel conduct, relying on allegations similar to those pled here of lockstep or simultaneous business decisions by defendants as the basis for pleading anti-competitive behavior. *Id*. at 548. The Court observed that "[b]ecause § 1 of the Sherman Act 'does not prohibit [all] unreasonable restraints of trade … but only restraints effected by a contract, combination or conspiracy,' 'the crucial question is whether the challenged anticompetitive conduct 'stems from independent decision or from an agreement, tacit or express.'" *Id*. at 553 (quoting *Copperweld Corp. v. Independence Tube Corp*., 467 U.S. 752, 775 (1984); *Theatre Enters., Inc. v. Paramount Film Distrib. Corp*., 346 U.S. 537, 540 (1954)). Thus, it is critical that the factual allegations "suggest that an agreement was made." *Id.* at 588. In *Twombly*, the allegations of concerted

7

actions were insufficient because they merely alleged "parallel conduct unfavorable to competition" without "some factual context suggesting agreement, as distinct from identical, independent action." *Id*. at 548-49. As this Court has noted, the *Twombly* court explained that:

> an allegation of parallel conduct and a bare assertion of conspiracy will not suffice. Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.

*Design Basics, LLC v. ProBuild Co., LLC,* 2011 WL 3366436 (D. Colo. 2011). *Mitchael v. Intracorp., Inc.,* 179 F.3d 847, 858-59 (10th Cir.1999) ("While consciously parallel behavior may contribute to a finding of antitrust conspiracy, it is insufficient, standing alone, to prove conspiracy."). As the Tenth Circuit held, a "conspiracy allegation will fail if there is an independent business justification which explains the alleged conspirators' conduct." *Cayman Exploration Corp. v. United Gas Pipeline Co.,* 873 F.2d 1357, 1361 (10th Cir. 1989). After all, "there is no reason to infer that [defendants] had agreed among themselves to do what was only natural anyway." *Twombly*, 550 U.S. at 566.

Here, Plaintiffs' allegations regarding the existence of a conspiracy are the epitome of bare conclusions and wanton speculation. Plaintiffs merely assert the Defendants acted in parallel by offering wages for shepherds "at precisely the wage floor set by the Department of Labor for foreign shepherds." (2d Am. Compl. at ¶ 70.) Fairly interpreted, all Western Range did was comply with the wage rate set by the states and the DOL, just as it and its membership were directed to do by the DOL.

Defendants' efforts to comply with DOL wage rates and other regulations similarly do not give rise to an inference of anticompetitive behavior. The H2-A visa application process expressly contemplates that "[a]n association may file a master application on behalf of its employer-members." 20 C.F.R. § 655.131. There are excellent business reasons why a ranch would wish to use the efficient scale of an

association for this lawful purpose, such as sharing regulatory compliance costs, obtaining expert assistance to ensure that all relevant laws are fully complied with, and to share the costs of advertising jobs across the United States and in foreign countries – all of which activities are difficult for small ranching operations to undertake alone.

Similarly, the allegation that Western Range notified its membership of an increase in the monthly wages in response to changes in DOL regulations is also entirely consistent with unilateral and lawful action.  (2d Am. Compl. at ¶ 106.)  The mere fact that Western Range might, as part of a commitment to compliance, alert its membership to periodic changes in the minimum wage laws is totally consistent with unilateral action. Each of its members has a compelling interest in paying hired shepherds wages in accordance with DOL regulations.  And, in other sections of the Second Amended Complaint, Plaintiffs attempt to hold Western Range strictly liable for the alleged failure of its members to comply with these regulations, suggesting they agree Western Range has a legal obligation to provide such information.  Nowhere do Plaintiffs assert – nor could they assert – that Western Range instructed its membership that they could *only* pay the minimum monthly wage.  *Mayor & Council of Baltimore v. Citigroup, Inc.,* 709 F.3d 129, 138 (2d Cir.2013) (alleged conduct did not support an inference of a conspiracy because it made "perfect business sense" for the defendants acting unilaterally). Allegations of action that the defendants naturally would undertake independently—or as in this case, actions that the defendants were required to take— do not warrant the inference of a conspiracy. *Twombly*, 550 U.S. at 566.

In sum, Plaintiffs' claim is a perfect example of parallel conduct coupled with a bare assertion of conspiracy, which the *Twombly* court specifically ruled does not suffice for stating a claim under § 1 of the Sherman Act. The Court's task is even easier where, as here, the Plaintiffs' own allegations demonstrate the independent business justification for the conduct. *See Compliance Marketing*, 2010 WL1416823, *12-13.

3.      Western Range's Conduct is Shielded From Liability In Any Event

a.      Western Range is Immune under Noerr-Pennington.

The First Amendment explicitly protects the right to petition the government. The *Noerr-Pennington* doctrine has long recognized immunity for the very same conduct alleged here. *See Eastern R. R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 671 (1965). Thus, in *Pennington*, the defendants could not be liable for paying wages set by the Secretary of Labor, to whom the defendants had petitioned, and in *Noerr*, petitions to the government could not be the basis for an antitrust claim because the Sherman Act is meant to control "business activity" and not "political activity." Simply stated, "parties are immune from liability arising from the antitrust injuries caused by government action which results from the petitioning." *A.D. Bedell Wholesale Co., Inc. v. Philip Morris, Inc.*, 263 F. 3d 239 (3d Cir. 2001).

Here, Plaintiffs expressly allege that the wages set by the DOL are the product of "wage surveys that review the wages paid to shepherds in the relevant market." (2d Am. Compl. at ¶ 75). Thus, to the extent Plaintiffs' allegations of anti-competitive conduct involve the sharing of wage data with the DOL, such activity is expressly protected under the *Noerr-Pennington* doctrine and cannot be the basis for antitrust liability.

b.      Western Range Cannot be Held Liable for Complying with State Minimum Wage Laws.

Compliance with official state government action cannot create antitrust liability. The *Parker* doctrine protects a state government's right to adopt "anticompetitive restraints that sovereign states impose as an act of government." *A.D. Bedell*, 263 F.3d at 254 (quoting *Parker v. Brown*, 317 U.S. 341, 352 (1943)). Private actors who follow such anticompetitive government action are similarly shielded from antitrust liability. *See, e.g., Sessions Tank Liners, Inc. v. Joor Mfg., Inc.*, 17 F.3d 295, 298 (9th Cir. 1994)

(observing that Parker immunity applies to "states as well as to private parties"). *Parker* applies where two conditions are met: "First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively supervised' by the State itself." *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 105 (1980) (internal citation omitted).

As alleged here, the DOL bases its rates on regular wage surveys and the states each set their own minimum wage rates. Such determinations by the states are clear, affirmative expressions of state policy, and they are actively supervised by the relevant state governments via minimum wage enforcement agencies. Western Range is, therefore, immune under *Parker*.

### C.     Plaintiffs' RICO Claim Under 18 U.S.C. § 1962(c) is Patently Defective.

Courts have long cautioned against overreaching with regard to RICO's civil provisions, dismissing those civil RICO claims which do not comply with RICO's specialized pleading requirements. "Although [RICO] provides a private civil action to recover treble damages for violations of RICO's substantive provisions, the statute was never intended to allow plaintiffs to turn garden-variety state law fraud claims into federal RICO actions." *Jennings v. Auto Meter Prods*., Inc., 495 F.3d 466, 472 (7th Cir. 2007); *In re Dow Co. Sarabond Prods. Liab. Litig*., 666 F. Supp. 1466, 1470 (D. Colo. 1987) ("RICO is a recurring nightmare for federal courts across the country" and "is not broad enough to embrace every fraudulent action."). Because of the stigma that affixes to RICO defendants, courts properly dismiss deficient civil RICO claims "at an early stage of the litigation." *Figueroa Ruiz v. Alegria*, 896 F.2d 645, 650 (1st Cir. 1990); *see also Brooks v. Bank of Boulder*, 891 F. Supp. 1469, 1477 (D. Colo. 1995).

It is well-settled that, in order to sustain a civil RICO claim, a plaintiff must plead: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *CGC Holding Co., LLC v. Broad & Cassel,* 773 F.3d 1076, 1088 (10th Cir. 2014); *Robbins v.*

*Wilkie*, 300 F.3d 1208, 1210 (10th Cir. 2002) (quoting *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496 (1985)). Plaintiffs' claim here falls far short of the pleading mark under Tenth Circuit precedent for two independent reasons: (1) the absence of allegations to demonstrate the existence of a RICO "enterprise" separate and distinct from the underlying RICO "persons"; and (2) the absence of specific allegations of fraud to serve as a requisite "predicate act" under Rule 9(b) and the requisite "pattern" of racketeering activity.

1.   Plaintiffs Fail to Plead a RICO "Enterprise" Distinct from the Association Itself

The Second Amended Complaint also does not adequately plead the existence of a racketeering "enterprise" that "exists 'separate and apart from the pattern of racketeering activity.'" *U.S. v. Smith*, 413 F.3d 1253, 1266-67 (10th Cir. 2005) (citation omitted); *Tal v. Hogan*, 453 F.3d 1244, 1263 n. 19 (10th Cir. 2006) (for purposes of RICO, "[t]he defendant must be separate from the enterprise."). Put another way, "an organization cannot join with its own members to do that which it normally does and thereby form an enterprise separate and apart from itself." *Yellow Bus Lines*, 883 F.2d at 141. *See also Bd. of Cnty. Comm'rs of San Juan Cnty. v. Liberty Grp.,* 965 F.2d 879, 885 (10th Cir. 1992) (an organization does not form a RICO enterprise with its own "officers and employees … carrying on [its own] business."); *Internet Archive v. Shell*, 505 F.Supp.2d 755 (D.Colo. 2007) (same). Rather, Plaintiff "must allege that the 'defendant [] conduct[s] or participat[es] in the conduct of the 'enterprise's affairs,' not just [its] own affairs.'" *Brannon v. Boatmen's First Nat. Bank of Okla.,* 153 F.3d 1144, 1148 (10th Cir. 1998) (citation omitted). This "distinctiveness requirement may not be avoided 'by alleging a RICO enterprise that consists merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendants'." *Dirt Hogs Inc. v. Nat. Gas Pipeline Co.*, No. 99-6026, 210 F.3d 389, 2000

WL 368411, at *3 (10th Cir. April 10, 2000) (quoting *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.,* 30 F.3d 339, 344 (2d Cir. 1994).).

Despite begin given numerous opportunities to amend, Plaintiffs' 60-page, 295-paragraph Second Amended Complaint "does not clearly identify an ongoing enterprise with an existence and a decision-making structure *separate from its corporate participant."* *Dirt Hogs*, 2000 WL 368411 at *2 (emphasis added).  Plaintiffs do not allege that Western Range engaged in any activity distinct from its existing course of business, which Plaintiffs concede involves, "among other things, recruiting shepherds for Colorado ranches."  (2d Am. Compl. at ¶ 22.)  To the contrary, Plaintiffs' allegation of an enterprise rests on an enterprise relationship between Western Range the defendant and Western Range acting with its executives, employees and membership as the enterprise. Plaintiffs concede as much, asserting that "[t]he common purpose of each of the members of the WRA Enterprise was and is recruiting shepherds for WRA member ranches and minimizing member ranches' payments to H-2A shepherds," and that "the WRA has existed as a membership organization recruiting shepherds for its members since at least the 1950s." *Id*. ¶¶ 123, 127.  In essence, Plaintiffs argue that Western Range formed an enterprise with its own membership – an association that happens to serve the exact same purpose that Western Range serves as a genuine association.

Federal courts have routinely reject*ed similar end-runs around RICO'*s distinctness requirement when the plaintiff alleges an "enterprise" to include combinations involving a corporation and its natural business relationships, such as its employees, its *directors, and its membership or agents.*  Thus, in *Yellow Bus*, the Court dismissed certain RICO claims because "while the corporate or organizational defendant may itself be a member of the enterprise association, the member of the enterprise association may not simply be subdivisions, agents, or members of the defendant organization." 883 F.2d at 141.  The Court found that the union could not

simultaneously be considered a "person" and the target "enterprise." *Id*. at 142. The Court reasoned:

> an organization cannot join with its own members to do that which it normally does and thereby form an enterprise separate and apart from itself ... [t]he requisite distinctness is lost when 'the whole is no different than the sum of its parts in this context.'

*Id*. Furthermore, allowing plaintiffs to generate such "contrived partnerships" consisting of an umbrella organization and its membership, would render the non-identity requirement of section 1962(c) meaningless. *Id*. The *Yellow Bus* court declined to permit such an "end run" around the statutory requirements, cautioning against a "broad rule ... [that] would allow the application of RICO in every fraud case against a corporation." *Id*. (citing *Brannon*, 153 F.3d at 1147).

In *Dirt Hogs*, the Tenth Circuit similarly dismissed a RICO claim on the grounds that plaintiff failed to differentiate between the alleged "enterprise," on the one hand, and the corporate entities and their individual employees and agents, on the other.  210 F.3d, at 3. "Such inconsistent and conclusory allegations," held the court, "employ a 'moving target' approach to describing an enterprise, by naming a string of participants, known and unknown, and alleging that they acted as an association in fact. Considering the centrality of the enterprise to a RICO claim, 'a nebulous, open-ended description of the enterprise does not sufficiently identify this essential element.'" *Id.*

Here, the only decision-making structure described by Plaintiffs is, as it was in *Dirt Hogs*, "the inherently hierarchical relationship" within a corporate association and its membership. Amending their Complaint yet again to include former Western Range executive director Dennis Richins in the alleged RICO conspiracy only serves to exacerbate the problem.  (2d Am. Compl. at ¶ 112 ("As Executive Director of the WRA, Defendant Richins formed an association-in-fact with the WRA….").) Just as an organization cannot form an enterprise with itself, it also cannot form an enterprise with its own "officers and employees … carrying on [its own] business." *Bd. of Cnty.*

*Comm'rs*, 965 F.2d at 885.   In sum, Plaintiffs' allegation that Western Range and its executives and membership constitute an enterprise does not meet the threshold requirements of RICO.

2.    <u>Plaintiffs Have Not Pled a "Pattern of Racketeering Activity."</u>

The Second Amended Complaint also fails to adequately plead the predicate acts of "racketeering activity" necessary for a substantive RICO claim.   The statute, in relevant part, defines "racketeering activity" as a violation of the federal mail or wire fraud statutes. *See* 18 U.S.C. § 1961(1) (citing, *inter alia, id.* §§ 1341, 1343). And the complaint, in turn, is limited to predicate acts of mail and wire fraud through submission of H-2A Applications and job orders to state agencies and the DOL.   (2d Am. Compl. at ¶ 137 ("The Enterprises, acting through Association Defendants, submit or have submitted H-2A Applications to the DOL with attached copies of job orders offering positions that domestic workers did not fill.   These job orders contain the promises to reimburse travel expenses described above."); *id.* at ¶ 141 ("In reliance on these H-2A Applications and job orders, the DOL reviews and approves H-2A Applications …."). All of the alleged predicate acts of mail and wire fraud involve allegedly false statements to government regulators.   *Id.* at ¶ 142 ("Pursuant to state and DOL instructions, all job orders and H-2A Applications must be submitted to the respective agencies by wire or mail.").)

But not every allegedly false communication by mail or wire falls within the scope of these statutes. To the contrary, the false communication must be one intended to: (1) "deprive another of the intangible right of honest services," (2) "sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious ... article," or (3) "obtain[] money or property" from the victim. 18 U.S.C. §§ 1341, 1343, 1346. Because the alleged false statements to government

regulators at issue here do not fall within any of these categories, the complaint fails adequately to plead "racketeering activity" as a matter of law.

As an initial matter, the alleged false statements at issue here do not qualify as a scheme "to deprive another of the intangible right of honest services." 18 U.S.C. § 1346. As the Supreme Court explained, this "honest services" provision "covers only bribery and kickback schemes." *Skilling v. United States*, 130 S. Ct. 2896, 2907 (2010). The complaint does not allege that Western Range paid or accepted a bribe or kickback. Nor does the complaint allege a scheme "to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious ... article." 18 U.S.C. § 1341.

In addition, the amended pleading does not, and cannot, allege any misrepresentations made to obtain "'money or property' in the victim's hands." *Pasquantino v. United States*, 544 U.S. 349, 355 (2005). According to the complaint, Western Range used the mails or wires to submit fraudulent job orders and applications to workforce agencies in order to obtain agency approval. (2d Am. Compl. at ¶¶ 129, 130, 136-142 (alleging false statements to obtain approvals on H-2A Applications).) The problem with this theory is that a regulatory approval is not "money or property" within the meaning of the federal mail and wire fraud statutes. The Supreme Court has confirmed that a regulatory approval "implicates the Government's role as sovereign, not as property holder," and thus does not entail a transfer of the Government's "money or property." *Cleveland v. United States*, 531 U.S. 12, 15, 21, 24 (2000); *see also McNally v. United States*, 483 U.S. 350, 359 n.8 (1987) ("[T]he mail fraud statute ... had its origin in the desire to protect individual property rights, and any benefit which the Government derives from the statute must be limited to the Government's interests as property holder."). Nor does it matter whether the approval at issue had value to the Defendants. "It does not suffice ... that the object of the fraud may become property in the [defendant's] hands; for purposes of the mail fraud statute, the thing obtained must

16

be property in the hands of the victim." *Cleveland*, 531 U.S. at 15 (emphasis added). Although a regulatory approval or permit may be quite valuable, it is not the regulators "money or property," and thus does not form the basis for a charge of mail or wire fraud. *See id.* at 22.

Finally, in addition to the foregoing substantive defects, this newest pleading once again fails on procedural grounds because the mail and wire fraud claims fail to fulfill the requirements of Fed. R. Civ. P. 9(b).  Addressing similar mail and wire fraud claims, the court in *Tal*, 453 F.3d at 1263, noted that "[t]he common thread among ... these crimes is the concept of 'fraud.'" In considering whether plaintiff's allegations had stated a claim, the *Tal* court held that "[t]he particularity requirement of Rule 9(b)…, applies to claims of mail and wire fraud" and that "[f]ailure to adequately allege any one of the nine elements is fatal to the fraud claim." *Id*. (citations omitted). "Thus, 'a complaint alleging fraud [must] 'set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof" and the "purpose of the mailing within the defendant's fraudulent scheme. *Id*. (citations omitted). The substance of Plaintiffs' allegations on this point is that Western Range "continually and repeatedly ha[s] made material and false representations to state governments, the federal government and shepherds …." It is clear on the face of these allegations that they fail to even list the elements of fraud, much less state those elements with the particularity the federal rules require.  As such, Plaintiffs have failed to allege the elements of these claims and cannot base their RICO claim on predicate acts of mail or wire fraud.

### D.      Plaintiffs Fail to State a Claim for Breach of Contract.

To allege breach of contract, a plaintiff must first "identify any contract entered into by [plaintiff] and [defendant]." *Shell v. Am. Family Rights Ass'n,* 899 F. Supp. 2d

1035, 1059 (D. Colo. 2012). It is not sufficient to plead "conclusorily and without record citation that [defendant] became bound by some unspecified contract." *Id*.

Plaintiffs allege that they and a class of "similarly situated persons" entered into contracts with Western Range and that Western Range breached those contracts by deducting unspecified "expenses." (2d Am. Compl. at ¶ 210.) But Plaintiffs make no effort to allege even the most basic facts regarding their own contractual relations, let alone those of the putative class members. Plaintiffs do not provide the names of the ranches that allegedly employed them, the state where those ranches were located, or their dates of employment. They similarly do not identify when their contracts were entered into, whether the contracts were entered into by Western Range or one of its members, or where the contracts were performed. Nor do they allege that they completed the term of their employment contract (assuming there was an employment contract) or that they performed the tasks for which they were hired. Se*e Tatten v. Bank of Am. Corp*., 562 F. App'x 718, 721 (10th Cir. 2014) (granting motion to dismiss where the plaintiff failed to include facts that show that the he at least partially performed on the contract); *Greenway Nutrients, Inc*., 2015 WL 1524941, at *9 ("Additionally, performance under the contract…must also be plausibly pled.").[3]

These basic details are within Plaintiffs' own knowledge and should be readily available to them. The failure to properly plead such basic elements warrants dismissal. *McDonald v. Miller,* 945 F. Supp. 2d 1201, 1206 (D. Colo. 2013) *reversed in part on different grounds*, 769 F.3d 1202, 1221 (10th Cir. 2014) (conclusory allegations that valid, binding contract existed and was breached insufficient to state a claim under *Iqbal/Twombly*); *Romstad v. City of Colorado Springs*, No. 14-CV-3508-CMA-CBS, 2015 WL 4743189, at *3 (D. Colo. Aug. 10, 2015) (granting motion to dismiss where "Plaintiffs [did] not allege the existence of a signed employment agreement between

---

[3] These same defects are fatal to Plaintiffs' alternative unjust enrichment theory.

them and the [employer]" and the alleged facts did not support an implied contract). Plaintiffs simply cannot state a claim for breach of contract without pleading some facts that would enable the Court and Western Range to identify the contracts at issue and understand the obligations of the parties. *Shell*, 899 F. Supp. 2d at 1059.

### III.    CONCLUSION

For the foregoing reasons, this Court should dismiss all claims against Western Range pursuant to Fed. R. Civ. P. 12(b)(6).

Respectfully submitted this 8th day of January, 2016.

GREENBERG TRAURIG, LLP
*s/ Naomi Beer*
Naomi G. Beer
Amber J. Munck
Harriet McConnell
1200 17th Street, Suite 2400
Denver, CO 80202
Tel: 303-572-6500/Fax: 303-572-6540
Email: beern@gtlaw.com
        muncka@gtlaw.com
        mcconnellh@gtlaw.com
**Attorneys for Defendant Western Range Association**

19

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 8th day of January, 2016 a true and accurate copy of the above and foregoing **DEFENDANT WESTERN RANGE ASSOCIATION'S COMBINED MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT and MEMORANDUM OF LAW IN SUPPORT THEREOF** was filed with the Clerk of the Court via the CM/ECF filing system which will send notification to the following:

Alexander Neville Hood
Nina E. DiSalvo
Andrew Schmidt
Towards Justice
1535 High Street, Suite 300
Denver, CO 80218
*Attorneys for Plaintiffs*

James Larry Stine
Elizabeth K. Dorminey
Raymond Perez, II
Wimberly, Lawson, Steckel,
  Schneider & Stine, P.C.
Suite 400, Lenox Towers
3400 Peachtree Toad, N.E.
Atlanta, George 30326
*Attorneys for Mountain Plains
  Agricultural Service*

Justin David Cumming
Kenneth R. Rossman, IV
Lewis Roca Rothgerber Christie LLP
1200 17th Street, Suite 3000
Denver, CO 80202-5855
*Attorneys for Nottingham Land
  and Livestock, LLLP; Two Bar
  Sheep Corporation, LLC*

Billie Jean Siddoway
Siddoway Law Office
P.O. Box 704
Driggs, ID 83422
*Attorneys for Dennis Richins
  d/b/a Dennis Richins Livestock; Ball
Brothers Sheep Company; Child Ranch,
LLC; Estill Ranches, LLC*

Brendan V. Monahan
Stokes, Lawrence, Velikanje,
  Moore & Shore
120 North Naches Avenue
Yakima, WA 98901
*Attorneys for Cunningham Sheep
  Company*

Bradford J. Axel
Stokes Lawrence, P.S.
1420 Fifth Avenue, Suite 3000
Seattle, WA 98101
*Attorneys for Cunningham Sheep
  Company*

Lauren E. La Val
J. Rod Betts
Paul, Plevin, Sullivan & Connaughton LLP
101 West Broadway, Ninth Floor
San Diego, CA 92101
*Attorneys for Martin Auza Sheep Company*

s/ Julie Eaton
    Julie Eaton