**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Case No. 15-cv-01889-REB-CBS

RODOLFO LLACUA, *et al.*

      Plaintiffs,

v.

WESTERN RANGE ASSOCATION, *et al.*

      Defendants.

---

**RESPONSE TO DEFENDANTS' MOTIONS TO DISMISS [DOCS. 83, 86-89, 91]**

---

## I.     INTRODUCTION

Shepherds working on western sheep ranches are paid extremely low wages. All shepherds—whether domestic employees or foreign shepherds working on H-2A temporary work visas—are offered exactly the minimum wage set for H-2A foreign shepherds by the United States Department of Labor (the "DOL"). But this is not a case about whether these DOL set minimum wages are "too low." Nor is this a case about whether sheep ranchers pay their shepherds at least the DOL minimum. Indeed, in the free market, natural market conditions can lead to low wages.

But shepherd wages are not the result of the free market. Instead, as the Plaintiffs' Second Amended Complaint [Doc. 73] (hereinafter, the "Complaint" or "SAC") alleges, these low wages are the result of illegal wage fixing by western sheep ranches and the associations they formed to recruit shepherd labor, Defendants Western Range

Association ("WRA") and Mountain Plains Agricultural Service ("MPAS") (together, the "Association Defendants").

It is undeniably illegal, and entirely at odds with our free market system, for competitors in an industry to collude to pay all of their employees *exactly* the minimum wage. That is wage fixing, and the proscription against this anticompetitive conduct is rooted in our faith in the free market to protect the interests of both workers *and* employers. But this collusive conduct is precisely what Plaintiffs, former shepherds, allege is happening here, and this conduct is precisely the basis for Plaintiffs' antitrust claims. *See* SAC ¶¶ 215-258 (Antitrust Counts).

The ranches—including the individual ranches named as Defendants—, through the WRA and MPAS, fix the wages offered to their shepherd employees at *exactly* the minimum wage set by the DOL for paying H-2A shepherds. Rather than merely complying with the law, as Defendants contend, the ranches and associations instead abuse the trust of the United States government. They turn a minimum wage meant to protect domestic workers into the fulcrum of a conspiracy to suppress the wages of those domestic workers and of vulnerable migrants who work for wages and in conditions that are entirely aberrational in our economy.

The low wages resulting from the wage fixing have also all but destroyed the labor market for domestic shepherds, as almost all shepherds hired in the United States are foreign shepherds brought here on H-2A temporary work visas, usually from Peru and Mexico. Pursuant to DOL regulation, ranches must first offer their shepherding jobs

to domestic shepherds and then, if the jobs are not taken domestically, may offer the jobs to foreign H-2A shepherds.

These offers also promise that shepherds will be reimbursed as required by 20 C.F.R. § 655.122, including for administrative costs associated with recruitment and costs associated with traveling to and from the ranches. The Complaint alleges that these costs are in fact never reimbursed. That failure to reimburse constitutes a breach of contract. *See* SAC ¶¶ 282-294 (Contract Counts). But it is also the result of fraud. The ranches' ability to recruit H-2A shepherds is contingent on making assurances to state labor agencies and the DOL that these required reimbursements will in fact be made. As the Complaint alleges, making those assurances over and over again, while in fact never reimbursing shepherds, is a pattern of racketeering and actionable under RICO. *See id.* ¶¶ 259-275 (RICO Counts).

Finally, given the gravity of what is alleged, it is perhaps easy to overlook Plaintiff Rafeal De la Cruz's Nevada minimum wage claim. *See id.* ¶¶ 276-281 (NV Minimum Wage Count). The illegal conduct at the core of this claim, however, is blatant. Nevada employers, including employers of shepherds, must pay their employees at least $7.25 an hour. Until November 2015, the MPAS ignored that minimum and offered its shepherds in Nevada—including Plaintiff De la Cruz—significantly less, $800 a month or less than $4.62 an hour.

In their motions to dismiss, the Defendants rest largely on misunderstandings of law and feigned claims of conclusory pleading in the face of detailed fact-intensive allegations. [1] These attempts must fail.

## II.   THE PLAINTIFFS PLAUSIBLY PLEAD THEIR CLAIMS

### A. <u>Antitrust (Counts I-III)</u>

The antitrust claims at the heart of this dispute are *not* novel. Commentators, courts, and federal agencies have examined at length the inherent potential of trade and professional associations to violate antitrust laws. *See, e.g.*, *N.C. St. Bd. Dental Examiners v. F.T.C.*, 135 S. Ct. 1101 (2015); Fed. Trade Comm., *Antitrust by association(s)*, May 1, 2014.[2]  It is now blackletter law that associations are prohibited from setting prices for their members. *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679 (1978) (upholding antitrust action against association that imposed ethical rule prohibiting competitive bidding by members); *Goldfarb v. Va. State Bar*, 421 U.S. 773, 781 (1975) (concluding that bar associations violated antitrust laws by setting fee schedules for their members). In fact, in 1926, the Supreme Court declared it a violation of the Sherman Act for "associations [of ship owners to] fix the wages which shall be

---

[1] Throughout this Response, Plaintiffs will refer to the various motions to dismiss as follows. The Western Range Association's motion [Doc. 87] shall be "WRA." The Mountain Plains Agricultural Service's motion [Doc. 91] shall be "MPAS." Child Ranch, LLC; Ball Brothers Sheep Company; Estill Ranches, LLC; Dennis Richins' combined motion [Doc. 89] shall be "Child." Martin Auza Sheep Corporation's motion [Doc. 83] shall be "Auza." Cunningham Sheep Company's motion [Doc. 86] shall be "Cunningham." Nottingham Land and Livestock, LLLP, and Two Bar Sheep Corporation, LLC's combined motion [Doc. 88] shall be "Two Bar."
[2] Available at https://www.ftc.gov/news-events/blogs/competition-matters/2014/05/antitrust-associations.

paid . . . seamen" by owners of merchant sea vessels. *Anderson v. Shipowners' Ass'n of Pac. Coast*, 272 U.S. 359, 362 (1926). Ninety years later, this Court is called upon to address the viability of Sherman Act claims alleging nearly identical concerted conduct.

For the reasons spelled out here, the Complaint plausibly alleges that the WRA and MPAS set the wages offered to shepherds by competing member ranches, and that Rancher Defendants willingly participate in this concerted conduct. By using the wage floor for H-2A shepherds as a ceiling for offers made to domestic and foreign workers, the concerted conduct alleged here, like other antitrust conspiracies to set prices, "prevents all customers"—in this case, workers—"from making [wage] comparisons in the initial selection of an [employer-ranch]." *Nat. Soc. of Prof. Engineers*, 435 U.S. at 695.

The motivations for and consequences of Defendants' wage-fixing are amplified by a reciprocal relationship between the wages offered to shepherds and the federal policy that allows ranchers to obtain temporary visas for foreign shepherds after establishing that there are no domestic shepherds willing to perform shepherd work at the offered wage. By fixing the wages offered to potential domestic shepherds, Rancher Defendants are able to artificially suppress the minimum wage floor for shepherds to less than $5 per hour, SAC ¶¶ 81-84, and likely *far* less than that amount when considering that shepherds work "24/7," as one of the rancher defendants asserts, Cunningham at 10 n.16. Furthermore, because Defendants' conduct artificially depresses wages offered to domestic workers, it deprives these workers of a realistic

opportunity to work in the industry, SAC ¶ 110, and allows ranchers to legally access a

desperate and easily-exploitable foreign labor market, *id.* ¶ 111.

The Complaint sets forth specific, factual allegations that support the plausibility

of Plaintiffs' wage-fixing claims, including, among others, that:

(1)  communications between Association Defendants and Rancher Defendants suggest that Association Defendants establish wages offered to all of member ranchers' shepherds at precisely the minimum wage floor with the knowledge and support of member ranchers including Rancher Defendants. In a startling illustration of the wage-fixing conspiracy, when Oregon raised the wage floor for H-2A shepherds, the WRA instructed its Oregon members to "immediately adjust . . . wage payments [to H-2A shepherds]" to precisely the new wage floor. SAC ¶ 99. It is now clear that the MPAS transmitted a similar communication to its Oregon members. Ex. A (MPAS Member Bulletin).[3]

(2)  substantially all of the job orders and H-2A certifications submitted by the WRA and MPAS offer a wage set at exactly the government-set wage floor—or at least what Defendants believe to be the wage floor[4]—for all ranches, often without even distinguishing between ranches in describing job offers. SAC ¶¶ 75-79, 94-97. Therefore, for H-2A shepherds who work at member ranches, the WRA and MPAS set the initial terms of employment, including wages. As a federal court has explained, the WRA prohibits member ranches from departing from these initial terms. *Ruiz v. Fernandez*, 949 F. Supp. 2d 1055, 1068 (E.D. Wash. 2013);

(3)  competing ranchers, including Rancher Defendants, use Association Defendants for the purpose of allocating decisions regarding wages offered to domestic and H-2A shepherds to "associations constituted by competitor ranches," SAC ¶¶ 69, 87, with the knowledge that Association Defendants fix wages offered to shepherds, *id.*, and with the motive to depress natural market wages to lock domestic shepherds out of the

---

[3] *Reynolds v. CB Sports Bar, Inc.,* 623 F.3d 1143, 1147 (7th Cir. 2010) ("We conclude that the Supreme Court's recent decisions, while raising the bar for what must be included in the complaint in the first instance, did not eliminate the plaintiff's opportunity to suggest facts outside the pleading, including on appeal, showing that a complaint should not be dismissed." (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 563 (2007)); *McZeal v. Sprint Nextel Corp.,* 501 F.3d 1354, 1356 n.4 (Fed.Cir.2007)).
[4] Plaintiffs also allege that the wages the MPAS offered to Nevada shepherds fell *below* the applicable wage floor.

industry, allowing for the importation of cheap easily-exploitable foreign shepherds, SAC ¶ 83;

(4)  it is unlikely that in a properly functioning labor market, wages for skilled shepherds would stagnate at the minimum wage floor, which is substantially less than the federal minimum wage and the market wage for workers performing similar in occupations that could also be filled by H-2A workers, SAC ¶¶ 101-106. Indeed, fixing wages at this level is inconsistent with Member Ranchers' pro-competitive self-interest, which should provide an incentive for ranches to use wages to attract and retain desirable shepherds or shepherds who work particularly well on a specific ranch. Indeed, Defendants' own motions to dismiss illustrate the irrationality of fixing offered wages. One of the motions to dismiss asserts that although member ranchers may offer the minimum wage floor to domestic and foreign shepherds, once ranches are able to higher foreign workers, they increase wage payments above the offered amount. Auza at 9-10. This conceded conduct violates both the antitrust laws and the immigration laws, which are designed to ensure that domestic workers have a fair shot at receiving the pay and benefits provided to H-2A workers. *See* WRA at 9 ("[I]t is actually illegal to offer H2-A visa holders a higher wage than domestic workers.").

Finally, "[i]t is well settled that exemptions from the antitrust laws are to be narrowly construed." *Grp. Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 231 (1979). In this case, none of Defendants' proffered defenses come close to immunizing their conduct: *Parker* immunity allows restraints on trade where the restraint is itself a clearly expressed state government policy, but it does not protect concerted conduct solely because it occurs in a heavily-regulated industry. *California Retail Liquor Dealers Ass'n v. Midcal Aluminum*, Inc., 445 U.S. 97 (1980). The Capper-Volstead Act allows certain agricultural businesses to "act together in associations" in "the processing, preparing for market, handling, and marketing" of agricultural goods, 7 U.S.C. § 291, but it has never been interpreted to sanction pre-production wage fixing. And, finally, the *Noerr-Pennnington* doctrine allows concerted conduct in "petitioning government officials," but it does not authorize trade associations to fix prices, even where

government officials might examine those prices in promulgating regulations. *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499 (1988).

## 1. Legal Framework

Before addressing Defendants' specific arguments it is important to note that Defendants' framing of the legal issues at stake in this case both misconstrues what constitutes a "contract" or "combination" "in restraint of trade" and misstates the standard Plaintiffs must meet at this stage for the opportunity to establish that such a "contract" or "combination" exists.

### a. *The Form of a Contract or Combination in Restraint of Trade*

Section 1 of the Sherman Antitrust Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States." 15 U.S.C. § 1. Defendants' motions to dismiss appear to suggest that this language prohibits only explicit agreements among competitors. That understanding of the antitrust laws ignores the fundamental principles underlying the Sherman Act:  "Plaintiffs need not allege the existence of collusive communications in 'smoke-filled rooms' in order to state a § 1 Sherman Act claim." *Bolinger v. First Multiple Listing Serv., Inc.*, 838 F. Supp. 2d 1340, 1357 (N.D. Ga. 2012) (internal quotation marks omitted). Rather, Section 1 of the Sherman Act targets "concerted action that restraints trade" no matter the conduct's form. *Am. Needle, Inc. v. Nat'l Football League,* 560 U.S. 183, 190 (2010); *see also In re Coordinated Pretrial Proceedings in Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 447 (9th Cir.1990) ("[T]he form of the exchange—whether through a trade association, through private

exchange. . . or through public announcements of price changes—should not be determinative of its legality.") (quoting R. Posner, Antitrust Law: An Economic Perspective 146 (1976)). As the Supreme Court recently explained in a case involving actions taken by a professional board constituted by competitors, federal antitrust laws "declare a considered and decisive prohibition . . . of cartels, price fixing, and other *combinations or practices* that undermine the free market." *N.C. St. Bd. of Dental Examiners*, 135 S. Ct. at 1109 (emphasis added). Contrary to Defendants' arguments, therefore, illegal conspiracies to restrain trade need not involve "*evil* intent." MPAS at 9 (emphasis added).

i.   *Association Defendants' Concerted Conduct*

In this case, the WRA and MPAS violate the antitrust laws if—by policy or practice—they uniformly set wages offered to shepherds. *See, e.g.*, *Nat'l Soc'y of Prof'l Eng'rs*, 435 U.S. 679 (1978) (upholding antitrust action against association that imposed ethical rule prohibiting competitive bidding by members); *Goldfarb*, 421 U.S. 773, 781 (1975) (concluding that bar associations violated antitrust laws by setting fee schedules for their members); *Osborn v. Visa Inc.*, 797 F.3d 1057, 1066-67 (D.C. Cir. 2015) ("The allegations here—that a group of retail banks fixed an element of access fee pricing through [Visa and MasterCard] rules—describe the sort of concerted action necessary to make out a Section 1 claim [against Visa and MasterCard]."). As the Tenth Circuit has explained, a rule permitting trade associations to fix wages or prices for their members would "eviscerate the protections of the Sherman Act because it would permit, for example, horizontal competitors to form associations in which all competitors agree

to sell their product at the same supracompetitive price. . . . [T]his type of price-fixing agreement is exactly what the antitrust laws were designed to prohibit." *Gregory v. Fort Bridger Rendezvous Ass'n*, 448 F.3d 1195, 1202 (10th Cir. 2006).

ii. *Rancher Defendants' Concerted Conduct*

It is true that "membership in an association does not render an association's members automatically liable for antitrust violations committed by the association." *See, e.g.*, *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048 (9th Cir. 2008); *AD/SAT, Div. of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999). But to adequately plead association members' participation in their association's misconduct, a plaintiff need not allege that the members all communicated with each other about the scheme. Rather, it is enough to plausibly state that the "association members, in their individual capacities, consciously committed themselves to a common scheme designed to achieve an unlawful objective." *AD/SAT, Div. of Skylight, Inc.*, 181 F.3d at 234. Allegations that members "*used* their . . . associations to adopt and enforce" the supracompetive pricing regime established by the association are clearly enough to state a claim against those members. *Osborn*, 797 F.3d at 1067 (emphasis added).

In performing this analysis, courts are mindful that trade associations may, in some cases, be a "formalistic shell for ongoing concerted action." *Am. Needle*, 560 U.S. at 200; Christopher R. Leslie, Trust, Distrust, and Antitrust, 82 TEX. L. REV. 515 (2004) (explaining how cartels use trade associations to oversee price-fixing and other anticompetitive agreements). Allowing businesses to conceal price fixing behind trade associations that fix prices *for them* would license competitors to knowingly "surrender[]

10

[themselves] . . . to the control of . . . associations," *Anderson*, 272 U.S. at 362, and thereby deprive the market of the "independent centers of decisionmaking that competition assumes and demands."  *Am. Needle*, 560 U.S. at 189.

      iii.    *Conscious Parallelism in Context of Trade Associations that Set Prices*

Where antitrust plaintiffs allege concerted conduct by competitors that is borne out in uniform inputs (*i.e.*, wages), outputs (*i.e.*, production), or prices, antitrust defendants often argue that this uniformity can be explained by independent decisionmaking or permissible "conscious parallelism."  Firms engage in permissible "conscious parallelism" when they *independently* "set[] their prices at a profit-maximizing, supracompetitive level by recognizing their shared economic interests and their interdependence with respect to price and output decisions."  *Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 227 (1993). "Coordinating . . . pricing without an actual agreement to do so" does not violate the Sherman Act. *In re Text Messaging Antitrust Litig.*, 782 F.3d 867, 871 (7th Cir. 2015).

Not surprisingly, Defendants argue that the undeniable uniformity of the process for establishing wages offered to shepherds—namely setting that wage at precisely the wage floor for H-2A shepherds in each state—is the product of permissible conscious parallelism among ranchers. It is worth spelling out in concrete terms what "conscious parallelism" within the factual context of this case would have to involve for it to be permissible under the Sherman Act. It might be permissible for Rancher Defendants each to communicate to Association Defendants that they desire to offer the minimum wage to all domestic and foreign shepherds. Even if the decision to offer this wage were

11

based on ranchers' awareness that other ranchers were also offering the minimum, this conduct would likely not trigger liability under the antitrust laws. *Id.* (stating that "follow the leader pricing" does not amount to an agreement in restraint of trade). But Defendants do not even assert that they have a mechanism for independent decisionmaking. And, in the absence of independent decisions regarding wages offered to shepherds, the uniformity of wages can only be explained by Association Defendants' policies or practices, codified or uncodified, of setting offered wages at precisely the legal wage floor without regard to differences between workers and ranches. Concerted conduct of this variety, no matter its precise form, is a classic "combination in restraint of trade."

### b. *Defendants' Burden at this Stage*

Defendants are not only wrong about exactly *what* Plaintiffs must plead to allege a Section 1 violation. They are also wrong about *how* Plaintiffs must plead the violation to state a claim for relief at this stage. Defendants' motions to dismiss are littered with the argument that Plaintiffs have not offered sufficient *evidence* to surpass a motion to dismiss under rule 12(b)(6). *See, e.g.*, MPAS at 8 (asserting that Plaintiffs have not offered a "shred of evidence" supporting illegal conduct). Of course, it should not and cannot be Plaintiffs burden to produce *evidence* at this stage. As the Supreme Court has explained, "[a]sking for plausible grounds does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery *will* reveal evidence of illegal agreement." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007) (emphasis added).

It is true that the Supreme Court has strengthened the pleading standard in federal court. In the antitrust context, "an allegation of parallel conduct and a bare assertion of conspiracy will not suffice." *Twombly*, 550 U.S. at 556. But this standard does not require antitrust plaintiffs to plead the specific "who-what-where-when" of the alleged conspiracies. *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 325 (2d Cir. 2010) ("Defendants next argue that *Twombly* requires that a plaintiff identify the specific time, place, or person related to each conspiracy allegation. This is . . . incorrect."); *In re Packaged Ice Antitrust Litig.*, 723 F. Supp. 2d 987, 1004 (E.D. Mich. 2010) ("Although Defendants dismiss each of the pieces of evidence offered as either 'conclusory hearsay' or lacking the 'who, what, when and where,' *Twombly* does not require the latter nor does Plaintiffs' CAC contain only the former."). Rather, an antirust plaintiff alleges sufficient factual specificity when her complaint puts the defendant on notice of the nature of those claims and the grounds upon which the claims rest. *See Twombly*, 550 U.S. at 55.

### 2. Plaintiffs Plausibly Have Pleaded a Combination in Restraint of Trade.

This is not a case where Plaintiffs allege parallel conduct and seek the right to perform costly and inefficient discovery in an effort to find "smoking gun" evidence of a horizontal conspiracy to fix wages. *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010). For the reasons, spelled out above, that evidence is unnecessary in a price fixing case involving a trade association openly setting wages for members. Here, the question is whether Association Defendants fixed prices and whether Rancher Defendants participated in the scheme.

### a. *Plaintiffs Point to Ample Circumstantial Evidence to Support their Allegations.*

Even if Association Defendants' uniform process for setting offered wages is *theoretically* consistent with parallel conduct, Defendants' motions to dismiss can succeed only if independent parallel conduct is the *sole* plausible explanation for uniform wages. *Anderson News, L.L.C. v. American Media, Inc.*, 680 F.3d 162, 190 (2d Cir. 2012) ("Consequently, although an innocuous interpretation of the defendants' conduct may be plausible, that does not mean that the plaintiff's allegation that that conduct was culpable is not also plausible."). In other words, to dismiss Plaintiffs' Complaint, the Court would have to accept that the only plausible explanation for the WRA and MPAS uniformly offering the wage floor to domestic and H-2A shepherds is that their members each independently instruct them to offer this amount. But Plaintiffs' Complaint identifies substantial circumstantial evidence of illegal concerted conduct to suggest that this explanation is unlikely, and at the very least that other explanations are *plausible. Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013) (parallel conduct alongside a combination "plus factors"—which include "common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications"—is enough to withstand a motion to dismiss (internal quotation marks omitted)).

### i.   *Association Defendants*

As for Association Defendants, it is hard to read their conduct as evidencing anything other than illegal wage fixing. Substantially all job orders and H-2A applications

prepared by Association Defendants for their members set the offered wage rate at

exactly the minimum wage floor. SAC ¶¶ 71-72, 91-97. The WRA's violations are

particularly blatant—at best, it lists the names of individual ranches in the offers it

prepares for members in an addendum. SAC ¶¶ 77-79, 94-96. Indeed, a federal court

has already concluded that the WRA sets the wages that member ranches offer H-2A

shepherds through WRA employees living and working abroad, and that the WRA does

not *allow* member ranchers to offer a different amount:

> The undisputed facts establish that Western Range plays an integral role in initiating H-2A sheepherders' employment with its member ranches. Western Range retains "recruitment coordinators" in Chile and Peru to recruit potential H-2A sheepherders. These recruitment coordinators work for Western Range alone and have no connection with any of Western Range's individual member ranches. Plaintiffs in this case were recruited by Western Range's recruitment coordinator in Chile.
>
> When Western Range recruits a sheepherder, the recruitment coordinator provides the sheepherder with a standard "Pre-Employment Notice of Rights and Obligations" that the sheepherder must sign before they may be transported to their work site in the United States. The form is prepared by Western Range and was provided to each of the Plaintiffs in this case. The Pre-Employment Notice generally describes the necessary qualifications for the job, the nature of the work that the sheepherder will perform, *the wage rate* that they will be paid, the transportation that will be provided to and from the sheepherder's home country, and the tools, housing, food, and insurance benefits that will be provided."

*Ruiz v. Fernandez*, 949 F. Supp. 2d 1055, 1066 (E.D. Wash. 2013) (citations to record

omitted).[5]

As further support for the assertion that Association Defendants set the wages of

competing member ranches offer shepherds—factual support that should be

---

[5] "A court may consider facts subject to judicial notice—including facts that are a matter of public record, such as documents filed in other litigation—without converting a motion to dismiss into a motion for summary judgment." *Pace v. Swerdlow*, 519 F.3d 1067, 1072-73 (10th Cir. 2008). This case was also cited in the Complaint. SAC ¶ 114

unnecessary at this stage of the litigation—when Oregon increased the minimum wage for H-2A shepherds, both the WRA and MPAS told member ranches in Oregon to raise the wages they paid to foreign shepherds to *precisely* the new wage floor. SAC ¶ 99 ('in January 2015, the WRA instructed its members in Oregon to *uniformly* begin paying *exactly* the new DOL wage floor: '[B]eginning January 1, 2015 the wage rate for shepherds working in Oregon is $1,326.46.' You 'should immediately adjust your wage payments to [that] monthly wage amount.'"); Ex. A (MPAS Bulletin). The plain language of these communications belies the WRA's suggestion that its communication was merely part of an effort to "alert its membership to periodic changes in the minimum wage laws." WRA at 9. A trade association acting with care not to violate antitrust laws might have notified its members that the wage floor had shifted; it would not instruct its members to "immediately adjust [their] wage payments to [that] amount." SAC ¶ 99.

ii.  *Rancher Defendants*

The Complaint also alleges substantial particularized facts supporting the claim that Rancher Defendants are consciously committed to a scheme to fix offered wages at the government-set wage floor. *See, e.g.*, SAC ¶¶ 69, 87 (alleging that Rancher Defendants maintain membership in Association Defendants with the purpose of allocating decisions regarding wages to Association Defendants and with the knowledge that Association Defendants fix wages offered wages to foreign and domestic shepherds). First, although members of a trade association might not always be willing participants in the actions that the association takes on its *own* behalf—for example, when the association "buy[s] or sell[s] products or services in its own right"—they would

16

almost certainly be consciously committed to association conduct taken on *their* behalf with respect to matters as integral to members as the wages they pay for labor. *AD/SAT, Div. of Skylight, Inc.*, 181 F.3d at 234.

Second, Association Defendants' communications to Rancher Defendants should resolve any doubt about whether the Complaint alleges plausible antitrust claims against Rancher Defendants. Courts have explained that "a high level of interfirm communications is a potential 'plus factor' allowing a factfinder to infer a conspiracy" based on uniform conduct. *Mayor & City Council of Baltimore, Md.,* 709 F.3d at 139. Plaintiffs allege here not only that Rancher Defendants communicated *frequently* as part of their membership in Association Defendants, SAC ¶ 60, but also that they communicated with Association Defendants about the wage-fixing scheme at issue in this case. As described above, when Oregon raised the minimum wage for H-2A shepherds, both the WRA and MPAS instructed Oregon ranchers to increase their wage payments to precisely the Oregon wage floor. SAC ¶ 99; Ex. A.

Third, Plaintiffs plausibly allege that Rancher Defendants have a motivation to fix offered wages. In a fluid labor market, wage fixing should backfire. As market conditions exert normal upward pressure on wages, workers confronting fixed, stagnating wages in one industry should be able to take their skills elsewhere. But when workers cannot easily transition between industries, fixing wages allows competitors to collectively control one of their most significant costs without risking a labor shortage. Ronald G. Ehrenberg & Robert S. Smith, Modern Labor Economics 128-47 (11th ed. 2012). Friction in a labor market, thus, creates an incentive to fix wages. Sometimes friction

results from workers having a special set of skills that might not translate well to other industries. *In re Animation Workers Antitrust Litig.*, No. 14-CV-04062-LHK, 2015 WL 4974343, at *28 (N.D. Cal. Aug. 20, 2015). But in this case, friction results from Rancher Defendants' employment of workers who cannot leave their jobs without being deemed a "runaway" by their employers. SAC ¶ 10. Rancher Defendants thus have a motive to fix wages offered to H-2A workers.

Rancher Defendants' motive to fix wages offered to *domestic* shepherds is even more apparent. SAC ¶¶ 101-106. Pursuant to DOL regulations, Rancher Defendants must offer and pay domestic shepherds at least the Adverse Effect Wage Rates ("AEWR"). Until 2015, the DOL established the shepherd AEWR based on surveys conducted by State Workforce Agencies (SWA) of the prevailing wage for domestic workers in this industry. *See, e.g.*, TEGL No. 32-10, *Special Procedures: Labor Certification Process for Employers Engaged in Sheepherding and Goatherding Occupations Under the H-2A Program*, 76 Fed. Reg. 47,256 (Aug. 4, 2011). In a free market, the AEWR would increase with market conditions. But by fixing the wage rate, Rancher Defendants were able to depress the AEWR and submit offers to domestic shepherds that were substantially below market rate. SAC ¶ 110. This has allowed Rancher Defendants to access a desperate and easily-exploitable foreign workforce that *accepts* wages far below the market rate, which, in turn, has reinforced the industry narrative that there are no American workers capable of doing this work. SAC ¶ 111 ("In this distorted labor market, Defendants rely on foreign shepherds, over whom

Defendants can exert substantial and even anachronistic control, including by preventing 'runaways.'").

Rancher Defendants' plausibly-pled motivation to collectively suppress shepherd wages is further evident in a 2010 survey of pay for domestic shepherds in Nevada. That survey concluded that the prevailing wage for shepherds in Nevada was $1350 per month based on a review of wages paid to a small number of domestic workers. *See* Ex. B. Under the rules in place at the time, this finding should have resulted in an increase in the minimum wage for H-2A shepherds in Nevada from $800 to $1350 per month. However, the survey was inexplicably withdrawn. As a result, the shepherd wage floor in Nevada remained at the $800 level. *See, e.g.*, 78 Fed. Reg. 19,019, 19,020 (Mar. 28, 2013).

Regardless of why the Nevada minimum wage did not increase to $1350, this survey and the potential it had to dramatically increase costs for shepherds throughout Nevada illustrates that suppressing shepherd wages results in self-perpetuating stagnation in the government-set wage floor to the benefit of ranchers and to the detriment of shepherds, both domestic and foreign. The Nevada story also illustrates that the industry benefits from wage suppression only if it acts in concert: in Nevada, it took only a handful of ranches to cause a potential increase in the Nevada wage for shepherds. In general, therefore, the shockingly low wage offered to domestic shepherds can only be maintained through concerted conduct by ranchers.

Fourth, Plaintiffs plausibly allege that Rancher Defendants would not have an interest in fixing shepherd wages at the minimum wage floor were it not for the

assurance—explicit or implicit—that other association members were doing the same. SAC ¶ 110; *see also Mayor & City Council of Baltimore, Md.*, 709 F.3d at 136 (2d Cir. 2013). Indeed, any suggestion otherwise is contradicted by Auza's admission that even though it indisputably *offers* the wage floor, it pays shepherds *above* the offered price.[6]

Auza's "cheating" from the cartel—by paying more than the offered wage floor—does not disprove the conspiracy. *See, e.g.*, Christopher R. Leslie, *Trust, Distrust, and Antitrust*, 82 Tex. L. Rev. 515, 526 (2004). Indeed, "cheating" is expected in any cartel and does not undermine the cartel as long as its members can still benefit from concerted conduct. Departing from cartel conduct by accepting a different price, or paying a different wage, does not undermine the benefits of concerted conduct in setting *offered* prices. *See, e.g.*, *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Cir. Ill. 2002) (Posner, J.) (holding that "[a]n agreement to fix list

---

[6] Defendant Cunningham makes a slight variation of this argument based on its misunderstanding of how the DOL wage-floor rules operate in Oregon and the difference between the AEWR and the wage-floor set by DOL. By regulation, H-2A employers must agree to pay H-2A workers *at least* the Adverse Effect Wage Rate (AEWR), the prevailing wage, the federal or *state minimum wage*, or the agreed-upon collective bargaining rate, whichever is highest. *See* 20 C.F.R. §§ 655.120(a), 655.122(l). Because the Oregon state minimum wage is higher than the DOL-calculated AEWR, the wage floor set by DOL is also higher. *See* SAC ¶ 55. This minimum wage has recently been increased to approximately $1600 per month, less a deduction that WRA and MPAS members are claiming for undisclosed expenses. *See* SAC ¶¶ 55, 99. Although this will be confirmed through discovery, Cunningham does not allege it is paying anything above the state minimum wage which is the DOL wage floor. Regardless, Cunningham argues that because he is paying above the AEWR he cannot be price fixing. *See* Cunningham at 12. But this misapprehends Plaintiffs' argument: Cunningham is participating in the price fixing if it has set the price floor established by DOL for Oregon, which is the state-established minimum wage. Finally, Cunningham asks that Count III be dismissed against it because it has never been a member of MPAS. *See id.* at 12 n.17. If this is the case, Plaintiffs withdraw this claim against Cunningham.

prices is . . . a *per se* violation of the Sherman Act even if most or for that matter all transactions occur at lower prices," and explaining that many monopolists "are blessed with customers who are 'sleepers,' that is, customers who don't shop around for the best buy; and even for those who do bargain for a lower price, the list price is usually the starting point for the bargaining").

Indeed, in this case, fixing *offered* wages is particularly beneficial to Rancher Defendants and particularly harmful to shepherds, even if H-2A shepherds are ultimately able to obtain more than the offered wage.  By fixing wages offered to domestic shepherds, Rancher Defendants deprive American workers of any realistic opportunity to work in the sheep industry. Further, out of concern that ranchers will pay H-2A shepherds more than the wages offered to domestic shepherds, DOL regulations prohibit precisely the conduct that Auza admits to here, *i.e*, offering one price and then paying more. *See* 20 C.F.R. § 655.122(a).  But by offering shepherds the wage floor— thus suppressing the prevailing wage—and then increasing the wage payments for desirable H-2A shepherds, Auza retains the cake of the conspiracy to fix wages and ensure access to a vulnerable immigrant labor market while eating the benefits of paying fluctuating wage rates depending on shepherd experience and skill.

> ### b. *Defendants' Theory of Parallel Conduct is Unlikely.*

Notwithstanding the abundant circumstantial evidence that the uniformity in offered wages is the result of concerted conduct, Defendants suggest that wages offered to shepherds have converged on the government-set wage floor because the

"market equilibrium" wage falls below this amount. WRA at 5. For this reason, they argue, the *only* plausible explanation for their parallel conduct is independent action.

As an initial matter, the argument illustrates the need for discovery and even trial on Plaintiffs' antitrust claims. Equilibrium prices usually are the subject of expert testimony, not naked assertions on a motion to dismiss. *See, e.g., Laumann v. Nat'l Hockey League*, No. 12-CV-1817 SAS, 2015 WL 3542322 (S.D.N.Y. May 29, 2015); *Minebea Co. v. Papst*, No. CIV.A. 97-0590 (PLF), 2005 WL 1459704, at *4 (D.D.C. June 21, 2005). Indeed, in support of its argument, the WRA invites the Court to examine a study on low-wage fast food workers. WRA at 6. Normally this kind of evidence would be subject to attack at trial, where the factfinder would be able to evaluate the implied equivalence of fast food workers in New York and immigrant shepherds working across the American West.

Even if the Court were to consider this argument, however, it should be rejected. In fact, the assumption that employees working in similar jobs should all earn a uniform wage is based on the "simplest economic model of the labor market." Ronald G. Ehrenberg & Robert S. Smith, Modern Labor Economics 36 (11th ed. 2012). The model assumes, among other things, that both employees and employers are fungible. *Id.* at 136. In the shepherd labor market, however, there is considerable variation between shepherds and between ranchers. SAC ¶ 100. For example, conditions that shepherds face vary from Spartan to squalid, and in a competitive labor market, employees with more unpleasant jobs would demand higher wages.

Even if the equilibrium were below the wage floor—an assertion belied by Auza's own concession of paying more than the fixed wage—in a free market, the wages offered to more productive shepherds would necessarily rise above the floor. Those shepherds would be able to signal to ranchers, usually through prior dealing, that they are more dependable, harder-working, or more skilled than the others. A profit-maximizing rancher would necessarily pay a premium over the floor because the increased efficiency (in this case, more lambs gaining more weight and wool) would more than pay for the increased wage. *Id.* ¶ 110. Similarly, it makes little sense, absent wage-fixing, to offer foreign and domestic workers exactly the same wage. The cost of the required travel reimbursement for a Peruvian shepherds is obviously much higher than the cost of recruiting a domestic employee and a profit maximizing rancher operating in the free market would offer the domestic shepherd more. *Id.* ¶ 80.[7] Therefore, not only are Defendants' assumptions inappropriate on a Rule 12(b)(6) motion, they are inapplicable to the shepherd labor market.

The Court should easily reject other Defendants' even more primitive assertions that a uniform wage is presumptively rational because H-2A shepherds accept it. This argument would justify all wage- and price-fixing conspiracies, which only survive because their perpetrators are able to extract monopolistic profits from consumers willing to pay a fixed price. *See, e.g.,* Herbert Hovenkamp, *The Antitrust Enterprise:*

---

[7] MPAS argues that this is a "ludicrous suggestion" because ranchers legally can offer U.S. worker no less than foreign workers. MPAS at 10 n.15 (citing 29 C.F.R. § 655.122(a)). MPAS's analysis is obviously backwards and Plaintiffs' logic holds. Plaintiffs' allegation refers to the likelihood that in a free market, Ranchers would offer U.S. workers *more* not *less* than foreign workers.

*Principle and Execution* 18-20 (2005). The purported efficiency of a uniform wage does not justify wage fixing. *Standard Oil Co. of New Jersey v. United States,* 221 U.S. 1, 65 (1911) ("Restraints of trade within the purview of the statute . . . [can]not be taken out of that category by indulging in general reasoning as to the expediency or nonexpediency of having made the contracts, or the wisdom or want of wisdom of the statute which prohibited their being made.").

Moreover, in this case, Plaintiffs plausibly allege that Defendants are able to access a labor market willing to accept the government-set wage floor only because they first fix wages offered to domestic shepherds. If they did not fix the wages offered to domestic shepherds, one would expect shepherd wages to "increase to something similar to the minimum wage for domestic ranch hands," SAC ¶ 88, a substantially similar industry that may also avail itself of H-2A labor when the domestic labor supply is inadequate. The fact that these wage levels have so greatly diverged suggests that shepherd wages have not evolved through normal free market competition.[8]  SAC ¶104.

### 3. Heavy Government Regulation of the Industry Does Not Justify Wage Fixing.

---

[8]  The WRA argues that domestic ranch hands' wages have converged around the wage floor for that occupation. WRA at 6-7. The WRA should not be granted that presumption at this stage. Furthermore, WRA's premise is mistaken.  There is, in fact, wide variation in ranch hand wages, and many domestic ranch hands receive far above the hourly AEWR for H-2A ranch.  The substantially higher wage that ranchers pay domestic ranch hands verus H-2A shepherds, notwithstanding the ranchers' legal authority to import H-2A ranch hands and pay them a minimum hourly AEWR, evidences market distortions in the shepherding labor market.  *See, e.g.*, *Temporary Agricultural Employment of H-2A Foreign Workers in the Herding or Production of Livestock on the Range in the United States*, 80 Fed. Reg. 62,958, 62,990 (Oct. 16, 2015) (to be codified at 20 C.F.R. pt. 655) (noting evidence cited by worker advocates suggesting such workers currently make around $2000 a month).

Sprinkled throughout Defendants' arguments is the suggestion that because the sheep industry is "heavily regulated" Defendants' wage-fixing conduct somehow is permissible. It is now axiomatic that "the presence of regulation, by itself, does not dictate the antitrust standard; antitrust actions involving regulated industries have been repeatedly tried under a *per se* standard." *United States v. Baltimore & O. R. R.*, 538 F. Supp. 200, 210 (D.D.C. 1982); *see also United States v. Joint-Traffic Ass'n,* 171 U.S. 505, 565 (1898) (concluding that competing operators could not fix rates even though those rates were approved by the Interstate Commerce Commission); *Webb v. Utah Tour Brokers Ass'n*, 568 F.2d 670, 675 (10th Cir. 1977) (affirming judgment of liability association of tour brokers for attempting to exclude the plaintiffs from the tour broker market, notwithstanding the Interstate Commerce Commission's heavy regulation of the industry).

In this case, the government may require that ranchers offer domestic workers at *least* the wage they offer to H-2A workers, but it does not *prohibit* ranchers from offering domestic workers more. The government may require ranchers to pay H-2A shepherds *at least* the minimum wage floor, but it does not *require* them to pay this amount. *See Menocal v. GEO Grp., Inc.,* 113 F. Supp. 3d 1125, 2015 WL 4095592, at *6 (D. Colo. 2015) (contractual *minimum* of $1/day reimbursement in a detainee work program "does not prohibit Defendant from paying detainees in excess of $1/day in order to comply with Colorado labor laws."). And, finally, the government may allow ranchers to form associations, as a matter of administrative convenience, to facilitate the recruitment of foreign shepherds, but it does not license ranchers to employ those associations to fix

wages across otherwise-competing ranches. WRA at 8 (citing § 20 C.F.R. 655.131). In sum, the fact that Defendants' course of conduct may appear permissible under the *immigration* laws does not mean that it is permissible under the *antitrust* laws. Nothing in any of Defendants' motions to dismiss rebuts the strong presumption that Section 1 of the Sherman Act prohibits concerted conduct among competitors. *Grp. Life & Health Ins. Co.*, 440 U.S. at 231.

### 4.  Immunity

The principle instructing courts to read exemptions from the antitrust laws narrowly is a rule of construction that runs through the antitrust laws and applies with "equal force" to both implicit exemptions and express statutory exemptions. *Grp. Life & Health Ins. Co.*, 440 U.S. at 231. In light of this principle, the Court should give short shrift to Defendants' requests that it extend various well-established antitrust exemptions to immunize conduct to which the exemptions have never been found to apply.

#### a.  *Parker Immunity*

Some Defendants argue that their conduct is immunized by *Parker* immunity. *Parker* immunity protects private parties from antitrust liability where a "state law or regulatory scheme . . . (1) has articulated a clear and affirmative policy to allow the anticompetitive conduct and (2) provides active supervision of anticompetitive conduct undertaken by private actors."  *F.T.C. v. Ticor Title Ins. Co.*, 504 U.S. 621, 631 (1992).

As an initial matter, *Parker* immunity is a federalism doctrine grounded in concern that the Sherman Act not be interpreted to trample the rights of states to regulate

matters of local concern. The doctrine is inapplicable to arguments that federal regulations abrogate federal antitrust law. *Parker v. Brown*, 317 U.S. 341, 360 (1943). Even accepting the doctrine's potential applicability to this case, it is difficult to see here how the government (state or federal) has a policy of allowing Defendants' anticompetitive conduct—let alone a *clear* one. Rancher Defendants do not engage in anticompetitive conduct solely by paying their shepherds dismal wages—although the staggeringly low wages paid to domestic shepherds may violate the law for other reasons, *see* SAC ¶¶ 276-281 (MPAS's failure to pay NV minimum wage), and may illustrate an incentive to engage in the anticompetive conduct at issue. Rather, Plaintiffs' Sherman Act claims allege a straightforward horizontal restraint on trade in the form of associations of competing members setting wages across an industry. Even if the wage floor is sanctioned by the government, the government does not authorize fixing wages at this amount.

But even if the alleged anticompetitive conduct were somehow authorized by the government, it is not actively supervised by the government. Recently—in the course of concluding that *Parker* immunity did not insulate concerted conduct by an association of dentists to which the state had delegated its licensing authority—the Supreme Court made clear how narrowly this exemption applies: "Concern about the private incentives of active market participants animates [the] supervision mandate, which demands realistic assurance that a private party's anticompetive conduct promotes state policy, rather than merely the party's individual interests." *N.C. State Bd. of Dental Examiners*, 135 S. Ct. at 1112. Although the government may set the wage floor for H-2A

shepherds, it is ranchers' individual interests, not state policy, that motivate ranchers to fix wages at this level.

### b. *Capper-Volstead*

The Court should also reject MPAS's Capper-Volstead defense, 7 U.S.C. § 291. (The WRA does not raise Capper-Volstead in its motion to dismiss).

As an initial matter, the Capper-Volstead exemption is an affirmative defense not properly before the Court on this motion to dismiss. *See Miller v. Shell Oil Co.*, 345 F. 2d 891 (10th Cir. 1965) (stating that affirmative defense based on matters outside the complaint cannot be dismissed under Rule 12(b)); *see also Fairdale Farms, Inc. v. Yankee Milk, Inc.*., 635 F.2d 1039, 1040 (2nd Cir. 1980) (Capper-Volstead is an affirmative defense to antitrust claims.). Capper-Volstead's express statutory language limits the exemption to agricultural cooperatives that can show that:

> (1) every member of the cooperative is an agricultural producer;
> (2) no member of the cooperative has more than one vote in affairs governing the cooperative;
> (3) the cooperative does not pay dividends on membership capital in excess of 8% per year; and
> (4) the cooperative does not deal in the products of nonmembers in an amount greater in value than the products of its own members.

7 U.S.C. § 291. The Court could not possibly dismiss Plaintiffs' antitrust claims based on the MPAS's Capper-Volstead defense without evaluating the applicability of these limitations based on a "fact intensive inquiry which should be completed by the Court only after proper discovery has been conducted." *In re Fresh & Process Potatoes Antitrust Litig.,* 834 F. Supp. 2d 1141, 1154 (D. Idaho 2011); *see also Alexander v. Nat. Farmers Org.*, 687 F. 2d 1173 (8th Cir. 1982) (affirming the district court's finding that

the cooperative was exempt, but only after the district court spent over a decade developing a 15,000 page factual record and trying the case in three phases).

Moreover, the Court should reject MPAS's invitation to extend the Capper-Volstead exemption to insulate wage fixing, which no other court has done. The Capper-Volstead exemption allows persons engaged in the "the production of agricultural products" to "act together in associations" on matters that are not integral to such production, but that are essential to small farmers and ranchers who seek to sell their product—for example, "processing, preparing for market, handling, and marketing in interstate and foreign commerce, such products." 7 U.S.C. § 291; *see also National Boiler Marketing Assn. v. United States*, 436 US 816, 830 (1978). The exemption does not license producers to engage in concerted conduct integral to the production of agricultural goods, like fixing the wages of laborers. *See In re Fresh & Process Potatoes Antitrust Litig.,* 834 F. Supp. 2d 1141, 1154 (D. Idaho 2011) ("[T]here are no cases where a court specifically approved, under the Capper–Volstead Act, a pre-production agricultural output limitation as opposed to a post-production marketing decision such as withholding of product from market.").

Indeed, the novel extension of Capper-Volstead into the wage-fixing context is particularly nonsensical because the statute and its antecedent, the Clayton Act, [9] were designed to protect individual farmers who were captive to the price demands of "processors and distributors." *Nat'l Broiler Mktg. Ass'n v. United States*, 436 U.S. 816,

---

[9]  The Clayton Act, in fact, expresses the federal policy that workers are not widgets to be treated like "processors or distributors" of agricultural products. 15 U.S.C. § 17 ("The labor of a human being is not a commodity or article of commerce.").

825 (1978). Just as the exemption from antitrust laws for labor unions protects concerted conduct by workers vis-à-vis management, but does not authorize unions to exert monopolistic power over the broader market, *see Connell Const. Co. v. Plumbers & Steamfitters Local Union No. 100*, 421 U.S. 616, 622 (1975), so too Capper-Volstead must be read to allow agricultural producers to engage in concerted conduct with respect to entities involved in processing and distribution, but not to authorize ranches to associate for the purpose of fixing one of the principal costs of production at the expense of exploitable agricultural laborers with significantly less market power than those ranches.

### c. *Noerr-Pennington*

In near unison, Defendants assert they are entitled to immunity under the *Noerr-Pennington* doctrine. They state that the First Amendment protects their right to petition the government to keep shepherd wages low; that they have exercised this right in lobbying the Department of Labor over shepherd minimum wages; and, accordingly, under *Noerr-Pennington*, Defendants "are immune from liability arising from the antitrust injuries caused by government action which results from the petitioning." (Defendants' Mts. to Dismiss  (all quoting *A.D. Bedell Wholesale Co. v. Philip Morris*, 263 F.3d 239 (3d Cir. 2001)).[10]

---

[10] Defendants rely on similar analyses and the exact same language from *A.D. Bedell*, all of which appears in near-identical form in the *Wikipedia* article on the doctrine. *See* MPAS at 13-14; WRA at 16; Two Bar at 9-10 n.9; Cunningham at 13-14; Auza at 13; *see also* https://en.wikipedia.org/wiki/Noerr-Pennington_doctrine.

Defendants’ reliance on this doctrine is misplaced. Plaintiffs have no quarrel with Defendants exercising their First Amendment rights to petition the government to pay shepherds $750 a month or $1 a month. What Plaintiffs challenge is Defendants’ conspiracy to set wages at precisely the same level. That concerted *and wholly private action* is illegal if Defendants set the wage for all shepherds at the DOL-allowed minimum or if they set it a $10 above the minimum—and it is an action separate and apart from any lobbying regarding what the minimum should be. It is therefore not covered under *Noerr-Pennington*.[11]

---

[11] *Accord Eastern R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 136 (1961) (holding that this doctrine only covers “trade or monopolization [that] is the result of valid governmental action, *as opposed to private action*'' (emphasis added)); *A.D. Bedell.*, 263 F.3d at 251 (applying *Noerr Pennington* when the effect of a settlement agreement petitioned for and entered into between a private actor and a state governments was alleged to have an anti-competitive effect). Further, *Noerr-Pennington* does not cover a restraints of trade that are the means by which Defendants obtained favorable government action. *See Federal Trade Commission v. Superior Court Trial Lawyers Ass’n*, 493 U.S. 411, 425 (noting that the doctrine that only covers restraints of trade that are “the consequence of public action” but not restraints that are “the means by which respondents sought to obtain favorable legislation”); *Allied Tube & Conduit Corp. v. Indian Head*, 486 U.S. 492, 499, 503 (1988) (counseling against a reading of *Noerr-Pennington* that would allow “[h]orizontal conspiracies or boycotts designed to exact higher prices or other economic advantages from the government . . . on the ground that they are genuinely intended to influence the government to agree to the conspirators' terms”). Finally, the fact that DOL must approve H-2A shepherd job applications also does not insulate Defendants from antitrust liability, as *Noerr-Pennington* only covers “petitions” to the government and it is well established that a request that a government actor take a ministerial action, such as reviewing and approving an H-2A job application, does not qualify as petitioning. *See, e.g.*, *Litton Systems, Inc. v. AT&T*, 700 F.2d 785, 807 (2d Cir. 1983) (reasoning that the *Noerr-Pennington* doctrine is “plainly inapposite” because the defendant was “engaged in private commercial activity, no element of which involved seeking to procure the passage or enforcement of laws” and that the Defendant could not “cloak its actions in *Noerr-Pennington* immunity simply because it is required [by law] to disclose publicly its rates and operating procedures” (citing *Continental Ore Co. v. Union Carbide & Carbon*

## B. RICO (Counts IV & V)

Before making any substantive arguments about RICO, Defendants incorrectly caution the Court against "overreaching" in its application of civil RICO protections. WRA at 11. This admonition is grounded in an incorrect understanding of the statute. In fact, as the Supreme Court has held, "RICO is to be read broadly. This is the lesson not only of Congress' self-consciously expansive language and overall approach, but also of its express admonition that RICO is to 'be liberally construed to effectuate its remedial purposes.'" *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 497 (1985).[12]

Regardless, under any fair reading of the statute, Plaintiffs' substantial factual allegations regarding the three RICO enterprises described in Plaintiffs' Complaint are sufficient. These enterprises are alleged to fraudulently mislead the government and deprive Plaintiffs of "money or property." This is so despite Defendants' misunderstanding of RICO enterprises, confusion about the type of "money or property" at issue and who the alleged victim of the fraud is, and general assertions that the complaint is insufficient, without citation to or reflection on actual allegations.

### 1. The Plaintiffs Properly Allege RICO Enterprises

---

*Corp.*, 370 U.S. 690, 707 (1962)); *Federal Trade Commission, Enforcement Perspectives on the Noerr-Penningthon Doctrine* 18-22 (2006) (noting that the doctrine does not apply to petitions by the government to perform ministerial functions and collecting authorities in support of this position).

[12] *See also Cedric Kushner Promotions v. King,* 533 U.S. 158, 163 (2001) (overturning attempt to limit the definition of RICO "enterprise"); *United States v. Turkette*, 452 U.S. 576, 593 (1981) (overturning an attempt to limit RICO to criminal conspiracies and reasoning that "[t]he language of the statute, . . . [which is] the most reliable evidence of its intent[,] reveals that Congress opted for a far broader definition of the word "enterprise," and we are unconvinced by anything in the legislative history that this definition should be given less than its full effect").

Defendants WRA and Richins argue that Plaintiffs have failed to properly allege a RICO enterprise by failing to properly plead that the RICO "person" is distinct from the RICO enterprise. *See* WRA at 12-15; Child at 15-16.[13] However, for each enterprise, Plaintiffs' allegations describe a distinct "person" and "enterprise" sufficient to meet the RICO pleading requirements established by the Supreme Court. *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001) ("to establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a `person'; and (2) an `enterprise' that is not simply the same `person' referred to by a different name.").

### a. *The Richins Enterprise*

For the purposes of the alleged Richins Enterprise, Defendant Richins (the WRA's former Executive Director) is the "person," and the WRA and Defendant Richins are alleged to be RICO "enterprise." SAC ¶¶ 112-115, 259-266. The Complaint further alleges that Mr. Richins was the WRA executive director from 2001 to 2014, that he signed substantially all H-2A job orders and certification applications, and that he otherwise played a substantial role in WRA's pay policies. SAC ¶¶ 32, 113-114. Finally, the Complaint alleges that fraudulent statements in these documents signed by Richins were the core of the alleged racketeering activity. SAC ¶¶ 128-144.

Clear Supreme Court precedent supports this formulation: "[t]he corporate owner/employee, a natural person, is distinct from the corporation itself, a legally

---

[13] MPAS does not make this argument and has therefore waived this argument at this stage.

different entity with different rights and responsibilities due to its different legal status. And we can find nothing in the statute that requires more 'separateness' than that." *See Cedric Kushner,* 533 U.S. at 163. No more distinctiveness is required.

  **b.** ***The WRA Enterprise***

  For the purposes of the alleged WRA Enterprise, Defendant WRA is the "person," and the WRA and its members are alleged to be the RICO "enterprise." SAC ¶¶ 116-121, 259-266.[14] Given this clear person-enterprise allegation, Defendant WRA attacks the WRA enterprise allegation by suggesting that a defendant organization and its agents, employee, or members can *never* form a RICO enterprise, WRA at 12. However, the Tenth Circuit declined to apply such a *per se* rule in the context of an alleged enterprise consisting of a parent corporation and its subsidiaries. *Brannon v. Boatmen's First Nat. Bank of Oklahoma*, 153 F.3d 1144, 1149 (10th Cir. 1998) (reasoning that "there are situations where a subsidiary and parent relationship, properly alleged, could state a claim for § 1962(c) liability"). And if forming an organization and vaguely labeling co-conspirators "members" were an automatic defense to RICO, RICO's effects would be vitiated in even the most grievous contexts. *See, e.g., In re ClassicStar Mare Lease Litigation*, 727 F.3d 473, 49 (6th Cir. 2013) (finding distinctiveness with a parent and a subsidiary) ("It would be strange indeed to absolve a parent corporation of liability for doing precisely what RICO was designed to

---

[14] Plaintiffs do not allege a RICO claim where the WRA is the Defendant and the WRA and Richins are the enterprise.

prevent: the use of an association of legally distinct entities 'as a vehicle through which unlawful . . . activity is committed.'" (quoting *Cedric Kushner*, 533 U.S. at 164)).

The Court should therefore decline the WRA's invitation to create a brightline rule and instead focus its analysis on whether the ranches are "functionally separate" from the WRA. As the Sixth Circuit explained in grappling with RICO distinctiveness in the context of corporate defendants:

> Out of the meandering and inconsistent case law from this and other circuits, as well as the Supreme Court's decision in *Cedric Kushner*, two important principles emerge: 1) individual defendants are always distinct from corporate enterprises because they are legally distinct entities, even when those individuals own the corporations or act only on their behalf; and 2) corporate defendants are distinct from RICO enterprises when they are *functionally separate*, as when they perform different roles within the enterprise or use their separate legal incorporation to facilitate racketeering activity.

*In re ClassicStar Mare Lease Litigation*, 727 F.3d at 492 (emphasis added).

When the RICO "person" is a corporation, the Tenth Circuit suggests that showing the RICO "person" and "enterprise" are "functionally separate" requires "allegations indicat[ing] how the relationship between [the two entities] allowed the defendant . . . to perpetrate or conceal the alleged mail fraud." *Brannon*, 153 F. 3d at 1149. Put another way, "the defendant corporation must be shown to use the alleged enterprise as the instrument of its criminality, and the plaintiff must plead that the alleged enterprise somehow made it easier to commit or conceal the fraud of which the plaintiff complains." *Brannon*, 153 F.3d at 1148.

Here we have just that. The WRA could not undertake its fraudulent shepherd racketeering activities without the ranches. *See* SAC ¶ 118 ("The WRA is the lynchpin of the WRA Enterprise, but the WRA Enterprise could not function without the informal,

association-in-fact established between the WRA and its members."). The WRA's members pay the WRA to provide recruiting services. SAC ¶ 120. As part of those recruiting services, the WRA fraudulently promises state and federal agencies that it will reimburse shepherds as required by 20 C.F.R. § 655.122, despite a policy of not reimbursing. The shepherds are in fact not reimbursed pursuant to 20 C.F.R. § 655.122 by either the WRA or the ranches. *See, e.g.,* SAC ¶ 149 ("[E]ach of the named Plaintiffs incurred travel and subsistence expenses from his place of recruitment and his workplace that were never reimbursed, e.g., bus tickets, hotels, and meals.").

At its most basic, without the ranches involvement, the WRA would have no reason to undertake its fraudulent recruiting activity. Why recruit shepherds for no one? Further, without the ranches complicity in the scheme—by not reimbursing shepherds along with the WRA—the scheme would fail. If either the WRA or the ranches reimbursed, the actual cost of recruiting, and the enterprise's purpose of cheaply recruiting shepherds through the fraudulent scheme, would be frustrated. Moreover, though the alleged fraudulent recruiting of shepherds for the ranches may be the extent of the relationship between the WRA and its member ranches, the Supreme Court has held that there need be no difference between the alleged pattern of racketeering activity and the enterprise itself. *See United States v. Hutchinson*, 573 F.3d 1011, 1020-21 (10th Cir. 2009) (citing *Boyle v. United States*, 556 U.S. 938, 946 (2009)).

Finally, at the very least, "[t]he [distinctiveness] analysis is so fact-intensive that a generic test is difficult to formulate." *In re ClassicStar Mare Lease Litigation*, 727 F.3d at 491. In the instant case, it is undisputed that the ranches are "members" of the WRA.

But that naked fact without more is not dispositive. What it means to be a "member"

matters, and that fact-intensive question is best left for summary judgment.

## 2. Plaintiffs Have Pled a Pattern of Racketeering Activity

### a. *The Withheld Reimbursements, Not the Government Regulatory Approval, Are the "Money or Property" Required by the Mail and Wire Fraud Statutes*

The WRA makes a confused attempt to claim that the allegations of fraudulent

statements to state and federal agencies regarding promised reimbursements to

shepherds, and the subsequent failure to reimburse shepherds, are not sufficient to

establish that the fraud is for the purpose of "obtaining money or property" under both

the mail and wire fraud statutes because the government did not suffer monetary loss

from this alleged fraud. WRA at 15-17.

This argument incorrectly assumes that the victim of the fraud (here, the

shepherds) and the object of the fraudulent statement (here, the government) must be

one in the same to trigger RICO liability.

As an initial matter, Plaintiffs never claim that the victim and object of the fraud

are one in the same. The Complaint alleges that the WRA made fraudulent statements

in filings to state and federal agencies promising reimbursements required by 20 C.F.R.

§ 655.122, despite a policy of not making those reimbursements. *See, e.g.*, SAC ¶¶

129-140, 143. The Complaint further alleges that the government agencies relied on

these fraudulent statements in approving the filings. *Id.* ¶ 141. The effect of the fraud

was that the ranches, through the WRA, were permitted to hire foreign shepherds, who

were then not reimbursed because of the WRA's alleged fraudulent scheme. *Id.* ¶¶ 145-

49. The object of the alleged fraud, therefore, was fraudulently keeping money that

otherwise should have been used to reimburse the Plaintiffs. This money that should have been reimbursed—that was instead kept by the Defendants and kept from the Plaintiffs—is by definition the "money or property" contemplated by the mail fraud statute. *See Pasquantino v. United States,* 544 US 349, 355-356 (2005) ("This right is an entitlement to collect money from petitioners, the possession of which is 'something of value'…. Valuable entitlements like these are 'property' as that term ordinarily is employed. (quoting *McNally v. United States,* 483 U. S. 350, 358 (1987)).

Second, contrary to the WRA's apparent position, it is well established that third-party reliance on a fraudulent statement that harms another is actionable under RICO. *See, e.g.*, *Bridge v. Phoenix Bond & Indem. Co.*, 553 US 639 (2008).

### b. *The Plaintiffs Have Sufficiently Plead The Fraud Under Rule 9*

The WRA, the MPAS, and Richins ignore the majority of the lengthy allegations in the Complaint to claim that the RICO claims are not adequately plead pursuant to Fed. R. Civ. Proc. 9(b). *See* WRA at 17; MPAS at 15-16; Child at 15. It is these arguments, not the Complaint, that are in fact cursory. The Defendants make generalized arguments, with little citation, if any, to the actual allegations in the Complaint.

To raise a claim of mail and wire fraud consistent with F.R.C.P. 9(b), a Plaintiff must plead the following elements "(1) a representation; (2) that is false; (3) that is material; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) the speaker's intent it be acted on; (6) the hearer's ignorance of the falsity of the representation; (7) the hearer's reliance; (8) the hearer's right to rely on it; and (9)

injury." *Tal v. Hogan*, 453 F. 3d 1244, 1263 (10th Cir. 2006). Further "a complaint

alleging fraud must set forth the time, place and contents of the false representation, the

identity of the party making the false statements and the consequences thereof." *Id.*

(quoting *Koch v. Koch Indus.*, 203 F.3d 1202, 1236 (10th Cir. 2000) (quotations and

citations omitted). Finally, "a plaintiff asserting fraud must also identify the purpose of

the mailing within the defendant's fraudulent scheme." *Id.* (quoting *McLaughlin v.*

*Anderson*, 962 F.2d 187, 191 (2d Cir.1992)).

In detailed allegations completely ignored by the Defendants in their motions, the

Plaintiffs carefully meet this standard by establishing that: (1) Defendants made

representations that travel and other administrative expenses would be reimbursed; (2)

that these were false representations because they repeatedly did not reimburse after

repeatedly making these representations; (3) that these false representation were

material because they deprived Plaintiffs of "money or property." *i.e.*, the

reimbursements; (4) that the Defendants knew this because, among other allegations,

WRA and MPAS cited the regulations requiring reimbursements, instructed shepherds

to incur the expenses that should have been reimbursed, and then did not reimburse;

(5) that the Defendants intended the fraudulent statements to be acted upon by state

agencies and DOL (namely, through approving the job orders and H-2A applications);

(6) that these government agencies did not know about the false representations

because otherwise they would not have approved the documents; (7) that these

government actors, by their approvals, relied on the misrepresentations about promised

reimbursements; (8) that the government agencies had a right to rely on the false

representations because they made the job orders and applications superficially compliant with the H-2A regulations; and (9) that this all injured Plaintiffs because they never received their money. SAC ¶¶ 128-150, 259-266 (RICO Count Against WRA), 267-275 (RICO Count Against MPAS), Ex. E to SAC.

Plaintiffs also set forth the time, place, contents, and purpose requirements by attaching copies of documents containing the alleged fraudulent statements, and government approval in reliance on those statements that harmed the named Plaintiffs as an exhibit to the Complaint. SAC ¶ 150 ("All H-2A Applications and job orders filed by the Enterprises with state workforce agencies or the DOL with start dates corresponding to the dates when Plaintiffs began working as H-2A shepherds contained the fraudulent statements detailed above in paragraphs 134-150, or substantially similar statements."); Ex. E to SAC.

### 3.  The Other Passing Arguments by MPAS Lack Merit

Finally, MPAS makes several other arguments in passing in an attempt to dismiss the RICO claim. These arguments lack merit. It argues that the Plaintiffs fail to allege the use of electronic communications, when the Complaint clearly does. *See* SAC ¶¶ 142, 263 (detailing that some of the communications with DOL might have been conducted by "wire" if not by mail). Without citation as to the legal relevance of the argument, MPAS argues that "none of the acts alleged can be remotely described as criminal," when the Complaint in fact details criminal mail and wire fraud. *See id.* ¶ 264.

MPAS's last argument is that the Plaintiffs fail to establish a proximate cause between the fraudulent statements and the injury. In so arguing, the MPAS ignores

*Bridge*, 553 U.S. 639, in which the Supreme Court unanimously recognized the third-party harm theory advanced here and established that the recipient of the fraud need not be the same as the victim of the fraud. MPAS's only cited authority, *Hemi Group, LLC v. City of New York*, 559 U.S. 1 (2010), is a case about fourth-party—not third party—harm. The attenuated fraud theory in *Hemi* was that a "defendant's fraud on the third party (the State) has made it easier for a fourth party (the taxpayer) to cause harm to the plaintiff (the City)." *Id.* at 11.

But this is not a case about such an attenuated theory of harm from fraud—the shepherds are directly harmed by the misrepresentation made to DOL and this establishes proximate harm. *Bridge*, 553 U.S. at 655-57 (rejecting for numerous reasons the argument raised by defendants in a RICO mail fraud claim that "proximate cause" for purposes of RICO cannot encompass a harm where the recipient and victim of the fraud are different).[15]

This case is directly analogous to *Bridge*. In that case, the RICO defendants were participants in a county lien auction and made fraudulent statements to the county in advance of the auction. Other auction participants sued under RICO claiming the

---

[15] *See also BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 756 (7th Cir. 2011) (Posner, J.) (handling the remand-order in *Bridge* and reasoning that "[t]he doctrine of proximate cause . . . protects the ability of primary victims of wrongful conduct to obtain compensation . . . ."); *Kaiser Foundation Health Plan, Inc. v. Pfizer, Inc. (In re Neurontin Mktg. & Sales Practices Litig.)*, 712 F.3d 21, 37 (1st Cir. 2013) (post-*Hemi* case joined by Justice Souter sitting by designation which recognizes that an insurance provider suffered proximate cause for purpose of a fraud claim under RICO as a result of a drug manufacturers fraudulent advertising campaign, which caused doctors to prescribe greater amounts of expensive but largely useless medication billed to the insurance company).

Defendants' statements to the county proximately caused their harm: the "lost …
opportunity to acquire valuable liens," and the Court found that this was sufficient for
proximate cause: the "alleged injury-the loss of valuable liens-is the direct result of
petitioners' fraud." *Id.*

Here, like *Bridge,* though the fraud was directed at the state and federal
agencies, the only persons harmed by the fraud were the shepherds. 553 U.S. at 658
("[T]here are no independent factors that account for respondents' injury, there is no risk
of duplicative recoveries by plaintiffs removed at different levels of injury from the
violation, and no more immediate victim is better situated to sue. Indeed, both the
District Court and the Court of Appeals concluded that respondents and other losing
bidders were the only parties injured by petitioners' misrepresentations."). The
allegations are sufficient for proximate cause.

## C.  Nevada Minimum Wage (Count VI)

In one sentence, with no citation, the MPAS attempts to dismiss Plaintiff De la
Cruz's claim for unpaid Nevada minimum wage. *See* MPAS at 17. Far from the "utter
vacuum" of facts claimed by MPAS, the Complaint includes numerous specific factual
allegations regarding the minimum wage violation, including that Mr. De la Cruz and the
putative class were employed in Nevada during the relevant statute of limitations, are
entitled to Nevada minimum wage, and were all paid approximately $800 a month for
working more than 40 hours per week (*i.e.*, less than $4.62 per hour). SAC ¶¶ 20, 148
151-159, 276-281.

Moreover, a Nevada minimum wage claim is not complex. An employee that is not paid minimum wage for hours he worked is entitled to recover his unpaid minimum wage. Mr. De la Cruz has certainly pled that. Nev. Const. art. 15, § 16 ("An employee claiming violation of this section may bring an action against his or her employer in the courts of this State to enforce the provisions of this section and shall be entitled to all remedies available under the law or in equity appropriate to remedy any violation of this section, including but not limited to *back pay*, damages, reinstatement or injunctive relief. An employee who prevails in any action to enforce this section shall be awarded his or her reasonable attorney's fees and costs.") (emphasis added).

Finally, for clarity to the Court, the MPAS rightly does not claim the agricultural exemption to Nevada's statutory minimum wage scheme. Nev. Rev. Stat. § 608.260. Nevada's constitutional minimum wage, Nev. Const. art. 15, § 16, preempts that exemption and ensures minimum wage in Nevada to shepherds. *See Thomas v. Nevada Yellow Cab Corp.,* 327 P. 3d 518 (Nev. 2014) (finding an analogous exemption for taxi drivers preempted by the constitutional minimum wage).

**D.  Contract (Counts VII & VIII)**

Contrary to the assertions by the WRA and MPAS, Plaintiffs present straightforward claims for breach of the terms of their employment contracts. As is the case with all contracts for H-2A workers, the contracts at issue here required the WRA and MPAS to pay for or reimburse administrative and travel expenses Plaintiffs and the putative class incurred in the process of obtaining their H-2A visas and travelling to work as shepherds in the United States. The Complaint plainly alleges that the WRA and

MPAS breached these employment contracts by making Plaintiffs foot the bill for these business expenses, which the employer is contractually obligated to cover. *See* SAC ¶¶ 128-150 (General Allegations); 282-295 (Contract Counts); Ex. E to SAC.

Plaintiffs allege that they were employees of WRA or MPAS working on H-2A visas. *See, e.g.*, SAC ¶¶ 16-19; 21 (alleging multiple contracts for each named Plaintiff and performance). The WRA and MPAS do not dispute this employment relationship existed for purposes of the motions to dismiss, and such an employment relationship is indisputably a contractual one. *See, e.g., Manning v. Boston Med. Ctr. Corp.*, 725 F.3d 34, 57 (1st Cir. 2013) ("an employer-employee relationship is, at heart, a contractual one" and that the "defendants, by hiring and employing the plaintiffs, entered into . . . employment contract[s] with them'") (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 74 (1984)).

Plaintiffs further allege these employment contracts incorporate regulations from the H-2A program and Defendants breached these contract terms when Defendants violated the regulations. *See, e.g.*, SAC at ¶¶ 284, 291. This is hardly a novel contract theory: as part of the process of seeking approval from DOL to hire H-2A workers, employers make job offers called often "clearance orders" that include specific representations including wages, hours, and working conditions. *See* 20 C.F.R. § 653.501. Once approved, "the clearance orders ultimately become the work contract between the employers and farmworkers," and, accordingly, H-2A employees have a cause of action for breach of contract if their employer fails to comply with a DOL H-2A

regulation. *Arriaga v. Fla. Pacific Farms,* 305 F.3d 1228, 1233 & n.5 (11th Cir. 2002) (in

the context of a claim raising in part a failure to reimburse travel expenses).

      In fact, "there are federal cases too numerous to count which have held that H-

2A workers may pursue state breach of contact claims against employers who fail to

comply with clearance orders." *Lopez v. Fish,* 2:11-cv-113, 2012 WL 2126856, at *2

(E.D. Tenn. May 21, 2012). One of those "numerous cases" actually concerns the WRA.

*See Ruiz*, 949 F. Supp. at 1072 (holding that "Western Range was party to an

employment contract with [plaintiff shepherds] incorporating all required provisions of

the H-2A regulations.").[16]

---

[16] This longstanding and well-recognized has been applied to both H-2A and H-2B temporary workers raising contract claims based on violations of DOL regulations incorporated into their job offers and therefore their employment contracts. Plaintiffs provide an illustrative—but hardly exhaustive—list of those authorities. *See, e.g., W. Colo. Fruit Growers Ass'n v. Marshall*, 473 F. Supp. 693, 696 (D. Colo. 1979) (employer's "clearance order is essentially an offer for a contract of employment" which may be accepted by individual employees); *Cuellar-Aguilar v. Deggeller Attractions,* Inc., --- F.3d ---, 2015 WL 8958642, at *5 (8th Cir. Dec. 15, 2015) (reaffirming that "[temporary] workers can enforce . . . federally mandated [employment terms] under . . . contract law" and collecting additional authorities); *Salazar-Calderon v. Presidio Valley Farmers Ass'n*, 765 F.2d 1334, 1341 (5th Cir. 1985) (holding that "because [the H-2] regulations have the force of law, these terms were part of [the workers'] employment agreement"); *Jurardo DeLeon Granados v. Eller & Sons Trees, Inc.,* 581 F. Supp. 2d 1295, 1316 (N.D. Ga. 2008) (holding that failure to reimburse H-2B workers for their visa, transportation, and recruitment expenses violates the work terms under which they were employed); *Frederick Cty. Fruit Growers Ass'n v. Martin*, 703 F. Supp. 1021, 1031 (D.D.C. 1989) ("The terms of [an H-2A] job clearance order which reflect DOL requirements become a part of the employment contract as a matter of law" even where "none of the [f]armworkers saw or relied upon the promise of higher wages."), *aff'd* 968 F.2d 1265, 1268 (D.C. Cir. 1992) ("Each grower's promise in the job clearance order created a contractual obligation running from that grower to each of its workers."); *see also Norfolk & W. Ry. Co. v. Am. Train Dispatchers Ass'n*, 499 U.S. 117, 130 (1991) ("Laws which subsist at the time and place of the making of a contract, and where it is to

Along with spelling out that Plaintiffs' theory is that H-2A regulations are incorporated into the Plaintiffs' employment contracts, Plaintiffs identify the specific H-2A regulation they believe was violated by Defendants. They allege that the employment contracts at issue here "explicitly or impliedly incorporated the requirements of 20 C.F.R. § 655.122 either through the H-2A Applications and job orders, which constitute job offers accepted by Plaintiffs and those similarly situated, or as implied terms in their employment contracts." SAC at ¶¶ 284, 291.

Finally, Plaintiffs allege how the WRA and MPAS violated § 655.122: by failing to pay or reimburse a specific list of expenses. This list includes the costs of "medical checkups, criminal background checks, and travel and subsistence expenses (which include bus fares, meals, and hotels necessary to travel between the shepherd's place of recruitment and the workplace, and travel necessary to complete the other pre-travel requirements, e.g., the medical checkups)." SAC, ¶¶ 285, 292.

In response to these straightforward allegations of breach of contract, the WRA and MPAS feign ignorance about the most basic facts of the contract claim, as plainly alleged in the SAC. They also attempt to impermissibly raise the bar as to what is required to obtain discovery in a case where an employment relationship is plausibly (and indisputably) alleged between the named Plaintiffs and Defendants.

First, the WRA and MPAS suggest that in order to proceed to discovery on this claim, they need more facts about the contract terms and about Plaintiffs and every

---

be performed, enter into and form a part of it, as fully as if they had been expressly referred to or incorporated in its terms.").

member of the proposed classes of Plaintiffs. In particular, WRA claims that Plaintiffs only discuss "unspecified 'expenses'" (WRA at 24), and MPAS claims that the sums not reimbursed are only "generally" alleged (WRA at 18). The WRA and MPAS also both ask for the specific dates Plaintiffs entered into the contracts, and the WRA seemingly wants the dates in which all class members accepted the job offers contained in H-2A applications. Finally, the WRA requests the names of the individual ranches where all shepherds worked. *See* MPAS at 24; WRA at 18.

There are a number of problems with raising these issues as basis for a motion to dismiss. As an initial matter, Defendants' lamentations about lack of specificity only find voice if one ignores facts actually pleaded in the SAC. For example, WRA and MPAS's concerns about "unspecified expenses" and "general" allegations of deductions ignore the very specific list of expenses Plaintiffs allege were not reimbursed, which was just referenced immediately above. Defendants do not explain how this list of unreimbursed expenses is not specific enough to understand Plaintiffs' contract claim theory, and they cite no authority suggesting that a greater level of specificity is necessary in order to proceed to discovery on the claim.[17]

---

[17] Defendants employ this same strategy (namely, of ignoring what is actually in the Complaint) in a number of other ways. For example, Defendant MPAS suggests that Plaintiff De La Cruz has not alleged consideration, breach, or damages. MPAS at 17-18. But these elements to pleading a contract claim are all provided in the Complaint: as explained above, the SAC alleges that Plaintiff De La Cruz provided services to his employer, MPAS, in exchange for MPAS fulfilling certain promises, including the reimbursement of his travel and administrative expenses. *See* SAC ¶¶ 20-21. Defendant MPAS's failure to reimburse these expenses constituted the breach.

Relatedly, much of the information that Defendants argue is necessary to proceed to discovery on the contract claim is in fact immaterial for that purpose. Again, Plaintiffs have alleged that an employment relationship existed between the named Plaintiffs and the WRA or MPAS, that the same relationship exists between the proposed classes of H-2A shepherds of the WRA and MPAS, and that the same contract terms (incorporating 20 C.F.R. § 655.122) are at issue for all Plaintiffs and proposed class members. *See, e.g.*, SAC, ¶¶ 16-19; ¶¶ 175-201. In light of these allegations—whose plausibility has not been contested—it does not matter if Plaintiffs entered into their employment contracts with Defendants on January 25 or 26, whether Plaintiffs did so on a particular ranch in Wyoming or Colorado, or whether ten or fifteen or twenty members of the proposed classes entered this agreement on WRA Ranch A instead of MPAS Ranch B. To be sure, some of these facts will likely be determined during discovery and might be relevant for further motions practice or a damages finding. But at this early stage of the litigation, Defendants have not provided any rationale for why such allegations would in fact be a necessary prerequisite for proceeding to discovery.

The WRA and MPAS also suggest Plaintiffs have not sufficiently alleged performance on the employment contracts and that this supposed defect means that the complaint must be dismissed. WRA at 24; MPAS at 17. This argument again ignores the facts alleged in the Complaint and misconstrues the pleading standard for a contract claim. Plaintiffs have alleged performance of the contract by working for Defendants. *See* SAC, ¶¶ 16-21. And even if this were not the case, a failure to plead performance is

not actually a basis for granting a motion to dismiss on a contract claim. *Tatten v. Bank of America Corporation.*, 562 F. App'x 718, 721 (10th Cir. Colo. 2014) ("[w]hether there has been substantial performance under a contract is generally a question of fact unless the facts are undisputed and only one inference can be drawn reasonably.") (cited by WRA at 17). Indeed, performance only becomes an issue at the motion to dismiss stage when allegations derived from a complaint indisputably establish a Plaintiff's non-performance, which would make the contract claim facially implausible. *Id.* But that is not in play here.[18]

Lastly, without citation to any authority applying this doctrine in the context of challenges by H-2A workers, MPAS suggests that the contract claim somehow fails because no private right of action exists under the Wagner-Peyser Act or 20 C.F.R. § 655.122. MPAS at 18-19. As an initial matter, it is unclear why the MPAS is referencing the Wagner-Peyser Act. It is cited nowhere in the Complaint, and the regulation actually relied upon by Plaintiffs is promulgated under the Immigration and Nationality Act. *See* 20 C.F.R. § 655.122 (noting that DOL recognizes its authority to issue this regulation under the INA: 8 U.S.C. §§ 1101(a)(15)(H)(ii), 1184(c), & 1188)

_____

[18] Other authorities cited by WRA in support of dismissal of the contract claim (WRA at 18) are similarly inapposite: unlike this case, the cases cited by WRA involved allegations related to contract formation or contract terms that were plainly contradicted by undisputed facts effectively conceded by the party opposing the motion to dismiss. *See, e.g.*, *McDonald v. Miller*, 945 F. Supp. 2d 1201, 1206 (D. Colo. 2013) (dismissing a contract claim alleging that plaintiff was not an at-will employee where controlling law and the explicit terms of an employment contract signed by the plaintiff established that he was at-will); *Romstad v. City of Colorado Springs,* 2015 WL 4743189, at *3 (D. Colo. Aug. 10, 2015) (dismissing a contract claim that alleged an employment handbook created a contractual relationship when the handbook explicitly stated that was not intended to create a contractual relationship).

Plaintiffs assume MPAS is arguing that 20 C.F.R. § 655.122 provides no private cause of action. And as to that contention, Plaintiffs do not bring a claim under 20 C.F.R. § 655.122. Instead, as explained above, Plaintiffs stand on well-trodden legal ground in alleging that a violation of a DOL regulation incorporated into a job offer for an H-2Aworker constitutes a breach of the term of an employment contract entered into by an H-2A worker. Further, in contrast to the MPAS, which provides no authority for its arguments, Plaintiffs provide a list of numerous cases from across the country that hold to the contrary and reaffirm Plaintiffs' contract-based theory. *See* note 16 and accompanying text, *supra*.

**E.  The DOL Is Not A Necessary Party**

Child Ranch also argues that Plaintiffs must join the Department of Labor as an indispensable party because this action cannot proceed "in equity and good conscience" without DOL, in light of DOL's role in establishing minimum wages and administering some aspects of the H-2A visa program. Child Ranch at 12.

This argument fails for several reasons. First, Plaintiffs make no challenge in this case that the harms alleged here resulted from illegal acts caused by DOL, even though DOL did approve Plaintiffs' job orders. *See, e.g.*, *Chesir v. Housing Authority of Milwaukee*, 801 F. Supp. 244, 249 (E.D. Wis. 1992) (collecting cases supporting the proposition that the Department of Housing and Urban Development (HUD) is not an indispensable party in every case alleging private discrimination in HUD-approved housing, as long as plaintiffs do not raise claims that the discrimination occurred as a result of HUD actions). Second, DOL is well aware of this suit, *see* DOL Response at

50

16, *HAP v. Perez*, No. 15-cv-1562 (D.D.C. Sept. 16, 2015) (ECF # 14), and has never

claimed an interest in intervening in this case or prejudice from not being joined, though

if this Court believes DOL must be joined there is no question this could be

accomplished. Third, the only authorities Child Ranch cites in support of its position are

inapposite here. *See New Mexico v. Backer*, 199 F.2d 426, 429 (10th Cir. 1952)

(dismissing action against a federal official as one in fact against the United States and

therefore inappropriate on sovereign immunity grounds); *Manygoats v. Kleppe*, 558

F.2d 556, 558 (10th Cir. 1977) (holding that a Native American tribe was not an

indispensable party because the tribe's absence from the litigation would not

necessarily prejudice them and reversing a district court's reasoning to the contrary).

### F. <u>Jurisdiction And Venue Over Defendants Ball Brothers, Child Ranch, Estill Ranches, And Dennis Richins</u>

Defendants Child Ranch, Estill Ranches, and Dennis Richins argue that they are

not subject to personal jurisdiction in this forum and that venue is improper. These

arguments fail. But, to the extent that the Court has any lingering doubts about them, it

should allow discovery on these matters.

#### 1. Dennis Richins

The exercise of venue and personal jurisdiction over Dennis Richins is

straightforward. Mr. Richins is a RICO Defendant in this case. Plaintiffs allege that

between 2001 and 2014, he oversaw the WRA's operations, including its submission of

job orders and H-2A applications on behalf of member ranchers. Indeed, Mr. Richins

signed "a substantial number of H-2A Certification Applications and job orders for

Colorado-based ranches." SAC ¶ 32. These H-2A applications and job orders, like

others filed by the WRA with Mr. Richins signature, materially misrepresent the reimbursements H-2A shepherds will receive for their pre-employment costs. SAC ¶¶ 259-266.

Mr. Richins' conduct, thus, was the direct cause of injury to H-2A shepherds employed in Colorado. He is properly haled into this Court based on the principles of specific personal jurisdiction related to the conduct giving rise to Plaintiffs' federal claims against him. *Quinones v. Pennsylvania Gen. Ins. Co.,* 804 F.2d 1167, 1177 (10th Cir. 1986). Furthermore, Plaintiffs' plausible allegations that a Mr. Richins signed a "substantial number" of job offers for Colorado-based ranches, is sufficient to establish proper venue in this Court under general venue rules. *See* 28 U.S.C. § 1391(b)(2).

**2. Ball Brothers, Child Ranch, and Estill Ranches**

*a. <u>Venue</u>*

Section 12 of the Clayton Act authorizes venue for antitrust claims in a judicial district where a corporate defendant "transacts business." 15 U.S.C. § 22. The phrase "transacts business" connotes a "broader and looser concept than the phrase 'doing business' in some of the other statutes." *Riss & Co. v. Ass'n of Am. Railroads,* 24 F.R.D. 7, 8 (D.D.C. 1959). The Second Circuit has explained that "[a] defendant manufacturer that promotes its goods in a judicial district through product demonstrations, that solicits orders through its salesmen in that district, and that ships its goods into that district clearly 'transacts business.'" *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 429 (2d Cir. 2005); *see also KM Enterprises, Inc. v. Glob. Traffic Techs., Inc.,* 725 F.3d 718, 731 (7th Cir. 2013) ("Lower courts have also found that a

defendant was transacting business in a district when the defendant maintained offices and provided customer assistance in the district, when it made substantial purchases in the district, and when it exercised extensive control over a subsidiary or distributor that transacted business in the district." (internal citations omitted)).

In this case, Plaintiffs allege that Ball Brothers, Child Ranch, and Estill Ranches are members of the American Sheep Industry, based in Colorado, and that they all use Colorado feedlots to finish their sheep. SAC ¶¶ 36, 40. None of these defendants dispute these facts in the declarations they have submitted to the Court. Ball Brothers Decl. ¶ 6 (acknowledging possibility that Ball Brothers may use feedlots in Colorado); Child Decl. (not mentioning allegations); Estill Decl. ¶ 6 (acknowledging possibility that Estill may use feedlots in Colorado). And, based on the broad venue provisions of Section 12, the Court should deny these defendants' motions to dismiss on venue grounds. If the Court has any doubt about whether venue is proper here, however, it should allow Plaintiffs to engage in discovery regarding the issue. *See Nat'l Union Fire Ins. Co. of Pittsburgh, P.A. v. Smith Tank & Steel, Inc.*, No. CIV.A. 11-3054, 2013 WL 1313063, at *3 (E.D. La. Mar. 28, 2013) (discovery on venue matters proper where defendant's declaration did not clearly resolve the issue).

### b. *Personal Jurisdiction*

Ball Brothers, Child, and Estill also argue that they are not subject to personal jurisdiction in the District of Colorado. Personal jurisdiction over Defendants in this forum based on Plaintiffs' federal antitrust claims does not implicate the familiar constitutional principles of "minimum contacts" with the forum state. These constitutional

principles are incorporated into state long-arm statutes, and therefore federal rules

regarding service of process, pursuant to Federal Rule of Civil Procedure 4(f) & (h). The

federal rules allow for more expansive service, however, where "federal law provides."

Fed. R. Civ. Proc. 4(h). As these three defendants concede, at the very least in cases

where venue is proper under Section 12 of the Clayton Act, federal law allows for

nationwide service of process. [19]   Child at 11. For the reasons set forth above, Plaintiffs

have plausibly alleged venue under Section 12 of the Clayton Act, and these

defendants are therefore subject to personal jurisdiction in this District.[20]

## III.   CONCLUSION

For the forgoing reasons, the Plaintiffs request that Defendants' motions to

dismiss be denied.

---

[19] Although these defendants do not address the issue, the Tenth Circuit has rejected the "so-called 'national contacts' test," under which the only *constitutional* limitation on personal jurisdiction in cases brought under federal statutes is that the defendant have minimum contacts with the United States. *Peay v. BellSouth Med. Assistance Plan*, 205 F.3d 1206, 1211 (10th Cir. 2000). In this Circuit, then, even where a statute authorizes nationwide service of process, service is impermissible under the Due Process Clause of the Fifth Amendment where the defendant demonstrates "that litigation in the plaintiff's chosen forum is unduly inconvenient, . . . [and the] federal interest in litigating the dispute in the chosen forum [does not] outweigh[] the burden imposed on the defendant." *Id.* at 1213. These defendants have forfeited the argument that personal jurisdiction might be improper even if nationwide service is permissible under the Clayton Act. If the Court chooses to address the issue, however, it should conclude that these defendants have failed to meet their burden of establishing undue inconvenience unjustified by the interests in efficient administration of justice that counsel in favor of allowing Plaintiffs to bring all of their claims against Defendants in the same litigation. Although these defendants assert that they have do not reside or employ shepherds in Colorado, they have not pointed to any undue costs involved with litigating in this forum. *Id.* at 1213.

Dated: 1/29/2016

Respectfully submitted,

s/Alexander Hood
Alexander Hood
Attorney and Director of Litigation
Towards Justice
1535 High St., Suite 300
Denver, CO 80218
Tel.: 720-239-2606
Fax: 303-957-2289
Email: alex@towardsjustice.org

s/David Seligman
David Seligman
Attorney
Towards Justice
1535 High St., Suite 300
Denver, CO 80218
Tel.: 720-248-8426
Fax: 303-957-2289
Email: david@towardsjustice.org

s/Dermot Lynch
Dermot Lynch
Attorney and Skadden Fellow
Towards Justice
1535 High St., Suite 300
Denver, CO 80218
Tel.: 720-239-2606
Fax: 303-957-2289
Email: dermot@towardsjustice.org

## Certificate of Service

I hereby certify that on 1/29/2016, the above was filed using this Court's CM/ECF system, which caused all counsel of record to be served electronically pursuant to Fed. R. Civ. P. 5.

<span style="margin-left:300px">s/Alexander Hood<br>Alexander Hood</span>