**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: 15-cv-01889-REB-CBS
RODOLFO LLACUA et al., and those similarly situated,
        Plaintiffs,
v.
WESTERN RANGE ASSOCIATION et al.,
        Defendants.

---

## OBJECTION TO REPORT AND RECOMMENDATION

---

Plaintiffs object to Magistrate Judge Shaffer's Report and Recommendation

[# 125], which recommends granting Defendants' Motions to Dismiss and dismissing

Plaintiffs' Second Amended Complaint with prejudice. Plaintiffs are former foreign

shepherds who worked on H-2A temporary agricultural visas for sheep ranches across

the American West. They bring claims against two ranching associations—the Western

Range Association and the Mountain Plains Agricultural Service—and a number of

individual ranches that are members of one or both of these Associations.[1]

The WRA and MPAS are deeply-entrenched institutions in the American

sheepherding industry. And Plaintiffs recognize that these Associations can serve many

important and legal purposes that would benefit their member ranches and the mainly-

Peruvian shepherds they employ. For example, the Associations can help ranches work

through the costs and benefits of hiring foreign shepherds; they can set up job fairs in

---

[1] Plaintiffs reference the Second Amended Complaint ("SAC") [# 73], their Response to
Defendants' Motions to Dismiss ("Resp.") [# 96], and the Report and Recommendation ("R&R")
[# 126]. They refer to Defendants Western Range Association ("WRA") and Mountain Plains
Agricultural Service ("MPAS") collectively as "Association Defendants" or "Associations," and to
the individual ranch defendants as the "Ranches."

1

Peru for Peruvian shepherds to learn about U.S. ranches; and they can help ranches with the logistics and paperwork involved in hiring a foreign shepherd and transporting him to the United States. The Associations may not, however, fix the wages that ranches offer to potential shepherds, and they may not lie to federal officials in saying they comply with a federal law that requires employers to pay foreign workers for the expenses they incur to travel to the United States. This case is about that illegal conduct.

## I.  ANTITRUST

Plaintiffs' first set of claims are for wage fixing in violation of Section One of the Sherman Act. 15 U.S.C. § 1. They allege that the Associations set the wages that individual ranches offer foreign shepherds—no matter the ranch and no matter the shepherd—at precisely the minimum allowable level authorized by the Department of Labor. They allege too that the Ranches participate in and benefit from this scheme.

It is not difficult to conceptualize the harm caused by the alleged arrangement. Consider a trade group that handles law firm associate recruitment and hiring for all or nearly all of the law firms in the United States. The group presents to—and signs—a form contract with all law school graduates seeking law firm work and all associates seeking to lateral from other firms. The association creates a salary schedule, setting the salary for these associates at a fixed rate in each state. The trade group offers all associates this salary whether they have practiced law for ten years, five years, or one year or whether they graduated order of the coif or bottom of the barrel. And it offers this salary for all law firms no matter their size, practice areas, or minimum billable hours. In

the real world (and in a classic example of "conscious parallelism"), "big law" firms are now competing to match salaries with other firms, which has resulted in an upward spiral that benefits associates.[2] But in the hypothetical world, associate salaries stagnate.

This case presents the same facts as the hypothetical, except that it is not about law firm associates, but foreign H-2A shepherds working across the American West. There should be no doubt that the trade group in the hypothetical is violating the Sherman Act, and little doubt that the competing law firms benefiting from the suppression of associate salaries are violating the Sherman Act too. Yet, accepting analogous facts as plausibly pled, the R&R holds that Plaintiffs' allegations are insufficient to advance to discovery. It reaches this result by ignoring a number of central precepts of antitrust law.

***First***, the R&R applies the wrong legal framework to Plaintiffs' allegations that Defendants entered into an illegal agreement in restraint of trade. The R&R relies at length on *Twombly*'s discussion of the need to present sufficient circumstantial evidence to obtain discovery for the purpose of learning of the existence of an agreement the parties may have entered into behind closed doors. But the agreement in this case is not behind closed doors; it is in the open. For Plaintiffs' claims against the Associations, Plaintiffs have alleged direct evidence that the Associations are combinations of competing members that set offered wages for their members. And for Plaintiffs' claims

---

[2] *See, e.g.*, Staci Zaretsky, *Big Law's Raise Riot: Which Firms Have Increased Salary*, *Above The Law* (June 13, 2016), *available at* http://tinyurl.com/h8hvnns.

against the Ranches, Plaintiffs have alleged—by pointing to both direct and circumstantial evidence—that Ranches purposefully delegated decisions about wages to an association of competitors, knowing that the Associations set wages uniformly at the government-set wage floor.

*Second*, the R&R assumes there is a legally relevant distinction between (1) a trade association creating a rule that *requires* competing members to offer the same wage to members' employees and (2) an association offering the same wage to competing members' employees *on behalf of* those competing members. There is not, nor could there be without eviscerating the antitrust laws.

*Third*, notwithstanding that none of the Defendants have made this argument, the R&R appears to assume that the antitrust laws may not apply here because of a statute that recognizes that agricultural associations can facilitate the hiring of *non-H-2A* workers. The statute is not applicable, and in any event, the R&R's assumption ignores the demanding legal standard—not met here—for determining whether federal law has impliedly abrogated application of antitrust laws to specific anticompetitive arrangements.

*Fourth*, the R&R assumes there can be no antitrust violation here because it would be irrational for ranches to offer shepherds more than what is legally required and sufficient to attract shepherd labor. That analysis is wrong on both the facts and law, and if accepted, it would immunize every cartel from liability, as cartels only ever exist because consumers are sometimes willing to pay prices higher than prices in a competitive market. Indeed, that is the whole point of a cartel.

**A.  The R&R Ignores the Differences between Association Defendants and Ranches, as well as the Alleged Evidence of Liability**

For present purposes, the only dispute between the parties is whether Plaintiffs plausibly allege a "contract, combination, or conspiracy" that violates Section One of the Sherman Act. Plaintiffs must establish this element through either ***direct*** or ***circumstantial*** evidence of an agreement. R&R at 10. "Direct evidence of a § 1 agreement may take the form of a written contract or agreement such as association rules." *Id.* at 10-11 (citation omitted). Where a plaintiff has alleged direct evidence, such as an association rule, the "court need go no further on the question whether an agreement has been adequately pled." *W. Penn. Allegheny Health Sys. v. UPMC*, 627 F.3d 85, 99-100 (3d Cir. 2010). In other words, "[a]llegations of direct evidence of an agreement, if sufficiently detailed, are independently adequate." *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 323 (3d Cir. 2010).

In contrast, in the absence of direct evidence, "a horizontal price-fixing agreement may be inferred on the basis of conscious parallelism, [only] when such interdependent conduct is accompanied by circumstantial evidence and plus factors." *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (Sotomayor, J.). In other words, when the defendants' have engaged in parallel conduct, but there is no direct evidence of an agreement, the plaintiffs must also allege circumstantial evidence, sometimes called "plus factors," sufficient to survive a motion to dismiss. These "plus factors" are not required when the plaintiffs are able to plausibly allege direct evidence of an agreement. *Brokerage Antitrust Litig.*, 618 F.3d at 324 n.23.

The Supreme Court's decision in *Bell Atlantic v. Twombly*, 550 U.S. 544 (2007), is of course relevant here with respect to Plaintiffs' claims against **both** the Associations and the Ranches because *Twombly* prescribes the legal standard for determining whether plaintiffs have "nudge[d] their claims across the line from conceivable to plausible." *Id.* at 554. This standard applies to every motion to dismiss.

But *Twombly* also includes a discussion—specific to antitrust law—about what an antitrust plaintiff must plead to obtain discovery on the question of whether the defendants have entered into an agreement, when instead of pointing to direct evidence, Plaintiffs only allege "parallel conduct or interdependence." *Id.* Under *Twombly*, plaintiffs may not go on a fishing expedition for evidence of a secret agreement absent sufficient circumstantial evidence tending to show that the defendants' actions were plausibly motivated by something other than unilateral action. *Id. Twombly's* antitrust analysis does not apply when the plaintiffs allege direct evidence of an agreement. *Beltran v. InterExchange, Inc.*, No. 14-CV-03074-CMA-KMT, 2016 WL 1253622, at *5 (D. Colo. Mar. 31, 2016) (observing, in another case involving allegations of direct evidence, that "*Twombly* offers very little guidance in this case"). *Twombly's* analysis of the circumstantial evidence needed to plead a conspiracy in addition to parallel conduct is only partially relevant here, and it is not at all relevant to

claims against the Associations—after all, conscious parallelism cannot possibly be an

excuse for their fixing wages offered to shepherds by their competing member ranches.[3]

1. **Plaintiffs' Claims Against Association Defendants Should Survive Because Association Defendants Engage in Anticompetitive Conduct on Behalf of their Members**

With respect to their claims against the Associations, Plaintiffs allege ***direct***

evidence of conspiracy: that the Associations exist and set wages for their members.

The only serious *Twombly* question for the Associations is whether Plaintiffs provide

sufficiently detailed allegations to make this claim plausible, and the only *Twombly*

defense is the Associations' halfhearted suggestion (in the face of almost

incontrovertible evidence to the contrary)[4] that the individual members—and not the

Associations—in fact set the wages.

The R&R rightly accepts that the Associations set shepherd wages, but then

concludes that this arrangement is legal:

> [E]ven taking as true Plaintiffs' allegation that the members allocate wage decisions to Association Defendants, and inferring that the members do not expressly instruct Association Defendants to offer the minimum wages, this does not plausibly suggest an agreement to fix wages. ***It merely shows that Association Defendants will handle the hiring for their members, including the determination of what wages to offer.*** Again, Plaintiffs do not allege any Association Defendant rules, requirements, or

---

[3] Plaintiffs laid out these separate standards in the Response, *see* Resp. at 9-10 (articulating the different standards); *id.* at 12-14 (applying the standards), but the R&R does not acknowledge the distinction and instead analyses ranch and association liability identically.

[4] This evidence is discussed at length in the Response, which in particular cites to *Ruiz v. Fernandez*, 949 F. Supp. 2d 1055, 1066 (E.D. Wash. 2013), where another federal district court determined that WRA set the wage rates offered shepherds. *See* Resp. at 14-16.

> instructions that prohibit their members from offering more
> than the minimum wage.

R&R at 24 (emphasis added).

What the R&R treats as a "mere[] show[ing]" is in fact the ***whole showing*** that Plaintiffs need to establish liability against the Association Defendants. It is direct evidence of a contract or combination. "The Courts have had little difficulty in treating organizations created to serve their member-competitors or to regulate their market behavior as continuing 'agreements' among the members," for purposes of finding an "agreement" in restraint of trade. 7 P. Areeda & H. Hovenkamp, Antitrust Law § 1477, p. 337 (3d ed. 2006) ("Areeda").[5] If "a trade association's [conduct] is unreasonably anti-competitive," the conspiracy that causes antitrust liability is the "agreement creating the organization." *Id*; s*ee also* Resp. at 9-10.

Although trade associations may engage in unilateral conduct on their own behalf, *AD/SAT v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999), they may not engage in unreasonably anticompetitive conduct on behalf of their competing members. Areeda, § 1477, p. 333. Where, as here, a trade association engages in anticompetitive conduct, the agreement that created it is no longer legal. *Id.* Just as the Associations would clearly violate the antitrust laws by selling their members' mutton at a uniform set

---

[5] Areeda is the foremost treatise on antitrust law. *See, e.g.*, Justice Stephen Breyer, *In Memoriam: Phillip E. Areeda*, 109 Harv. L. Rev. 889, 890 (1996) ("[M]ost practitioners would prefer to have two paragraphs of Areeda's treatise on their side than three Courts of Appeals or four Supreme Court Justices.").

price, so too they violate the antitrust laws by setting the wages offered shepherds at the government-set wage floor in each state.

## 2. The Ranch Defendants Are Liable for the Association Defendants' Violations if the Ranches were "Consciously Committed" to the Common Scheme to Fix Shepherd Wages

The R&R rightly observes that an allegation of the Ranches' mere membership in the Associations, standing alone, would be insufficient to survive a motion to dismiss. R&R at 22.[6] Plaintiffs must allege that the Ranches were consciously committed to the wage-fixing scheme employed by Association Defendants on their behalf. Plaintiffs have alleged sufficient facts—that both directly and circumstantially support their allegations—to advance to discovery on claims against the Ranches.

As direct support for their claims against the Ranches, Plaintiffs alleged that the Associations prepare the contracts and set the offered wage terms for the employment agreements that the Ranches use for their shepherd employees. *See, e.g.*, Resp. at 6; *Ruiz v. Fernandez*, 949 F. Supp. 2d at 1068. That arrangement, in conjunction with Plaintiffs' plausible allegations that the Ranches knew the Associations set offered wages for all members at the minimum amount allowable by law and continued to participate in the scheme to reap the benefits of fixed offered wages is more than enough to withstand the Ranches' motions to dismiss. *Interstate Circuit v. United States*, 306 U.S. 208, 226 (1939) ("[K]nowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it.");

---

[6] The R&R erroneously suggests that Plaintiffs assert that mere association membership is sufficient to incur liability. R&R at 21-22. *But see* Resp. at 10 (disclaiming this theory).

*Osborn v. Visa Inc.*, 797 F.3d 1057, 1067 (D.C. Cir. 2015), *cert. granted*, 15-962, 2016 WL 379292 (June 28, 2016); *United States v. Apple, Inc.*, 791 F.3d 290, 314 (2d Cir. 2015); *Meyer v. Kalanick*, No. 15 CIV. 9796, 2016 WL 1266801, at *4 (S.D.N.Y. Mar. 31, 2016).

Moreover, circumstantial evidence of the Ranches' conscious commitment abounds. First, the Association Defendants' communications with member ranches in Oregon about the shifting wage floor in that state suggests that member ranches knew that it was the stated, public policy of all member ranches to pay shepherds the legal wage floor and no more. Resp. at 6.

Second, there are a number of "plus factors" suggesting the Ranches' conscious commitment. Ranches are not powerless to change the Associations' practices. Areeda § 1477 n.18, p.335-36 (noting that in inability to change an association's practices might suggest the absence of conscious commitment). But, as Plaintiffs' plausibly allege, the Ranches participate in the Associations and their wage-fixing conspiracies because of a unique motivation to fix wages that does not exist in other industries. Whereas in other labor markets wage-fixing should backfire as workers migrate to industries paying market wages, the constraints of the H-2A visa program prevent shepherds from legally migrating to other industries or even other ranches. For the Ranches, therefore, fixing shepherd wages is lucrative in ways that it is not for other employers. Resp. at 17-18. This motivation is amplified by the fact that minimum wages for shepherds are set by reference to wages actually paid shepherds, creating an incentive to fix and suppress wages. Resp. at 17-19.

Third, the revelation that the Ranches often pay wages that are higher than the fixed offered wage rate is powerful circumstantial evidence of conscious commitment to the wage fixing scheme. *See, e.g.*, [# 84 at 3 n.3] (MPAS admitting as much in its motion to dismiss). Ranches know that it is illegal to pay H-2A shepherds more than what they are initially offered, and more than what is offered to domestic shepherds who must, by law, have an opportunity to access shepherd jobs before H-2A workers. Resp. at 20 n.6. Ranches nevertheless engage in this conduct because it allows them to benefit from the fixing of ***offered*** wages and the resulting wage stagnation and suppression, while also retaining skilled shepherds. Resp. at 20 (citing *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651, 656 (7th Cir. Ill. 2002) (Posner, J.)).

## B. <u>An Association May Not Set Wages for Its Members, No Matter the Mechanism.</u>

Wage-fixing is *per se* anticompetitive and therefore *per se* illegal. Accordingly, if a court finds that a plaintiff has plausibly alleged that an association fixes wages across competitor members, this normally leads to the straightforward conclusion that a Sherman Act violation is plausible or even likely. Judge Ebel, writing for the Tenth Circuit, found as much in a case involving the NCAA's policy of fixing the wages of coaches at one uniform level, holding that such a policy "constitutes the type of naked horizontal agreement among competitive purchasers to fix prices usually found to be illegal *per se.*" *Law v. NCAA*, 134 F.3d 1010, 1017 (10th Cir. 1998). But the principle goes back much further than Judge Ebel's decision. Nearly a century ago, the Supreme Court deemed an association of shipowners to be in violation of the antitrust laws when

it set the wages and conditions of employment for seamen uniformly across member, competing shipowners. *Anderson v. Shipowners Ass'n*, 272 U.S. 359, 362 (1926).[7]

The R&R departs from this principle because of a mistaken belief that the Sherman Act is concerned with **how** associations set prices for competing members. The R&R states: "Plaintiffs do not point to any association rules or express instructions to members that would [imply] a conspiracy." R&R at 22. In other words, the R&R appears to hold that it would be illegal for an association to issue "express instructions" to members to offer uniform wages to their workers and also illegal for associations to promulgate "rules" requiring members to offer uniform wages to their workers, but that it is not illegal for an association to itself offer uniform wages to workers on behalf of its competing members.

This distinction would eviscerate antitrust protections. Sometimes associations set rules; sometimes associations issue express instructions; and sometimes associations engage in conduct on behalf their members. What matters for the purposes of the Sherman Act is whether the association's action has any "impact whatsoever on the market behavior of individual members." Areeda, § 1477, p. 333. When it does, its conduct necessarily implicates the Sherman Act. *Id.* In other words,

---

[7] *See also Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001) (Sotomayor, J.) ("If the plaintiff in this case could allege that defendants actually formed an agreement to fix . . . salaries, [the] per se rule [for a violation of the Sherman Act] would likely apply."); *Chicago Professional Sports Ltd. Pshp. v. NBA*, 95 F.3d 593, 600 (7th Cir. 1996) (Easterbrook, J.) ("Just as the ability of McDonald's franchises to coordinate the release of a new hamburger does not imply their ability to agree on wages for counter workers, so the ability of sports teams to agree on a TV contract need not imply an ability to set wages for players."); Resp. at 9-10 (collecting additional authorities).

just as it is illegal for a trade association to **require** members not to compete, it is illegal for a trade association's members to **surrender** their freedom to compete to a single pricing decision-maker that sets uniform prices.

The R&R's reasoning on this point contradicts the Supreme Court's holding in *Anderson*, where the illegal conduct at issue involved the association hiring seamen on behalf of a group of shipowners and then assigning those seamen to certain vessels. 272 U.S. at 362. In a parenthetical, the R&R dismisses *Anderson* as being concerned solely with association rules prohibiting vessels from hiring outside of the association and from paying more than the set wage. R&R at 21 (citing *Anderson*). But the holding in *Anderson* did not depend on those facts. The association's conduct in *Anderson* was illegal because competing shipowners delegated decision-making to an association of competitors that controlled access to the labor market and set wages uniformly across competitors. *See Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 803-04 (1993) (describing the violation in *Anderson* as an illegal "attempt by an association of employers to establish industry-wide terms of employment"); *Drayer v. Krasner*, 572 F.2d 348, 355 n.8 (2d Cir. 1978) ("[T]he [*Anderson*] Court held illegal a requirement that prospective employers and employees surrender the power to negotiate employment terms, including such essential items as the level of wages . . . , to an employers' association").

Likewise, the Supreme Court has concluded that claims against National Football League Properties (NFLP) could go forward based on allegations that the NFLP granted an exclusive manufacturing and marketing license on behalf of competing, member NFL

13

teams. *American Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 187 (2010). It did

not matter to the Court that the NFLP itself granted the license as opposed to requiring

all of the NFL teams to grant their own exclusive licenses. In other words, in that case,

the plaintiff's antitrust claims did not turn on whether the plaintiff had alleged that the

NFLP issued "rules or express instructions to members." It was the NFLP's conduct ***on

behalf of*** its members that triggered scrutiny.

The R&R's proposed rule would also lead to absurd results. Under the R&R's

approach, competitors could easily avoid antitrust liability by allocating decisions to

associations to set prices. If that were the law, it would be ***illegal*** for an association of

law firms to instruct firms to offer the same salary to all prospective associates, but it

would be ***legal*** for the association to offer that salary uniformly on behalf of member law

firms. Similarly, it would be ***illegal*** for an association of gas stations to require members

to offer the same price to all customers, but it would be ***legal*** for that association to

drive around town posting the same price on gas station price signs.

## C.  Federal Law Does Not Immunize this Industry from Antitrust Claims

An alternative explanation for how the R&R arrives at the conclusion that

associations may set prices for their members lies in its suggestion that the Agricultural

Workers Protection Act (AWPA) "expressly permits" ranches to allow WRA and MPAS

to set wages offered to H-2A shepherds. R&R at 24. As an initial matter, the AWPA

does not bear on this question. It is a statutory scheme designed to protect the rights of

***non-H-2A*** farmworkers. In relevant part, it establishes merely that associations like the

MPAS and WRA can incur liability for violating **non-H-2A** workers' rights. *See* R&R at 20, 24 (citing 29 U.S.C. §§ 1801(d); 1821; 1822).

In any event, none of the federal laws and regulations governing the WRA and MPAS come close to evincing a "showing of clear repugnancy" with the Sherman Act. *Nat'l Gerimedical Hosp. & Gerontology Ctr. v. Blue Cross*, 452 U.S. 378, 388-89 (1981). Under federal law, the Associations may, of course, help their members with the logistics of identifying, hiring, and importing foreign workers. Nothing in federal law, however, gives the Associations license to violate the antitrust laws. *See also Marquis v. United States Sugar Corp.*, 652 F. Supp. 598, 601 (S.D. Fla. 1987) (finding no clear repugnancy between H-2A laws and regulations and the Sherman Act).

**D.** **It Makes No Difference that Some Shepherds Continue Accepting the Fixed Wages Offered**

The R&R also suggests that the alleged conspiracy is unlikely because shepherds continue to accept the anomalously-low offered rates, which means, according to the R&R, that the Ranches would independently offer this wage. R&R at 28. As an initial matter, this counterfactual—namely, the Ranches independently setting wages at the minimum because that is all that is needed in order to attract shepherd labor—presupposes that Ranches independently instruct the Associations to offer the minimum to foreign shepherds. Defendants have not even argued that this is how the Associations set offered wages.

But even if the Ranches did set their own offered wages in this way, the R&R's logic would still fail. The fact that shepherds continue to accept the fixed offered rates does not suggest the conspiracy does not exist. Were that the case, cartels could avoid

liability as long as customers accepted higher prices resulting from the conspiracy. What workers will accept, however, is only one of the forces that a free market generally applies to wage rates. **Competition** for the best labor normally exerts an additional pressure on wages. Defendants have acted in concert to eliminate that important variable.

Furthermore, the R&R's logic would only hold if the equilibrium wage for shepherds—the wage that ranches would pay in the absence of their concerted conduct—were at or below the government-set wage floor. This assumption is inappropriate at the motion to dismiss stage and is also belied by the facts. The Ranches themselves expressly acknowledge that they sometimes pay skilled shepherds more than the government-set wage floor. In other words, even though the wage ultimately **paid** shepherds is suppressed by the fixing of **offered** wages, *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d at 656, the paid wage still exceeds the offered wage in many cases, meaning that the equilibrium wage could not possibly fall at or below the minimum wage floor. Moreover, as Plaintiffs have explained at length, in the comparable labor market for ranch hands, which is ostensibly free from the concerted conduct at issue here, employers pay wages that fluctuate substantially and far exceed the wages offered shepherds. Resp. at 24 n.8 ("The substantially higher wage that ranchers pay domestic ranch hands verus H-2A shepherds, notwithstanding the ranchers' legal authority to import H-2A ranch hands and pay them a minimum hourly AEWR, evidences market distortions in the shepherding labor market."). This

labor market is, perhaps, the best indication of what the market for shepherds would look like under normal market conditions.

Finally, the R&R reasons that the "minimum wage for H-2A shepherds [is] so low that adding 'nominal amounts' would not attract domestic shepherds to fill the jobs." R&R at 32. But as Plaintiffs have alleged and explained, the collusion here allows the Ranches to access a desperate foreign labor market that accepts wages **much more than nominally lower than market rates**. *See id.* The extraordinarily low wages paid H-2A shepherds, therefore, is not evidence that the conspiracy does not exist. Rather, it is precisely the sort of "anomalous behavior" that the R&R elsewhere concedes is suggestive of concerted conduct. R&R at 32 (citing *In re Text Messaging*, 630 F.3d at 628, for proposition that "anomalous behavior" that is inexplicable without an agreement is a plus factor).

## II. RICO

Plaintiffs also bring RICO claims based on Defendants' fraudulent representations to the Department of Labor that Defendants paid for certain shepherd expenses incurred in obtaining H-2A visas. Plaintiffs allege this fraud was perpetrated by three different RICO Defendants: the two Associations and former WRA Executive Director Dennis Richins.

RICO requires distinctiveness between the RICO "enterprise" and the RICO "person"—or the defendant against whom that particular RICO claim is brought.

Plaintiffs describe the RICO persons and enterprises at length in their complaint.[8] The following table summarizes:

| RICO Claim | RICO Person (Defendant) | RICO Enterprise |
|---|---|---|
| Richins Claim | Richins | WRA and Richins |
| WRA Claim | WRA | WRA and members |
| MPAS Claim | MPAS | MPAS and members |

As the sole basis for dismissing all of Plaintiffs' RICO claims,[9] the R&R concludes that this level of distinction between these persons and enterprises is insufficient to plausibly plead RICO claims. R&R at 34-41. That analysis is incorrect.

First, the RICO claim against Richins is substantially the same as the one brought against boxing promoter Don King in *Cedric Kushner Promotions v. King,* 533 U.S. 158 (2001). Similar to Richins, King was alleged to be an employee of two corporations and was alleged to have used these businesses as RICO enterprises to perpetrate frauds. *Id.* at 160-61. Like Richins, King moved to dismiss the RICO claim by raising a distinctiveness problem: he said that an employee of a corporation could not be the RICO person if the corporation itself was the enterprise. *Id.* But *King* squarely rejected this positon. *Id.* at 163. That case should resolve the matter. And indeed, since *King*, the Fifth Circuit has rejected a distinctiveness defense in a case with facts strikingly similar to those here—an employee of a corporation fraudulently recruiting workers on temporary visas. *Abraham v. Singh*, 480 F. 3d 351, 357 (5th Cir. 2007).

_____

[8] These allegations are presented in greater detail in the Complaint. *See* SAC ¶¶ 112-115, 259-266 (Richins); *id.* ¶¶ 116-121, 259-266 (WRA); *id.* ¶¶ 267-75 (MPAS).

[9] MPAS has never argued that Plaintiffs' RICO claims have distinctiveness problems. *See* [# 84 at 16-17]. But the R&R claims that MPAS's separate arguments as to the particularity of Plaintiffs' fraud allegations are the same thing as distinctiveness arguments, R&R at 36 n.20. This misreads MPAS's motion to dismiss, and MPAS has forfeited this argument.

The R&R tries to distinguish *King* by reasoning that the *King* RICO claim "did not seek to make an enterprise by combining an employee and his corporation." R&R at 40. But *King* involved precisely a claim of an employee conspiring with "his corporation[s]."[10] The R&R also appears to suggest that Plaintiffs' *King* theory of liability for Richins is not "plain" from the face of the complaint, R&R at 38 & n.21, but even if that is the case,[11] it is unclear why Plaintiffs should not be granted leave to amend to more clearly match the allegations in the SAC to *King*'s materially indistinguishable facts.

The other RICO claims against WRA and MPAS are premised on the distinction Plaintiffs draw between a corporate RICO defendant "person" and a RICO "enterprise" comprised of that corporation and its members. When RICO distinctiveness is challenged in this context, the test articulated by Tenth Circuit in *Brannon v. Boatmen's First Nat. Bank of Oklahoma,* 153 F.3d 1144 (10th Cir. 1998), requires a showing the RICO "person" and "enterprise" are "functionally separate." *Id.* at 1149. That requires "allegations indicat[ing] how the relationship between [the two entities] allowed the defendant . . . to perpetrate or conceal the alleged . . . fraud." *Id.* Put another way, "the defendant corporation must be shown to use the alleged enterprise as the instrument of

---

[10] One possible reading of the R&R's statement here is that it is based on the assumption that Richins can only be held liable if the "enterprise" he used to pursue the fraud is the "WRA by itself" and not the "WRA and Richins." That separate question was not at issue in *King*, and there is also substantial authority allowing (or in some cases demanding) that the RICO "person" be named as part of the enterprise. *See River City Markets v. Fleming Foods West*, 960 F. 2d 1458, 1461 (9th Cir. 1992). Further, Plaintiffs have not relied on Richins' individual RICO liability as a means of establishing RICO liability for WRA. Plaintiffs assert a separate theory of RICO liability for both Associations. *Id.* at 34-35.

[11] Plaintiffs disagree with this premise, but Plaintiffs are not even certain what exactly is not "plain" on the face of the complaint for the Richins RICO claim, as the R&R does not elaborate on this point. Further, no pleading error was raised by Richins in his motion to dismiss.

its criminality, and the plaintiff must plead that the alleged enterprise somehow made it easier to commit or conceal the fraud of which the plaintiff complains." *Id.* at 1148.

The Plaintiffs alleged just that and explained why. *See* Resp. at 35-36 (citing the SAC). But while recognizing the existence of the *Brannon* test, the R&R ignores Plaintiffs' allegations that attempt to meet the test and instead summarily states: "Plaintiffs do not allege facts of that nature here." R&R at 39 n.23. This summary statement neither engages in the *Brannon* argument raised by Plaintiffs, nor provides Plaintiffs with any direction as to what facts are lacking to allege sufficient distinctiveness between a trade association defendant and its (non-defendant) members.[12]

Dated: July 1, 2016

Respectfully submitted,
s/Alexander Hood
Alexander Hood
David Seligman
Dermot Lynch
Andrew Schmidt
Towards Justice
1535 High St., Suite 300
Denver, CO 80218
Email: alex@towardsjustice.org
Attorneys for the Plaintiffs:

---

[12] The R&R also references a number of cases in which RICO distinctiveness was not found because a corporation was determined to be insufficiently distinct from its wholly-owned subsidiary, *see, e.g., Dawson v. Goldman Sachs & Co.,* No. 13-CV-02030-CMA-KMT, 2014 WL 5465127, at *1 (D. Colo. Oct. 27, 2014), or a group of individual defendants were found (by a preponderance of the evidence after a jury trial) to be insufficiently distinct from an enterprise-in-fact comprised of only these same defendants, *Yellow Bus Lines v. Drivers, Chauffeurs & Helpers Local Union 639*, 883 F.2d 132, 141 (D.C. Cir. 1989), *rev'd en banc on other grounds*, 913 F.2d 948 (1990). To be clear, however, the ranches do not have the same relationship with the Associations as would a wholly owned subsidiary with its parent—and none of the member ranches are named as RICO defendants.

**Certificate of Service**

I hereby certify that on July 1, 2016, I served a true and correct copy of the

forgoing on the individuals below pursuant to F.R.C.P. 5.

<u>s/Alexander Hood</u>
Alexander Hood