**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Case No. 15-cv-01889-REB-CBS
RODOLFO LLACUA, *et al.*
    Plaintiffs,
v.
WESTERN RANGE ASSOCATION, *et al.*
    Defendants.

---

**MOTION TO AMEND**

---

In the event that this Court grants (in part) any of Defendants' motions to dismiss, Plaintiffs move for leave to amend the Second Amended Complaint ("SAC") with a Third Amended Complaint ("TAC"). Plaintiffs seek leave to file the TAC under Rule 15(a)(2) and attach here the TAC as an exhibit. Prior to filing, Plaintiffs conferred with Defendants pursuant to D.C.COLO.LCivR 7.1(A). All Defendants oppose this motion.

Plaintiffs are former shepherds who have worked on temporary agricultural visas (called H-2A visas), and, as relevant here, bring antitrust claims for wage-fixing against all Defendants and RICO fraud claims against two Association Defendants and one of the Association's executive directors, Defendant Dennis Richins. Currently pending before this Court are Defendants' Motions to Dismiss the SAC and a Report and Recommendation ("R&R") recommending that this Court dismiss the SAC's federal claims with prejudice. Plaintiffs have objected to the R&R, and Defendants have responded to the Objection in two separate filings: a "Main Response" joined by all Defendants and a "Ranch Response" filed by the Ranch Defendants.[1]

---

[1] Throughout this motion, Plaintiffs reference the SAC [# 73], their Response to Defendants' Motions to Dismiss ("MTD Resp.") [# 96], the Report and Recommendation ("R&R") [# 126], their Objection to the R&R ("Obj.") [# 131], the Main Response to the Objection ("Obj. Resp.") [# 135], and the Ranch Response to the Objection [# 136] ("Ranch Resp."). Plaintiffs refer to the individual defendant ranches as "Ranch Defendants" or "Ranches" and to the two ranching

1

If the Court denies the motions to dismiss and overrules the R&R, this Motion to Amend is moot. Plaintiffs prefer that the Court do exactly this. Their SAC sufficiently alleges: (1) that the Associations illegally set wages offered by competing member ranches and that the Ranch Defendants are consciously committed to this common scheme, and (2) that the Associations and Defendant Richins are associated with "enterprises" and participate in these enterprises' schemes to defraud shepherds out of reimbursements for travel and other expenses the shepherds must be paid.

Plaintiffs move to amend in the alternative because, since the filing of the SAC, even more evidence has come to light that both corroborates Plaintiffs' claims and refutes the ever-evolving series of implausible defenses raised by Defendants at various stages of this litigation. Below, Plaintiffs: (A) summarize the content of the TAC, and (B) explain why this content can be properly considered by this Court if the Court determines that there is some defect in the SAC.

**A.**     **New Content in the TAC**

Plaintiffs file this motion mainly as a reaction to the new arguments raised in the Main Response and the Ranch Response. The TAC's supplemental allegations, which principally appear in two additional sections of the complaint, *see* TAC, Parts IV & VII, address the following five matters.

> **1.**     **Contrary to the Unsupported Assertions in the Objection Response, DOL Sets a Minimum Wage and <u>Does Not</u> Fix Shepherd Wages, nor Does DOL Prohibit Offering a Wage Higher than the Minimum**

---

associations, Western Range Association (WRA) and Mountain Plains Agricultural Service (MPAS), as the "Associations" or "Association Defendants."

Although the R&R does not embrace this point, Defendants' Main Response relies on an erroneous interpretation of the H-2A regulations defining the *minimum* wage the Department of Labor (DOL) establishes for different classes of H-2A workers, referred to as the Adverse Effect Wage Rate (AEWR) in the regulations. Without citing any authority as support, Defendants now claim that the DOL uses the AEWR to set a floor *and* a ceiling for shepherd wages by suggesting that the H-2A rules "require[] employers to hire all qualified [shepherds] at a predetermined rate." Obj. Resp. at 7.

There is no question that Defendants' assertion is legally incorrect. After all, DOL regulations clearly establish that "[t]he AEWR is a wage floor, and its existence does not prevent the worker from seeking, or the employer from paying, a higher wage." TAC at ¶ 245 (quoting DOL regulations). However, for antitrust purposes, Defendants apparent hope is that this proffered interpretation of the law—whether erroneous or not—will allow them to claim they were all independently offering what they thought they legally had to offer. But Defendants' assertion contradicts what they are saying to everyone other than this Court. As the TAC makes clear, Defendants themselves have stated that the AEWR constitutes a "wage floor," *id.* at ¶ 243, and "is a mandated minimum wage" from which a ranch is able to upwardly depart as long as a higher wage is advertised to domestic workers, *id.* at ¶ 244.

### 2. Contrary to the Main Response's Unsupported and Novel Argument, There Is Ample Support for the Proposition that Shepherds Would Earn Higher Wages but for the Alleged Conspiracy

Defendants and the R&R both erroneously assume that the equilibrium wage for shepherds is below the DOL-set wage floor and that because this must be true, the antitrust claim fails. *See* R&R at 28; Obj. Resp. at 12. This factual conclusion is inconsistent with allegations in the SAC that in comparable markets for cowboys and

ranch hands—which are free from cartel influence—wages are significantly higher and, as one would expect, vary for each worker depending on his experience and skill. *See* MTD Resp. at 24 & n.8 (citing SAC at ¶ 88); Obj. at 16. The R&R does not address the SAC's contention about ranch hands earning higher wages, and Plaintiffs emphasized in the Objection that this contention undermines the R&R's assumption about shepherd wages being below the shepherd AEWR.

Defendants' new response to the ranch-hand wage contention—raised for the first time in the Main Response to the Objection—is to baldly suggest that the labor market for such workers is not comparable *See* Obj. Resp. at 12. This is the first time Defendants have challenged the ***plausibility*** of Plaintiffs' allegation that one group of workers who work with animals on a ranch would not earn the same as another group of workers that labor with the same animals. And Defendants make this challenge to ***plausibility*** with nothing more than vague references to "market forces" and "market economics." Main Obj. at 12.

This intensely factual dispute—about what shepherds could earn in the market for their labor—is decidedly a point that should be decided on summary judgment (at the earliest). *See, e.g.*, *Evergreen Partnering Group, Inc. v. Pactiv Corp.*, 720 F. 3d 33, 45 (1st Cir. 2013) (reversing a grant of a motion to dismiss an antitrust claim and holding that "[i]t is not for the court to decide, at the pleading stage, which inferences are more plausible than other competing inferences, since those questions are properly left to the factfinder") (citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 766 n.11 (1984)).

Regardless, in response to Defendants' new challenge as to the plausibility of comparing shepherds to ranch hands, Plaintiffs supplement their allegations about why the shepherds would be earning higher wages but for the Defendants' wage-fixing. Plaintiffs point to, among other things, the following additional evidence:

- **Experienced shepherds earn more money than they are offered, and they earn these higher wages even though ranchers (including Defendants) tell DOL that all shepherds earn the same wage.** Plaintiffs provide evidence in which Defendants acknowledge that it makes sense (and is a common practice) to pay higher wages to more experienced shepherds (including all Plaintiffs), notwithstanding the uniform wage *offered* to all shepherds. Plaintiffs also show that despite paying these higher wages to experienced shepherds, the Ranches and Associations still report to DOL that all shepherds are offered *and earn* wages at the DOL-set wage floor. These misrepresentations to DOL violate the H-2A regulations and are incidentally strong evidence of the wage-fixing conspiracy. Were it not for the desire to artificially depress wage offers while still retaining experienced shepherd, Ranches would not lie to DOL—they would offer the wages paid and would pay the wages offered. *See* TAC, Part IV.C-E.[2]

---

[2] Although not an argument embraced by the R&R, Defendants suggest throughout the Main Response that the fact that MPAS states that an employer may give some workers a bonus is dispositive of whether Defendants can be liable for wage-fixing. *See, e.g.*, Obj. Resp. at 5. As an initial matter, only MPAS makes a vague offer of a bonus in its job orders: WRA's orders do not contain such language. *Compare, e.g.*, 73-2 at 4 (MPAS job order noting that an employer "may offer a bonus"), *with* 73-4 at 5 (same page from WRA job order without that language). Further, Defendants cite no authority for the proposition that a price-fixer can evade antitrust liability merely by making a vague reference to possibly pay, at his discretion, an undisclosed extra amount above the fixed price. Finally, the record evidence included in the TAC, *see* TAC, Part IV.C-E, establishes that Ranches do not only offer bonuses but in fact increase shepherd base pay without informing DOL of the increases. See, e.g., TAC at ¶ 186-88 (noting that MPAS concedes that it is a practice of its members to pay a higher "base wage," notwithstanding the uniform offered wage at the DOL minimum).

- **Shepherds not subject to the pressures of the wage-fixing cartels make more money.** Plaintiffs provide additional evidence from shepherds and other range and animal-husbandry workers in North Dakota and Texas who are outside the grasp of the wage-fixing conspiracy and, as a result, earn at least around $10 an hour, as compared with the Plaintiffs, who all earned (at most) $2-$3 an hour for most of their shepherd work. *See* TAC, Part IV.F.

   3. **Response to the Potentially Evolving Law Regarding Whether Members Are Liable for Antitrust Violations Committed by Their Trade Associations**

In their response to Defendants' motions to dismiss, Plaintiffs observed that plausible allegations that Associations set wage offers for their members—allegations that are effectively undeniable in this case—are sufficient to withstand the Associations' motions to dismiss. Plaintiffs also recognized, however, that they would have to plausibly allege that the Ranches were "consciously committed" to this scheme in order to withstand the Ranches' motions to dismiss. *See* MTD Resp. at 9-10 (articulating the different standards applied for the Associations and Ranches); *id.* at 12-14 (applying the different standards).[3]

To establish that they had sufficiently alleged such conscious commitment, Plaintiffs relied on the reasoning from a recent D.C. Circuit case, *Osborn v. Visa Inc.*, 797 F.3d 1057, 1067 (D.C. Cir. 2015); *see also* MTD Resp. at 9-10 (relying on *Osborn*). In that case, the D.C. Circuit concluded that the plaintiffs' claims against banks that

---

[3] Defendants suggest that the Objection is "the first time" Plaintiffs have stated that the standard for the Associations and the Ranches is different and that the evidence in support of the Associations' antitrust violation is direct evidence. *See* Obj. Resp. at 2. The above-referenced portions of the Response to the Motions to Dismiss undermine this contention. Plaintiffs said the same thing in the Objection, *see* Obj. at 7 n.3, but Defendants ignore that assertion in the Main and Ranch Responses.

were members of bankcard associations survived a motion to dismiss because "the member banks used the bankcard associations to adopt and enforce a supracompetitive pricing regime for ATM access fees." *Id.* On June 28, 2016, long after Plaintiffs' filed their SAC, the Supreme Court granted the member banks' petition for *certiorari*. *Visa Inc. v. Osborn*, 136 S. Ct. 2543 (2016). The question presented by the banks' petition is "whether allegations that members of a business association agreed to adhere to the association's rules and possess governance rights in the association, without more, are sufficient to plead the element of conspiracy in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1." *Visa v. Osborn*, pet. for writ of cert., No. 15-962 (Jan. 27, 2016).

While Plaintiffs are confident that the allegations against the ranches in their SAC will survive a motion to dismiss no matter how the Court resolves *Osborn*, in light of both the *cert.* grant in *Osborn* and the Ranches' continued complaints that the SAC does not include sufficient specific facts about each Ranch's involvement in the wage-fixing conspiracy, *see, e.g.*, Main Resp. at 2-3, the TAC includes even more particularized allegations regarding the Ranches' conscious commitment. Among other things, the TAC alleges: (1) the Ranches in particular have had extensive control over the Associations; (2) the Ranches, unlike even the banks in *Osborn*, could have maintained their memberships in the Associations while providing individualized wage offers; (3) the Ranches purposefully delegated the setting of wage offers to the Associations, with the knowledge that the Association set such wage offers at the minimum allowable level; (4) many of the Ranches have knowingly violated H-2A regulations, risking serious monetary penalties, by paying wages above their offers

7

while simultaneously benefiting from the fixing of wage offers; and (5) some of the Ranches' owners are on the boards of the Associations and are intimately familiar with the operations of the associations, including the Associations' wage-setting policies. *See* TAC, Part IV.H (summarizing this evidence for each Ranch Defendant and cross-referencing to other portions of the TAC as further support).

### 4. WRA and MPAS Set Shepherd Wages On Behalf of the Association Members

Contrary to their position in prior pleadings, Defendants now appear to concede that the Association Defendants submit H-2A applications for their members and that in these association-prepared documents, the Associations uniformly offer wages at the DOL-set minimum wage. Obj. Resp. at 4 ("Both Associations submit H-2A applications to USDOL for their members. The wages offered are the AWER, or higher state minimum wage, plus a bonus."). Plaintiffs have explained why this concession is all that is needed to establish antitrust liability for the Associations. *See, e.g.*, Obj. at 7-8.

In case Defendants attempt to disclaim this concession, however, the TAC includes newly-acquired evidence that shows that the associations—not the ranches independently—uniformly set shepherd wages for their members, principally: (1) pre-employment contracts for MPAS shepherds in Peru establishing that the wage offer is set by MPAS in-country without input from the Ranches; (2) form pre-employment contracts for WRA shepherds establishing that WRA forces shepherds to swear under oath to work for the shepherd minimum wage in any state the shepherd is employed before the shepherd even knows in which state he will work and what that state's minimum wage is; and (3) a salary schedule contained in a WRA member handbook for ranches that sets shepherd wages at the DOL wage floor. *See* TAC, Part IV.A.

Further, based on newly-acquired public records from Oregon, Plaintiffs also present further allegations regarding Defendant WRA's centralized decision-making: as detailed in those allegations, it is decidedly Defendant WRA that dictates what offered wage is placed on the job offers for shepherds in that state and what different (illegally low) rate should be paid by Ranch Defendants. *See* TAC, Part IV.B.

### 5. Supplemental RICO Allegations

As noted in Plaintiffs' Objection, the theory of RICO liability for Defendant Richins parallels the Supreme Court's holding in *Cedric Kushner Promotions v. King,* 533 U.S. 158 (2001); *see also* Obj. at 18-19. The R&R, however, appears to suggest that Plaintiffs' *King* theory of liability for Richins is not "plain" from the face of the complaint. R&R at 38 & n.21. And Defendants appear to continue to be confused about the nature of Plaintiffs' allegations against Defendant Richins: they cite to an inapposite authority, *George v. Urban Settlement Servs.*, No. 13-CV-01819, 2014 WL 4854576, at *9 (D. Colo. Sept. 30, 2014), where the alleged RICO "person" and the RICO "enterprise" were both the ***same*** corporation, creating the RICO distinctiveness issue addressed in the R&R. As Plaintiffs emphasized in the Objection, however, the Richins RICO claim is against ***Richins,*** who is the RICO "person," for his work with WRA, which is the RICO "enterprise." *See* Obj. Resp. at 14. *King* teaches that Richins and WRA are distinct: Defendants' distinctiveness argument simply does not work for Richins. Regardless, to the extent that Defendants' confusion on this point arises from unclear pleading, Plaintiffs address that issue by dividing the counts against Richins and the WRA into two separate counts. *See* TAC at ¶¶ 451-467.

Further, based in part on a review of Defendants' limited discovery responses, Plaintiffs have found evidence establishing Defendants' at-times brazen disregard for the H-2A rules. First, Plaintiffs have unearthed the Associations' prior detailed comments—prepared in part by one of the largest law firms in the world, with a sophisticated regulatory practice—on the H-2A rule that requires H-2A employers to reimburse H-2A worker travel expenses. Notwithstanding such comments, the DOL made it perfectly clear in the H-2A rules that the costs of the half-dozen or so trips that the Associations force the shepherds to make must be paid for by H-2A employers. This evidence makes it less likely that the Associations' failure to pay these reimbursements is not the result of some sort of technical oversight. Second, Plaintiffs have uncovered in discovery a WRA communication made **four months after this case began,** in which WRA admits that it charges shepherds for travel and administrative expenses and will continue to do so into the future. *See* TAC, Part VII.A.

Finally, Plaintiffs have continued their investigation into the nature of the illegal deductions paid by shepherds. They provide a more detailed and itemized list of the deductions incurred and their estimated cost, *see* TAC, Part VII.B, and further information on the nature of the Association Defendants' legal obligations to the H-2A workers, *see* TAC, Part VII.C-D.

**B.     Amendment in the Alternative Is Proper**

Under Rule 15(a), this Court should vindicate the "liberal" policy in favor of amending complaints and grant Plaintiffs leave to amend if the Court grants any part of Defendants' motions to dismiss. *See* Charles Alan Wright, *et al.*, 6 Fed. Prac. & Proc. Civ. § 1487 [hereinafter "Wright & Miller"] (describing this as a "liberal" policy).

First, this motion is timely. "[T]he courts have not imposed any arbitrary timing restrictions on requests for leave to amend and permission has been granted under Rule 15(a) at various stages of the litigation," including after discovery has ended; at the beginning, during, and at the close of trial; after a judgment has been entered; and even on remand following an appeal. *See* Wright & Miller, § 1488 (collecting authorities; footnotes omitted). Accordingly, amendment is proper because this case is in its very early stages: there is no scheduling order setting any deadlines for filing amendments to any pleadings or for discovery—indeed, the parties have hardly conducted any discovery in the first place. Further, with limited exception,[4] Plaintiffs have not advanced any new theories of liability—as discussed above, they have merely clarified or further substantiated their existing theories largely in response to Defendants' recent arguments about pleading deficiencies.

Second, allowing this amendment is consistent with concerns for fairness and judicial economy. As this Court recently noted, the "foundational inquiry" in resolving any motion to amend under Rule 15(a)(2) is whether there has been "undue delay" in moving to amend. *Alarid v. Biomet, Inc.*, No. 14-CV-02667-REB-NYW, 2016 WL 309053, at *1 (D. Colo. Jan. 26, 2016) (Blackburn, J.) (internal quotation marks omitted). Further, in the undue delay analysis, the burden rests with Defendants to establish, notwithstanding the liberal policy in favor of amendment, that delay has been undue. *See, e.g.*, *Pegasus Int'l, Inc. v. Crescent Mfg. Co.*, 2007 WL 1030457, at *5

---

[4] Plaintiffs did add an employment contract claim that parallels the claim brought under the Nevada Constitution. *See* TAC at ¶ 497-507. They did so after becoming aware that a case currently pending before the Nevada Supreme Court may affect the statute of limitations for the Nevada minimum wage claim. *See Williams v. Dist. Ct. (Claim Jumper Acquisition Co., LLC)*, No. 66629 (Nev. Sup. Court argued Oct. 6, 2015).

11

(E.D. Pa. Apr. 2, 2007)  (holding that it is the defendant's burden to "establish that it would be 'unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered' had the allegations in the amended complaint been timely made") (quoting *Arthur v. Maersk*, 434 F.3d 196, 206 (3d Cir. 2006)).

Relatedly, if delay is an issue, courts routinely find delay justified when a party amends pleadings in reaction to the evolving circumstances that might arise during the course of litigation. For example, delay is justified where additional investigation (including in discovery) by a plaintiff was necessary to support the plausibility of further allegations.[5] And delay is justified when controlling precedent from a higher court may change the nature of what is sufficient to plausibly plead a claim.[6]

Although they might try, Defendants cannot meet their burden of establishing undue delay here. To the contrary, Plaintiffs' amendment is a prompt reaction to the way this litigation has evolved. This case started with dozens of moving-target and evolving defenses raised by Defendants' six motions to dismiss and related pleadings. It has now crystalized into a case about the often novel arguments that Defendants have focused on in the Main and Ranch Response. Plaintiffs could not have predicted the true importance of addressing any of the five items outlined immediately above until

---

[5] *See, e.g.*, *Synthes, Inc. v. Marotta*, 281 F.R.D. 217, 226 (E.D. Pa. 2012) (holding that plaintiffs were justified in delay in amending a complaint because, even though they knew of the possibility of additional allegations, they did not have sufficient support for adding such claims absent beign able to test their theories in discovery); *Tillotson Corp. v. Shijiazhaung Hongray Plastic Prods.*, 244 F.R.D. 683, 691-92 (N.D. Ga. 2007) (granting leave to file a third amended complaint against additional defendants after further investigations gave rise to their plausible liability, even though such liability could have been plausibly established months prior).

[6] *See, e.g.*, *Romero v. Allstate Ins. Co.*, 2010 WL 2996963, at *11 (E.D. Pa. July 28, 2010); *see also Hoyle v. Dimond*, 612 F. Supp. 2d 225, 233-34 (W.D.N.Y. 2009) (suggesting that it would be appropriate to move to amend in response to a change in controlling law from a decision by the U.S. Supreme Court).

Defendants presented these issues in the Main and Ranch Response or until the Supreme Court agreed to grant *certiorari* in one of the principal cases Plaintiffs relied upon for their claims against the Ranches.

Further, given the evolving nature of this litigation, Plaintiffs have only now been able to investigate fully allegations that require a working knowledge of and contact with mountainous locales in rural Spanish-speaking Peru—investigations that have been prompted in part in reaction to arguments newly raised by Defendants. In short, Plaintiffs acted as quickly as they could, given this case's procedural history and the types of claims presented.

With reference to the five items that make up the principal content of the TAC, Plaintiffs' motion to amend is justified because of the following new arguments and legal theories that have emerged as central to this litigation:

(1) **DOL Setting Wages:** No motion to dismiss advanced the theory that Plaintiffs' antitrust claim failed because DOL set shepherd wages at a "predetermined rate." Obj. Resp. at 7. In fact, the R&R does not rely on this theory as a basis for dismissal. If this argument is not forfeited, Plaintiffs must be given a chance to respond with record evidence to an argument that Defendants decided to make a centerpiece of the Main Response. Further, the principal apparent means of placing this record evidence before this Court is in a motion to amend the complaint. *See, e.g.*, R&R at 26 n.13 (refusing to consider record evidence attached to Plaintiffs' Response to the Motions to Dismiss)

(2) **It Just Must Be True that Shepherds Would Earn at or Below the AEWR in Any Market for Shepherd Labor:** While one Defendant presented a similarly flawed

"equilibrium wage" argument in the motion to dismiss, see [#87 at 11-12], the Main Response for the first time challenged the plausibility of Plaintiffs' allegation that shepherds would earn wages close to what ranch hands earn, absent the price-fixing—prior to this filing, Defendants' strategy with this allegation was to ignore it. Further, it was only with Defendants' motions to dismiss that Plaintiffs were even alerted to the potential extent of Defendants' deviations from the wages offered with the wages paid. And Plaintiffs needed time to conduct investigations—including substantial review of thousands of pages of filings by the ranching industry over much of the last decade—to have sufficient allegations to present in a complaint about the scope of Defendants' false representations to DOL.

(3) **Association Member Liability**: Plaintiffs could not have predicted that one of the principal authorities they had relied upon to establish liability for the Ranch Defendants would be reviewed by the Supreme Court. They also provide additional evidence of conscious commitment based on recent discovery and investigations they have conducted as this case has developed.

(4) **Wage-Setting by the Associations**: Plaintiffs are still unclear on whether Defendants concede that it is the Association Defendants that set the wage and provide this evidence to amplify what they see as an important concession made by Defendants. An original defense by Defendant WRA was that the ranches were engaging in some form of "parallel conduct," see, e.g., [# 87 at 14], which would presumably mean that all the ranches were individually arriving at the decision to offer the minimum wage. See also [#107 at 4 (WRA seemingly suggesting that each ranch "independently" arrived at the minimum wage offer)]. But that parallel conduct

defense cannot apply if it is the Association itself that is setting the wages and the ranches have ceded this decision over wages to the association. As discussed above, this new position—that the Associations set the wages—appears to be the one that Defendants adopt in the Objection Response. Regardless, based on further investigation obtained in discovery, Plaintiffs can further support this concession with allegations substantiated through discovery.

(5) **RICO Claim for Richins**: Plaintiffs could not have predicted that the R&R would misperceive the nature of this claim against Richins, nor could Plaintiffs have anticipated Defendants' continued confusion as to the point, despite the explanation provided in the Objection. Plaintiffs' other supplemental allegations for RICO are based on further investigations about the nature and cost of the illegal deductions, including investigations in the country of Peru.

\* \* \*

For the foregoing reasons, Plaintiffs respectfully request that the Court either: (1) deny Defendants' Motions to Dismiss, Overrule the R&R, and deny this motion as moot; or (2) grant Plaintiffs motion for leave to amend.

Dated: August 18, 2016        Respectfully Submitted,

s/Alexander Hood
Alexander Hood
Towards Justice
1535 High Street, Suite 300
Denver, CO 80218
Tel.: 720-239-2606
Email: alex@towardsjustice.org

**Certificate of Service**

I hereby certify that on August 18, 2016, I served a true and correct copy of the forgoing to all other counsel in this case pursuant to F.R.C.P. 5 by filing this motion in the Court's electronic filing management system.

<u>s/ Alexander Hood</u>
Alexander Hood