**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Case 15-cv-01889-REB-CBS

RODOLFO LLACUA;
ESLIPER HUAMAN;
LEOVEGILDO VILCHEZ GUERRA;
LIBER VILCHEZ GUERRA;
RAFAEL DE LA CRUZ;
and those similarly situated,

       Plaintiffs,

v.

WESTERN RANGE ASSOCIATION;
MOUNTAIN PLAINS AGRICULTURAL SERVICE;
MARTIN AUZA SHEEP CORPORATION;
NOTTINGHAM LAND AND LIVESTOCK, LLLP;
TWO BAR SHEEP CO LLC;
CUNNINGHAM SHEEP COMPANY; and
DENNIS RICHINS DBA DENNIS RICHINS LIVESTOCK;[1]

       Defendants.

---

**THIRD AMENDED COMPLAINT**

---

    Plaintiffs file this Third Amended Complaint pursuant to Federal Rule of Civil

Procedure 15(a)(2).

---

[1] Three Defendants have been dismissed from this case pursuant to a tolling agreement between the Parties. See [# 117].

**Table of Contents**

Introductory Statement ...................................................... 4
    A.    Antitrust Violations ................................................. 4
    B.    Illegal Deductions and Violation of Nevada Law .............................. 8
Jurisdiction and Venue .................................................... 8
Parties ................................................................... 9
Statement of Facts ....................................................... 12
  I.   The American Sheepherding Industry and Its Shepherds ................................... 12
  II.     Regulatory Scheme Governing Importation of Foreign Shepherd Labor.......... 12
  III.    Allegations Regarding Defendants' Wage Fixing ............................ 16
    A.   Association Defendants, Rancher Defendants, and their Collusive Relationships....................................................... 16
    B.   Concerted Conduct to Fix Wages Offered to Domestic Shepherds ............. 18
    C.   Concerted Conduct to Fix Wages Offered to Foreign Shepherds................ 24
    D.   Effects of the Anti-Competitive Conspiracy on DOL's Wage Determinations 27
    E.   The Resulting Restraint of Trade and Antitrust Injuries.............................. 28
  IV.    Supplemental Antitrust Allegations................................... 29
    A.   WRA and MPAS Set Shepherd Wages ....................................... 29
    B.   Additional Evidence that WRA Sets Shepherd Wages in Oregon................ 34
    C.   Defendants Acknowledge It Is Irrational To Pay The Same Wage To Experienced and Inexperienced Shepherds, Even Though They Represent To DOL that All Shepherds Make the Same Wage Regardless of Experience................... 37
    D.   Revealing Their Conscious Commitment to the Wage-Fixing Scheme, Ranch Defendants Illegally Pay Shepherds Higher Wages Than They Offer to Domestic Workers....................................................... 40
    E.   Plaintiffs Have Personal Experience with the Irrationality of Defendants' Wage-Fixing Regime.............................................. 46
    F.   Other Workers Performing Almost the Same Work As H-2A Shepherds Are Paid Over Three Times As Much ................................................. 48
    G.   DOL Only Sets the Minimum Wage and All Ranchers Must Do To Legally Offer Shepherds a Higher Wage Is Report Doing So to DOL ................................ 50
    H.   There Are Numerous Other Ways that Each Individual Defendant Is Committed to the Wage Fixing Scheme.............................................. 51
    I.   Defendants' Wage-Fixing Conduct Has Persisted Through the Year-Long Life of this Lawsuit .................................................. 56
  V.   Allegations Regarding Illegal Deductions....................................... 57
    A.   The Enterprises........................................................ 57
    B.   Patterns of Racketeering ................................................. 59
    C.   These Patterns of Racketeering and Fraudulent Acts Injured Plaintiffs ........ 63
  VI.    Allegations Regarding the Failure to Pay Nevada Minimum Wage ................. 64
  VII.    Supplemental Illegal Deduction Allegations..................................... 65
    A.   The H-2A Travel Expense Payment Rule at Issue Here Is One Association Defendants Opposed—and Now Try To Ignore .......................................... 65
    B.   Nature of the Illegal Deductions .................................... 68

C.      Association Defendants Entered Into Contractual and Employment Relationships with Plaintiffs and All H-2A Shepherds that Association Defendants Employed ....................................................................................... 73

D.      Details About These Contractual Relationships ........................................... 75

VIII.   Class Definitions ........................................................................................... 77

A.      The Price Fixing Classes ............................................................................. 77

B.      The WRA Illegal Deduction Class ................................................................ 79

C.      The MPAS Illegal Deduction Class .............................................................. 81

D.      The Nevada Minimum Wage Class ............................................................... 83

Causes of Action ........................................................................................................ 85

## INTRODUCTORY STATEMENT

1.      The market that supplies labor for sheep ranchers is regulated by a complex scheme of federal and state laws that, among other things, allows for the importation of temporary foreign workers and sets wage floors for shepherds.

2.      This case principally concerns two types of violations of the law that have had the effect of illegally withholding millions of dollars from the thousands of mainly Peruvian shepherds who work in the American West on temporary agricultural visas, commonly called H-2A visas.

3.      Sheep ranchers perpetuate these violations through, with the aid of, and in conjunction with membership associations known as the Western Range Association ("WRA") and the Mountain Plains Agricultural Service ("MPAS"). The industry is dominated by ranches that are members of these associations.

### A.      Antitrust Violations

4.      Ranchers, like all employers, have a legal obligation to compete for shepherd labor in an open market. Instead, they use these membership organizations to fix offered wages across the industry—for both domestic **and** foreign shepherds—at precisely the wage floor set by the United States Department of Labor (the "DOL") for foreign shepherds working in the United States on temporary, H-2A visas.

5.      In the process of assisting in the hiring of shepherds for their member ranches, the Association Defendants uniformly fix all shepherd wages at exactly the minimum wages the associations believe are set for shepherds by the USDOL for each state.

6.      The Rancher Defendants consciously commit to this wage setting scheme by choosing to delegate the wage setting to the associations with the knowledge that the associations uniformly fix the wages for shepherds.

7.      The concerted conduct that results in the fixing of wages is starkly illustrated by a number of actions taken by Defendants, including the following:

     i.      The WRA and MPAS prepare job announcements and job offers for all of their rancher members, including Rancher Defendants, that set the wages offered all shepherds (both new and experienced) at precisely the DOL-set wage floor, without any acknowledgement of even the *possibility* that appropriate shepherd wages might differ from ranch to ranch or shepherd to shepherd.

     ii.      This lack of differentiation in wages *offered* shepherds is especially unlikely to be the result of a competitive market because, as Defendants themselves admit, shepherding is a *skilled* profession, where a shepherd's skill and his value to his employer only increases with experience on the job.

     iii.      In fact, some Rancher Defendants admit that they actually *pay* some of their shepherds (presumably their most experienced and skillful shepherds) above the *fixed, offered* wage. In other words, even though Defendants all *represent* that they are paying wages at the floor established by DOL, they are actually paying different wages, in accord with the different skill levels of their shepherds. These

misrepresentations to DOL violate H-2A rules and potentially trigger severe fines and even debarment from the H-2A program. But Ranch Defendants make these irrational misrepresentations notwithstanding these risks, because of their loyalty to the price fixing scheme that fixes offered wages at the DOL wage floor.

    iv.    On at least one occasion, the WRA and MPAS have explicitly instructed their members to adjust the wages they pay their shepherds to a precise wage-floor that was in fact below the minimum wage authorized under Oregon law. Oregon ranches in turn followed this direction from the Associations.

8.    Because of the ranches' collusion in setting wages offered shepherds at levels that are strikingly low even relative to the most low-wage employment opportunities in the rest of the American economy, few domestic workers desire to work as shepherds.

9.    This artificially created shortage of domestic workers allows the sheep ranching industry to rely on the importation of foreign H-2A shepherds who are often exploited because of their vulnerable immigration status.[2]

---

[2] This exploitation is well documented. *See, e.g.*, Southern Poverty Law Center, Close to Slavery: Guestworker Programs in the United States (2013), *available at* https://www.splcenter.org/sites/default/files/d6_legacy_files/downloads/publication/SPLC-Close-to-Slavery-2013.pdf; Colorado Legal Services, *et al.*, *Overworked and Underpaid: H-2A Herders in Colorado* (2009) (documenting some of the abuses), *available at* http://users.frii.com/cls/Overworked%20and%20Underpaid.pdf; *Pines Vivas Moreno, et al., v. James Craig Bair Ranch, et al.*, No. 16-cv-752-CBS (D. Colo. filed Apr. 30, 2016) (alleging that WRA and WRA members exploited H-2A shepherds and controlled them through physicial and emotional abuse and threats).

10.     The industry is not shy in viewing shepherds less as employees with legal rights and more as indentured servants who should be subject to even criminal sanction if they refuse to work. One sheep rancher and MPAS member recently introduced a state bill that would have made it a crime for a shepherd to leave his flock. Meanwhile, the WRA has labeled some shepherds as "runaways" that need to be rounded up and deported. As explained by a WRA President, "[a] significant effort was made jointly between Western Range and Mountain Plains last summer to locate and deport shepherds that had jumped their contract as well as to penalize those that assisted contract breakers in finding employment. While the effort succeeded in locating runaways, there was no assistance from Immigration officials or the Department of Labor to penalize, deport, or even make contact with known jumpers." The use of criminal sanctions to enforce civil work contracts and the industry's use of the terms "runaways" or "jumpers" to describe non-compliant workers echoes some of the darkest periods of our nation's labor past and is indicative of the problems engrained in the H-2A program in general and the importation of H-2A shepherds specifically.

11.     By setting offered wages below the market rate for shepherds—and even below the wage actually paid shepherds—Defendants bypass the domestic shepherd market and access a vulnerable labor market of foreign shepherds who cannot move between ranches without being deemed runaways, and thus lose the ability that most workers have to combat wage fixing by leaving their industry, profession, or employer in search of market wages.

**B.   Illegal Deductions and Violation of Nevada Law**

12.     The Association Defendants have also deprived shepherds of their lawfully

earned wages by making numerous illegal deductions from shepherd pay that are

specifically outlawed by the rules governing the H-2A visa program. Even though they

make these illegal deductions, Association Defendants fraudulently and falsely

represent to the Department of Labor that they are complying with these rules and not

making any such deductions.

13.     This fraud has continued throughout the life of this lawsuit. As of January 8,

2016, one of the Association Defendants has even openly conceded it forces shepherds

to incur these costs and suggested that it will continue to do so into the future.

14.     Finally, in at least one state—Nevada—the MPAS illegally refuses to pay Nevada

minimum wage to shepherds who fall within state minimum wage protections.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over all claims pursuant to 28 U.S.C. § 1331. This

Court has supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C.

§ 1367.

16.     Venue is proper pursuant to 28 U.S.C. § 1391, 18 U.S.C. § 1965(a), 15 U.S.C.

§§ 15(b) & 22. Defendants all transact business in Colorado and a substantial part of

the events or omissions giving rise to the claims against each Defendant occurred in

Colorado.

17.     The Court has *in personam* jurisdiction over Defendants because each, among

other things: (a) transacted business in the United States, including in this District; (b)

paid Plaintiffs and members of the Classes (defined herein) artificially fixed and suppressed wages throughout the United States, including in this District; or (c) had substantial aggregate contacts with the United States as a whole, including in this District.

## **PARTIES**

18.     Plaintiff Rodolfo Llacua is a former shepherd and WRA and MPAS employee who resides in Colorado. He is originally from Peru and worked as an H-2A shepherd for more than nine years.

19.     Plaintiff Esliper Huaman is a former shepherd and WRA employee who worked in Utah. He is originally from Peru and worked as an H-2A shepherd for around six years.

20.     Plaintiff Leovegildo Vilchez Guerra is a former shepherd and WRA employee who worked in Colorado. He is originally from Peru and worked as an H-2A shepherd for more than four years.

21.     Plaintiff Liber Vilchez Guerra is a former shepherd and WRA employee who worked in Colorado. He is originally from Peru and worked as an H-2A shepherd for more than three years.

22.     Plaintiff Rafael De La Cruz is a former shepherd and MPAS employee who worked in Nevada. He is originally from Peru and worked as an H-2A shepherd for around six years.

23.     Plaintiffs each entered into multiple H-2A employment contracts.  Each of the H-2A employment contracts entered into by each of the Plaintiffs included a wage term equal to the DOL-set wage floor for the state in which each Plaintiff worked.

24.     Defendant Western Range Association is a California non-profit corporation with its principal place of business at 161 Fifth Avenue South, Suite 100, Twin Falls, Idaho 83301. The WRA transacts business in Colorado by, among other things, recruiting shepherds for Colorado ranches.

25.     Defendant Mountain Plains Agricultural Service is a Wyoming non-profit corporation with its principal place of business at 811 N Glenn Rd, Casper, WY 82601. The MPAS transacts business in Colorado by, among other things, recruiting shepherds for Colorado sheep ranches.

26.     Together the WRA and MPAS shall be referred to as "Association Defendants."

27.     Defendant Martin Auza Sheep Corporation is an Arizona Corporation with its principal place of business in Yuma, Arizona. Defendant Martin Auza Sheep Corporation also does business in Brawley, California. Defendant Martin Auza Sheep Corporation is or was a member of the WRA and the MPAS.

28.     Defendant Nottingham Land and Livestock, LLLP, is a Colorado Limited Liability Limited Partnership with its principal place of business in Craig, Colorado. Defendant Nottingham Land and Livestock, LLLP, is or was a member of the WRA.

29.     Defendant Two Bar Sheep Co LLC ("Two Bar") is a Colorado Limited Liability Corporation with its principal place of business in Craig, Colorado. Defendant Two Bar is or was a member of the WRA and the MPAS.

30.     Defendant Cunningham Sheep Company is an Oregon Domestic Business Corporation with its principal place of business in Pendleton, Oregon. Defendant Cunningham Sheep Company is or was a member of the WRA.

31.     Defendant Dennis Richins DBA Dennis Richins Livestock is an individual who is domiciled in Utah. Defendant Richins is or was a member of the WRA.

32.      During at least some of the period from 2001 until 2014, Defendant Richins was the Executive Director of the WRA. During this period, he oversaw substantially all of the WRA's operations, including its submission of job orders and H-2A Applications (explained below) on behalf of ranches based in Colorado. In fact, Defendant Richins signed off on almost all—if not all—H-2A job orders and H-2A Certification Applications during his time as Executive Director, including a substantial number of H-2A Certification Applications and job orders for Colorado-based ranches.

33.     Together, Martin Auza Sheep Corporation, Two Bar Sheep Co., Nottingham Land and Livestock, LLLP, Cunningham Sheep Company, and Dennis Richins DBA Dennis Richins Livestock, shall be referred to as "Rancher Defendants."

34.     Each of the Rancher Defendants was a member of the WRA, the MPAS, or both at some point within 4 years prior to the filing of this action.

35.     Upon information and belief, all of the Rancher Defendants are either directly, or through their states' growers associations, members of the American Sheep Industry Association (ASI). The ASI is located in Colorado.

36.     Among other things, ASI members benefit from the ASI's news and educational materials, trainings and conferences, and public policy advocacy.

37.     All of the Rancher Defendants produce sheep on the open range.

38.     According to the National Research Council's Committee on the Economic Development and Current Status of the Sheep Industry in the United States, most

sheep raised on the open range are moved to feedlots for finishing, and all of the major sheep feedlots in the United States are located in Colorado.

39.     Upon information and belief, the Rancher Defendants use Colorado feedlots to finish their sheep.

## STATEMENT OF FACTS

**I.     The American Sheepherding Industry and Its Shepherds**

40.     Sheep ranches in the western United States raise sheep to produce meat and wool, which generate roughly $275 million per year for the industry.

41.     The industry depends upon thousands of shepherds, employed by ranches, to tend to the sheep herds.

42.     As the WRA and the MPAS describe, the shepherds tend herds of 1,000 sheep or more, "often in rugged high altitude terrain or dry desert conditions, hauling water for the animals, herding them to grazing areas and making sure they have enough to eat, keeping them from going astray, and protecting them from the constant threat of natural predators like coyotes, mountain lions, and wolves, harmful or poisonous plants, and man-made dangers like highways and domesticated dogs. During lambing, calving or kidding season, the shepherds assist the animals in the birthing process, and at all times, the shepherds provide for the health and medical needs of the herd."

**II.     Regulatory Scheme Governing Importation of Foreign Shepherd Labor**

43.     The H-2A Visa Program is an agricultural guest worker visa program administered by the DOL that allows for the issuance of work visas to foreign workers to fill positions that employers cannot fill through the domestic labor market.

44.     Pursuant to the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*,
before issuing H-2A visas, the DOL is charged with ensuring that there is in fact a
shortage of American workers willing and able to fill the positions that employers seek to
fill with foreign H-2A workers.

45.     Specifically, before permitting the importation of foreign workers under H-2A
visas, the INA requires the DOL to certify that:

> (A) there are not sufficient workers who are able, willing, and
> qualified, and who will be available at the time and place
> needed, to perform the labor or services involved in the
> petition, and
> (B) the employment of the alien in such labor or services will
> not adversely affect the wages and working conditions of
> workers in the United States similarly employed.

46.     To implement its statutory duty under the INA, the DOL has promulgated
regulations. *See* 20 C.F.R. §§ 655.100 *et seq.*

47.     Under the regulations, before a foreign worker can be imported under an H-2A
visa, an employer must first offer the job to U.S. workers through State Workforce
Agencies. *Id.* § 655.121. Because H-2A visas are only issued for positions that cannot
be filled by the domestic labor market, DOL regulations prescribe that employers offer
domestic workers "no less than the same benefits, wages, and working conditions that
the employer is offering, intends to offer, or will provide to H-2A workers." 20 C.F.R. §
655.122(a).

48.     Additionally, ranchers or membership associations acting on their behalf must
offer, among other things, the "worker at least the AEWR [Adverse Effect Wage Rate],
the prevailing hourly wage rate, the prevailing piece rate, the agreed-upon collective

bargaining rate, or the Federal or State minimum wage rate, in effect at the time work is performed, whichever is highest, for every hour or portion thereof worked during a pay period."  20 C.F.R. § 655.122(l).

49.     These job offers to domestic workers are called "job orders."

50.     Only if American workers do not accept a position offered through a job order can the employer submit an Application for Temporary Employment Certification (an "H-2A Application") to the DOL for certification.

51.     The DOL can promulgate exceptions to the H-2A Visa Program, known as "special procedures," for particular agricultural industries.

52.     The DOL has implemented special procedures in the sheepherding industry. The DOL implemented one set of special procedures in 2011 that were in effect until November 16, 2015. *See* 76 Fed. Reg. 47,256 (issued Aug. 4, 2011).

53.     Prior to November 16, 2015, the wage floor established by DOL was as follows (Plaintiffs will confirm these figures through discovery):[3]

| State(s) | Time Period | Wage Floor ($/Month) |
|---|---|---|
| Arizona, Colorado, Idaho, Montana, New Mexico, North Dakota, Utah, Washington, and Wyoming | September 1, 2011-November 16, 2015 | $750 |
| Texas and Oklahoma | September 1, 2011-January 8, 2013 | $1300 |

_____

[3] For a period between January 8, 2013 until March 2013, Defendant WRA and other ranches challenged an increase in the shepherd minimum wage. *See, e.g., Little v. Solis,* 297 F.R.D. 474 (D. Nev. 2014) (recounting this litigation). It is unclear what the established wage floor was for some of this period and what wages WRA and MPAS instructed their members to pay.

| | January 8, 2013-November 16, 2015 | $750 |
|---|---|---|
| Nevada | September 1, 2011-November 16, 2015 | $800[4] |
| California | September 1, 2011-July 1, 2014 | $1,422.55 |
| | July 1, 2014-December 31, 2015 | $1600.34 |
| | January 1, 2016-Present | $1777.98 |
| Oregon | September 1, 2011-January 1, 2015 | $1,227 |
| | January 1, 2015-Present | $1600.33 ($1326.46)[5] |

54.     As of November 16, 2015, the wage floor for most H-2A shepherds was raised by the Department of Labor to $1206.31 per month. *See Labor Certification Process for the Temporary Employment of Aliens in Agriculture in the United States: Adverse Effect Wage Rate for Range Occupations Through 2016*, 80 Fed. Reg. 70,840, 70840 (the "2015 Special Procedures"). This wage floor can be higher in individual states, such as California, Nevada, and Oregon, based on higher state-level minimum-wage laws.

---

[4] Although DOL has set a monthly wage floor of $800 per month, as is described below, Nevada state law dictates that all workers receive an hourly minimum wage for every hour worked.

[5] As is detailed below, Defendants represent to the Department of Labor that it is paying Oregon shepherds $1600.33 per month, but—at least Defendant WRA—has instructed members to actually pay $1326.46—that is to say, a salary that falls **below** the wage floor set by DOL.

55.     Although the special procedures depart from and expand upon the requirements set out in the regulations, they are intended to effectuate the same basic principles and policies: shepherd jobs paid at or above a DOL-set wage floor must first be offered to American workers through "job orders" and only after American workers do not take the offered jobs—and after application to, and certification by, the DOL—can ranchers import foreign shepherds through H-2A visas.

56.     Although "[t]he employer's job offer must offer to U.S. workers no less than the same benefits, wages, and working conditions that the employer is offering, intends to offer, or will provide to H-2A workers," 20 C.F.R. § 655.122(a), there is no statute, regulation, or special procedure preventing ranchers from offering higher wages to the domestic workers in the job orders than they do to H-2A workers in the H-2A Applications.

57.     Furthermore, although the DOL sets wage floors for foreign H-2A shepherds, there is no statute, regulation, or special procedure preventing ranchers from offering higher wages to some or all foreign shepherds working in the United States on H-2A visas.

III.     **Allegations Regarding Defendants' Wage Fixing**

   A. **Association Defendants, Rancher Defendants, and their Collusive Relationships**

58.     The sheep ranching industry is highly concentrated under Association Defendants. From October 1, 2013, to October 1, 2014, the WRA hired roughly 55% of all open range shepherds hired in the United States. From October 1, 2013, to October

1, 2014, the MPAS hired roughly 36% of all open range shepherds hired in the United States.

59.     Association Defendants play a considerable role in the recruitment, hiring, and oversight of H-2A shepherds, and as a consequence, WRA and MPAS members have frequent opportunities to communicate with Association Defendants and with each other regarding the recruitment and hiring of shepherds.

60.     Members of the ASI benefit from online educational tools and weekly newsletters that also provide ranchers with frequent opportunities to communicate about issues regarding the employment of shepherds.

61.     Although ranches compete in the sale of their products, principally meat and wool, the ranches that are members of the WRA and MPAS have conspired to fix one of their principal costs: shepherd wages.

62.     Rancher Defendants and other members of Association Defendants do not share profits or distribute losses, but through the WRA and MPAS they collude to fix shepherd wages at precisely the wage floor set by the DOL.

63.     The members of the WRA and the members of the MPAS each entered into and implemented nearly identical price fixing conspiracies and, together, tacitly colluded to perpetuate both conspiracies.

64.     The fixing and suppression of shepherd wages results in a windfall for MPAS and WRA members and causes shepherds to work for shockingly low wages without any opportunity to bargain for more.

65.     Absent this unreasonable restraint of trade resulting from the price fixing conspiracy or conspiracies, the ranchers currently conspiring to fix the wages of shepherds would compete in the shepherd labor market for shepherds. Similarly, absent the price fixing, shepherds would compete in the shepherd labor market for the best sheepherding jobs, putting normal upward pressure on wages.

### B.     Concerted Conduct to Fix Wages Offered to Domestic Shepherds

66.      With respect to the recruitment of domestic shepherds, the WRA and the MPAS each act as illegal combinations of competitors.

67.     In this role, among other things, the WRA's and the MPAS's principal purpose is to create job orders for and on behalf of their members.

68.     With respect to the recruitment of domestic shepherds, member ranchers— including Rancher Defendants—maintain membership in the WRA and the MPAS and enlist Association Defendants' services in preparing job orders. The member ranches knowingly allocate decisions regarding the wages offered to domestic shepherds to these associations constituted by competitor ranchers. The Ranchers do so with the knowledge that the Association Defendants use job orders to illegally fix shepherd wages at the wage floor in each state.

69.      Additionally, these job orders evidence concerted conduct among the WRA and its members and the MPAS and its members to offer domestic shepherds at precisely the wage floor set by the Department of Labor for foreign shepherds.

70.     Based upon a review of the WRA job orders associated with WRA, H-2A Applications filed between October 1, 2013 and October 1, 2014, the job orders to U.S.

workers that preceded these H-2A Applications offered the same wages as the H-2A Applications and therefore almost always offered <u>exactly</u> the DOL H-2A wage floors for each state as a fixed wage to potential U.S. workers.

71.     Based upon a review of the MPAS job orders associated with the MPAS H-2A Applications filed between October 1, 2013 and October 1, 2014, the job orders to U.S. workers that preceded these H-2A Applications offered the same wages as the H-2A Applications and therefore almost always offered <u>exactly</u> the DOL wage floors for each state as a fixed wage to the U.S. workers.

72.     Attached to this complaint as Exhibits A and B are job orders prepared by Association Defendants on behalf of Rancher Defendants within the four years prior to the commencement of this litigation.

73.     Each Rancher Defendant offered a shepherd position in at least one of the attached job orders, and in all of these job orders, Rancher Defendants, acting through either the WRA or the MPAS, offered exactly the same wage as all of the other ranches making offers within the same state. *See* Ex. A-1 & A-2; *see also* Ex. B.

74.     The content of the job orders strikingly illustrates Defendants' collusive activity. For example, in job orders filed by Association Defendants on behalf of multiple member ranches, Association Defendants do not separate out the wages offered to domestic shepherds by ranch, but instead provide a blanket wage rate for all ranches operating in a state. For example, the "Wage Rates" section of a job order prepared by the WRA in 2014 states as follows:

| 17. Wage Rates, Special Pay Information and Deductions / Tarifa de Pago, Información Sobre Pagos Especiales y Deducciones (Rebajas) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Crop Activities | Hourly Wage | Piece Rate / Unit(s) | Special Pay (bonus, etc.) | Deductions* | Yes/Sí | No | Pay Period / Período de Pago |
| Cultivos | Salario por Hora | Pago por Pieza / Unidad(es) | Pagos Especiales (Bono, etc.) | Deducciones | | | /    / |
| Sheepherding | $750.00 | $ | | Social Security / Seguro Social | ✓ | ☐ | Weekly / Semanal |
| | $ | $ | | Federal Tax / Impuestos Federales | ✓ | ☐ | ☐ |
| | $ | $ | | State Tax /Impuestos Estatales | ✓ | ☐ | Bi-weekly/ Quincenal |
| | $ | $ | | Meals / Comidas | ☐ | ✓ | ☐ |
| | $ | $ | | Other (specify) / Otro (especifica) | ☐ | ✓ | Monthly/Mensual ✓ |
| | | | | | | | Other/Otro ☐ |

18. More Details About the Pay / Mas Detalles Sobre el Pago:

75.   The wage offered in this order is $750 per month.

76.   The portion of the job order that requires listing the address of every employer offering this wage (Field 2 below) directs the potential job applicant to an addendum:

(Print or type in each field block – To include additional information, go to block # 28 – Please follow Step-By-Step Instructions)
(Favor de usar letra de molde en la solicitud – Para incluir información adicional vea el punto # 28 – Favor de seguir las instrucciones paso-a-paso)

| 1. Employer's and/or Agent's Name and Address (Number, Street, City, State and Zip Code / Nombre y Dirección del Empleador/Patrón y/o Agente (Número, Calle, Ciudad, Estado y Código Postal ): | Nos. 4 through 8 for STATE USE ONLY  Números 4 a 8 para USO ESTATAL | |
|---|---|---|
| **WESTERN RANGE ASSOCIATION A JOINT EMPLOYER**  **1245 E. BRICKYARD ROAD, SUITE190**  **SALT LAKE CITY, UTAH 84106**  a) Federal Employer Identification Number (FEIN) / Número federal de Identificación del Empleador: | 4. SOC (O*NET/OES) Occupational Code / Código Industrial:  a. SOC (ONET/OES) Occupational Title / Título Ocupacional | 5.Job Order No. / Num. de Orden de Empleo: |
| b) Telephone Number / Número de Teléfono:  **(801) 486-2004** | 6. Address of Order Holding Office (Include Telephone number) / Dirección de la Oficina donde se radicó la oferta (Incluya el número de teléfono): | |
| c) Fax Number / Número de Fax:  **(801) 486-2315**  d) E-mail Address / Dirección de Correo Electrónico:  **legal@westernrange.net** | a. Name of Local Office Representative (Include direct dial telephone number) / Nombre del Representante de la Oficina Local (Incluya el número de teléfono de su línea directa): | |
| 2. Address and Directions to Work Site / Domicilio y Direcciones al lugar de trabajo:  **(please see addendum attached)** | 7. Clearance Order Issue Date / Fecha de Emisión de la Orden de Empleo: | |
| | 8. Job Order Expiration Date / Fecha de Vencimiento o Expiración de la Orden de Empleo: | |
| | 9. Anticipated Period of Employment / Periodo anticipado o previsto de Empleo:  From / Desde: **01/10/2014**      To / Hasta: **01/09/2015** | |
| 3. Address and Directions to Housing / Domicilio y Direcciones al lugar de vivienda:  **(please see addendum attached)** | 10. Number of Workers Requested / Número de Trabajadores Solicitados:  **39** | |
| | 11. Anticipated Hours of Work per Week / Horas Anticipadas/Previstas de Trabajo por Semana. Total:*** ON CALL FOR UP TO 24 hours per day, 7 days a week | |
| | Sunday / Domingo_____      Thursday /Jueves_____  Monday / Lunes_____      Friday /Viernes | |

77.     In the case of the job order excerpted above, the addendum names 18 ranches, each of which, pursuant to the generic language in the "Wage Rates" section, offers domestic workers exactly the DOL-set wage floor and no more.  *See*, *e.g.*, Ex. A-1 at 12; *see also* Ex. B (showing numerous examples of similar job orders).[6]

78.     This job order is the same or substantially similar to dozens of other WRA job orders.

---

[6] The size of the records included in Exhibit A was too large to make it one single filing on the Court's electronic filing system. Plaintiffs have therefore broken Exhibit A into two parts: Exhibit A-1 and Exhibit A-2. Exhibit A-2 is merely a continuation of Exhibit A-1.

79.     The irrationality of Defendants' conduct provides further evidence of these conspiracies. In a competitive market, and absent the price fixing, ranchers would offer at the very least a nominally higher wage to U.S. workers than they do H-2A workers to account for the additional cost of bringing an H-2A worker to the country normally from Peru. H-2A workers are more costly to employers because, pursuant to the H-2A regulations, they must be paid by their employers for travel to and from the place of recruitment in their home country. Instead, Defendants fix wages for domestic workers at the DOL-set wage floor for foreign workers to ensure the unavailability of domestic workers and the stagnation of the DOL-set wage floor.

80.     In most states, the DOL-set wage floor for most H-2A shepherds used to be only $750 per month or $2 to $3 per hour. At the time of the filing of this Third Amended Complaint, the minimum is approximately $4.50 per hour or $1206.31 per month for most workers. And, yet, in the absence of the ranchers' combination or agreement to fix shepherd wages, ranchers would negotiate with available range workers and the average wage would increase to something similar to the minimum wage for domestic ranch hands, general ranch farmworkers, or closed range herders. All of these employees earn substantially more than H-2A shepherds and, unlike H-2A shepherds, these employees receive differing wages commensurate with multiple variables, including skill, job location, experience, and work environment, as would be expected in a competitive labor market.

81.     Furthermore, freely negotiated wages would be reflected in the wage surveys upon which the government will rely in setting a wage floor for foreign laborers in future years, thus increasing the meager wage floor for H-2A shepherds.

82.     Defendants set wages offered to domestic shepherds at low levels because Rancher Defendants know that if the positions are not filled domestically, the Immigration and Nationality Act allows them to look to an international market for vulnerable and desperate immigrants. These immigrants are willing to work for wages that are aberrational in the American labor market and that, for the reasons set out below, Defendants agree to fix at the bare minimum allowable by law.

83.     Further, as discussed in greater detail below, under the laws governing the H-2A visa program, Defendants are required to disclose the precise wage terms—including bonuses—that they intend to pay to the workers they hire. In other words, if they intend to offer higher wages than those required by the DOL-imposed wage floor or if they intend to offer a particular incentive bonus, they must disclose these facts in the job offers made to domestic workers.

84.     It is illegal and a violation of the laws governing the H-2A program to fail to disclose such intended higher wages and the existence of such bonuses.

85.     Defendants, however, frequently violate this law. They make an offer of lower wages even though they intend to offer foreign workers higher wages than what is in the job order. And they never disclose the amount of bonuses they regularly offer to their workers.

86.     Defendants choose not to disclose the wages they ultimately pay to their foreign H-2A shepherds because doing so would undermine their efforts to collude to set an offered wage at precisely the wage floor for H-2A workers.

87.     The result of this collusion is the wholesale elimination of the domestic shepherd workforce: the DOL recently estimated that there were only 18 domestic shepherds left in the United States.

### C.     Concerted Conduct to Fix Wages Offered to Foreign Shepherds

88.     With respect to the recruitment of foreign shepherds, the WRA and the MPAS each act as illegal combinations of competitors.

89.     Among other things, one of the principal purposes of the WRA and the MPAS is to file H-2A applications on behalf of their members with the DOL.

90.     With respect to the recruitment of foreign shepherds, member ranchers— including Rancher Defendants—maintain membership in the WRA and the MPAS, and enlist their services in preparing H-2A applications, for the purpose of allocating decisions regarding foreign shepherd wages to associations constituted by competitor ranchers, and with the knowledge that the Association Defendants use job orders to illegally fix shepherd wages at the DOL-set wage floor for each state.

91.     Additionally, these H-2A Applications evidence concerted conduct among the WRA and its members and the MPAS and its members to offer foreign shepherds exactly the wage floor set by the DOL for each state.

92.     The DOL releases statistics each year for the shepherd H-2A program. The latest year for which the DOL has released complete data runs from October 1, 2013 to October 1, 2014.

93.     In that time period, the WRA submitted, on behalf of its members, H-2A Applications for approximately 1,214 H-2A shepherds. All of these WRA H-2A Applications offered *exactly* the DOL-prescribed H-2A wage floors as the relevant wage term.

94.     In the same time period, the MPAS submitted H-2A Applications for approximately 788 H-2A shepherds for its members. All but one of these H-2A Applications offered *exactly* the DOL H-2A wage floors as a wage term.

95.     Attached to this complaint as Exhibits C and D are H-2A Applications prepared by Association Defendants on behalf of Rancher Defendants within the four years prior to the commencement of this litigation.

96.     Each Rancher Defendant offered a shepherd position in at least one of the attached H-2A Applications, and in all of these H-2A Applications, Rancher Defendants, acting through either the WRA or the MPAS, offered exactly the same wage as all of the other ranches making offers within the same state. *See* Ex. C, D, & E.

97.     The content of the H-2A Applications strikingly illustrate Defendants' collusive activity. For example, in substantially all H-2A Applications filed by Association Defendants on behalf of multiple member ranches, Association Defendants do not separate out the offered wages for H-2A shepherds by ranch, but instead provide a

blanket wage rate for all ranches operating in a state. For example, the "Rate of Pay" set out in a WRA-prepared H-2A Application filed in 2014 appears as follows:



Ex. D, at 5.

98.     The "Rate of Pay" section of the H-2A Application does not mention the names of individual ranches, which are set out in an attached "Addendum."

99.     In the case of the H-2A Application excerpted above, the Addendum includes the names of dozens of ranches, each of which, pursuant to the generic language in the "Rate of Pay" section pays its H-2A shepherds exactly the DOL-set wage floor and no more.

100.    This H-2A Application is the same or substantially similar to dozens of other WRA H-2A Applications.

101.    The price fixing conspiracy is further evidenced by Defendants' conduct in adjusting the wages paid to H-2A shepherds in lockstep with changes to the DOL-set wage floor for each state.

102.    For example, as is also described below, *see* Part IV.B, *infra*, in January 2015, the WRA instructed its members in Oregon to uniformly begin paying exactly the new DOL wage floor: "[B]eginning January 1, 2015 the wage rate for shepherds working in

Oregon is $1,326.46."  You "should immediately adjust your wage payments to [that] monthly wage amount."

103.    In the absence of a conspiracy, Defendants' conduct in fixing wages for H-2A shepherds would be irrational.  In a free market, ranchers would negotiate with H-2A shepherds who would, therefore, receive differing wages commensurate with multiple variables, including skill, job location, experience, and work environment.

      **D.**    **Effects of the Anti-Competitive Conspiracy on DOL's Wage Determinations**

104.    Until recently, the DOL set wage floors to prevent an "adverse effect" on the U.S. workers in the shepherd labor market and sets these floors by conducting wage surveys that review the wages paid to shepherds in the relevant market.

105.    By agreeing to a cap on the amount that Defendant ranchers offer their shepherds at exactly the minimum DOL wage floor, the result of Defendants' conspiracy is an artificial ceiling on wages that would otherwise increase under normal market forces. As a consequence of this wage stagnation, the DOL's wage surveys reflect an artificially low wage for shepherds.

106.    Because the Defendants' wage fixing has artificially depressed wages in the shepherd labor market, it has also artificially depressed the DOL's wage floors, the very same minimum wage that Defendants rely on in fixing wages paid to their workers.

107.    Until recently, the unique manner in which DOL determined shepherd minimum wages (*i.e.*, through the surveys of workers) provided a powerful motive to ranchers to fix wages at the DOL minimum. By agreeing to fix offered wages at the minimum with

the knowledge that DOL would rely on surveys of workers to determine new wages, ranchers were able to benefit from the stagnation of minimum wage rates.

108.    While wages in other similar industries have continued to rise with normal inflation, the wages for shepherds—until recently—were stuck, in some cases at less than half of the federal minimum wage for covered workers.

109.    The price fixing's downward pressure on the DOL's wage floors, and therefore on the fixed wage, has led to absurdly low wages for shepherds. When the Industrial Welfare Commission of the State of California examined shepherd wages in 2000, it determined that "the wages paid to shepherds may be inadequate to supply the cost of proper living and that the hours and working conditions of shepherds may be prejudicial to their health and welfare." It then voted to greatly modify the shepherd exemption from California's minimum wage.

110.    The stagnation of DOL's H-2A wage floor represents both a motive for Defendants' wage fixing and one of the market distortions resulting from Defendants' wage-fixing conspiracies in a highly regulated labor market.

### E.    The Resulting Restraint of Trade and Antitrust Injuries

111.    Defendants' wage-fixing conspiracy has artificially restrained trade in the United States labor market for shepherds, generally, as well as in the markets for domestic shepherds and H-2A shepherds separately.

112.    With regard to the market for shepherds generally, the result of Defendants' conspiracies is suppressed, stagnated wages for all shepherds in the United States. As

a consequence, shepherds working on U.S. sheep ranches are deprived of the normal fruits of their labor and have very little incentive to become better shepherds.

113.    The fixed wages entice relatively few domestic shepherds, who are effectively deprived of their right to work as shepherds in the domestic labor market.

114.    Ranchers historically have claimed that there is an insufficient supply of domestic shepherds and, therefore, that they must look to the foreign labor market to recruit workers. While there was a true labor shortage during the Second World War which gave rise to the Bracero program (a precursor to today's H-2A visa program), the dearth of domestic shepherds today is *not* the result of an unwilling or incapable workforce; rather the Defendants' concerted efforts to suppress wages well below the fair market value of the shepherds' work.

115.    In this distorted labor market, Defendants rely on foreign shepherds, over whom Defendants can exert substantial and even anachronistic control, including by preventing "runaways" and abusing employees whose lack of familiarity with English and the United States legal system renders less likely to complain about their deplorable working conditions.

## IV.        Supplemental Antitrust Allegations

116.    Plaintiffs present these supplemental allegations as further evidence of the wage-fixing conspiracy or conspiracies noted above.

### A.        WRA and MPAS Set Shepherd Wages

117.    Defendants now concede that the Associations set the wages for H-2A shepherds at the minimum allowable by the Department of Labor. As they state, "[b]oth

Associations submit H-2A applications to USDOL for their members. The wages offered are the AWER, or higher state minimum wage, plus a bonus." [# 135 at 4]

118.   As if this concession were not enough, there can be little doubt that Defendant Mountain Plains Agricultural Service sets the wages for H-2A shepherds because that is precisely what it does in employment contracts. *See* Ex. F at 2.[7]

119.   These employment contracts provide instructions for shepherds seeking to obtain visas through MPAS, including instructions on how they should prepare for an interview at the United States Consulate in Lima after the DOL approves their labor certifications.

120.   These employment contracts are form contracts, with template language used to communicate with every herder.

121.   Certain portions of the contract are filled in with information relevant to a particular shepherd's circumstances, such as the name of the ranch where the shepherd will work.

122.   The copy of the form contract in Plaintiffs' possession is for a shepherd who was to work in Texas.

123.   There is no space, however, to fill in employer-specific salary information.

124.   Further, in the attached record, MPAS states as follows in Spanish:

---

[7] Exhibit F contains all additoinal record evidence Plaintiffs rely upon in further support of this Complaint. Because of the size of some of the files included in Exhibit F and limitiations on size required by the Court's electronic filing system, Plaintiffs have broken in Exhibit F into several parts. Plaintiffs point to individual records in Exhibit F by reference to the page numbers included in the bottom left-hand corner of the exhibit.

Con esta carta mandamos copia de la aprobacion de su peticion: EAC07 007 53136.  La fecha de vencimiento es el 31 de Octubre 2007.  Estos documentos son para que usted tramite una Visa de H-2A, para la ocupacion de Pastor de Cabras.  En el Estado de Texas esta ocupacion paga--$750 mensualmente, con casa y comida.

Ex. F. at 2.

125.    This statement translates to English as follows: "With this letter we send a copy of the approval of your petition [for a shepherd visa with the Visa Number EAC07 00753136]. The expiration date is October 31, 2007. These documents are so you can process an H-2A visa for the occupation: goatherder.[8] ***In the state of Texas this occupation pays--$750 monthly, with house and food***." *Id.* (emphasis partially added).

126.    The portion of the statement highlighted above is not only factually misleading—the ***minimum wage*** for shepherds is actually $750 per month—but given that this is the only written communication between Defendant MPAS and the potential recruit, it establishes that Defendant MPAS—and not the individual ranch—sets the relevant offered wage at the minimum wage floor.

127.    WRA requires a similar employment attestation from its H-2A shepherds that locks them into an agreement with WRA that the worker will accept the minimum allowable wage. Ex. F at 3-4.

128.    The WRA attestation is notarized and signed in the presence of two witnesses. *Id.* at 4.

---

[8] A small portion of H-2A shepherds actually work taking care of goats and not sheep, but the same H-2A regulatory scheme applies to both types of workers.

129.    This form attestation contains blank spots to fill in the name of the shepherd and the relevant dates of the attestation. *Id.* at 3.

130.    This attestation also mandates the shepherd to abide by the following requirement:

> **QUINTO:** Se me asignará un lugar de trabajo (rancho) que no podré cambiarme o transferirme porque así lo desee. El sueldo que se me asigne es el mínimo que otorga el Departamento de Labor de EE.UU. para esa zona el cual variará de acuerdo al estado donde se encuentre el rancho.

*Id.* at 2.

131.    This requirement translates to English as follows: "**<u>FIFTH</u>**: I will be assigned to a place of work (ranch) that I will not be able to change or transfer because I desire to do so. ***The salary that I am assigned is the minimum that the U.S. Department of Labor provides for this region, something which will vary in accord with the state where the ranch is located.***" *Id.* at 2.

132.    This attestation makes clear that a shepherd has no choice in where he works or how much he is paid. In other words, he cannot request a higher-paying California shepherding job—which would pay him around $1700 today as compared with around $1200 in Colorado—nor can he continue to earn the higher California rate if the WRA wants to transfer him to a lower-paying state, such as Colorado.

133.    The H-2A shepherd signs this form attestation before he has even been interviewed by a representative of Defendant WRA in Lima—the first of a multi-step process (described below) for a shepherd to obtain an H-2A visa through Defendant WRA. *Id.* at 4.

134.    Only after most shepherds are interviewed for a job by a WRA representative in Lima will they learn the particular ranch and the particular state in which they will work.

135.    But the employment contract between the WRA and the shepherd requires that the worker attest that he will work for the minimum wage without even any reference to what that minimum wage is, the state where the shepherd will work, or the ranch that will employ him.

136.    This record makes clear that it is Defendant WRA—and not any individual rancher—that secures a commitment from each individual shepherd at a very early stage in his employment that the shepherd will be "assigned" the minimum wage.

137.    Finally, there can be little doubt that Defendant WRA sets wages for its members because that is exactly what WRA does in a handbook provided to all WRA members.

138.    The most recent version of the WRA handbook in Plaintiffs' possession outlines the "wage rate" that WRA instructs its members to pay to shepherds. *See* Ex. F at 7.

139.    The wage rate established in the WRA handbook is the same as the wage rate offered to all H-2A shepherds, as detailed above. *Id.*

140.    The wage rate established in the WRA handbook is also the minimum wage allowed by DOL for H-2A shepherds.

141.    The WRA handbook similarly establishes that members will use the minimum wage as the rate they use to pay to their shepherds. This is evident in part from how the handbook treats the issue of shepherd paid vacation time.

142.    All WRA contracts establish that an H-2A shepherd is entitled to two weeks of vacation pay, *id.* at 6, and the WRA handbook establishes that "[i]f a herder is

terminated[,] the herder must be paid full wages due on date of termination including, ***at the current rate of pay***, any unpaid vacation," *id.* at 7 (emphasis added). The only rate of pay that the handbook could be referring to is the salary schedule with the DOL-set wage floor, as this is the only rate of pay referenced in the entirety of the member handbook.

### B.    Additional Evidence that WRA Sets Shepherd Wages in Oregon

143.    Under Oregon law, those engaged in some forms of shepherd work are exempt from the minimum wage, as long as they are paid a salary of the Oregon minimum wage multiplied by 2080 hours per year, then divided by 12 months. *See* O.R.S. 653.020(1)(e), 653.010(9).

144.    The minimum wage in Oregon in 2014 was $9.10 per hour, which means that the minimum possible monthly wage earned by a shepherd under this formula would be $1577.33 per month (or $9.10 per hour times 2080 hours divided by twelve months).

145.    In 2014, however, Defendant WRA uniformly offered $1227 per month—or around three hundred dollars less than the Oregon minimum wage—in all job offers for domestic herders and reported the same wage in all applications for H-2A workers. *See* Ex. F at 166-73 (job order for Defendant Cunningham at this rate).

146.    Defendant WRA illegally claimed a three-hundred dollar deduction that brought shepherd wages below the Oregon minimum wage as a "private benefit" that could be applied against a shepherd's wages.

147.    The Oregon labor authorities put an end to this practice in January 2015, when the Oregon minimum wage increased to $9.25 per hour and the minimum monthly wage accordingly increased to $1603.33 per month.

148.    The Oregon labor authorities required that Defendant WRA offer at least $1603.33 per month. *See id.* at 8-14 (outlining Oregon's position on the required minimum wage including in communications with attorneys for WRA).

149.    And in turn, in January 2015, Defendant WRA began to submit job orders for H-2A shepherds, including job orders for Defendant Cunningham Ranch, that offered a wage of $1603.33 per month. *Id.* at 174-181.

150.    As noted above, however, *see* Part III.C, *supra*, in January 2015, while WRA was making these $1600 offers in records filed with the labor authorities, WRA instructed its members that: "beginning January 1, 2015 the wage rate for shepherds working in Oregon is $**1,326.46."** It then instructed all its members that they "should immediately adjust [their] wage payments to [that] monthly wage amount."

151.    In other words, despite being instructed by the state labor authorities to pay $1603.33 and not deduct any "private benefit," WRA instructed its members to maintain a practice declared illegal by the Oregon labor authorities.

152.    All WRA members, including upon information and belief, Defendant Cunningham Sheep Company, have paid this lower amount of $1326.46 per month, even though all Oregon WRA Members and Defendant WRA represent in job offers presented to the state and federal labor agencies that they will pay the higher amount of $1603.33 per month.

153.    In email correspondence with a WRA attorney, the Oregon Bureau of Labor and Industries (BOLI) reiterated its longstanding position that deducting any "private benefit" such that the wage falls below $1603.33 per month is illegal under Oregon law. *Id.* at 8-14.

154.    This has been the express positon of the Oregon labor authorities for almost twenty years. *Id.*

155.    This arrangement not only establishes a violation of Oregon law, it also demonstrates that Defendant WRA sets wages offered Oregon shepherds, and that member ranches in Oregon are aware of, and complicit in, the WRA's fixing of wage offers.

156.    The wage-fixing at issue in Oregon is in some ways even more nefarious than the fixed offered wages in other parts of the country because Defendant WRA misrepresents that the offered wage is $1603.33, when in fact WRA directs that shepherds be paid an actual monthly wage of only $1326.46.

157.    Defendant WRA makes this fixed higher offered wage as a means of obtaining a labor certification.

158.    Defendant MPAS has provided a similar communication to its members regarding the Oregon minimum wage, communicating that "the mandated wage is $1603.33/month plus housing," *id.* at 15, though Plaintiffs will need discovery to determine if Defendant MPAS has fixed the wage below the minimum in a manner similar to Defendant WRA.

**C.**     **Defendants Acknowledge It Is Irrational To Pay The Same Wage To Experienced and Inexperienced Shepherds, Even Though They Represent To DOL that All Shepherds Make the Same Wage Regardless of Experience**

159.    The fixed wage rates established in Defendants' form employment contracts and in membership handbooks are necessarily a bad fit for the type of skilled labor they ask their workers to perform.

160.    Shepherding is a skilled profession learned essentially at birth. Defendants WRA and MPAS concede as much in comments on the recent H-2A rulemaking, where they jointly note that "unlike some farmworker jobs in crop agriculture, for which no experience is required or a brief training session would suffice, the unique skills required of this job make it impossible for someone to walk off the street and begin working. The H-2A workers who comprise the current workforce have grown up doing this work, riding horses, tending herds, and living in the mountains." Ex. F at 41.

161.    A good shepherd is often hard to find and highly valued for his skill: in fact, as reported by sheep rancher Brent Espil, one member of Association Defendants, "Cowboys, historically, have been easier to employ than good sheepherders."[9]

162.    These skilled workers only become more valuable to their employers as they gain experience in managing the large flocks in their charge in the Western United States. Indeed, the simple economic rationale behind paying H-2A shepherds more as

---

[9] Mr. Espil was quoted in Tiffany Moore, *The Basques in Nevada, Running Sheep the Traditional Way* (Apr. 14, 2012), *available at* http://nevadabasque.com/running-sheep-the-traditional-way/.

they gain experience is well explained in a recent documentary directed by the Colorado Woolgrowers Association (CWGA).[10]

163.   The CWGA counts as members many ranches that are also members of WRA and MPAS.

164.   The CWGA also counts as members many Rancher Defendants, including the owner of Two Bar Ranch.

165.   The video makes clear that "[h]erders in Colorado make a **starting wage** of $750 per month" and suggests that that rate increases as the shepherd gains experience.

166.   As noted in the same documentary video by Anthony Theos, a member of Defendants WRA and MPAS (though not a defendant in this case), this "starting wage" contemplates that the ranchers will "have a training cost, we call it, [in a shepherd's] first year. It's the most difficult year. . . . Usually, lamb production is down; losses are up. And we absorb those costs based on the new individual, but . . . the second year is more productive and it goes from there."

167.   In the video, Mr. Theos goes on to emphasize the value added of an experienced herder, noting that "if an employee doesn't end up walking out on us, those [training] costs are never brought up because of all the money spent on training the individual to do the job." Mr. Theos similarly laments the loss of experienced shepherds because "[y]ou lose all that when [they] leave and you have to start over again."

_____

[10] The video is available at https://www.youtube.com/watch?v=smxOSbTjUus.

168.   If Mr. Theos were proceeding as a rational economic actor and acting in accord with the premises he presented in the documentary video, he would increase the wages of a second-year herder to avoid losing the value of the training costs incurred by a herder over the course of the first year.

169.   Mr. Theos is plainly able to make these wage increases: like all ranchers, he enters into approximately year-long contracts with H-2A shepherds that he normally renews for a total of three years.

170.   Mr. Theos might then engage the same shepherd for another three-year, annually renewable contract, after the shepherd has made a short trip to his home country.

171.   He must, of course, offer this opportunity of a new job to American workers in publicly available documents before he offers it to a current H-2A shepherd.

172.   Mr. Theos, however, seemingly does not follow this course. According to DOL data from the last four years, Mr. Theos through Defendants WRA and MPAS, has **never offered** more than the minimum wage floor established by DOL.

173.   If Mr. Theos pays shepherds more than this offered amount, he does so in contravention of the formal offers made in job orders and H-2A certifications.

174.   The same is true for all WRA and MPAS members—all of whom offer the minimum wage allowable under the law—despite the fact that H-2A shepherd contracts are frequently renewed annually for indeterminate periods of time in which employers hire the same shepherds.

175.    In other words, **_all_** of the job offers to domestic workers (which would legally be the maximum wages that could be offered to H-2A workers) are **_all_** set at the same "starting wage" rate normally of $750 per month, despite the concession in an industry-produced video that the equilibrium wage of second-year or trained shepherds should take into account the training received in the first year of work and the added value created by a second-year worker.[11]

176.    Rancher Defendants operate in a manner similar to Mr. Theos.  That is to say, Rancher Defendants, through the Association Defendants, offer wages at precisely the government-set wage floor for each shepherd, whether the shepherd has fifteen years of experience or one year and whether the shepherd retains 90 percent of his flock or 70 percent of his flock through the summer herding season.

> **D.      Revealing Their Conscious Commitment to the Wage-Fixing Scheme, Ranch Defendants Illegally Pay Shepherds Higher Wages Than They Offer to Domestic Workers**

177.    As noted above, *see* Part II, *supra*, a bedrock principle of the H-2A visa program is that employers of H-2A workers "must offer to U.S. workers no less than the same benefits, wages, and working conditions that the employer is offering, intends to offer, or will provide to H-2A workers." 20 C.F.R. § 655.122(a).

---

[11] To Plaintiffs' knoweldge, Mr. Theos's ranch has yet to petition for a herder under the new DOL rule, though he is bound to pay that higher wage.

178.   The DOL strictly enforces this provision. Every year, DOL fines H-2A employers thousands—and sometimes millions—of dollars for offering or paying less to domestic workers than what they offer or pay to similarly situated H-2A workers.[12]

179.   An H-2A employer can even be debarred from the H-2A program for substantially violating a material term or condition of a temporary labor certification, such as the promise to offer equal pay and benefits to H-2A and domestic workers. *See* 29 C.F.R. § 501.20.

180.   Because all job offers to H-2A shepherds are at the minimum wage, in order to comply with this DOL regulation and avoid incurring potential liability for serious and costly fines, employers of H-2A shepherds would have to offer to domestic shepherds the same wages in fact paid to H-2A shepherds.

181.   Some H-2A employers of shepherds, however, violate this requirement of the H-2A rules. These shepherd employers continue to ***offer*** the minimum wage to all shepherds, but in recognition, for example, of the added value brought by an experienced shepherd, pay these workers ***more*** than the wage offered to domestic shepherds. These actions constitute a violation of, *inter alia*, 20 C.F.R. § 655.122(a).

---

[12] *See, e.g.*, *In Re: Overdevest Nurseries, LP*, 2015-TAE-00008 (Feb. 18, 2016) (announcing a fines of hundreds of thousands of dollars for H-2A employers' failure to pay domestic workers the same as H-2A workers), *available at* http://www.oalj.dol.gov/Decisions/ALJ/TAE/2015/WAGE_AND_HOUR_DIVISI_v_OVER DEVEST_NURSERIES_2015TAE00008_(FEB_18_2016)_152251_CADEC_SD.PDF; News Brief, Department of Labor Wage and Hour Division, Vegetable Supplier to Major Grocery Chains Assessed over $1.M in Civil Money Penalties After Two-Year Federal Investigation (May 12, 2016), *available at* https://www.dol.gov/newsroom/releases/whd/whd20160512.

182.    This illegal practice is also a plainly established practice of many of the Defendants, as discussed below.

### 1.    Defendant MPAS

183.    Defendant MPAS admits that "some employers offered[13] and paid base wages in excess of the published minimum," wage established by DOL" and notes that "some offered opportunities to earn additional pay and bonuses." [# 91 at 3 n.3].

184.    Despite knowledge that its member ranches pay their shepherds in excess of the minimum (including base salaries in excess of the minimum), Defendant MPAS has continued to set offered wages for domestic and foreign shepherds at the minimum wage and represented this offered rate as the paid wage rate.

185.    This practice has continued through the life of this lawsuit, as Defendant MPAS continues to report the offered wage of all shepherds as the minimum allowable by DOL. *See also* Part IV.I, *infra*.

### 2.    Defendant Auza

186.    Similarly, Defendant Martin Auza Sheep Corporation has admitted that it has paid its shepherds a higher base wage than the minimum wage floor established by DOL. *See* Doc. ## 83 at 9-10 (admission in the motion to dismiss); 106 at 8 (same in the reply in support of motion to dismiss).

187.    Defendant Auza's admission in pleadings appears to be borne out by wage records provided in discovery.

---

13 Plaintiffs do not know what MPAS means by "offer" here, as the entity uniformly sets job offers at the wage floor allowed by DOL.

188.    Those records appear to indicate, for example, that one H-2A shepherd earned a base salary of over $2000 per month in June 2014. *See* Ex. F at 57.

189.    Defendant Auza's payment of over $24,000 a year to one H-2A shepherd constitutes a violation of the H-2A regulations.

190.    According to every job order on file with DOL that covers 2014, Defendant Auza offered domestic shepherds no more than $1422.52, or over seven thousand dollars less per year than this H-2A worker earned in 2014.

191.    Defendant Auza accordingly offered domestic workers much less than he offered and paid to foreign H-2A shepherds, in violation of the H-2A program regulations.

### 3.    Defendant Nottingham

192.    Defendant Nottingham also pays more money to H-2A shepherds than the DOL minimum wage for shepherds in Colorado.

193.    Documents obtained through discovery establish that at least one of Defendant Nottingham's H-2A shepherds appeared to earn $1000 a month. *See*, *e.g.*, Ex. F at 58.

194.    Those same documents establish that Defendant Nottingham pays bonuses to shepherds in excess of $1000. *Id.*

195.    Neither that higher base salary nor the amount of the bonus has been disclosed by Defendant Nottingham on job offers made available to domestic workers.

### 4.    Defendant Two Bar

196.    Defendant Two Bar Ranch also pays more to its H-2A shepherds than the salary it offers to domestic workers in publicly filed job offers.

197.   In fact, the owner of Defendant Two Bar, Steve Rafthopolous, has noted that Two Bar used the $750 per month rate as "a starting salary for inexperienced herders. We pay more to herders based on experience and provide bonuses based on performance." *Id.* at 61.

198.   Records obtained through discovery confirm these representations.

199.   According to these records, several Two Bar shepherds earned between $626 and $1250 per fifteen-day period in 2014, *id.* at 62, and Two Bar provides year-end bonuses of approximately between $800 and $900 for many of its shepherds, *id.* at 63.

200.   Yet, again, in all of the H-2A job orders submitted jointly by Two Bar and Defendants WRA or MPAS, Defendants represent that all shepherds on Two Bar Ranch will be offered the Colorado minimum wage (either $750 per month until November 2015 or at present $1206.31 per month).

### 5.   Defendant Cunningham

201.   Defendant Cunningham also deviates from the DOL-stated minimum wage for Oregon, which is the wage it offers in all job orders filed with DOL.

202.   Defendant Cunningham has represented in a filing opposing the 2015 Rule for shepherds that it consistently pays a yearly bonus and a certain amount of vacation pay to each shepherd. *See id.* at 64.

203.   Defendant Cunningham concedes that the annual bonus it offers is in fact factored into the annual operating expenses of the ranch.

204.    That bonus, however, is not disclosed on the official offers made to the state

Departments of Labor in which Defendant Cunningham solicits work from domestic

workers.[14]

### 6.    Non-Defendant Members of WRA and MPAS Who Have Made Similar Representations

205.    These misrepresentations about the offered and paid wage rate go beyond the

defendants in this case.

206.    For example, a rancher from Colorado has conceded that "[a] good,

knowledgeable, dependable herder is worth far more than one that doesn[']t have these

skills. We are more than willing to pay for an experienced herder with these abilities."

He similarly implied he would be willing to pay in excess of the DOL minimum wage for

a good shepherd. Ex. F at 66.

207.    Another Colorado rancher similarly conceded that, when the wage was $750 per

month, "[o]ur herders know their wages increase from the base as they become more

experienced. And, our herders often receive quarterly bonuses of $1000." *Id.* at 68.

208.    A Nevada rancher reported that "[m]ost herders, after the initial contract, are

compensated substantially more than the existing base rate and are often rewarded

with bonuses dependent upon profitable outcomes for the ranch." *Id.* at 74.

209.    And, as one final illustrative example, another rancher in Utah noted that for his

shepherd workers, "[r]aises are a necessary part of any operation; wages do go up and

---

[14] It is unclear to Plaintiffs for what period of time Defendant Cunningham deducted the
illegal "private benefit" from herder wages described above. *See* Part IV.B., *supra*.

Case 1:15-cv-01889-REB-STV   Document 139-1   Filed 08/18/16   USDC Colorado   Page 46 of 109


as the worker gets more skilled in what they do so it is appropriate to give a salary increase." *Id.* at 81.

### 7.   Conclusion

210.   Despite paying in excess of the offered wage, all of the ranches discussed in this part only offer domestic workers the wage floor established by DOL.

211.   It is irrational, not in their self-interest, and evidence of the alleged antitrust conspiracy, for the ranches described above to offer the minimum wage to domestic workers and fail to publish the fact that they are paying in excess of the minimum.

212.   It would be rational to simply pay what is offered and offer what is paid.

213.   The rancher's behavior is not only irrational; it also violates the H-2A regulations because no American workers could even know about the opportunity, for example, to earn $24,000 a year to work as a shepherd.

214.   Defendants, however, risk sanction for this irrational conduct out of loyalty to the cartel established through the Association Defendants, which sets offered wages at the minimum wage, suppressing wages offered domestic and foreign, and ensuring that ranches can access an easily-exploitable foreign labor market that it can more easily mistreat and underpay.

215.   And while benefiting from this concerted conduct, Rancher Defendants obtain the benefit of providing slight premiums to retain talented workers

### E.   **Plaintiffs Have Personal Experience with the Irrationality of Defendants' Wage-Fixing Regime**

216.   The policies described throughout these supplemental allegations conform to some of the Plaintiffs' own experiences with the activities of the cartel.

217.   For example, Plaintiff Rodolfo Llacua regularly received payments slightly above the $750 per month wage. He normally received $900 per month, even though his employers, through Defendant MPAS, represented to the DOL that they offered him $750 per month.

218.   Similarly, Plaintiff Liber Vilchez Guerra worked on one ranch for the California minimum of (at that time) around $1300 per month, but was then moved to another ranch, Defendant Two Bar, where he was instructed he would only be paid half of this amount ($750), despite his considerable skill and experience herding sheep.

219.   Plaintiff Leovegildo Vilchez Guerra had a substantially similar experience. He started out earning a high salary at a ranch in California (of around $1400 a month) but then found that his relative skill at sheepherding did not translate into a higher salary when he moved to Colorado, where he started earning $750 per month on Defendant Two Bar Ranch.

220.   Plaintiff Leovegildo Vilchez Guerra asked for a higher wage, but representatives of Defendant Two Bar would not allow him to receive this higher wage.

221.   Nevertheless, Plaintiff Leovegildo Vilchez Guerra was ultimately offered in excess of the wage Defendant Two Bar represented to the DOL that it offered to him. As of around December 2014, he began earning $800 per month, even though Defendant Two Bar represented to the Department of Labor that he would only be earning $750 per month.

222.   Finally, Plaintiff De La Cruz began earning $800 a month in Nevada but had his wage raised to $900 per month, despite representations from Defendant MPAS that he

would be earning the offered wage of $800 per month, which was the relevant minimum

wage in Nevada at the time.

### F.   Other Workers Performing Almost the Same Work As H-2A Shepherds Are Paid Over Three Times As Much

223.   The Defendants' concerted action to suppress wages is all the more evident

when one compares the wages of shepherds in regions dominated by Defendants'

wage-fixing cartel with the wages of shepherds in regions where the cartel has less

influence.

224.   Plaintiffs present this evidence based on state public records requests made to

the state labor authorities in locations in which Defendants WRA and MPAS seem to

certify fewer workers to labor as shepherds and accordingly seem to have less ability to

influence (and suppress) worker wages.

225.   These public records come in the form of state prevailing wage surveys, which

record the wages of only domestic (i.e., non-foreign) shepherds working in these states.

226.   These surveys are used to determine the "prevailing wage" of workers in this

industry in this state and include reporting on hundreds of individual workers' wages.

227.   Each individual record of a workers' wage is reported on these forms and then, at

its discretion, the state labor department might make a "finding" as to whether there is

sufficient data to warrant making a "finding" as to the prevailing wage.

228.   These records suggest the extent of the suppression of wages caused by the

Defendants' anticompetitive conduct.

229.   For example, whereas foreign workers trapped in the Defendants' wage-fixing

cartel have earned as little as $750 per month or $2-3 per hour, records obtained for

sheep-industry workers in North Dakota, where Association Defendants have been unable to make effective inroads among ranches, suggest the prevailing wage for shepherds is at least three times as high.

230.    In particular, in 2007, domestic workers in North Dakota who were classified as "sheep raisers/goat herders" or "sheep farm[ers]" made $10-12 per hour and "general animal handlers" made $12 per hour. *See* Ex. F at 83-86.

231.    Since 2008, North Dakota appears to have put sheep raisers and sheep farmers under a broader work category that includes all livestock workers—the formal title is "farm workers, farm and ranch animals." Findings under this category establish a prevailing wage of $10 per hour in 2008. *Id.* at 87-90.

232.    In 2009, that average rate rose to $10.50 per hour for a category of worker that included "sheep farm workers." *Id.* at 91.

233.    And there is evidence of a steady increase in wages for this category of worker that includes sheep farmworkers from this date to 2013, with the average wages of this class of worker increasing to a reported prevailing wage of between $12 and $15 per hour. *Id.* at 92-109.

234.    The wages of shepherds in Texas—another state largely beyond the reach of Defendants' cartel—similarly establish that but for the Defendants' wage fixing, wages for these workers would be much higher.

235.    In its prevailing wage surveys for 2013, Texas reported that shepherds (albeit from a small sample size) earned $90 per day (approximately $2700 per month). *Id.* at

110-11. In 2014, Texas reported wages of between $10 per hour and $2500 per month. *Id.* at 112-13.

236.   This record evidence is particularly useful here because it only should include data from other domestic workers, who are not guaranteed the AEWR—and could actually be paid less than this amount.

237.   These records in fact establish that domestic shepherds—free of the cartel's influence—are earning more than the AEWR or the minimum wage paid to H-2A shepherds. For example, when the hourly AEWR in North Dakota was $9.55 per hour, shepherds and other animal husbandry workers in this state were earning—at the least—$10-12 per hour.

### G.   DOL Only Sets the Minimum Wage and All Ranchers Must Do To Legally Offer Shepherds a Higher Wage Is Report Doing So to DOL

238.   As noted above, there is no statute or regulation that prevents ranchers from offering in excess of the minimum wage established by DOL. *See* Part II, *supra*.

239.   To the contrary, DOL has maintained a regulatory policy that explicitly recognizes—and even encourages—offering foreign workers more than the minimum wage established by DOL.

240.   In fact, Defendants WRA and MPAS both acknowledged together in comments to the DOL that the AEWR "constitute[s] a wage floor, but many of the H-2A workers have been returning to the same ranches for years or decades and are paid significantly higher amounts than this minimum requirement." Ex. F at 47 n.26.

241.   And, months after this case began, Defendant MPAS recently reiterated this principle by noting to its member ranches that the AEWR determined by DOL "is a

mandated minimum wage," and if a ranch "would like to pay a higher wage [it] can[;] however, that opportunity to earn more MUST be advertised to potential U.S. applicants." *Id.* at 114.

242.    This view of the AEWR as a minimum is confirmed by DOL's own interpretation of the regulations. As DOL similarly stated in enacting the current H-2A rules, "[t]he AEWR is the minimum wage rate that agricultural employers seeking nonimmigrant foreign workers must offer to and pay their U.S. and foreign workers." In other words, "[t]he AEWR is a wage floor, and its existence does not prevent the worker from seeking, or the employer from paying, a higher wage." *Temporary Agricultural Employment of H-2A Aliens in the United States*, 75 Fed. Reg. 6884, 6891 (Feb. 12, 2010).

243.    Further, DOL has recently—and unequivocally—reiterated that principle in the context of H-2A shepherds, noting that "[t]he terms and conditions of herder employment established in this Final Rule are intended as a floor and not a ceiling." *Temporary Agricultural Employment of H-2A Foreign Workers in the Herding or Production of Livestock on the Range in the United States*, 80 Fed. Reg. 62,958, 62,962 n.9 (Oct. 16, 2015) (codified at 20 C.F.R. pt. 655).

244.    The only requirement when offering in excess of the minimum, of course, is to offer the same salary and benefits to American workers that is offered to H-2A workers.

## H.    There Are Numerous Other Ways that Each Individual Defendant Is Committed to the Wage Fixing Scheme

245.    Plaintiffs provide these additional allegations further establishing their commitment to the wage fixing scheme.

246.   As to Defendant Martin Auza Sheep Corporation (MASC):

     i.     As outlined above, Defendant MASC has misrepresented to the DOL the actual wages he is paying foreign workers. *See* Part IV.D.2, *supra.*

     ii.     It joined WRA and MPAS.

     iii.     As a WRA member, it allowed this association to make job offers and to set on MASC's behalf the wage rate in those job offers, as shown in Exhibit A. *See* Ex. A-1 at 2-8 (job offer for MASC).

     iv.     Defendant MASC acquiesced to using the form contracts and attestations similar to the ones included in Exhibit F, at 2-4, that were prepared by MPAS and/or WRA and that set shepherd wages at the minimum offered by DOL.

     v.     Defendant MASC knew or should have known that it was not prohibited from setting its own offered wages, but instead decided to delegate that function to the Associations.

247.   As to Defendant Nottingham Land and Livestock, LLLP ("Nottingham"):

     i.     As outlined above, Defendant Nottingham has misrepresented to the DOL the actual wages it is paying foreign workers. *See* Part IV.D.3., *supra.*

     ii.     It joined WRA and MPAS.

     iii.     As a WRA member, it allowed this association to make job offers and to set on MASC's behalf the wage rate in those job offers, as shown in Exhibit A. *See* Ex. A-2 at 9-17 (job offer for Nottingham).

 

 

iv.     Nottingham acquiesced to using the form contracts and attestations similar to the ones included in Exhibit F, at 2-4, that were prepared by MPAS and/or WRA and that set shepherd wages at the minimum offered by DOL.

v.     Defendant Nottingham knew or should have known that it was not prohibited from setting its own offered wages, but instead decided to delegate that function to the Associations.

248.   As to Two Bar Sheep Co LLC ("Two Bar"):

i.     The owner or principal operator of Defendant Two Bar is Steve Raftopolous, who is the former president of the board of WRA.

ii.    Mr. Raftopolous had frequent conversations with the rest of the WRA Board regarding various items affecting members, including the wages to be paid H-2A shepherds.

iii.   Mr. Raftopolous, as former President of the WRA board, is intimately familiar with the policies of the association.

iv.    As outlined above, Defendant Two Bar has also misrepresented to the DOL the actual wages it is paying foreign workers. *See* Part IV.D.4, *supra*.

v.     Defendant Two Bar joined WRA and MPAS.

vi.    As a WRA member, Defendant Two Bar allowed these associations to make job offers and to set on Two Bar's behalf the wage rate in those

job offers, as shown in Exhibit A. *See* Ex. A-2 at 28-34 (job offer for Two Bar).

vii.    Defendant Two Bar acquiesced to using the form contracts and attestations similar to the ones included in Exhibit F, at 2-4, that were prepared by MPAS and/or WRA and that set shepherd wages at the minimum offered by DOL.

viii.    Defendant Two Bar knew or should have known that it was not prohibited from setting its own offered wages, but instead decided to delegate that function to the Associations.

249.   As to Cunningham Sheep Company ("CSC"):

i.    As outlined above, Defendant CSC has misrepresented to the DOL the actual wages it is paying foreign workers. *See* Part IV.D.5., *supra.*

ii.    Defendant CSC joined WRA.

iii.    As a WRA member, Defendant CSC allowed this association to make job offers and to set on MASC's behalf the wage rate in those job offers, as shown in Exhibit A. *See* Ex. A-1 at 23-30 (job offer for CSC).

iv.    Defendant CSC allowed WRA to make misrepresentations to Oregon and federal labor authorities about the actual wage offered to H-2A shepherds, even though Defendant CSC actually intended to pay less than this offered wage. *See* Part IV.B., *supra* (documenting this problem).

v.      CSC acquiesced to using the form contracts and attestations similar to the ones included in Exhibit F, at 2-4, that were prepared by WRA and that set shepherd wages at the minimum offered by DOL.

vi.     Defendant CSC knew or should have known that it was not prohibited from setting its own offered wages, but instead decided to delegate that function to WRA.

250.    As to Dennis Richins DBA Dennis Richins livestock ("Richins"):

i.      Defendant Richins is the former president of the board of WRA.

ii.     Upon information and belief, Mr. Richins had frequent conversations with the rest of the WRA Board regarding various items affecting members, including lawsuits filed over shepherd wages.

iii.    Mr. Richins, as an executive director of the WRA, is intimately familiar with the policies of the WRA.

iv.     In his capacity as operator of a ranching operation, Defendant Richins joined WRA.

v.      As a WRA member, Defendant Richins allowed WRA to make job offers and to set on his behalf the wage rate in those job offers, as shown in Exhibit A. *See* Ex. A-2 at 18-27 (job offer for Richins).

vi.     Defendant Richins acquiesced to using the form contracts and attestations similar to the ones included in Exhibit F, at 2-4, that were prepared by WRA and that set shepherd wages at the minimum offered by DOL.

vii.    Defendant Richins knew or should have known that it was not

prohibited from setting its own offered wages, but instead decided to

delegate that function to WRA.

**I.    Defendants' Wage-Fixing Conduct Has Persisted Through the Year-Long Life of this Lawsuit**

251.    Evidence of Defendants' wage fixing has extended through the life of this lawsuit.

252.    For example, a review of the available data for Fiscal Year 2016 (from June 2016

through June 30, 2016)[15] reveals that all shepherd labor certifications filed with the

United States Department of Labor were set at the minimum wage authorized by DOL

for the state in question.

253.    Defendants continue to make this lower offer, despite the record evidence,

discussed above, that at least some H-2A shepherds make in excess of this minimum

wage. *See* Part IV.D., *supra*.

254.    In responding to Defendants' motions to dismiss in late January, Plaintiffs clearly

informed Defendants that their failure to disclose the higher wages actually paid to H-2A

shepherds (but not offered to domestic workers). *See* [Dkt. # 96 at 20-21]

255.    In other words, despite being on notice since at least January 2016 that their

misrepresentations about the wage actually paid to DOL violate the H-2A regulations,

Defendants continue to both: (1) fix offered wages at the DOL minimum, and (2) do so

---

[15] The data are avalaible through this link:
https://www.foreignlaborcert.doleta.gov/docs/Performance_Data/Disclosure/FY15-FY16/H-2A_Disclosure_Data_FY16.xlsx

by knowingly violating H-2A regulations, which require the offered wages to match what is paid to the foreign workers.

## V.     Allegations Regarding Illegal Deductions

### A.     The Enterprises

#### 1.     Richins Enterprise

256.   As Executive Director of the WRA, Defendant Richins formed an association-in-fact with the WRA, which shall be referred to as the "Richins Enterprise."

257.   In the alternative, the "Richins Enterprise" shall be defined as the WRA alone.

258.   Richins served as Executive Director of the WRA from 2001 until sometime in 2014. From 1985 until 2001 he was a WRA board member, and president of the WRA from 1988 until 2001.

259.   In this role, Richins had substantial involvement in the WRA's policies regarding payment of shepherd wages and signed all—or almost all—H-2A job orders and H-2A Certifications for WRA employees. *See also Ruiz v. Fernandez*, 949 F. Supp. 2d 1055, 1069 (E.D. Wash. 2013) (citing Richins's testimony regarding WRA's wage-payment policies).

260.   In conducting their illegal racketeering scheme, Richins and the WRA acted with the common purpose of minimizing member ranches' payments to H-2A shepherds and thereby increasing the WRA's market share or profits.

261.   He achieved this goal by illegally allocating these costs to the workers, even though the law requires that H-2A employers pay these costs.

### 2.      The WRA Enterprise

262.    The WRA and its members have formed an association-in-fact, which shall be referred to as the "WRA Enterprise."

263.    The common purpose of each of the members of the WRA Enterprise was and is recruiting shepherds for WRA member ranches and minimizing member ranches' payments to H-2A shepherds.

264.    The WRA is the lynchpin of the WRA Enterprise, but the WRA Enterprise could not function without the informal, association-in-fact established between the WRA and its members.

265.    The WRA uses the WRA Enterprise to file job orders and H-2A Applications on behalf of the WRA's members.

266.     Because it receives fees from member ranches in exchange for preparing job orders and H-2A Applications, the WRA has independent financial incentive to participate in the WRA Enterprise's pattern of racketeering.

267.    The WRA has existed as a membership organization recruiting shepherds for its members since at least the 1950s.

### 3.      The MPAS Enterprise

268.    The MPAS and its members have formed an association-in-fact, which shall be referred to as the "MPAS Enterprise."

269.    The common purpose of each of the members of the MPAS Enterprise was and is recruiting shepherds for MPAS member ranches and minimizing member ranches' payments to H-2A shepherds.

270.   The MPAS is the lynchpin of the WRA Enterprise, but the MPAS Enterprise could not function without the informal, association-in-fact established between the MPAS and its members.

271.   The MPAS uses the MPAS Enterprise to file job orders and H-2A Applications on behalf of the MPAS's members.

272.   Because it receives fees from member ranches in exchange for preparing job orders and H-2A Applications, the MPAS has an independent financial incentive to participate in the MPAS Enterprise's pattern of racketeering.

273.   The MPAS has existed as a membership organization recruiting shepherds for its members since at least 1988.

### B.   Patterns of Racketeering

274.   The Enterprises engaged in patterns of racketeering activity by committing multiple, continuing, and related acts of fraud for the benefit of the respective Enterprises over a period of years.

275.   Specifically, the Enterprises continually and repeatedly have made material and false representations to state governments, the federal government, and shepherds by assuring all of these entities that shepherds would not be subject to unreasonable deductions pursuant to 20 C.F.R. § 655.122, which requires free and clear wage payments, bars illegal kickbacks, and bars employers from using deductions to "reduce the wage payment made to the employee below the minimum amounts required."

276.   The Enterprises also have continually and repeatedly defrauded state governments, the federal government, and shepherds by misrepresenting to these

entities that shepherds would be paid "for reasonable costs incurred by the worker for transportation and daily subsistence from the place from which the worker has come to work for the employer, whether in the U.S. or abroad to the place of employment," as required by 20 C.F.R. § 655.122.

277.    The Enterprises made these assurances despite simultaneously knowingly and intentionally implementing policies that violated 20 C.F.R. § 655.122.

278.    In recent job orders to state workforce agencies, the WRA has promised that

> [t]ransportation from point of recruitment to worksite and from the worksite back to the point of recruitment will be provided by Employer. Employer will reimburse worker for subsistence costs during travel to the worksite not later than the end of the first pay period upon the presentation of receipts and from the worksite at the end of the job based on the rates established by the applicable regulations.

279.    The WRA made this promise or substantially the same promise in substantially all of its job orders submitted within the four years prior to the filing of this Second Amended Complaint.

280.    In recent job orders to state workforce agencies, the MPAS has promised that

> [t]he employer will provide advance inbound transportation (most economical common carrier or other transportation which conforms to the Interstate Commerce Commission (ICC)). The employer will also provide subsistence at a minimum amount of $11.86 per 24-hour period of travel from the place of recruitment to the place of employment. Workers who provide receipts for meals and non-alcoholic beverages in excess of $11.86 will be reimbursed during the first pay period, up to the maximum amount of $46.00 per 24-hour period of travel (12:01 A.M.-12:00 midnight) from the place of recruitment to the place of employment. Transportation and subsistence which was advanced to the worker may be deducted from the worker's pay, but will be reimbursed to the worker upon 50% completion of the work contract. Workers who voluntarily quit or are terminated for cause prior to completing 50% of the contract period will be required to reimburse the employer for the full amounts of transportation and subsistence which were advanced and/or reimbursed to the worker. In

the event of termination for contract impossibility, employer will reimburse the worker the full amount of any deductions made from the workers' pay by the employer for transportation and subsistence expenses to the place of employment; and pay the worker for any costs incurred by the worker for transportation and daily subsistence to that employer's place of employment. Upon completion of the work contract, or termination for contract impossibility (including due to Act of God or medical reasons), the employer will provide or pay outbound transportation (under the most economical common carrier or other transportation which conforms to ICC regulations) and subsistence from the work site to the place of recruitment. The amounts the employer will pay outbound subsistence will be the minimum amount of $11.86 per 24-hour period of travel. The maximum amount reimbursed not to exceed $46.00 per 24-hour period of travel (12:01- 12:00 midnight) for workers who provide receipts. This requirement will be nullified if the worker has contracted with a subsequent H-2A employer who has agreed to pay for the worker's transportation and subsistence costs from the present employer's work site. Written notification to the NPC, and DHS in case of H-2A workers, or any other method specified by the Department or DHS in a notice published in the Federal Register, will relieve the employer of the responsibility of providing outbound (return to place of recruitment) transportation and subsistence expenses to workers who voluntarily abandon employment before the end of the contract period, or who are terminated for cause.

281.   The MPAS made this promise or substantially the same promise in substantially all its job orders submitted within the four years prior to the filing of this complaint.

282.   In reliance on statements like these in the job orders, the state workforce agencies review and approve job orders to be offered to domestic workers.

283.   The Enterprises, acting through Association Defendants, submit or have submitted H-2A Applications to the DOL with attached copies of job orders offering positions that domestic workers did not fill. These job orders contain the promises to pay travel expenses described above.

284.   All H-2A Applications filed within the relevant statute of limitations also make the following promise:

> The employer and its agents have not sought or received payment of any kind from the H-2A worker for any activity related to obtaining labor certification, including payment of the employer's attorneys' fees, application fees, or recruitment costs. For purposes of this paragraph, payment includes, but is not limited to, monetary payments, wage concessions (including deductions from wages, salary, or benefits), kickbacks, bribes, tributes, in kind payments, and free labor.

285.   Each H-2A Application submitted by the WRA is signed under penalty of perjury by an agent of the WRA.

286.   Each H-2A Application submitted by the MPAS includes a certification by an agent of the MPAS that the information in the H-2A Application is true and correct.

287.   In reliance on these H-2A Applications and job orders, the DOL reviews and approves H-2A Applications and allows the WRA and the MPAS to recruit foreign workers using H-2A visas.

288.   Pursuant to state and DOL instructions, all job orders and H-2A Applications must be submitted to the respective agencies by wire or mail.

289.   The statements by the WRA and the MPAS are fraudulent because the MPAS and WRA each has a policy of unreasonably deducting expenses that are primarily for the benefit or convenience of the employer from the wages of shepherd employees, including medical checkups, criminal background checks and travel and subsistence expenses (which include bus fares, meals, and hotels necessary to travel between the shepherd's place of recruitment and the workplace, and travel necessary to complete the other pre-travel requirements, *e.g.,* the medical checkups).

290.   The WRA's fraudulent intentions are further evidenced by the discrepancies between its representations to the state workforce agencies and the DOL, which parrot

the regulatory travel reimbursement requirements, and the vague promise made to shepherds in their form "PRE-EMPLOYMENT NOTICE OF RIGHTS AND OBLIGATIONS," which the WRA gives to shepherds before travelling to the United States. That form states only that "[t]ransportation for travel to and from your home country are paid if you complete the contract terms."

### C.   These Patterns of Racketeering and Fraudulent Acts Injured Plaintiffs

291.   The Enterprises' fraudulent misrepresentations caused Plaintiffs injury by inducing the DOL to issue H-2A certifications authorizing each of Plaintiffs' H-2A visas for employment as shepherds.

292.   Notwithstanding the assurances the Enterprises made to the DOL, Plaintiffs were victims of illegal deductions that were primarily for the benefit of the Association Defendants and their members. In this way, the Richins Enterprise's and the WRA Enterprise's underlying predicate acts of mail and wire fraud caused injury to Plaintiffs Huaman, Leovegildo Vilchez Guerra, and Liber Vilchez Guerra. And the MPAS Enterprise's underlying predicate acts of mail and wire fraud caused injury to Plaintiff De la Cruz.

293.   Furthermore, notwithstanding the assurances the Enterprises made to the Department of Labor, the Enterprises did not provide the legally-required payment for travel. In this way, the Richins Enterprise's and the WRA Enterprise's underlying predicate acts of mail and wire fraud caused injury to Plaintiffs Huaman, Leovegildo Vilchez Guerra, and Liber Vilchez Guerra. And the MPAS Enterprise's underlying predicate acts of mail and wire fraud caused injury to Plaintiff De la Cruz.

294.    These frauds occurred when Plaintiffs arrived in the United States after paying these expenses and not being paid back. Plaintiff De La Cruz arrived in the United States in or around March 2009, April 2012, and April 2015 without being paid for the travel and other expenses detailed above. Plaintiff Leovegildo Vilchez Guerra arrived in or around May 2011 and in or around September 2014 without being paid for these same expenses. Plaintiff Liber Vilchez Guerra arrived in or around January 2011 and in or around November 2014 without being paid back for these expenses. And Plaintiff Huaman arrived in March 2011 without being paid for these expenses.

295.    Each of these named Plaintiffs incurred expenses that were required to be paid by the employer pursuant to 20 C.F.R. § 655.122 and were not paid. For example, each of the named Plaintiffs incurred travel and subsistence expenses from his place of recruitment and his workplace that were never reimbursed, *e.g.*, bus tickets, hotels, and meals.

296.    All H-2A Applications and job orders filed by the Enterprises with state workforce agencies or the DOL with start dates corresponding to the dates when Plaintiffs began working as H-2A shepherds contained the fraudulent statements detailed above in Part V, *supra*, or substantially similar statements. *See* Ex. E (providing such records).

## VI.    Allegations Regarding the Failure to Pay Nevada Minimum Wage

297.    For several years until mid-November 2015, the MPAS has employed shepherds in Nevada, including Plaintiff De la Cruz, and paid those shepherds approximately $800 per month.

298.   Upon information and belief, the MPAS currently pays its shepherd employees in Nevada exactly the minimum set by the DOL in the 2015 Special Procedures.

299.   The MPAS has exerted substantial control over the recruitment and hiring of shepherds in Nevada and has set shepherd wages.

300.   At all relevant times, the MPAS controlled its shepherd employees' employment by, among other things, setting the terms and conditions of employment, including the wage rate, recruiting the employees, and maintaining employment records.

301.   At all relevant times, the Nevada minimum wage was set by the Nevada Constitution at either $7.25 per hour or $8.25 per hour, depending on whether the employer provides health benefits.

302.   Shepherds are entitled to the Nevada constitutional minimum wage.

303.   During a normal workweek, shepherds, including Plaintiff De la Cruz, work more than 40 hours per week.

304.   $800 in wages per month compensates an employee in Nevada for less than 24 hours per week of work.

305.   The $800 per month wage rate is therefore unconstitutional and illegal under Nevada law.

VII.   **Supplemental Illegal Deduction Allegations**

A.   <u>**The H-2A Travel Expense Payment Rule at Issue Here Is One Association Defendants Opposed—and Now Try To Ignore**</u>

306.   Plaintiffs' claims to illegal deductions center around the Association Defendants' knowing violation of H-2A regulations finalized in early 2010. *See Temporary*

*Agricultural Employment of H–2A Aliens in the United States*, 75 Fed. Reg. 6,884 (Feb. 12, 2010) ["2010 Rule"].

307.    In the 2010 Rule, DOL made abundantly clear that its intention was that "the employer is required to pay the costs of transportation from the worker's place of recruitment to and from the place of employment." *Id.* at 6,954.

308.    DOL even explicitly noted that this was a new cost to be incurred by employers and that it would, on average cost an employer $60 more in transportation costs, which is the average cost of a roundtrip bus ticket between the hometown of an H-2A worker and the location of the majority of American consulates that process H-2A visas. *Id.* at 6,954 & n.47.

309.    This cost of $60 is also the around the approximate cost of travel between Huancayo, Peru, the home region of most of the H-2A shepherds, and Lima, Peru, where most of the shepherds process their visas. *See* Part VII.B, *infra*.

310.    This trip between Huancayo and Lima—through high mountain passes in the Andes—takes most shepherds at least eight hours to complete.

311.    This is the equivalent in driving time of a trip between Denver and Salt Lake City.

312.    And many shepherds must make the trip around a half-dozen times to fulfill all of the requirements placed upon them by WRA and MPAS.

313.    The DOL also made clear in the rule that under the H-2A regulations, the "cost of furnishing any facility found to be primarily for the benefit or convenience of the employer is not reasonable and cannot be counted in computing wages." *Id.* at 6,916.

314.   And the DOL similarly made clear that it constitutes underpayment of wages for an employer to force an employee to pay any cost that primarily benefits the employer. As the DOL emphasized, "wages cannot be considered to have been received unless they are paid finally and unconditionally or free and clear, without any kickback, directly or indirectly." *Id.*

315.   DOL even clarified this position by way of example to an employer who forced an employee to pay for a uniform that the employee was supposed to use on the job, for the employer's benefit. Forcing the employee to bear such a cost would constitute a violation of the H-2A regulations, as these regulations were implemented "in order to ensure that the employee receives the legally required wage free and clear without any inappropriate, unauthorized deductions." *Id.*

316.   Both WRA and MPAS opposed the 2010 Rule. *See* Ex. F at 117-61.

317.   Both WRA and MPAS hired large, international law firms with considerable background in the H-2A regulations to provide in-depth analysis of the 2010 rule. *Id.*

318.   Both WRA and MPAS, with the assistance of the firms, submitted this commentary to the Department of Labor.

319.   Defendant Richins, on behalf of WRA, personally signed the commentary submitted to the DOL.

320.   Notwithstanding employer opposition to this aspect of the 2010 Rule, DOL adopted the requirement that employers pay for employee travel from the place of recruitment (i.e., their hometowns and not the town where the U.S. Consulate is located).

321.    Notwithstanding employer opposition to this aspect of the 2010 Rule, DOL adopted the requirement that employers pay for or immediately reimburse any expense that primarily benefited employers.

322.    Notwithstanding the Associations' deep knowledge of this regulatory scheme, they have opted to violate the H-2A regulations by not reimbursing shepherds for their travel expenses.

323.    Worse still, in a communication to WRA members issued well **_after_** the initiation of this lawsuit, Defendant WRA acknowledged that its uniform policy is to require shepherd employees to pay for many expenses the 2010 rule requires to be paid by the employer. The costs **_illegally_** shifted to workers include expenses for the medical examinations and background checks described below. *See* Ex. F at 164.[16]

324.    Defendant WRA takes this position despite the fact that the H-2A rule at issue here—on which WRA offered detailed comments—clearly requires that any costs incurred to obtain H-2A visas must be paid by the employer.

    B.    **Nature of the Illegal Deductions**

        1.    **WRA Illegal Deductions**

325.    The following table includes a non-exhaustive list of expenses that have been deducted from Plaintiffs' wages over the course of numerous separate trips between the

---

[16] The document provided to Plaintiffs that references a number of DOL records that apparently justify WRA's position. These records have yet to be provided to Plaintiffs in their entirety. Plaintiffs provide as much of the record of this communication as they in Exhibit F. *See* Ex. F at 361-64.

towns where they lived in rural Peru and where WRA and Richins instructed Plaintiffs to travel in Peru's capital, Lima.

326.    Plaintiffs incur these expenses because Defendants WRA and Richins have established policies that require shepherds to make multiple trips between the small towns near Huancayo, where most shepherds live, and the city of Lima, where they complete many administrative tasks required of them by these Defendants.

327.    Each trip between rural Peru and Lima included various forms of transportation, from a taxi from a local town to the larger city of Huancayo (or some larger city near Huancayo), to bus transportation from Huancayo to Lima, to transportation within Lima and the costs associated with completing each administrative task demanded by Defendant WRA.

328.    The illegal, unreimbursed costs that WRA shepherds incur to obtain H-2A visas include the following:

| Item | Approximate Cost in Peruvian Soles (As Applicable) | Approximate and/or Average Cost in Dollars |
|---|---|---|
| **(1) Trip to Conduct a Preliminary Interview with WRA Representative** | | |
| Trip from Hometown Outside of Huancayo to City of Huancayo or other Metropolitan Center | | $2.43 |
| Bus Transport from Huancayo (or other major metropolitan center) to Lima | | $24 |
| Transport from Lima Bus Terminal to WRA Representative's Office | | $4 |
| Transport from WRA Office to Lima Bus Terminal | | $4 |
| Bus Transport from Lima to Huancayo (or other major metropolitan center) | | $24 |
| Transport to Hometown | | $2.43 |
| One day food and lodging in Lima | | $10 |

| (2) Trip to Conduct a Medical Check-Up at the Request of WRA | | |
|---|---|---|
| Trip from Hometown Outside of Huancayo to City of Huancayo or other Metropolitan Center | | $2.43 |
| Bus Transport from Huancayo (or other major metropolitan center) to Lima | | $24 |
| Transport from Lima Bus Terminal to Medical Offices | | $4 |
| Return Transport from Medical Offices to Lima Bus Terminal | | $4 |
| Transport from Lima to Huancayo (or other major metropolitan center) | | $24 |
| Transport from Huancayo to Hometown | | $2.43 |
| Cost of the Medical Check-Up | | $150-$200[17] |
| One day food and lodging in Lima | | $10 |
| (3) Trip to Obtain Background Checks | | |
| Trip from Hometown Outside of Huancayo to City of Huancayo or other Metropolitan Center | | $2.43 |
| Bus Transport from Huancayo (or other major metropolitan center) to Lima | | $24 |
| Transport from Lima Bus Terminal to Peruvian Governmental Offices | | $4 |
| Transport from Governmental Offices to Lima Bus Terminal | | $4 |
| Bus transport from Lima to Huancayo (or other major metropolitan center) | | $24 |
| Transport from Huancayo to Hometown | | $2.43 |
| Purchase of a Police Record (used by the Peruvian government to record encounters with the Peruvian police—mostly for arrests and referred to in Spanish as a record of "antecedentes policiales") | 17 soles | $5.17 |
| Purchase of a Civil Judgement Record (used by the Peruvian government to record any civil actions brought against a Peruvian citizen and referred to in Spanish, a record of "antecedentes judiciales") | 37.70 soles | $11.47 |
| Purchase of Criminal Record (used by the Peruvian government to record any convictions and referred to in Spanish as a record of "antecedentes penales") | 53.90 soles | $16.40 |
| One day food and lodging in Lima | | $10 |
| (4) Trip for Interview in U.S. Embassy in Lima | | |
| Trip from Hometown Outside of Huancayo to City of Huancayo or other Metropolitan Center | | $2.43 |

---

[17] Plaintiffs do not remember the exact, full cost of the medical check-ups and such information is in the possession of Defendants WRA and Richins. Plaintiffs estimate the cost of these procedures at between $150 and $200.

| | | |
|---|---|---|
| Bus Transport from Huancayo (or other major metropolitan center) to Lima | | $24 |
| Transport from Lima Bus Terminal to US Embassy | | $4 |
| Transport from US Embassy to Lima Bus Terminal | | $4 |
| Transport from Lima to Huancayo (or other major metropolitan center) | | $24 |
| Transport from Huancayo to Hometown | | $2.43 |
| Administrative Fee for Embassy | | $190 |
| One day food and lodging in Lima | | $10 |
| **(5) Trip to DHS Mailing Office in Lima to Obtain Processed Visa Documents** | | |
| Trip from Hometown Outside of Huancayo to City of Huancayo or other Metropolitan Center | | $2.43 |
| Bus Transport from Huancayo (or other major metropolitan center) to Lima | | $24 |
| Transport from Lima Bus Terminal to DHL Office | | $4 |
| Transport from DHL to Lima Bus Terminal | | $4 |
| Bus Transport from Lima to Huancayo (or other major metropolitan center) | | $24 |
| Transport from Huancayo to Hometown | | $2.43 |
| One day food and lodging in Lima | | $10 |
| **(6) Trip for Departure to the United States** | | |
| Trip from Hometown Outside of Huancayo to City of Huancayo or other Metropolitan Center | | $2.43 |
| Bus Transport from Huancayo (or other major metropolitan center) to Lima | | $24 |
| Transport from Lima Bus Terminal to Lima Airport | | $4 |
| One day food and lodging in Lima | | $10 |
| **(7) Return to Peru from the United States** | | |
| Transport from Lima Airport to Lima Bus Terminal | | $4 |
| Bus Transport from Lima to Huancayo (or other major metropolitan center) | | $24 |
| Transport from Huancayo to Hometown | | $2.43 |

## 2.     MPAS Illegal Deductions:

329.   The following table includes a non-exhaustive list of expenses that have been deducted from Plaintiffs' wages over the course of numerous separate trips between the towns where they lived in rural Peru and where MPAS maintains its offices in Peru's capital, Lima.

330.   Plaintiffs incur these expenses because Defendant MPAS has established policies that require shepherds to make multiple trips between the small towns near Huancayo where the shepherds live and the city of Lima, where they much complete many administrative tasks required of them by these defendants.

331.   Each trip between rural Peru and Lima included various forms of transportation, from a small taxi from a small town to the larger city of Huancayo (or some larger city near Huancayo), to bus transportation from Huancayo to Lima, to transportation within Lima and the costs associated with completing each administrative task demanded by Defendant MPAS.

| Item | Cost in Peruvian Soles (As Applicable) | Approximate and/or Average Cost in Dollars |
|---|---|---|
| **(1) Trip to Conduct a Preliminary Interview with MPAS Representative** | | |
| Trip from Hometown Outside of Huancayo to City of Huancayo or other Metropolitan Center | | $2.43 |
| Bus Transport from Huancayo (or other major metropolitan center) to Lima | | $24 |
| Transport from Lima Bus Terminal to MPAS Representative's Office | | $4 |
| Transport from MPAS Office to Lima Bus Terminal | | $4 |
| Bus Transport from Lima to Huancayo (or other major metropolitan center) | | $24 |
| Transport from Huancayo to Hometown | | $2.43 |
| **(2) Trip for Interview in U.S. Embassy in Lima** | | |
| Trip from Hometown Outside of Huancayo to City of Huancayo or other Metropolitan Center | | $2.43 |
| Bus Transport from Huancayo (or other major metropolitan center) to Lima | | $24 |
| Transport from Lima Bus Terminal to U.S. Embassy | | $4 |
| Transport from U.S. Embassy to Lima Bus Terminal | | $4 |
| Transport from Lima to Huancayo (or other major metropolitan center) | | $24 |

| | | |
|---|---|---|
| Transport from Huancayo to Hometown | | $2.43 |
| Administrative Fee for Embassy | | $190 |
| One day food and lodging in Lima | | $10 |
| **(3) Trip to DHS Mailing Office in Lima to Obtain Processed Visa Documents** | | |
| Trip from Hometown Outside of Huancayo to City of Huancayo or other Metropolitan Center | | $2.43 |
| Bus Transport from Huancayo (or other major metropolitan center) to Lima | | $24 |
| Transport from Lima Bus Terminal to DL Office | | $4 |
| Transport from DHL Office to Lima Bus Terminal | | $4 |
| Bus Transport from Lima to Huancayo (or other major metropolitan center) | | $24 |
| Transport from Huancayo to Hometown | | $2.43 |
| One day food and lodging in Lima | | $10 |
| **(4) Trip for Departure to the United States** | | |
| Trip from Hometown Outside of Huancayo to City of Huancayo or other Metropolitan Center | | $2.43 |
| Bus Transport from Huancayo (or other major metropolitan center) to Lima | | $24 |
| Transport from Lima Bus Terminal to Lima Airport | | $4 |
| One day food and lodging in Lima | | $10 |
| **(5) Return to Peru from the United States** | | |
| Transport from Lima Airport to Lima Bus Terminal | | $4 |
| Bus Transport from Lima to Huancayo (or other major metropolitan center) | | $24 |
| Transport from Huancayo to Hometown | | $2.43 |

## C.  Association Defendants Entered Into Contractual and Employment Relationships with Plaintiffs and All H-2A Shepherds that Association Defendants Employed

332.   Plaintiffs Esliper, Huaman, Leovegildo Vilchez Guerra, and Liber Vilchez Guerra ("the WRA Plaintiffs") all entered into contractual relationships with WRA in which WRA agreed not to illegally deduct the above expenses from their wages.

333.    For the same reasons that the court in *Ruiz v. Fernandez*, 949 F. Supp. 2d 1055, 1071-72 (E.D. Wash. 2013), found that the shepherd plaintiffs in that case plausibly had entered into contractual relationships with the WRA that required WRA to

comply with the H-2A regulations, there is substantial evidence that Plaintiffs have entered into a similar contractual relationship with WRA in this case.

334.   In particular, the WRA Plaintiffs signed the same form contracts as the Plaintiffs in *Ruiz*, WRA has made no material changes in the way it handles shepherd employment matters or visa processing since *Ruiz* was decided, and the terms of the temporary employment certification and job order that form the basis of these employment contracts have not changed since *Ruiz* was decided.

335.   Indeed, many of the contracts reviewed in *Ruiz* are from the same time period as those at issue here.

336.   Plaintiff Rafael De La Cruz also entered into a contractual and employment relationship with MPAS. For example, Defendant MPAS directed and controlled much of Plaintiff De La Cruz's activities to obtain an H-2A visa in Peru, including by directing Mr. De La Cruz to make numerous trips from his hometown to Lima to perform various tasks for Defendant MPAS.

337.   Defendant MPAS also controlled many of the conditions of Plaintiff De La Cruz's employment by directing him to work on a particular ranch and by setting his rate of pay at the wage floor allowed for H-2A shepherds in Nevada. And Defendant MPAS also performed administrative functions for Plaintiff De La Cruz, most importantly by directing Plaintiff De La Cruz to call the MPAS main office if he had any trouble during the course of his employment.

338.   Finally, upon information and belief, Defendant MPAS drafted a form contract that Plaintiff De La Cruz signed with the individual rancher for whom he worked, and in

this contract, Defendant MPAS established additional terms of employment in which Defendant MPAS played an important role.

### D.     Details About These Contractual Relationships

339.   Plaintiffs entered into the employment contracts referenced immediately above on the dates that they began working on ranches operated by Association Defendants and their members.

340.   Per the industry standard, most of these contracts were for an approximately one-year term, with the expectation of renewal for three years followed by a trip to Peru.

341.   Any deductions for the above-mentioned expenses were either due immediately upon the herder's arrival in the United States or—at the latest—after he had completed fifty percent of his contract.

342.   All Plaintiffs substantially performed on at least one of these contracts by providing labor as shepherds for the approximately year-long term of the contract.

343.   WRA and MPAS, as parties to these contracts, breached these contracts by failing to pay Plaintiffs for the travel deductions they incurred, detailed above.

344.   Although all Plaintiffs performed on at least one contract, to the extent any Plaintiff finished a contract before the original proposed end date, he did so because of a prior breach of the terms of the contract or labor certification committed by a Defendant ranch—for example, a prior breach caused by unsanitary and unsafe living conditions that violate H-2A regulations.

345.   The specific dates the employment contracts and the specific ranches on which Plaintiffs worked are known to the Association Defendants, which are required to keep records of the visas and labor certifications they prepare for H-2A shepherds.

346.   By way of example, based on the discovery now provided by Defendant WRA:

    i.    Plaintiff Leovegildo Vilchez Guerra entered into one contract on or about June 10, 2011, with an end date of June 9, 2012. He continued working for WRA after June 9, 2012. Despite performing on this contract by conducting his shepherding duties (and despite having the contract later renewed), he was not paid back for most of the above-mentioned expenses.

    ii.    Plaintiff Liber Vilchez Guerra entered into a contract that began on or about January 20, 2011 and ended on or about January 9, 2012. He continued working for WRA after January 9, 2012. Despite performing on this contract (and having it renewed), he was not paid back for most of the above-mentioned expenses.

    iii.    Plaintiff Esliper Huaman entered into a contract on or about March 29, 2011, which ended on January 9, 2012. He continued working for WRA after January 9, 2012. Despite performing on this contract (and having it renewed), he was not paid back for most of the above-mentioned expenses.

347.   Further, although MPAS has yet to provide the employment records it is required to keep for Plaintiff De La Cruz, Mr. De La Cruz knows, for example, that he began his

second-to-last contract with MPAS in March 2012, and the contract could have lasted for no more than one year, or until around—at the latest—March 2013. He continued working for the same ranch through 2015. Despite performing on this contract (and having it renewed), he was not paid back for most of the above-mentioned expenses.

## VIII.     Class Definitions

### A.  <u>The Price Fixing Classes</u>

348.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

349.    Pending any modifications necessitated by discovery, the named Plaintiffs define the "Price Fixed Class" as follows:

> ALL PERSONS WHO WORKED OR APPLIED TO WORK
> AS A SHEPHERD FOR THE WRA, MPAS, OR ANY OF
> THE MEMBER RANCHERS OF THE WRA OR THE MPAS

350.    Pending any modifications necessitated by discovery, the named Plaintiffs define the "WRA Price Fixed Class" as follows:

> ALL PERSONS WHO WORKED OR APPLIED TO WORK
> AS A SHEPHERD FOR THE WRA OR ANY OF THE WRA
> MEMBER RANCHERS

351.    Pending any modifications necessitated by discovery, the named Plaintiffs define the "MPAS Price Fixed Class" as follows:

> ALL PERSONS WHO WORKED OR APPLIED TO WORK
> AS A SHEPHERD FOR THE MPAS OR ANY OF THE
> MPAS MEMBER RANCHERS

352.    The members of the putative class are so numerous that joinder of all potential classes members is impracticable. Plaintiffs do not know the exact size of the classes

because that information is within the control of the Defendants. However, WRA and the MPAS claim to recruit "nearly all" of the roughly 2000 to 2500 shepherds employed in the United States each year.

353.    There are questions of law or fact common to the classes that predominate over any individual issues that might exist. Common questions include, but are not limited to whether the WRA and the MPAS and their respective members fix shepherd wages through the operation of joint ventures that recruit workers and set wages.

354.    The class claims asserted by Plaintiffs are typical of the claims of all of the potential members of the classes because all potential class members suffered suppressed wages as a consequence of Defendants' price fixing. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because numerous identical lawsuits alleging similar or identical causes of action would not serve the interests of judicial economy.

355.    Plaintiffs will fairly and adequately protect and represent the interests of the class. Plaintiffs' wages were artificially kept at the same low level as other shepherds as a result of the same conspiracy.

356.    Plaintiffs are represented by counsel experienced in litigation on behalf of low-wage workers and in class actions.

357.    The prosecution of separate actions by the individual potential Class Members would create a risk of inconsistent or varying adjudications with respect to individual potential Class Members that would establish incompatible standards of conduct for Defendants.

358.   Plaintiffs are unaware of any members of the putative classes who are interested in presenting their claims in a separate action.

359.   Plaintiffs are unaware of any pending litigation commenced by members of the putative classes concerning the instant controversies.

360.   It is desirable to concentrate this litigation in this forum because many of the Defendants and Plaintiffs are located in, or do business in, Colorado and H-2A shepherds operate exclusively in the western United States.

361.   This class action will not be difficult to manage due to the uniformity of claims among the Class Members and the susceptibility of the claims to class litigation and the use of representative testimony and representative documentary evidence.

362.   The contours of the classes will be easily defined by reference to Defendants' records and government records.

**B.      The WRA Illegal Deduction Class**

363.   Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

364.   Plaintiffs Huaman, Leovegildo Vilchez Guerra, and Liber Vilchez Guerra assert Counts IV, V, and VIII as a Class Action pursuant to Fed. R. Civ. Proc. 23 on behalf of what is termed here the "Illegal Deduction Class."

365.   Pending any modifications necessitated by discovery, the "WRA Illegal Deduction Class" is defined as follows:

> ALL PERSONS WHO WERE RECRUITED AS
> SHEPHERDS, A.K.A. SHEEPHERDERS, BY THE WRA

366.    The members of the putative class are so numerous that joinder of all potential

class members is impracticable. The Plaintiffs do not know the exact size of the class

since that information is within the control of the Defendant. However, according to the

DOL's 2014 statistics, the WRA recruited approximately 1200 shepherds in the previous

year.

367.    There are questions of law or fact common to the classes that predominate over

any individual issues that might exist, including whether or not the WRA took illegal

deductions from shepherd wages.

368.    The class claims asserted by the Plaintiff are typical of the claims of all of the

potential Class Members because all potential Class Members experienced the same

illegal deductions due to the WRA's policies. A class action is superior to other available

methods for the fair and efficient adjudication of this controversy because numerous

identical lawsuits alleging similar or identical causes of action would not serve the

interests of judicial economy.

369.    Plaintiff will fairly and adequately protect and represent the interests of the class.

Plaintiff suffered from the same illegal deductions as the Class Members.

370.    Plaintiff is represented by counsel experienced in litigation on behalf of low-wage

workers and in class actions.

371.    The prosecution of separate actions by the individual potential Class Members

would create a risk of inconsistent or varying adjudications with respect to individual

potential Class Members that would establish incompatible standards of conduct for

Defendants.

372.    Plaintiff is unaware of any members of the putative class who are interested in presenting their claims in a separate action.

373.    Plaintiff is unaware of any pending litigation commenced by members of the Class concerning the instant controversies.

374.    It is desirable to concentrate this litigation in this forum because many of the Defendants and Plaintiffs are located in, or do business in, Colorado and shepherds operate exclusively in the western United States.

375.    This class action will not be difficult to manage due to the uniformity of claims among the Class Members and the susceptibility of the claims to class litigation and the use of representative testimony and representative documentary evidence.

376.    The contours of the class will be easily defined by reference to Defendant's records and government records.

### C.    The MPAS Illegal Deduction Class

377.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

378.    Plaintiff De La Cruz asserts Count III and VI as a Class Action pursuant to Fed. R. Civ. Proc. 23 as what is termed here the "MPAS Illegal Deduction Class."

379.    Pending any modifications necessitated by discovery, the "Illegal Deduction Class" is defined as follows:

> ALL PERSONS WHO WERE RECRUITED AS
> SHEPHERDS, A.K.A. SHEEPHERDERS, BY MPAS

380.    The members of the putative class are so numerous that joinder of all potential class members is impracticable. Plaintiff De La Cruz does not know the exact size of the

class since that information is within the control of the Defendant. However, according to the DOL's 2014 statistics, the MPAS recruited approximately 780 shepherds in the previous year.

381.    There are questions of law or fact common to the classes that predominate over any individual issues that might exist, including whether or not the MPAS took illegal deductions from shepherd wages.

382.    The class claims asserted by the Plaintiff are typical of the claims of all of the potential Class Members because all potential Class Members experienced the same illegal deductions due to the MPAS' policies. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because numerous identical lawsuits alleging similar or identical causes of action would not serve the interests of judicial economy.

383.    Plaintiff will fairly and adequately protect and represent the interests of the class. Plaintiff suffered from the same illegal deductions as the Class Members.

384.    Plaintiff is represented by counsel experienced in litigation on behalf of low-wage workers and in class actions.

385.    The prosecution of separate actions by the individual potential Class Members would create a risk of inconsistent or varying adjudications with respect to individual potential Class Members that would establish incompatible standards of conduct for Defendants.

386.    Plaintiff is unaware of any members of the putative class who are interested in presenting their claims in a separate action.

387.   Plaintiff is unaware of any pending litigation commenced by members of the Class concerning the instant controversies.

388.   It is desirable to concentrate this litigation in this forum because many of the Defendants and Plaintiffs are located in, or do business in, Colorado and shepherds operate exclusively in the western United States.

389.   This class action will not be difficult to manage due to the uniformity of claims among the Class Members and the susceptibility of the claims to class litigation and the use of representative testimony and representative documentary evidence.

The contours of the class will be easily defined by reference to Defendant's records and government records.

> **D.      The Nevada Minimum Wage Class**

390.   Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

391.   Plaintiff De La Cruz asserts Count IV and X as a Class Action pursuant to Fed. R. Civ. Proc. 23 as what is termed here the "NV Minimum Wage Class."

392.   Pending any modifications necessitated by discovery, the "NV Minimum Wage Class" is defined as follows:

> ALL PERSONS WHO WERE EMPLOYED AS
> SHEPHERDS, A.K.A. SHEEPHERDERS BY MPAS

393.   The members of the putative class are so numerous that joinder of all potential class members is impracticable. Plaintiff De La Cruz does not know the exact size of the class since that information is within the control of the Defendant. However, according

to the DOL's 2014 statistics, the MPAS employed 43 shepherds in Nevada in the previous year.

394.   There are questions of law or fact common to the classes that predominate over any individual issues that might exist, whether the MPAS fail to pay Nevada shepherds at least Nevada minimum wage.

395.   The class claims asserted by the Plaintiff are typical of the claims of all of the potential Class Members because all potential Class Members allege they were paid less than the Nevada minimum wage by the MPAS. A class action is superior to other available methods for the fair and efficient adjudication of this controversy because numerous identical lawsuits alleging similar or identical causes of action would not serve the interests of judicial economy.

396.   Plaintiff will fairly and adequately protect and represent the interests of the class. Plaintiff suffered from the same illegally low wage as the class.

397.   Plaintiff is represented by counsel experienced in litigation on behalf of low-wage workers and in class actions.

398.   The prosecution of separate actions by the individual potential Class Members would create a risk of inconsistent or varying adjudications with respect to individual potential Class Members that would establish incompatible standards of conduct for Defendants.

399.   Plaintiff is unaware of any members of the putative class who are interested in presenting their claims in a separate action.

400.   Plaintiff is unaware of any pending litigation commenced by members of the Class concerning the instant controversies.

401.   It is desirable to concentrate this litigation in this forum because many of the Defendants and Plaintiffs are located in, or do business in, Colorado and shepherds operate exclusively in the western United States.

402.   This class action will not be difficult to manage due to the uniformity of claims among the Class Members and the susceptibility of the claims to class litigation and the use of representative testimony and representative documentary evidence.

The contours of the class will be easily defined by reference to Defendant's records and government records.

## CAUSES OF ACTION

### COUNT I: ALL DEFENDANTS RESTRAINT OF TRADE (15 U.S.C. §§ 1, ET SEQ.)

**Plaintiffs and the Price Fixed Class Against All Defendants**

403.   Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

404.   As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all other similarly situated employees pursuant to Fed. R. Civ P. 23.

405.   The conduct of the Defendants, as described herein, substantially affected interstate and international commerce and caused antitrust injury.

406.   Defendant ranchers are competitors in the industry and should be competing with each other to attract the most capable shepherds.

407.   They do not share profits or risk of loss.

408.   But, through collusive conduct, they offer all shepherds price-fixed wages that vary solely based on the state in which the ranch is located.

409.   Also through collusive conduct, they offer all of their shepherds price-fixed wages that vary solely based on the state in which the ranch is located.

410.   The WRA, the MPAS, and their members, including Defendant Ranchers, conspired and agreed to fix the wages offered to shepherds at the minimum DOL wage floor. This fixed rate is artificially low, and the fixing of wages through the operation of Defendant membership associations, the WRA and the MPAS, amounts to a *per se* violation of the Sherman Antitrust Act.

411.   The tacit collusion between the WRA and the MPAS necessary to carry out identical illegal price fixing conspiracies within each organization is also a *per se* violation of the Sherman Antitrust Act.

412.   The WRA and its members conspired and agreed to fix wages offered to shepherds at the DOL wage floors through the WRA's filing of (a) job offers for domestic workers, and (b) applications for certifications of H-2A workers that both offered exactly the same wage set at exactly the wage floors set by the DOL. The fixing of wages amounts to a *per se* violation of the Sherman Antitrust Act, and the fixed rate set by Defendants has remained artificially low because it has continually put downward pressure on the DOL's wage surveys and, thus, the basis for Defendants' price-fixed wages.

413.   The MPAS and its members conspired and agreed to fix wages offered to shepherds at the wage floors set by the DOL through the MPAS's filing of (a) job offers

for domestic workers, and (b) applications for certifications of H-2A workers that both offered exactly the same wage set at exactly the DOL wage floors. The fixing of wages amounts to a *per se* violation of the Sherman Antitrust Act, and the fixed rate set by Defendants has remained artificially low because it has continually put downward pressure on the DOL's wage surveys and, thus, the same minimum wage requirements upon which Defendants rely to fix wages.

414.   In the alternative, Plaintiffs allege that the Defendants' price-fixing agreement is anticompetitive and illegal under the Rule of Reason. For purposes of the Rule of Reason, the relevant geographic market for the claim alleged in this Count is the United States, and the relevant markets consist of (a) the labor market for animal husbandry workers in the United States; (b) the labor market for shepherds in the United States; (c) the labor market for domestic shepherds in the United States; and (d) the labor market for immigrant, H-2A shepherds in the United States.

415.   The WRA's and MPAS's relevant conduct—price fixing in their role as a recruiter for their members—unreasonably restrains trade in the shepherd labor market. The price fixing is not essential to the H-2A program and has no procompetitive virtues.

416.   Defendants' collusive activity had and has the effect of –

>    (a) fixing the compensation of shepherd Plaintiffs and the Price Fixed Class at an artificially low level;

>    (b) eliminating, to a substantial degree, competition for shepherd labor, particularly among potential domestic shepherds;

>    (c) driving Plaintiffs and other workers from the shepherd labor market;

(d) restraining trade in that shepherds are not able to negotiate their wage

rates above the DOL wage floors; and

(e) restraining trade by artificially lowering the H-2A shepherd wage floors

resulting from the DOL's surveys.

417.   Defendants' unreasonable restraint or restraints of trade have damaged the

Plaintiffs and the members of the Price Fixed Class.

418.   As a result, Plaintiffs and those similarly situated suffered injuries and are entitled

to treble damages, fees, and costs as set forth by law.

419.   Plaintiffs and those similarly situated are also entitled to injunctive relief to end

the price fixing scheme, and to force the Defendants to take affirmative steps to correct

the market.

## COUNT II: WRA RESTRAINT OF TRADE (15 U.S.C. §§ 1, *ET SEQ.*)

### Plaintiffs and the WRA Price Fixed Class Against the WRA and Rancher Defendants

420.   Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if

fully re-written herein.

421.   As set forth above, Plaintiffs assert this count on their own behalf and on behalf

of all other similarly situated employees pursuant to Fed. R. Civ P. 23.

422.   The conduct of the Defendants, as described herein, substantially affected

interstate and international commerce and caused antitrust injury.

423.   Defendant ranchers are competitors in the industry and should be competing with

each other to attract the most capable shepherds.

424.   They do not share profits or risk of loss.

425.   But, through collusive conduct, they offer all shepherds price-fixed wages that vary solely based on the state in which the ranch is located.

426.   The WRA and its members, including Defendant Ranchers, conspired and agreed to fix the wages offered to shepherds at the minimum DOL wage floor. This fixed rate is artificially low, and the fixing of wages through the operation of the WRA amounts to a *per se* violation of the Sherman Antitrust Act.

427.   The WRA and its members conspired and agreed to fix wages offered to shepherds at the DOL wage floors through the WRA's filing of (a) job offers for domestic workers, and (b) applications for certifications of H-2A workers that both offered exactly the same wage set at exactly the wage floors set by the DOL. The fixing of wages amounts to a *per se* violation of the Sherman Antitrust Act, and the fixed rate set by Defendants has remained artificially low because it has continually put downward pressure on the DOL's wage surveys and, thus, the basis for Defendants' price-fixed wages.

428.   In the alternative, Plaintiffs allege that the Defendants' price-fixing agreement is anticompetitive and illegal under the Rule of Reason. For purposes of the Rule of Reason, the relevant geographic market for the claim alleged in this Count is the United States, and the relevant markets consist of (a) the labor market for animal husbandry workers in the United States; (b) the labor market for shepherds in the United States; (c) the labor market for domestic shepherds in the United States; and (d) the labor market for immigrant, H-2A shepherds in the United States.

429.    The WRA's relevant conduct—price fixing in their role as a recruiter for their members—unreasonably restrains trade in the shepherd labor market. The price fixing is not essential to the H-2A program and has no procompetitive virtues.

430.    Defendants' collusive activity had and has the effect of –

(a) fixing the offered compensation of shepherd Plaintiffs and the Price Fixed Class at an artificially low level;

(b) eliminating, to a substantial degree, competition for shepherd labor, particularly among potential domestic shepherds;

(c) driving Plaintiffs and other workers from the shepherd labor market;

(d) restraining trade in that shepherds are not able to negotiate their wage rates above the DOL wage floors; and

(e) restraining trade by artificially lowering the H-2A shepherd wage floors resulting from the DOL's surveys.

431.    Defendants' unreasonable restraint or restraints of trade have damaged the Plaintiffs and the members of the WRA Price Fixed Class.

432.    As a result, Plaintiffs and those similarly situated suffered injuries and are entitled to treble damages, fees, and costs as set forth by law.

433.    Plaintiffs and those similarly situated are also entitled to injunctive relief to end the price fixing scheme, and to force the Defendants to take affirmative steps to correct the market.

## COUNT III: MPAS RESTRAINT OF TRADE (15 U.S.C. §§ 1, *ET SEQ.*)

### Plaintiffs and the MPAS Price Fixed Class against the MPAS and all Rancher Defendants Except Defendants Cunningham, Nottingham Land and Livestock, and Richins

434.   Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

435.   As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all other similarly situated employees pursuant to Fed. R. Civ P. 23.

436.   The conduct of the Defendants, as described herein, substantially affected interstate and international commerce and caused antitrust injury.

437.   Defendant ranchers are competitors in the industry and should be competing with each other to attract the most capable shepherds.

438.   They do not share profits or risk of loss.

439.   But, through collusive conduct, they offer all shepherds price-fixed wages that vary solely based on the state in which the ranch is located.

440.   The MPAS and its members, including Defendant Ranchers that are members of the MPAS, conspired and agreed to fix the wages offered to shepherds at the minimum DOL wage floor. This fixed rate is artificially low, and the fixing of wages through the operation of the MPAS amounts to a *per se* violation of the Sherman Antitrust Act.

441.   The MPAS and its members conspired and agreed to fix wages offered and paid to shepherds at the DOL wage floors through the MPAS's filing of (a) job offers for domestic workers, and (b) applications for certifications of H-2A workers that both offered exactly the same wage set at exactly the wage floors set by the DOL. The fixing

of wages amounts to a *per se* violation of the Sherman Antitrust Act, and the fixed rate set by Defendants has remained artificially low because it has continually put downward pressure on the DOL's wage surveys and, thus, the basis for Defendants' price-fixed wages.

442.    In the alternative, Plaintiffs allege that the Defendants' price-fixing agreement is anticompetitive and illegal under the Rule of Reason. For purposes of the Rule of Reason, the relevant geographic market for the claim alleged in this Count is the United States, and the relevant markets consist of (a) the labor market of animal husbandry workers in the United States; (b) the labor market for shepherds in the United States; (c) the labor market for domestic shepherds in the United States; and (d) the labor market for immigrant, H-2A shepherds in the United States.

443.    The MPAS's relevant conduct—price fixing in their role as a recruiter for their members—unreasonably restrains trade in the shepherd labor market. The price fixing is not essential to the H-2A program and has no procompetitive virtues.

444.    Defendants' collusive activity had and has the effect of –

(a) fixing the offered compensation of shepherd Plaintiffs and the Price Fixed Class at an artificially low level;

(b) eliminating, to a substantial degree, competition for shepherd labor, particularly among potential domestic shepherds;

(c) driving Plaintiffs and other workers from the shepherd labor market;

(d) restraining trade in that shepherds are not able to negotiate their wage rates above the DOL wage floors; and

(e) restraining trade by artificially lowering the H-2A shepherd wage floors resulting from the DOL's surveys.

445.    Defendants' unreasonable restraint or restraints of trade have damaged the Plaintiffs and the members of the MPAS Price Fixed Class.

446.    As a result, Plaintiffs and those similarly situated suffered injuries and are entitled to treble damages, fees, and costs as set forth by law.

447.    Plaintiffs and those similarly situated are also entitled to injunctive relief to end the price fixing scheme, and to force the Defendants to take affirmative steps to correct the market.

## COUNT IV: WRA CIVIL RICO (18 U.S.C. 1964(C))

**Plaintiffs Huaman, Leovegildo Vilchez Guerra, Liber Vilchez Guerra, and the WRA Illegal Deduction Class against Defendant WRA**

448.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

449.    As set forth above, Plaintiffs Huaman, Leovegildo Vilchez Guerra, Liber Vilchez Guerra assert this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

450.    All relevant job orders submitted to the state workforce agencies within the relevant statute of limitations contained false promises that shepherds would be reimbursed consistent with 20 C.F.R. § 655.122. In fact, the WRA had and has a policy of not reimbursing consistent with 20 C.F.R. § 655.122, including failing to reimburse for expenses incurred by the named Plaintiffs and those similarly situated prior to leaving their countries of origin. The WRA therefore has and had knowledge that the

representations to the SWAs were false or, at best, had ignorance regarding the veracity of those representations. State workforce agencies rely on the representations in job orders to determine whether the jobs in the job orders will be offered to domestic workers. If a job order is not offered to domestic workers, it cannot subsequently be offered to foreign workers through an H-2A Application.

451.   All relevant H-2A applications submitted to the DOL by WRA during the relevant statute of limitations included, and were the result of, the fraudulent job orders described in the previous paragraph and contained additional false promises that any sheepherder hired pursuant to the applications would be reimbursed consistent with 20 C.F.R. § 655.122. In fact, the WRA had and has a policy of not reimbursing consistent with 20 C.F.R. § 655.122, including failing to reimburse for expenses incurred by the named Plaintiffs and those similarly situated prior to leaving their countries of origin. The WRA therefore has and had knowledge that the representations to the DOL in the applications were false or, at best, had ignorance regarding the veracity of those representations. The DOL relied on the representations in applications to determine whether the jobs requested in the applications would be offered to foreign workers. The WRA knew or should have known that it was not reimbursing consistent with 20 C.F.R. § 655.122, despite its representations to the state workforce agencies and DOL to the contrary, because it had agents directing the named Plaintiffs and those similarly situated to undertake these pre-departure expenses and knew that it did not reimburse for the expenses. As detailed above, these expenses include medical checkups, criminal background checks and travel and subsistence expenses (which include bus

fares, meals, and hotels necessary to travel between the shepherd's place of recruitment and the workplace, and travel necessary to complete the other pre-travel requirements, e.g., the medical checkups).

452.   The submission of job orders to the state workforce agencies and the H-2A Applications to the DOL containing the false statements, while simultaneously implementing a policy of not reimbursing consistent with 20 C.F.R. § 655.122, represents a scheme or artifice by the WRA to defraud or obtain money or property by false pretenses, representations, or promises. U.S. mails or interstate wires were used to execute this scheme because state workforce agencies only accept job orders by mail or email and the DOL only accepts H-2A Applications by mail or through its online filing system.

453.   These acts violated 18 U.S.C. § 1343 (wire fraud) or 18 U.S.C. § 1341 (mail fraud).

454.   By participating in WRA Enterprise, which engaged in patterns of racketeering and commission of the underlying predicate acts, Defendant WRA injured Plaintiffs and the WRA Illegal Deduction Class.

455.   Plaintiffs and those similarly situated suffered injuries and are entitled to treble damages, fees, and costs as set forth by law.

## COUNT V: RICHINS CIVIL RICO (18 U.S.C. 1964(C))

**Plaintiffs Huaman, Leovegildo Vilchez Guerra, Liber Vilchez Guerra, and the WRA Illegal Deduction Class against Defendant Dennis Richins**

456.   Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

457.   As set forth above, Plaintiffs Huaman, Leovegildo Vilchez Guerra, Liber Vilchez Guerra assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

458.   All relevant job orders submitted to the state workforce agencies within the relevant statute of limitations contained false promises that shepherds would be reimbursed consistent with 20 C.F.R. § 655.122. In fact, the Defendant Richins, as Executive Director of the WRA, implemented a policy of not paying shepherd travel expenses consistent with 20 C.F.R. § 655.122, including failing to pay for expenses incurred by the named Plaintiffs and those similarly situated. Defendant Richins therefore has and had knowledge that the representations to the SWAs were false or, at best, had ignorance regarding the veracity of those representations. State workforce agencies rely on the representations in job orders to determine whether the jobs in the job orders will be offered to domestic workers. If a job order is not offered to domestic workers, it cannot subsequently be offered to foreign workers through an H-2A Application.

459.   All relevant H-2A applications submitted to the DOL by Defendant Richins during the relevant statute of limitations included, and were the result of, the fraudulent job orders described in the previous paragraph and contained additional false promises that any sheepherder hired pursuant to the applications would be reimbursed consistent with 20 C.F.R. § 655.122. In fact, Defendant Richins implemented a policy of not reimbursing consistent with 20 C.F.R. § 655.122, including failing to reimburse for expenses incurred by the named Plaintiffs and those similarly situated prior to leaving their countries of

origin. Defendant Richins therefore has and had knowledge that the representations to the DOL in the applications were false or, at best, had ignorance regarding the veracity of those representations. The DOL relied on the representations in applications to determine whether the jobs requested in the applications would be offered to foreign workers.

460.    Defendant Richins knew or should have known that he was not reimbursing consistent with 20 C.F.R. § 655.122, despite his representations to the state workforce agencies and DOL to the contrary, because he had agents directing the named Plaintiffs and those similarly situated to undertake pre-departure expenses and knew that he would not reimburse for the expenses. As detailed above, these expenses include medical checkups, criminal background checks and travel and subsistence expenses (which include bus fares, meals, and hotels necessary to travel between the shepherd's place of recruitment and the workplace, and travel necessary to complete the other pre-travel requirements, e.g., the medical checkups).

461.    The submission of job orders to the state workforce agencies and the H-2A Applications to the DOL containing the false statements, while simultaneously implementing a policy of not reimbursing consistent with 20 C.F.R. § 655.122, represents a scheme or artifice by Defendant Richins to defraud or obtain money or property by false pretenses, representations, or promises. U.S. mails or interstate wires were used to execute this scheme because state workforce agencies only accept job orders by mail or email and the DOL only accepts H-2A Applications by mail or through its online filing system.

462.   These acts violated 18 U.S.C. § 1343 (wire fraud) or 18 U.S.C. § 1341 (mail fraud).

463.   By participating in the Richins Enterprise, which engaged in patterns of racketeering and commission of the underlying predicate acts, Defendant Richins injured Plaintiffs and the WRA Illegal Deduction Class.

464.   Plaintiffs and those similarly situated suffered injuries and are entitled to treble damages, fees, and costs as set forth by law.

## COUNT VI: MPAS CIVIL RICO (18 U.S.C. 1964(C))

### Plaintiff De La Cruz and the MPAS Illegal Deduction Class against Defendant MPAS

465.   Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

466.   As set forth above, Plaintiff De La Cruz asserts this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

467.   All relevant job orders submitted to the state workforce agencies within the relevant statute of limitations contained false promises that shepherds would be reimbursed consistent with 20 C.F.R. § 655.122. In fact, the MPAS had and has a policy of not reimbursing consistent with 20 C.F.R. § 655.122, including failing to reimburse for expenses incurred by the named Plaintiffs and those similarly situated prior to leaving their countries of origin. The MPAS therefore has and had knowledge that the representations to the SWAs were false or, at best, had ignorance regarding the veracity of those representations. State workforce agencies rely on the representations in job orders to determine whether the jobs in the job orders will be offered to domestic

workers. If a job order is not offered to domestic workers, it cannot subsequently be offered to foreign workers through an H-2A Application.

468.   All relevant H-2A applications submitted to the DOL by MPAS during the relevant statute of limitations included, and were the result of, the fraudulent job orders described in the previous paragraph and contained additional false promises that any sheepherder hired pursuant to the applications would be reimbursed consistent with 20 C.F.R. § 655.122. In fact, the MPAS had and has a policy of not reimbursing consistent with 20 C.F.R. § 655.122, including failing to reimburse for expenses incurred by the named Plaintiffs and those similarly situated prior to leaving their countries of origin. The MPAS therefore has and had knowledge that the representations to the DOL in the applications were false or, at best, had ignorance regarding the veracity of those representations. The DOL relied on the representations in applications to determine whether the jobs requested in the applications would be offered to foreign workers.

469.   The MPAS knew or should have known that it was not reimbursing consistent with 20 C.F.R. § 655.122, despite its representations to the state workforce agencies and DOL to the contrary, because it had agents directing the named Plaintiffs and those similarly situated to undertake these pre-departure expenses and knew that it did not reimburse for the expenses. These expenses include medical checkups, criminal background checks and travel and subsistence expenses (which include bus fares, meals, and hotels necessary to travel between the shepherd's place of recruitment and the workplace, and travel necessary to complete the other pre-travel requirements, e.g., the medical checkups).

470.    The submission of job orders to the state workforce agencies and the H-2A

Applications to the DOL containing the false statements, while simultaneously

implementing a policy of not reimbursing consistent with 20 C.F.R. § 655.122,

represents a scheme or artifice by the MPAS to defraud or obtain money or property by

false pretenses, representations, or promises. U.S. mails or interstate wires were used

to execute this scheme because state workforce agencies only accepts job orders by

mail or email and the DOL only accepts H-2A Applications by mail or through its online

filing system.

471.    These acts violated 18 U.S.C. § 1343 (wire fraud) or 18 U.S.C. § 1341 (mail

fraud).

472.    By participating in the MPAS Enterprise, which engaged in patterns of

racketeering and commission of the underlying predicate acts, Defendant MPAS injured

Plaintiffs and the MPAS Illegal Deduction Class.

473.    Plaintiffs and those similarly situated suffered injuries and are entitled to treble

damages, fees, and costs as set forth by law.

## COUNT VII: FAILURE TO PAY AT LEAST NEVADA MINIMUM WAGE (NEVADA CONSTITUTION)

### Plaintiff De La Cruz and the NV Minimum Wage Class against Defendant MPAS

474.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if

fully re-written herein.

475.    As set forth above, Plaintiff De La Cruz asserts this count on his own behalf and

on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

476.    MPAS employed Plaintiff De La Cruz and the NV Minimum Wage Class in Nevada during the relevant statute of limitations and paid the Plaintiffs less than the Nevada minimum wage, usually only $800 per month until mid-November 2015.

477.    Upon information and belief, since mid-November 2015, the MPAS pays its Nevada shepherd employees exactly the 2015 special procedures minimum, which is still far less than Nevada minimum wage.

478.    As a result, the Plaintiffs are entitled to the difference between the wages paid and the Nevada minimum wage pursuant to Nev. Const. art. 15, § 16; Nev. Rev. Stat. § 608.260; and *Thomas v. Nevada Yellow Cab Corp.*, 327 P. 3d 518 (Nev. 2014).

479.    Plaintiff De La Cruz sent a written demand demanding wages at least five days prior to bringing this claim. The Plaintiff and the NV Minimum Wage Class are therefore additionally entitled to attorney's fees.

## COUNT VIII: BREACH OF CONTRACT OR QUASI-CONTRACT FOR DEDUCTIONS

**Plaintiff Huaman, Leovegildo Vilchez Guerra, Liber Vilchez Guerra, and the WRA Illegal Deduction Class against Defendant WRA**

480.    Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

481.    As set forth above, Plaintiffs Huaman, Leovegildo Vilchez Guerra, and Liber Vilchez Guerra assert this count on their own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

482.    Plaintiffs and the WRA Illegal Deduction Class entered into contracts with the WRA that explicitly or impliedly incorporated the requirements of 20 C.F.R. § 655.122 either through the H-2A Applications and job orders, which constitute job offers

accepted by Plaintiffs and those similarly situated, or as implied terms in their employment contracts.

483.   As set forth above, the WRA breached these contracts by deducting expenses that were primarily for the benefit and convenience of the employer from shepherd wages. These deductions include expenses incurred by the Plaintiffs, which were never reimbursed by the WRA, such as expenses for medical checkups, criminal background checks, and travel and subsistence expenses (which include bus fares, meals, and hotels necessary to travel between the shepherd's place of recruitment and the workplace, and travel necessary to complete the other pre-travel requirements, e.g., the medical checkups).

484.   As a result of the breach, the Plaintiffs and the WRA Illegal Deduction class suffered damages.

485.   In the alternative to a contract claim, the Plaintiffs are entitled to relief in promissory estoppel. The WRA promised the Plaintiffs and the WRA Illegal Deduction Class that it would adhere to 20 C.F.R. § 655.122. The Plaintiffs and the WRA Illegal Deduction Class relied on this promise to their detriment by traveling to WRA member ranches to work as shepherds, where the WRA illegally deducted wages that were primarily for the benefit and convenience of the WRA. The Plaintiffs and WRA Illegal Deduction Class are entitled to damages, including the illegally deducted wages.

486.   Similarly, in the alternative to a contract claim, the Plaintiff and the WRA Illegal Deduction Class are also entitled to relief in unjust enrichment and quantum meruit. A benefit was conferred on the WRA when the Plaintiff and the WRA Illegal Deduction

Class traveled to WRA member ranches to work and the WRA illegally deducted amounts from their wages in violation of 20 C.F.R. § 655.122; that benefit was appreciated by the WRA as it retained the illegal deductions; and it is unjust for the WRA to be permitted to retain the illegally deducted wages. The Plaintiff and the WRA Illegal Deduction Class reasonably expected to be paid wages free and clear pursuant to 20 C.F.R. § 655.122 and were not. As a result, the Plaintiff and the WRA illegal deduction class are entitled to the reasonable value of the services provided without amounts illegally deducted and the WRA should be disgorged of the illegally deducted wages.

## COUNT IX: BREACH OF CONTRACT OR QUASI CONTRACT FOR DEDUCTIONS

### Plaintiff De La Cruz and the MPAS Illegal Deduction Class against Defendant MPAS

487.   Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

488.   As set forth above, Plaintiff De La Cruz asserts this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

489.   Plaintiffs and the MPAS Illegal Deduction Class entered into contracts with the MPAS that explicitly or impliedly incorporated the requirements of 20 C.F.R. § 655.122 either through the H-2A Applications and job orders, which constitute job offers accepted by Plaintiffs and those similarly situated, or as implied terms in their employment contracts.

490.   As set forth above, the MPAS breached these contracts by deducting expenses that were primarily for the benefit and convenience of the employer from shepherd

wages. These deductions include expenses incurred by the Plaintiffs, which were never reimbursed by the MPAS, such as expenses for medical checkups, criminal background checks, and travel and subsistence expenses (which include bus fares, meals, and hotels necessary to travel between the shepherd's place of recruitment and the workplace, and travel necessary to complete the other pre-travel requirements, e.g., the medical checkups).

491.    As a result of the breach, the Plaintiff and the MPAS Illegal Deduction class suffered damages.

492.    In the alternative to a contract claim, the Plaintiff is entitled to relief in promissory estoppel. The MPAS promised the Plaintiff and the MPAS Illegal Deduction Class that it would adhere to 20 C.F.R. § 655.122. The Plaintiff and the MPAS Illegal Deduction Class relied on this promise to their detriment by traveling to MPAS member ranches to work as shepherds, where the MPAS illegally deducted wages that were primarily for the benefit and convenience of the MPAS. The Plaintiff and MPAS Illegal Deduction Class are entitled to damages, including the illegally deducted wages.

493.    Similarly, in the alternative to a contract claim, the Plaintiff and the MPAS Illegal Deduction Wage Class are also entitled to relief in unjust enrichment and quantum meruit. A benefit was conferred on the MPAS when the Plaintiff and the MPAS Illegal Deduction Class traveled to MPAS member ranches to work and the MPAS illegally deducted amounts from their wages in violation of 20 C.F.R. § 655.122; that benefit was appreciated by the MPAS as it retained the illegal deductions; and it is unjust for the MPAS to be permitted to retain the illegally deducted wages. The Plaintiff and the

MPAS Illegal Deduction Class reasonably expected to be paid wages free and clear pursuant to 20 C.F.R. § 655.122 and were not. As a result, the Plaintiff and the MPAS Illegal Deduction Class are entitled to the reasonable value of the services provided without amounts illegally deducted and the MPAS should be disgorged of the illegally deducted wages.

## COUNT X: BREACH OF CONTRACT, QUASI CONTRACT, OR FOR EQUITABLE RELIEF (NV MIN WAGE)

### Plaintiff De La Cruz and the Nevada Minimum Wage Class Against Defendant MPAS

494.    As set forth above, Plaintiff De La Cruz asserts this count on his own behalf and on behalf of all those similarly situated pursuant to Fed. R. Civ. P. 23.

495.    Plaintiff and the Nevada Minimum Wage Class entered into contracts with Defendant MPAS that explicitly incorporated the requirements of 20 C.F.R. § 655.122 and 20 C.F.R. § 655.210 through the H-2A Applications and job orders, which constitute job offers accepted by Plaintiff and those similarly situated. In the alternative, Plaintiff and the Nevada Minimum Wage Class entered into contracts with Defendant MPAS that included as implied terms of the contracts the requirements of 20 C.F.R. § 655.122 and 20 C.F.R. § 655.210.

496.    These contracts provide that each worker employed by Defendant MPAS will be paid the higher of the monthly AEWR (adverse effect wage rate), the agreed-upon collective bargaining wage, or the applicable minimum wage imposed by Federal or State law or judicial action, in effect at the time work is performed, whichever is highest, for every month of the job order period or portion thereof. Defendant MPAS failed to pay

the required wage when it failed to pay the minimum wage required by Article 15,

section 16 of the Nevada Constitution for each hour worked, a violation of Nevada state

law and of the above cited regulations.

497.    As a result of the breach of contract, Plaintiff De La Cruz and the Nevada

Minimum Wage Class suffered damages.

498.    In the alternative to a contract claim, Plaintiff De La Cruz and the Nevada

Minimum Wage Class are entitled to relief in promissory estoppel. Defendant MPAS

promised Plaintiff De La Cruz and the Nevada Minimum Wage Class that it would

adhere to 20 C.F.R. § 655.122 and 20 C.F.R. § 655.210.

499.    Plaintiff De La Cruz and the Nevada Minimum Wage Class relied on this promise

to their detriment by traveling to the ranch operated by Defendant MPAS to work as

shepherds, where Defendant MPAS illegally failed to pay wages as promised by

Defendant MPAS.

500.    Plaintiff De La Cruz and the Nevada Minimum Wage Class are entitled to

damages, including all wages owed but not paid.

501.    In the alternative to the contract claim described in Count VIII, Plaintiff De La

Cruz and the Nevada Minimum Wage Class are also entitled to relief in unjust

enrichment and quantum meruit. A benefit was conferred on Defendant MPAS when the

Plaintiff and the Nevada Minimum Wage Class performed work as specified by

Defendant MPAS for which Defendant MPAS failed to pay the required compensation in

violation of 20 C.F.R. § 655.122 and 20 C.F.R. § 655.210.

502.   That benefit was appreciated by Defendant MPAS as it had the advantage of the Plaintiff's and class member's labor without paying for that labor as required; and it is unjust for the WRA to be permitted to benefit from the illegally obtained labor.

503.   Plaintiff De La Cruz and the Nevada Minimum Wage Class reasonably expected to be paid all wages owed when due under 20 C.F.R. § 655.122 and 20 C.F.R. § 655.210 and those wages were not.

504.   As a result, Plaintiff De La Cruz and the Nevada Minimum Wage Class are entitled to the full value of the services provided and Defendant MPAS should be disgorged of the illegally withheld wages.

**PLAINTIFFS DEMAND A JURY TRIAL**

**PRAYER FOR RELIEF**

505.   WHEREFORE, Plaintiffs respectfully request that judgment be entered in their favor and in favor of those similarly situated as follows:

   a.  Certifying and maintaining this action as a class action, with Plaintiffs as designated class representatives and with their counsel appointed as class counsel;

   b.  Declaring Defendants in violation of each of the counts set forth above;

   c.  Awarding treble damages for antitrust injuries to Plaintiffs and those similarly situated;

   d.  Awarding treble damages for RICO injuries to Plaintiffs and those similarly situated;

   e.  Awarding damages for failing to pay NV minimum wage;

f.   Awarding contract damages;

g.   Awarding pre-judgment, post-judgment, and statutory interest;

h.   Awarding attorneys' fees;

i.   Awarding costs;

j.   Ordering equitable relief, including a judicial determination of the rights and responsibilities of the parties;

k.   Awarding such other and further relief as the Court may deem just and proper.

Respectfully Submitted,

s/Alexander Hood
Alexander Hood
Andrew Schmidt
David Seligman
Dermot Lynch
Towards Justice
1535 High St., Suite 300
Denver, CO 80218
Tel.: 720-239-2606
Fax: 303-957-2289
Email: alex@towardsjustice.org
        andy@towardsjustice.org
        david@towardsjustice.org
        dermot@towardsjustice.org

*Attorneys for the Plaintiffs*

**Certificate of Service**

I hereby certify that on August 18, 2016, filed the forgoing with using this Court's CM/ECF system, which caused all Defendants that have appeared to be served pursuant to F.R.C.P. 5.

<u>s/Alexander Hood</u>
Alexander Hood