# Exhibit F

**Records Included in Exhibit F**

| Item | Record | Page Numbers |
|------|--------|--------------|
| 1. | Form Employment Contracts from MPAS and WRA | 2-4 |
| 2. | Selected pages of a handbook provided to WRA Members | 5-7 |
| 3. | Records from the Oregon Bureau of Labor and Industries Showing that WRA Dictates What Wage Is Offered (and Paid) to Shepherds in Oregon | 8-14 |
| 4. | MPAS Communication with Members Regarding Oregon Minimum Wage | 15-16 |
| 5. | WRA and MPAS Comments on the 2015 Rule for Shepherds | 17-56 |
| 6. | Payroll Records for Defendant Martin Auza Sheep Company | 57 |
| 7. | Payroll Records for Defendant Nottingham Land and Livestock, LLLP | 58 |
| 8. | Payroll and Other Records for Defendant Two Bar Sheep Co LLC | 59-63 |
| 9. | Records for Defendant Cunningham Sheep Company | 64 |
| 10. | Records for Non-Defendant Ranches | 65-82 |
| 11. | Records Related to Shepherd Wages in North Dakota | 83-109 |
| 12. | Records Related to Shepherd Wages in Texas | 110-113 |
| 13. | Communication from MPAS to its Members Noting that DOL only sets a Minimum Wage for Shepherds | 114-116 |
| 14. | WRA and MPAS Comments on 2010 H-2A Rule | 117-161 |
| 15. | WRA Communication to Members in Which WRA Admits that it forces Shepherds to Pay Travel and Administrative Expenses | 162-165 |
| 16. | Additional Job Orders and H-2A Applications for WRA Ranches in Oregon, Including for Defendant Cunningham Ranch | 166-181 |



Nov. 8. 2006  9:33AM   Mountain Plains Ag Service 1075

# Mountain Plains Agricultural Service

PO Box 3777, Casper, WY 82602 (811 N. Glenn Rd.); Telephone (307) 472-2135, FAX (307) 235-1075

11/7/06

Estimado(s) Señor(es):  **JUAN CARLOS ORELLANA FLORES**

MOUNTAIN PLAINS AGRICULTURAL SERVICE, recientemente completo todos los tramites de su/s Visa/s de H2A con el Departamento de Inmigracion para que usted/es pueda/n venir a trabajar en los Estados Unidos, con nuestro miembro, su patron:

    **TOMMY HAYRE**
    Ranch Road 2400, Sheffield, TX 79781
    Tele: (432) 836-4344, (432) 446-3321

Con esta carta mandamos copia de la aprobacion de su peticion: **EAC07 007 53136.  La fecha de vencimiento es el 31 de Octubre 2007.** Estos documentos son para que usted tramite una Visa de H-2A, para la ocupacion de Pastor de Cabras. En el Estado de Texas esta ocupacion paga—$750 mensualmente, con casa y comida.

Cuando usted reciba esta carta debe de hacer lo siguiente:

1. Es muy importante que usted obtenga una cita en el Consulado de Los Estados Unidos en Lima, inmediatamente, porque se puede tardar hasta tres semanas.  Numeros de telefonos son 14-343000 o 18-182397.  Por favor, llame a nuestra oficina el mismo dia que le dan la fecha de su cita para poder informarle a su patron.

2. El dia de su cita, al llegar al Consulado debe de decirles que ira tramitar su Visa de H-2A, para que lo/la atiendan con prioridad.  Presente su pasaporte junto con esta carta y la Forma I-797 (copia de peticion) que viene incluida con esta carta. **TAMBIEN SE EXIGE PRESENTAR TODAS LAS EXTENSIONES ANTERIORES EL DIA DE SU CITA. SI NO TIENE ESTOS DOCUMENTOS DEBE DE LLAMARNOS.**

---

**"LO MAS INPORTANTE"**

Se exige presentar documentos que verifiquen que tiene bastantes lazos y que usted esta bien estabilizado y tiene residencia en Peru (por ejemplo debe de llevar: Titulo de casa/terrenos, records de escuela de sus niños, acta de matrimonio de usted o acta(s) de nacimiento de su(s) hijo(s).  Tambien se requiere llevar recibo de agua o electricidad que estan registrados en su nombre, recibos que prueben que tienen cuentas en el banco, o otros documentos que demuestren que usted tiene algo de valor que no ira a abandonar).  Estos documentos TIENEN QUE ESTAR EN SU PROPIO NOMBRE!!!

---

3. Al completar todos sus tramites y tenga la Visa en sus manos, usted debe de mandar una copia de la Visa a nuestra oficina por FAX (307) 235-1075. Hasta que nuestra oficina recibe la copia de su Visa haremos los tramites de su viaje.

Si hay alguna pregunta, o cualquier problema, por favor llame a nuestra oficina, por cobrar:  Si usted habla fuera de los Estados Unidos, el telefono es: (307) 472-2135; o dentro los Estados Unidos 1(800) 349-6439.  Las horas de oficina son: Lunes a Viernes de 8:00-12:00 de la manana y de 1:00-5:00 de la tarde (Tiempo de Montana).

Sinceramente

Oralia G. Mercado
Directora Ejecutiva

5/19/06

**NOTARIA OJEDA SANCHEZ**
Jr. Coronel Guerra No. 186 -
Plaza Independencia
Telf: 439186
CHUPACA, JUNIN - PERU

**B-1**

**CONSTANCIA**

Por el presente documento, yo ....Vilchez Guerra, Leovegildo...................., con DNI
...44362100..........., natural de ...Centro Poblado Chala- S.J. Quero, y con domicilio en
.....Av. Los Heroes s/n - Chala............................., tomo conocimiento y aceptación de los
siguientes términos.

**PRIMERO:** Vengo por mi propia voluntad e interés a solicitar trabajo como pastor ovejero en Estados
Unidos de Norte América. Esto lo hago por recomendación del Sr....Juan Cochachi Vera.......
Que es mi....Tío............ y que trabaja actualmente como pastor ovejero.

**SEGUNDO:** Después de aprobar con los requisitos mínimos y las entrevistas de experiencia y
conocimiento en pastoreo de ovinos en la oficina de la Coordinación de Lima y en el Consulado de
EE.UU. se me otorgará la VISA de trabajo H2A correspondiente. Luego estoy obligado a inscribirme en
el Ministerio de Relaciones exteriores como inmigrante para que finalmente se me pueda otorgar el
pasaje de salida correspondiente.

**TERCERO:** Tengo claro conocimiento del tipo de trabajo que voy a efectuar que es de "pastor de
ovinos" a campo abierto y/o cerrado y que tengo que hacer todas las faenas que estas actividades
demanden.

**CUARTO:** Tendré que trabajar solo en el campo, viviendo en un trailer, camper o carpa la mayor parte
del tiempo de mi contrato. Las zonas de pastoreo son muy diversas destacándose zonas de altura que
son la mayor parte del oeste de EE.UU. lo cual estoy acostumbrado por ser pastor de las zonas alto
andinas del Perú.

**QUINTO:** Se me asignará un lugar de trabajo (rancho) que no podré cambiarme o transferirme porque
así lo desee. El sueldo que se me asigne es el mínimo que otorga el Departamento de Labor de
EE.UU. para esa zona el cual variará de acuerdo al estado donde se encuentre el rancho.

**SEXTO:** El contrato de trabajo lo firmo en EE.UU. de acuerdo a las normas laborales de campo y un
pre-contrato en Perú para conocer las obligaciones de mi trabajo y mis derechos. El periodo de
vigencia del contrato es de un año renovable hasta tres años, después tengo obligatoriamente que
regresar al Perú, porque así lo exigen las leyes de EE.UU. También es requisito renovar el permiso de
trabajo (visa) que me otorga el gobierno de EE.UU. cada año.

**SEPTIMO:** Si abandono el contrato sin causa justificada o sin previo aviso a la WRA, seré denunciado
a las autoridades competentes como inmigrante ilegal, exponiéndome a que sea arrestado y deportado.
Las últimas leyes de Inmigración son muy drásticas en este sentido.

**OCTAVO:** Dejo constancia en forma muy clara y tajante que en ningún momento o bajo ninguna
circunstancia he tenido que pagar algún dinero o dadiva a alguna persona de la oficina de la WRA en
Lima por concepto de tarifa, honorarios u otros, por los trámites que efectúan o para favorecerme de
alguna forma. Porque tengo conocimiento que estos trámites son completamente gratuitos.

**NOVENO:** Estando de acuerdo con los términos descritos en el presente documento, dejo estampada
mi firma en presencia de dos testigos como mínimo.

Lima, ..13.. de .......Marzo................ del 200

(vertical text in left margin) Documento no redactado en este...

NOMBRE: Leovegildo Vilchez Guerra
DNI: 44362100

TESTIGO: Magno Tacza Rojas
DNI: 42868468

TESTIGO: David Tacza Huayas.
DNI: 79971859

LEGALIZACION DE FIRMAS AL DORSO...///

**Exhibit F at 3**

CONFIDENTIAL

PROD0000478

CERTIFICO: LAS FIRMAS SUSCRITAS POR DON LEOVEGILDO VILCHEZ GUERRA, IDENTIFICADO CON D.N.I. No. 44362100, POR DON MAGNO TACZA ROJAS, IDENTIFICADO CON D.N.I. No. 42868468, Y POR DON DAVID TACZA HUAYAS, IDENTIFICADO CON D.N.I. No. 19971859, - QUIENES FIRMARON EN MI PRESENCIA. LEGALIZACION CONFORME ART. .108 LEY DEL NOTARIADO. CHUPACA, 13 DE MARZO DE 2,008. DOY - FE.- = = = = = = = = = = = = = = = = = = = = = = = = = = = = = =



**WESTERN RANGE ASSOCIATION**
1245 E Brickyard Road
Suite #190
Salt Lake City, Utah  84106
(801) 486-2004, fax# (801) 486-2315

**M E M B E R S   M A N U A L**

EXECUTIVE DIRECTOR
DENNIS RICHINS

Office hours:  8:00 am to 4:30 pm Monday through Friday

**IN CASE OF EMERGENCY: AFTER OFFICE HOURS CALL
DENNIS RICHINS at (801) 845-5163**

MM 3/07

WRA-000308

## WAGES

Members are required under the U.S. Department of Labor Regulations to pay sheepherders every two weeks. The department may accept that the herders be paid once a month if a letter from the herder (sample page 5) is on file stating that he prefers to be paid once a month, the signed contract also states monthly payment is acceptable.

### RECORD KEEPING

Accurate record must be kept for each sheepherder. Page 6 is a sample "wage statement" that we encourage all of our members to use. The wage statement lists all deductions in both English and Spanish. This form or a similar form must be filled out each payroll and given to the herder with the herders paycheck. The herder should be provided a copy and we suggest you have the herder sign a copy and retain it for your records. WRA may at any time request proof of payroll for H-2A sheepherders employed by it's members.

### VACATION PAY

On your Application Agreement the following statement appears in regard to vacation pay:

"(d) Employer shall grant Herder two weeks paid vacation (14 days) during each 12-month period in which Herder is in the United States and working under the Employment Agreement. Vacation pay shall be paid to Herder on a prorated basis, from date of arrival, when Herder leaves employer's employment, if Herder is employed by Employer for less than 12 months. Herder shall be allowed 2 weeks vacation and be paid annually, or sooner, whether vacation is allowed or not."

Make sure the herder understands he is being paid monthly and you have specified the payment as a separate line item described as Vacation Pay. Many members have elected to prorate 14 days vacation by paying 1.17 days vacation per month automatically, thus eliminating any problems in regards to vacation. If the herder takes vacation at the end of the year then he has already been paid.

If the member and the herder agree, and the herder elects not to take vacation, he must sign a waiver (sample page 7) to that effect but he will still earn "vacation pay" in addition to his regular wages. Members must be able to prove by check stub documentation that vacation has been paid. The inability to prove vacation has been paid will result in the member/employer being obligated to pay vacation pay again. Please document on the herders check stub, as a separate line item, for vacation pay when it is paid.

The following are samples letters in English and Spanish for the herder to sign.
   A. Waiver for monthly Wage Payment
   B. Vacation Pay Request
   C. Statement of Wages (this is only a sample make sure you are in compliance with legal deductions before deducting anything from a herders paycheck)

**If a herder is terminated, the herder must be paid full wages due on date of termination including, at the current rate of pay, any unpaid vacation. DO NOT HOLD payroll on any herder.**

MM203                                        -4-

**WAGE RATE - 2010/2011**

| STATE | 2008/2009 RATE | 2009/2010 RATE | 2010/2011 RATE | EFFECTIVE DATE |
|-------|----------------|----------------|----------------|----------------|
| Arizona | 750.00 | 750.00 | 750.00 | 7/1/2005 |
| California | 1,350.00 | 1,350.00 | 1,422.52 | 7/1/2010 |
| Colorado | 750.00 | 750.00 | 750.00 | 7/1/2005 |
| Idaho | 750.00 | 750.00 | 750.00 | 7/1/2008 |
| Montana | 750.00 | 750.00 | 750.00 | 7/1/2008 |
| Nevada | 875.00 | 800.00 | 800.00 | 7/1/2009 |
| Oregon | 1,211.55 | 1,211.55 | 1,211.55 | 1/1/2009 |
| South Dakota | 750.00 | 750.00 | 750.00 | |
| Utah | 750.00 | 750.00 | 750.00 | |
| Washington | 750.00 | 750.00 | 750.00 | 7/1/2006 |
| Wyoming | 650.00 | 750.00 | 750.00 | 7/1/2009 |

Plus room and board is supplied FREE to all sheepherders in ADDITION to the full salary paid (no less than the minimum stated above).
NOTE:  Room and board is supplied for the duration of the contract for a herder.  If a herder is unemployed for any reason, the employer is responsible for room and board and wages for 3/4 of the contract term.

Revised 7/9/10

-8-

WRA-000317

**Oregon**

Bureau of Labor and Industries

Brad Avakian
Commissioner

February 10, 2015

Dora Herrera
FLC Program Coordinator
875 Union St NE
Salem OR 97311

**Sent Via Email:** Dora.A.Herrera@state.or.us

Re: Application of Oregon State Minimum Wage Law Provisions to Sheepherders

Dear Ms. Herrera:

The Oregon Employment Department has asked me to provide it with guidance pertaining to the application of state minimum wage law provisions to the employment of sheepherders.

ORS 653.020(1)(e) exempts from the state minimum wage employees who are "principally engaged in the range production of livestock" and "earn(s) a salary and (are) paid on a salary basis." "Salary" is defined by ORS 653.010(9) to mean "no less than the wage set pursuant to ORS 653.025 [the current minimum wage], multiplied by 2,080 hours per year, then divided by 12 months." As stated in earlier letters to the Employment Department on this subject, it is the Bureau's position that, to meet this definition, the salary must be *no less* than the amount of wages required to be paid (in 2015, this amount is $9.25 per hour multiplied by 2,080 hours, divided by 12 = $1,603.33 per month) and not some lesser amount plus an amount calculated for the value of food and lodging provided.

In the case of an employee who is principally engaged in the range production of livestock but is not paid on a salary basis the minimum salary as described above, and thus does not qualify for the exemption, the employee would be subject to payment of the state minimum wage for all hours worked.

Pursuant to ORS 653.035 and OAR 839-020-0025, employers may deduct from minimum wage earnings the fair market value of meals, lodging, or other facilities or services furnished by the employer if the deductions are for the *private benefit* of the employee. In order for the employer to be able to claim credit toward or deduct from the minimum wage for providing meals, lodging or other facilities or services furnished to an

PORTLAND
800 NE Oregon St. Suite 1045
Portland, OR 97232-2180
(971) 673-0761
Fax (971) 673-0762

SALEM
3865 Wolverine St. NE; E-1
Salem, OR 97305-1268
(503) 378-3292
FAX (503) 373-7636

EUGENE
1400 Executive Parkway, Suite 200
Eugene, OR 97401-2158
(541) 686-7623
FAX (541) 686-7980

BEND
Apprenticeship and Training
Worksource Bend
1645 NE Forbes Rd, Ste 106
Bend, OR 97701-4990
(541) 322-2435
FAX (541) 389-8265

Oregon Relay TTY:711

www.oregon.gov/boli
AN EQUAL OPPORTUNITY EMPLOYER

MEDFORD
Apprenticeship and Training
119 N Oakdale Ave.
Medford, OR 97501-2629
(541) 776-6201
FAX (541) 776-6284

Dora Herrera
February 10, 2015
Page 2

employee, the deduction of these costs from the employee's wages must have been authorized by the employee in writing and the deduction must be recorded in the employer's books (or the deduction of these costs must be authorized by a collective bargaining agreement).

However, ORS 653.035 and OAR 839-020-0025 only apply to wages earned by employees subject to the minimum wage. They would not apply to any employee exempt from the minimum wage requirements pursuant to ORS 653.020(1)(e).

A separate state law, ORS 652.610, addresses deductions made to the wages earned by employees who are paid at "agreed" rates other than the minimum wage. Pursuant to this statute, deductions may not be made unless the employer is required to make the deduction by law; the deductions are authorized in writing by the employee, are for the employee's benefit, and are recorded in the employer's books; the employee has voluntarily signed an authorization for a deduction for any other item, provided that the ultimate recipient of the money withheld is not the employer, and that such deduction is recorded in the employer's books; or the deduction is authorized by a collective bargaining agreement to which the employer is a party.

While ORS 652.610 and its corresponding administrative rules do not define "for the employee's benefit," it is the Bureau's position that this phrase, with regard to deductions for meals and lodging, should be interpreted in a manner consistent with OAR 839-020-0025. Namely, meals or lodging provided to an employee as a condition of employment are not for the employee's benefit and thus an employer, pursuant to ORS 652.610, may not deduct from an employee's wages the cost of such items.

Please contact me if you have any further questions.

Sincerely,

Gerhard Taeubel
Administrator
Wage and Hour Division

## Taeubel, Gerhard

| | |
|---|---|
| **From:** | Taeubel, Gerhard |
| **Sent:** | Friday, February 06, 2015 11:12 AM |
| **To:** | CARTER Nate (nate.carter@state.or.us); RIEMENSCHNEIDER Johanna (johanna.riemenschneider@state.or.us); BOOKER James H * OED (James.H.BOOKER@oregon.gov) (james.h.booker@oregon.gov); HERRERA Dora A * OED (Dora.A.HERRERA@oregon.gov) |
| **Subject:** | FW: Western Range Association |

As requested during this morning's conference call, please find below my reply to Mr. Williams's email.

Gerhard


Gerhard Taeubel
Administrator
Wage and Hour Division

**BOLI**

800 NE Oregon Street, Suite 1045
Portland, OR 97232
971.673.0837 direct line  971.673.0769 facsimile
gerhard.taeubel@state.or.us • www.oregon.gov/boli


**From:** Taeubel, Gerhard
**Sent:** Friday, February 06, 2015 11:06 AM
**To:** 'Larry R. Williams'
**Cc:** cayiekrebs@yahoo.com; Dennis Richins; Sarah Peters
**Subject:** RE: Western Range Association

Dear Mr. Williams,

Thank you for your email. While I am receptive to meeting with you, whether in person or by telephone, to discuss the matter of Oregon's minimum wage law and its application to sheepherders working in the state under the federal H-2A program, I would first like to clarify some of your comments below by way of providing background information related to this issue.

It has long been BOLI's position that, for a worker to be exempt from Oregon's minimum wage law pursuant to ORS 653.020(1)(e)—as an employee who is "principally engaged in the range production of livestock and earns a salary and is paid on a salary basis"—the employee must receive as a salary the amount of the state's minimum wage, multiplied by 2,080 hours per year and then divided by 12 months. Under state law, a salary is defined as a wage which satisfies this minimum requirement; wages mean compensation due to an employee and payable in either legal tender or check convertible into cash, but to which deductions may be made under certain circumstances. Therefore, a combination of wages and the value of food, lodging, and other benefits does not satisfy the definition of "salary" and "salary basis."

Over the years, when it has been requested to do so, BOLI has reiterated this same position in response to inquiries about the regulations under discussion here. In addition, while BOLI is aware of the settlement in the class action lawsuit to which you refer, it is neither a party to this agreement nor bound by it. At no time has BOLI agreed that the

**Exhibit F at 10**                                  1

formula developed as a resolution to the lawsuit satisfies the salary requirement for the exemption to apply. For this reason, I do not think it can be said that BOLI previously has "certified" the formula.

If, with an understanding of the explanation provided above, you still believe that it would be fruitful to discuss further BOLI's enforcement position regarding ORS 653.020(1)(e), I am available to meet at a time which is mutually convenient. If time is of concern, and in light of the geographic distance between the persons who may wish to participate in such a meeting, I would suggest a telephone conference.

Kind regards,

Gerhard Taeubel
Administrator
Wage and Hour Division

# B🌣LI

800 NE Oregon Street, Suite 1045
Portland, OR 97232
971.673.0837 direct line  971.673.0769 facsimile
gerhard.taeubel@state.or.us • www.oregon.gov/boli

---

**From:** Larry R. Williams [mailto:larry.r.williams@comcast.net]
**Sent:** Tuesday, February 03, 2015 3:27 PM
**To:** Taeubel, Gerhard
**Cc:** caylekrebs@yahoo.com; Dennis Richins; Sarah Peters
**Subject:** FW: Western Range Association

Mr. Taeubel,

My name is Larry Williams. I am an attorney in Salt Lake City, Utah and represent an organization of Sheep Ranches named the Western Range Association. Certain members of the Association live, own property and conduct sheep raising operations in Oregon. WRA assists its members navigate through the federal temporary visa process to identify and employ foreign labor who are employed by those members in the range production of livestock as sheepherders under the H-2A program (H-2A Sheepherders). H-2A Sheepherders are a critical workforce without which the sheep industry could not produce the necessary food or fiber for the American people.

For more than 20 years the wage rate for Sheepherders has been determined through a formula that was developed as a result of a settlement in a class action lawsuit in Oregon that was approved by the Oregon Courts. The formula was certified by the Oregon Bureau of Labor and Industries through its reporting to the United States Department of Labor of prevailing wage summary for many years. WRA Oregon members, as well as the United States Department of Labor, has relied on this formula in determining the proper wage to pay H-2A sheepherders in Oregon. This formula takes into account a deduction for food and other Private Benefits that are provided by the employer to the sheepherder.

On December 26, 2014 Western Range Association received an email from Dora Herrera which seemed to imply that Oregon would no longer allow the deduction for the Private Benefits supplied by the Oregon Employer. Upon further inquiry we were directed to you as someone who could help resolve this confusion.

I am requesting that we set up a meeting as soon as possible to discuss this issue. Some of the Oregon WRA members will want to participate in this discussion since they are the employers who will have to comply with the final outcome of our discussions. We are willing to come to your office, or we could hold a telephone conference. I can provide you as much additional information as you may require to become fully informed regarding this matter.

**Exhibit F at 11**

2

Please let me know when we can meet to discuss this matter. WRA Oregon members want to have certainty here so that they can fully comply with all wage rules. Your prompt response will be greatly appreciated.

Larry

LARRY R. WILLIAMS
P. O. BOX 95017
SOUTH JORDAN, UT 84095
(801) 573-2110
(801) 277-0905 FAX
larry.r.williams@comcast.net

CONFIDENTIALITY NOTE: The information contained in this message and any attached files are for the exclusive use of the addressee and may contain confidential, privileged, proprietary, and non-disclosable information. If you have received this message and are not the addressee, or person responsible for delivering this message to the addressee, you are strictly prohibited from reading, printing, photocopying, distributing, or otherwise using this message transmission, or its contents, in any way. If the recipient has received this message in error, please notify the sender immediately, delete the message and destroy any printed copies. You will be reimbursed for any telephone or other expenses.

**From:** HERRERA Dora A * OED [mailto:Dora.A.HERRERA@oregon.gov]
**Sent:** Thursday, January 22, 2015 11:14 AM
**To:** Larry R. Williams
**Cc:** Sarah Peters; csuram@frontier.com
**Subject:** RE: Western Range Association

Mr. Williams, thank you for your inquiry. If you wish to provide the Employment Department with further information regarding this topic, the Department is glad to review it. However, the Department does not administer or enforce Oregon's minimum wage laws. The Bureau of Labor and Industries (BOLI) is charged with interpretation and enforcement of those laws, as the Department indicated in its prior e-mail to you. If you have questions regarding the interpretation of Oregon's minimum wage laws, or their application to sheepherders, those questions should be directed to BOLI. Please contact Gerhard Taeubel at BOLI if you have any further questions. His e-mail address is gerhard.taeubel@state.or.us.

Thank you,

**Dora Herrera**
FLC Program Coordinator
875 Union St NE
Salem, OR 97311
Dora.A.Herrera@oregon.gov
(P) (503) 947-1659
(F) (503) 947-1634
www.employment.oregon.gov



State of Oregon
Employment
Department

Confidentiality Notice: This e-mail may contain information that is confidential or otherwise exempt from disclosure under applicable law. If you are not the addressee or it appears from the context or otherwise that you have received this e-mail in error, please advise me immediately by reply e-mail, keep the contents confidential, and immediately delete the message and any attachments from your system.

**Exhibit F at 12**                                    3

**From:** Larry R. Williams [mailto:larry.r.williams@comcast.net]
**Sent:** Friday, January 16, 2015 2:02 PM
**To:** HERRERA Dora A * OED
**Cc:** Sarah Peters; csuram@frontier.com
**Subject:** RE: Western Range Association

Thank you for this information. However, I think that the information indicates that you need more information regarding this issue and I think that it would be best if we met to discuss this. Because the resolution of the issue affects more than Western Range members I would like to get additional input from the American Sheep Industry and then set up a time when we can talk. Would you be willing to meet with a group which would include Oregon sheep ranchers to come to a resolution on this?
Larry

LARRY R. WILLIAMS
P. O. BOX 95017
SOUTH JORDAN, UT 84095
(801) 573-2110
(801) 277-0905 FAX
larry.r.williams@comcast.net

CONFIDENTIALITY NOTE: The information contained in this message and any attached files are for the exclusive use of the addressee and may contain confidential, privileged, proprietary, and non-disclosable information. If you have received this message and are not the addressee, or person responsible for delivering this message to the addressee, you are strictly prohibited from reading, printing, photocopying, distributing, or otherwise using this message transmission, or its contents, in any way. If the recipient has received this message in error, please notify the sender immediately, delete the message and destroy any printed copies. You will be reimbursed for any telephone or other expenses.

**From:** HERRERA Dora A * OED [mailto:Dora.A.HERRERA@oregon.gov]
**Sent:** Friday, January 16, 2015 1:19 PM
**To:** Larry.R.Williams@comcast.net
**Subject:** Western Range Association

Mr. Williams,

Below you will find the response written by our counsel Nate Carter in response to the questions made to me on January 12, 2015.

This e-mail is a follow-up to your telephone conversation with Dora Herrera of the Oregon Employment Department on January 12, 2015. Your questions pertained to the Department's notice to employers, dated December 19, 2014, regarding the minimum wage law and the H-2A program. In that notice, the Department announced that it no longer would approve H-2A job orders for workers engaged in the range production of livestock unless the worker would be paid either (1) an hourly wage that was at least equal to the Oregon minimum wage (and otherwise complied with the requirements of 20 CFR part 655) or (2) a salary that, on a monthly basis, equaled the minimum wage multiplied by 2,080 hours and divided by 12. A lower wage would not comply with Oregon's minimum wage laws, and as such, the Department would be required to reject the job order.

In your conversation with Ms. Herrera, you asserted that in the past, the Department had approved job orders that paid lower wages conforming to the terms of the stipulated settlement agreement approved by the Malheur County Circuit Court in *Arturo Zapata v. Western Range Association*, Civil No. 92-10-25, 244L, as of January 20, 1994. The settlement agreement requires the Oregon employer members of Western Range Association to pay a monthly salary of at least $650 per month to certain sheepherder employees. The agreement also provides that the monthly salary of $650 includes a "stipulated offset amount" equal to the value of "private benefits"

4

**Exhibit F at 13**

provided to the employees, which equals at least $173.33 per month (and you opined in your telephone call that that value had increased since the settlement agreement was entered). You asked whether the minimum salary required by Oregon law would include the stipulated offset amount, and asserted that if the Department did not deduct that stipulated amount, it would be requiring WRA's employer members to pay a salary higher than the minimum wage law requires.

The Department has discussed your question with the Bureau of Labor and Industries (BOLI), the agency that is responsible for enforcing the minimum wage laws. The Department understands BOLI's position regarding those laws to be that, while ORS 653.035(1) allows an employer to deduct the value of items furnished for an employee's 'private benefit' from the minimum wage, that would not necessarily allow an employer to pay a salary less than the amount specified in ORS 653.020(1)(e) and ORS 653.010(9) to a worker engaged in the range production of livestock. Whether or not BOLI allows a specific deduction from the minimum wage will depend on the facts and circumstances surrounding the deduction, and whether the deduction otherwise meets the requirements of ORS 653.035(1) and OAR 839-020-0025. For example, you mentioned in your telephone call that the stipulated offset amount consisted, at least in part, of the value of meals provided to workers engaged in the range production of livestock. Under BOLI's rules, "meals actually received by the employee and furnished by the employer are regarded as being for the private benefit of the employee except when meal expenses are incurred by an employee while traveling away from the employee's home on the employer's business." OAR 839-020-0025(6). Therefore, whether the value of meals provided to range livestock workers could be deducted from the minimum wage would depend on whether, at the time that the meals were provided, the workers were traveling away from their homes on their employer's business.

The settlement agreement in *Zapata v. Western Range Association* appears to assume that the stipulated value of at least $173.33 per month will be treated, under ORS 653.035(1), as an amount to be furnished for the private benefit of the employees who are parties to the agreement. However, the Department is not a party to that agreement, nor is BOLI or any other agency or subdivision of the State of Oregon. As such, neither the Department nor BOLI is bound by the settlement agreement, nor by its assumption that the stipulated offset amount is "furnished by the employer for the private benefit of the employee" under ORS 653.035(1). Furthermore, even if the Department or BOLI had been party to the case, neither agency would have been able to create exceptions to the State's laws through a settlement agreement.

If an employer presents the Department with an H-2A job order that includes information regarding the fair market value of lodging, meals, and other facilities or services furnished by the employer, the Department will consult with BOLI to determine whether the salary offered in the job order complies with Oregon's minimum wage laws. The Department will accept or reject the job order after making that determination.

Please contact the Bureau of Labor and Industries if you have questions regarding the interpretation and application of Oregon's minimum wage law. Otherwise, if you have any further questions, please contact the Department.

Thank you,

**Dora Herrera**
FLC Program Coordinator
875 Union St NE
Salem, OR 97311
Dora.A.Herrera@oregon.gov
(P) (503) 947-1659
(F) (503) 947-1634
www.employment.oregon.gov

**Exhibit F at 14**                                            5

**Kelli  Griffith**

| | |
|---|---|
| **From:** | Kelli  Griffith |
| **Sent:** | Friday, January 09, 2015 11:32 AM |
| **To:** | Linda Reyna; Sandra Stuntebeck; Dolores Hernandez |
| **Subject:** | MPAS Weekly Bulleting - January 9, 2015     MEMBERSHIP DUES AND AGREEMENT ARE DUE!!! |

This Weekly Update is a benefit of membership in Mountain Plains Agricultural Service. If you would like additional information reply to this email or call the office at 307-472-2105.

**Director's Note:** I hope everyone enjoyed the holiday season and that you are staying warm. MPAS is still working to transition to the new database system, it seems these never go as quickly as they should. On Wednesday December 31, 2014 we sent out invoices for all members annual dues as well as the 2015 Membership Agreements. Your 2015 dues and signed agreement are due in the office by January 31, 2015. Keep in mind that your membership is not considered active unless you have submitted your dues AND completed 2015 Membership Agreement. A copy of the agreement is attached in case the copy sent has been misplaced.

# Issue Updates:

**Special Procedure Rulemaking process**: The firm hired to run the coalition for Special Procedures has been busy speaking to Congressional members when opportunities have arisen. Now that the holiday season is over, we should see materials to begin a "grassroots" campaign through industry groups and with individuals. If any member has an opportunity to visit with a U.S. Congressional member contact the office and I can get information to you asap.

**Wage Change in Oregon!**: On Friday, December 26, 2014 the Oregon State Workforce announced: "The Oregon Employment Department (OED) has determined that it has been calculating the minimum wage for sheepherders and livestock workers incorrectly under Oregon's minimum wage laws.  Both the Oregon Bureau of Labor and Industries (BOLI) and U.S. Department of Labor (USDOL) have informed OED that the minimum wage laws generally apply to all livestock workers, and USDOL has informed OED that it must notify all affected employers of this change in its enforcement of the H-2A program….Under 20 Code of Federal Regulations § 655.122(l) and 20 CFR § 655.120(a), an employer, in its job offer, must offer, advertise, and pay "a wage that is the *highest* of the Adverse Effect Wage Rate, the prevailing hourly wage or piece rate, the agreed-upon collective bargaining wage, or the Federal or State minimum wage, except where a special procedure is approved for an occupation or specific class of agricultural employment." Furthermore, under 20 CFR § 655.135(e) and 20 CFR § 653.501(d)(2)(xii), an employer submitting a job order must certify that it will comply with all applicable state laws.  This includes state laws governing the minimum wage…Therefore, OED may not approve a job order for workers engaged in the range production of livestock unless the worker would be paid either (1) an hourly wage that was at least equal to the Oregon minimum wage (and otherwise complied with the requirements of 20 CFR part 655) or (2) a salary that, on a monthly basis, equaled the **minimum wage multiplied by 2,080 hours and divided by 12**…If the offered wage does not comply with Oregon's minimum wage laws, OED must reject the job order…Our office will implement this change **January 1, 2015** on any current and future job listings posted within our iMatchSkills system." Based on this announcement as of January 1, 2015 the wage for both Open Range Livestock Workers and Sheepherders in the state of Oregon is **$1603.33/month plus housing**.  MPAS is looking into this matter and we will keep you up to date if things change, but as of 1/1/15 the mandated wage is **$1603.33/month plus housing.**

# Did you know…..

To continue with definitions and explanations regarding the H2A process:

1. *Certification* – Determines contract dates. A worker's contract begins either on the 1st date of certification (for workers present in the country) or the day a worker enters the country. Contract dates are crucial for determining the employer liabilities. Some major points include: 1. Travel expenses (from front porch to place of employment) must be reimbursed within 1st week of work. 2. An employer can withhold the travel expenses from worker pay UNTIL worker completes 50% of a contract, at that time the expenses must be reimbursed to worker. 3. If a worker completes 100% of 1 contract, the employers owes the worker all expenses home (this is not eliminated with a 2nd contract).

2. *Petition* – A petition refers to the application to US Customs and Immigration Service. In order for a worker to either process a visa or remain in the country, a petition must be approved. A petition requires signed blue sheets. One (1) petition may contain multiple opportunities for workers to transact visa, however, must only request one set of dates and one action. The dates will not be longer than those on the corresponding certification. An action could be a request to "extend" workers or bring in "new" workers.

3. *Extend worker* – This action ONLY applies to sheepherders. A worker may only be extended if they are actually present in the U.S. at the end of their contract. It is a request to extend the stay of a worker in the U.S.

4. *New worker* – This action refers to both workers that are returning to work or coming to work for the first time. These workers are NOT present in the country after the end of a contract and therefore, must transact a visa to enter.

5. *Visa -* A visa is a travel document. When a visa is issued by the Dept. of State, it is for the exact dates matching an employer's certification dates. If a worker is extended, their visa will expire while present in the U.S.

6. *I-94* – This is the document that proves your worker is present in the U.S. legally. A worker should always carry his I-94 on his person. When a worker enters the country, it is the worker and employer responsibility to print out his I-94 off the website: cbp.gov/I94 . When a worker extends his stay in the U.S. the I-94 arrives at MPAS when the petition is approved. MPAS then sends the I-94 to the employer. If an I-94 has expired and a new petition has not been submitted for a worker, he is present in the U.S. illegally.

7. *Passport* – If this is requested, we are typically referring the actual information page found in the passport book. Keep in mind it is the responsibility of the worker and employer to monitor the expiration date.

Thank you and have a great holiday. Remember MPAS offices will be closed on Thursday and Friday next week.

Kelli Griffith
Executive Director
811 N. Glenn Rd.
Casper, WY 82601
www.mpaswy.com



**Exhibit F at 16**   Llacua et al v. WRA, MPAS, et al                                    6

 

June 1, 2015

**VIA WWW.REGULATIONS.GOV**

Adele Gagliardi
Administrator
Office of Policy Development and Research
Employment and Training Administration
U.S. Department of Labor
200 Constitution Avenue, NW
Room N-5641
Washington, DC 20210

     **Re:**   **RIN 1205-AB70**
            *Temporary Agricultural Employment of H-2A Foreign Workers in the Herding or Production of Livestock on the Open Range in the United States*

Dear Ms. Gagliardi,

      Mountain Plains Agricultural Services (Mountain Plains or MPAS) and Western Range Association (Western Range or WRA) (collectively, "Commenters") submit the following comments with respect to the Notice of Proposed Rulemaking (NPRM) issued April 15, 2015, *Temporary Agricultural Employment of H-2A Foreign Workers in the Herding or Production of Livestock on the Open Range in the United States*, RIN 1205-AB70 (NPRM or the "Rule"). Those two organizations represent nearly all of the U.S. employers using the H-2A program to hire foreign workers involved in the production of grazing livestock (sheep, goats, and cattle). Since there have been shortages of U.S. workers willing to perform this work since World War II and virtually no U.S. workers at all for decades, Mountain Plains and Western Range's employer members must rely on the "special procedures" under which the Department of Labor (DOL) has administered the H-2A visa program (and its predecessors) for more than 60 years. These associations, their members, the businesses that supply them and purchase the meat and wool that they produce, and the rural communities in which they operate share in the grave concern that the Rule will deeply wound or eliminate this industry and end a way of life in the American West.

Adele Gagliardi
Administrator, Office of Policy Development and Research
June 1, 2015
Page 2 of 40

This grave concern stems from the numerous proposed changes to the longstanding special procedures. Each specific concern is discussed in turn – but the two most alarming changes in the Rule are the tripling of monthly wage rates in conjunction with new and unrealistic limits on work that may be performed by H-2A workers involved in the grazing production of livestock.

These two changes alone will exclude hundreds of ranchers from the H-2A program and will cause any who remain to operate at a loss, sell their herds, and go out of business. As DOL has refused multiple requests by Mountain Plains and Western Range to meet to discuss any proposed changes to the special procedures – reversing decades of valuable stakeholder-agency interaction – Mountain Plains and Western Range fear that the Department has issued the proposed Rule based on fundamental misunderstandings of the unique characteristics of the livestock grazing industry and that the resulting errors will cause the extinction of that industry.

MPAS and WRA offer these comments in response to DOL's specific questions raised in the NPRM, to better explain their industry, to identify those areas of the Rule that will cause the greatest harm, to propose alternatives to address the Department's policy concerns without inflicting that harm. Many of the rancher-members of MPAS and WRA graze their livestock on the same land that generations of their family have used since the 1800's. They work shoulder to shoulder with and treat their workers as part of the family and understand DOL's role in protecting those workers; they hope to pass the ranch on to their children and grandchildren, and they understand and support updating the H-2A rules for this industry in a way that balances those two goals.

### Range Production of Sheep and Livestock

Mountain Plains Agricultural Service was created in 1988, as employers engaged in range production of livestock sought more certainty for their workforce following the enactment of the Immigration Reform and Control Act of 1986 ("IRCA"). Mountain Plains has approximately 280 members who operate in 16 states, primarily in the Rocky Mountains. Mountain Plains acts as an "agent" on behalf of its employer members who utilize the H-2A visa program to hire workers involved in the production of grazing livestock (sheep, goats, and cattle). Mountain Plains does not file a "master" application for H-2A workers; each member employer is a single employer. Mountain Plains is based in Casper, Wyoming.

Western Range Association was first incorporated in 1953, after the enactment of the Immigration and Nationality Act ("INA") in 1952. In the 60-plus years since its incorporation, Western Range has grown to include 216 members in 11 western states. Western Range files "master" applications for H-2A sheepherders, who transfer between WRA members as the need for workers requires. Western Range is based in Salt Lake

Adele Gagliardi
Administrator, Office of Policy Development and Research
June 1, 2015
Page 3 of 40

City, Utah.  A more extensive history of Western Range and its role in this program and the larger H-2A program are included below as an Addendum to this document.

Roughly 40% of all sheep in the U.S. and beef cows in the Western United States are herded by H-2A workers.  The notion of "open range" is antiquated and inaccurate, as discussed below, but the production of grazing livestock in the American West is performed on a combination of privately-owned and federally-owned public land for which livestock producers pay annual grazing fees.  Through the grazing of sheep and cattle, these producers help the U.S. government manage more than 250 million acres of public land.  Prescribed grazing is a critical conservation practice on behalf of local governments throughout the West as well.

Whether individually or as part of a team, herders can tend a large "band" or "herd" of 1,000 head of livestock or more, often in rugged high altitude terrain or dry desert conditions, hauling water for the animals, herding them to grazing areas and making sure they have enough to eat, keeping them from going astray, and protecting them from the constant threat of natural predators like coyotes, mountain lions, and wolves, harmful or poisonous plants, and man-made dangers like highways and domesticated dogs.  During lambing, calving or kidding season, the herders assist the animals in the birthing process, and at all times, the herders provide for the health and medical needs of the herd.

Dating back to World War II, sheep producers found it first difficult and later impossible to find United States workers able and willing to perform the difficult work of "range" sheepherding.  In recent years, the number of U.S. born sheepherders has essentially dropped to zero.  For example, in 2012, Western Range's members sought to hire nearly 1,000 sheepherders.  Out of that number, only 22 U.S. workers even applied, and only 2 met the qualifications and were hired.  Neither completed the job contract.  In 2014, Mountain Plains filed H-2A applications seeking 49 goat/sheepherders, 27 goatherders, 734 sheepherders, 235 grazing cattle herders, and 30 sheep shearers and wool graders.  Of the more than 1,000 positions for which Mountain Plains' employers needed workers, exactly 2 qualified U.S. workers applied.  One was not interested in the job and the other was hired but quit before completing his contract.

Even where there are "U.S." workers applying for work in the production of grazing livestock, nearly all are foreign-born, possible former H-2A workers who have obtained permanent resident status by marrying U.S. spouses.  The remote and demanding nature of this work makes it unattractive to U.S. workers.  Without the sheepherders hired from Peru, Mexico, and Chile, the generations' old industry of grazing livestock would disappear forever in the United States.

Even with access to the H-2A program, grazing livestock producers face an unforgiving present and an uncertain future:  producers face both rising input costs (feed,

Adele Gagliardi
Administrator, Office of Policy Development and Research
June 1, 2015
Page 4 of 40

water, transportation, etc.) and a price-taking market in which more than half of the U.S. lamb supply and most of the U.S. wool supply is provided by China, Australia, and New Zealand.  Prolonged droughts only compound these problems, and large, well-established sheep operations are going out of business every year.  Where U.S. herds included more than 56 million head of sheep at the beginning of World War II, the current total is now less than 10% of that figure, with fewer than 5.3 million head of sheep as of the January 30, 2015 USDA NASS Sheep and Goat Report.[1] According to USDA data, lamb imports have increased from approximately 6,000 pounds per month in January 2000 to more than 20,000 pounds per month in March 2015, primarily from Australia, due in part to the increase in purchase power of the U.S. dollar vs. the Australian dollar in recent years.[2]

The attached report by Stephen Bronars, Ph.D., "Analysis of the Wages of H-2A Temporary Foreign Workers Employed in the Herding and Production of Range Livestock" (Bronars Report), addresses the current world market for the wool and meat produced by this industry, as well as suggesting an alternative to the NPRM's proposed wage methodology and a discussion of how that wage alternative would provide a far better standard of living for herders than that seen by other workers in this region.  First, as discussed in the Bronars Report, the massive increase in mandated wages proposed in the NPRM assumes that employers would be able to pay those increased wages by raising prices, without losing their market share to foreign competitors in the global market.  As shown in that report, however, U.S. producers account for less than seven tenths of one percent of the world's wool production and less than nine tenths of one percent of the world's lamb production.  U.S. market share has been shrinking for decades, but United Nations data show that U.S. wool production is down 65% since 1990, while lamb production is down 56% over that same period.  Beef producers in the U.S. face the same pressures, with roughly 3% of the world's beef supply produced on the range.[3]  The unavoidable bottom line of these market conditions is that U.S. producers will <u>not</u> be able to increase their prices and will, instead, be forced out of business by the tripling of their labor costs, leaving foreign competitors to slightly increase their own production to meet that demand at a lower price.

Due to the fortitude of U.S. ranchers and the hard work of the H-2A herders that they hire, some family ranches have stayed in business.  The estimated value of direct production by sheep under the care of H-2A workers is $275 million, with revenue created in indirect "upstream" and "downstream" businesses valued at more than $665 million.  The value created by H-2A workers involved in the production of grazing goats

---

[1] By way of contrast, in the early 1800's there were fewer than 10 million people in the United States but more than 7 million head of sheep.  U.S. sheep herds stayed above that number for 200 years before dropping below 7 million head in 2003 and staying below that figure ever since.

[2] http://www.ers.usda.gov/data-products/livestock-meat-international-trade-data.aspx#26050

[3] Range beef producers face competition both from foreign producers as well as U.S. feedlots.  Increasing the operating costs for range producers will eliminate their remaining market share and lead to only foreign or feedlot beef.

Adele Gagliardi
Administrator, Office of Policy Development and Research
June 1, 2015
Page 5 of 40

and cattle involves similar "multiplier" effects on local economies.  This is a small industry relative to some, but it plays a significant role in the livelihood and survival prospects of small towns throughout the West.  From the meat on a family's dinner table to the wool in the uniforms worn by the U.S. military, the range production of sheep and livestock contributes to the American economy and continues the American story.  The Commenters respectfully urge the Department of Labor to reconsider its proposed Rule, which threatens to end this way of life.

### Early Program History and *Mendoza* Litigation

The Department of Labor set forth the early history of the program to admit foreign workers to address the shortages of U.S. workers in the production of grazing livestock in Field Memorandum No. 24-01 (FM 24-01):

> Historically, employers in several western states have utilized the provisions of the Immigration and Nationality Act (INA), 8 U.S.C. 1101, et seq., to import nonimmigrant foreign workers to work as sheepherders and goatherders in conjunction with their ranching activities.
>
> The unique occupational characteristics of sheepherding (spending extended periods of time grazing herds of sheep in isolated mountainous terrain; being on call to protect flocks from predators 24 hours a day, 7 days a week) have been recognized by the Department, the United States Citizenship and Immigration Service (USCIS), and Congress as significant factors in limiting the number of U.S. workers who might be interested in and capable of performing these jobs.
>
> During the early 1950's, Congress enacted three special laws authorizing the admission of a certain number of "foreign workers skilled in sheepherding" for many of these jobs.  Special privileges were granted with respect to the issuance of visas which enabled the foreign workers to gain entry into the U.S. on an expedited basis, provided that they were otherwise admissible into the U.S. for permanent residence.  There were no required tests of U.S. worker availability or adverse effect at the time.
>
> During 1955 and 1956, the House Judiciary Committee (Committee), in response to requests from sheep ranchers, undertook an investigation to examine allegations that a number of foreign sheepherders admitted under the special laws were leaving sheepherding shortly after arriving in the U.S., and were instead employed in other industries and occupations.
>
> The Committee's investigation substantiated many of these allegations.  In a report issued on February 14, 1957, the Committee stated that American

Adele Gagliardi
Administrator, Office of Policy Development and Research
June 1, 2015
Page 6 of 40

employers and the sheep raising industry had not fully benefitted from the services of foreign sheepherders, as was intended by the special legislation. The Committee recommended that no additional special legislation be enacted to admit foreign sheepherders and also that the future importation of foreign sheepherders be governed by the H-2 temporary worker provisions of the INA and administered by the Immigration and Naturalization Service (INS) (now, USCIS) and the Department. H.R. Rep. No. 67, 85th Cong., 1st Session (1957).

Following the issuance of the Committee's report, Congress permitted the special legislation to expire. No additional legislation for sheepherders has been enacted to date. The labor certification program for temporary foreign sheepherders and goatherders was implemented consistent with the H-2 program administered by INS (now, USCIS) and the Department.

After Congress passed the Immigration Reform and Control Act of 1986 ("IRCA"), the H-2 program was divided into the agricultural H-2A program and the non-agricultural H-2B program. With IRCA, sheepherders came under the H-2A program, subject to special procedures that have been in place, in one form or another, since that time. DOL issued regulations for the H-2A program on June 1, 1987 (the "1987 Rule").[4] In the 1987 Rule, 20 C.F.R. § 655.93(c) specifically provided for the continued use of "special procedures" in the sheep industry and the extension of such procedures to other range production of livestock.

DOL issued Field Memorandum No. 74-89 (FM 74-89), effective May 31, 1989, setting forth special procedures for temporary foreign herders. As stated in DOL's Field Memorandum No. 24-01 (FM 24-01), the 1987 Rule "was based on past experience under the sheepherding program, and is consistent with the views of IRCA's Congressional sponsors." Further explaining the 1987 Rule in 2011, DOL stated that:

The 1987 regulations provided for the administration of the H-2A Program by the Employment and Training Administration (ETA) Regional Administrators, and instituted procedures to offset the adverse effects of immigration on U.S. workers, procedures which did not exist until that time. Although neither the IRCA amendments nor the INA specifically address the employment of nonimmigrant foreign sheepherders and goatherders in the U.S., the Department's 1987 regulations established special procedures for certain occupations, as long as they did not deviate from the Secretary's statutory responsibility to determine U.S. worker availability and to make a determination as to the adverse effect of foreign workers on the wages and working conditions of U.S. workers.

---

[4] 54 Fed. Reg. 20496 (June 1, 1987).

Adele Gagliardi
Administrator, Office of Policy Development and Research
June 1, 2015
Page 7 of 40

TEGL 32-10 (76 Fed. Reg. 47256, 47257 [Aug. 4, 2011]).  On August 1, 2001, DOL issued FM 24-01, which continued the special procedures set forth in FM 74-89.  DOL next issued TEGL 15-06 on February 9, 2007.  This TEGL reiterated (nearly verbatim) DOL FM 24-01.

The 1987 Rule was replaced in 2008 (the 2008 Rule)[5] and again in 2010 (the 2010 Rule)[6] through notice-and-comment rulemaking.  The 2010 Rule is currently in effect and governs DOL's administration of the H-2A program, including the special procedures.  The 2010 Rule explicitly authorize the OFLC Administrator to "establish, continue, revise or revoke" special procedures in order "[t]o provide for a limited degree of flexibility in carrying out the Secretary's responsibilities under the Immigration and Nationality Act (INA), while not deviating from statutory requirements."  29 C.F.R. § 655.102.  The 2010 regulations reference by name the "special procedures currently in effect for the handling of applications for sheepherders in the Western States (and adaption of such procedures to occupations in the range production of other livestock), and for custom combine harvesting crews."  *Id.*  The regulations further provide that "[p]rior to making determinations under this section, the OFLC Administrator may consult with affected employer and worker representatives."  *Id.*  After the 2010 Rule took effect, DOL issued new guidance for the special procedures at issue here in 2011 (TEGL 15-06, Change 1, "Open Range Production of Livestock" and TEGL 32-10 "Sheepherding and Goatherding").

Those two TEGLs were the subject of a lawsuit in U.S. District Court for the District of Columbia, *Mendoza v. Solis*, 1:11-cv-01790-BAH.  DOL was a defendant in the *Mendoza* litigation, and MPAS and WRA intervened as defendants.  While the District Court agreed with the Intervenors-Defendants that the Plaintiffs in that case lacked standing to bring the case, that decision was subsequently overturned on appeal to the U.S. Court of Appeals for the District of Columbia.  The D.C. Circuit further ruled that the TEGLs issued in 2011 were "legislative rules" that required notice-and-comment rulemaking pursuant to the Administrative Procedure Act.  The decisions in *Mendoza* required that the special procedures undergo notice-and-comment rulemaking to bring them into compliance with the requirements of the APA, but did not require the substance of the TEGLs be cast aside and radically re-written.

On remand, the District Court set a schedule that allowed DOL 5½ months to prepare the NPRM for issuance by April 15, 2015, with a Final Rule to be issued by November 1, 2015 and to take effect by December 1, 2015.  Of the 6½ months between issuance of the NPRM and issuance of the Final Rule, DOL allotted only 30 days for public comment on the rule, later agreeing to a 45-day comment period after significant

---

[5] 73 Fed. Reg. 77110 (Dec. 18, 2008).

[6] 75 Fed. Reg. 6883 (Feb. 12, 2010).

Adele Gagliardi
Administrator, Office of Policy Development and Research
June 1, 2015
Page 8 of 40

public outcry from the grazing livestock industry and from Congress. This is particularly ironic because the argument driving the *Mendoza* litigation giving rise to the current rulemaking was the lack of adequate opportunity for public comment on the special procedures.

### Administrative Procedure Act Concerns

Beyond the disastrous substance of the rules discussed below, there are serious concerns with the procedure by which the Rule has been prepared. The truncated public comment period aside, it appears that the Department has failed to meet its procedural requirements for preparing and issuing the NPRM. The NPRM does not include a proper Initial Regulatory Flexibility Analysis (IRFA) of the Rule's impact on the regulated community (nor on other parts of the U.S. economy or other agencies of the U.S. government). *See* 5 U.S.C. § 603. In particular, the only "alternatives" identified in the NPRM relate to the phase-in period for the new wage methodology: immediately, over a 3-year period, or over a 5-year period. This does not come close to satisfying the requirements of Section 603(c), of describing "any significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize any significant economic impact of the proposed rule on small entities."[7]

The new definition of range production of livestock proposed in the NPRM represents a radical departure from statutory language, previous DOL regulatory text, and a long series of DOL guidance documents with respect to the special procedures for range production of livestock. The APA requires that changes in regulatory practice be based on an agency's reasoned explanation for the change. The NPRM does not explain why a definitional change is necessary, does not identify any problem or confusion with the longstanding definition of the work covered by the special procedures, and makes no effort to explain why the particular definition chosen for the Rule is necessary or appropriate. As discussed below, the definition's reliance on "unenclosed" land is at least 100 years out of date, suggesting that the reasoned explanation for the change required by the APA is not possible.

#### *The Department of Labor Has Not Met its RFA Requirements*

The NPRM openly concedes that it "will have a significant economic impact on a substantial number of small entities." 80 Fed. Reg. 20330. The purported IRFA in the NPRM, however, contains only the most cursory analysis of the statutory factors from Section 603. The NPRM states that it is issuing the NPRM in response to the D.C.

---

[7] As set forth in the comments of the American Sheep Industry Association and the Small Business Administration Office of Advocacy, all but 0.02% of the total sheep operations in the United States are small businesses. All or nearly all of the members of Mountain Plains and Western Range would meet the statutory definition of "small business" for agricultural enterprises.

Adele Gagliardi
Administrator, Office of Policy Development and Research
June 1, 2015
Page 9 of 40

Circuit's decision in *Mendoza* and because of "the continuing difficulty the Department experiences in determining an appropriate AEWR using the current wage setting methodology." *Id.* This explains why DOL is considering taking any action, but does not explain why the Department is considering *this* particular action.

The analysis of the impact of the Rule on small businesses contains a similarly brief discussion, contains repeated underestimation of the actual costs to be imposed, and fails to include a number of significant costs. Mountain Plains and Western Range contend that the defects inherent in the NPRM's IRFA render the rulemaking invalid as contrary to the requirements of the APA and the Regulatory Flexibility Act. For example, the NPRM attaches no economic impact to the change in definition of "open range" – a change that will exclude an estimated 40% or more of the employers currently using the H-2A program in this industry, as discussed in greater depth below.

The NPRM takes the current workforce and provides a projection of the impact of the wage "transfer" from employers to workers. Unlike most economic analyses of proposed rules, this is not simply a transfer from employers to employees, normally a zero-sum prospect. Here, since very nearly 100% of the workforce consists of nonimmigrant foreign workers with little or no opportunity to spend money while in the United States, this is a transfer of tens of millions of dollars from U.S. employers to foreign markets. This is not a situation where U.S. workers would have more money in their pocket to spend within the U.S. economy, but rather, where all or nearly all of the paycheck of these workers is wired out of the U.S. to Peru or Mexico, where that money is used to build homes and buy consumer items there, a significant net loss for the U.S. economy.

### The NPRM Fails to Consider the Impact of Forcing Ranches Out of Business

The NPRM does not analyze the cost to ranches of going out of business because of this massive wage increase or the change in the definitions of who may use the program, forcing them to sell their herds, their equipment, and their land into a buyer's market as hundreds or thousands of other ranches face the same plight.[8] If the Rule were to take effect as currently written, and all of the H-2A sheep producers were forced to slaughter 40% of the country's sheep without being able to sell them to market (as would likely happen, since the world market could not absorb that influx of supply), the total loss would be $212 million, based on the total value of the U.S. sheep supply. While these are small employers in a single part of the economy, the direct losses associated

---

[8] The NPRM actually states that the Department of Labor estimates that the number of H-2A employers will increase from the current 560 to 669 by 2025 with the Rule in effect, based on "an annual growth rate of two percent." 80 Fed. Reg. 20327. This statement alone demonstrates how fundamentally wrong DOL's assumptions are and how much the Department misunderstands this industry and the terrible consequences of the Rule on these small businesses.

Adele Gagliardi
Administrator, Office of Policy Development and Research
June 1, 2015
Page 10 of 40

with them forced out of business would be huge, to say nothing of the "upstream" or "downstream" losses that would ensue.

The NPRM does not calculate the loss to rural communities if these ranchers are forced out of business by the Rule. Each of the jobs at issue in this rulemaking in the production of grazing livestock creates at least 8 full-time U.S. jobs, upstream and downstream, from suppliers to processors, truck drivers to shearers, supermarket clerks in rural Wyoming to butchers at a natural meat cooperative in New York City. Losing 2,000 H-2A workers could mean the loss of tens of thousands of U.S. jobs. For small Western towns already battling to stay alive, this Rule could turn them into ghost towns.

Even for East Coast sheep operations that pasture-raise their sheep and cattle and do not use H-2A workers, the loss of Western livestock producers will cause shippers, shearers, and processors to go out of business, leaving them unable to continue their operations as well. No consideration is given to these workers or businesses in the NPRM, which somehow assumes (against the weight of all economic theory and the entire history of this industry) that employers have an unlimited capacity to increase wages and the economy will suffer no ill-effects from tripling or quadrupling labor costs in an industry that operates on razor-thin margins already.

Beyond the tangible economic cost of lost jobs, lost farms, and lost businesses, there would be an incalculable injury to the Western lands, themselves. Grazing livestock producers manage 250 million acres of Western land, and grazing activities contribute significantly to fire suppression, endangered species management (the protected sage grouse needs grasslands grazed to a reasonable height), and related conservation activities. The lands under the stewardship of the Department of the Interior, the Forest Service, and the Bureau of Land Management would suffer tremendously without the presence of range livestock producers.

### The NPRM Fails to Properly Value the Costs of the Rule

On the more technical aspects of the Rule, beyond the two largest concerns with the definition of the job and the new wage methodology, the NPRM misunderstands and/or underestimates the impact that it will have on employers. The Rule proposes to change how camps or mobile housing facilities are used, introducing a "one worker to a camp" requirement. The NPRM does not include the cost of purchasing additional housing in its summary of costs per employer. 80 Fed. Reg. 20334. If it had, it would see that employers will have to spend $20,000 or more to purchase each additional camp, with some operations facing a bill of $80,000 to comply. Even that assumes that: (1) employers will be able to locate such housing in order to purchase it; and (2) they will be able to actually use the new housing. In Winter months, when the days are short and the nights are dark, it will be impossible for herders traveling on horseback and towing camp wagons to follow the sheep to be able to move the herd, move one wagon, then loop back

Adele Gagliardi
Administrator, Office of Policy Development and Research
June 1, 2015
Page 11 of 40

to move the second wagon before nightfall.  These workers often travel over terrain with no roads, and the NPRM's changes to housing create serious safety concerns.  This is just one example of how the Rule will have far-reaching effects on this industry to an extent not analyzed by DOL in the NPRM (and perhaps not considered or understood by the Rule's authors).

Even without considering all of the additional or "hidden" costs built into the changes in the rule[9], the Department estimates that the additional costs will constitute between 19.5% and 24.1% of total revenue for sheep or livestock employers with 3 workers, respectively.  80 Fed. Reg. 20334, Ex. 22.  No justification is given for measuring the impact only for those employers with 3 workers, since the Colorado Wool Growers Association's 2010 study (cited in the NPRM at 80 Fed. Reg. 20309 for an unrelated issue but ignored here) showed that its members used an average of 5 workers.[10]  Across the entire Western portion of the U.S. the average number of workers per operation is at least 4, but even the extremely limited estimate used by DOL gives a good sense of just how costly the Rule will be.  The 19.5% and 24.1% figures do not include the single largest additional financial burden of the Rule, the wage increases.  The American Sheep Industry Association (ASI) estimates that labor costs make up 24% of the total operating costs for sheep ranchers.  It is slightly disappointing but not ultimately surprising that the NPRM does not include a similar calculation of the percentage of total revenue that would be devoured by the new wage methodology.  This is likely because the new costs and transfers proposed in the Rule will exceed total revenue for all or nearly all of the employers in this industry.

Despite having months and months to prepare the NPRM, DOL has failed to prepare a valid IRFA as required by the APA.  Some of the costs of the Rule are unknowable today, given how radically the Rule proposes to change the longstanding practices of the special procedures program.  Still, the Department should be expected to understand the harm that it proposes to inflict on small businesses before embarking on this course of action.  To do otherwise is unwise and unlawful.

### Definition of "Open Range" and Limits on "Incidental" Work

Together with the new wage methodology introduced in the NPRM and discussed below, the most devastating element of the proposed Rule is the definition of "open range" in 20 C.F.R. § 655.201 (proposed); 80 Fed. Reg. 20339.  This goes to the core of

---

[9] For example, the NPRM estimates the additional cost of the increased water requirements in the NPRM at $1.0 million annually.  80 Fed. Reg. 20326-27. This estimate does not include the cost of purchasing additional trucks or water trailers (tens of thousands of dollars each), nor does it accurately estimate the average length of a trip from the ranch to a sheep or livestock camp.  This estimate is extremely low and reflects the fundamental lack of understanding of the industry by the Department.

[10] Colorado Wool Growers Association, *The Real Wage Benefits Provided to H-2A Sheep Herders and the Economic Cost to Colorado Ranchers* (Mar. 5, 2010).

Adele Gagliardi
Administrator, Office of Policy Development and Research
June 1, 2015
Page 12 of 40

the special procedures and acts as a gatekeeper over whether employers may use the Rule at all or be excluded from the H-2A program altogether.  The Rule states that:

> These procedures apply to job opportunities with the following unique characteristics:
>
> (1) The work activities involve the herding or production of livestock, as defined under § 655.201.  Any additional job duties performed by the worker must be minor, sporadic, and incidental to the herding or production of livestock;
>
> (2) The work is performed on the open range requiring the use of mobile housing, as defined under § 655.201, for at least 50 percent of the workdays in the work contract period because the worker is not reasonably able to return to his or her place of residence or to employer-provided fixed site housing within the same day.  Any additional work performed at a place other than the open range (*e.g.,* an enclosed farm or ranch) that does not constitute the production of livestock must be minor, sporadic, and incidental to the herding or production of livestock; and
>
> (3) The work activities generally require the workers to be on call 24 hours per day, 7 days a week.

20 C.F.R. § 655.200(b) (proposed); 80 Fed. Reg. 20339.  Proposed Section 201 contains definitions of the following terms:

> *Herding*.   Activities associated with the caring, controlling, feeding, gathering, moving, tending, and sorting of livestock on the open range.
>
> *Livestock*.  An animal species or species group such as sheep, cattle, goats, horses, or other domestic hooved animals.  In the context of this subpart, livestock refers to those species raised on the open range.
>
> *Minor, sporadic, and incidental work.*  Work duties and activities that are closely and directly related to herding and the production of livestock and are performed on no more than 20 percent of the workdays spent at the ranch in a work contract period.
>
> *Mobile housing.*   Housing meeting the standards articulated under § 655.235 that can be moved from one area to another area on the open range.

Adele Gagliardi
Administrator, Office of Policy Development and Research
June 1, 2015
Page 13 of 40

> *Open range.*  Unenclosed public or private land outside of cities and towns in which sheep, cattle, goats, horses, or other domestic hooved animals, by ownership, custom, license, lease, or permit, are allowed to graze and roam.  Animals are not meaningfully enclosed where there are no fences or other barriers protecting them from predators or restricting their freedom of movement; rather a worker must actively herd the animals and direct their movement.  Open range may include intermittent fencing or barriers to prevent or discourage animals from entering a particularly dangerous area.  These types of barriers prevent access to dangers rather than containing the animals, and therefore supplement rather than replace the worker's efforts.

> *Production of livestock.*  The care or husbandry of livestock throughout one or more seasons during the year, including guarding and protecting livestock from predatory animals and poisonous plants; feeding, fattening, and watering livestock; examining livestock to detect diseases, illnesses, or other injuries; administering medical care to sick or injured livestock; applying vaccinations and spraying insecticides on the open range; and assisting with the breeding, birthing, raising, weaning, castration, branding, and general care of livestock.

20 C.F.R. § 655.201 (proposed); 80 Fed. Reg. 20339.

Understanding the need to distinguish when these "special procedures" would apply and when the general H-2A rules would apply, these definitions are inappropriately restrictive and are not a realistic reflection of the industry's labor needs.  In a recent survey that Mountain Plains conducted of its members, asking them whether their ranch's operations using H-2A workers currently and for previous years would fit within the definitions quoted above.  Of the 140 employer-members who responded, 45% of respondents indicated that their operation would **NOT** qualify as "open range" according to the definition in the NPRM.  Of those respondents, 34% indicated that their operation would **NOT** qualify as "herding" according to the definition in the NPRM.  This came as a shock to employers who have been using the H-2A special procedures program for many years and who now face the prospect of losing their workforce and, as a result, their family farm.

In place of those definitions, Commenters suggest the following:

> ***Grazing Livestock Production System.***  A livestock production system that is dependent on the sustainable utilization of herbage or forage on a piece of land via grazing or supplementation.  In the context of this subpart, production refers to the processes and methods used to transform tangible inputs (grasses, grazing, forage) and intangible inputs (sunshine

Adele Gagliardi
Administrator, Office of Policy Development and Research
June 1, 2015
Page 14 of 40

> and animal husbandry) into goods (protein, wool, by-products, and carbon sequestration). Resources and practices are used to create animal products that are suitable for consumption or further processing. Practices may include but are not limited to: animal husbandry, temporary fencing, permanent fencing, management of urban interface, transport of water for animal use, use of structures and corrals to facilitate production practices, assistance with production of feed sources for animals being cared for, assistance with repair and maintenance of equipment and facilities used in production practices, trailing livestock, assistance in loading and unloading animals into livestock trucks for movement.

This would address the need for a definition, make clear that feedlots and similar operations are not covered, and tie the definition to the critical component of the job, the grazing of livestock, rather than an arbitrary characterization of the housing, topography or landscape where the grazing is conducted, or where the herder's work is to be conducted.  Likewise, where the term "herding" is used in Section 655.210 of the proposed Rule, Commenters suggest "herding and grazing production of livestock" to maintain consistency and more accurately describe the job to be performed.

### The Term "Open Range" is Antiquated and Should be Retired

The NPRM does not suggest that there has been any confusion as to what work would be appropriately covered by the existing special procedures, nor does it communicate any concern that workers not engaged in "herding" or "production of livestock" as defined above are being improperly included in the special procedures.  The most recent TEGL for sheepherders and goatherders, TEGL 32-10, made two passing references to "the open range" but did not restrict access to the program to a particular definition of that term.  The most recent TEGL for those involved in grazing livestock, TEGL 15-06, Change 1, did reference the term "open range" but did not define that term.

The FLSA's exemption for this work applies to "any employee employed in agriculture … if such employee is principally engaged in the range production of livestock."  29 U.S.C. § 213(a)(6)(E).  The Wage & Hour Division (WHD) regulations interpreting this livestock production FLSA exemption (29 C.F.R. §§ 780.323 – 780.329) matches the NPRM's language on some issues (*e.g.,* the definition of "livestock" in Section 780.328; the recognition that the job duties necessitate remaining with the herd and "make the computation of hours worked extremely difficult" in Section 780.329) but differs from the NPRM in certain critical areas.  The Commenters respectfully assert that the existing WHD regulations are a better fit for the definition of the jobs that have been performed under the special procedures for decades than is the NPRM.

For example, the WHD regulations use the phrase "range" instead of "open range."  Section 780.326 defines "range" as "land that produces native forage for animal

Adele Gagliardi
Administrator, Office of Policy Development and Research
June 1, 2015
Page 15 of 40

consumption" and specifically states that the "range may be on private or Federal or State land, and need not be open."  Furthermore, any part of a ranch beyond the "ranchhouse, barns, sheds, pen, bunkhouse, cookhouse, and other buildings in the vicinity… would be the 'range.'"  Section 780.329(b).  The WHD regulations make clear that the worker's "primary duty must be the range production of livestock" but acknowledges that "[t]he fact that an employee generally returns to his place of residence at the end of each day would not affect the application of the exemption."  Section 780.329(a).  The critical distinction between ordinary agricultural work and work "on the range" in the WHD regulations is that the work is sometimes "performed away from the 'headquarters'" (the specific buildings listed above) (Section 780.329(b)), and consistent with the legislative history of the exemption, it "was not intended to apply to feed lots or to any area where the stock involved would be near headquarters" but rather to situations where the herd are grazing under the supervision and protection of the workers in question.  Section 780.329(c).  There are times when weather conditions require that the herd be brought to the ranch for periods of time, but that does not mean that the workers caring for them and herding them are not "principally engaged" in range production of sheep and livestock.

The NPRM uses (for the first time) the requirement that the herd be grazed on "[u]nenclosed public or private land outside of cities and towns" where they are "allowed to graze and roam."  80 Fed. Reg. 20339.  While that description might once have fit portions of the American West, it has no application to the present landscape.  Stated simply, there is no such place.  All of the land in the West (indeed, in the whole country) is owned either privately or by the Federal government or a State government.  The "range" is less open every year.  Fences line every highway and most roads throughout the West.  Even within Federal lands, the U.S. Bureau of Land Management and USDA Forest Service have deployed fences to keep certain plant or animal species apart, to protect certain portions of that land, to keep grazing ungulates (wild or domesticated) away from rivers, streams or other riparian areas, or to restrict access for some other reason.  These fences delineate boundaries and limit the access of people or certain larger wild animals, but generally do not restrict the movement of sheep.  While there are still places in the West where one might not see a fence nearby, every parcel of land is bounded by fences at some point.  Thus, the reference to "unenclosed" land is antiquated and would effectively eliminate this program.

### *Temporary Fencing Has Been Used Since the Beginning of this Program*

The use of temporary fencing is an essential tool used by livestock production workers since before the beginning of the H-2A herder program and its predecessor programs, with DOL's approval.  Temporary fencing neither replaces workers nor diminishes the need for those workers.  The NPRM mistakenly treats fencing as a substitute for these H-2A workers, apparently operating under a misperception that a herd can be led into a fenced area and left alone for the night or for longer periods of time.  Nothing could be further from the truth.  Temporary fencing is used to keep sheep away

Adele Gagliardi
Administrator, Office of Policy Development and Research
June 1, 2015
Page 16 of 40

from certain plants (either those grown by another farmer that must be protected or those that are hazardous to sheep who must be protected from the plants) and to keep them from falling into ravines or drowning in rivers. The U.S. Fish & Wildlife Service expressly requires that sheep grazing on certain U.S. Forest Service allotments be kept in "night pens" (temporary enclosures using electric fences) for purposes of "deterring bears and reducing grizzly bear/sheep conflicts." A ban on the use of temporary fencing by the Department of Labor directly contradicts explicit requirements by the Department of the Interior and the Department of Agriculture.

Temporary fences are erected, taken down, and moved with the herd to avoid over-grazing a particular area of land, as many as 12 times per week in some areas. Even with fences, herders are still required to move the herd from place to place, to keep members of the herd from straying off, to tend to the medical needs of the herd and to provide adequate water, minerals, and additional feed as required, but perhaps most critically, to guard the herd from predators. Herders must be able to care for the livestock and travel through rough terrain, possibly on horseback. They may also be needed to handle a rifle when the time comes. A hungry mountain lion, coyote, or wolf (or even certain domesticated dogs) will not let a fence stand between it and a lamb dinner. The use of fencing is a valuable tool for herders but nothing replaces the watchful eyes and ears of a trained herder. Banning the use of this fencing will not protect U.S. jobs, but will make the jobs of herders far more difficult, and will result in the death of more animals and possibly more motorists.

The NPRM specifically requests comments on whether the definition of "open range" should include a minimum acreage of the land on which the animals roam. The phrase "open range" should be removed from the Rule entirely, and there should definitely not be a bright-line definition of acreage. Very often, the employer and the worker would have no way of knowing the acreage of a given parcel of land, making the application process and compliance efforts essentially impossible. In a similar vein, the NPRM asks whether the "open range" definition should take into account barriers, fences or other enclosures on the same land and, if so, under what circumstances. For the same reasons articulated above, the phrase "open range" is 100 years out of date and should be replaced with the simpler "range" definition from the WHD regulations or, better still, with a focus on the actual labor to be performed rather than on the topography of the landscape where it is to be performed, referring instead to workers involved in the production of grazing livestock.

By tying the work to "grazing," the Rule would more than adequately avoid the potential scenario of applications for H-2A workers on feedlots. The WHD regulations recognize this and the distinction drawn between work on a feedlot and grazing operations remains viable and relevant. Commenters strongly urge the Department to reconsider its proposed definition in order to align the Rule with the WHD regulations and with the reality of the modern Western landscape.

Adele Gagliardi
Administrator, Office of Policy Development and Research
June 1, 2015
Page 17 of 40

### *The 50% and 20% Rules Are Arbitrary and Unworkable*

As quoted above, the WHD regulation regarding work "on the range" explicitly includes range work spent herding, tending to, and caring for grazing livestock, even where the "employee generally returns to his place of residence at the end of each day." Section 780.329(a). The NPRM requires, instead, that workers must use mobile housing "for at least 50 percent of the workdays in the work contract period because the worker is not reasonably able to return to his or her place of residence or to employer-provided fixed site housing within the same day." 20 C.F.R. § 655.200(b)(2) (proposed); 80 Fed. Reg. 20339. Under this proposed Rule, a sheepherder spending 182 days each year in a camp but the remaining time in a bunkhouse during lambing, docking, or castrating season would not be eligible under the Rule but would not be eligible under the regular H-2A provisions, either, since even 1 day is spent away from fixed-site employment and housing. This would be an absurd outcome.

The better approach would be to follow the existing DOL regulations in the WHD context, which look to the "primary duty" of the employee (Section 780.329(a)) or whether the employee is "principally engaged" in the range production of livestock, including all of the duties associated with that work (Section 780.325(a)). As the WHD regulations state:

> To determine whether an employee is "principally engaged" in the range production of livestock, one must consider the nature of his duties and responsibilities. To qualify for this exemption the primary duty and responsibility of a range employee must be to take care of the animals actively or to stand by in readiness for that purpose. A determination of whether an employee has range production of livestock as his primary duty must be based on all the facts in a particular case. The amount of time spent in the performance of the range production duties is a useful guide in determining whether this is the primary duty of the employee. In the ordinary case it will be considered that the primary duty means the major part, or over 50 percent, of the employee's time.

Section 780.325(a). Moreover, an employee spending more than 50% of his or her time during the year on the range in the production of livestock would be exempt "even though the employee may perform some activities not directly related to the range production of livestock, such as putting up hay or constructing dams or digging irrigation ditches." Section 780.325(b). That definition includes a more holistic and flexible approach to the definition – maintaining the general rule that the worker is "principally engaged" or has a "primary duty" or spends the majority of his or her time out on the range, but recognizing that other work has historically been connected to that work and must be included in the definition of the job.

**Exhibit F at 33**

Adele Gagliardi
Administrator, Office of Policy Development and Research
June 1, 2015
Page 18 of 40

The arbitrary and artificial 50% and 20% limits proposed in the NPRM are unworkable and treat work in the production of grazing livestock as a series of discrete tasks rather than the collection of work performed in service to the livestock and their needs. The NPRM makes no attempt to explain how the 20% "incidental activity" test would help U.S. workers.[11] Nor does the NPRM offer any explanation of how H-2A foreign workers are being harmed by not having this 20% limit in place. What is the policy goal that this rule achieves? Without any effort to articulate a benefit to U.S. or foreign workers, the NPRM simply imposes this limit that will: (1) make it impossible for many current H-2A program users to utilize the H-2A program at all; and (2) impose tremendous recordkeeping and "HR" burdens on family farms to follow their workers and record every activity in which they engage. The work performed by these employees is often performed far from the ranch and to expect workers or ranchers to track their activities like a lawyer billing for his or her time would be impossible. Moreover, what possible benefit could result from attempting to do so? These "bright-line" limits on how and when this work should be performed demonstrate how little the Department understands this work and would be absolutely unworkable in reality.

### Responses to NPRM Questions About the Work to be Performed

The NPRM solicits specific comments on a number of questions as to the season in which the work is performed, the nature of the job duties on the range vs. at the ranch, and the time period and location where such work is performed.[12] The general response is that the work is performed on an "as the need arises" basis, and there is no single description of a worker's typical day. The work is defined first and foremost by the needs of the animals in the herder's care. During lambing, kidding, and calving season, the days are longer and the work is focused on the healthy birthing of new animals. Those duties occur at certain times of the year according to the natural cycles of the seasons and the animals. In parts of the West, employers use fixed structures (known as "sheds") to keep livestock and their offspring safe and healthy during the birthing process. Other ranches perform birthing in open-air pastures. The amount of time spent assisting with this phase depends on the natural conditions of the male and female livestock.

---

[11] Of all the complaints raised by the *Mendoza* plaintiffs, none of them related to the amount of "incidental activity" that was included in the job. The job of a herder includes all of the duties related to caring for and herding the grazing animals, and there is no black-and-white distinction between what is primary and what is "incidental" work.

[12] Commenters note, as an aside, that the answers to these questions have not changed dramatically over the past 60+ years of this program and that, if the Department of Labor had been willing to follow through on its repeated promises of accepting stakeholder input and engaging with the industry, it would have all of these answers already.

Adele Gagliardi
Administrator, Office of Policy Development and Research
June 1, 2015
Page 19 of 40

Responding to health emergencies experienced by the animals can occur at any time of the day or night, as can responding to threats from predators. The time spent in a particular grazing area before moving to another is dictated by the amount and type of forage available. Different plants grow at different rates and are consumed by the herd at different rates. The NPRM seeks specific comment on a number of issues related to the season and time spent by H-2A workers on particular tasks, and the Commenters offer the following brief responses to those requests.

With respect to the 10-month limitation for "livestock" occupations compared with the longstanding 12-month limit for sheep and goat work, the Commenters strongly urge the Department to keep those existing limits in place in the Rule. Switching the sheep and goat job orders to a 10-month limit would not fully meet the needs of those industries and would put herders and herds in jeopardy if workers were required to switch in or out during the middle of the grazing season. All of these animals require year-round care, and the 10-month limit for livestock other than sheep and goats should be extended to match the 12-month limit for workers caring for those animals.

Regarding the differing functions for sheep and goat herders in a particular region, the key distinguishing factor in any region and at any given time of year is the weather. These occupations are subject to both the expected changes in weather throughout the year as well as the unpredictable weather conditions that can change in a matter of minutes. In warmer weather, herders must transport and provide additional water to the herd, while in winter months, they must be careful of snow and ensure that the herd has sufficient food. In various climates, the work will depend on the particular reproductive cycle of the animals. The work is ongoing and while variable, it is impossible to establish definitive "seasons" due to entirely too many variables beyond the control of the employer or the herder.

The NPRM asks for the length of time within which employees are on the "open range" as opposed to being at the ranch. As discussed at some length above, the by-gone notion of the "open range" is misinformed and misleading. The location of the work is not the determining factor in defining the occupation. The occupation is defined by the care and management of grazing livestock, with all of the tasks and duties that go with that responsibility. What is best for the health and safety of the herd will dictate where and when the herd must be (and where the herder must bring them). For some operations, weather may require a sheep producer to use a fixed structure (lambing shed) to keep livestock and newborn offspring safe and healthy during and immediately following the birthing phase of production. However, the length of time that a given worker may be assisting with the birthing phase would depend on the vagaries of the reproductive cycles of the particular sheep under his care.

The description of the occupation above is linked inextricably to the care and management of grazing livestock. The NPRM seeks further information about the duties

Adele Gagliardi
Administrator, Office of Policy Development and Research
June 1, 2015
Page 20 of 40

typically performed by these workers.  Again, the specific duties will vary from day to day or month to month, but are all tied to the needs of the herd.  The job orders filed by the Commenters reflect a sizable list of potential job duties to ensure that the H-2A workers are not working "out of contract" and to advise potential applicants of the nature of the work that would be performed.  The following language that the American Sheep Industry Association submitted to DOL in Fall 2014 is non-exhaustive, and specific to sheep and goat herding, but gives a general sense of the work performed by herders:

> Attends sheep and/or goat flock grazing on the range or pasture.  Herds flock and rounds up strays using trained dogs.  Beds down flock near evening campsite.  Guards flock from predatory animals and from eating poisonous plants.  Drenches[13] sheep and/or goats.  May examine animals for signs of illness and administer vaccines, medications and insecticides according to instructions.  May assist in lambing, docking, and shearing.  May perform other farm or ranch chores related to the production and husbandry of sheep and/or goats.

As for the question of during what time period each duty is performed, the only real answer is "as the need arises."  There is simply no way to set a specific time for these duties.  Even a fairly regular event like birthing will vary depending on the particular geographic location – lambing season comes to different places at different times.[14]

Above all else, weather is probably the single largest factor in determining what work must be done and where it may be performed.  For example, wet and rainy weather may require that the herd be moved to the ranch to separate lambs for sale.  In drier conditions, this can take place at facilities out on the range.  The members of the two Commenter associations are spread across thousands of miles of the American West, with extreme differences in climate and topography.  These differences help dictate whether lambing can be conducted in the open air on the range or must be done in sheds.  Drought conditions in certain areas dictate how often a herd must be moved and where they would be able to graze, as can excessive snow or rain.  The herder understands all of these various conditions and makes daily decisions as to where and when activities will take place based on the health and welfare of the herd entrusted to his care.

### Wage Methodology

The NPRM proposes an extreme departure from the wage methodology that has been in place since the beginning of this program decades ago.  The result of this

---

[13] A de-worming process to remove certain parasites.

[14] This is one of the reasons why it is critical for Western Range to preserve its ability to transfer workers between its employer members so that they can assist with the lambing season in California and then go help with lambing operations in Wyoming or Colorado that may occur at a different time.

Adele Gagliardi
Administrator, Office of Policy Development and Research
June 1, 2015
Page 21 of 40

departure is tripling or quadrupling the wages that must be paid by employers. Abandoning the history of the program, cutting out the role of the state workforce agencies, and ignoring the unique characteristics of the herding industry, the NPRM proposes a one-size-fits-all wage methodology taken from crop agriculture.[15]  Rather than continuing to honor the well-established wage methodology that looks to the wages actually earned in this occupation, the Department has pulled a wage out of thin air based on a survey of aggregated farmworker positions *except* herders.  Those positions pay by the hour, and do not provide housing or food, making those rates of pay completely inapposite to the range production of livestock.

The rationale cited by the Department in the NPRM does not provide a reasoned explanation for the proposed change.  Nor does the NPRM include the required analysis of alternative wage methodologies that would address the concern with the lack of survey respondents stated in the NPRM without imposing the non-herding Adverse Effect Wage Rate where it does not belong and does not work.  The Commenters have provided two different alternative wage methodologies below, in addition to the proposal that was submitted to the Department in Fall 2014.  Those proposals offer a better fit for this industry, solve the concern with survey responses, and even provide a future solution to prevent wage stagnation.  The Department should adopt one of these alternative wage methodologies.

### *Proposed Wage Methodology*

The Proposed Rule abandons the decades-old practice of state workforce agencies conducting surveys to determine the appropriate wages for workers involved in the production of grazing livestock under the H-2A program.  80 Fed. Reg. 20300, 20307. The reason offered for doing so is:

> the dearth of information available to [DOL] through these surveys regarding the actual wages paid to U.S. workers.  Often, and almost always more recently, the SWAs determine that there are no survey results or the survey does not return statistically valid results.  Thus, for many years, the Department has been unable to determine a statistically valid prevailing wage rate each year in each State in which one is needed, requiring the OFLC Administrator to set the AEWR based on other data or to use the survey results from another adjoining area or State.

---

[15] The NPRM seems to be infected by the Department's apparent decision to turn its back on decades of precedent and clear Congressional direction that range herding is to be treated differently from other agriculture and subject to different requirements.  This history is included in the brief filed by Commenters with the District Court in the *Mendoza* litigation, attached hereto as Exhibit A.

Adele Gagliardi
Administrator, Office of Policy Development and Research
June 1, 2015
Page 22 of 40

*Id.*  The result of this lack of valid survey data in recent years is the perceived stagnation of wages, with the NPRM comparing the monthly wage rates from 1994, as taken from a 1993 memorandum from Barbara Ann Farmer, Administrator of the Office of Regional Management, and the wages in place in 2015.  The NPRM notes that wages have not increased significantly during the period from 1994-2015 because new wage determinations rely on the previous year's determinations, and so forth.[16]  *Id.*

The NPRM does not assert that the state surveys were invalid in 1994 or previous years, simply that the more recent surveys have not produced sufficient results from which to set a higher wage level.  *Id.*  For what it's worth, the validity of the 1994 survey results was not challenged in the *Mendoza* litigation by Public Citizen or Legal Services; those groups argued only that the current wage levels were inappropriately low.  The use of the state surveys in the early years of the H-2A herder program was part of the larger recognition that this work is fundamentally different from crop agriculture for which the overwhelming majority of H-2A visa holders are employed.  For example, workers "principally engaged in the range production of livestock" are explicitly exempt from the minimum wage and overtime requirements of Section 206 of the Fair Labor Standards Act.  *See* 29 U.S.C. § 213(a)(6)(E).

In place of the longstanding program of a monthly salary based on state surveys, the NPRM proposes to use the data from the semi-annual Farm Labor Survey (FLS) conducted by the National Agricultural Statistics Service (NASS) of the USDA.  80 Fed. Reg. at 20308.  The FLS provides wage averages for four types of workers:  field workers, livestock workers (primarily dairy or poultry farms or feedlots, including graders, sorters, packers, and equipment operators), supervisors, and "other" workers not included in the first three categories.  The NPRM proposes to aggregate states into 15 multi-state groupings, determine the average wage level from the FLS data for that grouping, and require that workers involved in the production of grazing livestock be paid that rate multiplied by 44 hours/week and 4.33 weeks per month.[17]

---

[16] Wage rates for California and Oregon are the exception, since those states' herder wages are set by statute (Cal. Labor Code § 2695.2(a)) and judicial settlement (*Zapata v. Western Range Ass'n*, Civ. N. 92-10-25, 244L (Ore. 1994), respectively.  As a result of these alternative methods, California's minimum salary is $1,600.34 per month as of July 1, 2014, set to increase on January 1, 2016 to $1,777.98.  Oregon's court-ordered minimum salary is $1,319.07 per month in 2014 and increases each year to reflect inflation and changes in the price of food, for which each methodology allows an employer credit.

[17] The NPRM acknowledges DOL's receipt of correspondence on this issue from Mountain Plains and from the American Sheep Industry Association.  80 Fed. Reg. 20309, nn. 17, 18, 20.  The wage methodologies included in those documents, however, are not referenced in the NPRM and are not part of the Department's required consideration of alternatives to the proposed rule under the Regulatory Flexibility Act.

Adele Gagliardi
Administrator, Office of Policy Development and Research
June 1, 2015
Page 23 of 40

### *The Proposed Wage Methodology is Misguided*

The use of the generic "Adverse Effect Wage Rate" (AEWR) used for H-2A crop agriculture is inappropriate for use for H-2A workers involved in the production of grazing livestock.  First, the NPRM concedes that there were no more than 18 "domestic workers performing sheepherding" in FY 2014.  80 Fed. Reg. 20314.  That number has been declining steadily in past years, according to the NPRM:  30 in FY 2012 and 26 in FY 2013, so the figure for FY 2016 could be even lower still.  *Id.*  The danger of any "adverse effect" on this minuscule domestic workforce is beyond negligible, particularly as compared to the larger agricultural community, for whom the AEWR is most often used.  Second, the FLS data reflects the full amount of "take home" pay that the average farmworker receives.  From that paycheck, however, that worker must make rent or mortgage payments, must purchase food at the grocery store, and must purchase his or her own work clothes.  The remaining earnings, if any, can be used as disposable income on consumer goods or to go out to dinner or a concert or a bar on the weekend.

By contrast, grazing livestock production workers receive, 100% free of charge and with no credit to the employer, housing, food, and clothing, and spend most or all of their time in remote areas and therefore do not tend to frequent stores or restaurants or bars.  Many H-2A herders have 100% of their monthly salary wired home to their families in their home country.  The 2010 Colorado Wool Growers Report cited earlier found that the base salary of $750/month produces an "actual wage" of $1,638/month when living expenses were included.  The wage proposals included below, under that same analysis, would yield "actual wages" of well over $2,000/month.

### *The Proposed Wage Methodology Will Destroy this Industry*

The result of this proposed methodology will be to nearly double the wages of H-2A workers in the first year and more than double, triple, or quadruple those wages by 2020 when the full weight of the wage increase is imposed on employers.  The NPRM forecasts monthly wage rates between $2,125 and $3,244.  80 Fed. Reg. 20318, Ex. 6.  The NPRM identifies no other wage methodology[18] as a potential solution to the concerns with the state surveys, and the only alternatives considered in the NPRM were whether to impose this massive additional wage burden on employers immediately, phased in over three years, or phased in over five years.  As the least destructive option in the short-term, the five-year phase-in is the best of three terrible choices presented, but this is a false choice and ignores numerous alternatives that would achieve the Department's "competing goals" under the INA "to provide an adequate labor supply and to protect the jobs of U.S. workers."  80 Fed. Reg. at 20308.  The wage methodology proposed in the NPRM neither provides an adequate labor supply nor protects the jobs of U.S. workers.

---

[18] Again, despite Mountain Plains, Western Range, and ASI submitting specific alternatives months ago.

Adele Gagliardi
Administrator, Office of Policy Development and Research
June 1, 2015
Page 24 of 40

Instead, the proposed wage methodology makes it absolutely impossible for U.S. ranchers to access an adequate labor supply by pricing that labor far beyond what could be paid in the current market.  Even if the doubled or tripled wages would attract more workers (which they have not and will not, as discussed below), no employer could afford to pay those wages, making it impossible to use the H-2A program at all.  Furthermore, the NPRM itself states that there are 18 or fewer domestic workers in this industry.  *See supra*.  The NPRM estimates the cost of the Rule to employers (including net costs and "transfers" of wage payments to workers) at more than $50 million per year, on average for the next ten years based on the five-year phase-in plan.  80 Fed. Reg. 20329, Ex. 21.  Once the new system is fully in place, the NPRM forecasts an annual cost of $63.6 million per year.  Even if there were still 18 U.S. workers by then (a highly unlikely scenario, given the decades-old trend), the Rule would cost employers more than $3.5 million per year for each of those workers at that rate.  That is not a "balanced" approach to resolving the Department's perceived "competing goals" under the statute.

Given the market values for the meat and wool that ranchers are able to secure for their products, the absurd result outlined above will never come to pass.  This is because all or nearly all of the employers of grazing livestock will be forced to sell off their herds for slaughter, sell their family ranches, and go out of business long before those full costs could be felt.  A study by the University of Wyoming, submitted with these comments, compared historic market trends for lamb and wool for the past 20 years with the labor and operation costs for ranchers on a per-ewe basis.[19]  Based on the current Wyoming herder minimum monthly salary of $750, a rancher would need to have total receipts per ewe of at least $97.85 just to cover operating costs.[20]  Over the past 20 years, the market would have allowed the average Wyoming ranch to break even on these costs 85% of the time, resulting in a relatively stable population of employers.  Under the wage rate for Wyoming set forth in the Rule, of $2,402.96 for 2020 and subsequent years, a rancher would need to book a return of $137.45 per ewe, something that has only happened 30% of the time during the past 20 years.  Thus, for 14 years out of 20, the ranch would lose money as a direct result of the NPRM's proposed wage methodology.  Factoring in ownership costs lowers the odds for the ranch by creating annual losses in 11 years out of every 12 for the average ranch.  That is an extinction scenario for employers; there is simply no way for any employer to sustain losses year in and year out for that long.

Specific examples highlight how destructive the proposed wage methodology will be.  This is not a situation where employers are simply taking the standard stance against increasing wages and slightly reducing their marginal profit.  Rather, the proposed rule

---

[19] As discussed above and in the Bronars Report, U.S. producers have no ability to raise their prices for meat and wool and remain remotely competitive in the world market.

[20] A higher return would be required to cover additional "ownership costs" such as purchasing the livestock, other overhead, and maintenance costs on housing, machinery, equipment, and vehicles.

Adele Gagliardi
Administrator, Office of Policy Development and Research
June 1, 2015
Page 25 of 40

would completely erase any profit and force ranchers to operate at a loss almost immediately and for all years to come.  For example, a rancher in Oregon, already paying wages well above those in other states, faces an increased wage bill of $35,000 in 2015, climbing to $66,000 by 2020.  The average profit margin for the ranch has been $25,000 for the past four years, making even the phased-in increase unmanageable with no relief in sight.  In a survey of more than 200 Mountain Plains members, each of them stated that they would be forced to downsize their workforce and herd size immediately and most would be forced to sell off their operations within a few years.

### *The Damaging Proposed Wages Will Not Attract U.S. Workers*

To the extent that the Rule is intended to increase wages in order to attract more U.S. workers into the occupation, that policy is misguided for several reasons.  First, unlike some farmworker jobs in crop agriculture, for which no experience is required or a brief training session would suffice, the unique skills required of this job make it impossible for someone to walk off the street and begin working.  The H-2A workers who comprise the current workforce have grown up doing this work, riding horses, tending herds, and living in the mountains.  Virtually no U.S. workers can say the same.

Second, higher wages are no guarantee of more applicants.  As a test for what a massive increase in wage rates would do, the Department need look no further than comparing the recruitment history of employers in Rocky Mountain states with a monthly pay rate of $750 or $800 with that of employers in California with a wage rate set by state law at $1,600/month.  Under the Department's theory that doubling or tripling wages would lead to more qualified, willing, and able U.S. applicants for those positions, the facts over the past 14 years since California changed its wage rules for herders simply do not support that conclusion.

In the past 4 years, dating back to March 2011, during which time the Rocky Mountain states and California have had the herder wage rates listed above, Western Range and Mountain Plains combined have received only a handful of applications from U.S. workers for more than 1,500 open positions each year.  Of those applicants, an average of two or three per year have the minimum qualifications to perform the work required and are hired.  During that entire 4-year time period, Mountain Plains has had a grand total of 18 applicants for approximately 400 "sheepherder" or "goat/sheepherder" positions in California, an average of 4 applications per year.  Of those 18 prospective U.S. workers, 10 had no experience whatsoever and were not qualified for the work.  The remaining 8 withdrew their applications because they were not interested in the job.

There are actually fewer applicants in California and fewer U.S. workers that take the jobs advertised there as compared to states like Wyoming or Colorado, regardless of the wage levels.  Having a wage rate twice that found in most of the Mountain West for these positions has not led to an increase in U.S. workers coming forward to do this work

Adele Gagliardi
Administrator, Office of Policy Development and Research
June 1, 2015
Page 26 of 40

in California, contrary to the arguments underlying the *Mendoza* plaintiffs' complaint or the Department's proposed wage increases. This is not a question of wage levels but one of lifestyle. Workers from Peru, Chile, Mexico, or Mongolia are familiar with this lifestyle and take work here so that their families and communities at home can have a much better life. Workers in the U.S. have, almost without exception, proven to be uninterested in this remote and rugged way of life, and year after year, they have left the occupation and taken 9-to-5 jobs in cities and towns.[21]

When California switched from a survey-based model to a much higher statutory rate, it forced livestock producers there to cut back on the size of their herds, hire fewer employees (U.S. and H-2A), and to ask their remaining workers to take on more responsibility in order for the ranch to survive. Under the NPRM's definition of the job for purposes of the Rule, workers will not be able to take on additional duties related to the production of livestock, despite the obvious economic pressures to do so. The one-two punch of the Rule will make each worker far more expensive but able to perform far less work.

If the Department wishes to increase wages for livestock production workers out of a perception that the survey-based rates in place for the past 20 years are inaccurate, the proposals identified below would address that concern. If, however, the Department aims to massively increase wages by a factor of 3x or more in the interest of bringing qualified, willing, and able U.S. workers "out of the woodwork" to take these jobs that have always been available, then that policy is misguided and directly contradicted by the reality and experience of this occupation.

To the extent that the Department is proposing to dramatically alter the longstanding rules governing this part of the H-2A program, the Commenters would propose that DOL re-visit these rules after they have been in place for a period of time, in order to determine whether the new Rule has achieved the Department's policy objectives of drawing more U.S. workers to this profession. If two or three years pass without a significant reversal of the decades-old (indeed, generations-old) trend of U.S. workers leaving or staying out of this occupation, then the Commenters would ask the Department to review the burdensome rules to be imposed and reconsider whether the balance required by the INA between providing a workforce and protecting U.S. workers has been properly struck or not.

### *Alternative Wage Proposals*

For the reasons set forth above, the wage methodology proposed in the NPRM is grounded on poor logic and would destroy the livestock grazing industry in short order.

---

[21] This is particularly true today, with high-paying jobs in the oil and gas sector throughout the West making it more difficult to fill agricultural jobs of any sort, let alone range herding jobs.

Adele Gagliardi
Administrator, Office of Policy Development and Research
June 1, 2015
Page 27 of 40

The AEWR times 44 hours/week and 4.33 weeks/month model is unworkable, but Mountain Plains and Western Range take this opportunity to suggest alternatives. Mountain Plains, Western Range, and the American Sheep Industry Association submitted a wage proposal in October 2014 to the Department that was referenced but not analyzed in the NPRM, and we ask that the Department consider that proposal in addition to those set forth below.  In response to the specific question about deducting the cost of food from wages, the ASI proposal included an excellent discussion of this point – both as to the appropriateness and the amount of such deduction – looking to the USDA "liberal" meal plan to best reflect the protein-rich diet appropriate for active young to middle-aged men working outdoors in high-altitude environments.

The wage proposals included below do not include such a deduction, but the Commenters encourage the Department to consider permitting one, or at least permitting a deduction reflecting the difference between the more extensive and more expensive food provided to these workers compared to the subsistence and meal charges that the Department uses for other workers.  Allowing a partial or complete credit for the food provided would bring this part of the H-2A program in line with the rest of the program, while preserving the existing incentives to provide these workers with the best possible food.

### Proposal #1 – Inflation-Updated Wage Rates

The only problem that the NPRM identifies with the state-survey-based wage methodology in place for more than 60 years for this industry is that the dwindling number of U.S. workers in the occupation has made it increasingly difficult to conduct a statistically valid survey of those workers.  As a result, the once-valid survey results have become frozen in time.  The NPRM offers no argument that the surveys conducted by the state workforce agencies were not valid at the time that they were prepared.  The NPRM cites 1994 as the last year for which such surveys were conducted with statistically valid results, and the Department has essentially used those results for more than 20 years since that time.

Rather than scrap the old methodology that benefited from the expertise of the state workforce agencies and looked to the actual wages being paid in this occupation, a methodology that the Department of Labor recognized and relied upon, and impose a wage system better suited for crop agriculture, there is a way to update those survey results to the present day labor market and also to create a path forward to avoid future wage stagnation.  The key is the Bureau of Labor Statistics' Employment Cost Index (ECI) for wages and salaries, considered to be the most accurate measure of inflation in wages and salaries.

In the stakeholder-negotiated, bipartisan, Senate-passed comprehensive immigration reform bill in the last Congress, S. 744, agricultural employers and the

Adele Gagliardi
Administrator, Office of Policy Development and Research
June 1, 2015
Page 28 of 40

United Farm Workers agreed to a wage methodology for nonimmigrant agricultural workers that provided for guaranteed annual increases in farmworker wages in order to eliminate the danger of wage stagnation.  In Section 2232 of the Bill, a new Section 218A in the INA would have been created.  Section 218A(f)(3)(B) provided an "escalator" clause tied to the ECI. After a one-time shift to a base wage rate with a multi-year phase-in, future wage rates would increase annually as follows:

- By 1.5% if the percentage increase in the ECI during the previous calendar year were less than 1.5%;
- By the percentage increase in the ECI if such percentage were between 1.5% and 2.5%, inclusive, in the previous calendar year; or
- By 2.5% if the percentage increase in the ECI exceeded that amount in the previous calendar year.

This proposal won the approval of Senators from both political parties, the UFW, and agricultural employers by providing for a guaranteed raise each year on a defined inflation "track" of between 1.5% and 2.5%.

Using that same agreed-upon methodology, it is possible to start from the highest state survey figure of $800 and apply this inflation track from 1994 to the present to get a current version of what had been a valid monthly salary in 1994.  Going forward, using that updated monthly figure as the starting point, Mountain Plains and Western Range would propose this same ECI-based inflation model for calendar years 2017 and beyond, guaranteeing consistent and predictable increases in the wage rate for years into the future.  Bear in mind, ranch owners do not enjoy the same guarantee of future price increases for the meat and wool that these workers produce.  By offering this proposal, they understand that they are agreeing to absorb increased risk as to future profitability in an extremely difficult international marketplace.

As set forth in the attached report of labor market economist, Dr. Stephen Bronars, taking the highest of the existing state-conducted survey results from 1994 ($800/month)[22] and updating that figure from 1994 dollars to 2015 dollars using the ECI-model described above yields a monthly wage rate of $1,280.73 in 2015 dollars.  Mountain Plains and Western Range propose that wage rate as the base wage rate for 2016.

---

[22] As noted in the NPRM at 80 Fed. Reg. 20307, the survey-based rates for that year for monthly rates of pay were actually $650/month for three states, $700/month for nine more, and $750/month for the other. The Commenters offer the $800/month figure as the base rate, recognizing that this is higher than any of those rates and higher than the $772.53 average of the five historic and current wage rates identified in the NPRM.  They do so in the spirit of cooperation and the interest of stable future wages.  The Bronars Report also includes the ECI-adjusted 2015 wage levels for those lower survey-based 1994 salaries ($1,040.59, $1,120.64, and $1,200.68, respectively), and the Commenters would welcome the use of any of those figures as well.

Adele Gagliardi
Administrator, Office of Policy Development and Research
June 1, 2015
Page 29 of 40

The following table sets forth the resulting range of wages for the upcoming years, showing the 1.5% and 2.5% increase levels with an averaged 2.0% assumption for calculating the next year's high-low range.[23]  The NPRM proposes a five-year phase-in under which employers would pay 60% of the full amount in 2016, 70% in 2017, 80% in 2018, 90% in 2019, and the full rate of pay in 2020 and beyond, since "the full wage increase in a single year could lead to significant disruptions that might cause job losses that could be avoided by a gradual implementation period." 80 Fed. Reg. 20314.  If DOL were willing to use this inflation-based model instead of the crop agriculture AEWR model, the full phase-in period would not be required, and Mountain Plains and Western Range would propose a shorter and more level 4-year phase-in, starting at a higher initial percentage (80%, 85%, 90%, and 100%).

|      | 1.5%       | 2.5%       | Phased 1.5%         | Phased 2.5%         |
|------|------------|------------|---------------------|---------------------|
| 2016 | $1,280.73  | $1,280.73  | $1,024.58 (80%)     | $1,024.58 (80%)     |
| 2017 | $1,299.94  | $1,312.75  | $1,104.95 (85%)     | $1,115.84 (85%)     |
| 2018 | $1,325.94  | $1,339.00  | $1,193.35 (90%)     | $1,205.10 (90%)     |
| 2019 | $1,352.46  | $1,365.78  | $1,352.46           | $1,365.78           |
| 2020 | $1,379.51  | $1,393.10  | $1,379.51           | $1,393.10           |

As with Proposal #2, discussed below, this proposal involves a single national rate, subject to the exceptions for California and Oregon to the extent that those states would require a higher monthly salary under their own methodologies.  Because food, housing, and clothing would already be provided by the employer, the differences in cost of living from state to state would be irrelevant and the monthly salary would effectively be 100% disposable income for the workers.

This proposal still constitutes a massive increase in wage costs for ranchers – hundreds of dollars per worker per month – but is at least potentially a burden that some ranchers can survive, unlike the AEWR approach proposed.  As set forth in the University of Wyoming study discussed above, wages in this range will be difficult for ranchers to absorb and may put many out of business.  Ranches still have no better than a 60% chance of breaking even in any given year, but it offers more years in the black than years in the red, and that may be enough to keep this industry alive.  Wages under this methodology at least give the majority of ranchers a fighting chance to survive them and to preserve their family farms.  The same is not true of the rates proposed in the Rule.

---

[23] The actual wage levels will obviously be slightly different, particularly in later years, depending on the actual ECI rates in the early years, but this offers a reasonable forecast of the range of wages in the next five years.

**Exhibit F at 45**

Adele Gagliardi
Administrator, Office of Policy Development and Research
June 1, 2015
Page 30 of 40

This model also squarely addresses the concerns raised by the *Mendoza* plaintiffs. The only monthly salary proposed by the Plaintiffs in the *Mendoza* litigation came from lead plaintiff Reymundo Zacarias Mendoza, who submitted a sworn declaration stating that "I would be willing to work as a herder if the employer paid $1,300 to $1,500 per month."[24]  This model meets that requirement.  It also addresses the concern that DOL raised in the NPRM regarding wage levels:  the nearly complete absence of U.S. workers in this occupation makes state surveys impossible and current wages are out-of-date and frozen in place as they rely on the valid 1994 surveys.  By updating the 1994 wage rate to present dollars and setting a course for guaranteed future increases, this model solves that problem while retaining the program's roots in valid state surveys rather than abandoning the history of the program and looking to irrelevant and inaccurate outside data.

The proposal to base the herder salaries on FLS data fails to recognize that herders receive housing, meals, transportation, clothing, and utilities for free from their employers. The Bronars Report compares the disposable income of herders with that of other blue collar workers in various cities throughout the Mountain West, using the earning levels of workers moving freight, stock and materials by hand and data taken from the U.S. Department of Housing and Urban Development, USDA, and DOL's Bureau of Labor Statistics.  The amount of "disposable income," *i.e.*, what is left in the worker's pocket after paying for rent, food, utilities, and transportation (which would be an H-2A herder's entire pay check), varies slightly, but is between $308.01 in Flagstaff, Arizona and $815.75 in Boise, Idaho, with the differences relating to income levels and fair market rental values.  At either end of that range, the herder wages proposed above would be two to four times those levels, as compared to three to eight times those levels in the NPRM's proposed methodology.  This does not account for the huge increase in spending power of these U.S. dollars in rural Peru, where the money will actually be spent, but even for the rare U.S. worker willing and able to do this job, the wage rates proposed by the Commenters would lead to a significant increase in his or her standard of living, as compared to similar jobs in this area.

### *Proposal #2 – FLSA Rate in place of AEWR*

If DOL is determined to transition away from a survey-based monthly salary in favor of a monthly salary using the 44-hour week estimate and a base wage rate, Commenters submit that the Federal Minimum Wage of $7.25/hour is a more reasonable starting point than the Farm Labor Survey based AEWRs, which are projected to range from $11.19 to $17.02/hour in the states in which this work would be performed by the time of full implementation.  Unlike the ASI proposal from 2014, this proposal would not follow the California and Oregon model and give credit for food and housing.  The

---

[24] This statement appears at ¶ 11 of his Declaration, Doc. 26-1, filed in opposition to Intervenors-Defendants' Motion to Dismiss, and is dated January 27, 2012.

Adele Gagliardi
Administrator, Office of Policy Development and Research
June 1, 2015
Page 31 of 40

$7.25/hour in the FLSA was intended by Congress to serve as a living wage, and those paid at that rate must purchase their own food, housing, and clothing from those earnings. Thus, paying that full amount to workers involved in the production of grazing livestock amounts to double-pay of thousands of dollars per season worked. Still, this is a more reasonable approach than that proposed in the NPRM.

Using the NPRM's estimate of hours worked and the FLSA hourly wage rate results in a monthly salary of $1,381.27. Since many of these herds and workers travel across state lines, because food, housing, and clothing are already provided for free, and in order to create a more uniform process, Commenters would propose this single monthly rate in all states, except to the extent that the California or Oregon state statutes or judicial settlements require a higher rate already. While this will place a greater burden on employers in some states more than others, the FLSA wage rate applies uniformly across the nation and serves as a model for this proposal. As the NPRM observes, "[e]stablishing a single set of procedures for these occupations will create administrative efficiencies for the Department." 80 Fed. Reg. 20303.

If DOL were willing to change the base rate to the FLSA rate, Commenters would welcome the change and would even propose a shorter phase-in period of 4 years, with annual phased-in rates of 75% in 2016, 80% in 2017, 90% in 2018, and 100% by 2019 and thereafter. Using the $1,381.27 figure as the 100% mark and this four-year schedule, the monthly phased-in rates of pay would be $1,035.95 for 2016, $1,105.02 for 2017, $1,243.14 for 2018, and $1,381.27 for subsequent years.[25] As recognized in the NPRM, the phase-in period would allow employers who have built their businesses around a starting wage level[26] of $750 to $800 for the most part to adjust to the significantly higher wage levels.

Labor costs under this model will nearly double for ranchers – hundreds of dollars per worker per month, even without considering the increased cost of workers' compensation insurance that is tied to wages – but it is at least potentially a burden that some ranchers can survive, unlike the AEWR approach proposed. Looking to the University of Wyoming study referenced above, using the phased-in FLSA-based wage methodology instead of the NPRM's wage methodology would mean that ranches could break even perhaps 56% of the time, on average. That's not much better than a flip of the coin for survival, but at least offers a chance at staying alive that the NPRM does not. Moreover, as quoted above, this proposal meets the monthly salary request of the

---

[25] To the extent that the Department is concerned with "stagnation" at this new level, the use of the ECI "inflation track" agreed to by employers and the United Farm Workers in S. 744, as discussed in Proposal #2, could be used to address that concern.

[26] The special procedure wage rates for H-2A workers constitute a wage floor, but many of the H-2A workers have been returning to the same ranches for years or decades and are paid significantly higher amounts than this minimum requirement. Increasing the minimum will create pressure to increase those already higher wages as well.

Adele Gagliardi
Administrator, Office of Policy Development and Research
June 1, 2015
Page 32 of 40

plaintiffs from the *Mendoza* litigation, who sought $1,300 to $1,500 per month.  If the purpose of an "adverse effect wage rate" is to be the level of pay at which qualified, willing, and able U.S. workers (which the D.C. Circuit believed the *Mendoza* plaintiffs to be), would take the job, then this proposal meets that test.  As discussed above in Proposal #1, the Bronars Report demonstrates that the resulting level of disposable income for herders under this proposal would be several times higher than that earned by their non-herding counterparts in the Mountain West.

### Other Specific Concerns with the Rule

If the definition of "open range" were corrected and one of the alternative wage methodologies outlined above were adopted, ranchers could live with most of the changes from the longstanding special procedures to the Rule, particularly the retention of the experience requirements and seasons for sheep and livestock production.  Not all of those changes are realistic, however, and the Commenters wish to discuss some of those changes below.

#### *Contents of Job Orders*

Section 655.210 sets forth the contents of the H-2A job order for this occupation. The job qualifications continue over from the TEGLs and are essential for identifying and hiring workers who possess the requisite skills for this special work.  It would be a disaster to send 1,000 head of sheep or cattle off to the range with a new worker, only to have that worker decide that he or she did not really enjoy the work as much as he thought he or she might or to find out that the worker did not know how to care for the animals' needs or to protect them from harm.

The use of the phrase "on call for up to 24 hours per day, 7 days per week" is potentially misleading, and might be better phrased as being "available" for that period – making more clear that work is not performed during that entire period but, rather, sporadically and as needed.

As discussed above with respect to the definitions of the job from Section 655.201, the focus in Section 655.210 (b) on whether the work performed by herders is "closely and directly related to herding or the production of livestock" and the 20% hard cap on performing such work do not address any concerns with such work identified in the NPRM and would lead to confusion and substantial inefficiency.  First, the 20% limit is worded such that "[w]ork that is closely and directly related to herding or the production of livestock must be performed on no more than 20 percent of the workdays spent at the ranch in a work contract period."  Section 655.210(b).  The limit is not on the total workdays in the work contract period spent doing this work, but only on how the days spent at the ranch are used.  Is the goal to have one day out of five spent at the ranch spent working and the other four resting, since work that is not "closely and directly"

Adele Gagliardi
Administrator, Office of Policy Development and Research
June 1, 2015
Page 33 of 40

related to livestock production almost certainly falls outside the scope of the job order? Is some other purpose intended by this provision?  This wording is confusing.

Second, the grazing production of livestock definition that already exists in the WHD regulations discussed above offers a less confusing and more workable approach to defining the job.  Instead of arbitrary percentages and percentages within those percentage directing how the worker may spend a particular day, focusing on the larger picture of the "primary duties" or whether the worker is "principally engaged" in the grazing production of livestock makes more sense and would be better understood (and complied with) by employers.

The NPRM asks five related questions regarding keeping hourly records for work performed at the ranch and on the range:  (1) is it reasonable to keep such records; (2) how could such records be maintained and submitted; (3) is it reasonable to keep daily records of work performed on the range; (4) how could those records be maintained and submitted; and (5) is there another recordkeeping method by which employers could assure DOL that employees are meeting the 50% and 20% requirements in the Rule?  Mountain Plains and Western Range would respond to all five questions by referring to the two proposed alternative wage methodologies already discussed above, as well as their comments regarding the use of the WHD regulations' model for describing the job rather than the 50%/20% requirements proposed in the NPRM.  By making those two changes, it would be an unnecessary waste of time to track the workers' hourly or daily activities.  If such a recordkeeping requirement were imposed, the Commenters would contend that many of their members do not currently possess the human resources capacity to create or maintain such records and doing so would place an enormous and unreasonable burden on them.  As these associations' members are already the subject of frequent and exhaustive audits by the Department of Labor, the reference to "submitting" the records is also confusing.  If the employer is required to attest in the job order that certain arbitrary percentage targets must be met, why would records be "submitted" and to whom?

### Housing

The NPRM proposes certain changes regarding mobile housing that require some clarification.  In Section 655.210(c), the "employer must specify in the job order mobile housing will be provided."  For purposes of advising prospective job seekers of the availability of mobile housing, this makes sense.  For some employers, however, this requirement would be inaccurate and misleading.  While virtually all of the employers that would be covered by this Rule use the traditional means of mobile housing, there are a limited number of employers using remote fixed site bunkhouses for their livestock workers.  In particular, some operations in Montana and Texas graze cattle over vast areas of land but maintain fixed wooden structures at points throughout that land and have employed H-2A workers under the special procedures for many years.  Read

Adele Gagliardi
Administrator, Office of Policy Development and Research
June 1, 2015
Page 34 of 40

together, Sections 655.200(b)(2) and 655.210(c) would require these employers to include incorrect statements in their job order and could potentially bar them from this program altogether.

The NPRM specifically asks whether, if a worker desires to live in a mobile housing unit while on the ranch, should that be allowed? The answer is, of course. It would be unreasonable and inhumane to mandate that a worker move out of the home that he has made in a mobile unit for the short time that work is performed at the ranch if the worker did not wish to do so. The related question asked in the NPRM is, if a worker prefers to live in fixed-site housing while on the ranch, should the employer be required to provide separate fixed housing? Again, if the worker prefers to continue living in the home that he has made, why should a separate housing structure be built or set aside simply to remain vacant. However, if the worker preferred to live in fixed housing while working at the ranch, then that would be a different question, but requiring an employer to maintain two sets of housing per worker is unreasonably burdensome.[27]

The NPRM proposes new restrictions on "sleeping facilities" in Section 655.235(*l*). This definition is unclear, however, since many of the mobile camps that have been in use for years include separate beds or bunks with a shared kitchen. Since workers must be available to assist the herd on a 24/7 basis and often trade shifts to ensure full coverage, it is somewhat rare that both members of a team would be sleeping in the camp at the same time. Requiring each worker to haul his own camp would be unrealistic and unnecessary, particularly during Winter months, as described above. The phrase "sleeping facility" is not defined and is confusing as to whether it means a bed or the entire camp structure? Instead, the Commenters propose replacing that subsection with the following language: "*Sleeping unit.* A separate sleeping unit must be provided for each person, except in a family arrangement. A sleeping unit is a comfortable bed, cot, or bunk with a clean mattress." This definition would achieve the goal of preserving separate sleeping units for each worker, while providing clarity and efficiency with respect to the number of camps and kitchens required.

### Water

Employers already supply water to herders in the camps, hauling it in by truck or four-wheeler where possible, or on horseback when necessary.[28] During winter months,

---

[27] The NPRM also asks specifically about the cost of providing room on the ranch vs. on the range. The 2010 study by the Colorado Wool Growers Association, referenced earlier, estimated the monthly cost of providing housing on the range at $425 ($288 for rental value and $137 for maintenance and utilities). No estimate for providing housing at the ranch was provided in that study, but similar fixed-site housing was estimated at $350-$450/month up to $600/month in certain areas. This question may best be answered by way of individual comments.

[28] The NPRM requires employers to provide water with which workers can do their own laundry in the camp. Many employers will bring the workers' dirty laundry back from the camp, wash it properly in a

Adele Gagliardi
Administrator, Office of Policy Development and Research
June 1, 2015
Page 35 of 40

large tanks of water quickly turn to large blocks of ice.  Under those conditions – as well as during warmer months when spending time in remote locations – there is abundant water at hand, from streams or rivers or by melting freshly fallen snow and hauling water to snowed-in camps can be difficult or impossible.  While a survey of ranchers turns up no accounts of workers becoming sick from these longstanding practices, treating or filtering this water to local health standards can be affordably and safely achieved – often far more safely than having to haul the water over rugged trails.  Providing the tablets or osmosis filters used by hikers and backpackers would cost pennies per day and have a proven track record of success.  The exact method of achieving the requirement of potable water should best be left to the rancher and/or workers to assess what works best under the conditions in which they will be operating and what the worker's personal preference is for ease of use.

### Food and Refrigeration

Section 655.235(h)'s requirement of butane or propane refrigerators in the tents used in the Summer months is not feasible.  This equipment cannot be packed onto horses to be carried over rough mountain trails.  Other methods of food preservation and storage have been used successfully for years, but this new requirement will simply not work and should be eliminated.

The NPRM asks what constitutes a sufficient meal and what constitutes adequate food provision.  These questions are related and can be addressed together here.  The most common refrain heard from employers in preparing these comments is "my workers eat better than I do!"  The physical demands of the job call for a protein-rich diet for the hearty men that perform this work, and that is precisely what these employers provide.  There is no clear way to draw a line or set a standard for a "sufficient" or "adequate" meal.  Setting an arbitrary calorie count or menu would violate the workers' choice of food and would be unnecessary.  These workers ask for certain food items that are part of their traditional diet in their native country, and the employers purchase and deliver that food to them on the range.  Each worker has his own preference for food, and a "one size fits all" approach to mandating a particular diet would violate those preferences and be a logistical nightmare for the Department and employers to enforce and comply with.

### Communication Devices and Equipment

The most recent TEGLs introduced the requirement of a cell phone, satellite phone, or two-way radio by which workers could communicate with the ranch in case of emergency.  In the years since then, employers have adapted to the requirement.  In

---

machine, and bring the clean clothes back to the workers to exchange for dirty clothes.  This system works better than trying to hand-wash clothes in the backcountry (particularly during colder months), and the NPRM should be updated to permit this practice to continue, requiring water for laundry only where the workers prefer to wash their own clothes.

Adele Gagliardi
Administrator, Office of Policy Development and Research
June 1, 2015
Page 36 of 40

response to specific questions in the NPRM regarding contact between workers and the employer, the Commenters would state that employers have a strong interest in tracking the health and well-being of their employees, as well as the health and well-being of the herd – *in that order.* To that end, employers travel hundreds of miles to visit with their employees on the range, checking that their needs are met, delivering mail, food, and supplies, and conveying any instructions needed for moving the herd to another location. Having communication devices assists in this, but never takes the place of face-to-face communication. At the same time, however, mandating a specific interval of time between such meetings or calls is problematic, given the unpredictable nature of terrain, weather, and cellular telephone signals. Employers literally go to great lengths to maintain communication, and micromanaging that interaction is neither necessary nor feasible.

With respect to the NPRM's question about the tools, supplies, and equipment that are required to work safely and effectively, the best answer is that "it depends." The items suggested in the NPRM are among those used on the range, binoculars, firearm, boots, rain gear, an ATV or four-wheeler, and/or a horse, but this list should not be considered exhaustive nor mandatory. During different times of the year or in different parts of the West, some or all of these items would be strictly necessary while others would be entirely useless. Contrary to what Public Citizen and Legal Services are likely to claim, the employers in these two associations care deeply for their workers and provide them all of the tools needed to perform the job safely and effectively. Additional specific requirements will not increase job safety or efficiency but would simply provide a "gotcha" opportunity for ambitious plaintiffs' lawyers.

### *Joint-Employer Status of Western Range*

The Rule does not specify (as the TEGLs and previous DOL guidance documents had previously) that Western Range may continue to operate as a joint employer for its members H-2A herders or maintain the ability to transfer workers between member employers as needed. The NPRM references the ability to file a "master application" and other provisions related to the filing of the application, but not specifically to the ability to transfer workers. This ability is already built in to the INA (8 U.S.C. § 1188(d)(2)), and does not necessarily require explicit regulatory permission to continue, but Western Range would take this opportunity to ask that the Department's Final Rule clarify that this longstanding arrangement (dating back to the earliest days of the foreign sheepherder program) is to continue under the new Rule. For example, in the most recent iteration of the special procedures, TEGL 32-10, the Department stated as follows:

> Pursuant to 8 U.S.C. 1188(d)(2), the Department's certification granted to the association may be used for the certified job opportunities of any of its members and such workers may be transferred among its members to perform the services for which the certification was granted. Although a

Adele Gagliardi
Administrator, Office of Policy Development and Research
June 1, 2015
Page 37 of 40

worker may be transferred from one member to another member, the association may not transfer workers to any non-member employer or employer-members not disclosed on the master job order.

76 Fed. Reg. 47260-61 (Aug. 4, 2011).

### Transition Rule and Retroactivity

The District Court's schedule from *Mendoza* addresses *when* the Rule will take effect (December 1, 2015), but is silent as to *how* the Rule will take effect. The NPRM also does not articulate how the Rule will take effect. The concern of the Commenters is that the Department will apply the new substantive requirements of the Rule to the employment of H-2A workers approved by DOL prior to the December 1 effective date of the Rule. This retroactive effect of the Rule would violate longstanding legal principles. *See, e.g., Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208-209 (1988) ("Retroactivity is not favored in the law."). The Rule should apply only to those applications for labor certifications filed on or after the effective date of the rule.

### Conclusion

Mountain Plains and Western Range welcome the opportunity to provide comments with respect to the NPRM and trust that the Department of Labor will sincerely consider the comments included herein and change the proposed Rule to avoid the disastrous impact on this industry that the rule, as currently written, would have. With the changes suggested above, this program and this industry can remain a viable part of the American economy for generations to come. Getting this rule wrong – particularly the definition of the work and the wage methodology – will spell immediate extinction for a way of life that spans the past two centuries of this country's history and has come to define our image of the American West. The current Rule would be a death sentence for H-2A employers, and the multiplier effect of those employers on small businesses in rural communities would create a wave of ghost towns throughout the Mountain West. We urge you to take to heart the longstanding history of this industry and this program and to craft a rule that allows them to continue.

Very truly yours,

Erik Lehfeldt
Chairman
Mountain Plains Agricultural Services

Lane Jensen
Chairman
Western Range Association

Adele Gagliardi
Administrator, Office of Policy Development and Research
June 1, 2015
Page 38 of 40

## Addendum – Western Range Association

As an original participant in the H-2A sheepherder program, Western Range Association feels compelled to speak on the proposed changes to the sheepherder program on a historical and goal-driven level because this issue speaks to some of the core principles of who we are as an industry and as a nation.

For over 60 years, the sheepherder program, not originally known as the H-2A sheepherder program, was started by a group of tenacious, innovative, and forward thinking sheep men known as the California Range Association, later to become the Western Range Association. They were immigrants or sons of immigrants, embodied with a spirit of hard work and a sense of duty to family and country. They were driven by what some people called ambition, one-on-one relationships and goal-driven zeal that was evidenced by the way they lived.

They were complimented by a group of Congressmen who looked at them and their efforts not as a threat or annoyance but as a group of idea driven and nation building citizens looking for help. Congress viewed their request for help as an opportunity to create a guest worker program that had Congressional authority and administrative oversight of the former Immigration and Naturalization Service. There was a time when representatives from California Range Association and Western Range could pick up the phone and call high-level administrative representatives to discuss issues or problems with a degree of consensus that a workable and program-sustainable solution could be obtained.

This relationship resulted in a dialogue and joint effort to address problems and create solutions. It is because of that relationship that we even have a program to discuss today. There was a time when dialogue and discussion were solicited not mandated by the courts and, yes, even back then, herders used fencing. It also resulted in a program that was not a threat to domestic workers, but did the opposite and resulted in the net creation of jobs and growth. Local businesses, regional trucking companies, national meat companies, and national woolen mills were created and supported because men came to this country to herd sheep when no one else would.

The effort to sustain this program was not viewed as a threat to be diminished by making it so onerous that it could not longer function but as an endeavor worthy of promulgation.

These thoughts would be remiss without some reflections on the herders themselves. The relationship that exists between the employer and the herder is one of the closest that exists in the workplace. Employers buy herders groceries, send money home, take herders to the doctor, guarantee employment, supply a place to live, guarantee a wage rate, supply transportation, and even transfer herders to another employer when

Adele Gagliardi
Administrator, Office of Policy Development and Research
June 1, 2015
Page 39 of 40

irreconcilable differences arise. This all results in herders sending money home to raise families, build homes, start businesses, buy property, put children and family members through college, and secure a retirement. The attestation to the success of the program is that many herders return, time after time, on renewed contracts. Before IRCA, in previous generations, the early program was so successful that some sheepherders were able to use their earnings to move to the U.S. to build businesses of their own.

These comments would also be remiss if the issue of noncompliant members in the sheep industry who choose to work outside the rules of the H-2A program was not addressed. Although they amount to a very small part of growers, they have become the subject of attention, being portrayed as representing the entire industry. Western Range, because of its status as a joint employer, monitors, investigates, sanctions, and in some cases debars members because of program violations. The status as a joint employer creates more liability and a more financially punitive exposure for Western Range but has been accepted by its members in order to preserve the integrity of the program.

This is an overview and background of where the H-2A sheepherder program came from and where it is today. The result has become a template for other groups to follow. The H-2A sheepherder program has had the net effect of creating jobs not taking them away. It represented and represents a group, which in conjunction with a willing and helpful DOL, helped create and mold a guest worker program that became an answer and example to others not only for addressing a need but also as a way for government and the private sector to work together to address a problem.

The program was viewed as a means to achieve the goal of maintaining the viability of the sheep industry which added to and was a part of what made us a great nation.

These comments are not only designed to be an appeal for prudence in rule making but also a reminder of the longstanding ideals and historical context that brought us to this point, encouraging us to proceed in this exercise in the same context and intent in which the H-2A sheepherder program was conceived and administered.

WRA is proud of who we are and grateful to the efforts of those all who preceded us, as well as the American Sheep Industry Association, Mountain Plains Agricultural Services, and stakeholders who join us now. Never before has such a concentrated effort been mounted to sustain the range production of sheep, goats and livestock as the one evidenced now, attesting to the paramount nature of our resolve to protect our livelihoods. We are mindful that over the years, with the help of Congress and DOL, we have been able to create and maintain a program which doesn't pose a threat to domestic workers but fills a need, creates domestic jobs and overcomes obstacles resulting in

Adele Gagliardi
Administrator, Office of Policy Development and Research
June 1, 2015
Page 40 of 40

equitable solutions.  We invite DOL to work with the sheep industry and continue that effort.


Western Range Association

*Martin R. & Shirley J. Auza / Martin Auza Sheep Company*

Efrain Bernardo

6/14/14    L   5439

Wages:June 1-15, 2014 (6/1/14, 6/8/14 & 6/15/14 PA     1,056.00
Phone     25.00
Overtime hours for 5/29/-5/31     72.00
Wages to date: $ 11,019

4524 NBA Corporation   Wages:June 1-15, 2014 (6/1/14, 6/8/14 & 6/15/1     1,153.00

---

*Martin R. & Shirley J. Auza / Martin Auza Sheep Company*

Efrain Bernardo

6/15/14    L   5441

Wages:June 1-15, 2014 (6/1/14, 6/8/14 & 6/15/14 PD     1,056.00
Phone     25.00
Overtime hours for 5/29/-5/31     72.00
Supervisory/Time Cards     25.00
Wages to Date: $ 11,019

4524 NBA Corporation   Wages:June 1-15, 2014 (6/1/14, 6/8/14 & 6/15/1     1,178.00

---

*Martin R. & Shirley J. Auza / Martin Auza Sheep Company*

Efrain Bernardo

6/30/14    L   5444

Wages:June 16, 2014 -6/30/14 (6/22/14, 6/29/14 DA     1,144.00
Phone     25.00
Supervisory/Time Cards,...     25.00
Wages to Date: $ 12,238

4524 NBA Corporation   Wages:June 16, 2014 -6/30/14 (6/22/14, 6/29/14     1,194.00

**Exhibit F at 57**

**CONFIDENTIAL**

MASC 000029

| SHEET NO. | | | | | | ACCOUNT NO. | | |
|-----------|---|---|---|---|---|---|---|---|

NAME

ADDRESS

| DATE | ITEMS | FOLIO | √ | DEBITS | DATE | ITEMS | FOLIO | √ | CREDITS |
|------|-------|-------|---|--------|------|-------|-------|---|---------|
| Sept 30 | Earned & WR | | | 1000 00 | | | | | 27 00 |
| | | | | | | | | | 973 00 |
| Oct 31 | Earned & WR | | | 1000 00 | | | | | 27 00 |
| | | | | | | | | | 973 00 |
| Nov 30 | Earned & WR | | | 1000 00 | | | | | 27 00 |
| | | | | | | | | | 973 00 |
| Dec 31 | Earned & WR | | | 1000 00 | | | | | 27 00 |
| | | | | | | | | | 973 00 |
| | | | | 12267 00 | | | | | |
| | Bonus | | | 11733 00 | | | | | Redacted |
| | | | | Redacted | | | | | |
| | $ch = 12,733.00$ | | | | | | | | |

**Exhibit F at 58**

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

NOTTINGHAM000203

Two Bar Sheep Co., LLC

Craig, Colorado


Department of Labor

Employment and Training Administration

Federal Register of April 15, 2015

FR Doc 2015-08505

Temporary Agricultural Employment of H-2A Foreign Workers in the Herding or Production of Livestock on the Open Range in the United States


Our operation consists of private owned, private leases, USDA Forest Service, BLM, and association lands.  We have a migratory operation where sheep are grazed under the watch of sheepherders from the Elkhead Mts of Colorado to the high desert range of Wyoming.  From October to May the herders graze on this migratory path.

Latter April brings herds to our headquarters to be sheared.  Each herd takes it's turn coming through the shearing shed and then proceeding on to our lambing grounds.  A crew of herders stays at the fixed site housing during the shearing process which may take up to 8 days to complete.

During lambing, each herd is followed by several men, where they separate ewes with lambs from the pregnant ewes, and care for ewes that need help during lambing.  The lambing process takes place in fenced pastures where ewes that have lambs are left behind in pastures as the "drop herd" (pregnant ewes) moves on.  Our lambing takes up to 35 days to complete.  As lambs get older, herders are sent back to care for the ewes and lambs and form groups for the summer bands.  The sheep and herders may spend up to 60 days in fenced pastures as this process proceeds to the point of trailing or hauling to the high country.  Forest Service lands have some boundary fencing. We also have fixed site housing used during the lambing process where there are facilities for ewes that need help are housed and cared for.

In September herds are brought to the summer headquarters where lambs are sorted and shipped to different feedlots and pastures, ewes are culled, wormed, vaccinated and made into winter bands. During this process, sheep may be grazed in different pastures until the new bands are selected to continue the migratory process. Ewes that may need help through the winter as well as our rams are fed during the winter by herders at a fixed housing site.

We have herders that stay in mobile housing during all periods, yet may stay at a fixed housing site during certain times of the year. We have others that use fixed housing because of the livestock facilities needed and the work being done. Fixed site facilities offer herders bathing and washing facilities to use. There are also facilities to care for their personal items.

A sheepherder should not only herd sheep, whether on open range or fenced pastures, but engage in activities that are related to the animal husbandry practices of raising sheep.  Duties may include but not be limited to:

Working in the shearing process which includes getting sheep to sheep shearer, branding, vaccinating, loading sheep and wool

All types of lambing procedures (pasture, range as well as shed type lambing)

Caring for horses and animals (guard dogs and herding dogs) which include feeding, grooming, shoeing

Feeding supplements to sheep with the use of machinery or other means

Repairing and building fence when sheep are in pastures

Irrigating pastures where sheep graze, or hay raised to feed the sheep

Caring for and repairing equipment used

Using pack animals to move tents in roadless areas

Hauling water or groceries/supplies to sheep and other herders

Clean and care for their housing facilities including cutting wood for heat and cooking

Cook meals for themselves as well as other herders when necessary


Our family has been producing protein and fiber for the American consumer since the 1930's.  We have relied on the guest worker program since the 1970's due to the inability to hire American workers. We rely heavily on the current Special Procedures of the H2A program to remain viable.  The courts directed DOL to follow the proper procedure in implementing the previous rule, not to make drastic changes to the rule which will have a devastating impact on my operation and the sheep industry.

Our sheep operation contributes $1,000,000 annually to the local community. Since agricultural products are considered new money, that has a multiplier effect of 5. The impact of our operation is $5,000,000 to the local economy annually.  Our ranch depends on as many as 20 sheepherders to make this economic contribution which I estimate provides another 160 full time jobs for American workers. The revenue from sheep allows my family to ranch which in turn provides thousands of acres of private land open space, habitat for sage grouse, and habitat and migratory access for deer, elk, and other wildlife.

As proposed, the definitions and job descriptions would make it impractical and impossible to comply and hire H2A labor. The additional administrative burden placed on employers is not only costly and time consuming, but opens the door to noncompliance.   Livestock grazing with sheepherders entails the use of widely varying terrain, rangelands and feedstuffs. The use of resources and production practices evolve and change over time as does our environment and society.  As these changes occur, the use of sheepherders becomes more important in caring for and watching over our sheep. The job description and duties of a sheepherder should be what is necessary to produce food and fiber, good animal husbandry practices, and care for the welfare of the animal.  It cannot be restricted to specific duties.

**Exhibit F at 60**

The Department must work with stakeholders and industry in order to develop the proper job description and definitions. I concur with the Western Range Association, Mountain Plains Agricultural Service and American Sheep Industry Association proposed definitions and job description.

We recognize that the current survey to determine wages has caused a stagnation of wages for the past twenty years. Our operation uses the rate as a starting salary for inexperienced herders. We pay more to herders based on experience and provide bonuses based on performance. The survey should be updated due to the lack of US workers hired. The Department of Labor's proposed wage increase and implementation will immediately and by 2020 drive most, if not all, producers that rely on the H2A program out of business. The base wage proposed by DOL reflects what is paid to other categories of H2A workers who are not provided free room, board, clothing, transportation expense as well as other amenities currently provided. Our herder's salaries are disposable income because of what we currently provide. These other costs should be deducted or used in determining salaries.

Our sheep operation operates on a 2-5% profit margin. In 2014, we had a cash flow loss of $32,908. Using DOL projections of salary increase, maintaining all other expenses constant, with no capital outlays for equipment replacement or other capital improvements, income steady, we will incur a loss of approximately $120,000 in 2017 and a $320,000 loss by 2020. This proposed wage increase and implementation will force us out of business! The industry and stakeholders have offered two proposals for determining wages. I support the second option. Starting with a base rate of $800/month, applying a "stagnation" factor to bring wages up to date, a 3 year phase in with the ECI factor used to determine future increases. This allows participants of H2A to adjust to a fair increase, with the opportunity for better weather and markets to allow for the ability to pay these increases. Without profitability by operations, there will be no employment of guest workers or American workers.

The guest worker program has been in place for over 50 years. It has succeeded in bringing guest workers to fill jobs neither sought nor wanted by American workers. The special procedures are a necessary and important part of the H2A program allowing the sheep and livestock producers to provide the American public naturally raised protein and fiber, provide open space and habitat for an abundance of wildlife, and provide generations of families the opportunity to maintain viable operations. The proposed changes by DOL undermine the intent of the courts. As presented, it will devastate sheep operations and have a direct detrimental impact on all segments of the sheep industry (farm gate to plate) as well as local communities and economies that rely on them for sustainability.

Our son has returned to the ranch after graduating from college to be the third generation to operate this ranch. His first year as a sheep rancher may be his last. Please use stake holder input during this comment period so he can continue on the family ranch.

Steve Raftopoulos

Two Bar Sheep Co., LLC



**TWO BAR SHEEP CO., LLC**

Redacted

1 0 2 5 9

1/15/2014

1,250.00

January Wages - 1/2 month less deductions

2 - Ckg

1,250.00

PRODUCT DLT TC4    USE WITH 91593 ENVELOPE

CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER

TwoBar000295

**Exhibit F at 62**

| 2- Sheep Company | |
| --- | --- |
| 2014 Year End Bonus | |
| | Amount |
| Francisco Javier Adame Alarcon | 0 |
| Juvenal Casallo Guerra | 1500 ⁰⁰ ✓ |
| Pedro Jeremias Casallo Guerra | 800 ⁰⁰ ✓ |
| David DeJesus Altamirano | 500 ⁰⁰ ✓ |
| Blas W. Golzuita | will take care of ✓ |
| Jaime Esteban Lancaster Sanchez | _____ ✓ |
| Deyvis Elviz Lozano Huaman | _____ ✓ |
| Camerino Medina Bernabe | 850 ✓ |
| Carlos Quispe Camayo | ~~500~~ 750 ✓ |
| Ramiro Adame Sanchez | 1000 ✓ |
| Estevan Tadeo Serratos | _____ ✓ |
| J. Trinidad Tadeo Serratos | _____ ✓ |
| Leovegildo Vilchez Guerra | 850 ✓ |
| Liber Vilchez Guerra | _____ ✓ |
| Marcial Karther Yapias Geronimo | 800 ✓ |
| Nazario Onofrio Yapias Astuhuaman | ~~1000~~ 1500 |

Two Bar 000001

| | ANNUAL PAYROLL HISTORY | | | | | |
|---|---|---|---|---|---|---|
| | 2011 | 2012 | 2013 | 2014 | 2015 | |
| ANNUAL WAGE | $ 15,629.00 | $ 15,960.00 | $ 15,960.00 | $ 15,960.00 | $ 19,240.08 | 20.5% increase from 2014 to 2015 |
| VACATION PAY | $ 599.45 | $ 612.22 | $ 612.22 | $ 613.85 | $ 740.00 | |
| CHRISTMAS BONUS | $ 300.00 | $ 300.00 | $ 300.00 | $ 300.00 | $ 300.00 | |
| PAYROLL TAXES | $ 472.19 | $ 540.81 | $ 584.57 | $ 522.90 | $ 494.52 | OR UI & WBF Assessment |
| SAIF PREMIUMS | $ 465.76 | $ 676.15 | $ 710.95 | $ 760.74 | $ 1,054.95 | 38.5% increase (rate increase + payroll increase) |
| WESTERN RANGE COSTS | $ 1,514.00 | $ 1,632.00 | $ 1,752.00 | $ 2,472.00 | $ 2,112.00 | |
| FOOD | $ 4,416.11 | $ 3,624.30 | $ 3,798.00 | $ 3,137.40 | $ 3,600.00 | |
| INSURANCE | $ 360.00 | $ 360.00 | $ 726.13 | $ 1,046.63 | $ 648.25 | Will rise annually (2013 & 2014 included temporary policy costs) |
| CELL PHONE | $ - | $ 88.00 | $ 198.00 | $ 264.00 | $ 264.00 | |
| HOUSING | Provided | Provided | Provided | Provided | Provided | |
| CLOTHING, ETC. | Provided | Provided | Provided | Provided | Provided | |
| ANNUAL COST PER HERDER | $ 23,756.51 | $ 23,793.48 | $ 24,641.87 | $ 25,077.51 | $ 28,453.80 | |

| | PROPOSED ANNUAL PAYROLL | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2015 OR MIN. WAGE | 2016 OR MIN. WAGE | 2017 AEWR | 2018 AEWR | 2019 AEWR | 2020-25 AEWR | |
| ANNUAL WAGE | $ 19,240.08 | $ 19,240.08 | $ 21,348.24 | $ 25,276.32 | $ 29,459.52 | $ 33,911.16 | 112.5% increase from 2014 to 2020 |
| VACATION PAY | $ 740.00 | $ 740.00 | $ 821.09 | $ 972.17 | $ 1,133.06 | $ 1,304.28 | |
| CHRISTMAS BONUS | $ 300.00 | $ 300.00 | $ 300.00 | $ 300.00 | $ 300.00 | $ 300.00 | |
| PAYROLL TAXES | $ 494.52 | $ 501.39 | $ 547.36 | $ 633.02 | $ 724.25 | $ 821.33 | Increases based on current tax rates |
| SAIF PREMIUMS | $ 1,054.95 | $ 1,054.95 | $ 1,170.54 | $ 1,385.92 | $ 1,615.29 | $ 1,859.37 | Increases based on current SAIF rates |
| WESTERN RANGE COSTS | $ 2,112.00 | $ 2,237.00 | $ 2,362.00 | $ 2,487.00 | $ 2,612.00 | $ 2,737.00 | Estimated increases |
| FOOD | $ 3,600.00 | $ 3,700.00 | $ 3,800.00 | $ 3,900.00 | $ 4,000.00 | $ 4,000.00 | Estimated increases |
| INSURANCE | $ 648.25 | $ 680.66 | $ 714.70 | $ 750.43 | $ 780.45 | $ 811.67 | Estimated increases |
| CELL PHONE | $ 264.00 | $ 264.00 | $ 300.00 | $ 300.00 | $ 325.00 | $ 325.00 | Estimated increases |
| HOUSING | Provided | Provided | Provided | Provided | Provided | Provided | |
| CLOTHING, ETC. | Provided | Provided | Provided | Provided | Provided | Provided | |
| ANNUAL COST PER HERDER | $ 28,453.80 | $ 28,718.08 | $ 31,363.92 | $ 36,004.86 | $ 40,949.56 | $ 46,069.80 | |

| | PROPOSED MONTHLY PAYROLL COST INCREASES | | | | | | |
|---|---|---|---|---|---|---|---|
| | 6/1/2015 OR Min. Wage | 2016 OR Min.Wage | 2017 AEWR | 2018 AEWR | 2019 AEWR | 2020-25 AEWR | |
| MONTHLY WAGE * | $ 1,603.33 | $ 1,603.33 | $ 1,779.02 | $ 2,106.36 | $ 2,454.96 | $ 2,825.93 | 112.5% increase from 2014 to 2020 |
| HOURLY WAGE ** | $ 9.25 | $ 9.25 | $ 9.33 | $ 11.05 | $ 12.88 | $ 14.82 | |
| MONTHLY WAGE INCREASE | $ 273.33 | $ - | $ 175.69 | $ 327.34 | $ 348.60 | $ 370.97 | |
| PAYROLL TAX INCREASES | $ 12.60 | $ - | $ 10.55 | $ 13.74 | $ 14.18 | $ 14.65 | Increases based on current tax rates |
| SAIF PREMIUM INCREASE | $ 14.43 | $ - | $ 9.28 | $ 17.28 | $ 18.41 | $ 19.59 | Increases based on current SAIF rates |
| MONTHLY INCREASE PER HERDER | $ 300.37 | $ - | $ 195.52 | $ 358.36 | $ 381.19 | $ 405.21 | |

* AEWR monthly salaries are calculated as follows: Hrly rate x 44 hrs per week x 4.333 weeks per month.
  Oregon minimum wage salaries are calculated as follows: Hrly rate x 2080 hrs per year divided by 12 months.

** Employers are required pay the higher of the Oregon Minimum Wage Salary or the AEWR Salary determined by the DOL.
   In 2015 and 2016 the Oregon minimum wage salary is the higher of the two.

Oregon employers are continually threatened with substantial minimum wage increases,
as high as $15 by 2017. This would mean earlier and larger wage increases for herders.

**Exhibit F at 64**

# PUBLIC SUBMISSION

**As of:** November 12, 2015
**Received:** May 20, 2015
**Status:** Posted
**Posted:** May 20, 2015
**Tracking No.** 1jz-8iyh-wweo
**Comments Due:** June 01, 2015
**Submission Type:** Web

**Docket:** ETA-2015-0004
Temporary Agricultural Employment of H-2A Foreign Workers in the Herding or Production of Livestock on the Open Range in the United States

**Comment On:** ETA-2015-0004-0001
Temporary Agricultural Employment of H-2A Foreign Workers in the Herding or Production of Livestock on the Open Range in the U.S.

**Document:** ETA-2015-0004-0137
NA - Parker, John

## Submitter Information

**Name:** John Parker
**Address:**
   6425 Eagle Butte Ave
   Frederick,  CO,  80516
**Email:** jbp1977@msn.com
**Phone:** 720-635-2754
**Organization:** NA

## General Comment

RE: Temporary Agricultural Employment of H-2A Foreign Workers in the Herding or Production of Livestock on the Open Range in the United States. [RIN 1205-AB70 & Federal Register No. 2015-08505]

1. Proposed changes in the definition of the H-2A sheepherders and goat herders job description currently provided for in special procedures.

As a sheep producer I want to point out how devastating the proposed changes in the definition of the sheepherders job description will be to my sheep operation. Sheep cannot be left alone while grazing on the range for fear they will stray from the band and be lost, attacked by predators or graze unintended areas. A herder must be available at all the times to make sure the sheep are safe. The Department of Labor has for decades recognized the unique nature of open-range sheep herding by providing special procedures for H-2A workers. Now it wants to redefine the unique characteristics of the sheepherders and goat herders job. The herding profession is more 10,000 years old and with the nature of sheep being what they are will always require a herder to watch over them. The herder must be able to move and watch over the sheep at all times. The Department of Labor cannot and should not try and change the definition of a job that has not changed for thousands of years.

It has been proven over and again that we cant hire U.S. workers to herd our sheep. For the last 80 years we have had to bring herders in from other countries to do this work. If we could hire dependable, dedicated American herders that would stay and care for the sheep at the job requires

**Exhibit F at 65**

**AR0835**

we would. We cannot.

H-2A workers come to this country for a few years to herd approximately 40% of Americas sheep in order to make far more money than they can at home. They depend on this money to feed and care for their families back home before returning to their home country. It is important to note that these H-2A workers are non-immigrants. They are here for a short time. They are reliable and responsible workers that care for our sheep. These foreign herders are a valuable asset to the American sheep industry and more particularly to our operation. If we didnt have these herders we wouldnt be in the sheep business.

2. Proposed changes in the wage methodology.

Turning to the issue of wage rates, the proposed wage increase is frankly ludicrous. A sheep operation doesnt make enough revenue to pay a 300% increase its labor expenses. If these rules were to be implemented most sheep operations would go out of business. The Department of Labor is inserting its self into a monthly salary rate that is set by the applicable state agencies. Currently, we negotiate a wage with the herder before he comes to work here. In addition, these rules dont take into consideration the experience and knowledge of a particular herder. A good, knowledgeable, dependable herder is worth far more than one that doesnt have these skills. We are more than willing to pay for an experienced herder with these abilities.

Unlike other jobs, a herder has additional expenses paid by the sheep rancher. The sheep rancher must pay for all of the herders food, clothing, supplies, housing, travel, visa expenses, etcAs with all labor markers, if we dont pay him enough he will either go to work for another sheep operation that will pay more or he can refuse the job. These proposed across-the-board rules do not reflect the specifics of the job or the costs associated with it.

3. 2014 Court Order directive to the Department of Labor.

Further, the 2014 U.S Court of Appeals for the District of Columbia Circuit necessitated the Department of Labor implement the notice-and-comment rulemaking under the Administrative Procedures Act. The Department of Labor simply has to notice the existing special procedures guidance of the H-2A sheep and livestock herding occupations for public comment, not change altogether the regulations governing certification of the employment of nonimmigrant workers in temporary or seasonal agricultural employment of the H-2A program. How the Department of Labor interpreted the courts order to engage in substantive rule changes to the special procedures is a mystery. What precipitated the Department of Labor to suddenly propose changing the rules of a successful program that has functioned well for 80 years is unwarranted. The old saying if it isnt broke dont fix it comes to mind.

I want to conclude by making it clear I am against the proposed rules changes for the reasons mentioned above. But to comply with the court order, the Department of Labor should proceed with promulgating the Special Procedures guidance as is for public comment of the H-2A sheep and livestock herding occupations. If after those comments are received it appears there is a need for change, then in that event, propose changes to the H-2A Special Procedures can address those issues.

---

# Attachments

H-2A Notice & Comment Rulemaking 5-15-15

# PUBLIC SUBMISSION

**As of:** November 12, 2015
**Received:** May 27, 2015
**Status:** Posted
**Posted:** May 28, 2015
**Tracking No.** 1jz-8j3b-podk
**Comments Due:** June 01, 2015
**Submission Type:** Web

**Docket:** ETA-2015-0004
Temporary Agricultural Employment of H-2A Foreign Workers in the Herding or Production of Livestock on the Open Range in the United States

**Comment On:** ETA-2015-0004-0001
Temporary Agricultural Employment of H-2A Foreign Workers in the Herding or Production of Livestock on the Open Range in the U.S.

**Document:** ETA-2015-0004-0263
NA - Hansmire, Julie

## Submitter Information

**Name:** Julie Hansmire
**Organization:** NA

## General Comment

May 27, 2015

Adele Gagliardi, Administrator
Office of Policy Development, Research, Employment and Training Administration
U.S. Department of Labor
200 Constitution Avenue, N.W.
Room N-5641
Washington DC 20210

Dear Ms. Gagliardi,

I am writing about the impact of the proposed H-2A rule on the U.S. Sheep and Goat Industries. My son and I run a range sheep operation in Colorado and Utah H-2A herders been a vital part of our operation for 30 years.

The sheep industry is an old industry and does not fit into any mold from another industry. We often graze remote native range, raising lambs from our renewable natural resources. Sometimes we are grazing close to towns/ski areas. The need for a qualified individual to care for our animals is paramount. We continue to improve our rangelands including techniques in grazing plans and water improvements.

Our yearly wages for herders is $70,000 plus room, board, telephone, work clothes,boots etc.). However, to multiply our $70,000 x 3 as in the proposed regulations would make our herder wages approximately $210,000. This would make our operation unworkable. We have native range that fits

AR1060

our type of operation: raising lambs. The wage proposed is not sustainable for us. We cannot afford wages to triple. Please withdraw the proposed wage and replace it with a formula that is sustainable. Please look at the wage alternatives that is submitted by ASI(American Sheep Industry Association).

Increasing wages will not add more money in our local economy, as almost all of the herders wages go back to their families(Herders have no food or housing cost!) The proposed H-2A wages will affect our local community in the amount of fuel, supplies, insurance, dog food, etc. that we no longer purchase when we are no longer in business.

We have mostly Peruvian Sheep herders in our operation. Each week I receive faxes from men that are interested in working for us. These men want to work here as there is little opportunity in their home areas in Peru. They send their kids to college, build homes and buy businesses. Some of their living conditions in South America are rudimentary, at best. They are very proud to come to the United States to work. They become our friends and family. The current system works. Our herders know their wages increase from the base as they become more experienced. And, our herders often receive quarterly bonuses of $1000.

The men that work for us have specific talent for the job. They are slow when they sit with a herd during the day but quick to recognize issues with individual sheep or recognize a herd problem. Our herders live in self-contained mobile units specially made for this type of work. I also live in a sheep camp for 6 months of the year. I haul water to my camp along with water to the herders. Camps are made for rough terrain, have wood stoves. They are comfortable and efficient to live in.

Concerning the definition for open range, please do not limit the description of open range to the proximity of fences. We sometimes have a fence within a quarter of a mile where the sheep are grazing under the guidance of a herder or sometimes 20 miles. Our sheep need a herder with them 12 months of the year, regardless of any fencing.

Also, please do not restrict the use of mobile housing if our men come in to our headquarters. We can not build fixed housing. I also have a mobile sheep camp during our spring lambing. It is very acceptable and comfortable.

In summary, please note that the current program is successful. It has been used for decades. If there are improvements to be made, please include us in any decision making. Our historic Sheep Industry needs to continue providing wool and lamb for our Country. And in the west, where the majority of sheep production takes place, H-2A herders are a key to the success.

Sincerely,


Julie Hansmire
CAMPBELL HANSMIRE SHEEP, LLC
BOX 100
MACK, CO 81525

ile:///S|/...4%20H-2A%20Sheepherding/Needs%20to%20be%20converted%20to%20PDFs/ETA-2015-0004-0263.html[11/17/2015 1:15:09 PM]

Exhibit F at 68

AR1061

RIN 1205-AB70

May 31, 2015

**VIA WWW.REGULATIONS.GOV**

Adele Gagliardi
Administrator
Office of Policy development and research
Employment and Training Administration
U.S. Department of Labor
200 Constitution Avenuue NW
Room N-5641
Washington, DC 20210

REGARDING: 20 CFR Part 655: RIN 1205-AB70
Temporary Agricultural Employment of H-2A Foreign Workers
in the Herding or Production of Livestock on the Open Range
in the United States

Dear Ms. Gagliardi:

      We submit the following comments in response to the
Notice of Proposed Rulemaking (NPRM) issued April 15, 2015
regarding the above noted proposal concerning H-2A
sheepherders and range livestock workers.

      Our family has been in the sheep business in America
since the late 19th century when Martin Espil came from the
Basque country of France to herd sheep in the high deserts
of Nevada and California. Martin's great, great
granddaughters are now involved in the sheep raising
business – the fifth generation in virtually the same
geographic area. Although all working family members hold
college degrees and embrace technology, we still adhere to
many practices of husbandry that reach back thousands of
years.

J & C Espil                                                    1

AR1368

RIN 1205-AB70

More than a century of continued respect and compassion for sheepherders has been a major reason for our longevity and success. Since the beginning, our family developed longstanding relationships with generations of sheepherders and their families. Our reputation transcends borders, continents, languages and cultures through this association. Some of the early herders became productive U.S. citizens. Others returned to their countries, educated their children, built homes, and started businesses.

This tradition continues today through appreciation and support for the sheepherders and their families. These H-2A sheepherders have played by the rules, entering the country legally and dedicated themselves to the sheep business here and to their families at home. This proposed rule would end our far-reaching generosity and cause great harm to men who have dedicated a part of their working lives to the American sheep industry.

We have studied the proposed rule, and commented on major issues in the text that follows.  However, the length and complexity of the proposal and references to other regulation and law make a comprehensive criticism difficult. Suffice it to say, the proposal is poorly conceived and has no redeeming merit.


Respectfully submitted,


John R. and Carolyn Espil

**Exhibit F at 70**

**AR1369**

RIN 1205-AB70

**Page: 20300**

Most notable: Proposed rule was published on April 15 allowing 30 days for comment. This was subsequently expanded to 45 days, the excuse for the short period that the judge expected rule by November 2015 – 7 months from the proposed rule.  This shortened period is contrary to Executive Order 13563, which is cited on page 20313 in the proposed rule.  According to that Executive order, comment period for such changes should be "at least" 60 days.  The order also states that the agency must seek views of those "likely to be affected".  No such meaningful consultation occurred, as evidenced by the impractical nature of most of the proposals.   The period for comment coincides with the essential work of spring that occurs in the industry most impacted – a dubious choice of timing on the part of the agency involved.

Cost to our business, which has survived for four generations, would be catastrophic, considering just the proposed, three-fold increase in wages. Currently, our immediate costs for H-2A labor – salaries, Western Range Association fees, commissary, compensation insurance – over the last five years account for a range of 25% - 45% of the gross income generated by lamb and sheep sales and wool proceeds.  Not included are the costs for transportation, housing, water, tools, clothing, phone, bookkeeping, maintenance of pickups and housing, general insurance, taxes, rents, grazing fees, capital improvements, livestock purchases, and many other items essential for the viability of this business.  The nature of the livestock business and, indeed, any producing agriculture enterprise, is volatility of markets, variability in weather and nature, and the unpredictable politics of over-reaching government agencies.  The concept of markets in which price is dictated for perishable commodities is a difficult one to grasp for the policy makers.  However, knowledge of the industry and its history, its contribution to the economy and society, and a basic understanding of the financial realities of production should be a requisite for such far-reaching rules as proposed in this document. Unfortunately, throughout this proposal, the gross errors in cost estimation, impacts on livestock ranching, the detriment to supporting industry and the loss of income to state and local governments coupled with misstatement of simple statistics indicate an agency more interested in agenda driven outcomes than the rule of law, statute, and reason.

**Page 20304**

The Department' proposed definition of "open range" is narrow and trifling in scope. Public lands – both BLM and Forest Service land interfacing with private property may be fenced. Public lands also are often fenced to separate grazing allotments, to protect resources or to designate pastures.  Fencing is not and should not be a limiting factor in the definition of range or grazing pasture.  Additionally, fencing does not preclude the need to herd sheep.

J & C Espil                                                                                           3

**AR1370**

RIN 1205-AB70

### c. 655.210(d) Employer provided items

DOL claims that employers have failed to provide all tools necessary for the job of sheepherding. The DOL claims that employers have charged herders for such tools bringing the monthly wage below that required. It is doubtful that the DOL investigators could, in the scope of their investigation, determine whether the charge was for an item requested by the herder for his personal possession or if it was an item that the employer should provide. For example, work boots are listed as a necessary tool, although DOL gives no variance for price, personal preference, or frequency of purchase. The implication of wrongdoing on the part of employers in this instance with the naming of two items of clothing and a vehicle ostensibly charged to herders has little bearing on the so-called provision of "tools and supplies".

The list of items DOL defines as tools of the trade expands with each paragraph. We already supply bedding and clothing and boots within reason. However, this proposal apparently eliminates all expenses for the herder. So far we have never had a complaint concerning lack of tools or supplies. Incidentally, these necessities are often re-supplied yearly due to disappearance or breakage or wear and tear. This "list" has been formed without consultation with those buying the items, which are definitely a cost of employment of H-2A sheepherders, a benefit not often offered to other workers.

### d. 655.210(e)

We have always supplied nutritious food and clean water in abundance to herders. However, DOL suggests that with the drastic wage increase, the employer may petition to charge for food. It would be problematic to apply one figure equally to all herders, for as with any group there is a wide variance in consumption. Items are supplied to the camps in large quantities weekly with little restraint on how much or how little is taken from the camp tender. Typically, there are two herders in each camp. The quandary is how to alter a long-standing practice and apply a new charge equitably. However, there are methods, which may suffice. This may all be a moot point, since our company cannot survive the wage increase alone.

### e. 655.210 (f)

This entire section serves as evidence of the dismal lack of understanding of ranching held by the Department. Workers under the open range livestock production designation are paid a minimum monthly salary not based on hourly work. Under this system some days are longer than others and some shorter, but each day counts toward the monthly salary. How then is a requirement of daily records for these employees compatible with a monthly stipend? The distorted view regarding the dynamics of livestock husbandry and the jobs associated with that profession is very apparent on page 20306 in the statement that, "Department believes that keeping records for the herders or open range production workers who are performing work on the ranch or farm does not create a significant new

J & C Espil                                                                                   4

RIN 1205-AB70

burden on employers." For in its wisdom, the Department believes that, "Employers should already be keeping and maintaining hourly work records for other ranch or farm employees…". What if all "other" employees are salaried or are family or are non-existent?

**Page 20306**

**g. 655.210**

The provisions of this section have been the standard that we have maintained. We have always fulfilled herder's requests for advances on wages. Herders have never requested payment more frequently than monthly, but would be obliged if they preferred that schedule.

**Page 20307**

Regarding the wage scale in California, it should be noted that this high rate has been detrimental to the industry and has resulted in a distinct hardship for growers in that state.

**Pages 20308-20311**

The Department's "central dilemma" regarding determination of wages for sheepherders stems from the "dearth" of information resulting from SWA wage surveys of American sheepherders. The salient fact is that the American worker generally does not want the work nor is he suited to it. Therefore, with few domestic employees, little data is available. The attempt by the Department to increase wages to a level acceptable to the American worker ignores these facts: the jobs have always been available and, preferentially so, to domestic workers; yet the few who have tried the employment in our experience were dismal failures. If wages were the prime deterrent for American workers, then California, with its high pay scale, should have ample recruits. In fact they have few U.S. applicants. Furthermore, among the few who have qualified and taken the job, not one has ever completed a contract. The Department also ignores the reality that sheepherding is not a simple, unskilled task. A master of sheep husbandry generally has years of experience and an exceptional aptitude for his work. Unfortunately, for many who work in agriculture, the skill and talent necessary for success go unrecognized and little appreciated. This document is evidence of that attitude.

The Department's leap to Farm Labor Survey statistical determination of agriculture workers' wages contradicts all references by the Department to the unique nature of the range production of sheep and to precedent and history also cited in this document. In essence the Department, for ease of argument, lumps a very singular industry's workers in with all other agricultural workers regardless of similarity. There are distinct reasons

J & C Espil                                                                                    5

**Exhibit F at 73**

RIN 1205-AB70

for the "special procedures" allotted to sheepherding, due to its uniqueness in the field of livestock management. These statistics make no mention of length of employment, conditions of employment, and benefits in addition to wages.  H-2A sheepherders, as outlined in this document, are supplied with virtually all needs at no cost to them. Included are all transportation to and from the country of origin and all costs associated with that travel. By law sheepherders are not subject to social security or Medicare taxes or to income tax withholding.  They are bound, as is the employer, by a contract, which guarantees a certain period of work, the three-quarters rule, under specified parameters. How many of the farm workers in the survey have such assurances as terms of employment?  How many receive pay that is in essence net to them? How many are full-time, yearlong employees.  These all are pertinent to any wage comparison, but are summarily ignored in the proposal. This circuitous manner that the Department uses for the determination is far more complicated and less accurate than the present method. Apparently, the employer must alter the wage scale according to frequent reports by FLS. How does this work with workers under contracts that specify the wage?  A "floating" wage defies the "clarity" the Department claims as one reason for this proposal.

Most herders, after the initial contract, are compensated substantially more than the existing base rate and are often rewarded with bonuses dependent upon profitable outcomes for the ranch.  Even under these circumstances, our most senior and most respected herders are not paid the rate you have proposed.

As stated elsewhere in these comments, at present levels from 2010 through 2012, the basic costs of employment for our sheepherders – wages and other compensation, Western Range Association travel and fees, worker's comp, and commissary – consumed from 23% to 45% of the GROSS income from sale of lambs, ewes, and wool.  With all other expenses considered, it becomes apparent that our company lost money in some of these years.  Such is the nature of all agriculture, a difficult business subject to cycles of nature and markets. The Department does not understand this concept, chooses to ignore it, or is using this fact for an agenda only implied in this document.  Our expenses rise each year – for example the cost of gasoline was $1.86 in 2008, but at times has reached $4.00 in the interim. Lamb prices for the time period cited above have fluctuated from slightly under $1.00 to $1.90, not sequentially. Since fuel prices are closely tied to the costs of all goods, the economic disadvantage should be clear. Thirty and more years ago gas prices and lamb prices were very closely aligned.

The Department also neglects to consider the impact of losing businesses that generate capital from nothing but dedication, hard work and initiative as opposed to those dependent upon such enterprise, in particular government.  The Department fails to recognize what the Nevada Department of Agriculture terms the "agriculture value chain", which encompasses inputs used by ranches that are purchased from other industries as well as those enterprises that process, manufacture, market and sell for consumption the products of agriculture." NV Dept of Ag continues with, "Nevada farm and ranch enterprises create value from capital they use and workers they employ."

**Exhibit F at 74**

**AR1373**

RIN 1205-AB70

**Page 20315**

Transfer costs – a ridiculous concept that is merely income redistribution by another name. However, in this instance the income is distributed out of the country and in real terms there will be no "transfer", since the proposed rules will ultimately destroy the H-2A program for sheepherding. This is apparently the unstated, but obvious goal of the Department.

**Page 20316**

**Exhibit 2 – number and Percentage of H-2A Employers by Occupation and State**

This table is a total misrepresentation of the profile of the industry. For example Department shows one employer in Nevada, while Western Range Association has 17 members in Nevada as of January 2015. None of the other numbers mirror the Western Range membership numbers either. If Department cannot truthfully represent such basic statistics, how can any of the mathematical machinations be trusted?

**Page 20322**

**TRANSFERS (see page 20315 comment)**

The concept of "transfers" is simply, in the lexicon of socialism, a redistribution of wealth as forced by rules and regulations promulgated by unelected bureaucrats. The one factor that such philosophical jargon neglects is that someone or some entity must have access to capital used in food production. The Nevada Department of Agriculture in the publication "Economic Contribution of Nevada Agriculture" (2013) states it in this manner: "Capital used in food and agriculture production can be categorized as human capital, natural-resource capital (land and water), physical capital (agricultural equipment, livestock inventory, and crop inventories), and off-farm manufactured capital like fertilizers, pesticides, and financial capital".

The Department in its proposed rule assumes a steady supply of all the above and an incremental increase, much like that afforded bureaucracies. However, in the private agriculture sector, uncertainty is the rule. In the sheep industry, in particular, success or failure is not determined until the product is marketed, shipped, and paid for. We are paid once a year for 12 months of work and generations of sacrifice, planning, and shared expertise. Sometimes that compensation does not cover all expenses and financial capital must be borrowed to meet obligations. In that "transfer" the employer "rents" the capital for a cost called interest on the loan. That may be added to the interest on loans for other forms of capital also. Therefore, the concept of a simply "transfer" is not so simply at all.

J & C Espil                                                                                                                7

**Exhibit F at 75**

**AR1374**

RIN 1205-AB70

**Page 20323**

The Department estimates an annual growth rate of 2% in the certification of H-2A workers. It predicts 2,929 H-2A workers in 2016 and 3,500 in 2025.

This renders one speechless!  The proposed rule, by Department admission, will have deleterious effects on growers, their businesses, and their need for workers of any kind. How, then, will that "need" GROW for H-2A range sheepherders and livestock workers? In addition Department repeats its role in the protection and promotion of the U.S. worker throughout this proposal.  Purportedly, according to the Department, the increased wages will allow domestic workers to become sheepherders.  The implication is that with an influx of domestic workers there will be a concomitant decline in H-2A sheepherders.

History is a stark reminder of what has happened to the range sheep industry.  The USDA statistics in a report dated June 1938 gave the number of sheep in Nevada as 558,651, a decline from the 728,305 of 1930.  In the succeeding years numbers have plummeted to the estimated 70,000 sheep on Nevada's ranges today.

The Bureau of Labor Statistics, U.S. Department of Labor's "Occupational Outlook Handbook, 2014-15 Edition, Farmers, Ranchers, and other Agricultural Mangers", job outlook 2012-22 prediction is a -19% with a loss of 179,000 jobs.

**Page 20324**

The circuitous "reasoning" of the comments in the first two paragraphs of column one is a sad reminder of power without wisdom.  The reasoning goes somewhat like this.  This taking of money from the employer may help U.S. workers, not just H-2A workers, by encouraging their employment as herders. This will then allow them a surplus to be spent in their local communities after meeting basic needs (which naturally will be spent in some sort of community, too), notwithstanding that the "transfer" money is already spent by the employer for the needs of the herders and the business at large "in the local communities".  But the glitch is that perhaps this transfer will render all herders unemployable due to the loss of economic viability of the businesses that required herders in the first place. But wait – there may be another benefit to employers due to lower expenditures on unemployment benefits, as the unemployed who previously declined sheepherding, for financial reasons alone, may get off unemployment. (One side note – H-2A herders are not counted for unemployment benefits, since they are guaranteed employment by reason of a contract and for other reasons dictated by government edict.)

The Department does concede that it doesn't have a clue about predicting all of the above.

J & C Espil                                                                                              8

RIN 1205-AB70

For the next few pages, the Department continues with suppositions regarding expenditures for all the additional demands placed upon employers to satisfy terms of an ever-expanding body of regulations.  Most are without merit and are condescending attempts at micro-management of complex businesses. Apparently, the exercise is performed to satisfy statutory requirements addressed later in this commentary.

**Page 20327**

Obligations to keep daily records for operations that are open-range with far-flung locations are an unnecessary imposition that serves little purpose other "compliance" monitoring.  The Department, only acquainted with compartmentalized work environments, proposes an added burden that is nonsensical. Compliance is established through contractual agreement when the worker arrives in this country to perform work as a livestock range specialist.

**The Regulatory Flexibility Act of 1980 as amended by the Small Business Regulatory Enforcement Fairness Act of 1996**

The Department concedes that its proposed rule will have significant and substantial economic impact of a number of small entities – which would include virtually all the participants in the H2A programs covered by this proposal.  This has triggered the need for an IRFA or initial regulatory flexibility analysis by the Department.

The IRFA, which accompanies the proposal, fails in many ways, but particularly in its fiscal assumptions and omission of costs. By definition "small entity" would include most, if not all, those ranches affected by this rule. Practically speaking, the hypothetical farm imagined by the Department is a fiscal impossibility, unless the $252,050 annual revenue is augmented by off-farm income or if it is net income.  Revenue of this level would not support three employees plus the owner and his family in our estimation.  For this discussion that premise immediately negates the resultant figures, which are ridiculously hypothetical in any regard.

**By law Department is to:**
  **Identify and analyze all major cost factors**.

Two glaring omissions are: the costs associated with operating revenue (interest on loans) resulting from this rule; and the workers compensation insurance increase. Of course there is also the failure to state that certain other aspects of this rule will totally eliminate some of the businesses from the onset (for example, the change of range or pasture conditions to the narrow "idea" of open range). As stated elsewhere in these comments, "open" range without fencing is a thing of history.

J & C Espil                                                                                     9

**Exhibit F at 77**

**AR1376**

RIN 1205-AB70

By its own admission Departments proposal will destroy businesses.  Yet, this analysis fails to quantify the losses associated with massive sale of livestock.  Since 40% of the nation's sheep graze on ranges of the West, liquidation of that resource as precipitated by this rule, would probably lead to the sale of breeding ewes for slaughter at prices well below their value today.  Also, BLM and Forest Service sheep permits would be rendered valueless. The sheep industry in this nation is heavily dependent upon infrastructure, so with a major decline in the need for supporting industry, all sheep associated business from coast to coast would suffer a hit. Incidentally, most affected businesses would be "small entities".

**Identify all significant alternatives that would allow the agency to accomplish its stated purpose while minimizing the adverse impact or maximizing the benefits to small entities.**

Department has failed to meet this requirement, offering only phased-in alternatives to one formula concerning wage increases. The "piggy-backed" rules accompanying the wage change cannot be termed necessary or proper for function of the H-2A program, but they are many and damaging also.

**Page 20337**

**Department claims that "Proposed Rule is not a major rule requiring review by the Congress under the SBFEFA…"**

We contend that Department has not adequately reviewed the ramifications of the proposal, so this claim is without merit.  We declare:

1. There will be an annual effect on the economy of $100 million or more for reasons already stated in this discussion.
2. There will be an increase in costs for consumers due to loss of domestically produced lamb, wool, beef, and associated by-products.  There will be increased costs to various levels of government and geographic regions due to failed business and loss of the careful stewardship of land by livestock ranchers.
3. Loss of 40% of the sheep industry and diminishment of the livestock industry in general will significantly affect competition, employment, investment, productivity, innovation and the ability of U.S. based businesses to compete.

These are then the requisites for Congressional review.

**Department also contends that this rule does not qualify under Executive Order 13132.**

**We disagree**, since this proposal does have a direct affect on the States, particularly those in the West.  Whenever the federal government proposes rules that destroy industry in a State and, indeed, in a region, and do so in the absence of meaningful dialogue with the communities or entities most impacted, federal overreach is implicated.

J & C Espil                                                                                                  10

**Exhibit F at 78**

**AR1377**

RIN 1205-AB70

**Regarding the Department's contention that the proposal will not have a negative impact on families – we disagree.**
We are a family business that is working upon the fifth generation in the sheep industry. Statistics prove that we are no exception in Nevada.  According to the Nevada Department of Agriculture, the majority of agricultural operations in Nevada – 82.78% - are engaged in livestock production.  The NDA's "Economic Contribution of Agriculture Report" states, "The largest share of farms and ranches (82.2%) are owned by families or individuals, and many of these have been Nevada small family owned businesses for many years"
Our family-owned ranching enterprise will be severely altered by the proposal and, therefore, a generational way of life may change forever.

**Executive Order 12630 –**

This rule may not fit the traditional definition of "takings", but the Department through "transfers" is certainly taking property from an employer to give to another person or entity.  Additionally, Department is dictating use of resources through rules necessary for the employment of H-2A workers – another "taking" of personal and business property. Any demand for micro-management of private business that is non-productive in nature is also a "taking" of human capital, an unreasonable "taking" of precious time and effort. Through this proposal with its burdensome dictates and rules, the potential for "taking" a ranch and all its resources and the intangibles of "way of life" is very real.  For these reasons and others we claim that this proposal does constitute a "takings".

**Page 20338**

Department refers to a "Human Resource Manager", as if ranches have such an individual on staff, or even have a staff for that matter.  We feel that the added record keeping duties regarding the hours, locations, specific duties of sheepherders and livestock workers are excessive and inconsequential.  The purported point, as stated in the proposal, is to secure and confirm compliance. But if compliance is made impossible or unrealistic or oppressive, then no amount of paperwork will render it less so. Department should identify the situations or actions deemed non-compliant and remedy those.  Perhaps, some of the rules and regulations are failure-prone due to bureaucratic lack of understanding of the situations involved, due to ambiguity or simply due to bad policy.   Hopefully, the goal of this proposal isn't to render compliance impossible.

**Page 20340**

**655.211**
Department in addition to dictating impossible wages also determines that the wage is a floating factor that must be adjusted according to "publication" of a new wage in the Federal Register.  The "Human Resource Manager" will be kept very busy adjusting

J & C Espil                                                                                                     11

**Exhibit F at 79**

RIN 1205-AB70

herder's pay and records and then using the "formula" to arrive at the new wage.  Again, this a moot point, for we, as H-2A employers, cannot survive the wage requirement and edicts of this proposal. Department stated elsewhere in the proposal that the purpose of the substantive alterations to existing special procedures was for clarification, (page 20303, column 1, paragraph 1), specifically to "provide greater clarity for employers with respect to program requirements". Obviously, they have failed in that regard.

**This entire proposal has no redeeming merit and should be discarded.**

**John R. and Carolyn Espil**

**Exhibit F at 80**

**AR1379**

# PUBLIC SUBMISSION

**As of:** November 12, 2015
**Received:** May 19, 2015
**Status:** Posted
**Posted:** May 20, 2015
**Tracking No.** 1jz-8ixy-5itw
**Comments Due:** June 01, 2015
**Submission Type:** Web

**Docket:** ETA-2015-0004
Temporary Agricultural Employment of H-2A Foreign Workers in the Herding or Production of Livestock on the Open Range in the United States

**Comment On:** ETA-2015-0004-0001
Temporary Agricultural Employment of H-2A Foreign Workers in the Herding or Production of Livestock on the Open Range in the U.S.

**Document:** ETA-2015-0004-0133
NA - Olsen, Allen

---

## Submitter Information

**Name:** Allen Olsen
**Organization:** NA

---

## General Comment

My name is Allen Olsen. I own and operate a commercial sheep ranch in central Utah consisting of about 2000 ewes. I am the fourth generation to carry this ranch as my father and his father and grandfather did before me. This ranch has been battered and bruised over the last century. It has seen world wars and depressions but still it stands. It seems as if the country is working against the agricultural world everyday even though it is what feeds, cloth, and drives this county to thrive.

We are not large corporations that can strong hold and manipulate our place in the political world. But we are here because we are a hard working essential part of this country. It has not always been that the agricultural world relied on H2H workers but as the agricultural in the United States shrinks it has demanded more from us at a cheaper cost. To keep up with the demand we rely on H2H workers help us fill the shelves.

On this ranch we have had H2H workers for over 18 years -- most of the workers for multiple 3 year contracts because they enjoy working for this ranch. The operating cost of this ranch and how much we pay our employees is a very tight running machine. For us to breath we cannot afford a significant raise like they propose.

There are good years but we have to plan for the bad and the worst years, which in this ranchs history there has been more bad than good. If this regulation happens you will be able to watch this country's agricultural businesses topple right in front of you. Ranches will have to significantly down size or even toss in the towel and go out of business completely. The country will have to be fed and clothed by other countries. Which will sink us into even more debt to other countries.

Raises are a necessary part of any operation; wages do go up and as the worker gets more skilled in what they do so it is appropriate to give a salary increase. But to double or triple salary is not a fair increase to anyone, but just an attempt to cripple this country's agricultural industry.

Exhibit F at 81

**AR0827**

Sincerely,
Allen Olsen and Family

Exhibit F at 82

AR0828

# Domestic Agricultural In-Season Wage Report

**U.S. Department of Labor**
Employment and Training Administration

| Wage Reporting Area | | |
|---|---|---|
| Name: STATE WIDE | State: North Dakota | OMB Approval No. 1205-0017 Expires: 03/31/04 |

Number: 04-38-00

Survey Period
Beginning: 02-28-07   Ending: 05-11-07

Crop and Activity: Sheep Raising/Goat Herding (Naics-112410)

Date of Finding (Month, Day, Year): 06-27-07

## 1. Prevailing Wage Rate Findings   Animal Handler

a. All Workers .............. $10.00/hr  By 40% rate Monthly fails 25% rule

b. Instate .................. $10.00/hr  By 40% rule Monthly fails 25% rule

c. Interstate (Including Contract P.R.) ..... 0 < 25%

## 2. Estimated Number of Employers and Employees in Crop Activity

a. Employers ............. 89

b. Contract Foreign Workers ...... 1

c. TOTAL Domestic Hired Workers .......... 11

1. Instate (Local and Intrastate) ........ 11

2. Interstate (Excl. Cont. P.R.) .......... 0

3. Contract Puerto Rican .......... 0

## 3. Employer Contacted:

a. Number ......... 38   b. Percent of Total in Crop Activity ..... 42.7%

## 4. Number of Domestic Hired Workers in Sample, by Rate

| Rate (Amount per Unit) | Number of U.S. Workers | | |
|---|---|---|---|
| | Total | Instate | Interstate (Incl. Contract P.R.) |
| I | II | III | IV |
| **TOTAL** | | | |
| Hourly      $10.00 | 5 | 5 | 0 |
|             12.00 | 4 | 4 | 0 |
|             15.00 | 1 | 1 | 0 |
|                   | 10 | 10 | |
| Monthly   $1,020.00 | 1 | 1 | 0 |

Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. Respondents obligation to reply to these reporting requirements are voluntary (20 CFR 653.500 and 20 CFR 655). Public reporting burden for this collection of information is estimated to average 11 hrs. per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the U.S. Department of Labor, Office of Workforce Security, Room C-4518, 200 Constitution Avenue, N.W., Washington, DC 20210 (Paperwork Reduction Project 1205-0017).

ETA 232 September 1990

| Domestic Agricultural In-Season Wage Report | U.S. Department of Labor Employment and Training Administration |
|---|---|

**Wage Reporting Area**

Name: _STATEWIDE_

Number: _04-38-00_

Crop and Activity: _Sheep Raisin (Goat Herding (Naics -112410)_

State: _North Dakota_

OMB Approval No. 1205-0017  Expires: 03/31/04

Survey Period
Beginning: _02-28-07_   Ending: _05-11-07_

Date of Finding (Month, Day, Year): _06-27-07_

**1. Prevailing Wage Rate Findings**   _General Farm Hands_

a. All Workers .................. _$12.00/LW (40% rule) No other time period has 25%_

b. Instate .................. _$12.00/LW (40% rule) No other time period has 25%_

c. Interstate (Including Contract P.R.) ..... _0  <25%_

**2. Estimated Number of Employers and Employees in Crop Activity**

a. Employers .................. _89_

b. Contract Foreign Workers ...... _0_

c. TOTAL Domestic Hired Workers .......... _8_

   1. Instate (Local and Intrastate) .......... _8_

   2. Interstate (Excl. Cont. P.R.) .......... _0_

   3. Contract Puerto Rican .......... _0_

**3. Employer Contacted:**

a. Number .......... _38_   b. Percent of Total in Crop Activity ..... _38/89 = 42.7%_

**4. Number of Domestic Hired Workers in Sample, by Rate**

| Rate (Amount per Unit) | | Number of U.S. Workers | | |
|---|---|---|---|---|
| | | Total | Instate | Interstate (Incl. Contract P.R.) |
| **TOTAL** | | II | III | IV |
| _2 weeks_ | _$425_ | _1_ | _1_ | _0_ |
| | _<25%_ | | | |
| _Hourly_ | _$10.00_ | _1_ | _1_ | _0_ |
| _*_ | _$12.00_ | _3_ | _3_ | _0_ |
| _.4*6= 2.4_ | _15.00_ | _2_ | _2_ | _0_ |
| | | _6_ | _6_ | |
| _Monthly_ | _1,300.00_ | _1_ | _1_ | _0_ |
| | _<25%_ | | | |

Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. Respondents obligation to reply to these reporting requirements are voluntary (20 CFR 653.500 and 20 CFR 655). Public reporting burden for this collection of information is estimated to average 11 hrs. per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the U.S. Department of Labor, Office of ... , Room ... , Constitution Avenue, N.W., Washington, DC 20210 (Paperwork Reduction Project 1205-0017).

Exhibit Final 64

FOIA 630

ETA 232 September 1990

Domestic Agricultural
In-Season Wage Report

**U.S. Department of Labor**
Employment and Training Administration

| Wage Reporting Area | | |
|---|---|---|
| Name: STATEWIDE | State NORTH DAKOTA | OMB Approval No. 1205-0017 Expires: 03/31/04 |
| Number: 04-38-00 | Survey Period Beginning: 02-28-07 Ending: 05-10-07 | |
| Crop and Activity Misc Crops (Nurs-11998) | Date of Finding (Month, Day, Year) 06-27-07 | |

## 1. Prevailing Wage Rate Findings   Animal Handler

a. All Workers ................. $12.00/hr (51% rule)

b. Instate ................. $12.00/hr (51% rule)

c. Interstate (Including Contract P.R.) ...... 0 (fails 35% rule)

## 2. Estimated Number of Employers and Employees in Crop Activity

a. Employers ............. 715

b. Contract Foreign Workers ...... 0

c. TOTAL Domestic Hired Workers ............. 8

    1. Instate (Local and Intrastate) .......... 8

    2. Interstate (Excl. Cont. P.R.) .......... 0

    3. Contract Puerto Rican .......... 0

## 3. Employer Contacted:

a. Number ............. 292   b. Percent of Total in Crop Activity ..... 292/715 = 40.8%

## 4. Number of Domestic Hired Workers in Sample, by Rate

| Rate (Amount per Unit) | | Number of U.S. Workers | | |
|---|---|---|---|---|
| | | Total | Instate | Interstate (Incl. Contract P.R.) |
| I | | II | III | IV |
| **TOTAL** | | | | |
| HR | 9.00 | 1 | 1 | 0 |
| | 10.00 | 1 | 1 | 0 |
| | 11.00 | 1 | 1 | 0 |
| | 11.50 | 1 | 1 | 0 |
| * | 12.00 | 2 | 2 | 0 |
| | 12.25 | 1 | 1 | 0 |
| | 15.00 | 1 | 1 | 0 |
| | | 8 | 8 | |

.4 * 8 = 3.2 fails
.51 * 8 = 4.08

Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. Respondents obligation to reply to these reporting requirements are voluntary (20 CFR 653.500 and 20 CFR 655). Public reporting burden for this collection of information is estimated to average 11 hrs. per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the U.S. Department of Labor, Office of Workforce Security, Room S-4231, 200 Constitution Avenue, N.W., Washington, DC 20210 (Paperwork Reduction Project 1205-0017).

FOIA 631

ETA 232 September 1990

Domestic Agricultural
In-Season Wage Report  *H*

**US Department of Labor**
Employment and Training Administration

Wage Reporting Area Name: *STATEWIDE*

State: *ND*

OMB Approval No. 1205-0017
Expires: 08/31/2010

Number: *04-38-00*

Survey Period
Beginning: *01-01-07*   Ending: *12-31-07*

Date of Finding: *3-1-08 ; 5-16-08*

**1. Prevailing Wage Rate Findings**  *SHEEP FARMING (NAICS 112410)*

a. All Workers .......... *$10.00/HOUR BY 40% RULE*

b. Instate .............. *$10.00/HOUR BY 40% RULE*

c. Interstate (Including Contract P.R.) .... *ANIMAL HANDLERS PAGE 1*

**2. Estimated Number of Employers and Employees in Crop Activity**

a. Employers ............. *86*

b. Contract Foreign Workers. .. *1*

c. TOTAL Domestic Hired Workers ..... *12*
   1. Instate (Local and Intrastate. . . . . . . *12*
   2. Interstate (Excl. Cont. P.R. ....... *0*
   3. Contract Puerto Rican ........... *0*

**3. Employer Contacted:**

a. Number . . . . . . . . . . . . . . *38*   b. Percent of Total in Crop Activity . . . . . . . . . . . *44.2%*   *38/86*

**4. Number of Domestic Hired Workers in Sample, by Rate**

| Rate (Amount per Unit) | | Number of U.S. Workers | | |
|---|---|---|---|---|
| | | Total | Instate | Interstate |
| I | | II | III | IV |
| Total | | | | |
| *HOURLY* | *$7.50* | *3* | *3* | *0* |
| *40% RULE* | *8.50* | *4* | *4* | *1* |
| | *~~10.00~~* | | | |
| *PASS 25% RULE* | *15.00* | *10* | *10* | *0* |
| *.25 X 12 = 3* | | | | |
| *.40 X 10 = 4* | | | | |
| *.51 X 10 = 5.1* | | | | |
| *MONTHLY* | *$1020.00* | *1* | *1* | *0* |
| *FAIL 25% RULE* | *1100.00* | *2* | *2* | *0* |

Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. Respondents obligations to reply to these reporting requirements are voluntary (20 CFR 653.000 and 20 CFR 655). Public reporting burden for this collection of information is estimated to average 15 mins. per response, including the time for reviewing instruction, searching existing data sources , gathering and maintaining the data needed, and completing and reviewing the collection. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the U.S. Department of Labor, Office of National Programs, Room C-4312, 200 Constitution Avenue, N.W., Washington, D.C. 20210 (Paperwork Reduction 1205-0017).

**Exhibit F at 86**

FOIA 634

Case 1:15-cv-01889-REB-STV   Document 139-11   Filed 08/18/16   USDC Colorado   Page 87 of 90



Domestic Agricultural
In-Season Wage Report

**US Department of Labor**
Employment and Training Administration

| Wage Reporting Area<br>Name: STATEWIDE | State<br>NORTH DAKOTA | OMB Approval No. 1205-0017<br>Expires: 08/30/2010 |
|---|---|---|
| Number: 04-38-00 | Survey Period<br>Beginning: 01-01-08     Ending: 12-31-08 | |

Date of Finding: 03-01-09 TO 04-24-09

**1. Prevailing Wage Rate Findings** FARM WORKERS,  FARM AND RANCH ANIMALS (45-2093)

a. All Workers . . . . . . . . . . $10.00 AT 51% OF WAGES

b. Instate . . . . . . . . . . . . . . $10.00 AT 51% OF WAGES

c. Interstate (Including Contract P.R.) . . . .N/A

**2. Estimated Number of Employers and Employees in Crop Activity**

a. Employers . . . . . . . . . . . . . . 695

b. Contract Foreign Workers. ..142

c. TOTAL Domestic Hired Workers . . . . .383
   1. Instate (Local and Intrastate. . . . . . 383
   2. Interstate (Excl. Cont. P.R. . . . . . . . N/A
   3. Contract Puerto Rican . . . . . . . . . . N/A

**3. Employer Contacted:**

a. Number . . . . . . . . . . . . . . 255     b. Percent of Total in Crop Activity . . . . . . . . . . . .36.7%     255/695 = 36.7

**4. Number of Domestic Hired Workers in Sample, by Rate**

| Rate<br>(Amount per Unit) | Number of U.S. Workers | | |
|---|---|---|---|
| | Total | Instate | Interstate |
| I | II | III | IV |
| Total | | | |
| WAGES PER HOUR | | | |
| 5.75 | 1 | 1 | |
| 6.25 | 1 | 1 | |
| 7.00 | 5 | 1 | |
| 7.00 | 7 | 2 | |
| 7.50 | 1 | 1 | |
| 7.75 | 1 | 4 | |
| 8.00 | 5 | 1 | |
| 8.00 | 2 | 1 | |
| 8.00 | 3 | 1 | |
| 8.25 | 1 | 5 | |
| 8.50 | 11 | 2 | |
| 8.50 | 13 | 9 | |
| 8.50 | 6 | 4 | |
| 9.00 | 11 | 2 | |
| 9.00 | 2 | 7 | |
| 9.00 | 3 | 2 | |
| 9.00 | 2 | 1 | |
| 9.00 | 2 | 3 | |
| 9.25 | 4 | 5 | |
| 9.50 | 1 | 1 | |
| 9.50 | 1 | 36 | |
| 9.55 | 5 | 2 | |
| 9.75 | 1 | 3 | |
| 9.90 | 20 | 2 | |
| 9.90 | 2 | 2 | |
| • 51% RULE  10.00 | 34 | 1 | |
| 10.00 | 2 | | |

FOIA 638

| | | |
|---|---|---|
| 10.00 | 9 | 3 |
| 10.00 | 2 | 1 |
| 10.01 | 13 | 7 |
| 10.40 | 1 | 2 |
| 10.50 | 8 | 1 |
| 10.50 | 1 | 1 |
| 10.65 | 1 | 2 |
| 10.90 | 1 | 2 |
| 11.00 | 24 | 24 |
| 11.00 | 1 | 9 |
| 11.00 | 10 | 1 |
| 11.25 | 1 | 1 |
| 11.50 | 8 | 13 |
| 11.50 | 2 | 22 |
| 11.65 | 3 | 1 |
| 11.75 | 1 | 61 |
| 12.00 | 18 | 19 |
| 12.00 | 1 | 2 |
| 12.00 | 2 | 1 |
| 12.50 | 1 | 2 |
| 13.00 | 1 | 11 |
| 13.00 | 2 | 4 |
| 13.50 | 1 | 1 |
| 13.63 | 1 | 4 |
| 14.00 | 4 | 6 |
| 14.50 | 1 | 30 |
| 15.00 | 4 | 6 |
| 15.00 | 5 | 2 |
| 16.00 | 2 | 2 |
| 18.00 | 1 | 2 |
| PASSES 25% RULE   599.09 | 277 | 277 |
| .25 x 383 = 96 | | |
| .40 x 277 = 111 FAILS 40% RULE | | |
| .51 x 277 = 141.27 | | |
| | | |
| | | |
| WAGES PER MONTH   740.00 | 2 | 2 |
| 790.00 | 1 | 1 |
| 1,200.00 | 2 | 2 |
| 1,200.00 | 1 | 1 |
| 1,200.00 | 2 | 2 |
| 1,200.00 | 1 | 1 |
| 1,500.00 | 1 | 1 |
| 1,600.00 | 2 | 2 |
| 1,600.00 | 1 | 1 |
| 1,616.66 | 1 | 1 |
| 1,681.32 | 1 | 1 |
| 1,700.00 | 22 | 22 |
| 1,708.34 | 1 | 1 |
| 1,733.32 | 1 | 1 |
| 1,750.00 | 4 | 4 |
| 1,872.00 | 2 | 2 |
| 1,924.00 | 1 | 1 |
| 1,928.16 | 1 | 1 |
| 1,976.00 | 4 | 4 |
| 2,000.00 | 1 | 1 |
| 2,000.00 | 2 | 2 |
| 2,000.00 | 3 | 3 |
| 2,050.00 | 1 | 1 |
| 2,080.00 | 1 | 1 |
| 2,142.40 | 2 | 2 |
| 2,184.00 | 1 | 1 |
| 2,200.00 | 1 | 1 |
| 2,250.00 | 1 | 1 |
| 2,266.00 | 1 | 1 |
| 2,288.00 | 1 | 1 |
| 2,300.00 | 1 | 1 |
| 2,356.64 | 2 | 2 |
| 2,400.00 | 1 | |

**Exhibit F at 88**

FOIA 639

|  | | | |
|---|---|---|---|
| 2,500.00 | 2 | 2 | |
| 2,570.88 | 1 | 1 | |
| 2,600.00 | 1 | 1 | |
| 2,600.00 | 1 | 1 | |
| 2,718.56 | 1 | 1 | |
| 2,765.00 | 1 | 1 | |
| 2,800.00 | 1 | 1 | |
| 2,808.00 | 1 | 1 | |
| 2,840.00 | 1 | 1 | |
| 2,870.40 | 1 | 1 | |
| 2,882.88 | 1 | 1 | |
| 2,999.36 | 1 | 1 | |
| 3,000.00 | 1 | 1 | |
| 3,000.00 | 2 | 2 | |
| 3,082.56 | 1 | 1 | |
| 3,200.00 | 2 | 2 | |
| 3,213.60 | 1 | 1 | |
| 3,500.00 | 1 | 1 | |
| 3,930.00 | 1 | 1 | |
| 4,055.00 | 1 | 1 | |
| FAILS 25% RULE   119,373.08 | 93 | 93 | |
|  | | | |
|  | | | |
|  | | | |
| WAGES PER YEAR   25,000.00 | 1 | 1 | |
| 35,000.00 | 1 | 1 | |
| 36,000.00 | 2 | 2 | |
| 47,500.00 | 1 | 1 | |
| FAILS 25% RULE   143,500.00 | 5 | 5 | |
|  | | | |
|  | | | |
| WAGES PER DAY   72.00 | 6 | 6 | |
| 100.00 | 2 | 2 | |
| FAILS 25% RULE   172.00 | 8 | 8 | |

Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number. Respondents obligations to reply to these reporting requirements are voluntary (20 CFR 653.000 and 20 CFR 655). Public reporting burden for this collection of information is estimated to average 15 mins. per response, including the time for reviewing instruction, searching existing data sources , gathering and maintaining the data needed, and completing and reviewing the collection. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the U.S. Department of Labor, Office of National Programs, Room C-4312, 200 Constitution Avenue, N.W., Washington, D.C. 20210 (Paperwork Reduction 1205-0017).

ETA 232 September 1990

**Exhibit F at 89**                    FOIA 640

5. Productivity and Average Earnings of Piece Rate Workers

| Rate and Unit | Number | | Total Unit of Production | Average Hourly Earnings | Worker Interviews | |
|---|---|---|---|---|---|---|
| | | | | | Number | Avg. Hrly Earnings |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

6. Comments (Use an attachment if more space is needed)
   a.   Variables affecting rates

b.  Prevailing wage rate(s) previous season

c.  Other

| Signature | Title | Date |
|---|---|---|
| *Warren M. Boyd* | *Research Analyst* | 5-8-09 |

Page 2 of 2

ETA 232 September 1990

**Exhibit F at 90**

FOIA 641