IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-1889-REB-CBS

RODOLFO LLACUA, *et al.,*

       Plaintiffs,

v.

WESTERN RANGE ASSOCIATION, *et al.,*

       Defendants.

_____

MEMORANDUM OPINION AND RECOMMENDATION ON PLAINTIFFS' MOTION TO
AMEND THE SECOND AMENDED COMPLAINT
_____

Craig B. Shaffer, Magistrate Judge

     This case comes before the court on the referred motion (doc. #140, public entry for doc.

#139) of the named Plaintiffs to amend their Second Amended Complaint ("SAC," doc. #73) in a

proposed Third Amended Complaint ("TAC"). Doc. #139-2 (redline version). Defendants

oppose that motion. Doc. #148. As follows, the court grants the motion in part and recommends

denying in part.[1]

STATEMENT OF THE CASE

     As the court previously described in more detail in its Recommendation (doc. #125,

referred to hereafter as the "Recommendation") on motions to dismiss the SAC, five named

Plaintiffs bring this lawsuit: Messrs. Llacua, Huaman, Leovegildo Vilchez Guerra, Liber Vilchez

Guerra, and De La Cruz. TAC ¶¶ 18-22. The Recommendation recites the SAC's allegations

---

[1] Recently, Plaintiffs have moved (doc. #156) to sever Plaintiff Rafael de la Cruz's Nevada
minimum wage claim (Count VII in the TAC) and transfer it to the District of Nevada. As
explained in more detail below, the court will address that motion by separate order.

and claims in detail, and the court here assumes familiarity with it.  To summarize, Plaintiffs

bring a putative class action.  Plaintiffs allege that they are "originally from Peru" and worked in

the United States as "H-2A shepherd[s]."  TAC ¶¶ 18-23.  Plaintiffs allege that two industry

associations (Western Range Association, "WRA," and Mountain Plains Agricultural Service,

"MPAS," collectively the "Associations") and five ranches[2] who are members of one or both

Associations violated § 1 of the Sherman Act by agreeing to fix shepherds' offered and paid

wages.  Plaintiffs further allege that the Associations and Dennis Richins, a former officer of

WRA, violated the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §

1964(c).  Plaintiffs also bring several state law claims.

The U.S. Department of Labor ("DOL") regulates the employment of foreign shepherds

under the H2-A program.  The DOL requires employers to "offer domestic workers 'no less than

the same benefits, wages, and working conditions that the employer is offering, intends to offer,

or will provide to H-2A workers."  TAC ¶ 47 (quoting 20 C.F.R. § 655.122(a)).  The employer

must offer the "worker at least the AEWR [Adverse Effect Wage rate], the prevailing hourly

wage rate … or the Federal or State minimum wage rate, in effect at the time work is performed,

whichever is highest, for every hour or portion thereof worked during a pay period."  TAC at ¶

48 (quoting 20 C.F.R. § 655.122(l)).  For convenience, the court refers to these state-by-state

mandatory minimum wages as the "minimum wage."

This case has been pending since September 1, 2015, when two of the Plaintiffs filed the

original complaint.  Doc. #1.  Plaintiffs have amended the complaint twice.  Defendants moved

to dismiss each version.  On March 8, 2016, the court held a scheduling conference.  Doc. #112.

---

[2] Defendant Martin Auza Sheep Company ("Auza"); Defendant Cunningham Sheep Company
("Cunningham"); Defendant Nottingham Land and Livestock, LLLP ("Nottingham") and Two
Bar Sheep Co., LLC ("Two Bar"); and Defendant Dennis Richins d/b/a Dennis Richins
Livestock ("Richins").  Plaintiffs have dismissed three other ranches.

In light of the then-pending motions to dismiss, the court did not enter a scheduling order. Doc. #112. Accordingly, the court has not yet set a deadline for motions to amend the pleadings. The parties have proceeded with some discovery. *Id.*

On June 3, 2016, this court recommended dismissal of the SAC's federal claims with prejudice and recommended that the district court decline to exercise supplemental jurisdiction over the state law claims. Recommendation at pp. 41-42. On July 1, 2016, Plaintiffs objected to the Recommendation; on August 1, 2016, Defendants responded in support of the Recommendation. Docs. #131, 135, 136. Soon thereafter, on August 18, 2016, Plaintiffs filed their motion to amend the SAC, requesting that if Judge Blackburn agreed with the Recommendation that the Plaintiffs be permitted to file a proposed TAC. Doc. #139.[3] On September 6, Judge Blackburn overruled Plaintiffs' objections and adopted the Recommendation, except modifying to dismiss the federal claims without prejudice to Plaintiffs' motion to amend. Doc. #142. Plaintiffs then filed a notice of supplemental authority in support of their motion to amend (doc. #144) and a reply. Doc. #152. Judge Blackburn referred the motion to amend to this court.

ANALYSIS

I.     *The Standard for Motions to Amend the Complaint.*

Rule 15(a) provides that "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). "The purpose of the Rule is to provide litigants the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties." *Minter v. Prime Equip. Co.,* 451 F.3d 1196, 1204 (10th Cir. 2006) (citations and internal quotation marks omitted).

---

[3] Plaintiffs filed the entirety of doc. #139 and its attachments under seal. Within seven days, Plaintiffs shall confer and file a motion to restrict that complies with D.C.COLO.LCivR 7.2 regarding that filing.

> If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be "freely given."

*Foman v. Davis,* 371 U.S. 178, 182 (1962). Here, Defendants oppose the motion on the grounds of failure to previously cure deficiencies, undue prejudice, undue delay, and futility. The court addresses futility first, as it is dispositive for most of the proposed federal claims.

## II. Antitrust Claims

"A proposed amendment is futile if the complaint, as amended, would be subject to dismissal." *Full Life Hospice LLC v. Sebelius,* 709 F.3d 1012, 1018 (10th Cir. 2013) (internal quotation marks omitted). However, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the alleged] facts is improbable, and that a recovery is very remote and unlikely." *Sanchez v. Hartley,* 810 F.3d 750, 756 (10th Cir. 2016)).

The legal standards for a § 1 claim and the pleading standard for its conspiracy element have not changed since the court discussed those standards at length in the Recommendation. Doc. #125 at pp. 9-17. "The essence of a claim of violation of Section 1 of the Sherman Act is the agreement itself." *Champagne Metals v. Ken-Mac Metals, Inc.,* 458 F.3d 1073, 1082 (10th Cir. 2006). "[T]he crucial question' is whether the challenged anticompetitive conduct 'stem[s] from independent decision or from an agreement, tacit or express.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007). "[W]hen allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action." *Id.* at 556-557. The allegations in *Twombly* are quite similar to Plaintiffs' allegations here: multiple corporate defendants engaged in the same conduct as their competitors, consistent with the regulatory

system that governed the business in question. *Id.* at 567-68. With no allegations of direct evidence that the defendants had agreed among themselves to engage in that conduct, the Supreme Court held that circumstantial allegations of parallel conduct were insufficient to state a § 1 Sherman Act claim. *Id*. at 564-66.

A.      *Plaintiffs' Antitrust Allegations Taken as a Whole*

In the SAC, Plaintiffs alleged that MPAS, WRA, and their members conspired to fix the wages offered and paid to shepherds. Plaintiffs alleged that Defendants agreed to offer domestic and foreign shepherds only the minimum wage. They alleged that the job orders for domestic shepherds went unfilled, such that Defendants hired only foreign shepherds. Plaintiffs further alleged that Defendants agreed to fix the wages that they paid at the minimum wage. The court concluded that the SAC's alleged conspiracy was not plausible under *Twombly* because (a) the Associations were authorized by statute to recruit and hire on behalf of their members, and thus were authorized to set the offered wages for their members, and (b) Defendants' uniform offering and paying only the minimum wage was consistent with a conspiracy but not suggestive of it because the same conduct was equally or more likely the result of parallel decisions under the H-2A regulatory system. Recommendation at pp. 20, 29.

In their motion to amend, Plaintiffs do not propose to cure the deficiencies of the SAC with any direct allegations of an agreement, nor any new circumstantial allegations that would be plausible in light of the H-2A regulatory environment. Plaintiffs continue to allege conclusorily that the Associations are anticompetitive combinations of competitors. TAC at ¶¶ 66, 88. They also continue to allege that all Defendants conspired to fix the wages offered to shepherds at the minimum wage. TAC at ¶¶ 5, 6, 7(i), 68, 170. Plaintiffs seek to add more detail regarding the Associations' setting of the offered wages at the minimum wage, and the members' knowing delegation of hiring to the Associations. *Id.* at *e.g.*, ¶¶ 68, 69, 90, 91, 117-158, 246-50.

However, the proposed Third Amended Complaint drops the alleged conspiracy to fix wages *paid* to foreign shepherds. TAC at *e.g.,* ¶¶ 4, 7(i), 7(ii), 91, 409, 412. Plaintiffs now concede that Defendants (and some non-party ranches) at times pay experienced foreign shepherds varying amounts above the minimum wage. *Id.* at ¶ 7(iv), 177-203, 217, 221, 222.[4] Plaintiffs allege that shepherding is a skilled profession in which years of experience at a ranch make a shepherd's services more valuable. *See, e.g.,* TAC at ¶¶ 160-174, 175, 206-209. Plaintiffs point to admissions of some Defendants regarding the value of shepherds' experience. TAC at *e.g.,* ¶¶ 160, 240. Thus, Plaintiffs claim that although Defendants actually paid foreign shepherds varying amounts above the minimum wage, they still offered only the minimum wage.[5]

For purposes of factual support for the fixing of offered wages, Plaintiffs continue to allege many facts that regard only *paid* wages. *See, e.g.,* TAC at ¶¶ 104-110, 137-141, 150, 153 (alleging Association correspondence, handbook, and DOL wage surveys). Plaintiffs allege that Defendants' payments of higher wages support a conspiracy to fix the offered wages in two ways. First, they claim that the variation in pay shows that a shepherd's skill and experience have additional value, and thus the lack of variation in offered pay must show an agreement to

---

[4] Plaintiffs allege that five Defendants paid above minimum wage: MPAS, Auza, Two Bar, Cunningham, and Nottingham. *Id.* at ¶¶ 186-204. They further allege that four nonparty ranches paid above minimum wage. *Id.* at ¶¶ 205-209. However, Plaintiffs also allege generically that "Defendants" paid above the minimum wage. *Id.* at *e.g.,* ¶¶ 85, 86, 214, 215. Whether the group allegation suffices is questionable. *See, e.g., Compliance Marketing, Inc., v. Drugtest, Inc.,* Case No. 09-cv-1241-JLK, 2010 WL 1416823, at *6 (D. Colo. Apr. 7, 2010) ("generalized allegations of agreements … do not provide sufficient factual basis to demonstrate concerted action"). For argument's sake, the court assumes that all Defendants paid above minimum wage.

[5] Plaintiffs generally assume that Defendants paid wages that they did not offer, and the court will assume this is true. However, two paragraphs differ: Plaintiff Leovegildo Vilchez Guerra alleges that he was offered above the minimum wage that Defendants represented to DOL as the offer. TAC at ¶ 221. Plaintiffs also allege that Defendants "intended to offer" above the minimum wage to foreign shepherds (TAC at ¶ 85), implying that they did so. If Defendants offered varying compensation to foreign shepherds, regardless of whether that information was disclosed to DOL, that fact alone would contradict Plaintiffs' remaining theory of conspiracy.

fix wages.  TAC at ¶¶ 7(i), 7(ii), 159, 175.  This theory does not take into account the equally logical explanation that Defendants independently offer only the minimum wage because they do not need to differentiate their job openings by years of experience.  Plaintiffs do not allege anything in the H-2A regulatory system that requires the employer to offer positions differentiated by experience level.

Second, Plaintiffs allege that (a) Defendants pay higher wages but do not disclose them to DOL, (b) the nondisclosure subjects Defendants to risks of DOL fines and debarment from H-2A for noncompliance with 20 C.F.R. § 655.122, and (c) Defendants run those risks only to protect their agreement to fix offered wages at the minimum wage.  TAC at ¶¶ 7(iii), 83-86, 177-182, 210-215; Doc. #152 at p.7.  As with the SAC, Plaintiffs continue to ignore that their own allegations suggest more likely explanations for Defendants' uniform offers of the minimum wage: each Defendant wished to hire foreign shepherds under the H-2A program to take advantage of their "vulnerable immigration status."  TAC at ¶ 9.

Plaintiffs allege that Defendants wish to exploit foreign workers' immigration status so that among other things, Defendants can obtain the value of their experience without needing to pay more than "slight premiums" for it.  TAC at ¶¶ 9-11, 82, 214-215.  Plaintiffs allege that Defendants know that in light of other, similar jobs paying higher wages or offering better conditions, the minimum wage is (or was, prior to November 2015) too low to attract domestic shepherds.  *Id.; see also* TAC at ¶¶ 229-37.  Offering the minimum wage ensures that the Defendants can hire foreign shepherds under H-2A.  Thus, the H-2A regulatory system gives each Defendant an individual, parallel incentive to offer only the minimum wage.

As the Recommendation concluded, there is no need for an agreement to do what the Defendants would do anyway.  Doc. #125 at p. 29.  Regardless that nondisclosure of higher

wages may violate 20 C.F.R. § 655.122(a) or other H-2A rules,[6] a ranch's rule violation does not carry over to the association or vice versa "unless the OFLC Administrator determines that the association or another association member participated in the violation." 20 C.F.R. § 655.182(a). *Twombly* rejected the theory that multiple defendants' alleged regulatory violations suggest conspiracy. Recommendation at p. 13 (quoting *Twombly*, 550 U.S. at 566). Moreover, Plaintiffs in this case continue to infer that prior to the November 2015 rule change, disclosing the higher paid wages to DOL would have resulted in Defendants paying a higher minimum wage going forward. *See, e.g.,* TAC at ¶¶ 104-105. Thus, each Defendant had a direct, independent self-interest to not disclose the higher wages to DOL. As in the SAC, Defendants' alleged conduct is equally explainable by consciously parallel decisions.[7]

In their motion, Plaintiffs do not cite any new cases regarding when a § 1 claim based on only circumstantial evidence of an agreement is plausible. Instead, Plaintiffs again argue that the Association Defendants' setting of wages for their members is sufficient, specifically asserting that "the existence of associations that uniformly offer wages for their members' employees … constitutes allegations that, if true, are direct evidence of an agreement to restrain trade in violation of the Sherman Act." Doc. #152 at p. 2 n.1. In Plaintiffs' view, if an industry association sets the offered wage for its members, the association itself manifests the competitors' agreement to unreasonably restrain trade.

Other than now asserting that the Association Defendants are *direct* evidence of an agreement, this is the same unavailing "association standard" argument. Recommendation at pp.

---

[6] The court does not reach whether any Defendants actually violated DOL regulations.

[7] Plaintiffs also contend that the regulatory environment is relevant only if there is a "showing of clear repugnancy" with the Sherman Act sufficient to show immunity. Doc. #152 at p. 10 (citing *Nat'l Gerimedical Hosp. & Gerontology Ctr. V. Blue Cross,* 452 U.S. 378, 388-89 (1981)). *Twombly* demonstrates that the regulatory environment is relevant to the plausibility of the alleged conspiracy, regardless of whether it also meets the standard for implied immunity.

21-24.  More is required than merely the existence of an industry association whose membership is comprised of competitors: "a legally single entity violate[s] [Section] 1 when the entity [i]s controlled by a group of competitors *and serve[s], in essence, as a vehicle for ongoing concerted activity.*"  *Am. Needle, Inc. v. Nat'l Football League,* 560 U.S. 183, 191 (2010) (emphasis added).  An association is a vehicle for concerted antitrust activity when it requires its members to actively participate in the association's anticompetitive conduct; this generally requires showing association rules, canons or agreements that prohibit members from competing.  Recommendation at pp. 20-23 (citing cases).

Plaintiffs rely again on a case that they cited in opposing the motions to dismiss, *Beltran v. InterExchange, Inc.,* 176 F. Supp. 3d 1066 (D. Colo. 2016).  In *Beltran*, the plaintiffs alleged direct evidence of an agreement in that "several of the [Defendant] Sponsors' employees (the 'Directors') explicitly admitted to Plaintiffs' investigator that the Sponsors had expressly agreed among themselves to keep *au pair* wages at the lowest possible level;" the complaint also alleged the specific telephone conversations in which those admissions occurred.  *Beltran,* 176 F. Supp. 3d at 1073-74.  The court did not find the defendants' memberships in (or officers' ties to) an industry association in themselves made the conspiracy plausible.  Rather, the plaintiffs alleged that the industry association had recently sponsored a key note speaker who, in a published article, advocated that the members should not compete with each other on *au pair* wages.  *Id.* at 1078.  That fact was part of the circumstantial evidence that, together with the direct admissions, the court found plausibly alleged antitrust conspiracy.  *Id.* at 1079.  Thus, *Beltran* still does not support Plaintiffs' contention. [8]

---

[8] Plaintiffs also argue that the law may be "evolving" because a petition for *certiorari* was granted regarding *Osborn v. Visa Inc.,* 797 F.3d 1057 (D.C. Cir. 2015).  Doc. #139 at pp. 6-7.  The petition was later dismissed as improvidently granted.  *Visa v. Osborn,* No. 15-961, 2016 WL 6808590, at *1 (U.S. Nov. 17, 2016).

Plaintiffs also cite a treatise on which they relied in their objections to the Recommendation, 7 P. Areeda & H. Hovenkamp, *Antitrust Law* ¶ 1477, p. 337 (3d Ed. 2006). Plaintiffs rely on this treatise to argue "the Courts have had little difficulty in treating organizations created to serve their member-competitors or to regulate their market behavior as continuing 'agreements' among the members," for purposes of finding an 'agreement' in restraint of trade." Doc. #152 at p. 2, n.1 (quoting Areeda and Hovenkamp ¶ 1477, p. 337). Section 1477 addresses intraenterprise conspiracy, *i.e.,* the circumstances in which a single organization, such as a trade association, is capable of constituting a conspiracy despite being incapable of conspiring within itself. The treatise recognizes that trade associations are

> routinely treated as continuing conspiracies …of their members … [but] [o]f course that leaves the second question, whether the trade association's decision controls the members' behavior in some way. * * * This brings association rules having a competitive impact within the reach of §1 of the Sherman Act.

Areeda and Hovenkamp ¶ 1477 at pp. 332-333. The trade association as a collaboration of competitors is generally permissible, and "the courts focus on and remedy only a particular alleged impropriety – such as a particular rule forbidding the members from engaging in competitive bidding." Areeda and Hovenkamp ¶ 1477 at pp. 333-34. The treatise then discusses several examples of associations that controlled their members' actions through rules or canons requiring non-competition. *Id.* at 334-337. These are the same cases on which Plaintiffs misplaced their reliance in opposing the motions to dismiss. Recommendation at pp. 22-23. Just like the SAC, the TAC does not point to any rules, canons or membership agreements of WRA or MPAS that prohibit members from offering above the minimum wage.[9] The Areeda and Hovenkamp treatise does not support Plaintiffs' argument regarding the Associations.

---

[9] As discussed below, Plaintiffs allege that MPAS and WRA directed members to offer the minimum wage in correspondence and a handbook excerpt attached to the TAC, but the documents do not support the contention.

Furthermore, Plaintiffs' association argument continues to ignore that the H-2A program specifically authorizes associations to handle recruitment and hiring for ranches. 29 U.S.C. § 1801(d);[10] 8 U.S.C. § 1188(d)(1) ("[a] petition to import an alien as a temporary agricultural worker, and an application for a labor certification with respect to such a worker, may be filed by an association of agricultural producers which use agricultural services"); 20 C.F.R. § 655.131 ("[a]ssociations of agricultural employers may file an Application for Temporary Employment Certification for H–2A workers as a sole employer, a joint employer, or agent"); 20 C.F.R. § 655.215(b)(1) (Nov. 16, 2015) (H-2A applications for foreign herding and range livestock workers "may be filed by an individual employer [or] association"). Therefore, the fact that the Associations set the offered wages for their members does not make plausible that the Associations are vehicles for anticompetitive activity. *See* Recommendation at p. 20.

Thus, at least in the H-2A context, the fact that members "knowingly allocate decisions regarding the wages offered to domestic shepherds to these associations constituted by competitor ranchers" (TAC ¶ 68; *see also Id.* at ¶ 90; ¶¶ 246-250) does not suggest a conspiracy. Alleging that the members "do so with the knowledge that the Association *Defendants use job orders to illegally fix shepherd wages at the wage floor in each state" (Id*. at ¶ 68; *see also Id.* at ¶ 6) is the same conclusory assertion as in SAC ¶ 91. Recommendation at p. 19. It remains conclusory. That each ranch "knew or should have known that it was not prohibited [by DOL] from setting its own offered wages, but instead decided to delegate that function to the Associations," TAC ¶ 247(v), likewise does not suggest that the ranches delegated hiring to

---

[10] Plaintiffs argue that 29 U.S.C. § 1801 *et seq.* is irrelevant because it regards only recruitment of migrant or seasonal U.S. agricultural workers, not H-2A workers. Doc. #139 (Motion) at p. 8 (referring to Plaintiffs' objections, Doc. #131, at pp. 7-8). Excepting foreign workers, "the term 'migrant agricultural worker' means an individual who is employed in agricultural employment of a seasonal or other temporary nature, and who is required to be absent overnight from his permanent place of residence." 29 U.S.C. § 1802(8)(A). The domestic job orders appear to fall within this definition.

WRA because of a conspiracy. It is equally if not more likely that the ranches delegated to WRA because they wished to participate in the H-2A program (TAC at ¶¶ 9-11, 82, 214-215), and delegating was more efficient than each ranch individually handling its own H-2A hiring. *See, e.g.,* 20 C.F.R. § 655.121(2) (associations can file master applications on behalf of several ranches).

In short, Plaintiffs' motion to amend and proposed amendments do not attempt to meet the pleading standards for § 1 antitrust conspiracy claims noted in the Recommendation. Nor do Plaintiffs' rely on new cases to take issue with those pleading standards. Just as the court concluded in the Recommendation, Plaintiffs must meet *Twombly's* requirement of fact allegations that are not equally likely caused by consciously parallel conduct. None of the documents attached to the TAC and none of the specific, proposed fact allegations meet that standard, as follows.

B.     *Attachments to the TAC: MPAS Job Orders for Domestic Shepherds*

Even if Plaintiffs had otherwise pled facts to make the conspiracy plausible, several of the job orders that Plaintiffs attach to the TAC contradict that conspiracy.[11] The court can consider the attachments to the TAC at the Rule 12(b)(6) phase. *Tal v. Hogan,* 453 F.3d 1244, 1264 n.24 (10th Cir. 2006). *See also Gee v. Pacheco,* 627 F.3d 1178, 1186 (10th Cir. 2010). Several of the MPAS[12] job orders to U.S. workers offer compensation above the minimum wage, and do so in terms varying from ranch to ranch. *See, e.g.,* Doc. #139-3 at p. 4 ¶ 18 (2015 job

---

[11] Defendants argue that the "attachments to the Second Amended Complaint had revealed [this] all along." Doc. #148 at p. 11. In earlier briefing, Defendants did not rely on this argument until MPAS's reply. Doc. #91 (Motion) at p. 3 n.3; Doc. #105 (Reply) at p. 3. The court recommended dismissal without reaching this issue.

[12] As to WRA and its members, the attachments to the TAC do not appear to show variation in the compensation offered. *See, e.g.,* Doc. #139-3 at pp. 12, 26; Doc. #139-4 at pp. 12, 21; Doc. #139-5 at p. 5; Doc. #139-6 at pp. 17, 40, 64, 76. Whether WRA and its members varied the offered compensation would be a fact issue to resolve later if any of the antitrust claims were plausible.

order for Auza, "[e]mployer may offer a bonus"); *Id.* at p. 20 ¶ 18 (2014 job order for Child

Ranch, "[e]mployer, at the employer's discretion, may pay wages higher than the established

minimum wage rate."); Doc. #139-4 at p. 4 ¶ 18 (2015 job order for Estill Ranches, "[b]onuses

and/or wages that are higher than the guaranteed wage rate may be offered at the employer's

discretion. Any such added benefit(s), if elected by the employer, will be applied in a non-

discriminatory manner to all employees under this job order who meet the employer's determined

criteria, example: length of service with the employer."); *Id.* at p. 30 ¶ 18 (2015 job order for

Two Bar, same language as for Estill).[13] Indeed, Plaintiffs indirectly recognize these facts in

alleging that "MPAS admits that 'some employers offered and paid base wages in excess of the

published minimum, wage established by DOL' and notes that 'some offered opportunities to

earn additional pay and bonuses.'" TAC at ¶ 183 (footnote omitted). Because the TAC

attachments show that MPAS, Auza and Two Bar offered above the minimum in their job orders,

the court cannot infer that these Defendants agreed to fix offered wages to domestic shepherds.

Plaintiffs allege that these differences in the compensation that MPAS, Auza and Two

Bar offered are insignificant because they do not state specific amounts for potential bonuses,

which Plaintiffs assert is a violation of unspecified DOL regulations. *See, e.g.,* TAC at ¶¶ 83, 84.

This is a legal conclusion that the court need not accept as true. In 20 C.F.R. § 655.122, DOL

defines the content that it requires for job offers, and it does not mention any requirement that the

employer must specify the amounts of potential bonuses or potentially higher wages. 20 C.F.R.

§ 655.122(a)-(q). The rule prohibits the employer from providing better compensation to foreign

---

[13] The MPAS H-2A applications attached to the TAC appear to offer foreign shepherds only the minimum wage. *See, e.g.,* Doc. #139-6 at pp. 2-12, 30, 53, 92. Yet, in opposing the motions to dismiss, Plaintiffs recognized that "in a free market, Ranchers would offer U.S. workers *more* not *less* than foreign workers." Doc. #96 at p. 23, n.7. If any of the antitrust claims against MPAS were plausible, its offered compensation to foreign shepherds would be a fact issue.

shepherds than it offers to domestic workers, but it does not specify the level of detail that the employer must disclose regarding offered compensation:

> The employer's job offer must offer to U.S. workers *no less than the same* benefits, wages, and working conditions that the employer is offering, intends to offer, or will provide to H–2A workers. Job offers may not impose on U.S. workers any restrictions or obligations that will not be imposed on the employer's H–2A workers.

20 C.F.R. § 655.122(a) (emphasis added). The H-2A form likewise requires the ranch to certify that "[t]he job opportunity offers U.S. workers *no less than* the same benefits, wages, and working conditions that the employer is offering, intends to offer, or will provide to H-2A workers and complies with the requirements at 20 CFR 655, Subpart B." Doc. #139-6 at p. 8 ¶ 4 (emphasis added). So long as the job orders describe the compensation in sufficient detail to ensure the employer describes no less than what it intends to offer to foreign shepherds, and at least meets the minimum wage, the rule does not impose any particular requirements on how the compensation must be described.

Plaintiffs also argue that notwithstanding these offers of potential bonuses and higher wages, the *base wage rates* MPAS uniformly offered were the minimum wage. Doc. #152 at p. 9. In support of their theory that the base wage rate is the key and potential bonuses are immaterial, Plaintiffs cite *In re High Fructose Corn Syrup Antitrust Litig.,* 295 F.3d 651, 656 (7th Cir. 2002). The case does not support Plaintiffs' argument. *High Fructose* notes that an agreement to fix list prices (here, offered wages) can constitute a per se violation of § 1. However, the court expressly recognized that the existence of list prices and transactions based off of them do not in themselves show more than parallel conduct.

> [I]f many sales are made at prices below the list price, the fact that the sellers' list prices are the same is not compelling proof of collusion. … But it wouldn't be anyway, since identical list prices might be adopted by imitation rather than by explicit agreement.

*High Fructose,* 295 F.3d at 656 (citing *Reserve Supply Corp. v. Owens-Corning Fiberglas Corp.,* 971 F.2d 37, 53–54 (7th Cir. 1992)). *Reserve Supply* similarly reasons that

> [T]he industry practice of maintaining price lists and announcing price increases in advance does not necessarily lead to an inference of price fixing. The fact that a standard product is priced according to a standard formula does not indicate that a conspiracy exists; one manufacturer could have implemented the pricing system, and its competitors could have decided independently to adopt it.

971 F.2d at 53.[14]  The Seventh Circuit's reasoning is persuasive here.  Particularly in light of the incentives resulting from the H-2A program, MPAS, Auza and Two Bar's "minimum wage plus" offers are at best only consistent with an agreement to fix the base wage, not suggestive of such an agreement.  In sum, the MPAS job orders attached to the TAC show that they did not agree to fix the wages offered to domestic shepherds.

C.      *Association Documents that Plaintiffs Attach to the TAC: Contracts With Shepherds, Correspondence, and Handbook.*

Plaintiffs rely upon several documents of MPAS and WRA as factual support for the alleged agreement to fix offered wages.  The court addresses these in the order alleged.

1.      *Form Contracts or Affidavits With H-2A Shepherds*

Plaintiffs allege that form contracts or affidavits with H-2A shepherds establish that MPAS and WRA, not the individual ranches, set the offered wage.  TAC at ¶¶ 126, 136.  They attach one example as to each association.  Doc. #139-11, Ex. F at pp. 2-4.  However, as noted above, the fact that MPAS and WRA set the offered wages to foreign shepherds for their members is not suggestive of conspiracy in the H-2A context.

Plaintiffs also essentially allege that the form contracts/affidavits are misleading or unconscionable, and that this unlawfulness supports the conspiracy to fix offered wages.

---

[14] The Tenth Circuit does not appear to have addressed whether an industry-wide list price suggests an agreement to fix prices.  *Cf., In re Urethane Antitrust Litig.,* 768 F.3d 1245, 1264 (10th Cir. 2014) (only assuming "[f]or the sake of argument … that evidence of parallel price-increase announcements would not establish a price-fixing conspiracy").

Specifically, they allege that MPAS' form contract with shepherds informs the shepherd: "***In the state of Texas this occupation pays--$750 monthly, with house and food***." TAC at ¶ 125 (Plaintiffs' translation from Ex. F at p. 2, emphasis original to TAC). Plaintiffs assert that $750 is only the minimum wage, and therefore the MPAS contract is misleading. Plaintiffs allege that WRA requires shepherds to execute an affidavit[15] before WRA interviews them in which they state that they agree to (a) the minimum salary set by DOL for the region, varying by state, without specifying either those amounts or which state the shepherd will be hired in; and (b) not be able to transfer or relocate at will. The shepherd does not learn in which state WRA will place him until later. TAC ¶¶ 134-135. Assuming the truth of these allegations, as the court must, these documents support Plaintiffs' more general allegations that WRA sets the offered wage at the minimum and seeks to exploit foreign shepherds' immigration status. However, as discussed above, in the H-2A regulatory system, neither of those facts suggests that WRA agreed with anyone to fix wages. *See supra* at § II.A.

    *2.    WRA Handbook for Members*

Plaintiffs also add allegations that in WRA's handbook for members, WRA directs them to pay only the minimum wage. TAC at ¶¶ 137-142; Doc. #139-11, Ex. F at pp. 5-7.

> 141. The WRA handbook similarly establishes that members will use the minimum wage as the rate they use to pay to their shepherds. This is evident in part from how the handbook treats the issue of shepherd paid vacation time.

> 142. All WRA contracts establish that an H-2A shepherd is entitled to two weeks of vacation pay, *id.* at 6, and the WRA handbook establishes that "[i]f a herder is terminated[,] the herder must be paid full wages due on date of termination including, ***at the current rate of pay***, any unpaid vacation," *id.* at 7 (emphasis added). The only rate of pay that the handbook could be referring to is the salary schedule with the DOL-set wage floor, as this is the only rate of pay referenced in the entirety of the member handbook.

---

[15] Plaintiffs refer to this document, Doc. #139-11, Ex. F at pp. 3-4, as both an attestation and as WRA's form contract with shepherds. TAC at *e.g.,* ¶¶ 127-135, 246(iv), 247(iv). The court presumes both allegations to be true at this phase.

TAC at ¶¶ 141-42 (emphasis original in TAC).  This document concerns *paid* wages, not offered

wages.  Plaintiffs do not articulate how an instruction to members regarding paid wages would

support the alleged agreement to fix the wages offered.  Assuming that the WRA handbook

indirectly relates to offered wages, immediately following the sentence that Plaintiffs quote,

WRA provides a "Wage Rate – 2010/2011" table in which WRA states: "Plus room and board is

supplied FREE to all sheepherders in ADDITION to the full salary paid (*no less than the*

*minimum stated above)*."  Doc. #139-11, Ex. F at p. 7 (emphasis added).  Thus, the handbook

recognizes that the wage rates stated therein are only minimums, and that ranches can pay above

those rates.  It neither instructs nor requires the ranches to offer or pay only the minimum wage,

and therefore adds no plausibility to the alleged conspiracy.

3.     *WRA's January 2015 Email to Oregon Members*

As in the SAC, Plaintiffs continue to quote a sentence from a January 2015 WRA email

to its Oregon members that the court addressed in the Recommendation.  Doc. #125 at pp. 26-27.

> [I]n January 2015, the WRA instructed its members in Oregon to uniformly begin
> paying exactly the new DOL wage floor: "[B]eginning January 1, 2015 the wage
> rate for shepherds working in Oregon is $1,326.46."  You "should immediately
> adjust your wage payments to [that] monthly wage amount."

TAC at ¶¶ 102, 150 (compare SAC ¶¶ 99).  Plaintiffs do not attach the email.

The quoted sentence informs the ranches of "the [new] wage rate" in Oregon and that

they should adjust their "wage payments" accordingly.  Again, Plaintiffs do not articulate how an

instruction from WRA regarding *paid* wages would support the alleged conspiracy to fix *offered*

wages.  Even assuming that this email indirectly relates to offered wages, Plaintiffs allege that

WRA (on behalf of its members) always offered no more than the minimum wage to shepherds.

TAC at *e.g.,* ¶¶ 7(i), 70, 93.  Plaintiffs allege that in Oregon, WRA actually offered less than the

minimum wage because it made impermissible deductions from the minimum wage. *Id.* at ¶¶ 7(iv), 145. Plaintiffs do not identify WRA as having paid shepherds above the minimum wage, nor as having knowledge (when it sent the email) that any of its Oregon members had done so. Contrast this to Plaintiffs' allegation that MPAS knew that some of its members at times paid above the minimum wage. TAC at ¶ 183, doc. #139-12 at pp. 114-116; *see supra* at § II.B. Given this context, the court cannot reasonably infer from the quoted sentence that WRA instructed its Oregon members to offer only the minimum wage, let alone that any of the members agreed with such a directive. *See* Recommendation at pp. 26-27.

    *4.    WRA's January/February 2015 Emails with Oregon State Agencies*[16]

Plaintiffs add allegations that in January and February 2015, WRA's counsel exchanged several emails with representatives of the Oregon Employment Department and the Oregon Bureau of Labor and Industries. In the correspondence, WRA's counsel seeks a meeting to advocate its position regarding deductions from shepherds' wages for food and private benefits. TAC at ¶ 153; Doc. #139-11, Ex. F at pp. 8-14. Plaintiffs allege that WRA had instructed Oregon members to pay less than the minimum wage that they had offered, by deducting food and private benefits, and that the Oregon members did pay less than the minimum wage. TAC ¶ 150-152. Plaintiffs allege that this correspondence shows "member ranches in Oregon are aware of [WRA's violation of Oregon law regarding the minimum wage and what can be deducted] and complicit in, the WRA's fixing of wage offers." TAC at ¶ 155.

Again, these allegations and the correspondence in question regard *paid* wages, not offered wages. Plaintiffs do not articulate how an instruction from WRA regarding paid wages

---

[16] Plaintiffs also attach two sets of comments filed by WRA and/or MPAS in DOL rulemaking proceedings. Doc. #139-11 at pp. 17-56, #139-12 at pp. 117-61. Plaintiffs allege those comments only with respect to other issues, not as factual support for the alleged conspiracy. TAC at ¶¶ 160, 240, 316-19. The court expressly does not reach whether any of the communications with government agencies are subject to immunity doctrines.

would support the alleged conspiracy to fix offered wages.  Assuming that the correspondence indirectly relates to offered wages, neither the TAC nor Plaintiffs' motion makes clear how Plaintiffs believe the correspondence supports the alleged conspiracy.  Plaintiffs apparently refer to a sentence in WRA's email dated February 3, 2015, in which counsel says that "[s]ome of the Oregon WRA members will want to participate in this discussion [between WRA's counsel and the Bureau of Labor and Industries] since they are the employers who will have to comply with the final outcome of our discussions."  Doc. #139-11, Ex. F at p. 11.

Even assuming that Plaintiffs are correct that WRA and its Oregon members had violated the state's rules regarding deductions, WRA's efforts to obtain a meeting with the state agency to discuss the deductions policy does not suggest an agreement to fix wages.  It is equally or more likely to arise from WRA's role for its members under the H-2A program.  That the members wanted to participate in the meeting with the state agency also does not suggest an agreement to fix wages; it is equally likely to arise from parallel decisions to exercise their right to petition.  Thus, the court cannot reasonably infer from WRA's emails to the Oregon state agency that WRA had agreed with its members to fix offered wages.  *See, e.g., Khalik v. United Air Lines,* 671 F.3d 1188, 1191 (10th Cir. 2012) (when allegations "encompass a wide swath of conduct, much of it innocent, then the plaintiffs have not nudged their claims across the line from conceivable to plausible.").

     *5.     MPAS's January 2015 Email to Oregon Members*

Plaintiffs allege that in January 2015, MPAS emailed its Oregon members "regarding the Oregon minimum wage, communicating that 'the mandated wage is $1603.33/month plus housing,' [Ex. F] at 15, though Plaintiffs will need discovery to determine if Defendant MPAS

has fixed the wage below the minimum in a manner similar to Defendant WRA." TAC at ¶ 158.

The lengthy paragraph from which Plaintiffs take their quote reads:

> Wage Change in Oregon!: On Friday, December 26, 2014 the Oregon State Workforce announced: "The Oregon Employment Department (OED) has determined that it has been calculating the minimum wage for sheepherders and livestock workers incorrectly under Oregon's minimum wage laws. Both the Oregon Bureau of Labor and Industries (BOLI) and U.S. Department of Labor (USDOL) have informed OED that the minimum wage laws generally apply to all livestock workers, and USDOL has informed OED that it must notify all affected employers of this change in its enforcement of the H-2A program.... Under 20 Code of Federal Regulations § 655.122(1) and 20 CFR § 655.120(a), an employer, in its job offer, must offer, advertise, and pay "a wage that is the *highest* of the Adverse Effect Wage Rate, the prevailing hourly wage or piece rate, the agreed-upon collective bargaining wage, or the Federal or State minimum wage, except where a special procedure is approved for an occupation or specific class of agricultural employment." Furthermore, under 20 CFR § 655.135(e) and 20 CFR § 653.501(d)(2)(xii), an employer submitting a job order must certify that it will comply with all applicable state laws. This includes state laws governing the minimum wage... Therefore, OED may not approve a job order for workers engaged in the range production of livestock unless the worker would be paid either (1) an hourly wage that was at least equal to the Oregon minimum wage (and otherwise complied with the requirements of 20 CFR part 655) or (2) a salary that, on a monthly basis, equaled the minimum wage multiplied by 2,080 hours and divided by 12... If the offered wage does not comply with Oregon's minimum wage laws, OED must reject the job order... Our office will implement this change January 1, 2015 on any current and future job listings posted within our iMatchSkills system." Based on this announcement as of January 1, 2015 the wage for both Open Range Livestock Workers and Sheepherders in the state of Oregon is $1603.33/month plus housing. MPAS is looking into this matter and we will keep you up to date if things change, but as of 1/1/15 the mandated wage is $1603.33/month plus housing.

Doc. #139-11, Ex. F at p. 15. Plaintiffs focus on the last sentence's phrase "the mandated wage" to allege that MPAS directed members to offer only the minimum wage. TAC at ¶ 158.

Essentially, Plaintiffs read the "mandated wage" as referring either to a wage mandated by MPAS, or as misinforming the members that the minimum wage was both a floor and a ceiling. In the context of the complete paragraph, however, the court cannot reasonably infer either reading. The paragraph advises members regarding compliance with the minimum wage

mandated by DOL and the Oregon Employment Department, not by MPAS. The paragraph uses the phrase "minimum wage" eight times and specifies that the job order must be "*at least* equal to the Oregon minimum wage." Doc. #139-11, Ex. F at p. 15 (emphasis added). Taking the paragraph as a whole, the court cannot reasonably infer that MPAS instructed or required its Oregon members to offer only the minimum wage.

D.      *The Equilibrium Wage for Shepherds*

In their briefing, Plaintiffs also argue that their allegations of higher payments to foreign shepherds show the "equilibrium wage" is above the offered minimum wage. Doc. #139 at p. 3; Doc. #152 at p. 8. Plaintiffs define the equilibrium wage as the wages that shepherds would earn but for the Defendants' conspiracy to fix wages. On this issue, Plaintiffs' motion reads more like a motion to reconsider the Recommendation than a motion to amend the SAC. Plaintiffs argue that in the Recommendation, this court erroneously assumed the equilibrium wage was below minimum wage and ignored the allegations that other ranch workers earn far more than the minimum wage for H-2A shepherds. Doc. #139 at p. 4. Judge Blackburn has already adopted the Recommendation in the meanwhile, thus mooting this argument.[17]

From Plaintiffs' new allegations, the court can reasonably infer in their favor that at least some H-2A shepherds are paid above the minimum wage because (a) the minimum wage is too low to reflect the value of shepherds' experience, (b) ranches are reacting to other market forces, (c) the ranches' views of fairness, etc. This does not, however, reasonably infer an "equilibrium wage" as Plaintiffs have defined it because Plaintiffs have not alleged a plausible conspiracy to cause the difference between offered wages and paid wages. As noted above, the case on which

---

[17] In the SAC, Plaintiffs alleged that H-2A shepherds were uniformly offered and paid no more than the minimum wage. The reasonable inference from those allegations was that the minimum wage had always sufficed for filling Defendants' jobs, regardless that other types of ranch workers earned more. Recommendation at pp. 6, 29, 32.

Plaintiffs rely held that transactions based on a list price do not in themselves show more than independent, parallel decisions. *High Fructose,* 295 F.3d at 656. This fact is too weak to find the conspiracy plausible.

For the equilibrium wage, Plaintiffs also point to allegations that shepherds and other farm or ranch workers in states where WRA and MPAS do not control hiring are paid far more than the minimum wage. TAC at ¶¶ 229-37. As support, Plaintiffs attach DOL prevailing wage surveys in ND and TX. Doc. #139-11, Ex. F at pp. 83-90; Doc. #139-12, Ex. F at pp. 91-113. But Plaintiffs do not allege that these other farm or ranch workers are subject to H-2A regulations. On their face, the DOL wage surveys regard specifically U.S. workers, not H-2A workers. *Id.* That the H-2A shepherds earn far less than other types of U.S. ranch workers is equally explainable by the H-2A rules that set the minimum wage for H-2A shepherds, while the wages for other, similar U.S. ranch jobs were not set under the H-2A rules. This fact is too weak to make the alleged wage fixing conspiracy plausible.

E.      *Director/Officer Overlap Between WRA and Members.*

Plaintiffs would add allegations that two members of WRA have officer ties to WRA: Dennis Richins (owner of Richins Livestock) was formerly a president of WRA's board and executive director of WRA. Steve Raftopolous, an officer of Two Bar, was a formerly a president of WRA's board. Plaintiffs allege that both men are "intimately familiar with the policies of the association," and had "frequent conversations with the rest of the WRA Board regarding various items affecting members, including lawsuits filed over shepherd wages." TAC at ¶¶ 248(ii), (iii); 250(ii), (iii). In Plaintiffs' motion to amend, they appear to refer to these allegations in asserting that "the Ranches in particular have had extensive control over the Associations." Doc. #139 at p. 7.

The reasonable inferences from the overlapping officers and directors are that these two Ranch Defendants knew of and could have established WRA's practice of uniformly offering the minimum wage to shepherds for WRA's members. However, as noted above, Plaintiffs have not alleged any facts that WRA ever made that practice mandatory for its members. *Compare Osborn,* 797 F.3d at 1067 (the "member banks appointed representatives to the … associations' Boards of Directors, which in turn established the anticompetitive  … rules" that required anticompetitive conduct). Plaintiffs do not allege any specific meetings, discussions, statements, or communications of these two individuals that would suggest they did anything as former officers or directors of WRA to create or implement a wage fixing conspiracy.

In short, taking all of Plaintiffs' antitrust allegations together as the court did in the overview section, these allegations do not sum up to a plausible conspiracy to fix offered wages. Rather, the documents attached to the TAC contradict the conspiracy as to MPAS, Auza and Two Bar's offers to domestic shepherds. As in the SAC, individual parallel actions under the unique influence of the DOL regulatory scheme are more likely explanations for all of the alleged concerted conduct. Thus the proposed amendment would (a) be directly akin to the claims that *Twombly* found did not allege a plausible conspiracy and (b) contrast to the allegations of direct and circumstantial fact allegations that made antitrust conspiracies plausible in for example *Beltran,* 176 F. Supp. 3d at 1079*, Champagne Metals,* 458 F.3d at 1086-87, and the other cases cited in the Recommendation. Accordingly, for the same reasons the court found in the Recommendation regarding the SAC, the court finds that Plaintiffs' proposed amendment to their antitrust claims is futile. The court recommends denying the motion to amend as to the antitrust claims.

*III.*     *Civil Racketeering Influenced and Corrupt Organizations (RICO) Claims*

The Recommendation discusses in detail the allegations and claims that Plaintiffs (specifically, Messrs. De La Cruz, Huaman, Leovegildo Vilchez Guerra, and Liber Vilchez Guerra) pled in the SAC for their civil RICO claims against WRA, Richins and MPAS. Doc. #125 at pp. 34-41. In short, "[t]he elements of a civil RICO claim are (1) investment in, control of, or conduct of (2) an enterprise (3) through a pattern (4) of racketeering activity." *Dewey v. Lauer,* No. 08-cv-01734-WYD-KLM, 2009 WL 3234276, at *3 (D. Colo. Sep. 30, 2009) (internal quotation marks omitted, quoting *Tal v. Hogan,* 453 F.3d 1244, 1261 (10th Cir. 2006)). Plaintiffs' SAC attempted to bring two claims for violations of RICO, both of which failed for lack of distinctiveness between the "person" who allegedly operated the "enterprise" and the alleged enterprise. Count IV against WRA and Richins failed because Plaintiffs pled Mr. Richins and the WRA as both the persons and enterprises. Count V against MPAS failed because it pled an association in fact between MPAS and its members – but alleged only the usual business that MPAS conducted on behalf of its members. Recommendation at pp. 36-41.

The court will first address the aspects of proposed Counts IV, V and VI in which Plaintiffs have not changed their theories of "persons" and "enterprises." Plaintiffs continue to allege that Richins as a former director and officer of WRA associated in fact with WRA. TAC at ¶ 256. This claim is futile. In their Notice of Supplemental Authority and Reply, Plaintiffs rely heavily on the Tenth Circuit's recent reversal of one of the cases cited in the Recommendation, *George v. Urban Settlement Servs.,* No. 13-cv-01819-PAB-KLM, 2014 WL 4854576, at *8 (D. Colo. Sep. 30, 2014). The Recommendation quotes *George's* reasoning that officers of a corporation acting within that role cannot form an association of fact with the corporation. Doc. #125 at p. 38. The Tenth Circuit did not reverse this aspect of *George*, and to the contrary, continues to recognize that "officers and employees of an organization cannot, in

the ordinary course of their duties, constitute an association in fact separate from the organization itself." *George v. Urban Settlement Servs.,* 833 F.3d 1242, 1249 (10th Cir. 2016) (quoting, as did the Recommendation, *Bd. of Cty. Comm'rs of San Juan Cty. v. Liberty Grp.*, 965 F.2d 879, 886 (10th Cir. 1992)).

For Counts IV and VI against respectively WRA and MPAS, these claims continue to assert each enterprise is an association in fact between the Associations and their members. The law has not changed on this issue: pleading the usual business between an association and its members fails the distinctness element. *Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local,* 883 F.2d 132, 141 (D.C. Cir. 1989), *rev'd in part on other issues on rehrg,* 913 F.2d 948, 956 (D.C. Cir. 1990) (*en banc*). "[I]f an entity is named as a defendant in a RICO action, the enterprise it participates in cannot merely be a reframing of the same entity that is the target of the indictment." *United States v. Mongol Nation*, 132 F. Supp. 3d 1207, 1219 (C.D. Cal. 2015), *appeal pending* (citing *Yellow Bus,* the alleged association in fact between an unincorporated gang's "leadership and official membership" and its circle of unofficial members and hang-arounds was insufficient because "[t]here is simply no substance to the [alleged] … enterprise independent of [the Defendant]." *Id.* at 1221.

Again, Plaintiffs' reliance on the Tenth Circuit's *George* opinion as a purported change in the law is misplaced. *George* does not address a claim alleging an association of fact between an association and its members. The case recognizes that "associations in fact" among corporations that are already related to each other – parents and subsidiaries for instance – typically fail for lack of distinctiveness: "[I]t's true that a defendant corporation, acting through its subsidiaries, agents, or employees typically can't be both the RICO 'person' and the RICO 'enterprise.'" *George,* 833 F.3d at 1249 (citing *inter alia Brannon v. Boatmen's First Nat. Bank of Oklahoma,*

153 F.3d 1144, 1149 (10th Cir. 1998); *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 493 (6th Cir. 2013)).  The Tenth Circuit also noted that "because 'an employer and its employees cannot constitute a RICO enterprise,' a 'manufacturer plus its dealers and other agents (or any subset of the members of the corporate family) do not constitute' a RICO enterprise."  *George*, 833 F.3d at 1249 (quoting *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 226–28 (7th Cir. 1997)).

As the Recommendation noted, all of these cases must be read in light of the purpose of RICO: to "prevent a person from victimizing, say, a small business … or to prevent a person from using a corporation for criminal purposes."  *Cedric Kushner*, 533 U.S. at 162.  Plaintiffs here instead essentially allege that WRA or MPAS (as the "persons" sued in these claims) used themselves (*i.e.,* their status as industry associations acting on behalf of their members) for criminal purposes.  Because they lack distinctness, Counts IV and VI are accordingly futile.

However, in Count V against Mr. Richins, Plaintiffs plead in the alternative that Richins is the person who operated WRA as the enterprise.  TAC at ¶ 257.  This claim does not appear to be futile for lack of distinctiveness between the person and enterprise.  "The corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status."  *Cedric Kushner,* 533 U.S. at 163.  *See also Ad-X Int'l, Inc. v. Kolbjornsen,* 97 F. App'x 263, 266–67 (10th Cir. 2004) (applying *Cedric Kushner*, individual debtor as RICO person alleged to have used his bankruptcy estate as a RICO enterprise was sufficiently distinct); *Mongol Nation*, 132 F. Supp. 3d at 1218 ("an individual employee or officer may always be named as the RICO person distinct from the corporate enterprise"); *ClassicStar,* 727 F.3d at 492 ("individual defendants are always distinct from corporate enterprises"); *N. Star Gas Co. v. Pac. Gas & Elec. Co.,* No. 15-cv-02575-HSG, 2016 WL 5358590, at *20-21 (N.D. Cal. Sep. 26, 2016) ("no question that the RICO Act

proscribes employees from using their jobs as a vehicle to conduct a racketeering enterprise"). It may strike a savvy judge that proof of Richins operating WRA as a RICO enterprise is improbable (*Sanchez,* 810 F.3d at 756), but Plaintiffs sufficiently allege Richins as a RICO person distinct from WRA as the enterprise.[18]

Richins' other arguments of futility regarding the RICO claim are not persuasive. Richins argues that Plaintiffs do not allege racketeering activity. Doc. #148 at pp. 15-17.

> As defined in 18 U.S.C. § 1961(1)(B), "racketeering activity" includes indictable acts of mail and wire fraud as prohibited under 18 U.S.C. §§ 1341 and 1343, respectively. To establish a pattern of racketeering activity, the plaintiffs must allege at least two predicate acts. *See* 18 U.S.C. § 1961(5).

*George*, 833 F.3d at 1254. Plaintiffs allege that through WRA, Richins engaged in predicate acts of wire fraud and mail fraud, submitting job orders to state workforce agencies and H-2A Applications to DOL that falsely certified compliance with requirements regarding shepherds' expense reimbursement. TAC at ¶¶ 257-61, 275-79, 283-96, Count V. Plaintiffs allege that a regulation required reimbursement of all travel expenses (beginning from the H-2A worker's hometown), medical checkups, and criminal background checks. TAC at ¶ 460.

Mr. Richins argues that DOL regulations do not require reimbursement of any expenses incurred before leaving the home country ("pre-departure" expenses). Doc. #148 at pp. 16-17. Richins quotes the DOL's preamble to the 2010 version of 20 C.F.R. § 655.122 as announced in *Temporary Agricultural Employment of H-2A Aliens in the United States*, 75 Fed. Reg. 6884 (Feb. 12, 2010):

> Enhanced Coverage of Transportation Expenses

---

[18] *See also N. Star,* 2016 WL 5358590, at *21 ("It is true that private civil actions under the state are being brought almost solely against legitimate defendants, rather than against the archetypal, intimidating mobster. Yet this defect – if defect it is – is inherent in the statute as written, and its correction must lie with Congress," quoting *Odom v. Microsoft Corp.,* 486 F.3d 541, 553 (9th Cir. 2007)).

> Under the 2008 Final Rule, the employer provides for travel expenses and
> subsistence for foreign workers only to and from the appropriate U.S. consulate or
> port of entry. Under this Final Rule, the employer is required to pay the costs of
> transportation from the worker's place of recruitment to and from the place of
> employment.

Doc. #148 at p. 17 (quoting 75 Fed. Reg. at 6884-01).  This does not support Richins' argument.

Rather, the quoted excerpt itself says that DOL extended its former rule to encompass

"transportation from the worker's place of recruitment."  The rule further specifies: "the

employer must pay the worker for reasonable costs incurred by the worker for transportation and

daily subsistence *from the place from which the worker has come to work for the employer*,

whether in the U.S. or abroad to the place of employment."  20 C.F.R. § 655.122(h)(1) (emphasis

added).  Finally, Richins does not address Plaintiffs' contention that the same DOL

pronouncement also:

> noted that this was a new cost to be incurred by employers and that it would, on
> average cost an employer $60 more in transportation costs, which is the average
> cost of a roundtrip bus ticket between the hometown of an H-2A worker and the
> location of the majority of American consulates that process H-2A visas. *Id*. at
> 6,954 & n.47.

TAC at ¶ 308.  The court cannot find from Richins' response that as a matter of law DOL does

not require reimbursement of travel expenses from the worker's hometown.  At this point, the

court cannot conclude that pre-departure travel expenses are not required reimbursements under

Section 655.122(h)(1).[19]

    As to the medical checkup and criminal background check expenses, this is a closer call.

Plaintiffs have the burden under Rule 9(b) to plead fraud with particularity.  Plaintiffs allege that

---

[19] Richins also argues that circuits have differed regarding whether the Fair Labor Standards Act
("FLSA") requires reimbursement of "transportation costs for the departure."  Doc. #148 at p.
17.  However, Plaintiffs do not allege that WRA misrepresented compliance with the FLSA. The
FLSA also does not immunize WRA from the H-2A requirements but rather "applies
independently of the H–2A requirements and imposes obligations on employers regarding
payment of wages."  20 C.F.R. § 655.122(h)(1).

WRA's certification of compliance with 20 C.F.R. § 655.122 is fraudulent in part because WRA did not intend to pay the medical checkup and background check expenses. However, the only expenses for which the rule expressly requires reimbursement are "transportation and daily subsistence." 20 C.F.R. § 655.122(h)(1). In their reply brief, Plaintiffs point instead to 20 C.F.R. § 655.122(p). This subsection in relevant part limits "deductions from the worker's paycheck" to those that are "reasonable," including that "an employer subject to the FLSA may not make deductions that would violate the FLSA." 20 C.F.R. § 655.122(p)(1), (2). Plaintiffs assume that for purposes of this rule, a failure to reimburse is the same as a deduction. Richins' response does not address this question. Nor does it appear that the Defendants' motions to dismiss the SAC addressed this question. In the absence of briefing on whether DOL has offered interpretive guidance, the court cannot conclude that Section 655.122(h)(1) does not require reimbursement of Plaintiffs' medical check-up and background check expenses.

Richins also argues that the claim fails to allege predicate acts because the job orders and H-2A applications were wired or mailed to government agencies, and government approvals of those applications are not property or money. Doc. #148 at p. 20. "To establish the predicate act of mail fraud, [a plaintiff] must allege (1) the existence of a scheme or artifice to defraud or obtain money or property by false pretenses, representations or promises, and (2) use of the United States mails for the purpose of executing the scheme." *Tal,* 453 F.3d at 1263 (internal quotation marks omitted). "The elements of wire fraud are very similar, but require that the defendant use interstate wire, radio or television communications in furtherance of the scheme to defraud." *Id.* (quotation omitted). *See also Dewey v. Lauer,* No. 08-cv-01734-WYD-KLM, 2009 WL 3234276, at *3 (D. Colo. Sept. 30, 2009).

Richins' argument fails.  Plaintiffs do not allege that Richins operated WRA to deprive government agencies of money or property; they allege that Richins operated WRA to deprive Plaintiffs of money through misrepresentations to the government agencies.  TAC at Count V.  Civil RICO claims do not require that the predicate act be directed to the same person whom the defendant intends to deprive of property or money.  *Bridge v. Phoenix Bond & Indemnity Co.,* 553 U.S. 639, 643 (2008).  "The gravamen of the offense is the scheme to defraud, and any mailing that is incident to an essential part of the scheme satisfies the mailing element," even if the mailing itself "contain[s] no false information," and "even if no one relied on any misrepresentation."  *Bridge*, 553 U.S. at 647-48 (citation and quotation marks omitted).  The only limitation on this principle is that the victim's injury must "not [be] derivative of someone else's."  *Phoenix Bond & Indem. Co. v. Bridge,* 477 F.3d 928, 932 (7th Cir. 2007), *aff'd, Bridge,* 553 U.S. 639.  *See also CGC Holding Co., LLC v. Broad & Cassel,* 773 F.3d 1076, 1088-89 (10th Cir. 2014) ("[D]espite its usefulness as a stand-in for causation, strict first-party reliance is not a prerequisite to establishing a RICO violation").  Giving the TAC reasonable inferences, Plaintiffs allege that WRA's scheme of false certifications injured no one but Plaintiffs.  In short, to the extent Count V alleges Mr. Richins as the person who operated WRA as a RICO enterprise (TAC at ¶ 257), filing the TAC to bring this claim is not futile.

Nor does Richins show any other reason under *Foman* to deny Plaintiffs' motion to file this amended claim.  Richins argues that because (a) Plaintiffs failed to cure deficiencies in previous amendments, (b) his consent to Plaintiffs' request to file the SAC was with the understanding that it would be Plaintiffs' last, and (c) Plaintiffs' several amendments already resulted in three rounds of Rule 12 motions, incurring further attorneys' fees in this case would be unduly prejudicial.  In light of Judge Blackburn's September 6, 2016 order that rejected this

court's recommendation to dismiss the claims with prejudice because the SAC was already Plaintiff's third complaint, the court does not find the failure to cure or undue prejudice warrant denying the motion.

> Defendants' undue delay argument has more substance but ultimately is not persuasive.
>
> This Circuit … focuses primarily on the reasons for the delay. We have held that denial of leave to amend is appropriate when the party filing the motion has no adequate explanation for the delay.

*Minter v. Prime Equip. Co.,* 451 F.3d 1196, 1205–06 (10th Cir. 2006) (internal quotations and footnotes omitted). "[C]ourts have denied leave to amend where the moving party was aware of the facts on which the amendment was based for some time prior to the filing of the motion to amend," or "when it appears that the plaintiff is using Rule 15 to make the complaint 'a moving target.'" *Id.* at 1206 (footnote and internal quotations omitted).

Here, Plaintiffs argue that their timing is justified because they could not anticipate that the court would "misperceive the nature of this claim." Doc. #139 at p. 15. This argument ignores that all of the cases the Recommendation cites on this issue (doc. #125 at pp. 37-38) predate the SAC.[20] Plaintiffs' multiple rounds of amendments were inefficient for the court and parties alike. Shortly after Plaintiffs filed this action, Rule 1 was amended to "emphasize that just as the court should construe and administer these rules to secure the just, speedy and inexpensive determination of every action, so the parties share the responsibility to employ the rules in the same way." Fed. R. Civ. P. 1, 2015 Advisory Committee Note. It is difficult to see how Plaintiffs' approach has been consistent with that responsibility. However, there is no trial date set, and the parties have proceeded in the meanwhile with at least some discovery. Under the circumstances, Plaintiffs "ought to be afforded an opportunity to test [their] claim on the

---

[20] It further appears that Plaintiffs' counsel should have known already many of the facts that they propose to add as relevant to this claim, such as the specific amounts of unreimbursed expenses. TAC at ¶¶ 302-331.

merits." *Foman*, 371 U.S. at 182. The court will not find that Plaintiffs' delay was so undue as to warrant denying Plaintiffs' request to bring the amended RICO claim against Richins.[21]

In sum, the court recommends denying the motion to amend as to the RICO claims in Counts IV and VI, and Count V to the extent it is based on Richins as an association in fact with WRA (TAC at ¶ 256). The court grants the motion to amend as to Count V based on Richins as the person operating WRA as the enterprise.

IV.    *The State Law Claims*

In the TAC, Plaintiffs propose to bring four state law claims, three of which they also pled in the SAC. Two of the four proposed state law claims brought by Plaintiff de la Cruz against MPAS allege that MPAS violated the Nevada minimum wage statute by failing to pay him (and a putative class) the minimum wage. TAC at Count VII. Plaintiff de la Cruz further alleges that the same conduct also breached contract, quasi-contract or equitable principles. *Id.* at Count X. As the court will further address by separate order, Plaintiffs recently filed an unopposed motion to sever and transfer Count VII (of the TAC, formerly Count VI of the SAC) to the District of Nevada. Doc. #156. Plaintiffs describe Count VII as regarding a "different course of conduct" than the other claims. Doc. #156 at p. 1. Plaintiffs request severance and transfer of this claim to the District of Nevada, where another plaintiff has filed a putative class action regarding the same claim against MPAS (among other defendants), *Castillo v. Western*

_____

[21] If the court did not find the proposed antitrust claims to be futile, Plaintiffs' delay in seeking to amend those claims would likewise give the court some pause. Plaintiffs assert that they are reacting to new theories raised recently by the Defendants and are adding facts obtained from discovery. Doc. #139 at 2; Doc. #152 (Reply) at 2. Yet, Plaintiffs were aware when they filed their earlier complaints that Defendants at times paid three of the Plaintiffs more than the minimum wage. TAC at ¶¶ 217, 221, 222. Plaintiffs also knew (or should have known) that the MPAS job orders attached to the SAC varied regarding the compensation offered, and other facts that they propose to add for these claims: MPAS's contract, doc. #139-11, Ex. F at p. 2; and WRA's affidavit, *Id.* at p. 3. However, this is not entirely clear from the TAC's attachments. For instance, the affidavit that Plaintiff Leovegildo Vilchez Guerra signed for WRA is BATES stamped, but the TAC does not state who produced the document. Doc. #139-11, Ex. F at p. 3.

*Range Association, et al.,* Civ. 16-237-RCJ-VPC. *Id.* at 2. However, Plaintiffs did not seek to sever or transfer Mr. de la Cruz's proposed, new claim regarding the same conduct under Nevada common law: Count X, entitled breach of contract, quasi-contract or equitable relief for failure to pay the Nevada minimum wage.

Procedurally, it appears that the court must first give leave for Plaintiffs to file the TAC before the court can sever and transfer Count VII. Consistent with the Recommendation, Judge Blackburn declined to exercise supplemental jurisdiction over the SAC's state law claims (including the now Count VII), albeit without prejudice to Plaintiffs' motion to amend the SAC. In their motion to sever and transfer, Plaintiffs do not address whether the court can sever and transfer a claim in such a posture. Moreover, until the TAC is accepted, Plaintiff de la Cruz has not yet brought Count X. From a judicial economy perspective, it would make little sense to address severance and transfer of Counts VII and X separately. Therefore, the court proceeds here with Plaintiffs' motion to file the state law claims that they propose in the TAC. The court will address the motion to sever and transfer by subsequent, separate order(s).

Defendants do not address whether they believe any of the proposed state law claims would fail under Rule 12(b)(6). Defendants' previous motions to dismiss argued that the three existing state law claims failed because Plaintiffs had not pled sufficient facts regarding their contracts and the amounts for which Plaintiffs assert WRA and MPAS owe them reimbursement. In the TAC, Plaintiffs add fact allegations regarding both. TAC at ¶¶ 332-347. None of the state law claims, Counts VII-X, appear to be futile.[22] With respect to undue delay in seeking leave to

---

[22] The court has supplemental jurisdiction over the state law claims because they are "so related" to the RICO claim against Richins that "they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Count VIII regards the same facts as the RICO claim under common law theories. Count IX regards MPAS's same alleged illegal deductions from a different Plaintiff, Mr. De La Cruz. Counts VII and X regard rather

amend these claims, as noted above Plaintiffs' counsel should have been aware of the facts regarding their contracts and unreimbursed expenses that they now seek to add. The court will not look with favor on any further motions to amend the complaint, but Plaintiffs have leave to file the state law claims.

CONCLUSION

For the foregoing reasons, the court RECOMMENDS denying in part and GRANTS in part Plaintiffs' motion to file the TAC as follows. The court RECOMMENDS that the motion to file amended complaint be DENIED as to Counts I-IV, V (in part, as described above regarding ¶ 256 asserting an association in fact among Richins and WRA) and VI. Amending to state those claims would be futile. With respect to Count V against Mr. Richins, the motion is GRANTED IN PART to the extent it asserts (¶ 257) Mr. Richins as the RICO "person" and WRA as the RICO "enterprise." The motion to file an amended complaint is GRANTED as to Counts VII-X.[23] The court further RECOMMENDS that after Judge Blackburn rules on any objections to this recommendation (or after the time has passed without objections), Plaintiffs should prepare and file a version of the TAC that omits all claims for which Plaintiffs do not have permission to file.

IT IS FURTHER ORDERED that within 7 days, Plaintiffs shall confer and file a motion to restrict under Local Rule 7.2 regarding docket entry #139 and its attachments.

_____

different facts (MPAS's alleged failure to pay the Nevada minimum wage) but nonetheless appear so related that they form part of the same case and controversy.
[23] All of the claims on which Plaintiff Rodolfo Llacua was named would be futile, as would all claims against the Ranch Defendants (Martin Auza Sheep Corporation, Cunningham Sheep Company, Dennis Richins Livestock, Nottingham Land and Livestock, LLLP; and Two Bar Sheep Co. LLC). This Recommendation would leave the remaining Plaintiffs to be Esliper Huaman, Leovegildo Vilchez Guerra, Liber Vilchez Guerra and Rafael de la Cruz; and the remaining Defendants would be WRA, MPAS and Dennis Richins.

DATED at Denver, Colorado, this 21st day of December, 2016.

BY THE COURT:


_s/Craig B. Shaffer_
United States Magistrate Judge