**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: 15-cv-01889-REB-CBS
RODOLFO LLACUA et al., and those similarly situated,
    Plaintiffs,
v.
WESTERN RANGE ASSOCIATION et al.,
    Defendants.

## OBJECTION TO REPORT AND RECOMMENDATION

### I. INTRODUCTION

Plaintiffs object to Magistrate Judge Shaffer's Report and Recommendation [# 158] ("R&R"), which recommends granting in part and denying in part Plaintiffs' Motion to Amend their Second Amended Complaint with a proposed Third Amended Complaint ("TAC"). [# 139] (motion to amend).

This case is brought on behalf of current and former foreign shepherds against employer sheep ranchers (sometimes "Rancher Defendants") and two associations of ranchers (sometimes "Association Defendants"). It alleges two distinct courses of misconduct on the part of Defendants: (1) an illegal agreement to restrain trade in violation of the Sherman Act by setting wages offered to foreign and domestic shepherds at the minimum wage allowable by the Department of Labor; and (2) an ongoing pattern of denying foreign H-2A shepherds reimbursements for expenses that their employers are required to reimburse under federal law, in violation of the RICO Act

and state contract law.[1] The R&R recommends, among other things, that the Court deny Plaintiffs' Motion to Amend with respect to their Sherman Act claims and deny in part their Motion to Amend with respect to their RICO claims. Plaintiffs object to both of those recommendations.

## II.  ARGUMENT

### A. <u>Antitrust Claims</u>

#### 1. The R&R Misunderstands the Framework for Determining whether an Association or Other Joint Venture Violates the Sherman

Confronted with extensive allegations regarding Association Defendants' role in recruiting and hiring foreign H-2A shepherds, the R&R denies neither that Plaintiffs have plausibly pled that Association Defendants "set[] the offered wage at the minimum" for their otherwise *competing* members,[2] R&R at 16, nor that at least some of the Rancher Defendants' are consciously committed to this scheme. R&R at 23 ("The reasonable inferences . . . are that these two Ranch Defendants knew of and could have established WRA's practice of uniformly offering the minimum wage to shepherds for WRA's members.").

The R&R nonetheless reasons that Plaintiffs have not plausibly pled an antirust conspiracy, apparently under either a *per se* or "rule of reason" theory of liability, both of which Plaintiffs' plead in the TAC. To arrive at that conclusion, the R&R reasons (1) that

---

[1] Plaintiff De La Cruz has also asserted a claim regarding "rather different facts" under Nevada minimum wage law. R&R at 33 n.22.
[2] Importantly, the R&R appears to accept that Plaintiffs have alleged *direct* evidence of this fact. R&R at 8-9. But it concludes that an association of competitors is permitted to set prices for its members.

the conduct alleged in the TAC is "equally explainable by consciously parallel decisions," R&R at 8, and (2) that association conduct does not violate the Sherman Act unless the association "requires its members" to participate in that conduct, which "generally requires showing association rules, canons or agreements that prohibit members from competing," R&R at 9. Both of those conclusions fundamentally misstate American antitrust law.

> a. Twombly *does not require that concerted conduct be the probable explanation for parallel conduct.*

In at least **seven** places, the R&R suggests that § 1 Sherman Act claims cannot withstand a motion to dismiss if the alleged conduct is "equally or more likely" the result of permissible parallel decisionmaking. *See, e.g.* R&R at 5, 7, 8, 9, 19, 22, 23. In other words, in the Magistrate Judge's view, a § 1 claim can advance to discovery only if the alleged conduct is more likely the result of illegal concerted conduct than independent behavior like conscious parallelism, or put another way, only if an antitrust violation is the **probable** explanation for the alleged conduct.

That statement of the pleading standard in § 1 cases is clear error. As the Supreme Court itself explained in *Twombly*, requiring "plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). In fact, antitrust claims may survive a motion to dismiss even when illegal conduct seems "*improbable*." *Id.* (emphasis added).

3

The R&R's apparent confusion is not entirely unprecedented. A smattering of district court opinions similarly appear to rely on an "equally or more likely" standard at the pleading stage, notwithstanding *Twombly*'s clear admonitions not to. *See, e.g.*, *SD3, LLC v. Black & Decker (U.S.), Inc.*, 2014 WL 3500674, at *5 (E.D. Va. July 15, 2014). Some appellate courts have reasoned that this sporadic confusion arises from the conflation of the motion to dismiss and summary judgment standards. *See Erie County, Ohio v. Morton Salt, Inc.,* 702 F.3d 860, 868 (6th Cir. 2012). Others have speculated that it might arise from *Twombly*'s suggestion that antitrust plaintiffs must plead something "more" than mere parallel conduct. *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 425 (4th Cir. 2015). But whatever may cause some courts to engage in a probability analysis when evaluating motions to dismiss § 1 Sherman Act claims, appellate courts have been unanimous in rejecting the approach.[3] The R&R's error on this point on its own warrants rejection of the Magistrate Judge's recommendation to dismiss Plaintiffs' Sherman Act claims.

    *b. Association Conduct*

---

[3] *See, e.g.*, *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 427 (4th Cir. 2015); *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 47 (1st Cir. 2013) ("It is also clear that allegations contextualizing agreement need not make any unlawful agreement more likely than independent action nor need they rule out the possibility of independent action at the motion to dismiss stage."); *Erie County*, 702 F.3d at 868 (6th Cir. 2012) ("At the pleading stage, the plaintiff is not required to allege facts showing that an unlawful agreement is more likely than lawful parallel conduct."); *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012) ("[T]o present a plausible claim at the pleading stage, the plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action.").

The R&R further misstates the law in discussing how and when an association of competitors violates the Sherman Act. The R&R carefully articulates the legal proposition at the core of Plaintiffs' theory—"[I]f an industry association sets the offered wage for its members, the association itself manifests the competitors' agreement to unreasonably restrain trade," R&R at 8—but then rejects that proposition based on a legal conclusion that contradicts blackletter law: "An association is [only] a vehicle for concerted antitrust activity when it ***requires*** its members to actively participate in the association's anticompetitive conduct." R&R at 9 (emphasis added).

Contrary to the R&R's novel approach, it is well accepted that associations or other joint ventures constituted by competitor members cannot set prices for those members, whether they do so through rules imposed on the members or through action taken on behalf of those members.[4] That principle is supported by several sources that Plaintiffs identified for the Magistrate Judge, including *American Needle, Inc. v. Nat'l Football League*, 560 U.S. 183 (2010). That case concerned the activities of a corporate entity (the NFLP) created and managed by the 32 NFL football teams for the purposes

---

[4] *See, e.g.*, *Texaco Inc. v. Dagher*, 547 U.S. 1, 5-6 (2006) (former competitors entering joint venture to set prices permitted only because they did not compete in the region at issue); *United States v. Sealy, Inc.*, 388 U.S. 350 (1967) (licensees engaged in concerted conduct through actions of corporate licensor in which they all owned shares); *Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 817 F.3d 934, 937 (6th Cir. 2016); *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1146 (9th Cir. 2003) (finding Sherman Act liability where corporate entity set prices for competitor shareholders); *N.Y. ex rel. Spitzer v. Saint Francis Hosp.*, 94 F. Supp. 2d 399, 413 (S.D.N.Y. 2000).

of developing, marketing, and licensing the teams' trademarks. In 2000, the NFLP declined to renew nonexclusive licenses with several manufacturers, including American Needle, and instead granted Reebok an exclusive license to manufacturer all "trademark headware for all 32 teams." *Id.* at 188. Notably, while the NFLP negotiated and entered into the license on behalf of the teams it did not ***require*** the teams to enter into the license. *Id.* at 187 ("[T]he teams are able to and have at times sought to withdraw from this arrangement."). And yet, the absence of a "rule[], canon[] or agreement[] that prohibited" the teams from negotiating a license on their own did not cause the Court any pause in deciding that American Needle had stated a plausible antitrust claim.[5]

While the R&R does not discuss the *American Needle* case in this context, it does discuss Professor Areeda's antitrust treatise, 7 P. Areeda & H. Hovenkamp, Antitrust Law ¶ 1477 (3d ed. 2006) ("Areeda").[6] As the R&R notes, Areeda explains how association rules can violate the antitrust laws by constraining member behavior. R&R at 10. But nothing in Areeda suggests that an association ***only*** violates the antitrust laws if it promulgates such rules. The focus of the discussion in ¶ 1477 of the Areeda

---

[5] The question occupying the Court was whether the NFLP constituted a "single entity" capable of conspiring with itself. *American Needle*, 560 U.S. at 188. The Court reasoned that the NFLP could serve as the focal point for a conspiracy among the teams because the teams "compete in the market for intellectual property," and thus the NFLP deprived the "marketplace of independent centers of decisionmaking." *Id.* at 199.
[6] Plaintiffs cited that treatise for the basic proposition that unreasonable restraints of trade effected by trade associations or other joint ventures necessarily trigger § 1 liability. If "a trade association's [conduct] is unreasonably anti-competitive," the conspiracy that causes antitrust liability is the "agreement creating the organization." Areeda ¶ 1477, p. 337.

6

treatise is the distinction between association's conduct on its "own" behalf (*e.g.*, an association's decision to have its annual conference in "New York rather than Missouri") and association conduct on behalf of its members (*e.g.*, setting or negotiating prices). Areeda ¶1477, p. 336-37. The question therefore is *whether* the association takes action on behalf of its members, not *how* it engages in such conduct. And as evident throughout his treatise, Areeda clearly understands that joint ventures may violate the antitrust laws through action taken on behalf of their participants, particularly where—as is the case here—those "participants are actual or potential competitors." Areeda & Hovenkamp, Antitrust Law ¶ 1478a (2010).

Finally, it is worth considering a hypothetical to illustrate the sweeping consequences that Magistrate Judge's rule would have for American antitrust law. Consider an association of the clear majority of the gas stations in Denver. Those gas stations of course compete over consumers, and that competition drives down prices to an optimal level—at the present, somewhere just above $2.00 per gallon. But there are at least two ways in which the hypothetical association could stabilize prices at $3.00 per gallon:

1. The association could create a rule saying that "members must set their prices at $3.00 per gallon." Every morning, a gas station employee, supervised by the gas station, would have to post the $3.00 price on the gas station sign pursuant to that rule. If she did not, the gas station would be expelled from the association. But because cartels profit their members, few if any gas stations would "cheat" from the association's pricing rules.

2. Alternatively, the association and the gas stations could decide that gas stations should not be involved in either the setting or posting of gas station prices. Instead of a rule requiring a certain price, the association's employees would drive around Denver each morning posting that same $3.00 price on each sign. On any given day, a gas station could decide to beat the

association to its gas station sign and post a sub-$3.00 price—just as a gas station in the first hypothetical could decide to defy the association rule and ask its own employee to post a sub-$3.00 price. But just as in the first hypothetical, most gas stations would perceive the benefits of the pricing scheme and allow the association to post the $3.00 price for them.

These two schemes are largely identical. In each case, the association sets a supracompetitive price that its otherwise-competing members might not on their own set if they were acting independently. Further, in each case, the members can theoretically *choose* to cheat from that price—in the first by refusing to post the required price and in the second by beating the association to the gas station sign. And yet, in each case, members *consciously commit* to the scheme because they know their competitors will as well. From the consumer's perspective, these schemes are identical, but under the R&R's approach, only the first is illegal. If the Court adopts that analysis, it gives competitors like the gas stations in Denver a clear blueprint for setting supracompetitive prices without violating the antitrust laws.

**2. Laws Allowing Association Defendants to "File" Job Orders and Labor Certifications Do Not License Defendants' Collusion**

The R&R further seems to reason that the fact that the Association Defendants have certain legitimate purposes—like filing H-2A applications for their members—suggests that they cannot be liable for engaging in illegal conduct—like fixing offered wages for member ranches. R&R at 12. That analysis misreads the statutes and regulations governing the H-2A program, and it ignores well-developed law regarding whether and when competitors in a heavily regulated sphere are impliedly immune from antitrust liability.

8

As for the first point, the R&R correctly quotes regulations expressly allowing trade associations to "file" job orders or labor certifications on behalf of their members. *See, e.g.*, R&R at 12 (citing 20 C.F.R. § 655.121(2)). Those provisions are consistent with Association Defendants goal of helping members navigate the administrative and technical aspects of the process for hiring foreign shepherds. But the regulations neither license nor invite the conduct alleged here, namely *setting* the wage offered by competing ranches. Returning to the gas station example, it may be permissible for individual gas stations to communicate with the association what prices they would like to offer consumers and then to ask the association to perform the physical task of posting that price on their gas station signs each morning. It would, however, not be permissible for the gas stations to ask the association to decide what price the gas station should offer consumers. In the former case, the association would be performing a technical service for its members, but in the latter, the association would be removing from the market the "independent centers of decisionmaking" that normally govern pricing decisions. *American Needle*, 560 U.S. at 199. The H-2A regulations at issue here expressly allow for the first kind of conduct, but they say nothing of the second, and there is no requirement that the Rancher Defendants delegate to Association Defendants decisions about wage offers to "participate" in an H-2A program that allows Association Defendants to "file" those wage offers.

Further, even if the Rancher Defendants' decision to delegate pricing decisions to the Association Defendants were motivated in part by a desire to "participate" in the H-2A program, that consideration would bear on Plaintiffs' antirust claims only if

9

participation in the H-2A program somehow excused the illegality of the alleged concerted conduct. On this question, the law is clear that a regulated entity is impliedly immune from Sherman Act liability only if the regulations at issue are "clearly repugnan[t]" to the Sherman Act. *Credit Suisse Sec. (USA) LLC v. Billing*, 551 U.S. 264, 275 (2007). In addressing this question, courts generally examine whether the regulatory regime provides directly conflicting guidance from the antitrust laws and whether the scheme amounts to "a substitute for antitrust regulation" by "alternative methods for supervising the regulated activity." *See, e.g.*, *Churchill Downs Inc. v. Thoroughbred Horsemen's Grp.*, LLC, 605 F. Supp. 2d 870, 881 (W.D. Ky. 2009).

The H-2A regulatory scheme is not clearly repugnant to the Sherman Act. The H-2A regulations allow Association Defendants to support their rancher members in the filing of wage offers, but they do not license the Association Defendants to set the offered wage. More importantly, however, the H-2A scheme does not purport to provide a substitute for antitrust regulation. In fact, the scheme *depends* on a free and competitive labor market to ensure that capable American shepherds are not being crowded out by foreign H-2A shepherds willing to work for substantially less. 8 U.S.C. § 1188(a)(1)(B) (H-2A authorization only appropriate where workers "will not adversely affect the wages and working conditions of workers in the United States similarly employed"). Indeed, the only case considering wage fixing as applied to the H-2A program allowed an antitrust wage-fixing claim to proceed beyond a motion to dismiss and rejected the "clear repugnancy" argument. *See Marquis v. U.S. Sugar Corp.,* 652 F.

Supp. 598, 600-601 (S.D. Fla. 1987) (citing H-2A regulations, 20 C.F.R. part 655 & Immigration and Nationality Act, 8 U.S.C. § 1101, *et seq.*)).

### 3. The Suggestion in *Some* Job Orders that The Ranches May Pay a "Bonus" Does Not Contradict Plaintiffs' Claims

The R&R further reasons that Plaintiffs' claims are undermined by the fact that some of Defendant Ranchers' job orders for domestic shepherds suggest the possibility that shepherds might be awarded "bonuses." R&R at 13.

Once again, that reasoning reflects a misunderstanding of antitrust law. As the Supreme Court explained nearly 80 years ago in *Socony-Vacuum*, "prices are fixed . . . if the range within which purchases or sales will be made is agreed upon, if the prices paid or charged are to be at a certain level or on ascending or descending scales, if they are to be uniform, or if by various formulae they are related to the market prices. They are fixed because they are agreed upon." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 222 (1940). In other words, purely parallel wage rates (whether offered or paid) are not necessary to establish antitrust liability. All that is necessary is that Plaintiffs' plausibly plead that the wage-fixing scheme restrained competing ranchers' free and independent decisionmaking regarding wage rates.[7] In plausibly

---

[7] In making this same point earlier in this litigation, Plaintiffs cited *In re High Fructose Corn Syrup Antitrust Litig.*, 295 F.3d 651 (7th Cir. 2002), in which Judge Posner similarly reasons that an agreement to fix list prices violates the antitrust laws even where actual prices vary from those list prices. *Id.* at 656. The R&R notes that this case also observed that parallel list prices do not on their own plausibly suggest a conspiracy. R&R at 14 ("[T]he fact that the sellers' list prices are the same is not compelling proof of collusion." (internal quotation marks omitted)). Plaintiffs do not take issue with that statement of the law. Parallel conduct is not enough to plead an antitrust conspiracy—whether that parallel conduct concerns list prices or paid prices. *Id.* at 15

11

pleading that Association Defendants set offered base wage rates—which are the only wage rates they are required to perform—at precisely the minimum allowable by law, Plaintiffs easily surpass that standard.[8]

### 4. The R&R's Discussion of Equilibrium Wages Reflects an Impermissible Weighing of Facts

The R&R's factual conclusion that the "equilibrium wage" for shepherds falls at or below their actual wages is inconsistent with pleading standards (and, indeed, is likely a question for the factfinder). First, although the R&R explains that Plaintiffs have plausibly pled that some Rancher Defendants pay some shepherds above the offered wage, even though that conduct appears to violate Department of Labor Rules, TAC ¶¶ 178-81, the R&R ignores the import of that allegation—that Rancher Defendants' are consciously committed to the common scheme to suppress shepherd wages while still striving to hire experienced and skillful shepherds.

Further, the R&R disregards Plaintiffs' factual allegations that similar workers performing similar work in different fields earn *substantially* more than H-2A shepherds.

---

("[O]ne manufacturer could have implemented the pricing system and its competitors could have decided independently to adopt it." (internal quotation marks omitted)). But in this case, Plaintiffs have pled far more than independent parallel conduct. They have pled that an association of competitors has set offered wages for all of those competitors.

[8] *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 427 (4th Cir. 2015) ("A plaintiff establishes parallel conduct when it pleads facts indicating that the defendants acted 'similarly.'"); *Plymouth Dealers' Ass'n of No. Cal. v. United States*, 279 F.2d 128, 132-33 (9th Cir. 1960) ("It was an agreed starting point; it had been agreed upon between competitors; it was in some instances in the record respected and followed;6 it had to do with, and had its effect upon, price.The fact that there existed competition of other kinds between the various Plymouth dealers, or that they cut prices in bidding against each other, is irrelevant.").

The Magistrate Judge reasons—once again applying an inappropriate probability standard—that the pay differential is "equally explainable" by the H-2A rules that set the minimum wage for H-2A shepherds, which do not apply to these domestic ranch hands. As Plaintiffs' have pled, however, Defendants' collusion is what allows them to consistently offer wages well below what domestic workers can accept, thus allowing association members to access the foreign shepherd labor market. TAC ¶¶ 223-37. Furthermore, in the TAC Plaintiffs also allege that workers performing *shepherd* work, for which H-2A shepherds would be eligible and to which H-2A minimum wage rules apply, earn substantially more than Plaintiffs. TAC ¶¶ 230-37. There is no difference between the work performed by Plaintiffs and the work performed by these domestic shepherds in North Dakota and Texas, and there is no difference in the legal regime regulating their hiring and pay. The only difference is that those domestic shepherds are hired through a competitive process free of cartel influence.

## B. RICO Claim

Plaintiffs also object to the R&R's recommendation that Counts IV and VI be dismissed. In those counts, Plaintiffs name Association Defendants as RICO defendants and Association Defendants together with their member-ranches as RICO enterprises. The R&R recommends dismissing the claims on distinctiveness grounds. *See* R&R at 25-6. But in so doing, the R&R misstates the law by stating, "pleading the usual business between an association and its members fails the distinctness elements." *Id.* at 25 (citing *Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local*, 883 F.2d 132, 141 (D.C. Cir. 1989)).

The R&R's formulation suffers from an obvious flaw: if the "usual business" of two otherwise distinct corporations is racketeering, it would be absurd to think that the existence of the association somehow insulates them from RICO liability. *See, e.g., In re ClassicStar Mare Lease Litigation*, 727 F.3d 473, 49 (6th Cir. 2013). The Court should instead apply the Tenth Circuit's test from *Brannon v. Boatmen's First Nat. Bank of Oklahoma,* 153 F.3d 1144 (10th Cir. 1998). *Brannon* requires a showing that the RICO "person" and "enterprise" are "functionally separate." *Id.* at 1149. That requires "allegations indicat[ing] how the relationship between [the two entities] allowed the defendant . . . to perpetrate or conceal the alleged . . . fraud." *Id.* Put another way, "the defendant corporation must be shown to use the alleged enterprise as the instrument of its criminality, and the plaintiff must plead that the alleged enterprise somehow made it easier to commit or conceal the fraud of which the plaintiff complains." *Id.* at1148.

Here, Plaintiffs allege that the associations *and* their ranches work together in a fraudulent scheme for a common purpose: "minimizing member ranches' payments to H-2A shepherds." TAC ¶¶ 263, 269. If it were not for the ranches, then, the associations would have no reason to undertake their fraudulent recruiting activities. Why recruit shepherds for no one? Further, without the ranches' complicity in the scheme—by not reimbursing shepherds along with the WRA—the scheme would fail. If either the associations or the ranches reimbursed, the actual cost of recruiting, and the

enterprise's purpose of cheaply recruiting shepherds through the fraudulent scheme, would be frustrated. *See* TAC ¶¶ 262-96.[9]

### III. CONCLUSION

For all these reasons, the Court should reject the Magistrate Judge's recommendation to deny part of Plaintiffs' Motion to Amend.[10]

Dated: January 26, 2017

Respectfully submitted,

s/David H. Seligman
David H. Seligman
Alexander N. Hood
Towards Justice
1535 High St., Suite 300
Denver, CO 80218
Phone: 720-248-8426
Fax: 303-957-2289
Email: david@towardsjustice.org
Attorneys for the Plaintiffs

---

[9] The Tenth Circuit more recently took a similarly deliberative approach in finding distinctiveness between two corporations allegedly composing a RICO enterprise in *George v. Urban Settlement Servs.*, 833 F.3d 1242, 1248-49 (10th Cir. 2016). There, the Court again acknowledged that there were relationships between otherwise legally distinct corporations that "typically" did not allow for RICO distinctiveness. *Id.* But the Court also refused to apply a bright line rule, and then, as *Brannon* teaches, probed the facts surrounding the relationship to eventually find the corporations distinct for RICO purposes. *Id.* This Court should do the same.

[10] If, however, the Court decides to adopt any of the R&R's recommendations and dismiss some of Plaintiffs' claims entirely, it should consider entering final judgment on those claims under Rule 54(b) or certifying the issue for appeal under 28 U.S.C. § 1292. Plaintiffs' antitrust claims in particular raise factual and legal issues entirely distinct from the claims that the R&R recommends allowing to progress. Additionally, dismissing Plaintiffs' antitrust claims would finally resolve all the claims asserted by Plaintiff Llacua.

## Certificate of Service

I hereby certify that on January 26, 2017, I served a true and correct copy of the forgoing on the individuals below pursuant to Fed. R. Civ. P. 5.

s/David H. Seligman
David H. Seligman
