FILED
United States Court of Appeals
Tenth Circuit

**July 16, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

RODOLFO LLACUA; ESLIPER
HUAMAN; LEOVEGILDO
VILCHEZ GUERRA; LIBER
VILCHEZ GUERRA; RAFEAL DE
LA CRUZ,

        Plaintiffs - Appellants,

v.

WESTERN RANGE ASSOCIATION;
MOUNTAIN PLAINS
AGRICULTURAL SERVICE;
MARTIN AUZA SHEEP
CORPORATION; NOTTINGHAM
LAND AND LIVESTOCK, LLLP;
TWO BAR SHEEP CORPORATION,
LLC; CUNNINGHAM SHEEP
COMPANY; DENNIS RICHINS,
D/B/A Dennis Richins Livestock,

        Defendants - Appellees.

No. 17-1113

---

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:15-CV-01889-REB-CBS)**

---

David H. Seligman (Alexander N. Hood with him on the briefs), Towards Justice, Denver, Colorado for Plaintiffs-Appellants.

James Larry Stine, Wimberly, Lawson, Steckel, Schneider & Stine, P.C., Atlanta Georgia, and Amber J. Munck, Greenberg Traurig, Denver, Colorado (Elizabeth

K. Dorminey, Wimberly, Lawson, Steckel, Schneider & Stine, P.C., Atlanta, Georgia, and Naomi G. Beer and Harriet McConnell, Greenberg Traurig, Denver, Colorado, with them on the brief), for Defendants-Appellees Western Range Association and Mountain Plains Agricultural Service.

Kenneth F. Rossman IV, Lewis Roca Rothgerber Christie LLP, Denver, Colorado, (Stacy Kourlis Guillon, Lewis Roca Rothgerber Christie LLP, Denver, Colorado; Bradford J. Axel, Stokes Lawrence, P.S., Seattle, Washington; and J. Rod Betts, Paul, Plevin, Sullivan & Connaughton LLP, San Diego, California, with him on the brief), for Defendants-Appellees Nottingham Land and Livestock, LLLP, Two Bar Sheep Corporation, LLC, Cunningham Sheep Company, and Martin Auza Sheep Company.

––––––––––––––––––

Before **HARTZ**, **MURPHY**, and **McHUGH**, Circuit Judges.

––––––––––––––––––

**MURPHY**, Circuit Judge.

––––––––––––––––––

## I. INTRODUCTION

Five Peruvian shepherds (the "Shepherds")[1] who worked in the Western

United States pursuant to H-2A agricultural visas[2] brought antitrust[3] claims, on

––––––––––––––––––

[1]Rodolfo Llacua, Esliper Huaman, Leovegildo Vilchez Guerra, Liber Vilchez Guerra, and Rafael De La Cruz.

[2]8 C.F.R. § 214.2(h)(1)(ii)(C) ("An H-2A classification applies to an alien who is coming temporarily to the United States to perform agricultural work of a temporary or seasonal nature."). H-2A visas are authorized by a program administered by the Department of Labor ("DOL") that allows for issuance of visas to foreign workers to temporarily fill positions American employers cannot fill through the domestic labor market. 8 U.S.C. §§ 1101(a)(15)(H)(ii)(a) and 1188; *see generally* 20 C.F.R. part 655, subpart B (Labor Certification Process for Temporary Agricultural Employment in the United States (H-2A Workers)).

[3]*See* 15 U.S.C. § 1 (making illegal "[e]very contract, combination . . . , or
(continued...)

behalf of themselves and similarly situated classes of shepherds, against several sheep ranchers (the "Rancher Defendants"),[4] two associations (the "Association Defendants"),[5] and Dennis Richins[6] (referred to collectively as the "Defendants"). The Shepherds alleged the Defendants "conspired and agreed to fix wages offered and paid to shepherds at the minimum DOL wage floor." The Shepherds also brought class action RICO[7] claims against Richins and the Association

---

[3](...continued)
conspiracy, in restraint of trade"). This provision is referred to as § 1 of the Sherman Act. *See* Hart-Scott-Rodino Antitrust Improvements Act of 1976, Pub. L. No. 94-435, tit. III, § 305(a), 90 Stat. 1383 at 1397; *see also, e.g.*, *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 186 (2010); *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 755 (1984).

[4]Cunningham Sheep Company; Martin Auza Sheep Corporation; Nottingham Land and Livestock, LLLP; and Two Bar Sheep Corporation, LLC.

[5]Western Range Association ("WRA") and Mountain Plains Agricultural Service ("MPAS"). These associations represent ranches in, among other things, recruiting and employing shepherds. *See generally* 29 U.S.C. §§ 1802(1), 1821, 1822; 20 C.F.R. § 655.103(b).

[6]Richins is sued in two capacities. The Shepherds bring suit against "Dennis Richins d/b/a Dennis Richins Livestock" for purposes of the complaint's antitrust claims. Thus, Richins is included within the term Rancher Defendants. The Shepherds also bring suit against Richins as a former executive director, board member, and president of WRA for purposes of one of their RICO claims. *See infra* n.7.

[7]*See* Racketeer Influenced and Corrupt Organizations Act, Pub. L. No. 91-452, tit. IX, 84 Stat. 941 (1970) (codified at 18 U.S.C. §§ 1961-1968). Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such
(continued...)

Defendants.  The RICO claims focus on allegedly false assurances made by the Association Defendants to the federal government that H-2A shepherds are being properly reimbursed for "reasonable costs incurred by the worker for transportation and daily subsistence from the place from which the worker has come to work for the employer," as required by 20 C.F.R. § 655.122.

The district court dismissed the antitrust claims on the ground the allegations in the operative complaint, the second amended complaint ("SAC"), did not plausibly allege an agreement to fix wages.  The district court dismissed the RICO claims because the SAC failed to allege the existence of enterprises distinct from the persons alleged to have engaged in those enterprises.  Thereafter, the district court denied the Shepherds' request to file a third amended complaint ("TAC").  It concluded the majority of the proposed amendments were futile.  Alternatively, the district court concluded the proposed amendments were dilatory and allowing amendment would unduly prejudice the Defendants.  The Shepherds appeal, asserting the SAC states valid Sherman Act and RICO claims and insisting the district court abused its discretion in denying their motion to file the TAC.  We agree that the district court erred in dismissing the RICO claim naming Richins as a defendant.  In all other regards, the district court is affirmed.

---

[7](...continued)
enterprise's affairs through a pattern of racketeering activity."

Thus, exercising jurisdiction pursuant to 28 U.S.C. § 1291, this court **affirms in part**, **reverses in part**, and **remands** to the district court for further proceedings.

## II. DISCUSSION

### A.  Second Amended Complaint

#### 1.  Background

##### a.  Federal Regulatory Background

The federal regulatory scheme governing the importation and employment of H-2A shepherds is set out in detail in the SAC.  Because it is necessary to an understanding of the Shepherds' antitrust claims, this court sets out the regulatory scheme at some length.

H-2A shepherds are nonimmigrant foreign nationals permitted to work temporarily in the United States under visas authorized by the DOL.[8]  The H-2A program allows for issuance of visas to foreign workers to fill agricultural

---

[8] 8 U.S.C. § 1101(a)(15)(H)(ii)(a) defines qualifying "nonimmigrant aliens" as those "having a residence in a foreign country" with "no intention of abandoning [it]," and who come to the United States "to perform agricultural labor or services . . . of a temporary or seasonal nature."  "H-2A-visa holders have no independent route to apply for permanent residency or legal citizenship. Instead, they are dependent on their visa sponsors to lawfully stay in and return to the United States for work."  *Hispanic Affairs Project v. Acosta*, 901 F.3d 378, 382 (D.C. Cir. 2018).  Once an H-2A visa issues, the immigrant worker can stay for the duration of the "validity of the labor certification or for a period of up to one year," but in no event can the stay "exceed three years."  8 C.F.R. § 214.2(h)(15)(ii)(C).  In practice, most shepherds "stay and work for just short of three years, spend three months in their home country, and then return to the United States on another H-2A visa."  *Hispanic Affairs Project*, 901 F.3d at 383.

positions employers cannot fill through the domestic labor market.[9]  *See generally*

8 U.S.C. §§ 1101(a)(15)(H)(ii)(a), 1188.  Under regulations promulgated by the

DOL to implement its statutory duty to protect American workers, employers must

first offer the job to workers in the United States.  20 C.F.R. § 655.121.[10]

Furthermore, the employer must offer domestic workers "no less than the same

benefits, wages, and working conditions that the employer is offering, intends to

offer, or will provide to H-2A workers."  *Id.* § 655.122(a).[11]  Only if an American

---

[9]Importation of foreign workers under the H-2A visa program is prohibited
unless the DOL certifies as follows:

> (A) there are not sufficient workers who are able, willing, and
> qualified, and who will be available at the time and place needed, to
> perform the labor or services involved in the petition, and

> (B) the employment of the alien in such labor or services will
> not adversely affect the wages and working conditions of workers in
> the United States similarly employed.

8 U.S.C. § 1188(a)(1).

[10]The highly regulated method employers must use to offer such jobs to
American workers, referred to by the regulations (and throughout this opinion) as
a Job Order, is set out in § 655.121.

[11]The employer must offer the "worker at least the AEWR [Adverse Effect
Wage Rate (defined at 20 C.F.R. § 655.1300(c)], the prevailing hourly wage rate
[as defined in 20 C.F.R. § 655.1300(c)],  . . . or the Federal or State minimum
wage rate, in effect at the time work is performed, whichever is highest, for every
hour or portion thereof worked during a pay period."  20 C.F.R. § 655.122(l).
Like the district court and the parties, we refer to the rate required in § 655.122(l)
as the minimum wage or wage floor.  The AEWR component of the minimum
wage is the minimum rate DOL determines is necessary to ensure that wages of
(continued...)

worker does not accept a position offered through this process can the employer submit an Application for Temporary Employment Certification (an "H-2A Application") to the DOL. *See generally* 8 U.S.C. § 1188(a), (c)(3)(A).

The DOL can promulgate exceptions to the H-2A visa program, known as "special procedures," for particular agricultural industries. *See* 20 C.F.R. § 655.102. The DOL has implemented special procedures governing the minimum wage for H-2A shepherds.[12] *See id.*; *see also* Labor Certification Process for the Temporary Employment of Aliens in Agriculture in the United States: Adverse Effect Wage Rate for Range Occupations Through 2016, 80 Fed. Reg. 70,840, 70,840 (Nov. 16, 2015) (hereinafter the "2015 Special Procedures"); Special Procedures: Labor Certification Process for Employers Engaged in Sheepherding and Goatherding Occupations under the H–2A Program, 76 Fed.

---

[11](...continued)
similarly situated domestic workers will not be adversely affected by the employment of H–2A workers. 20 C.F.R. § 655.1300(c); *Am. Fed'n of Labor & Cong. of Indus. Orgs. v. Brock*, 835 F.2d 912, 913 (D.C. Cir. 1987) (holding that the AEWR is "designed to approximate the rates that would have existed had there been no increase in labor supply from foreign labor").

[12]"[E]mployers of open-range herders, such as sheep and goat herders, are exempt from [the standard] minimum-wage requirement due to the unique characteristics of the position, which include spending extended periods of time in isolated areas and being on call twenty-four hours a day, seven days a week to protect livestock." *Hispanic Affairs Project*, 901 F.3d at 384 (quotations omitted).

Reg. 47,256 (Aug. 4, 2011) (hereinafter the "2011 Special Procedures").[13]  Under

the 2011 Special Procedures, the DOL established an AEWR component of the

minimum wage that varied by state.  As of November 16, 2015, the AEWR

component of minimum wage for H-2A shepherds was raised by the DOL to

$1206.31 per month and made uniform across all states.[14]  *See* 2015 Special

Procedures, 80 Fed. Reg. 70,840, 70,840.[15]  The SAC alleges that there is no

statute, regulation, or special procedure preventing employers from offering

higher wages to domestic workers, via relevant Job Orders, or to foreign

shepherds via H-2A Applications.

---

[13]Although the 2011 Special Procedures only applied to sheep and goat herders, the 2015 Special Procedures also apply "to open-range herding of other livestock, such as cattle."  *Hispanic Affairs Project*, 901 F.3d at 384.

[14]To be clear, however, the minimum wage can be higher in individual states, such as California and Oregon, based on higher state-level minimum-wage laws.  *See* 2015 Special Procedures, 80 Fed. Reg. 70,840, 70,840.  Nevertheless, it appears that in most states the AEWR is the de facto minimum wage.  Under the 2015 Special Procedures, the AEWR is now adjusted yearly pursuant to a formula set out in the rule.

[15]The history behind the DOL's change to the method used to calculate the AEWR for shepherds in the 2015 Special Procedures is set out *Hispanic Affairs Project*, 901 F.3d at 391-95.

### b. The Parties

### i. The Association Defendants

WRA and MPAS are membership associations for sheep ranchers. They recruit and hire shepherds for their member ranches. WRA characterizes itself as a joint employer on Job Orders and H-2A Applications. *See* 20 C.F.R. § 655.103(b) (defining the term "joint employment").[16] MPAS, on the other

---

[16]WRA's status of a joint employer of the H-2A shepherds employed by its members is a significant contextual background fact with regard to the antitrust claims set out in the SAC. The statute allowing for the admission of H-2A agricultural workers into the United States, 8 U.S.C. § 1188, specifies as follows:

> If an association is a joint or sole employer of temporary agricultural workers, the certifications granted under this section to the association may be used for the certified job opportunities of any of its producer members and such workers may be transferred among its producer members to perform agricultural services of a temporary or seasonal nature for which the certifications were granted.

*Id.* § 1188(d)(2); *see also* 20 C.F.R. §§ 655.130(d), 655.131. In furtherance of this statutory directive, the implementing regulations authorize associations that are acting as joint employers to "file a master application on behalf of its employer-members." 20 C.F.R. §131(b). That is,

> An association may submit a master application covering the same occupation or comparable work available with a number of its employer-members in multiple areas of intended employment, just as though all of the covered employers were in fact a single employer, as long as a single date of need is provided for all workers requested by the [H-2A Application] and all employer-members are located in no more than two contiguous States.

*Id.* By acting as a joint employer for all H-2A shepherds hired by its member

(continued...)

hand, characterizes itself as an agent for its member ranches.  *See id.* (defining

the term "agent"); *see also* 20 C.F.R. § 655.133 (setting out requirements for

agents).  The relevant statute and regulations expressly contemplate that agents

and associations acting as an agent can file Job Orders on behalf of sheep

ranchers.  8 U.S.C. § 1188(d); 20 C.F.R. §§ 655.130, 655.131, 655.133.  The

Shepherds specifically focus on WRA's and MPAS's recruitment and hiring of

"open range" shepherds.[17]  From October 1, 2013, to October 1, 2014, WRA hired

approximately 55% of all open range shepherds hired in the United States.

During that same time frame, MPAS hired approximately 36% of all open range

shepherds hired in the United States.  WRA and MPAS submitted Job Orders for

domestic workers on behalf of the Rancher Defendants.  They also submitted

H-2A Applications to DOL on behalf of the Rancher Defendants.

---

[16](...continued)
ranchers pursuant to a master application, WRA is entitled to reassign H-2A
shepherds within the association's membership to deal with shifting labor needs.
It is worth noting that the Shepherds have never appropriately acknowledged how
these provisions impact the plausibility of their antitrust claims.

[17]According to the Shepherds, the Rancher Defendants produce sheep on
the open range.  Most sheep raised on the open range are moved to feedlots in
Colorado for finishing.  The Shepherds contrast this to "closed range" herders,
who are alleged to earn substantially more than open range shepherds and receive
differing wages based on many variables.

## ii. The Rancher Defendants

Each of the Rancher Defendants is alleged to be, or have been, members of WRA or MPAS within the four years prior to the filing of the SAC.  The Rancher Defendants are located in multiple western states.  All of them, however, send their sheep to Colorado for "finishing."  Except as to Richins, *see supra* n. 6, the Shepherds do not allege any facts that distinguish the Rancher Defendants from other members of WRA and/or MPAS.  For example, the Shepherds allege they were each an WRA or MPAS "employee,"[18] but do not identify the ranches at which they worked.  Instead, after identifying each of the Rancher Defendants, the remainder of the SAC refers to these Defendants collectively.[19]

---

[18]The allegation in paragraph 20 that plaintiff Rafael De La Cruz is an "employee of MPAS" appears to be inconsistent with exhibits attached to the SAC.  In particular, those exhibits (a Form 790 Agricultural and Food Processing Clearance Order and an H-2A Application) show that the Martin Auza Sheep Company is consistently listed as De La Cruz's employer, while MPAS is listed solely as Martin Auza Sheep Company's agent.  Because this pleading anomaly is not relevant to this court's resolution of this appeal, we do not consider the matter further.

[19]In their brief on appeal, the Rancher Defendants assert, as an alternative basis for affirmance, that the failure of the SAC to set out concrete, particularized allegations as to each of them leaves the antitrust claims against them utterly lacking in factual support.  *See* Rancher Defendants' Response Br. at 13 ("Here, every allegation against the Ranchers—other than their addresses and association membership—is pled generally, even though the Ranchers are distinct, unrelated parties differently situated for this litigation.  Not a single fact is pled about any individual Rancher's conduct . . . .").  Because this court concludes *infra* that the SAC does not plead a plausible conspiracy or agreement, it is unnecessary to address the Rancher Defendants' proposed alternative basis to affirm the district

(continued...)

-11-

### iii.  The Shepherds

Paragraph forty-three of the SAC describes the essential functions of a

shepherd as follows:

> shepherds tend herds of 1,000 sheep or more, often in rugged high
> altitude terrain or dry desert conditions, hauling water for the
> animals, herding them to grazing areas and making sure they have
> enough to eat, keeping them from going astray, and protecting them
> from the constant threat of natural predators like coyotes, mountain
> lions, and wolves, harmful or poisonous plants, and man-made
> dangers like highways and domesticated dogs.  During lambing . . .
> season, the shepherds assist the animals in the birthing process, and
> at all times, the shepherds provide for the health and medical needs
> of the herd.

Appellant's App. Vol. I at 31.  The complaint also alleges that the life of a

shepherd is socially isolated and generally devoid of most modern conveniences

Americans take for granted (i.e., access to functional indoor plumbing).

---

[19](...continued)
court's order of dismissal.

### c. The Allegations in the Second Amended Complaint

#### i. Antitrust Claims[20]

Job Orders submitted to the DOL by the Association Defendants during the relevant period offered exactly the applicable minimum wage. *See supra* at 6-8 & n.10 (explaining that the Job Order process is a highly regulated attempt to hire domestic shepherds as a precursor to the filing of an H-2A Application). WRA filed Job Orders on behalf of multiple member ranches with an identical wage rate for all ranches operating in a state. For instance, one of the many representative Job Orders attached to the SAC offers eighteen possible domestic shepherds $750.00 per month—the then-minimum wage for H-2A shepherds under the 2011 Special Procedures—without distinguishing between ranches. Furthermore, the Job Order does not allow shepherds to apply to specific ranches, instead instructing them to apply through the WRA.

---

[20]In setting out the relevant factual allegations from the SAC, the court omits those allegations that are nothing more than a recitation of antitrust "buzz words." *Tal v. Hogan*, 453 F.3d 1244, 1261 (10th Cir. 2006) ("A complaint is subject to dismissal where it does little more than recite the relevant antitrust laws. Conclusory allegations are insufficient. Bare bones accusations of a conspiracy without any supporting facts are insufficient to state an antitrust claim. Moreover, the use of antitrust buzz words does not supply the factual circumstances necessary to support conclusory allegations." (citations, quotations, and alterations omitted)). Furthermore, making the reasonable assumption that they are most relevant to this court's resolution of this appeal, we focus on the factual allegations highlighted in the Shepherds opening brief on appeal.

The Defendants followed this same course of allegedly anticompetitive conduct during the H-2A Application process. *See supra* at 6-8 (noting that H-2A Applications cannot offer to pay Shepherds any more than the wages and benefits offered to domestic shepherds through the Job Order process). The WRA and MPAS, as joint ventures operating on behalf of their member ranches, applied for approximately 2000 H-2A visas for shepherds. Many of the shepherds WRA and MPAS hired through this process were already working on member ranches in the United States, meaning they were experienced and had a relationship with their employer. Just as with its Job Orders, however, H-2A Applications filed by WRA on behalf of multiple employers do not distinguish between ranches and do not purport to allow workers to shop between ranches, as in a competitive labor market.[21] The H-2A Applications include a "rate of pay" section that expressly pegs the wage for all H-2A shepherds at precisely the minimum wage in each state, without even identifying the ranches.

---

[21]Notably, no such factual assertion is made as to MPAS. As noted above, WRA acted as a joint employer as to all H-2A shepherds hired by its members. Accordingly, consistent with the regulations set out in footnote sixteen, WRA filed master applications listing numerous positions. MPAS, on the other hand, acted as its members' agent in hiring shepherds. Thus, each of the Job Orders and H-2A Applications attached to the SAC filed by MPAS lists the specific Ranch that is seeking to hire shepherds. *See* 20 C.F.R. § 655.131(b) ("An association may file a master application on behalf of its employer-members. The master application is available only when the association is filing as a joint employer.").

The Shepherds assert communications between the Association Defendants and their members corroborate that these joint ventures fix wages at the minimum level—as opposed to the ranchers instructing the Associations to make offers to shepherds at that level.  In support of this assertion, the Shepherds note that in January 2015, in response to an increased Oregon minimum wage for shepherds, WRA instructed its members that they should "immediately adjust wage payments to [that] amount."[22]

The SAC also alleges the market wage for shepherds exceeds the minimum wage offered.  According to the SAC, other jobs on ranches that require similar or less skill than shepherding— but that are also theoretically available to H-2A workers—are filled by domestic workers.  Those workers receive wages that are

---

[22]In its brief on appeal, the Shepherds assert MPAS issued a similar communication to its Oregon members.  The Shepherds' brief further asserts that a single Rancher Defendant does not always comply with the requirement that H-2A shepherds be paid no more or less than the rate set out in the H-2A Application.  In support of this assertions, however, they cite not to the SAC (or even, for that matter, to the appendix), but to motions on the district court docket filed by Rancher Defendants.  With a few narrow exceptions, review of the propriety of the grant of a Fed. R. Civ. P. 12(b)(6) motion to dismiss is limited to the contents of the complaint.  *Gee v. Pacheco*, 627 F.3d 1178, 1186-87 (10th Cir. 2010).  Because the Shepherds do not assert the cited documents fall within one of the exceptions set out in *Gee*, we do not consider these allegations in reviewing the propriety of the district court order dismissing the SAC.

variable— commensurate with experience, skill, work environment, etc.—and substantially higher than the wages offered to domestic and foreign shepherds.[23]

### ii. RICO Claims

The Shepherds' RICO claims concern the Association Defendants' allegedly false assurances to the federal government that H-2A shepherd employers reimburse shepherds for "reasonable costs incurred by the worker for transportation and daily subsistence from the place from which the worker has come to work for the employer," as required by 20 C.F.R. § 655.122. Both WRA and MPAS have promised full reimbursement of these costs in Job Orders and H-2A Applications submitted on behalf of their members. WRA and MPAS have obtained H-2A shepherds for their members based on these assurances.

---

[23]Although this court need not, and does not, question the validity of this factual assertion for the purposes of resolving this appeal, the assertion that herding jobs are substantially analogous to other ranching jobs is subject to serious dispute. Indeed, in adopting the 2015 Special Procedures, DOL specifically examined this question, including information indicating "that livestock worker positions and herders were not analogous because, unlike livestock and other H-2A workers, employers paid for herders' food, housing, work supplies, and protective clothing, and transportation." *Hispanic Affairs Project*, 901 F.3d at 393 (quotation omitted). Ultimately, based on information received during the notice and comment period, DOL settled on the federal minimum as the AEWR. *Id.* at 394. In so doing, DOL chose a pay rate midway between that set out in the 2011 Special Procedures (as advocated by ranches) and a wage based on the Farm Labor Survey (as advocated by labor). *Id.* at 393-95. It appears that many allegations in the SAC amount to objections to the DOL's scheme for regulating H-2A shepherds simply clothed as claims arising under § 1 of the Sherman Act.

Notwithstanding these promises, WRA and MPAS, together with their members, allegedly have a policy of not paying for expenses H-2A shepherds frequently incur in Peru when they are preparing to travel to the United States for work (i.e., costs of transportation, meals, medical checkups, and criminal background checks). Even though WRA promises the DOL it will reimburse these costs, it allegedly does not say anything to H-2A shepherds about any such costs but, instead, instructs only that "[t]ransportation [costs] for travel to and from your home country are paid if you complete the contract terms."

### d.  The District Court Decision

### i.  Antitrust Claims

The district court began its analysis of whether the SAC stated a plausible antitrust claim by noting that "[t]he essence of a claim of violation of Section 1 of the Sherman Act is the agreement itself." *See Champagne Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1082 (10th Cir. 2006). The agreement must be "designed unreasonably to restrain trade." *Abraham v. Intermountain Health Care Inc.*, 461 F.3d 1249, 1257 (10th Cir. 2006). Thus, "the crucial question is whether the challenged anticompetitive conduct stems from independent decision or from an agreement, tacit or express." *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 553 (2007) (quotation and alteration omitted).  As the district court

recognized, the facts showing such an agreement can be direct or circumstantial.[24]

    With this legal background set out, the district court moved on to conclude

the SAC did not allege facts that directly establish a § 1 agreement.  Instead, the

SAC alleged "tacit collusion" and "collusive conduct" on the part of Defendants.

That being the case, the district court applied the rule set out by the Supreme

court in *Twombly*: mere allegations of parallel conduct, absent additional

contextual facts, fail to state a plausible conspiracy claim.  *See Twombly*, 550

U.S. at 556-57.  That is, when the antitrust claim relies solely on circumstantial

facts of parallel behavior, the conspiracy is not plausible if in light of common

economic experience the alleged conduct is equally likely to result from

independent action.  *See id.* at 567-68.

    Finally, the district court concluded the facts alleged in the SAC did not

plausibly allege an agreement to fix wages, especially when those facts were

viewed in the context of the laws and regulations relating to the hiring of H-2A

shepherds.  To imply such an agreement, the SAC alleged five types of

_____

    [24]Direct facts are "explicit and require[] no inferences." *Champagne
Metals v. Ken-Mac Metals, Inc.*, 458 F.3d 1073, 1083 (10th Cir. 2006).  Direct
evidence of a § 1 agreement may take the form of a written contract or agreement,
such as association rules, or admissions of an agreement. *See id.* at 1083-84.  In
contrast, circumstantial facts require inferences to show that an anti-competitive
agreement exists. *Id.* at 1084.

overlapping facts: (a) the Association Defendants recruit and hire shepherds for their members; (b) opportunities exist within the associations to communicate regarding recruiting and hiring of shepherds; (c) Job Orders and H-2A Applications offer only the minimum wages permitted by DOL; (d) common motives to depress wages; and (e) wages for open range shepherds are unusually low for employees working in the United States.  According to the district court, however, these allegations are factually neutral.  That is, these facts describe conduct equally likely to result from independent, lawful action based on the H-2A program and DOL regulations that established the process of hiring foreign shepherds and set the minimum wage.

As to the first type of facts, membership in associations that recruit and hire shepherds, the district court noted it was undisputed (a) associations can lawfully represent ranchers in recruiting and hiring; and (b) ranchers or associations on their behalf can lawfully hire foreign employees by complying with the DOL's regulations.  *See* 29 U.S.C. §§ 1802, 1821, 1822; 20 C.F.R. §§ 655.121, 655.122.  Furthermore, the Shepherds did not cite authority indicating membership in a trade organization, standing alone, is suggestive of a conspiracy.  Regarding the second type of facts—opportunity to communicate via the association—the district court stated the SAC's implication was no different from

the argument trade associations are inherently anticompetitive.[25]  The third type of facts—Defendants always offered the minimum wage—did not suggest a conspiracy because such parallelism is merely consistent with, not suggestive of, conspiracy.  That was true, concluded the district court, because it is equally consistent with independently following the DOL's minimum wage and hiring regulations.  As a matter of economic reality, it was in each Defendant's interest to pay no more wages than (a) legally required and (b) necessary to adequately fill their positions.  These exact considerations also demonstrated why the SAC's fourth type of facts—common motive to fix wages—was not suggestive of a conspiracy.  As to the final type of facts identified in the SAC—low and stagnant wages—the district court noted the Shepherds did not address the fact very low wages paid to shepherds are just as likely to result from individual decisions to

---

[25]The district court noted the only specific communication identified by the Shepherds is that in January 2015, the WRA instructed its members in Oregon to uniformly begin paying exactly the new DOL wage floor.  As alleged in the SAC, however, the applicable regulations require that employers of H-2A shepherds, including joint employers like the WRA, pay at least the state minimum wage if that wage is higher than the AEWR.  *See* 20 C.F.R. § 655.122(l).  The SAC further alleges shepherds had always accepted WRA's offers of the minimum wages for its members.  That is, WRA knew Oregon ranches were paying shepherds the minimum wage.  Informing the Oregon members to increase their wages to reflect a change in the minimum wage did not, according to the district court, imply an instruction or agreement that the members could not pay more than the minimum.  Given these facts, the district court concluded the WRA communication did not plausibly advance the Shepherds' claim WRA had reached an agreement with its members to suppress the wages of H-2A shepherds.

use the DOL's minimum wage and H-2A program or that the legal minimum wage

for H-2A shepherds was so low that adding "nominal amounts" would not attract

domestic shepherds to fill the jobs.

In sum, taking all of the allegations described above as a whole, and

considering them in light of common economic experience, the district court ruled

the SAC did not allege facts that plausibly support the conclusory assertions of an

anti-competitive agreement.  Instead, the Shepherds' allegations were like the

claims dismissed in *Twombly* as conduct equally likely to result from independent

parallel action.  "Because the [Shepherds] . . . ha[d] not nudged their claims

across the line from conceivable to plausible," *Twombly*, 550 U.S. at 570, the

district court granted Defendants' motions to dismiss the Shepherds' antitrust

claims.

### ii.  RICO Claims

The district court began by noting "[t]he elements of a civil RICO claim are

(1) investment in, control of, or conduct of (2) an enterprise (3) through a pattern

(4) of racketeering activity."  *Tal v. Hogan*, 453 F.3d 1244, 1261 (10th Cir. 2006).

RICO defines an enterprise broadly as "any individual . . . corporation,

association, . . . and any . . . group of individuals associated in fact although not a

legal entity."  18 U.S.C. § 1961(4).  The latter type of enterprise, an

"association-in-fact," is a group of persons associated together for a common

-21-

purpose of engaging in a course of conduct and requires evidence of an ongoing organization, formal or informal, and evidence that the various associates function as a continuing unit. *See United States v. Turkette*, 452 U.S. 576, 583 (1981). "[T]o establish liability under § 1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001).

In light of these requirements, WRA, MPAS, and Richins argued the SAC's allegations failed to satisfy the "enterprise" element of a RICO claim as to each of the three alleged association-in-fact enterprises.[26]  The district court agreed with this assertion, concluding the three RICO Defendants are part of, not distinct from, the identified enterprises.  As to the Association Defendants, the district court concluded the SAC alleged nothing more than that they associated-in-fact with their members to submit fraudulent Job Orders and H-2A Applications. Relying on the decision of the D.C. Circuit in *Yellow Bus Lines, Inc. v. Drivers,*

---

[26]Count IV of the SAC defines two enterprises: a "Richins Enterprise" comprised of an association-in-fact of WRA and Richins, its former executive director and president [SAC paras 112-15; SAC R & R at 36] and a "WRA Enterprise" comprised of an association-in-fact of WRA and its members [SAC paras 116-21; SAC R & R at 36].  The "persons" sued as defendants in Count IV are WRA and Richins.  [SAC R & R at 36]  In Count V, the SAC alleges an "MPAS Enterprise" comprised of an association-in-fact of MPAS and its members.  [SAC paras. 122-27; SAC R & R at 36].  MPAS is the defendant "person" for Count V.  [SAC R & R at 36]

*Chauffeurs & Helpers Local Union 639*, 883 F.2d 132, 141 (D.C. Cir. 1989), the

district court ruled such allegations did not demonstrate the necessary distinctness

between the alleged enterprise (the alleged association-in-fact between WRA and

MPAS and their members) and the allegedly responsible person (WRA and

MPAS).  *See id.* ("[A]n organization cannot join with its own members to do that

which it normally does and thereby form an enterprise separate and apart from

itself.  Where, as here, the organization is named as defendant, and the

organization associates with its member to form the enterprise 'association-in-

fact,' the requisite distinctness does not obtain.").  As to Richins, the district

court first stated the SAC suffered from its failure to plead the WRA Enterprise

and Richins Enterprise separately.  This fact doomed the claim against Richins,

according to the district court, because a corporation and its officer cannot be a

RICO association-in-fact regarding conduct undertaken in the corporation's

regular business as an officer of the corporation.  Because the SAC failed to

allege any enterprise distinct from the person alleged to have controlled or

conducted them, the district court dismissed all three of the RICO claims set out

in the SAC.

### 2.  Analysis

This court reviews de novo a Fed. R. Civ. P. 12(b)(6) dismissal for failure

to state a claim.  *Wasatch Equal. v. Alta Ski Lifts Co.*, 820 F.3d 381, 386 (10th

Cir. 2016).  To survive a motion to dismiss, a complaint must contain sufficient

factual matter, accepted as true, to "state a claim to relief that is plausible on its

face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A claim is facially plausible

when the plaintiff has pled "factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*

When a complaint alleges "facts that are merely consistent with a defendant's

liability, it stops short of the line between possibility and plausibility of

entitlement to relief."  *Id.* (quotation omitted).  The question is whether, if the

allegations are true, it is plausible and not merely possible that the plaintiff may

obtain relief.  *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008).

### a.  Antitrust Claims

#### i.  Applicability of *Twombly*

The Shepherds assert the district court erred when it applied the analytical

framework set out in *Twombly* in analyzing whether the SAC states a plausible

antitrust conspiracy.  This argument is not well taken.

*Twombly* addressed whether, in a putative class action, "a § 1 complaint can

survive a motion to dismiss when it alleges that major telecommunications

providers engaged in certain parallel conduct unfavorable to competition, absent

some factual context suggesting agreement, as distinct from identical,

independent action."  550 U.S. at 548-49.  The Supreme Court answered that

question in the negative. *Id.* at 549 ("We hold that such a complaint should be dismissed."). The district court here concluded the general principles set out in *Twombly* applied to the Defendants' motion to dismiss because the SAC did not allege facts that directly establish an agreement to fix wages. The Shepherds argue the district court erred in applying the *Twombly* framework because the SAC alleges direct evidence of a § 1 agreement.

In contrast to the Shepherds' argument, the district court correctly defined direct evidence as "evidence that is explicit and requires no inferences to establish the proposition or conclusion being asserted. With direct evidence the fact finder is not required to make inferences to establish facts." *Champagne Metals*, 458 F.3d at 1083 (quotation and alterations omitted). It also correctly concluded no allegation in the SAC directly established a § 1 agreement. There is no allegation of fact showing the Association Defendants controlled member ranches' decision-making processes to further a collective scheme. Nor is there any allegation member ranches lobbied their colleagues or the Association Defendants to adopt or fix a particular wage rate. There were no factual allegations of agreements, no reports, memoranda, or tapes of meetings, no plainly anticompetitive association rules compelling certain behavior. In other words, there are no factual allegations in the SAC that explicitly establish, without the need for inferences, the existence of an agreement to fix the wages of

domestic or H-2A shepherds. *See id.*[27]  The absence of such evidence is not

surprising.  *See, e.g., N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883

F.3d 32, 39 (2d Cir. 2018) ("Rarely do co-conspirators plainly state their purpose.

As a result, courts often must evaluate circumstantial evidence of a conspiracy by

weighing plus factors, which, when viewed in conjunction with the parallel acts,

can serve to allow a fact-finder to infer a conspiracy." (quotation omitted));

*Mayor & City Council of Balt., Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir.

2013) (describing direct evidence in this context as a "smoking gun" and noting

such evidence "can be hard to come by, especially at the pleading stage");

*Mendocino Envtl. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1302 (9th Cir. 1999)

("Direct evidence of improper motive or an agreement among the parties to

violate a plaintiff's constitutional rights will only rarely be available.  Instead, it

will almost always be necessary to infer such agreements from circumstantial

evidence or the existence of joint action.").

When the Shepherds argue they alleged direct evidence, they are referring

to allegations in the SAC that the Association Defendants prepared and submitted

---

[27]To the extent the Shepherds argue on appeal that the January 2015 communication from WRA to its Oregon members regarding the increase in the Oregon state minimum wage is direct evidence, this argument is misplaced.  As noted by the district court, *see supra* n.25, no commonsense reading of this document is compatible with the allegation that it is some kind of binding directive to Oregon ranchers to pay H-2A shepherds no more than the minimum wage.

Job Offers and H-2A Applications for the Rancher Defendants and other association members.  In contrast to this argument, however, assistance in locating and hiring H-2A shepherds as permitted under federal statutes and regulations does not amount to evidence of a conspiracy that is beyond inference or dispute.  *N. Am. Soccer League*, 883 F.3d at 40 ("Not every action by a trade association is concerted action by the association's members.  Indeed, even though a trade association by its nature involves collective action by competitors, a trade association is not by its nature a walking conspiracy." (quotations, citations, and alterations omitted)).  Thus, such evidence does not constitute direct evidence.  Instead, the Shepherds are asking this court to draw inferences that, by using WRA and MPAS to help locate and hire workers, the Rancher Defendants and other association members have ceded control of wage decisions to the Association Defendants.  This is the classic type of circumstantial evidence antitrust plaintiffs have historically used to attempt to demonstrate an agreement or conspiracy.  *See Mendocino Envtl. Ctr.*, 192 F.3d 1283.  It is also the exact type of circumstantial evidence *Twombly* considered in holding that parallel conduct, absent some additional type of contextual evidence, is generally not sufficient to nudge an antitrust conspiracy allegation beyond the line from possible to plausible.  550 U.S. at 556-57.

The SAC does not allege that the Rancher Defendants (or any other members of WRA or MPAS) explicitly agreed to any limitation on their behavior with regard to wages paid to either foreign or domestic shepherds. Because the SAC did not allege direct evidence as to any of the three supposed conspiracies, the district court correctly applied *Twombly* in evaluating whether the SAC plausibly alleged an antitrust agreement.

### ii. Application of *Twombly*

Alternatively, even assuming the applicability of the principles set out in *Twombly*, the Shepherds assert the SAC alleges plausible conspiracies on the part of Defendants to fix the wages of shepherds at the minimum wage.[28] In so asserting, the Shepherds again focus on the allegations in the SAC that the Association Defendants assisted in the hiring of H-2A shepherds on behalf of their members by submitting Job Orders and H-2A Applications. The SAC

---

[28]This court specifically agrees with the Shepherds that to the extent the district court applied a "probability" standard in evaluating the factual allegations set out in the SAC it erred. *See* Appellants' Opening Br. at 37 (identifying places in the district court's analysis stating § 1 claims cannot withstand a motion to dismiss if the alleged conduct is "equally or more likely" the result of permissible parallel decisionmaking). As *Twombly* itself made clear, "plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Given that this court's review of the grant of a Fed. R. Civ. P. 12(b)(6) motion to dismiss is de novo, and given that in conducting its review this court has hewed directly to the plausibility standard set out in *Twombly*, any error on the part of the district court here is not meaningful.

alleges no facts, however, supporting a plausible inference that WRA and MPAS assist in hiring because of an agreement to keep wages low, nor do they allege facts supporting a plausible inference individual members of either association could not offer a salary above the minimum wage if they so desired.  To be clear, the facts alleged, even taken as true, do not plausibly lead to the conclusion association members gave up control over the wages offered or otherwise entered into an agreement to keep wages low.  *See N. Am. Soccer League*, 883 F.3d at 40 (noting not every trade association is a de facto conspiracy and recognizing "it is when a § 1 plaintiff establishes the existence of *an illegal* contract or combination that the plaintiff can proceed to demonstrate that the agreement constituted an unreasonable restraint of trade.  Evidence should tend to show that association members, in their individual capacities, consciously committed themselves to a common scheme designed to achieve an unlawful objective." (quotations, citations, and alterations omitted)).

The Supreme Court has long warned courts to be hesitant about inferring concerted action from evidence that is merely circumstantial.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588 (1986) ("[A]ntitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case."); *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 763 (1984) ("On a claim of concerted price-fixing, the antitrust plaintiff must present evidence

sufficient to carry its burden of proving that there was such an agreement.  If an inference of such an agreement may be drawn from highly ambiguous evidence, there is a considerable danger that [important distinctions between independent and concerted action] will be seriously eroded.").  Such evidence must "tend[] to exclude the possibility" of independent action. *Twombly*, 550 U.S. at 554.[29]  An inference of conspiracy is impermissible if the defendants "had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations."  *Matsushita Elec. Indus. Co.*, 475 U.S. at 596.  Where circumstantial evidence is just "as consistent with" unilateral action as with concerted action, it "does not, standing alone, support an inference of antitrust conspiracy."  *Id.* at 588; *see also In Re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 326 (3d Cir. 2010) (explaining that "a claim of conspiracy predicated on

---

[29]In this regard, *Twombly* states as follows:

> In identifying facts that are suggestive enough to render a § 1 conspiracy plausible, we have the benefit of the prior rulings and . . . commentators . . . that lawful parallel conduct fails to bespeak unlawful agreement. . . .  [A]n allegation of parallel conduct and a bare assertion of conspiracy will not suffice.  Without more, parallel conduct does not suggest conspiracy, and a conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.  Hence, when allegations of parallel conduct are set out in order to make a § 1 claim, they must be placed in a context that raises a suggestion of a preceding agreement, not merely parallel conduct that could just as well be independent action.

550 U.S. at 556-57.

parallel conduct" is insufficient when "common economic experience, or the facts alleged in the complaint itself, show that independent self-interest is an obvious alternative explanation for the defendants' common behavior" (quotations omitted)); *see also Twombly*, 550 U.S. at 554 ("The inadequacy of showing parallel conduct or interdependence, without more, mirrors the ambiguity of the behavior: consistent with conspiracy, but just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market.").

The Supreme Court has observed that business associations are "beneficial to [] industry and to consumers." *Maple Flooring Mfrs.' Ass'n v. United States*, 268 U.S. 563, 566 (1925). Congress obviously reached a similar conclusion with regard to associations like MPAS and WRA and their role in recruiting foreign shepherds. *See* 8 U.S.C. § 1188(d). To avoid deterring the collaboration that yields these benefits, it is necessary to ensure circumstantial evidence in cases challenging the conduct of joint ventures is held to the same standard applicable to every § 1 case: it must "tend[] to exclude the possibility" the parties to the venture were acting independently. *Twombly*, 550 U.S. at 554.[30]

---

[30]The cases cited by the Shepherds are distinguishable because in each there was an explicit agreement, typically set out in an association rule or otherwise enforced by the association. In *Anderson v. Shipowners' Association of Pacific Coast*, 272 U.S. 359 (1926), ship owners in an association were found to have

(continued...)

The Shepherds allege no explicit agreement among the Association Defendants or their members, nor any votes, rules, or enforcement mechanisms. Instead, they ask this court to assume that because the Association Defendants assist their members in completing Job Offers and H-2A Applications, they are "fixing" or "setting" wages. These allegations do not, however, plausibly suggest individual member ranches entered into any agreement with the Association Defendants or among themselves to establish and adhere to a specific wage. *See N. Am. Soccer League*, 883 F.3d at 40 (noting circumstantial evidence in the context of a business association must show "that association members, in their individual capacities, consciously committed themselves to a common scheme designed to achieve an unlawful objective" (quotation and alteration omitted)). There is no allegation association members discussed or agreed among themselves how to pay foreign shepherds. Instead, the allegations in the SAC simply indicate

---

[30](...continued)
conspired when they established regulations that controlled the circumstances under which ships could hire staff and the wages the ship could pay. *Id.* at 362. The plaintiff pled (and proved) the ship owners did far more than participate in the governance of the association; they colluded in a scheme by which they surrendered themselves "completely to the control of the associations." *Id.* Similarly in *Goldfarb v. Virginia State Bar*, 421 U.S. 773 (1975) and *Law v. National Collegiate Athletic Association*, 134 F.3d 1010 (10th Cir. 1998), the associations established schedules or rules binding on all members. Finally, in *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411 (1990), the Court considered a publicly recorded member vote to take joint action to be sufficient evidence of agreement. In each case, the key factor in the analysis was the existence of a rule, with an enforcement mechanism, binding on all members.

member ranches unilaterally decided to join the Association Defendants and utilize their services in filling out paperwork as they saw fit in their individual business judgment. The same goes for the Shepherds' allegation that the wages offered in H-2A Applications prepared by the Association Defendants were identical. A Job Order must disclose the offered wage. 20 C.F.R. § 655.122(l). The Job Orders attached to the SAC show the Association Defendants complied with this regulation. There are no facts alleged in the SAC from which it can be inferred ranches needed to offer more to attract a sufficient number of qualified workers. The federal government sets the lowest wage that may be offered to H-2A shepherds. Assuming a sufficient supply of qualified labor is available at this wage, no rancher would be logically inclined to offer more.

In addition, the alleged conspiracy does not make economic sense. The Shepherds ask this court to infer that ranches in California and Oregon participated in a conspiracy to seriously depress wages paid by their competitors in other states. The inference ranches in the higher-wage states would participate in a conspiracy that locks in substantial advantages for their competition is implausible. The Supreme Court has indicated courts should look carefully at antitrust cases where the defendants "had no rational economic motive to conspire." *Matsushita Elec. Indus. Co.*, 475 U.S. at 596.

In sum, if the Shepherds' allegations suffice to allege a plausible § 1 agreement, all members of an association could be deemed to have entered into an antitrust conspiracy simply because they joined the association, participated in its governance, and agreed to abide by its rules. This would be true even, as is the case here, absent the existence of an anticompetitive rule or practice binding on all association members. *Cf. supra* n.30 (discussing cases involving associations with such rules or practices). This is simply not the law. The district court correctly determined the exceedingly limited factual allegations in the SAC did not plausibly state the existence of a conspiracy to fix wages.

Moreover, in reaching this conclusion, the district court correctly concluded the H-2A regulations play an important role. The regulatory overlay is a critical backdrop that provides relevant economic context to the Association Defendants' and Rancher Defendants' alleged conduct. As *Twombly* directs, in analyzing whether allegations in a complaint state a plausible antitrust agreement, courts must consider the larger context. 550 U.S. at 557. That the regulatory scheme permits, and in places *requires*, the very actions the Shepherds contend support the inference of a conspiracy is an important contextual consideration. For example, federal law governing the H-2A program explicitly and specifically authorizes associations to coordinate with members to submit "Master Applications" and to act as joint employers of H-2A shepherds. *See supra* n.16

-34-

(quoting relevant provisions). Given these regulations, the mere process of utilizing joint applications and acting as joint employer does not give rise to a plausible inference of an improper agreement.

### b. RICO Claims

#### i. Background Legal Concepts

Under 18 U.S.C. § 1962(c), a RICO plaintiff must allege a "person" "(1) conducted the affairs (2) of an enterprise (3) through a pattern (4) of racketeering activity." *George v. Urban Settlement Servs.*, 833 F.3d 1242, 1248 (10th Cir. 2016). A "person" is "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). A person sued as a RICO defendant conducts the affairs of a RICO enterprise by "participat[ing] in the operation or management of the . . . enterprise." *Resolution Tr. Corp. v. Stone*, 998 F.2d 1534, 1541 (10th Cir. 1993); *see also W. Hills Farms, LLC v. ClassicStar Farms, Inc. (In re ClassicStar Mare Lease Litig.)*, 727 F.3d 473, 490 (6th Cir. 2013) ("The enterprise itself is not liable for RICO violations; rather, the 'persons' who conduct the affairs of the enterprise through a pattern of racketeering activity are liable."). "RICO broadly defines enterprise as any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *Safe Sts. All. v. Hickenlooper*, 859 F.3d 865, 882 (10th Cir. 2017) (quotations omitted);

*see also* 18 U.S.C. § 1961(4). Each of the RICO enterprises identified in the SAC falls within the last portion of this definition, i.e., the association-in-fact. "Association in fact enterprises are composite entities whose legal status derives from 18 U.S.C. § 1962(c)." Laurence A. Steckman, RICO Section 1962(c) Enterprises and the Present Status of the "Distinctness Requirement" in the Second, Third, and Seventh Circuits, 21 Touro L. Rev. 1083, 1205 (2006) [hereinafter "Steckman Article"]. The Supreme Court has made clear that "the very concept of an association in fact is expansive." *Boyle v. United States*, 556 U.S. 938, 944 (2009). An "association-in-fact enterprise is a group of persons associated together for a common purpose of engaging in a course of conduct." *Id.* at 946 (quotation omitted). It "need not have a hierarchical structure or a chain of command." *Id.* at 948 (quotation omitted). Its existence only requires "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946, 956.

For liability to attach to a RICO defendant, the defendant "'person' must be an entity distinct from the alleged enterprise." *Brannon v. Boatmen's First Nat'l Bank of Okla.*, 153 F.3d 1144, 1146 (10th Cir. 1998); *see also ClassicStar*, 727 F.3d at 490 ("To establish liability under § 1962(c), a plaintiff 'must allege and prove the existence of two distinct entities: (1) a "person"; and (2) an "enterprise"

that is not simply the same "person" referred to by a different name.'" (quoting

*Cedric Kushner*, 533 U.S. at 161)).  "This interpretation flows from the statute's

mandate that the person who engages in the pattern of racketeering activity be

'employed by or associated with' the enterprise." *Brannon*, 153 F.3d at 1146

(quoting 18 U.S.C. § 1962(c)).[31]  This statutory distinctness requirement "is one

of the most heavily litigated requirements in RICO cases."  Steckman Article at

1088-89.  It has also generated substantial disagreement among the circuits.  *See*

*id*. at 1089 & n.10, 1092-93 & n.20; *see also ClassicStar*, 727 F.3d at 490 ("The

federal courts have encountered significant conceptual difficulties when

attempting to apply the distinctness requirement in the context of complex

relationships among affiliated and non-affiliated corporations and individuals.").

This is most likely because "[e]xactly what type of 'separateness' must be pleaded

for § 1962(c) purposes is not described in the statute."  Steckman Article at 1092.

    In dismissing the RICO claims set out in the SAC, the district court focused

solely on the distinctness requirement.  That is, the district court concluded each

of the three prospective RICO defendant persons (respectively, Richins, WRA,

and MPAS) was not distinct from the relevant RICO association-in-fact enterprise

whose affairs he/it was alleged to have conducted (respectively, WRA, WRA and

---

[31]"Many courts and commentators have concluded that it is illogical that a
person or entity can associate with oneself, and many cases have been dismissed
for this reason." Steckman Article at 1092 & n.19.

its membership, and MPAS and its membership).  Even given the high level of

disagreement as to the contours of the distinctness requirement, and the lack of

definitive Tenth Circuit precedent as to the appropriate test(s) courts should

employ in analyzing distinctness, this court concludes the district court erred in

dismissing the RICO claim against Richins.  On the other hand, this court affirms

the district court's dismissal of the RICO claims against WRA and MPAS.  Such

a result is compelled by the limited nature of the allegations in the SAC, as well

as the failure of the Shepherds to cite to analogous authority supporting their

position that an association can be distinct from an association-in-fact involving

itself and its members in the context alleged in the SAC.[32]

### ii. RICO Claim Against Richins

At base, the district court ruled that, as a matter of law, "a corporation and

its officer cannot be a RICO association-in-fact regarding conduct undertaken in

the corporation's regular business as an officer of the corporation."  Although this

---

[32]The issues in the instant appeal exist at the very core (claim against
Richins) or beyond the boundaries (claims against the Association Defendants) of
the distinctness requirement.  For that reason, it is unnecessary to adopt or
formulate a definitive test (or, more likely, set of tests) for routinely analyzing the
distinctness requirement.  *See generally* Steckman Article (setting out numerous
tests employed by just three circuits to analyze the existence of distinctness in the
multiple situations in which the issue can come into play); *see also ClassicStar*,
727 F.3d at 491 ("The number of different approaches to the distinctness analysis
roughly mirrors the number of cases that have addressed it.  The analysis is so
fact-intensive that a generic test is difficult to formulate.").

statement of the law is *generally* true in the abstract, *see Brannon*, 153 F.3d at

1149 (collecting cases), it has no application to the allegations in the SAC.  This

rule arises in cases attempting to hold a corporation responsible as the RICO

defendant person for a RICO enterprise composed of the corporation and its

officers and/or employees.  *Id.*; *see also* Steckman Article at 1119-25.  *Brannon*

specifically recognized this distinction and noted the inapplicability of the rule to

situations in which the RICO defendant person was the corporate employee or

officer.  153 F.3d at 1147-48 & 1148 n.4[33]

---

[33]In particular, *Brannon* "decline[d] plaintiffs' invitation to adopt a rule in
this circuit that a mere allegation that the RICO "person" is the subsidiary
conducting the affairs of the parent is sufficient to state a claim under § 1962(c)."
153 F.3d at 1147-48.  Then, in a footnote, *Brannon* went on to note as follows:

> Plaintiffs also contend that the result they seek is compelled by
> the Third Circuit's decision in *Jaguar Cars, Inc. v. Royal Oaks
> Motor Car Co.*, 46 F.3d 258 (3d Cir. 1995).  In so doing, they
> misconstrue that opinion.  *Jaguar Cars* holds only that "corporate
> officers/employees . . . may properly be held liable as persons
> managing the affairs of their corporation as an enterprise through a
> pattern of racketeering activity."  *Id.* at 261.  We note that this
> conclusion has long been the rule in this circuit.  *See Liberty Group*,
> 965 F.2d at 886 (noting that employee of partnership may be liable
> under § 1962(c) for conducting the affairs of the partnership).

*Id.* at 1148 n.4; *see also Bd. of Cty. Comm'rs v. Liberty Group*, 965 F.2d 879,
884-86 (10th Cir. 1992) (rejecting RICO claims against a defendant person
corporation because the corporation was not distinct from the alleged association-
in-fact, while noting an individual officer of the corporation was a proper RICO
defendant person).

The distinction drawn in *Brannon* was explicitly endorsed by the Supreme Court in *Cedric Kushner*, 533 U.S. at 161 (citing *Brannon*'s footnote 4); *see also id.* at 164.  In *Cedric Kushner*, the Supreme Court considered a case from the Second Circuit that extended the distinctness requirement regarding corporations as RICO defendant persons to also cover suits where the corporation was the RICO enterprise and the corporate officer was the RICO defendant person.  *Id.* at 163; *see also* Steckman Article at 1119-25 (discussing the decision in *Cedric Kushner*).  The Court rejected that extension, holding as follows:

> While accepting the "distinctness" principle, we nonetheless disagree with the appellate court's application of that principle to the present circumstances—circumstances in which a corporate employee, "acting within the scope of his authority," allegedly conducts the corporation's affairs in a RICO-forbidden way.  The corporate owner/employee, a natural person, is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its different legal status.  And we can find nothing in the statute that requires more "separateness" than that.

> Linguistically speaking, an employee who conducts the affairs of a corporation through illegal acts comes within the terms of a statute that forbids any "person" unlawfully to conduct an "enterprise," particularly when the statute explicitly defines "person" to include "any individual capable of holding a legal or beneficial interest in property," and defines "enterprise" to include a "corporation."  And, linguistically speaking, the employee and the corporation are different "persons," even where the employee is the corporation's sole owner.  After all, incorporation's basic purpose is to create a distinct legal entity, with legal rights, obligations, powers, and privileges different from those of the natural individuals who created it, who own it, or whom it employs.

*Cedric Kushner*, 533 U.S. at 163 (citations and alteration omitted).[34]

*Brannon* and *Cedric Kushner* make clear that the RICO distinctness requirement is satisfied when a corporate officer, such as Richins in his role as executive director, board member, and president of WRA, is sued as the RICO defendant person and the alleged RICO enterprise is the corporation or association (i.e., WRA). Thus, the district court erred in determining, as a matter of law, that Richins was not distinct from WRA.

### iii. RICO Claims Against WRA and MPAS

In dismissing the RICO claims against the Association Defendants as defendant persons, the district court concluded the SAC alleged WRA and MPAS were "part of, not distinct from, the identified enterprises." In so ruling, the

---

[34]In rejecting the Second Circuit's extension of its distinctness requirement to a RICO claim against a corporate employee as the defendant person, *Cedric Kushner* noted as follows:

> We note that the Second Circuit relied on earlier Circuit precedent for its decision. But that precedent involved quite different circumstances which are not presented here. This case concerns a claim that a corporate employee is the "person" and the corporation is the "enterprise." It is natural to speak of a corporate employee as a "person employed by" the corporation. [18 U.S.C.] § 1962(c). The earlier Second Circuit precedent concerned a claim that a corporation was the "person" and the corporation, together with all its employees and agents, were the "enterprise." It is less natural to speak of a corporation as "employed by" or "associated with" this latter oddly constructed entity.

533 U.S. at 164 (citation omitted).

district court relied on, inter alia, the D.C. Circuit's decision in *Yellow Bus Lines*,

883 F.2d at 141.  As *Yellow Bus Lines* aptly noted,

> Several courts . . . have disallowed a § 1962(c) claim where the relationship among the members of the enterprise association is the relationship of parts to a whole.  That is, while the corporate or organizational defendant may itself be a member of the enterprise association, the member of the enterprise association may not simply be subdivisions, agents, or members of the defendant organization.
>
> In short, an organization cannot join with its own members to do that which it normally does and thereby form an enterprise separate and apart from itself.  Where, as here, the organization is named as defendant, and the organization associates with its member to form the enterprise "association-in-fact," the requisite distinctness does not obtain. . . .  [T]here is no difference between the union as an entity including Woodward as officer, and the union plus Woodward, since "the whole is no different than the sum of its parts in this context."  Furthermore, allowing plaintiffs to generate such "contrived partnerships" consisting of an umbrella organization and its subsidiary parts, would render the non-identity requirement of section 1962(c) meaningless.  We decline to permit such an "end run" around the statutory requirements.

883 F.2d at 141 (citations omitted).  In our view, the rule set out in *Yellow Bus Lines* is entirely consistent with extant Tenth Circuit precedent, *Brannon* and *Liberty Group*, and sets out the proper rule for evaluating whether the allegations in the SAC state a valid RICO claim against the Association Defendants in light of the RICO distinctness requirement.  Indeed, in setting out the rule adopted therein, *Brannon* specifically cited with approval the decision in *Yellow Bus Lines*.  *Brannon*, 153 F.3d at 1146.  The limited allegations in the SAC merely state that each Association Defendant has formed an association-in-fact with its

members, the common purpose of each member of these associations-in-fact is to recruit shepherds at low wages, and that Association Defendants file job orders and H-2A Applications on behalf of their membership.  As to the acts of racketeering, the SAC simply states that WRA and MPAS have filed numerous Job Orders and H-2A Applications that falsely state shepherds are properly reimbursed for travel costs, as required by 20 C.F.R. § 655.122.  The SAC further asserts, in entirely conclusory fashion, that the Association Defendants are the "lynchpins" of the alleged associations-in-fact.  Based on these limited allegations, this court can perceive no distinction between the alleged RICO persons (WRA and MPAS) and the corresponding RICO enterprises (WRA and its members and MPAS and its members).

Importantly, especially given the very limited set of facts set out in the SAC, the Shepherds have not directed this court to a single case holding that an association like WRA and MPAS can be legally distinct from an association-in-fact made up solely of the association and its members.  Nor has this court been able to locate any such precedent.  Instead, the Shepherds claim this court's recent decision in *George* supports the assertion WRA and MPAS are distinct from the enterprises composed of themselves and their members.  The Shepherds have significantly misread *George*.  In *George*, the plaintiff alleged an association-in-fact, composed of, inter alia, a Bank and a Mortgage Solutions Provider, had a

"common purpose" to provide as few loan modifications as possible.  833 F.3d at

1246, 1248.  The district court concluded Bank was not distinct from the

association-in-fact enterprise for no reason other than Mortgage Solutions

Provider was Bank's agent.  *Id.* at 1249.  That is, although it was a distinct legal

entity, Mortgage Service Provider was hired by Bank to conduct certain business

on Bank's behalf.  In reversing, this court specifically noted it was delivering a

decision entirely consistent with *Cedric Kushner*, *Brannon*, and *Liberty Group*.

*Id.* at 1249.  That is, *George* recognized § 1962(c) embodies a distinctness

requirement; a RICO plaintiff must plausibly allege the defendant person

conducted the affairs of the enterprise, rather than its own affairs; and a defendant

corporation, acting through its subsidiaries, agents, or employees cannot typically

be both a RICO enterprise and a RICO person.  *Id.* at 1249-50.  *George*

concluded, however, that the plaintiff's claim satisfied the distinctness

requirement because Bank and Mortgage Solutions Provider were entirely distinct

legal entities:

> [T]he plaintiffs here allege an association-in-fact enterprise.  They
> don't contend that either a parent corporation or its subsidiary
> corporation is the enterprise.  Rather, they assert that [Bank] and
> [Mortgage Solutions Provider]—two separate legal entities—joined
> together, along with several other entities, to form and conduct the
> affairs of the . . . association-in-fact enterprise.  The plaintiffs
> further allege that [Bank] conducted the enterprise's affairs, rather
> than [Bank's] own affairs, by acting in concert with [Mortgage
> Solutions Provider] and other members of the enterprise to

-44-

implement and execute a scheme to fraudulently deny . . . loan modifications to qualified borrowers.

Moreover, [Bank's] act of contracting with [Mortgage Solutions Provider] to provide [loan-modification-related] services didn't somehow render [Mortgage Solutions Provider] a [Bank] subsidiary, a [Bank] agent, or even part of the [Bank's] corporate family. Instead, the plaintiffs assert that [Bank] and [Mortgage Solutions Provider] remained separate legal entities in distinct lines of business. Specifically, [Bank] is a mortgage lender whose services extend well beyond participation in [loan modifications], while [Mortgage Solutions Provider] is a limited liability corporation that provides mortgage-related services to numerous clients, including [Bank]. Further, the plaintiffs allege that each entity performed distinct roles within the enterprise while acting in concert with other entities to further the enterprise's common goal of wrongfully denying [loan modification] applications.

*Id.* at 1250.[35]

As should be clear from this recitation, there is nothing in *George* to indicate that the type of association-in-fact at issue here, one between an agricultural association and its members, is sufficiently distinct from the agricultural association so as to allow the agricultural association to be a RICO person. Instead, *George* reaffirms the analytical approach set out in *Brannon*,

---

[35]The Shepherds' reliance on the Sixth Circuit's decision in *ClassicStar* is likewise misplaced. In *ClassicStar*, the record demonstrated with particularity the distinct roles the related entities played that helped facilitate the fraudulent scheme. 727 F.3d at 493. Other than conclusory and general assertions, there are no such allegations in the SAC. Likewise, the Shepherds' attempt in their appellate brief, *see* Appellants' Opening Br. at 57, to cobble together such information from the limited allegations in the SAC is entirely unsuccessful. Absent even the allegation of the kind of meaningful evidence of distinctness at issue in *ClassicStar*, that decision is not remotely helpful to the Shepherds.

*Liberty Group*, and *Cedric Kushner* and supports this court's conclusion that

*Yellow Bus Lines* has properly synthesized those precepts in the context of a

RICO claim involving an association as the RICO person, while also being a part

of the alleged RICO enterprise-in-fact with its own members.  *Cf. Tronsgard v.

FBL Fin. Group, Inc.*, 312 F. Supp. 3d 982, 998 (D. Kan. 2018) (so interpreting

*George*).  All that *George* held is that when two legally distinct entities combine,

even if that combination is initiated by one entity hiring the other, the distinctness

requirement *can* be satisfied.  Because, given the facts alleged in the SAC, the

Association Defendants are not distinct, as RICO defendant persons, from the

alleged associations-in-fact (the Association Defendants and their respective

members), the district court properly dismissed the RICO claims against WRA

and MPAS.

### 3.  Conclusion

The district court erred in dismissing the RICO claim against Richins.

Pursuant to *Brannon* and *Cedric Kushner*, Richins is legally distinct from the

association-in-fact composed of himself and WRA.  In all other respects, the

district court properly dismissed the RICO and antitrust claims set out in the SAC.

### B.  Proposed Third Amended Complaint

The Shepherds appeal from the district court's denial of their motion to file

the TAC, a complaint designed to rectify the inadequacies identified in the SAC.

According to the Shepherds, the district court abused its discretion in concluding the filing of the TAC should not be allowed because of undue delay.  They assert the delay was not "undue" or "unexplained," *see Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1205-11 (10th Cir. 2006), because the proposed amendments were based largely on reactions to late-breaking arguments of the Defendants and new evidence.  The Shepherds further assert there was no prejudice to Defendants because little discovery has been taken and continued litigation cannot constitute prejudice.  *See id.*

## 1.  Background

### a.  Factual Background

Soon after this case was filed, MPAS filed a motion to stay discovery pending resolution of various motions to dismiss.  Less than a week later, the Shepherds filed their First Amended Complaint ("FAC").  A magistrate judge held a status conference to consider, inter alia, MPAS's motion to stay.  In addressing the stay motion, the magistrate judge pointed out that Fed. R. Civ. P. 1 expressly imposed on both the court and all parties the responsibility for ensuring the "just, speedy, and inexpensive determination of every action."  Emphasizing the seriousness with which the court took the objectives underlying Rule 1, the magistrate judge cautioned the parties at length that it already foresaw the case—a putative class action involving complex antitrust and racketeering claims—"on a

glide path to slow." The magistrate judge, therefore, denied the motion to stay and authorized limited discovery.

The magistrate judge then addressed the Shepherds' counsel. Noting two motions to dismiss the FAC already had been filed and two more were anticipated within the next few days, the magistrate judge told the Shepherds they should not expect unfettered leeway to proffer multiple iterations of their complaint, followed inevitably by multiple rounds in which Defendants' motions to dismiss were countered with yet further requests to amend. The magistrate judge specifically informed the Shepherds he would "impose upon [them] a specific obligation":

> As to the motions to dismiss that were filed [or are soon to be filed], I will require plaintiffs' counsel, to the extent that plaintiffs' counsel has any inclination, even as a fall-back position, to the extent that plaintiff's counsel has any inclination to raise the possibility of further amendments as a cure, I'll require you to take the initiative to put together a telephone conference call with all the defense counsel [within less than ten days] to raise that prospect. I don't want to wait 21 days [after the motions to dismiss are filed] for you to simply say "OK, judge, well we think the motions are losers, [but] we want to amend yet one more time." Because that doesn't benefit . . . it certainly doesn't benefit the plaintiffs and I can tell you without a moment's of [sic] hesitation, it doesn't benefit the court.
>
> So if you have any inclination to respond to these motions by raising or asserting yet another motion for leave to amend, I want that discussed with defense counsel [relatively quickly]. You're going to have to put your cards on the table. Okay?

Appellants' App. Vol. V at 1287-88.  Counsel for plaintiff's replied, "Understood,
Your Honor."  In case that discussion was not sufficiently clear, the magistrate
judge again cautioned it did not "want to be in a situation where we spend untold
months briefing, with an outside possibility of amending."

The magistrate judge eventually recommended that the federal claims set
forth in the SAC be dismissed without further leave to amend.  Two-and-a-half
months after that recommendation was docketed, and nearly three weeks after the
Shepherds' objections to the recommendation were fully briefed, the Shepherds
submitted a proposed TAC, conditioned on the district court's ruling on the
magistrate judge's recommendation regarding the pending motions to dismiss.
The district court referred the motion to file a TAC to the magistrate judge.
Meanwhile, three weeks later, the district court adopted the magistrate judge's
recommendation to dismiss the antitrust and RICO claims asserted in the SAC.
Thereafter, focusing exclusively on the issue of futility, the magistrate judge
recommended that the Shepherds be allowed to file a TAC as to the RICO claim
against Richins, but that all other aspects of the motion to amend be denied.

### b.  District Court Decision

The district court rejected the magistrate judge's recommendation to allow
partial amendment of the RICO claim against Richins.  The district court
concluded the magistrate judge took inadequate account of the court's prior

efforts to prevent the filing of seriatim complaints and motions to dismiss. The district court further concluded delays in moving the case to completion were attributable largely to the Shepherds' failure to set out a definitive articulation of their claims. It concluded the Shepherds' serial amendments were "inefficient" and inconsistent with their responsibilities under Rule 1, exactly the circumstance the court had attempted to avoid, more than a year earlier, when it directed the Shepherds to "put their cards on the table" just prior to the filing of the SAC. Importantly, the district court also concluded the Shepherds should have been aware of many of the facts they proposed to add by way of the TAC. Given this history, the district court concluded the Shepherds' attempts at amendment were dilatory, resulting in undue delay and prejudice to all Defendants. The district court recognized "[l]ateness does not of itself justify the denial of the amendment," *see Minter*, 451 F.3d at 1205, but noted that longer delays weighed more heavily against allowing amendment, *see id*. Given the length of the delay and the relative lack of a reasonable explanation therefor, the district court denied the motion to amend.

### 2. Analysis

#### a. Standard of Review

This court reviews the denial of a Fed. R. Civ. P. 15(a) motion to file an amended complaint for abuse of discretion. *Minter*, 451 F.3d at 1204. In

applying this standard, we keep in mind that "[t]he court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a); *Minter*, 451 F.3d at 1204.  A district court abuses its discretion when it "clearly err[s] or venture[s] beyond the limits of permissible choice under the circumstances" or when it "issues an arbitrary, capricious, whimsical, or manifestly unreasonable judgment." *Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1247 (10th Cir. 2015) (quotations omitted).

### b. Merits

The district court acted well within the bounds of its discretion in denying the Shepherds' motion to file a TAC.  The Shepherds' appellate briefing of this issue can charitably be described as exceedingly limited.  They merely assert as follows:

> The delay was not "undue" or "unexplained."  Plaintiffs based their amendment largely on reactions to late-breaking arguments of Defendants and new evidence procured between the filing of the SAC and the TAC, including through an investigative trip by counsel to rural Peru.  Further, there was no prejudice to Defendants because little discovery has been taken, and continued litigation cannot constitute prejudice.

Appellants' Opening Br. at 59.  The problem with this argument is that the district court specifically concluded the information set out in the TAC was known or reasonably should have been known to the Shepherds at the time the SAC was filed.  Rather than acting out of surprise or the acquisition of new information, the district court concluded the Shepherds had engaged in strategic

gamesmanship.[36]  Given the failure of the Shepherds to offer a convincing explanation for the delay; the relative length of the delay, *Minter*, 451 F.3d at 1205; and the significant expenditure of resources on the part of the defendants *and the judiciary* in responding to three previous iterations of the Shepherds' complaint, the district court acted well within the bounds of its discretion in denying the Shepherds' motion to file the TAC.

### 3.  Conclusion

The district court's denial of the motion to file the TAC was a reasonable and permissible choice under the circumstances of this case.  *See Minter*, 451

---

[36]In that regard, the district court found as follows:

> What strikes this court as far more likely is that plaintiffs— knowing the magistrate judge recommended dismissal of their federal claims, and fully aware from prior discussions with the magistrate judge that this court was likely to rule on the motions to dismiss the Second Amended Complaint before the end of September 2016— decided to chance one last shot at attempting to cure the deficiencies the magistrate judge had identified.  It is precisely this type of manipulation which has led the Tenth Circuit to caution courts against allowing plaintiffs "to make the complaint a moving target, to salvage a lost case by untimely suggestion of new theories of recovery, [or] to present theories seriatim in an effort to avoid dismissal[.]" *Minter*, 451 F.3d at 1206 (citations and internal quotation marks omitted).  All three of those boundaries are transgressed by plaintiffs' efforts to amend in this matter.

Appellants' App. Vol. V at 1292 (alterations in original).

F.3d at 1204; *Birch*, 812 F.3d at 1247.  Thus, that decision does not amount to an abuse of discretion.

### III.  CONCLUSION

The district court's dismissal of the Shepherds' RICO claim against Richins is **REVERSED** and the matter is **REMANDED** to the district court for further proceedings.  In all other respects, the orders of the district court are hereby **AFFIRMED**.

### UNITED STATES COURT OF APPEALS
### FOR THE TENTH CIRCUIT
### OFFICE OF THE CLERK
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157

| | | |
|---|---|---|
| Elisabeth A. Shumaker<br>Clerk of Court | July 16, 2019 | Chris Wolpert<br>Chief Deputy Clerk |

Mr. Alexander Hood
Mr. David Hollis Seligman
Towards Justice
1410 High Street, Suite 300
Denver, CO 80218

**RE:**   **17-1113, Llacua, et al v. Western Range Association, et al**
      Dist/Ag docket: 1:15-CV-01889-REB-CBS

Dear Counsel:

Enclosed is a copy of the opinion of the court issued today in this matter. The court has entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. 40(a)(1), any petition for rehearing must be filed within 14 days after entry of judgment. Please note, however, that if the appeal is a civil case in which the United States or its officer or agency is a party, any petition for rehearing must be filed within 45 days after entry of judgment. Parties should consult both the Federal Rules and local rules of this court with regard to applicable standards and requirements. In particular, petitions for rehearing may not exceed 3900 words or 15 pages in length, and no answer is permitted unless the court enters an order requiring a response. If requesting rehearing en banc, the requesting party must file 6 paper copies with the clerk, in addition to satisfying all Electronic Case Filing requirements. *See* Fed. R. App. P. Rules 35 and 40, and 10th Cir. R. 35 and 40 for further information governing petitions for rehearing.

Please contact this office if you have questions.

Sincerely,

*Elisabeth A. Shumaker*

Elisabeth A. Shumaker
Clerk of the Court

cc: Bradford Joseph Axel
   Naomi Beer
   Jon Roderick Betts
   Andrew Graham Deiss
   Stacy Kourlis Guillon
   Amber J. Munck
   Harriet A. Retford
   Kenneth F. Rossman IV
   Billie J. Siddoway
   J. Larry Stine


EAS/lg